## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

      :       Case No. 17-cr-00684-ER

v.       :

      :       ECF Case

LAMONT EVANS       :

EMANUEL RICHARDSON, a/k/a "Book,"       :

ANTHONY BLAND, a/k/a "Tony,"       :

CHRISTIAN DAWKINS, and       :

MERL CODE,       :

      :

      Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## OMNIBUS REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTIONS (1) TO DISMISS THE INDICTMENT, (2) TO SUPPRESS WIRETAP EVIDENCE, (3) TO SUPPRESS CELLPHONE EVIDENCE, AND (4) A BILL OF PARTICULARS, AND ADDITIONAL DISCOVERY, INCLUDING, EARLY DISCLOSURE OF ANY *BRADY* AND *GIGLIO* EVIDENCE

**NEXSEN PRUET LLC**
William W. Wilkins
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211
*Attorneys for Defendant Merl Code*

**HANEY LAW GROUP PLLC**
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 2

DEFENDANTS' MOTION TO DISMISS ................................................................. 2

   I.   A Violation of NCAA Rules Does Not Constitute Federal Funds Bribery. ....................... 2

   II.  The Federal Funds Bribery Statute and the Honest Services Fraud Statute are
Unconstitutionally Vague as Applied. ................................................................................. 6

   III.  Payments in Violation of NCAA Rules Do Not Constitute Honest Services Fraud. .......... 7

   IV.  A Scheme to Make Payments in Violation of NCAA Rules is Not a Travel Act
Conspiracy. ....................................................................................................................... 11

DEFENDANTS' MOTION TO SUPPRESS WIRETAP EVIDENCE ....................................... 12

   I.   Title III Mandates Suppression of the Communications Intercepted Pursuant to the April 7
Wiretap Order. .................................................................................................................. 12

   II.  The April 7 Wiretap Order Was Not Supported by Probable Cause. ............................... 17

   III.  The Wiretap Orders Were Unnecessary and, Therefore, Unlawful. .................................. 18

   IV.  The Good Faith Exception Does Not Apply to Title III's Mandatory Suppression Remedy
for Statutory Violations. .................................................................................................... 21

   V.  Title III Mandates Suppression of the Communications Intercepted Pursuant to the
Subsequent Wiretap Orders. ............................................................................................. 23

   VI.  Defendants' Request for the Grand Jury Minutes Should be Granted............................... 25

DEFENDANTS' MOTION TO SUPPRESS CELL PHONE EVIDENCE ................................ 25

   I.   The Warrants do not Establish Probable Cause to Search Defendants' Cell Phones. ....... 25

   II.  The Warrants are Impermissibly Overbroad....................................................................... 26

   III.  The Good Faith Exception does not Apply......................................................................... 29

DEFENDANTS' MOTION FOR A BILL OF PARTICULARS AND ADDITIONAL
DISCOVERY ....................................................................................................................... 30

   I.   Defendants' Motion for a Bill of Particulars Should be Granted. ..................................... 30

   II.  Defendants' Motion for Additional Discovery and Early *Brady* and *Giglio* Disclosures
Should be Granted............................................................................................................... 33

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Dahda v. United States*, 138 S.Ct. 1491 (2018).................................................................. 13, 17

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983) ............................................................ 25

*In re a Warrant for All Content & Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.,* 33 F. Supp. 3d 386 (S.D.N.Y. 2014) ...................................................................................................................... 28

*In Re Application to United States for an Order for Prospective Cell Site Location Info. On a Certain Cellular Tele.*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006)................................................. 16

*In re Nextel Cellular Telephone*, No. 14 MJ 8005, 2014 WL 2898262 (D. Kan. June 26, 2014). 29

*McDonnell v. United States*, 136 S.Ct. 2355 (2016)........................................................... 2, 3, 6

*People v. Jacobs*, 130 N.E.2d 636 (N.Y. 1955)......................................................................... 11

*Sabri v. United States*, 541 U.S. 600 (2004)............................................................................... 3

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................................................... 7, 8

*U.S. v. Rybicki*, 354 F.3d 124 (2d Cir 2003) ............................................................................... 7

*United States v. Bellomo*, 954 F. Supp. 630 (S.D.N.Y. 1997) .................................................. 22

*United States v. Bianco,* 998 F.2d 1112 (2d Cir. 1993)............................................................ 22

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ...................................................... 31

*United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003) ......................................................... 27

*United States v. Caruso* , 415 F. Supp. 847 (S.D.N.Y. 1976) .................................................. 24

*United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849 (1974)........................................ 13, 14, 15

*United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997)........................................................ 10

*United States v. Concepcion*, 579 F.3d 214 (2d Cir. 2009) ..................................................... 19

*United States v. deVegter*, 198 F.3d 1324 (11th Cir. 1999) ...................................................... 9

*United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658 (1977) ................................................ 13

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) ........................................................ 4, 6

*United States v. Frega*, 933 F. Supp. 1536 (S.D. Cal. 1996).................................................... 3

*United States v. Gatto et al.*, 17 Cr. 686 (LAK) .............................................................. 1, 12, 26

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004)............................................................... 11

*United States v. George*, 975 F.2d 72 (2d Cir. 1992)................................................................ 30

*United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820 (1974)....................................... passim

*United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013) .................................................. 13, 14, 16

*United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010)..... 27

*United States v. Jain*, 93 F.3d 436 (8th Cir. 1996).................................................................. 10

*United States v. Juarez*, 2013 WL 357570 (E.D.N.Y. Jan. 29, 2013) ..................................... 28

*United States v. Kilgore*, 524 F.2d 957 (5th Cir. 1975)........................................................... 24

*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984)................................................... 29

*United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983) ...................................................... 18, 19, 20

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013)........................................................ 7, 8, 9

*United States v. Person et al.*, 17 Cr. 683 (LAP) .......................................................... 1, 2, 6, 26

*United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000)............................................................. 3

*United States v. Reddy*, 190 F. Supp. 2d 558 (S.D.N.Y. 2002) ............................................... 32

*United States v. Robinson*, 663 F.3d 265 (7th Cir. 2011) ...................................................... 4, 5

*United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016) .................................................. 7

*United States v. Thompson*, No. 13 CR. 378 AJN, 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) 30

*United States v. Tomero*, 462 F. Supp. 2d 565 (S.D.N.Y. 2006) .................................................. 22
*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)................................................... 31
*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) ................................................... 27, 28
*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015)................................................... 2, 3
*United States v. Vilar*, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).......................................... 28
*United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993)........................................... 17, 18
*United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ................................................ 27, 29
*United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009) ........................................... 3, 4
*United States v. Winn,* 79 F. Supp. 3d 904 (S.D. Ill. 2015) ................................................ 28, 29
*United States v. Worldwide Indus. Enterprises, Inc.*, 220 F. Supp. 3d 335 (E.D.N.Y. 2016)......... 5
*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013)............................................. 30

**Statutes**
18 U.S.C. § 2515 ........................................................................................................ 23
18 U.S.C 666 ...................................................................................................... passim
18 U.S.C. § 2518(10)(a) .............................................................................................. 12
18 U.S.C. § 2518(10)(a)(i) ........................................................................................... 17
18 U.S.C. § 2518(10)(a)(ii) .......................................................................................... 23
A.R.S. § 13-2605 ...................................................................................................... 11
Cal. Penal Code § 641.3.............................................................................................. 11
N.Y. Penal Law § 180.00 ............................................................................................ 11
Okl. St. Ann. § 380 ................................................................................................... 11
S.C. Code Ann. § 16-17-540........................................................................................ 11

**Other Authorities**
*Black's Law Dictionary* (10th ed. 2014) .................................................................... 5
*Merriam-Webster Dictionary*..................................................................................... 5

**Rules**
Federal Rule of Criminal Procedure 16(a)(1)(E) ....................................................... 33
Rule 6(e)(3)(E)(ii) ...................................................................................................... 25

## PRELIMINARY STATEMENT

Defendants Christian Dawkins and Merl Code (collectively "Defendants") respectfully submit this memorandum of law in further support of the following pretrial motions:

1. Defendants' Joint Motion to Dismiss the Indictment ("Defendants' Motion to Dismiss"), (ECF Nos. 132, 133);

2. Defendants' Joint Motion to Suppress Wiretap Evidence and for Additional Information Concerning the Presentment of Those Interceptions to the Grand Jury ("Defendants' Motion to Suppress Wiretap Evidence"), (ECF Nos. 128, 130);

3. Defendants' Joint Motion to Suppress Evidence Obtained From the Search of Defendants' Cell Phones ("Defendants' Motion to Suppress Cell Phone Evidence"), (ECF Nos. 124, 126); and

4. Defendants' Joint Motion for a Bill of Particulars and Additional Discovery, Including, the Release of Brady Materials ("Defendants' Motion for a Bill of Particulars and Additional Discovery"), (ECF Nos. 125, 127, 129), (collectively, "Defendants' Pretrial Motions").

While the Government argues that "[t]hese motions are almost entirely a reiteration of arguments made and rejected in the related cases of *United States v. Person et al.*, 17 Cr. 683 (LAP), and *United States v. Gatto et al.*, 17 Cr. 686 (LAK)[,]" Defendants respectfully part company with the holdings of those cases and request that this Court decline to follow them. Accordingly, for the reasons set forth below, Defendants' Pretrial Motions should be granted in their entirety.[1]

---

[1] Unless otherwise defined, capitalized terms shall have the same meaning ascribed to them in each of Defendants' respective Pretrial Motions. Exhibits attached to each respective Pretrial Motion will be defined according to the applicable Pretrial Motion (*i.e.*, Ex. 1 to Defs.' Mot. to Dismiss, Ex. 1 to Defs.' Mot. to Suppress Wiretap Evid., etc.). The Government's opposition brief, filed January 30, 2019, is hereinafter referred to as "Opp." (ECF No. 153). Codefendants Lamont Evans, Emmanuel Richardson, and Anthony Bland are hereinafter collectively referred to as the "Coach Defendants."

**ARGUMENT**

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

From the outset, Defendants recognize that several of Judge Preska's holdings in *Person*, many of which the Government cited in its response, run contrary to the arguments within Defendants' Motion to Dismiss. However, Defendants respectfully disagree with those holdings and, for the reasons set forth below, request that this Court decline to follow them.

**I.   A Violation of NCAA Rules Does Not Constitute Federal Funds Bribery.**

The federal funds bribery statute specifically requires proof that an "agent" of a federally funded organization was influenced or rewarded "in connection with any business, transaction, or series of transactions of such organization." *See* 18 U.S.C. § 666. These elements require a clear focus on whether the employee's conduct was corrupted in connection with the employer's business. Relying entirely on cases outside the Second Circuit, the Government contends that the term "agent" and the transactional element ("in connection with any business, transaction, or series of transactions") should be construed "broadly," such that a college basketball coach's agreement to recommend that his players retain the services of a specific individual's firm if and when they enter the NBA falls within the ambit of § 666. (Opp. at 7–9).

The Government's appeal to construe § 666 "broadly" runs afoul of *McDonnell v. United States*[2] and the well settled principle that courts should "construe criminal statutes narrowly." *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015). The Government's position is also completely untethered from the statute's goal "to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery." *Sabri v.*

---

[2]     *See* 136 S.Ct. 2355, 2373 (2016) (holding that prosecution of public official for "the most prosaic interactions" would violate due process).

*United States*, 541 U.S. 600, 606 (2004). Put simply, the federal funds bribery statute was not intended to be "a general anti-corruption statute." *United States v. Frega*, 933 F. Supp. 1536, 1542 (S.D. Cal. 1996).

First, the Government's proposed interpretation of "agent" is improperly expansive. It would capture any employee of a federally funded organization, from the part-time janitor to the chief executive officer, regardless of whether they control (directly or indirectly) any of the federally funded entity's dollars. This broad definition stretches § 666 well beyond its stated purpose and is particularly troubling in the context of this case, where the Government is not seeking to vindicate any federal interest but is instead seeking to enforce a private association's rules. *See United States v. Phillips*, 219 F.3d 404, 415 (5th Cir. 2000) (holding that "the absence of any federal interest in this prosecution militates in favor of our analysis that the statutory term 'agent' should not be given the broadest possible meaning, as urged by the government").

Given the very broad scope of the term "agent" if it is read to be any employee, and particularly in light of *McDonnell*, this Court should follow the Fifth Circuit and adopt a definition for federal funds bribery related to private employers that tracks the statutory language and is consistent with the purpose of § 666: "for an individual to be an 'agent' for the purposes of section 666, he must be 'authorized to act on behalf of [the agency] ***with respect to its funds***.'" *United States v. Whitfield*, 590 F.3d 325, 344 (5th Cir. 2009) (quoting *Phillips*, 219 F.3d at 411) (emphasis added). At a minimum, "agent" cannot be read so broadly as to apply to any employee regardless of the circumstances. *See Valle*, 807 F.3d at 528 (cautioning that courts must "construe criminal statutes narrowly so that Congress will not unintentionally turn ordinary citizens into criminals").

Second, § 666 does not apply to conduct performed outside the scope of an individual's duties as an agent of his federally funded principal. Indeed, the statutory definition of the term "agent" is limited to "a person authorized to act **on behalf of**" the federally funded organization. 18 U.S.C. § 666(d)(1) (emphasis added). Consistent with that definition, § 666 requires a nexus between any payment and the "business" or "transaction" of the federally funded organization. *See* 18 U.S.C. §§ 666(a)(1)(B), 666(1)(2). Taken together, the definition of agency and the nexus requirement make clear that federal funds bribery reaches only conduct performed in an individual's capacity as an agent of a federally funded organization. That is the lesson of *Whitfield*, in which the Fifth Circuit vacated § 666 convictions where the defendants' acceptance of payments had nothing to do with their role as agents of a federally funded organization. *See* 590 F.3d at 346. Indeed, in the successful § 666 prosecutions cited by the Government (and Defendants), an agent of a federally funded organization was paid **to carry out his duties** corruptly. *See, e.g.*, *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) (Puerto Rico legislator bribed to pass certain legislation); *United States v. Robinson*, 663 F.3d 265 (7th Cir. 2011) (attempted bribery of police officer to "get the heat off" a drug distribution operation). As in the context of honest services fraud, the Court should consider the scope of the Coach Defendants' agency as employees of their respective universities in determining whether Defendants can be prosecuted under § 666. Because it was clearly not part of the Coach Defendants' duties to recommend that their players retain the services of a specific individual's firm if and when they entered the NBA, it cannot be said that they were bribed to act "on behalf of" their universities when they allegedly did so.

Third, Defendants cannot be charged under § 666 because their alleged conduct was not connected to any "business" or "transaction" of the universities at issue. The Government

4

concedes that the relevant universities are not in the business of recommending financial advisors to basketball players. (Opp. at 14). Nevertheless, the Government contends that they "are certainly in the business of running an NCAA compliant athletics program." (*Id*.) The Government's reframing of the universities' "business" in terms of their interest in complying with the NCAA rules is untenable for the same reason discussed below in the context of honest services fraud: the Government improperly conflates the *quid* and *quo* elements essential to any bribery charge. The alleged payments received by the Coach Defendants did not induce them to violate NCAA rules; the payments themselves were the alleged violations.

The Government has also failed to cite to a single case that supports its distorted view of the transactional element where the word "business" means compliance with private rules. Instead, at least in the application of § 666 to the private sector, "business" should be given its ordinary meaning of commercial activity. *See Black's Law Dictionary* (10th ed. 2014) (defining "business" as "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain"); *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/business (last visited February 25, 2019) (defining "business" as "a usually commercial or mercantile activity engaged in as a means of livelihood"); *see also United States v. Worldwide Indus. Enterprises, Inc.*, 220 F. Supp. 3d 335, 339 (E.D.N.Y. 2016) ("Alongside the statutory context, a court may also consult dictionaries to determine the ordinary, common-sense meaning of the words." (internal citations and quotation marks omitted)).[3] Complying with the NCAA's amateurism rules is not remotely the sort of commercial or economic activity that implicates the integrity of federal funds.

---

[3]     The Government cites to out-of-circuit cases to argue that, for purposes of § 666, the term "business" includes non-commercial activity. But those cases involved bribes to influence public officials – a very different context. *See, e.g.*, *Robinson*, 663 F.3d at 274 (bribes paid to police

**II.    The Federal Funds Bribery Statute and the Honest Services Fraud Statute are Unconstitutionally Vague as Applied.**

As detailed in Defendants' opening brief, it would run afoul of due process to permit Defendants to be prosecuted for federal funds bribery and honest services fraud under the facts of this case. (*See* ECF No. 133 at 27-32). And, as detailed above, Defendants respectfully request that this Court part company with Judge Preska's holdings on this issue in *Person*. (*See* Opp. at 15). In short, due process forecloses the Government's effort to expand the scope of federal funds bribery and honest services fraud to fit these circumstances. Under the Government's theory in this case, an individual who works for a federally funded organization governed by broad private rules like the NCAA rules has a duty – extending to every aspect of his life – never to give or accept something of value if it results in a violation of those private rules. That approach abolishes any meaningful limits to the type of conduct prohibited by § 666 and is inconsistent with the Supreme Court's direction that the "quo" element in a corruption case must be construed narrowly to prevent the "standardless sweep of the Government's reading." *McDonnell*, 136 S.Ct. at 2373.

As to honest services fraud, due process likewise precludes the Government from importing the entire NCAA rulebook into the federal criminal code via the honest services fraud statute. Like *McDonnell*, the theory of prosecution in this case raises a significant due process concern about criminalizing "the most prosaic interactions" in the form of routine and otherwise lawful conduct. *See McDonnell*, 136 S.Ct. at 2373. Just as that concern compelled the Supreme Court to cabin the "quo" (*i.e.*, the "official act") in public sector honest services fraud cases, *see*

---

officers); *Fernandez*, 722 F.3d at 14 (bribes paid to legislators). We are aware of no federal funds bribery case involving a private employer where the term "business" was given a similarly expansive meaning, and there certainly is no Second Circuit case construing the statute this way.

*id.* at 2372–73, the same concern demands a coherent, limiting principle for "honest services" in a private sector honest services fraud case. *See United States v. Silver*, 203 F. Supp. 3d 370, 379 n.8 (S.D.N.Y. 2016) (observing that "[t]he Supreme Court was clearly seeking to cabin the 'quo' in the quid pro quo element of honest services fraud and extortion in order to avoid [certain] constitutional concerns," including subjecting individuals to prosecution without fair notice).

## III.     Payments in Violation of NCAA Rules Do Not Constitute Honest Services Fraud.

Although the honest services fraud statute is broadly written, the Supreme Court has narrowed its reach to the "solid core" of cases involving defendants who, "in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling v. United States*, 561 U.S. 358, 407 (2010). The Second Circuit had previously identified such schemes as those in which "a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment." *U.S. v. Rybicki*, 354 F.3d 124, 139 (2d Cir 2003). The Government does not dispute that the conduct alleged in the Indictment falls completely outside the *Rybicki* definition of bribery and kickback cases. Instead, citing *United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013), the Government argues that "the existence of a fiduciary relationship between an employee and employer is beyond dispute, and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (Opp. at 18-19).[4]

---

[4]     In *Nouri*, executives of a publicly traded company bribed a brokerage firm employee to purchase the company's stock on behalf of the brokerage firm's customers. There was no question in that case that the broker had a fiduciary duty to his employer to act faithfully when he bought and sold stock for his customers, and that he breached that duty when he bought and sold the company's stock in exchange for payments from the company's executive. *Nouri* thus presented a classic honest services fraud case in which the defendants secretly paid bribes to an employee of that brokerage firm for the purpose of getting the employee to perform a key aspect

At bottom, this charge improperly collapses the *quid* and *quo* elements essential to honest services fraud. In all honest services fraud cases, the *quid* is the bribe or kickback, and the *quo* is the independent violation of a fiduciary duty. *See Skilling*, 561 U.S. at 407. Logically, the *quid* and the *quo* cannot be one and the same; otherwise, for instance, every violation of an employer's prohibition on outside income would be a federal crime. But that is precisely how honest services fraud is charged here. According to the Indictment, the Coach Defendants agreed to steer players to use the services of Mr. Dawkins and others in exchange for improper payments. This theory does not work because the alleged payments to the Coach Defendants did not induce them to act in a way that violated their fiduciary duties to their respective employers. The Coach Defendants' acceptance of payments were themselves the breaches of their duties to the respective universities. The conduct sought in exchange – steering their basketball players to Mr. Dawkins and others – is not alleged to be the violation. This is because the NCAA rules do not prohibit college coaches from recommending that their players retain the services of a specific individual's firm if and when they entered the NBA; the rules prohibit only the acceptance of the payment. Thus, even if the Coach Defendants should not have accepted money under applicable NCAA rules, the payments did not induce the Coach Defendants to perform their jobs in a way that were contrary to their respective universities' interests because those universities had no independent interest in recommending that their players retain the services of a specific individual's firm. In other words, the payments did not corrupt the services that the Coach Defendants performed for their respective universities.

---

of his job – buying stocks for clients – faithlessly. *See id.* at 133–36, 144–45. In other words, the *Nouri* defendants wanted something from the broker-dealer (execution of transactions for customers) and required a corrupt employee to obtain it.

The Government's error is based on the notion that the Coach Defendants were fiduciaries of their respective universities for all purposes. But their duties to those universities were necessarily limited by the scope of their employment relationships with the universities. *See, e.g.*, *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) (defining breach of fiduciary duty in private sector honest services fraud as conduct that "contravene[s] – by inherently harming – the purpose of the parties' relationship"). For honest services fraud, it is essential to look at the services that the Coach Defendants were obligated to provide to their respective universities to determine whether bribes or kickbacks corrupted those services. Recommending that their players retain the services of a specific individual's firm was not part of the Coach Defendants' jobs, and neither the Coach Defendants nor their universities were (or were alleged to be) fiduciaries to any of the players. The Coach Defendants were, instead, simply basketball coaches, with duties like recruiting players, running basketball practices, teaching basketball skills, developing basketball strategies, and coaching during games. There is nothing in the Indictment that suggests that they failed to perform these services faithfully.

The Government invokes the NCAA rules to counter that the Coach Defendants nevertheless committed honest services fraud because they supposedly violated their obligation to follow the NCAA rules. But the NCAA rules do not define the scope of the Coach Defendants' services. Rather, the rules are an all-encompassing code of conduct regulating nearly every aspect of college coaches' lives; because they are designed to further the goals of amateurism and the ideal of student athletes, the rules in many instances prohibit or regulate conduct that has nothing to do with the services that coaches have been hired to perform.[5] Perhaps it is unethical or

---

[5]     In this regard, the NCAA rules are entirely unlike the FINRA rules considered in *Nouri*, which related directly to the duties of a broker.

immoral for coaches to receive payments for introducing players to certain financial advisors or firms for those players potentially to use in the future, but such introductions have nothing to do with the coaches' job duties.

A broad code of conduct like the NCAA rules cannot, standing alone, support an honest services fraud charge. To hold otherwise would mean that every employee with a "morals clause" in his employment contract would commit honest services fraud by receiving payment for outside work that brings disrepute upon his employer. Courts have properly rejected efforts to stretch private sector honest services fraud this broadly. *See, e.g.*, *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997) (holding that "it would give us great pause if a right to honest services is violated by every breach of contract"). Rather than rely on an employee's compliance with a general code of ethics, the focus properly belongs on the services the employee was supposed to provide to his employer. In *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996), for instance, the Eighth Circuit reversed a psychologist's conviction for honest services fraud based upon his referral of patients to a psychiatric hospital in exchange for referral fees. The Government grounded the defendant's breach of duty in the ethical rules governing psychologists, which prohibited referral fees. *See id.* at 442 & n.3. Although the defendant had violated this ethical rule, the Eighth Circuit rejected the Government's theory of prosecution "because the breach did not affect the services rendered." *Id.* at 442. Because the evidence showed that the psychologist had faithfully rendered services to his patients, and the ethical violation "did not affect the quality or cost of his services," the court reversed the honest services fraud conviction. *See id.* For these reasons, the honest services fraud statute cannot bear the Government's strained interpretation.

**IV.    A Scheme to Make Payments in Violation of NCAA Rules is Not a Travel Act Conspiracy.**

The Indictment alleges a Travel Act conspiracy with South Carolina, Oklahoma, Arizona, and California misdemeanors as the predicate offenses: commercial bribery, bribery with respect to agents servants, or employees, S.C. Code Ann. § 16-17-540; bribery of fiduciary, 21 Okl. St. Ann. § 380; commercial bribery, A.R.S. § 13-2605; and commercial bribery, Cal. Penal Code § 641.3. These statutes, like the New York commercial bribery statute, require the conferral of a benefit upon an employee, agent, or beneficiary with the intent to influence his conduct in relation to his employer's, principal's, or fiduciary's business, conduct, or affairs. *See* S.C. Code Ann. § 16-17-540; 21 Okl. St. Ann. § 380; A.R.S. § 13-2605; Cal. Penal Code § 641.3; *see also* N.Y. Penal Law § 180.00.

The Second Circuit has interpreted this statutory language to mean that "the payment must be made for the purpose of inducing the employee to act contrary to the interest of, and inconsistently with, his duties to his current employer." *United States v. Geibel*, 369 F.3d 682, 699 (2d Cir. 2004) (interpreting New York commercial bribery statute). As with private sector honest services fraud, the quintessential violation of a state commercial bribery statute involves "payment of money to a purchasing agent, to cause him to buy goods for his employer from one vendor rather than from another." *People v. Jacobs*, 130 N.E.2d 636, 637 (N.Y. 1955) (interpreting New York commercial bribery statute). Here, just as the Coach Defendants' conduct did not concern the business or transaction of their respective employers as required by § 666, *see supra*, their alleged agreements to steer players to use the services of Mr. Dawkins and others in exchange for improper payments were entirely unconnected to their duties as basketball coaches for their respective universities. Accordingly, the Travel Act charge should be dismissed.

11

**DEFENDANTS' MOTION TO SUPPRESS WIRETAP EVIDENCE**

Similar to the circumstances surrounding Defendants' Motion to Dismiss, Defendants recognize that several of Judge Kaplan's holdings in *Gatto*, many of which the Government cited in its response, run contrary to the arguments within Defendants' Motion to Suppress Wiretap Evidence. However, Defendants respectfully disagree with those holdings and, for the reasons set forth below, request that this Court decline to follow them.

## I.   Title III Mandates Suppression of the Communications Intercepted Pursuant to the April 7 Wiretap Order.

The Government argues that Defendants' suppression motion should be denied because the Supreme Court has "repeatedly made clear" that "suppression [under Title III] is required only" when a defect in a wiretap order "undermine[s] the Government's compliance with the core statutory requirements of Title III."  (Opp. at 29-30).   Accordingly, the Government contends, "suppression is not appropriate" here because the April 7 Order "while imperfect, was not insufficient," since "there is no question that an appropriate official did, in fact, authorize the application."  (Opp. at 29, 32).

The Government misconstrues Supreme Court precedent.  The Supreme Court has ***never*** applied the "core concerns" test cited by the Government to a suppression motion brought pursuant to Subsection (ii).[6]  In each of the Supreme Court cases cited by the Government, the Supreme Court employed the "core concerns" test to assess whether a communication was "unlawfully intercepted" in violation of Subsection (i), ***not*** whether a wiretap order was "facially

---

[6]      As Defendants explained in their opening brief, *see* ECF No. 130 at 15, Title III provides for suppression on any of the following grounds:  (i) the "communication was unlawfully intercepted" ("Subsection (i)"); (ii) the "order of authorization or approval under which it was intercepted is insufficient on its face" ("Subsection (ii)"); or (iii) the "interception was not made in conformity with the order of authorization or approval" ("Subsection (iii)").  18 U.S.C. § 2518(10)(a).  Defendants have moved to suppress pursuant to Subsection (ii).

insufficient" under Subsection (ii).  *United States v. Donovan*, 429 U.S. 413, 432, 97 S.Ct. 658,

670 (1977) ("There is no basis on the facts of this case to suggest that the authorization orders are

facially insufficient . . . thus, only [Subsection (i)] is relevant"); *United States v. Giordano*, 416

U.S. 505, 525 n.14, 94 S.Ct. 1820, 1831 n.14 (1974) ("intercept order was facially ***sufficient***

under [Subsection (ii)]" because the "order, on its face, clearly, though erroneously, identified

Assistant Attorney General Wilson" as the authorizing official) (emphasis added); *United States*

*v. Chavez*, 416 U.S. 562, 573-74, 94 S.Ct. 1849, 1855 (1974) (finding "facial sufficiency"

because "the interception order clearly identified 'on its face' Assistant Attorney General Wilson

as the person who authorized the application to be made."). Indeed, as the Government correctly

recognized, the Supreme Court recently held that the "core concerns" test does not apply where

the suppression motion is made pursuant to Subsection (ii). (*See Dahda v. United States*, 138

S.Ct. 1491, 1498 (2018); *see also* Opp. at 39 n.12).

       Contrary to the Government's assertions, Supreme Court precedent supports the

interpretation of Title III that the D.C. Circuit has adopted and which Defendants urge this Court

to apply here, *i.e.*, that suppression motions brought under Subsection (i) require a "broad inquiry

. . . to determine whether the government's actions transgressed the core concerns of the [wiretap]

statute," but motions to suppress under Subsection (ii) require only "a mechanical test; either the

warrant is facially sufficient or it is not."  *United States v. Glover*, 736 F.3d 509, 513 (D.C. Cir.

2013).

       While the Government claims that *Chavez* allows a court, under Subsection (ii), to

"engage[] in a substantive inquiry into whether the Government had satisfied the core statutory

requirements of Title III" by "look[ing] behind the [defective] order" to see whether an

appropriate Justice Department official approved the wiretap, *see* Opp. at 35 n.8, 36, a close

reading of *Chavez* leads to the exact opposite conclusion.  The wiretap order in *Chavez* mistakenly identified one Justice Department official as authorizing the wiretap, when it had been authorized by a different official.  416 U.S. at 573-74.  The Supreme Court engaged in a "mechanical test" under Subsection (ii) to ascertain whether the order was "facially sufficient," *see Glover*, 736 F.3d at 513, and concluded that it was, because – unlike the April 7 Order – the "order clearly identified 'on its face'" an authorized Justice Department official.  *Chavez*, 416 U.S. at 573-74.  After concluding that the order was "facially sufficient," the Court noted: "Moreover, ***even if we were*** to look behind the order ***despite the clear 'on its face' language of [subsection (ii)]***, it appears that the Attorney General authorized the application."  *Id*. at 574 (emphasis added).  This language demonstrates that "look[ing] behind the order" to see whether an appropriate official authorized the wiretap is ***not*** part of a Subsection (ii) analysis.[7]

The Supreme Court's opinion in *Giordano* also refutes the Government's contention that suppression of the April 7 Order is not warranted under Subsection (ii) because "there is no question that an appropriate official did, in fact, authorize the application."  (Opp. at 29).  In *Giordano*, the Court explicitly drew a distinction, for purposes of Subsection (ii), between orders that did not merit suppression because they ***misidentified*** the authorizing Justice Department official, as in *Chavez*, and orders that failed to identify any official "at all," as is the case with the April 7 Order.  *Giordano*, 416 U.S. at 525 n.14 (wiretap order is "insufficient on its face" when it "fail[s] to identify ***at all*** in the interception order the person who authorized the application," but is "facially sufficient" when "on its face," the order "clearly, though erroneously, identif[ies]" an

---

[7]     The Government is correct that the Supreme Court applied the "core concerns" test in *Chavez*, but ***only*** with respect to its analysis of whether there had been a Subsection (i) violation, not as part of its analysis under Subsection (ii).  *Id*. at 575-580

authorizing Justice Department official) (emphasis added).  When an order is "insufficient on its face," Subsection (ii) requires suppression.

Giordano and Chavez also make clear that the Supreme Court did not develop the "core concerns" test in order to prevent Title III's suppression remedy from being used for "technical" errors, as the Government implies.  Instead, the "core concerns" test was designed to ensure that Subsection (ii) could be distinguished from Subsection (i) so that there would be no statutory redundancies.  Id. at 526-27.  In Giordano, the challenged order stated that the wiretap had been approved by an authorized Justice Department official, when in fact approval had been given by an official who lacked authority to do so.  Id. at 510, 525.  As in Chavez, the Supreme Court held in Giordano that the order was "facially sufficient" because, on its face, the order met all the statutory requirements of Title III, and thus, there was no basis for suppression under Subsection (ii).  Id. at 525 n.14.  The only question was whether the lack of approval from an authorized Justice Department official rendered the wiretap interceptions "unlawful" under Subsection (i).

The dispute concerned whether Subsection (i)'s prohibition on "unlawful" interceptions was meant to encompass only interceptions that violated a constitutional right or whether the provision also covered certain statutory violations.  Id. at 525-27.  The question posed a difficult statutory interpretation issue for the Supreme Court because Subsection (ii) and Subsection (iii) already reached "some purely statutory defaults without constitutional overtones."  Id.  If Subsection (i) was *also* read to include non-constitutional statutory violations, Subsection (ii) and (iii) would be "drained of all meaning" and would constitute "surplusage."  Id.

To address this problem and to preserve a meaningful distinction between the "statutory violations" addressed by Subsections (ii) and (iii) and the "statutory violations" that could render an interception "unlawful" under Subsection (i), the Supreme Court developed the core concerns

test, which holds that a statutory violation only renders an interception "unlawful" for purposes of suppression under Subsection (i) when the statutory provision violated is one that plays a "central role in the statutory scheme." *Id.* at 527-528; *see also Chavez*, 416 U.S. at 575 ("it is apparent . . . that [Subsection] (i) was not intended to reach every failure to follow statutory procedures, else [Subsections] (ii) and (iii) would be drained of meaning. . . . [Subsection] (i) does include any failure to satisfy any of those statutory requirements that directly and substantially implement" Congress's intent for "this extraordinary investigative device."). Statutory violations that do ***not*** implicate the "core concerns" of Title III are not "unlawful" under Subsection (i), but may still require suppression under Subsection (ii) if they involve a facial insufficiency.

In its response, the Government claims that suppression under Subsection (ii) requires application of the "core concerns" test. The Government's interpretation ***cannot*** be correct because this reading of Title III re-creates the very redundancy that the Supreme Court fixed, via the "core concerns" test, in *Giordano*. Applying the "core concerns" test to suppression under Subsection (ii) would mean that any statutory insufficiency that merited suppression under Subsection (ii) would necessarily also merit suppression under Subsection (i)—the very redundancy that the Supreme Court sought to avoid in *Giordano* when it first adopted the "core concerns" test in order to limit the phrase "unlawfully intercepted" in Subsection (i). *Glover*, 736 F.3d at 513-14 ("applying the 'core concerns' test to [Subsection (ii)] would actually treat that paragraph as 'surplusage'—precisely what the Supreme Court tried to avoid"). The Government offers no rebuttal to this fundamental problem. *In Re Application to United States for an Order for Prospective Cell Site Location Info. On a Certain Cellular Tele.*, 460 F. Supp. 2d 448, 458 (S.D.N.Y. 2006) (Kaplan, J.) (statutory interpretation improper where it "would violate the settled

rule that the Court must, if possible, construe a statute to give every word  some operative effect.").

Moreover, the Government asks this Court to adopt an interpretation of Title III that is at odds with the recent Supreme Court holding in *Dahda*, *supra*, which recognized that the "core concerns" test does not apply where the suppression motion is made pursuant to Subsection (ii). (*See* 138 S.Ct. at 1498; *see also* Opp. at 39 n.12 ("In *Dahda*, the Court held that the 'core concerns' test . . . with respect to a suppression motion made pursuant to 18 U.S.C. § 2518(10)(a)(i), does not apply where, as here, the motion is made pursuant to Section 2518(10)(a)(ii). . . . Instead, the Court held that with respect to subparagraph (ii), '[t]he statute means what it says. That is to say, subparagraph (ii) applies where an order is 'insufficient on its face.'")). Accordingly, the insufficiency in the April 7 Order warrants suppression.

## II.   The April 7 Wiretap Order Was Not Supported by Probable Cause.

As set forth in Defendants opening brief, the April 7 Wiretap Order (and all subsequent Wiretap Orders) failed to set forth a sufficient factual basis to establish probable cause to believe that any target was committing any of the target offenses enumerated in the Wiretap Orders. (ECF No. 130 at 17-20). In response, the Government attempts to overcome this deficit by first asking the Court to consider the alleged bribery scheme detailed in the April 7 Warrant Application, (Opp. at 45-46), an then by attempting to distinguish this case from *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993). (Opp. at 47).

Contrary to the Government's assertion, however, that this case is "completely distinguishable from *Walters*," *see id.*, this case is actually extremely similar to *Walters*. In fact, the only material difference between this case and *Walters* is that the charges were brought in different circuits. Indeed, notwithstanding its initial assertion to the contrary, the Government is

keenly aware of the similarities between this case and *Walters* along with the fact that Defendants – in all likelihood – would not have been criminally charged for engaging in identical conduct in the Seventh Circuit. (*See id.* ("[E]ven *assuming a factual similarity between the cases*, the law of *Walters* is not the law of this Circuit.") (emphasis added)).

The Government also points to a handful of facts in the April 7 Warrant Application regarding NCAA rules and violations of the same. (Opp. 45-46). These facts, without more, are wholly insufficient to establish probable cause that Defendants or the Coach Defendants intended to defraud the universities at issue or that defrauding such universities was ever the object of the supposed scheme. Moreover, the inclusion of certain facts regarding the NCAA certification process did not establish that a scheme to defraud the universities was afoot. Accordingly, the April 7 Wiretap Order (and all subsequent Wiretap Orders) were not supported by probable cause.

## III. The Wiretap Orders Were Unnecessary and, Therefore, Unlawful.

In *United States v. Lilla*, the Second Circuit held that Title III does not authorize a wiretap where "the normal investigative procedures that were used were successful." 699 F.2d 99, 104 (2d Cir. 1983); *see also* ECF No. 130 at 27. Here, as in *Lilla*, the April 7 Affidavit clearly evidenced Marty Blazer's cooperation with law enforcement. Indeed, at the Government's direction, Mr. Blazer surreptitiously recorded his communications with several individuals—the content of which were described at length in the April 7 Affidavit. Collectively, the recordings painted a complete picture of the financial arrangement between Mr. Blazer and Codefendant Evans. Likewise, future acts related to the supposed bribery scheme, including future payments to Mr. Evans or any introductions of players to Mr. Blazer, would have been subject to similar surveillance through the Government's cooperator. Under these circumstances,

18

where the Government had a willing cooperator who was able to obtain sufficient information

regarding the alleged offense, tapping Defendants' cell phones was wholly gratuitous and thus

unlawful. *See, e.g., United States v. Concepcion*, 579 F.3d 214, 220 (2d Cir. 2009) ("A wiretap is

not a device to be turned to as an initial matter, but only where the circumstances demonstrate

that it is necessary.").

In its response, the Government attempts to justify its serious invasion of privacy by

arguing: (1) that the wiretaps of Defendants' phones were "needed to capture . . . criminal

conversations with others that did not involve [Mr. Blazer]" (Opp. at 54); (2) that employing

normal investigative techniques would have been too difficult (*id.*); and (3) that *Lilla* is

distinguishable because the April 7 Affidavit "was not for a 'small-time narcotics case,' but for a

complex white-collar investigation of corruption in the billion-dollar industry of college athletics

perpetrated by sophisticated and publicly known figures" (Opp. at 56). None of these arguments

is persuasive. Instead, they confirm the obvious: the Government tapped Defendants' phones, not

because it needed additional evidence of the arrangements between its cooperator and Mr. Evans,

but because the Government wanted to obtain evidence of *other* potential offenses.

Here, the only stated, non-boilerplate justification for the highly intrusive use of a wiretap

on Defendants' cell phones, notwithstanding Mr. Blazer's cooperation, was that wiretaps were

needed to uncover additional, *potentially criminal* conversations involving Mr. Dawkins. (*See*

ECF No. 130 at 6). Notably, the April 7 Affidavit included no factual support for this conclusory

assertion that additional, "potentially criminal conversations" existed. Using a wiretap to detect

*other* offenses is unlawful, and in this regard the April 7 Affidavit is no different than the

defective affidavit considered in *Lilla*. That the Government can now point to evidence from the

wiretaps that it may rely on in proving its alleged bribery schemes against Defendants, such as

19

communications between Defendants and certain coaches, is beside the point. The question is whether the Government *needed* the wiretaps to investigate its bribery scheme—it did not.

Second, there is no merit to the Government's argument that the April 7 Affidavit proved necessity because "[i]n over 13 pages, [it] set forth in exacting detail . . . why over a dozen typical methods of investigation would either be futile, not feasible, or insufficient to fully investigate the alleged schemes." (Opp. at 53). The Court should discredit these boilerplate, self-serving statements regarding the insufficiency of certain other investigative methods where one in particular – a cooperator taking direction from law enforcement and consensually recording every communication – was thoroughly successful. *See Lilla*, 699 F.2d at 104.

Finally, the Government's efforts to distinguish this case from *Lilla* are unavailing. Just as the investigation in *Lilla* could be viewed as occurring in the multi-billion-dollar narcotics industry, so too can the supposed scheme involving Defendants be viewed as taking place within the "billion dollar industry of college athletics." (Opp. at 56). The principal problem in both cases is the same: the wiretap applications alleged a single, narrow scheme already known to the Government. The only additional evidence the wiretaps would reveal was evidence of other potential crimes that the Government suspected might exist, but did not have probable cause to believe in fact occurred or were occurring. Likewise, the investigation related to Defendants was hardly "a complex white-collar investigation" requiring the Government to unravel a labyrinth paper trail. To the contrary, the investigation here more closely resembled the narcotics investigation described in *Lilla* in that the Government relied primarily on cooperating witnesses and recorded conversations. In any event, the comparative significance of a particular case does not warrant relaxation of the stringent requirements of the Wiretap Act.

**IV.**     **The Good Faith Exception Does Not Apply to Title III's Mandatory Suppression Remedy for Statutory Violations.**

The Government argues that even if the Court concludes that the April 7 Order is facially insufficient under Subsection (ii), suppression is not required because the Government "acted in good faith" in reliance upon it.  (Opp. at 57).  The Government's claim that the good-faith exception to the exclusionary rule applies in Title III cases, *id.*, overstates the law.  In fact, the "good faith" exception applies only where there is a "constitutional" infirmity in a Title III wiretap order, ***not*** a statutory violation, as is the case with the April 7 Order.

Within its statutory framework, certain Title III provisions codify Fourth Amendment requirements: for example, Section 2518(1)(b) codifies the Fourth Amendment's particularity requirement and Section 2518(3)(a) codifies its probable cause requirement.  Other Title III provisions, in contrast, have no antecedent in the Fourth Amendment.  The Constitution does not require the approving Justice Department official to be identified by name in a search warrant, but Section 2518(4)(d) requires this information to be included in every wiretap order.

As discussed above, the Supreme Court in *Giordano* considered a wiretap order that was facially "sufficient," but nonetheless violated the provision of Title III that limited approval authority over a wiretap request to certain Justice Department officials.  *Id*. at 525.  The Supreme Court found that this statutory violation violated a "core concern" of Title III and thus, Subsection (i)'s suppression remedy was triggered.  *Id*. at 528 ("We are confident that . . . suppression must follow" because the "statutory requirement has been ignored.").

The Government in *Giordano* argued against suppression, claiming, as it does here, that "search and seizure law" under the Fourth Amendment should control.  *Id.*  The Supreme Court squarely rejected this argument and explicitly distinguished constitutional "search and seizure law" from Congress's right to statutorily mandate the "suppression of evidence obtained in

21

violation of explicit statutory prohibitions." *Id*. at 529.  The Supreme Court confirmed that both

the text and the legislative history of Title III "provide for the suppression of evidence" whenever

that evidence is obtained in "violation of the [statute]." *Id*.; *id.* at 524 (suppression as a remedy

"does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of

Fourth Amendment rights, but upon the provisions of Title III.").

 The Second Circuit's reasoning in *United States v. Spadaccino* echoes the reasoning in

*Giordano*.  800 F.2d 292 (2d Cir. 1986).  In *Spadaccino*, the Circuit declined to apply the good-

faith exception to a state wiretapping statute that was "analogous" to Title III and explained that

there is a distinction between the "judicially-crafted" remedies developed under the Fourth

Amendment – *e.g.*, the good-faith exception – and instances in which "suppression is required by

a statutory mandate" for a statutory violation:

> The Fourth Amendment exclusionary rule is based on the Supreme Court's
> weighing of the costs and benefits of the exclusion of evidence as a deterrent to
> police conduct that violates certain federal constitutional rights.  In the present case,
> in contrast, suppression is required by a statutory mandate. Thus, in determining
> such matter as the nature of the rights to be protected, the conduct that constitutes
> a statutory violation, and the remedy warranted by a violation, it is appropriate to
> look to the terms of the statute and the intentions of the legislature, rather than to
> invoke judge-made exceptions to judge-made rules.

*Id.* at 296.  The Title III cases decided by this Court and cited by the Government, *United States*

*v. Tomero* and *United States v. Bellomo*, are consistent with this distinction.  In both, the Court

dealt with provisions codifying the Fourth Amendment principles of particularity and/or probable

cause, and thus the use of the "good-faith exception" was appropriate.  *Tomero*, 462 F. Supp. 2d

565, 568 (S.D.N.Y. 2006); *Bellomo*, 954 F. Supp. 630, 641 (S.D.N.Y. 1997).  For the same

reason, the Government's reliance on the Second Circuit's decision in *United States v. Bianco* is

also misplaced.  998 F.2d 1112, 1125-26 (2d Cir. 1993) (challenge to a wiretap order's

compliance with Section 2518(11), which addresses the constitutional requirements of

particularity and probable cause in the context of a "roving intercept" order). Because the "good-faith exception" applies only to constitutional violations, there is no basis for its application here, since the insufficiency in the April 7 Order is statutory.

## V.   Title III Mandates Suppression of the Communications Intercepted Pursuant to the Subsequent Wiretap Orders.

When a wiretap order is found to be "insufficient on its face," Title III mandates that all intercepted communications as well as any "evidence derived therefrom" must be suppressed. 18 U.S.C. § 2518(10)(a)(ii); 18 U.S.C. § 2515.  In *Giordano*, the Supreme Court suppressed evidence from an invalid wiretap order, dated October 16, 1970, as described above.  The Supreme Court also suppressed communications intercepted pursuant to an "extension" of the invalid October 16 order, as well as evidence obtained via two unrelated "pen register" orders, on the basis that each of these subsequent orders "detailed at considerable length the contents of conversations intercepted pursuant to the [invalid October 16] order."  416 U.S. at 511, n.2.

The Government wholly ignores the Supreme Court's suppression of evidence derived from these pen register orders and incorrectly informs the Court that the "extension" order was "all that was at issue in *Giordano.*"  (Opp. at 65).  On the basis of this mistake, the Government extrapolates a "rule" that evidence derived from an "extension" order may be suppressed without an "independent source" analysis, but that evidence derived from any other order may not be suppressed without an "independent source" analysis.  (Opp. at 58-67).  The Government misreads *Giordano*.  The extension order in *Giordano* was suppressed because its application "set down in detail the relevant communications overheard under the [invalid October 16] order."  416 U.S. at 531.  While the Supreme Court explained that Title III's requirement that a judge "consider[] the results" obtained from an initial order before authorizing an extension made it "obvious" that the interceptions captured pursuant to the invalid October 16 order had been

23

"presented [to], considered and relied on" by the court, *id*. at 533, the lesson to be taken from this language is not that suppression is mandatory only for "extensions," but rather that suppression is mandatory wherever communications captured via an invalid order are used to obtain a subsequent order.

This conclusion is buttressed by the Supreme Court's treatment of the pen register orders, which were ***not*** extensions of the invalid October 16 order at all, but rather were extensions, dated October 22, 1970 and November 6, 1970, of a wholly separate pen register order. *Id*. at 533, n.19.  The Supreme Court affirmed suppression of these unrelated orders because the applications for them included "logs of telephone conversations monitored under the [invalid] October 16 order." *Id*.  In confirming that suppression was appropriate, the Supreme Court did ***not*** engage in the "independent source" analysis that the Government argues is required.  Indeed, Justice Powell dissented from the majority's opinion precisely because he believed an "independent source" test should have been applied, but wasn't.[8]  *Id*. at 554-556 (Powell, J., dissenting).  Because the Supreme Court has confirmed that interceptions captured pursuant to subsequent orders constitute derivative evidence where the applications for those orders "detail[ed] at considerable length the contents of conversations intercepted pursuant to the [prior invalid] order," *id.* at 511, n.2, the

---

[8]     The Government cites to several decisions in which other Circuits have distinguished between original and extension orders in reliance upon "Justice Powell's characterization of the majority opinion [in *Giordano*]" where Justice Powell stated, in footnote 7 of his dissent, that "the independent source doctrine is fully applicable to original orders."  (Opp. at 65-66 & n.25 (citing *United States v. Kilgore*, 524 F.2d 957, 959 (5th Cir. 1975)).  *Giordano*'s majority opinion, however, says no such thing and its treatment of the pen register orders belies Justice Powell's "characterization" of its holding.  In any event, it is the majority's opinion in *Giordano* that is binding on this Court.  Indeed, the one district court decision cited by the Government from this Circuit, *United States v. Caruso*, acknowledged that *Giordano* "casts some doubt on the validity of the independent source rule in some contexts." 415 F. Supp. 847, 851 (S.D.N.Y. 1976).  The Second Circuit affirmed "without opinion" and in the 40 years since it was decided, *Caruso* has not once been cited as standing for the proposition that there is a difference between extension and original orders.

24

communications obtained via the subsequent Wiretap Orders of Defendants' phones should be suppressed.

## VI.   Defendants' Request for the Grand Jury Minutes Should be Granted.

Defendants have moved pursuant to Rule 6(e)(3)(E)(ii) for a copy of the grand jury proceedings, so that they may ascertain whether the Indictment against them was based almost exclusively upon communications intercepted pursuant to the April 7 Wiretap Order, or evidence derived therefrom.  In opposition, the Government flatly states that the Indictment was based on legitimate evidence.  At a minimum, however, this Court should conduct an *in camera* view, rather than taking the Government's word for it.

## DEFENDANTS' MOTION TO SUPPRESS CELL PHONE EVIDENCE

Again, Defendants recognize that several of Judge Kaplan's holdings in *Gatto*, many of which the Government cited in its response, run contrary to the arguments within Defendants' Motion to Suppress Cell Phone Evidence. However, Defendants respectfully disagree with those holdings and, for the reasons set forth below, request that this Court decline to follow them.

## I.   The Warrants do not Establish Probable Cause to Search Defendants' Cell Phones.

To satisfy the Fourth Amendment's probable cause requirement, the Government must demonstrate that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983). As detailed in Defendants' opening brief, a search warrant application purporting to establish that an individual has engaged in criminal activity does not provide probable cause to search the entirety of that individual's possessions. (*See* ECF No. 126 at 13).  Rather, the probable cause must be based on "a sufficient nexus between the criminal activities alleged" and the location or items searched.  *Id.*

In its response, the Government argues that the applications for each warrant established a "fair probability that contraband or evidence of a crime" would be found in Defendants' cell phones because they "specifically identified calls and text messages relevant to the charged crimes and made using one or more of the Cell Phones." (Opp at 76). In support of that claim, the Government cites Judge Kaplan's holding in *Gatto*, (Opp. at 76-77), which, like Judge Preska's holdings in *Person* (as cited by the Government and discussed above), Defendants respectfully disagree with.

In short, the Code and Dawkins Applications' statements that Mr. Code engaged in thirteen calls, and that in addition to calls Mr. Dawkins had a single relevant text message, are insufficient to establish probable cause to search Defendants' cell phones. Aside from Judge Kaplan's holding in *Gatto*, the Government cites no case suggesting that cell phone usage in an alleged fraud provides probable cause to search data contained on the phone. Accordingly, the evidence obtained from these searches should be suppressed.

## II.     The Warrants are Impermissibly Overbroad.

Even assuming that the Court finds that the Warrant Applications provided probable cause to search Defendants' phones, the Search Warrants authorized an all-encompassing sweep of information beyond the data identified in the Applications that purportedly contained evidence of criminality.[9] In permitting the Government to search the entirety of the data contained on Defendants' cell phones, the Warrants stretch far beyond the scope of the probable cause set forth in the Applications and therefore are impermissibly overbroad.  A warrant permitting seizure of "fairly broad" types of materials is permissible if "the affidavit in support of the search warrant

---

[9]     The Warrants authorized "***examination of all of the seized data*** to evaluate its contents and determine whether the data is responsive to the warrant."  (Ex. 3 to Defs.' Mot. to Suppress Cell Phone Evid. at MC_00000115; Ex. 4 to Defs.' Mot. to Suppress Cell Phone Evid. at CD_00000184) (emphasis added)).

application provides the necessary basis for a determination of probable cause *to seize items in each of these categories*." *United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (emphasis added).  The Applications here provide no such basis.

In response, the Government argues that it may search the entirety of a premises for evidence enumerated in a warrant and that this general rule "applies with equal force to searches of cell phones and electronic media."  (Opp. at 77-78).  The Government is wrong, and the authorities that it relies upon are inapposite.  In *United States v. Ulbricht*, the warrant permitted the Government to broadly search the defendant's laptop for evidence related to allegations that he created and operated Silk Road, an online black market for drugs and other illicit materials. 858 F.3d 71, 82-83 (2d Cir. 2017).  In upholding the warrant, the Second Circuit relied on the "permeated with fraud" exception to the Fourth Amendment's breadth requirement, explaining that because the crimes under investigation "were committed largely through computers," and  the "search warrant application gave ample basis" to conclude that evidence of the crimes "likely permeated [defendant's] computer," *Ulbricht* was different from "the more typical case in which" a computer "largely contains non-criminal information," and therefore a broad search of the defendant's laptop was warranted.  *Id*. at 103-04.

Here, however, there is no basis to conclude that evidence of fraud "permeates" Defendants' phones.  Moreover, "if the government is relying upon the 'permeated with fraud' exception to support an application for an otherwise overly-broad search warrant, it should state so in the application[.]"  *United States v. Wey*, 256 F. Supp. 3d 355, 392 (S.D.N.Y. 2017) (quoting *United States v. Bridges*, 344 F.3d 1010, 1020 (9th Cir. 2003)) (quotation marks omitted).  The Warrant Applications, however, fail to mention this exception.  Instead, Defendants' case involves the "more typical situation" in which electronic devices – here,

personal cell phones – "largely contain[] non-criminal information" and a broad search is
inappropriate.  *Ulbricht*, 858 F.3d. at 103-04.

No case cited by the Government supports its contention that it is entitled to search all the
data on a phone because the phone was used for calls.  In *United States v. Vilar*, the court held
that probable cause to search certain offices for certain documents did ***not*** support the broad
seizure of ***all*** business records.  No. S305 Cr. 621, 2007 WL 1075041, at *20 (S.D.N.Y. Apr. 4,
2007).  In *United States v. Juarez*, the court noted that the warrant limited the evidence to be
seized to particular categories of data, such as photos and videos, that were likely to contain
evidence of unlawful surveillance by the defendant.  No. 12 CR 59 (RRM), 2013 WL 357570, at
*5 (E.D.N.Y. Jan. 29, 2013).  Similarly, the warrant at issue in *In re a Warrant for All Content &*
*Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at*
*Premises Controlled by Google, Inc.* related to a single category of data – emails – for which the
Government demonstrated probable cause to search.  33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014).

As Defendants' opening brief made clear, case law squarely on point compels the
conclusion that the Search Warrants are impermissibly overbroad.  (*See* ECF No. 126 at 16-19).
In *United States v. Winn,* 79 F. Supp. 3d 904 (S.D. Ill. 2015), the court held that a search warrant
was overbroad because, although there was probable cause to search "a very small and specific
subset of data," the warrant "authorized the police to seize the entirety of the phone and
rummage through every conceivable bit of data."  *Id*. at 922.  While the Government claims that
*Winn* rested on the fact that the warrant application did not set forth facts learned during the
investigation or the affiant's training and experience, the court's primary concern was that the
warrant's search methodology – which is indistinguishable from the methodology set forth in the
Search Warrants – "authorized the seizure of virtually every piece of data that could conceivably

28

be found on the phone." 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015); (Opp. at 80-81). Similarly, although the Government contends that *In re Nextel Cellular Telephone* turned on the fact that the warrant application did not specify search protocols, the key concern underlying the opinion was that "the government [was] requesting it be allowed to search everywhere and seize anything regardless of whether or not the data contained therein falls under the scope of its warrant." No. 14 MJ 8005, 2014 WL 2898262, at *13 (D. Kan. June 26, 2014); (Opp. at 81-82). This is the same concern that renders the Warrants here constitutionally defective.

As Judge Nathan recently explained, "'if [the applying officer] wants to seize every type of data from the cell phone, then it was incumbent upon him to explain in the complaint how and why each type of data was connected to [Defendants'] criminal activity[.]'" *Wey*, 256 F. Supp. 3d at 392 (quoting *Winn*, 79 F. Supp. 3d at 920). Here, the Applications at best explain how certain discrete categories of data in Defendants' phones – like call logs and contacts – might be connected to criminal activity: they are silent as to every other category of data. The Warrants are thus overbroad.

## III. The Good Faith Exception does not Apply.

Because no case law supports a finding of probable cause to search the data on a cell phone based on its use for calls in an alleged fraud, and because the Warrants were facially overbroad, any law enforcement officer's reliance upon them was unreasonable. *See United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421 (1984) (suppression is appropriate where a warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."); *Wey*, 256 F. Supp. 3d at 408 (good faith exception inapplicable where "agents – who are charged with reasonable knowledge of what the law prohibits – appear[ed] to have disregarded well-established constitutional principles that provide a bulwark against the execution of general warrants."); *United States v. Zemlyansky*, 945 F. Supp.

2d 438, 472 (S.D.N.Y. 2013) (declining to apply the good faith exception because "all applicable law was clearly established at the time of the [search], and . . . the Government's agents nonetheless violated the law[.]").  Thus, the Government cannot carry its burden to "demonstrate the objective reasonableness of the officers' good faith reliance [on an invalidated warrant]," *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992), and all evidence obtained from the searches of Defendants' phones should be suppressed.

## DEFENDANTS' MOTION FOR A BILL OF PARTICULARS AND ADDITIONAL DISCOVERY

### I.   Defendants' Motion for a Bill of Particulars Should be Granted.

"Whether to grant a bill of particulars rests within the sound discretion of the district court." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 485 (S.D.N.Y. 2013) (quotations omitted); *see also* Opp. at 89. "When exercising this discretion, a court must consider the totality of the information available to the defendant . . . to determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Thompson*, No. 13 CR. 378 AJN, 2013 WL 6246489, at *7 (S.D.N.Y. Dec. 3, 2013) (citations and quotations omitted); *see also* Opp at 89.

Contrary to the Government's outlandish assertion that "there is nothing particularly unique about the charges here," (Opp. at 85), there is no question that the unprecedented criminalization of private NCAA rule violations presents a novel theory of liability in the world of federal law enforcement. Under the Government's theory, any NCAA rule violation could be tantamount to a federal crime, which makes it difficult to fathom how the Government can suggest that there is "nothing particularly unique" about this case.

Furthermore, and likewise contrary to the Government's assertion that Defendants "have more than sufficient information to prepare for trial," (Opp. at 85), Defendants cannot adequately

prepare for trial without specification of certain details concerning the nature and scope of the scheme charged in this case. (*See* ECF No. 129 at 5-6); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (bill of particulars is warranted where a defendant would otherwise be "unable to prepare adequately for trial").

The Government correctly recognizes that Rule 7(f) of the Federal Rules of Criminal Procedure permits Defendants to seek a bill of particulars where necessary to "prepare for trial" or "prevent surprise." (Opp. at 86); *see also Bortnovsky*, 820 F.2d at 574. That is exactly the case here. However, throughout its response, the Government repeatedly suggests that Defendants are attempting to use a bill of particulars for an improper purpose, such as to preview the evidence or legal theory of the Government's case or to otherwise lock the Government into its proof. (Opp. at 87, 88, 90). Those suggestions are false. The only reason Defendants are requesting a bill of particulars is because the information sought is ***necessary*** to allow Defendants to adequately prepare for trial. *See United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("[T]he proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is necessary for the defense[.]"). And, notably, the Government highlights the well-established rule that a defendant must be allowed to "prepare fully for trial," (Opp. at 89), which Defendants cannot do without the requested information.

With respect to Request 4, which seeks the identities of unindicted co-conspirators, the Government lists a number of factors that courts have considered in evaluating such a request. (Opp. at 91). These factors include "the number of co-conspirators, the duration and breadth of the alleged conspiracy, whether the Government has otherwise provided adequate notice of the particulars, the volume of pretrial discovery, the potential danger to co-conspirators and the nature of the alleged criminal conduct, and the harm to the Government investigation." (*Id.*; *see*

*also United States v. Reddy*, 190 F. Supp. 2d 558, 570 (S.D.N.Y. 2002)). The Government incorrectly argues that "many of these factors weigh against requiring the Government to disclose the identities of co-conspirators in advance of trial" when, in fact, most of them weigh in favor of disclosure. (Opp. at 91). Specifically, aside from the duration of the conspiracy and the volume of pretrial discovery, the remaining factors all weigh in favor of disclosure.

While the breadth of the types of crimes alleged in the conspiracy may have been narrow, *see id.*, the "breadth of the alleged conspiracy" itself is extremely broad. Indeed, the alleged conspiracy involved a multitude of different universities across the United States. With respect to the number of co-conspirators, there is no way of knowing that information absent its disclosure to Defendants. Likewise, if the Government would have provided adequate notice of the particulars, Defendants would not have been forced to make this request. Furthermore, the Government has offered nothing to suggest that disclosure of the requested information would pose some sort of danger to the undisclosed co-conspirators and, given the nature of the alleged criminal conduct in this case, it is difficult to fathom how disclosure of the information would put any co-conspirator in harm's way. Lastly, the Government has offered no explanation as to how disclosure of the requested information would harm its investigation. Consideration of these factors, especially combined with the fact that Defendants cannot fully and adequately prepare for trial without knowing the identity of unindicted co-conspirators, weigh heavily in favor of disclosure.

With respect to Requests 1, 2, and 3, Defendants are not seeking the "minutiae" of the Government's case. Rather, as detailed above, Defendants are merely attempting to fully and adequately prepare for trial, which is currently scheduled to begin in less than two months. Given the unique theory of liability posed by this case, the requested information is necessary for

Defendants to be able to adequately furnish a defense. Accordingly, Defendants are entitled to a bill of particulars.

**II.    Defendants' Motion for Additional Discovery and Early *Brady* and *Giglio* Disclosures Should be Granted.**

As detailed in Defendants opening brief, Federal Rule of Criminal Procedure 16(a)(1)(E) entitles Defendants to the outstanding discovery that Defendants requested nearly seven months ago. (ECF No. 129 at 4). Not only are the requested materials relevant to the preparation of their defense, but they may also prove key in examining the legality of the extensive wiretapping which occurred in this case. (*Id.*). While Defendants are admittedly "acknowledg[ing] the obvious[,]" "the obvious" is not a "fishing expedition" like the Government suggests. (Opp. at 95). Rather, "the obvious" is exactly what Defendants explained in their opening brief, which is that without the ability to review the requested materials, Defendants cannot be certain as to their relevance to Defendants' defense, and Defendants cannot ascertain the legality of the extensive wiretapping that occurred in this case. (ECF No. 129 at 4). Accordingly, Defendants request for additional discovery should be granted.

Regarding Defendants request for the immediate disclosure of *Brady* and *Giglio* material, it is self-evident that counsel for Defendants cannot mount an adequate and effective trial defense without timely *Brady/Giglio* disclosure. Notably, the Government admits that it is required to "turn over constitutionally required exculpatory and impeachment information in time for defendants to use it effectively at trial[.]" (Opp. at 95). That time is now, especially when considering the history of voluminous productions in this case combined with the fact that trial is scheduled to begin in less than two months. Moreover, while Defendants appreciate the Government's correspondence containing acknowledgments of its *Brady* obligations and

representations that it intends to comply fully will those obligations, *see* Opp. 95-96, the unfortunate fact of the matter is that there have been a rash of recent *Brady* violations within the Southern District. (*See* ECF No. 129 at 7 n.3).  Accordingly, notwithstanding the Government's promises and guarantees, Defendants respectfully request that this Court order the Government to produce the requested information immediately.

## CONCLUSION

For the foregoing reasons, Defendants' Pretrial Motions should be granted in their entirety.


Dated:  New York, New York
        March 1, 2019

Respectfully submitted,


**NEXSEN PRUET LLC**

By: /s/ Mark. C. Moore
William W. Wilkins
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211
*Attorneys for Defendant Merl Code*

**HANEY LAW GROUP PLLC**

By: /s/ Steven A. Haney
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*