J4JADAWCps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                           17-cr-684 (ER)

CHRISTIAN DAWKINS and
MERL CODE,

           Defendants.           Conference

------------------------------x

                             New York, N.Y.
                             April 19, 2019
                             11:00 a.m.

Before:

                 HON. EDGARDO RAMOS

                           District Judge

                   APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  ROBERT L. BOONE, ESQ.
     ELI J. MARK, ESQ.
     NOAH D. SOLOWIEJCZYK, ESQ.
     Assistant United States Attorneys

NEXSEN PRUET, LLC
     Attorneys for Defendant Code
BY:  ANDREW A. MATHIAS, ESQ.

HANEY LAW GROUP PLLC
     Attorneys for Defendant Dawkins
BY:  STEVEN A. HANEY, SR., ESQ.

J4JADAWCps

```
 1              (Case called)

 2              THE CLERK:  Counsel, please state your name for the

 3     record.

 4              MR. BOONE:  Good morning, your Honor.  Robert Boone

 5     for the government.  Here with me at counsel's table are Eli

 6     Mark and Noah Solowiejczyk.

 7              MR. MARK:  Good morning.

 8              THE COURT:  Good morning.

 9              MR. MATHIAS:  Andrew Mathias, here on behalf of Merl

10     Code.

11              MR. HANEY:  And -- good morning, your Honor -- Steve

12     Haney on behalf of Mr. Dawkins, who appears here to my right.

13     Would you care for him to stand and make an appearance?

14              THE COURT:  No need.

15              MR. HANEY:  Thank you, your Honor.

16              THE COURT:  And I'm sorry, is it Mr. Mathias?

17              MR. MATHIAS:  Yes, your Honor.

18              THE COURT:  Do you want to make a record as to

19     Mr. Code's presence?

20              MR. MATHIAS:  Yes.  Mr. Code is not here, and he

21     waives his right to be here.

22              THE COURT:  Very well.

23              There's been a lot of activity on the docket over the

24     last couple of days.  I think the last communications that I

25     received from the parties concerned, what?  Letters from
```

J4JADAWCps

1  yesterday.

2          MR. BOONE:  The letters from yesterday were regarding

3  travel reimbursements.

4          THE COURT:  That's right.

5          MR. BOONE:  The issue is whether the government should

6  be forced to turn over certain underlying documents relating to

7  entrapment.

8          THE COURT:  That's right.  So this is what we're going

9  to do.  This matter is on for a final pretrial conference.  I

10  take it that we will be starting Monday; there is no possibly

11  of any pleading between now and then, so far as the parties are

12  concerned as they sit here?

13          MR. BOONE:  The government is not aware of any

14  interest in pleading.

15          MR. HANEY:  That is correct, your Honor.

16          MR. MATHIAS:  No, your Honor.

17          THE COURT:  All right.  So the first thing I will do

18  is, I will rule on the substantive motions that have been made.

19  I will give a very high-level discussion of how I rule, and

20  then an opinion will follow.  But essentially the defendants'

21  motions, substantive motions, are denied.  The first motion was

22  a motion to dismiss the indictment.  An indictment is

23  sufficient if it, first, contains the elements of the offense

24  charged and fairly informs the defendant of the charge against

25  which he must defend; and, second, enables him to plead an

J4JADAWCps

acquittal or conviction and bar future prosecutions for the same offense.

The superseding indictment here sufficiently states the offenses with which defendants are being charged and is therefore is facially valid.  First, the indictment properly tracks the language of the statute by including the verbatim language of the relevant subsections, Subsections 666, 1343, 1346, 1349, and 1952.  And the indictment also states the time and place and approximate terms of the alleged crimes by including details surrounding the alleged criminal interactions between the defendants and various NCAA coaches that were involved in the scheme, the dates that those meetings took place, and the amount of the bribes that were discussed and paid.  The detailed account of defendants' alleged criminal conduct that was included in the superseding indictment is sufficient to inform the defendants of the crimes charged, allow them to prepare a defense, and if necessary allow them to plead double jeopardy in a later prosecution.

The superseding indictment also alleges, properly alleges, a federal funds bribery scheme.  The defendants urge the Court to dismiss Counts One and Two on the grounds that the superseding indictment does not alleged a federal funds bribery scheme.  When examined under the lens of the statutory language as well as the defendants in this case, Section 666 makes it a crime to "corruptly give, offer, or agree to give anything of

J4JADAWCps

value to any person with intent to influence or reward an agent

of an organization in connection with any business transaction

or series of transactions of such organization involving

anything of value of $5,000 or more when that organization

receives in any one-year period benefits in excess of $10,000

under a federal program."

Defendants first claim that the federal funds bribery

charge fails to allege that the coaches were acting as agents

of the respective universities, the coaches that were the

object of the defendants' scheme.  The term "agent" is

expressly defined in Section 666 as "a person authorized to act

on behalf of another person or a government and, in the case of

an organization or government, includes a servant or employee."

Importantly, Section 666's statutory definition of "agency" is

broader than its common law meaning.  In the instant case, it

is undisputed that the coaches whom defendants' bribed, or

allegedly bribed, were employees of the respective universities

at all times during the course of the alleged bribery scheme.

Given that the section explicitly includes employees of an

organization, it is clear that the coaches acted as agents

within the meaning of the statute when they allegedly accepted

the defendants' bribes.

Second, the defendants argue that even if the

superseding indictment does allege that the coaches were agents

of the respective universities, it fails to allege that the

J4JADAWCps

1    coaches were acting within the scope of the agency.  However,

2    there is no basis in the statute to support their arguments.

3    Section 666 imposes no requirement that the agents must be

4    acting within the scope of their agency.  Instead, defendants

5    appear to be simply and erroneously alluding to a common law

6    definition of "agency," which, as mentioned previously, differs

7    from the statute's broader statutory definition.

8         Finally, defendants argue that they cannot be charged

9    under Section 666 because their alleged conduct was not

10   connected to any, quote, business or transaction of the

11   university at issue.

12        And despite defendants' accurate statement that the

13   universities are not in the business of recommending financial

14   advisors to student athletes, the Court finds that the

15   universities are in the business of running NCAA-compliant

16   athletics programs, which would have a clear connection to

17   defendants' alleged scheme.  In fact, in the related

18   prosecution before Judge Preska, she found that running an

19   NCAA-compliant program was a business of the university.

20        The Court also finds that the superseding indictment

21   properly alleges an honest services wire fraud.  Defendants

22   argue that Counts Three, Four, and Five should be dismissed

23   because they fail to allege that any of the coaches, the three

24   coaches, owed a fiduciary duty to their respective universities

25   or, in the alternative, that even if they did owe a fiduciary

J4JADAWCps

duty to their universities, the indictment fails to allege that they were acting within the scope of that duty.

As relevant to this case, the Second Circuit has held in *United States v. Nouri* that the existence of a fiduciary relationship between an employee and employer is beyond dispute and that the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by Section 1346.  In the instant case, the superseding indictment clearly alleges that the coaches whom the defendant allegedly bribed were employees of their respective universities at all relevant times. Accordingly, fiduciary relationships did in fact exist between the coaches and their respective universities.

The Court also finds that the coaches were acting within the scope of their fiduciary duty as alleged in the superseding indictment.  The scope of the coaches' professional duties and responsibilities to their respective universities included compliance with NCAA rules, including prohibitions on facilitating contact between student athletes and agents or financial advisors.  Accordingly, the coaches acted within the scope of their fiduciary duty when they allegedly facilitated such contact and received compensation related to this alleged scheme.

The Court also finds that the superseding indictment properly alleges a Travel Act conspiracy.  The defendants argue

J4JADAWCps

that Count Six should be dismissed because, although the

coaches may have violated private NCAA rules, they were not

involved in any organized crime or other criminal activity.

Title 18 United States Code § 1952 applies to whoever travels

in interstate or foreign commerce or uses the mails or any

facility in interstate or foreign commerce with intent to

distribute proceeds of an unlawful activity, or commit any

crime of violence to further any unlawful activity, or

otherwise promote, manage, establish, carry, or facilitate the

profession, management, establishment, or carrying on of any

unlawful activity.  As relevant in this case, the statute

itself defines "unlawful activity" to include, among other

things, bribery.  Here, defendants' alleged criminal conduct,

involving bribery, falls squarely within the unlawful activity

as defined by Section 1952, because the indictment asserts that

defendants have violated both the federal funds bribery statute

and several state commercial bribery statutes.

          The Court also finds that the federal funds bribery

and honest services wire fraud counts are not -- or statutes --

are not unconstitutional as applied.  Defendants argue that the

charges against them would violate due process because the

statutes are unconstitutionally vague, both facially and if

applied to the facts of their case.

          The Supreme Court and the Court of Appeals have held

that the honest services fraud statute is not

J4JADAWCps

unconstitutionally vague.  In *Skilling*, the Supreme Court held

that the private-sector honest services fraud statute, as

narrowed to encompass only bribery and kickback schemes, is not

unconstitutionally vague.  With regard to the federal funds

bribery statute, in *United States v. Boyland*, the Second

Circuit held that the *McDonnell* standard, i.e. an official act

requirement, does not apply to Section 666 counts because

Section 666 was intended to cover more expansive behavior than

Section 201.  Therefore, the federal funds bribery and honest

services wire fraud statutes are not facially unconstitutional

for vagueness.

Defendants claim that they lacked fair notice that

their conduct might have been prohibited under these statutes.

That argument is meritless because the Supreme Court stated in

*Skilling*, "it has always been as plain as a pikestaff that

bribes and kickbacks are prohibited."

Moving now to the motion to suppress the wiretap

evidence, that motion is also denied.  Defendants argue that

the April 7 wiretap order is facially insufficient because it

failed to identify by name on the appropriate line on the order

the name of the Justice Department official who authorized the

wiretap application.  The government argues that the error on

the order does not compel suppression of the wiretap evidence.

The Court agrees.  The April 7 wiretap order failed to identify

the correct authorizing official in the dedicated space.

J4JADAWCps

| | |
|---|---|
| 1 | However, the order was based upon the application, which |
| 2 | correctly identified the authorizing official.  The Court |
| 3 | agrees with those circuits that have found that a failure to |
| 4 | identify, or misidentify, the wiretap's application authorizing |
| 5 | official to be facially insufficient under the appropriate |
| 6 | section, that need not be suppressed where an authorizing |
| 7 | official in fact existed. |
| 8 | The Court also finds that the wiretap was supported by |
| 9 | probable cause, contrary to defendants' argument that no |
| 10 | probable cause existed to believe that any target was |
| 11 | committing any of the target offenses.  Probable cause for a |
| 12 | wiretap order exists when the facts made known to the issuing |
| 13 | court are sufficient to warrant a prudent person in believing |
| 14 | that the evidence of a crime could be obtained through the use |
| 15 | of electronic surveillance.  Once a wiretap order has been |
| 16 | issued, the order is entitled to a presumption of validity. |
| 17 | The April 7 wiretap order specified among others wire |
| 18 | fraud under Section 1343 as a target offense.  The Court finds |
| 19 | that probable cause exists to believe that the defendants were |
| 20 | committing honest services wire fraud.  The government's |
| 21 | application included an affidavit describing recorded phone |
| 22 | calls involving Mr. Dawkins and CW-1 discussing the alleged |
| 23 | bribery scheme and meetings in which CW-1 provided Mr. Evans |
| 24 | with the cash bribes alleged.  It also included detailed |
| 25 | allegations regarding phone calls between Mr. Sood and CW-1 |

J4JADAWCps

1   regarding anticipated meetings with two coaches in Las Vegas to

2   determine that they would be willing to accept money in

3   exchange for directing players to retain the services of

4   Mr. Sood, Mr. Dawkins, and CW-1.

5           Defendants argue that the honest services wire fraud

6   is not one of the target offenses in the application.  The

7   Court disagrees.  The application lists wire fraud under 18

8   U.S.C. § 1343 as a target offense.  Honest services fraud,

9   which is defined in Section 1346, is one type of scheme or

10  artifice to defraud that is outlined by Section 1343.

11          Defendants argue that all communications intercepted

12  pursuant to the April 7 wiretap should be suppressed on the

13  grounds that the wiretap was unnecessary, given the

14  government's engagement with a cooperating witness.  Here,

15  however, the April 7 wiretap included over 13 pages outlining

16  the applicants' rationale behind the need for the wiretap.

17  Specifically, the application provides a basis for concluding

18  that less-intrusive methods, including the use of physical

19  surveillance and analysis of telephone records, were

20  insufficient, given the nature of the investigation.  It would

21  not be feasible for the cooperating witness to record

22  conversations in which he did not participate, of course.

23  Therefore, the application met the requirements of necessity by

24  providing a basis for the issuing judicial officer to conclude

25  that the nature of the current case is such that neither the

J4JADAWCps

1    use of a single cooperating witness nor less intrusive

2    investigative procedures would have been feasible.

3              In addition, I find that the government was entitled

4    to rely on the good faith of the April 7 order.  The fruits of

5    a wiretap which is later found to be insufficient will not be

6    suppressed unless one of the following occurs: (1) the issuing

7    judge abandoned his detached mutual role; (2) the agent was

8    dishonest or reckless in preparing the supporting affidavit of

9    the wiretap order; or (3) the agent's reliance on the warrant

10   was not reasonable.  I find that, in the instant case, none of

11   these conditions for suppression have been met.

12             Turning now to the defendants' request for grand jury

13   proceedings, for the transcripts, they contend that they're

14   entitled to such transcripts because the indictment may have

15   been based on the intercepted communications which they have

16   sought to suppress.  As I have concluded the suppression of the

17   communications is not warranted, I need not consider

18   defendants' argument as to the request for the grand jury

19   transcript.

20             Defendants also move to suppress the cellphone

21   evidence obtained after their arrest.  That motion also is

22   denied.  They argue that all evidence obtained from the

23   cellphones seized during their arrest and later search pursuant

24   to judicially authorized warrants should be suppressed because

25   the warrants were not supported by probable cause.  Here, I

J4JADAWCps

agree with Judge Kaplan, who addressed the identical motion in
United States v. Gatto, where he denied the suppression,
specifically the applications for search warrants each attached
to complaint which identify calls and text messages in
furtherance of the applicable crimes and which were made using
one or more of the cellphones in question.  Evidence of these
calls and messages was sufficient to establish a fair
probability that contraband or evidence of a crime would be
found through the various content of the defendants'
cellphones.

Turning now to the bill of particulars, request for a
bill of particulars, I find that defendants are not entitled to
such a bill.  Given the level of detail that is contained in
both the criminal complaint and the superseding indictment,
defendants cannot properly claim that the charges alleged
against them are so general that they do not advise them of the
specific acts of which they are accused.  Specifically, the
complaint and indictment describe in detail the alleged
criminal interactions between defendants and the various NCAA
coaches that were involved in the scheme.  These details
include the dates when the meetings took place, the amount of
the bribes that were discussed and paid, and the approach that
defendants took to identify and establish relationships with
the coaches.

In addition, the discovery material which is available

J4JADAWCps

1   to defendant, including hours of incriminating phone calls,

2   serves to further give notice to defendants about the charges

3   against them and prevents them from being surprised at trial or

4   claiming double jeopardy.

5           Accordingly, that motion is denied.

6           The balance of the motions concern discovery, which I

7   assume has been provided as of now, Mr. Boone?

8           MR. BOONE:  Yes, your Honor.

9           THE COURT:  OK.  Turning now to the motions in limine

10  that have been filed first with respect to the entrapment

11  defense, Mr. Haney, did you wish to speak any further with

12  respect to that motion?

13          MR. HANEY:  Yes, just briefly, your Honor.  I don't

14  need my notes.  This will be a rather straightforward, I think,

15  conversation.

16          First of all, thank you, your Honor, for having me in

17  your courtroom.  I understand that out-of-jurisdiction

18  attorneys have no right to be here; it's a privilege.  And I

19  want to thank you the Court for allowing me to be in your

20  jurisdiction.

21          THE COURT:  You're welcome.

22          MR. HANEY:  Thank you, sir.

23          Now, we've had conversation, myself and the

24  government, recently, about this issue of the entrapment.

25  Though I believe it's supported factually based on what I've

J4JADAWCps

```
 1    submitted in the responsive pleadings, we would agree that it
 2    is a bit premature, that that issue may be better determined at
 3    the end of proofs and the Court then could make a determination
 4    of whether or not the Court believes that, based on the proofs
 5    that have been presented, whether or not entrapment occurred
 6    and a charging instruction would be appropriate to the jury.
 7    Now, that's my position.  I've had this conversation as
 8    recently as yesterday with counsel from the government, and I
 9    would submit that they agree with that and would leave to the
10    Court's discretion at the appropriate time to make that
11    determination.
12            THE COURT:  Very well.
13            MR. HANEY:  Thank you, your Honor.
14            THE COURT:  And I'm happy to hear you at the
15    appropriate time.
16            Then the government seeks to preclude defendants from
17    adducing evidence that they did not bribe other men's college
18    basketball coaches who remain uncharged, on relevance grounds.
19    Mr. Boone or one of your colleagues, does either one of you
20    want to speak further on this issue?
21            MR. MARK:  Your Honor, I think we have laid that out
22    fairly in our motion, that it appears that the defense, by
23    their subpoenas and by their motion, intends to call witnesses
24    and adduce evidence regarding the defendants' relationships
25    with other coaches who are not part of this bribery scheme.
```

J4JADAWCps

1   That appears to be clearly irrelevant as it is outside the

2   scope of their criminal conduct and it doesn't bear upon

3   whether the defendants actually intended to and did bribe the

4   coaches that are at issue here.  And as a result, we think not

5   only is it irrelevant, but it would pose other issues and

6   should be precluded under 403.

7              THE COURT:  Does either defendant want to respond?

8              MR. HANEY:  I would, your Honor.  And I would like to,

9   at the Court's pleasure, elaborate on that just a minute if I

10  might.

11             THE COURT:  Sure.

12             MR. HANEY:  Your Honor, we have what I submit is

13  troubling -- there's no other word for what it is -- evidence

14  in this case that we have two head coaches that are engaged in

15  systematic cheating at the highest level.  Now, not only is

16  there evidence of that; there's evidence that my client is on

17  the phone with those coaches, and there's also evidence that my

18  client has a very close relationship with those coaches, and I

19  would submit the jury could make that determination by and

20  through the context of the conversations and the language that

21  they're using and the things that they're talking about, your

22  Honor.

23             Now, this information, this evidence, would not be

24  submitted to show character.  It would show my client's intent.

25  My client is charged with bribing assistant coaches, associate

J4JADAWCps

1   head coach, which is a difference.  It's a significant

2   difference.  Book Richardson, from the University of Arizona,

3   associate head coaches.  There's a number of -- two guys right

4   behind the head coach.  My client is charged with bribing that

5   associate head coach.  My client is on the phone, having a

6   conversation with the head coach, Sean Miller.  And not only is

7   he on the phone having a conversation with Sean Miller; he's

8   talking specifically to Sean Miller about the future number one

9   pick in the NBA draft.  And during the course of that

10  conversation, there's more than enough opportunity for my

11  client to ask Sean Miller what it would take to get the

12  ratings.  In fact he does.  And during the course of that

13  conversation, there's never any suggestions of there being any

14  offers, inducements, bribes, of that nature.

15          More significantly, your Honor, the evidence in this

16  case, the government is aware of, establishes very clearly that

17  Sean Miller is paying players in Arizona.  I submit to the

18  Court that's relevant, because if Sean Miller is paying players

19  in Arizona, certainly he would have more of an influence on

20  those players than the associate head coach, who is not paying

21  those players.  Now, if Sean Miller, as the evidence

22  establishes --

23          THE COURT:  I'm sorry.  I want to stop you for a

24  second.  So you have information tending to establish that a

25  head coach was paying his players.

J4JADAWCps

1          MR. HANEY:  That is correct, this particular head

2     coach, at Arizona, yes.

3          THE COURT:  And did your client have knowledge of

4     that?

5          MR. HANEY:  He did.  He had knowledge of it.

6          THE COURT:  At the time?

7          MR. HANEY:  Yes, he did.  And not only did he have

8     knowledge of that, but my point is, if anyone had influence, if

9     a head coach is paying the rent, if the head coach is paying

10    the car fee, if the head coach is paying the grocery bill,

11    certainly that individual, in theory, would have some influence

12    over the folks who he is paying for.  So if my client is

13    charged with bribing Book Richardson, I would submit there is

14    no evidence that he did, certainly it is worthy of

15    cross-examination to explore, if you go on the same theory,

16    which, again, I'm not going to articulate my theory now to the

17    Court of how preposterous it is to believe that a coach that

18    had been on campus for five months would somehow influence that

19    decision.  They're not even there for a year.  One of them is a

20    very, very un -- there's no accurate way of characterizing what

21    they are.  They're happier now.  They go to the first semester.

22    As soon as they're done playing basketball they leave school to

23    prepare for the NBA draft.  No coach is going to have an

24    influence in that sort of period of time.  However, if you want

25    to follow the government's theory, which is what we're doing,

J4JADAWCps

1    certainly the head coach, who has evidence of paying players,

2    would be one who would impose some influence on that player,

3    and we would, I submit to the Court, it's relevant to the

4    defendants, and my client's motive, intent, to allow me to

5    cross-examine that particular witness with respect to Sean

6    Miller.

7            THE COURT:  OK.

8            MR. HANEY:  Thank you.

9            MR. MARK:  Just briefly, your Honor.  I mean, there

10   might be a lot of different people who have influence over a

11   particular player or players' decision.  The question here is

12   really whether the defendant bribed certain people who had

13   influence over that decision.  Book Richardson is one.  There

14   is no allegation here in this case that the defendant bribed,

15   for instance, Sean Miller, the head coach at Arizona.

16           Now, Judge, it's outside of the sports world; if

17   you're thinking of a drug dealer and you're considering, does

18   that drug dealer have a relationship, you know, such that he's

19   supplying two different distributors, the fact that there are

20   two different distributors and he decides to supply one

21   distributor not the other doesn't mean that the other

22   distributor's conduct is relevant here.  The question is, did

23   he have a relationship and did he enter into a conspiracy with

24   one of those distributors.

25           So I think largely this goes outside, meaning it

J4JADAWCps

1    becomes irrelevant.  And the fact that Mr. Haney is talking

2    about two coaches engaging in systemic cheating, I think, sort

3    of goes to the broader concern of what he is looking to do.

4    This sort of opens the door into all sorts of other extraneous

5    issues that are outside the scope of the sort of core issues

6    here, which is whether the defendant did or did not engage in a

7    conspiracy to commit bribery with these particular coaches.

8              THE COURT:  Thank you.

9              I'm going to grant the government's motion.  And I

10   hasten to add, obviously, these are motions in limine and they

11   are subject to being revisited depending on how the evidence at

12   the trial plays out.  But at this juncture I will grant the

13   government's motion.  Whether defendants had relationships with

14   basketball coaches, including head coaches, who they did not

15   bribe, is irrelevant to both the issues of whether defendants

16   bribed the coaches they are alleged to have bribed and whether

17   they intended to do so.  To hold otherwise would be to suggest

18   that if a criminal defendant conducted himself properly in some

19   cases, he likely lacked intent when he failed to do so.  But

20   nobody only does things properly or improperly.  The Second

21   Circuit recognized this principle in *United States v. Walker*,

22   in which it affirmed the district court's refusal to admit the

23   honest asylum applications prepared by defendant accused of

24   preparing false asylum applications.  The Second Circuit

25   disagreed with defendant's theory that the honest applications

J4JADAWCps

disproved his, quote, fraudulent intent, holding instead that

whether the defendant had prepared other nonfraudulent

applications was simply irrelevant to whether the applications

charged as false statements were fraudulent.

MR. MATHIAS:  Your Honor, if I might clarify

something?

THE COURT:  Yes.

MR. MATHIAS:  I just want to make sure that this

ruling is limited to coaches such as Sean Miller and Will Wade.

Part of Mr. Code's defense is that the coaches that were

introduced to Jeff DeAngelo and Marty Blazer in Las Vegas, that

list was not entirely his.

THE COURT:  Not entirely whose?

MR. MATHIAS:  Not entirely Mr. Code's.  And so the

coaches who did actually take money were in Vegas because

someone else put them there, not Mr. Code.  So Mr. Code does

want to use as evidence the fact that the coaches he introduced

did not take money, so for a different purpose than what

Mr. Haney was talking about.

MR. MARK:  That's really not what the government's

motion is geared towards.  I think what defendant Code is

saying is that there are certain coaches that Mr. Code was

involved with who they introduced to the undercover officer,

and we're not seeking to preclude evidence related to those

particular coaches by this motion.

J4JADAWCps

1         MR. MATHIAS:  I'm satisfied with that.

2         THE COURT:  Very well.

3         There is another motion concerning evidence to admit

4    as to intent that's been made by the defendants, and I don't

5    know that I have the information necessary in order to make

6    that determination.  I think, as the government suggested, I

7    don't -- I believe I have all of the recordings, but I don't

8    have transcripts.  I don't know anyone's voices, so I could

9    listen to them and it would get me exactly nowhere.  So it

10   would be helpful for me to have transcripts of those

11   recordings, and I'd be happy to review those transcripts at the

12   appropriate time.

13        MR. HANEY:  Thank you, your Honor.

14        THE COURT:  Now, with respect to the most recent

15   motion that was made, does the government wished to be heard

16   any further?

17        MR. BOONE:  Just briefly, your Honor.  Essentially the

18   government's argument is that Marty Blazer was not sort of

19   better financial off having participated and cooperated with

20   the FBI; essentially he was just reimbursed for travel expenses

21   that were incurred as a result of his cooperation.  We view

22   that as very different from the cases that defense counsel

23   cite, in which the cooperators at issue gained financially.  In

24   some cases they were just straight up paid as sources.  In

25   other cases it seems as if they were paid to relocate for

J4JADAWCps

1    safety reasons.  In our case, sort of the net gain was zero for

2    our cooperator.  He simply got reimbursed for travel that the

3    FBI asked him to make, frankly, on behalf of the investigation,

4    and therefore it was not of benefit to him.

5         Furthermore, as we've said, we have disclosed it.

6    This is probably why defense counsel is raising it, because we

7    have disclosed this to them.  What they want, it appears, are

8    the underlying documents, perhaps to get a number figure so

9    they can cross the defendant on that.  We think that's

10   irrelevant.  It doesn't matter how much the investigation cost.

11   That was what we addressed in our motion.  So to the extent

12   that the end goal here is to sort of make a big deal that this

13   was an investigation that cost a lot of money, frankly, number

14   one, Marty Blazer doesn't know how much the investigation cost;

15   number two, that's wholly appropriate.

16        THE COURT:  And was he reimbursed dollar for dollar,

17   which is to say if he spent $18 on lunch he got paid $18 and

18   that's it?

19        MR. BOONE:  Correct.  Our understanding is that he did

20   not gain anything at all financially from cooperating.

21        And as we pointed out, just by way of background, your

22   Honor, the investigation, in terms of Marty Blazer's

23   participation, lasted approximately three years.  He started

24   proffering with the government in the fall of 2014.  The FBI

25   didn't become involved until the fall of 2016.  So for the

J4JADAWCps

1    majority of the time, he was not working at the direction of

2    the FBI but was working at the direction of our office's

3    internal investigators and was not reimbursed for anything.  He

4    was just paying out of pocket.  So we're dealing with a

5    relatively short time frame.

6               THE COURT:  How long, do you know?

7               MR. BOONE:  I think it was approximately ten months.

8    I think the FBI came in in around November 2016 and the arrests

9    were made in September 2017.

10              THE COURT:  I see Mr. Mathias shaking his head that he

11   does not believe that your cooperator was paid, reimbursed

12   dollar for dollar.  Mr. Mathias?

13              MR. MATHIAS:  I think that that did occur in some

14   instances, but in the 3500 material we got from the government

15   last night, it's clear that Mr. Blazer received a per diem and

16   he knows that, if he did not spend it, he kept the balance.

17              THE COURT:  That's true of any government employee.

18   Correct?

19              MR. MATHIAS:  Correct.

20              THE COURT:  That's why we eat at McDonald's.

21              MR. MATHIAS:  Correct.  But that's not a dollar-for-

22   dollar reimbursement.  There was a balance that he kept.

23              And one thing to sort of explain the background of why

24   this is important is that he was working at the behest of FBI

25   agents who are now under investigation and are not going to be

J4JADAWCps

1     called to testify in this case.  They put all of their eggs in

2     the Blazer basket.  And we need to know everything to know how

3     to effectively cross-examine him to determine his reliability

4     and his truthfulness.  He is a guy who has 20 years of criminal

5     history as a fraudster.  He entered into this arrangement and

6     agreed to cooperate, certainly had no way, or no traditional

7     way, or the way he had been making money, did not have means to

8     do that.  Instead, he was flying all over the country, staying

9     in hotels in Las Vegas that were, I think, a thousand dollars a

10    night, being reimbursed in cash by the FBI agents who are not

11    going to testify in this case because they're under

12    investigation for misuse of government funds.

13          THE COURT:  Let me ask you this.  Is there any

14    relation between the misconduct that is being alleged against

15    those agents and the payments that were made here?

16          MR. MATHIAS:  I don't know.  We have not been given

17    any information that can lead us to know that.  And in fact, I

18    don't know how to argue whether or not it's relevant without

19    seeing the underlying documentation.  In their 3500 production

20    to us and in their motion that they filed subsequently, I think

21    they say that turning over the notes that talk about the fact

22    that reimbursements did occur fulfills their *Giglio*

23    obligations.  I don't see how that can be when there is this

24    underlying documentation that provides more detail that could

25    be fertile ground for cross-examination.  I just don't.  And I

J4JADAWCps

1    think we're entitled to it.  That does not necessarily mean we

2    could cross-examine him on it, but we're entitled to it,

3    entitled to them.

4            THE COURT:  Well, beyond the per diem, which is an

5    interesting argument, I guess sort of conflicting with, if he

6    only got a per diem and he was staying at the Venetian,

7    whatever the name of the hotel is, and he's substantially

8    underwater with respect to what he's getting reimbursed.

9            MR. MATHIAS:  Potentially.  We just don't know.

10   Without having the information, we don't know.

11           THE COURT:  Mr. Boone?

12           MR. BOONE:  First of all, defense counsel is right in

13   terms of, it was a per diem -- I think we laid that out in our

14   letter last night, that he did get paid on a per diem basis for

15   travel.

16           At any rate, to answer your question, no, there is no

17   relation between the conduct regarding the FBI agent that

18   defense counsel references and Marty Blazer.  Frankly he's not

19   even aware of that, at all.

20           Secondly, to the extent defense counsel wants to

21   cross-examine him on his previous history of fraud, they

22   certainly are entitled to do so and they have the information

23   to do that.  If they want to get into sort of how he became a

24   cooperator and what he pled guilty to, they have the

25   information to do that.  That's obviously fair game.  If they

J4JADAWCps

1    want to cross him on the fact that, isn't it true you were

2    flying around the country and the FBI was paying for it, yes.

3    He was.  That's not a secret.  It's obvious.

4         So I'm not exactly sure what they're going to gain

5    from getting the particular receipts of what he ate while he

6    was in South Carolina or wherever.  At the end of the day,

7    unless there is an allegation that there is a good-faith basis

8    to believe, on defense counsel's part, that the cooperator was

9    doing something improper, in other words, he was stealing money

10   from the government or he was spending more than he had been

11   told he was allowed to, I don't know what basis there is to

12   simply give the documents to confirm what we would explain,

13   which is that he was reimbursed mostly dollar for dollar,

14   although he did get a per diem on occasion.

15        And to the extent that he stayed in a fancy hotel in

16   Vegas, which defense counsel references, the cooperator did not

17   pick the hotel; the FBI picked the hotel.  Part of this scheme

18   involved the cooperator presenting himself as a financial

19   advisor who was successful and had connections to a wealthy

20   investor, who was interested in giving money to pay the bribes

21   that we've talked about in the scheme.  To that end --

22        THE COURT:  Was his testimony, for example, that he

23   stayed at a fancy Las Vegas hotel or they had a meeting on this

24   yacht?  What would his testimony be, that he was directed to do

25   that by the agents?

J4JADAWCps

1          MR. BOONE:  Yes, correct, your Honor.  On the hotel he

2     would say he did not book his travel for that trip; the agents

3     told him to stay where he stayed.  Indeed, if pressed further,

4     frankly, he would say that, were it left to him, he wouldn't

5     have stayed there and probably would have stayed somewhere sort

6     of less expensive.

7          In terms of the yacht, he doesn't know whose yacht it

8     was.  He doesn't know how that came to be.  He was just told to

9     show up at this place.

10          THE COURT:  OK.  I'm going to grant the government's

11     motion, again without prejudice.  It seems to me that, if the

12     payments were made as the government represented, that it does

13     not provide a basis for impeachment of Mr. Blazer.  It may

14     provide a basis for impeachment of the government's

15     investigation.  But I don't think that that's an appropriate

16     basis upon which to have him turn over that information.  So

17     that motion is granted.

18          MR. MATHIAS:  Just a point of clarification.  I

19     believe the motion was to preclude us from cross-examining

20     Mr. Blazer on payments and reimbursements.

21          THE COURT:  I understood the motion to be to not give

22     you the documents.

23          MR. MATHIAS:  OK.  If that's your ruling, I'm going

24     with that.  But if we could cross-examine him.

25          THE COURT:  Oh, yes, you can cross-examine him on

J4JADAWCps

1    where he stayed and what he ate and whatever.

2              MR. MATHIAS:  Thank you.

3              THE COURT:  I think that resolves all the motions

4    except for one, which has been filed under seal, and I will

5    give the parties my decision on that shortly.  OK?

6              MR. MARK:  Your Honor, just, I know there are a couple

7    of motions generally as to sort of what the government

8    considers and argued was improper arguments or improper

9    evidence that were raised in *Gatto*.  I understand that sort of

10   defendants in their response sort of just said that they are

11   going to follow their ethical obligation.

12             THE COURT:  Yes.

13             MR. MARK:  Essentially what the government seeks is a

14   concession that the things that are laid out in the

15   government's motion are improper, and if those are brought up,

16   the government will be objecting sort of regularly to things

17   such as, if they try to put in matters such as unfairness of

18   the rules, schools profiting from the business of college

19   basketball, the considerations whether players did not have

20   lots of money or that coaches were paid large salaries or

21   evidence of generally rule breaking by others, what Judge

22   Kaplan called the "everybody's doing it defense," that to the

23   extent said those things get introduced here -- I mean, the

24   government considers those to be improper matters and the

25   government will be objecting regularly.

J4JADAWCps

1          THE COURT:  I received representations from counsel

2     that they will not be going into those matters.

3          MR. HANEY:  Your Honor, that is correct.  This case is

4     very narrowly focused, I think, on some particular issues, and

5     we are not going to get into other matters.

6          Thank you.

7          THE COURT:  Was there anything else, any other legal

8     issues that the parties wanted to raise?

9          MR. BOONE:  Your Honor, just briefly.  I know

10    Mr. Haney earlier today said that he was OK with his argument

11    on having a ruling on whether or not they could make an

12    entrapment defense.  Just because the word "entrapment" could

13    be sort of very loaded, we just want to make sure that defense

14    counsel do not plan to say the word "entrapment" in allusion to

15    an entrapment defense in their opening statement.

16         MR. HANEY:  I have no intention, I've made that known

17    to them a few times, I will not use the word "entrapment" in my

18    opening statement.

19         THE COURT:  All right.

20         MR. HANEY:  Thank you.

21         MR. MATHIAS:  And Mr. Code does not have that defense.

22         THE COURT:  OK.  Anything else on the legal front?

23         There being none, I have provided counsel with a draft

24    of the voir dire form that I intend to use with the jury

25    venire.  I don't believe I've received any information from

J4JADAWCps

1    defendants on proposed questions or individuals who may be

2    mentioned or entities that may be mentioned, so I am going to

3    give the parties some weekend homework.  There are some blanks

4    in here.  I would ask that the parties provide me with that

5    information by no later than midday Sunday so that it can be

6    included in this form.

7           I did receive the government's requests.  I think I

8    included, at least in substance, almost all of what you

9    provided.  And this is a form, for the folks that are not from

10   this district, that are used widely in this district in

11   connection with conducting jury selection.  This form will be

12   provided to every potential juror.  And I will go over this

13   form with them as I question them.  And the way that I do it is

14   that, once I sit the jurors -- and we'll talk about that in a

15   minute -- I ask the first potential juror every question in

16   part one, and I ask every other juror to listen very carefully

17   and to list those questions as to which they have an

18   affirmative response or as to which they have an issue.  And

19   once I go through each one of those questions in part one with

20   potential Juror No. 1, I then go to potential Juror No. 2 and I

21   say, just tell me whether you have an issue with any of these

22   questions, and we focus just on those questions.

23          The questions in part one are sort of meant to elicit

24   responses that may provide a basis for being stricken for

25   cause.  And as those issues arise, as I question the particular

J4JADAWCps

1    juror, if it becomes obvious that the person should be stricken

2    for cause, they are stricken immediately and replaced

3    immediately from someone else in the venire.  And we go through

4    that process with each potential juror until we have the number

5    of jurors in the box that will be necessary in order to start

6    on the peremptory strikes.

7         And then once we have what I refer to as a clean jury

8    in the box, which is to say folks for whom there is no basis to

9    strike for cause, then I turn to the part two questions, which

10   is more, tell me about yourself and your family and your job.

11   and I ask each juror, each potential juror, each question on

12   part two.  That gives you an opportunity to make a determi-

13   nation as to, this is a person that you want or don't want on

14   the jury, so that you can exercise your peremptory challenges.

15        So any questions on the form?

16        MR. HANEY:  No, your Honor.

17        MR. BOONE:  Not from the government.

18        THE COURT:  I'm going to ask the defendants, if they

19   have any questions that they want included, they should get

20   them to me, any names, etc., by no later, and the government as

21   well, by no later than midday Sunday so that they can be

22   included on the form.

23        I will take it upon myself to accept or reject any of

24   the questions that you may want.  This is not meant to be an

25   advocacy piece.  It is just meant to inform the jury as to what

J4JADAWCps

1    the case is about and the possible bases for striking for

2    cause.

3            I do want the parties to read this very carefully.

4    And please point out to me any typographical errors, any

5    grammatical errors that you may find.  I have no pride of

6    authorship.  I'm giving this to the jury and I want them to

7    know or believe that I am able to write English.  So any

8    typographical error of that type will be appreciated.

9            Now, with respect to the jury selection, I take it

10   this case will take two weeks.  Correct?  Is that still the

11   plan?

12           MR. BOONE:  Yes, your Honor.

13           MR. HANEY:  We believe so, your Honor.

14           THE COURT:  OK.  So do we need more than two alternate

15   jurors?

16           MR. HANEY:  Your Honor, we had four, I believe, in the

17   prior trial.  I would assume that perhaps more than two.

18           MR. BOONE:  The government is fine with more than two.

19           THE COURT:  I'm sorry?

20           MR. BOONE:  We're OK with more than two.

21           THE COURT:  OK.  So I'm happy with two as safe in a

22   two-week trial.

23           I use the strike method.  So what we will do,

24   therefore, with two alternates, each side -- rather, the

25   defense gets ten peremptories with respect to the 12 jurors and

J4JADAWCps

1    one peremptory with respect to the alternate jurors.  The

2    government gets six peremptories with respect to the 12 jurors

3    and also one peremptory with respect to the alternate jurors.

4    So we will have 32 potential jurors in the box at any one time.

5    And for purposes of your graphing this, we will have to figure

6    out how many we can put in the box proper and how many we will

7    need to put in one of the first benches.  But the way that we

8    will do it is the last four potential jurors, so 29, 30, 31,

9    32, they're also potential alternate jurors, so that you can

10   use your peremptories in any way that you see fit.

11            Any questions on that?

12            MR. HANEY:  No, your Honor.

13            MR. MATHIAS:  No, your Honor.

14            THE COURT:  OK.  With respect to the conduct of the

15   trial, I propose to use the truncated day.  That has become

16   more popular in these parts.  What that is is, once we get the

17   jury selected, every subsequent day we sit from 9:30 until

18   2:30, giving the jurors no lunch break but two 15-minute

19   breaks.  And the way that that works out is, we go an hour and

20   a half, 15-minute break, an hour and a half, 15-minute break,

21   an hour and a half.  And I've actually done the math on this,

22   and if you do that five days over the course of a week, you

23   actually get more hours than if you do a full day Monday

24   through Thursday.

25            Any objection to that?

J4JADAWCps

1        MR. MARK:  No.

2        MR. HANEY:  Not on behalf of defense, your Honor.

3        MR. MATHIAS:  No, your Honor.

4        MR. BOONE:  No, your Honor.

5        THE COURT:  Very well.  So that's what we will do.

6            With respect to, again, lawyer conduct, I don't

7   handcuff lawyers to the podium.  And I will allow you, with

8   some reason, to go beyond the podium, especially in your

9   presentations to the jury.  With respect to time of the

10  openings, again, I don't set strict time limits, but in a

11  two-week trial, I wouldn't expect more than 20, 25 minutes for

12  the opening arguments.  Does any side expect to use

13  substantially more than that?

14       MR. MARK:  No, your Honor.

15       MR. HANEY:  No, your Honor.

16       MR. MATHIAS:  No, sir.

17       THE COURT:  With respect to objections, you can stand

18  up, say "Objection, hearsay," "Objection, asked and answered."

19  Anything beyond that that's going to require some discussion,

20  don't do that in front of the jury, we'll do it at sidebar.

21           Also, on timing, I expect the lawyers here every day

22  at 9 o'clock, for the jury to be here at 9:30.  I find that

23  there's always something to do.  So we'll use that time rather

24  than the jury's time.

25           I start on time every day.  If I take a 15-minute

J4JADAWCps

1    break, it's a 15-minute break, and I send the jurors home at

2    2:30 like I tell them I'm going to.  I make sure that we do

3    everything possible to maintain a strict schedule, certainly

4    from the jury's perspective.  So they're here at 9:30.  They

5    leave at 2:30.  They get two 15-minute breaks.  I don't want

6    the jury sitting in the box and lawyers coming in from the

7    bathroom two or three minutes late.  So please do be conscious

8    of the fact that I start everything on time.

9         Any questions on any of that?

10        MR. BOONE:  Your Honor, if your Honor knows, it would

11   be helpful to know if you expect us to open on Monday or

12   Tuesday.

13        THE COURT:  In a criminal case, it usually takes the

14   better part of a day to pick a jury, so I play it by ear.  If

15   there's an hour left at the -- Monday we'll go from 9:30, or,

16   as soon as we get the venire, I'll expect you guys here at 9

17   o'clock, but as soon as we get the venire -- that could be

18   anywhere between 10 o'clock to 10:30 -- we'll start then.

19   We'll see how far we go, until 5 o'clock.  But if it's 3:30, I

20   would be inclined to open; if it's 4:30, I would be inclined

21   not to open.  So we'll have to play that by ear.

22        MR. BOONE:  Thank you.

23        THE COURT:  One other bit of instruction.  I don't

24   want parties to conduct document discovery in front of the

25   jury.  What I mean by that is, it happens frequently in trials

J4JADAWCps

1    where a witness makes mention of a document that the lawyers

2    believe they haven't seen or believe they haven't turned over

3    and immediately they stop, they look at me, and they say, your

4    Honor, we demand that this document be turned over.  Don't do

5    that.  If you believe that a document hasn't been turned over,

6    just let me know at sidebar.  I say that because it is

7    frequently the case that either the witness is mistaken or the

8    lawyer is mistaken about what has and has not been turned over

9    or whether the document even exists, and it would be unfair to

10   the other side to suggest that they have been keeping documents

11   back.

12            Any questions?

13            MR. HANEY:  No, your Honor.

14            MR. BOONE:  No, your Honor.

15            Just one last thing, a heads up.  The defendants do

16   need to be arraigned on the indictment.  We can obviously do

17   that Monday.

18            THE COURT:  We can do that Monday before the venire

19   comes up.

20            I don't think I have anything more.  With that, we are

21   adjourned.  I will see you all Monday morning at 9.  Please get

22   me that information by Sunday.  And if you need anything, I'll

23   be around Sunday in the office.

24            MR. HANEY:  Thank you, Judge.

25            (Adjourned)