J4N9DAW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                           17 CR 684 (ER)

CHRISTIAN DAWKINS AND MERL
CODE ,

              Defendants.
------------------------------x

                            New York, N.Y.
                            April 23, 2019
                            9:00 a.m.

Before:

                  HON. EDGARDO RAMOS

                            District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
ROBERT L. BOONE
NOAH D. SOLOWIEJCZYK
ELI J. MARK
    Assistant United States Attorneys

HANEY LAW GROUP PLLC
    Attorney for Defendant Dawkins
BY:  STEVEN A. HANEY

CHANEY LEGAL SERVICES, LLC
BY:  DAVID A. CHANEY, JR.
             -and-
NEXSEN PRUET, LLC
BY:  ANDREW A. MATHIAS
    MARK C. MOORE
    Attorneys for Defendant Code

ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
YOLANDA BUSTILLO, Paralegal Specialist USAO
EMILY GOLDMAN, Paralegal Specialist USAO

J4N9DAW1

1           (Jury not present)

2           THE COURT:  When we left off yesterday evening the

3      government indicated that they would be getting me some

4      language overnight concerning NCAA rules.  I take it you have

5      chosen not to go that route.

6           MR. MARK:  Yes, your Honor.  I think given the Court's

7      comments during voir dire that it's -- the government included

8      some language like that in the request to charge.  So I don't

9      think we need to belabor that point right now at the beginning

10     of trial.

11          THE COURT:  I think that's right.  And certainly you

12     can make some statement in your openings in that regard if you

13     wish, I think.

14          Is there anything else that the parties wish to bring

15     to my attention before 9:30?

16          MR. MOORE:  Yes, your Honor.  I think I mentioned

17     yesterday that there was a point I wanted to make.  And I'm

18     assuming that the Court may, if the Court wishes, have an

19     extended discussion about -- probably wants to do it in camera

20     as it relates to your granting of the government's motion in

21     limine with respect to UC1 and UC2.

22          But, we -- I've read your Honor's order under seal.

23     We also sent a Touhy letter which was copied I think in the

24     government's original motion in limine because we issued

25     subpoenas to four agents.  And we have never received a

J4N9DAW1

1   response from the FBI or the U.S. Attorney's Office

2   specifically to our *Touhy* letter because we do, intend to call

3   those agents as witnesses in the defense case.  And I think

4   that's a horse of a different color from the prohibition on

5   cross-examination concerning the matters that are reflected in

6   your Honor's order and whether we should be able to call those

7   agents.  So I simply wish to flag that for your attention.  We

8   obviously don't have to deal with it now.  But we would need to

9   deal with it at some point before we get to the defense case.

10  And I will tell your Honor that in Gatto we sent a similar

11  *Touhy* letter to the U.S. Attorney's Office and to the FBI.  We

12  received no response.  And when I raised it before Judge Kaplan

13  at the end of the case, because the government sought an

14  instruction in that case that both parties had equal access to

15  all witnesses, my point was that's not necessarily true with

16  respect to the Department of Justice employees.  Judge Kaplan

17  politely chided me and said I should have brought that to his

18  attention earlier.

19          Well, that case was a very different case than this

20  case and the defense in that case was a very -- is a very

21  different defense than the defense in this case.  And in that

22  case we basically admitted that our clients made payments to

23  players and their families.  Here, we deny that we made any

24  bribe payments to any coaches.  And so the conduct of the

25  undercover officers in pushing Mr. Code in particular and

J4N9DAW1

1   Mr. Dawkins to make bribe payments despite the fact that they

2   both said we don't believe that that is a viable model is very

3   much an issue in this case.

4           So in the first case I didn't push the envelope

5   because I didn't think I had to in that case.  In this case I

6   very much believe that it is absolutely essential to the

7   defense that we be allowed to call UC1 and UC2.  I understand

8   why at this point I may not have a great argument on

9   Mr. Carpenter but we'll see what develops in the government's

10  case.  And Mr. Convenient anywhere REUS who is the fourth

11  person who was listed with our subpoena is here.  So no

12  subpoena needs to compel his attendance.  But I simply wanted

13  to flag that for your Honor's consideration because we do

14  need -- we will need a ruling on the *Touhy* letter and I take

15  the position at this point that it's been over a month since I

16  sent the *Touhy* letter.  I received no response.  I take the

17  position that the government's denial of our request is, in

18  fact, they do intend to deny it, is arbitrary and capricious at

19  this point and their denial should be overridden by the Court

20  which has the authority to do so.

21          THE COURT:  Does anyone want to respond?

22          Mr. Marks.

23          MR. MARK:  Yes.  Just briefly, your Honor.

24          As an initial matter and as we laid out in our motion,

25  that related to the request for certain testimony related to

J4N9DAW1

1    certain FBI agents.  We acknowledge that the FBI had received

2    this *Touhy* request.  We acknowledge that there was a response

3    to it.  That response was going to be coming in the form of a

4    motion to preclude testimony that was sought under this *Touhy*

5    request.  That was not geared towards just testimony on

6    cross-examination.  It was prompted by the subpoenas that were

7    issued by the defense.  It was broadly as to testimony that

8    related to those subject matters.  And my read of the Court's

9    ruling was broadly that the Court issued a ruling precluding

10   evidence about that because it was completely irrelevant or if

11   it wasn't irrelevant it was unduly prejudicial.

12        So, I don't think it really matters whether the

13   defense is trying to get that through cross-examination or

14   through their case in chief.  That subject matter is sort of

15   out of bound, is our understanding of the Court's ruling.

16        THE COURT:  I understood Mr. Moore's argument -- and

17   he's standing up so he can speak for himself -- to be that they

18   were subpoenaing those agents for purposes of cross-examining

19   them on the facts that are at issue in this case.

20        MR. MOORE:  That's correct, your Honor.  I mean we can

21   put aside the alleged misconduct.  Because, as I reread the

22   government's motion last night, I reread all the pleadings and

23   I reread your Honor's order, and I believe that the

24   government's motion was directed at preclusion of

25   cross-examination of any witness with respect to the alleged

J4N9DAW1

conduct in Las Vegas.  My argument is that we should be allowed to examine those agents about the facts that are at issue in this case.

The facts that are at issue here are that the FBI pushed Mr. Code and Mr. Dawkins to make bribe payments for the purposes of trying to get a conviction despite the fact that Mr. Code and Mr. Dawkins repeatedly told the FBI agents and the cooperating witnesses that they did not believe that was a viable model.  Obviously there's a reason for the FBI to do that, because the FBI wants convictions of people.  And when you, as Mr. Code and Mr. Dawkins say, you don't need to pay coaches, that doesn't sit well with the FBI when it's looking for scalps.

THE COURT:  Just for my own benefit, Mr. Moore, I take it, given our conversation Friday, that the theory, as you've just described it, is that the agents pushed these defendants to make cash payments but that pushing, at least at this point, you're not saying -- that fell short of entrapment?

MR. MOORE:  I'm not going to speak for Mr. Dawkins and Mr. Haney.  I'll let Mr. Haney speak for himself.

I think that there are some entrapment issues here. However, I represent Mr. Code.  Mr. Code never made a payment to any coach.  Mr. Code never cautioned -- never told any coach to take a payment.  In point of fact, Mr. Code pushed back every time he had an opportunity to speak to an agent.  And

J4N9DAW1

1    Mr. Code, as we will present most likely in our defense, told

2    coaches who were on his list and people that he was introducing

3    not to take any payments from the agents because he did not

4    believe it was a viable model.  And every time someone

5    suggested to Mr. Code that you should make a payment, Mr. Code

6    pushed back.

7            I believe I should be able to question Mr. -- UC1 and

8    UC2 about why they were pushing so hard about the instructions

9    that they gave Mr. Blazer about pushing for this.  So I believe

10   that that is an issue in this case, your Honor.

11           MR. HANEY:  Your Honor, may I address just briefly on

12   behalf of Mr. Dawkins?

13           THE COURT:  Sure.

14           MR. HANEY:  My interest would be nothing other than

15   cross-examining on the facts of the case.  The order in the

16   Court is clear.  The misconduct is off limits.  However, as

17   Mr. Moore has noted, this coach's model was pushed by,

18   particularly UC1 who was the operative of D'Angelo who posed as

19   an undercover investor.  My client -- there's a lot of evidence

20   that my client impressed upon UC1 that that model was not a

21   model that would work and that he didn't feel that that was a

22   model that would result in signing players to the management

23   company.  My interest is only in cross-examining based on the

24   facts of the model that was promoted and created by the

25   undercover.  This wasn't a model.  This coaches' model, as

J4N9DAW1

1   referred to during the course of this trial, it was never

2   suggested as a model by Mr. Dawkins or Mr. Code during the

3   course of the trial.  We only want to cross-examine -- I only

4   really want to cross-examine to that particular point.

5           Thank you, your Honor.

6           MR. MOORE:  I just wanted to make one final point

7   before Mr. Marks stands up, since he's about to stand.

8           I take the position that their motion in limine is not

9   an appropriate response to a *Touhy* letter.  I was an Assistant

10  United States Attorney for 23 years.  We always responded in

11  letter form to *Touhy* letters that were provided to us by the

12  civil division or by chief division counsel from the FBI.  I do

13  not believe they responded to our *Touhy* letter, your Honor.

14          THE COURT:  Mr. Mark.

15          MR. MARK:  There appear to be two different things

16  that are being raised sort of in advance of openings.  One is

17  it sounds like there's some suggestions about what essentially

18  seems to be an entrapment defense or arguments about entrapment

19  defense.

20          I know Mr. Code said that he's not going to push an

21  entrapment defense.  He actually said in response to his motion

22  in limine that he wasn't going to advance one.  I assume that

23  he's going to cabin his opening remarks with that in mind.

24          As to the question of really what he is saying that he

25  wants to talk about is the thoughts and mental state of

J4N9DAW1

1    particular law enforcement agents in the conduct of this

2    investigation.  That is something that's sort of new to us and

3    that is also something that really should be absolutely off

4    limits.

5            There are some case law I believe that we cited within

6    our motion in limine that makes reference to that, that what is

7    going through the minds of a law enforcement agent who is

8    conducting an investigation is not the appropriate grounds for

9    discussion here at trial.  The question is really what the

10   defendants were thinking when they were taking their actions,

11   not what law enforcement agents were thinking when they were

12   taking their actions.

13           So to the extent that those are comments that they

14   want to put into their opening remarks, we would request that

15   those be precluded.  To the extent that they want to present

16   that in their defense case in chief, we're happy to brief those

17   issues for the Court.

18           MR. MOORE:  I'm not seeking to question an agent about

19   what was going through the agent's mind.  I'm seeking to

20   question an agent about what he told these gentlemen and why he

21   was pushing it so hard.

22           THE COURT:  Well now you just --

23           MR. MOORE:  But I'm also seeking to cross -- to

24   question him about what he told Mr. Blazer about whether

25   Mr. Blazer was to push this, and his statements to Mr. Blazer

J4N9DAW1

1    are admissions or statements of a party opponent.  They might

2    be hearsay if they came from the government, but they're not

3    hearsay if we seek to elicit them because they are agents of

4    the party opponent in this case, the United States.

5          THE COURT:  My understanding is that Mr. Blazer will

6    be testifying.

7          MR. MOORE:  Yes, sir.

8          THE COURT:  So why can't you just get that directly

9    from him?

10          MR. MOORE:  We do intend to ask him questions and then

11    we'll see whether we need to pursue this line of inquiry or

12    push this line of inquiry further.

13          We do not intend to make specific reference to these

14    issues in an opening statement.  We know what an opening

15    statement is supposed to be about and so we can cabin our

16    comments there.

17          But I simply wanted to flag this issue for the Court's

18    attention because it is a real issue in this case.  And I don't

19    want someone suggesting that I waived my argument.

20          THE COURT:  OK.

21          MR. HANEY:  Your Honor, briefly, since I'm making the

22    opening statement, may I make a comment with regards to what

23    I'm just hearing from the government?

24          THE COURT:  Sure.

25          MR. HANEY:  They're attempting to tell me what I can

J4N9DAW1

cabin during opening statement when there's direct evidence,
your Honor, that there's a point in time in the relationship
between my client and this undercover operative where that
undercover, UC1, tells my client:  This is the coach's model;
you're going to follow that model or I'm not going to fund you
anymore.

       Now, I don't know how they can suggest that that is
not something that should be addressed in an opening statement
when that's the direct evidence in this case.  And it's my
position, your Honor, I'm not going to mention entrapment
during the opening statement.  However, that is a very
fundamental pivotal point in the relationship between my client
and the undercover operative where at that point my client
says:  OK.  No problem.  You want to do it your way,
Mr. D'Angelo, you got all the money.  You're funding my sports
agency.  No problem.  I'm going to pay those coaches just like
you're telling me I have to do.  And then from that point
forward he does it.  He takes his money.

       And that is not some crazy theory, your Honor.  That
is what the evidence is going to be supported during the course
of this trial.  And to suggest that that can't be presented
during opening statement I would say would be patently unfair
when that's what happened.  And, certainly, I don't believe
that's hearsay.  If that statement was made by that operative,
it goes to the effect on the listener, my client, of what that

J4N9DAW1

1   was said to him.  And he moved forward from that point and he

2   did exactly what he said he was going to do.

3          Further, there's conversation the same day when the UC

4   tells my client that, where my client calls Mr. Code and goes

5   on and on about how ridiculous the UC's model is, his coaches'

6   model, how he's not going to follow that model.  Then they talk

7   on the phone, my client and Mr. Code, about how they're going

8   to take the guy's money.

9          And that is facts in this case as evidence.  And I

10  don't believe that I should be restricted.  And I'm not going

11  to mention entrapment.  I'm not going to suggest entrapment.

12  But I do believe it's fair in an opening statement to be able

13  to at least tell the story of what really happened here.  Thank

14  you.

15          MR. MOORE:  I was speaking, when I spoke about opening

16  statements, I was speaking about what I understand

17  Mr. Mathias's opening statement is going to be for our side.

18          THE COURT:  OK.  Mr. Mark, do you disagree with what

19  Mr. Haney said about what's appropriate for an opening

20  statement if he believes that during the course of this trial

21  the jury will hear certain conversations, why isn't he allowed

22  to comment on that or to talk about that?

23          MR. MARK:  We were never making the argument that

24  his -- I mean if he's going to present what his view on the

25  facts are, we never sought to preclude him from doing that in

J4N9DAW1

1    opening statement.

2              Our issues have only been to the suggestion of whether

3    any sort of pushing that he's saying happened from agents is a

4    reason that he needs to be found not guilty.  If he's just sort

5    of going through the evidence and making arguments about the

6    mental state of his defendant, or what his defendant did,

7    that's definitely something that we're not looking to preclude

8    him from presenting in an opening statement.

9              THE COURT:  Let me ask you about the *Touhy* letter,

10   Mr. Mark.  As you sit here, does the government have any

11   intention to respond or do you believe that you've responded

12   appropriately or what?

13             MR. MARK:  Your Honor, as Mr. Moore knows, when the

14   *Touhy* letter came in we gave that to the FBI as well as the

15   subpoenas that he issued.  We also enlisted counsel from the

16   civil division which is particularly informed in dealing with

17   this.  We expected that the motion in limine was, I think,

18   adequate at that time.  But what we want to do is go back to

19   our civil AUSAs and sort of enlist them; and if there's

20   anything else in addition that we need to do, we'll let the

21   Court know.

22             MR. MOORE:  I would take the position that any such

23   response is untimely, your Honor.  I just wanted to put that on

24   the record.

25             THE COURT:  Very well.

J4N9DAW1

1          Mr. Mathias, I'm not making any direction but that

2     looks like an OSHA violation over there.

3          MR. MOORE:  It was prompted by the government, your

4     Honor.  The government put those on our table.

5          THE COURT:  Anything else that anyone wants to bring

6     up?

7          So what we'll do when the jury is here -- hopefully

8     they'll all be here by 9:30 -- we'll swear them first thing.  I

9     will give some additional preliminary instructions and then I

10    will go to openings.

11         Who is going to be opening for --

12         MR. MARK:  I will for the government and can I -- may

13    I ask you a question.  I noticed the podium is tilted forward.

14    Does the Court have any concern if we change the tilt of the

15    podium?

16         THE COURT:  You can move it any way you want.

17         And Mr. Haney you will be opening?

18         MR. HANEY:  Yes, sir.

19         THE COURT:  And Mr. Mathias?

20         MR. MATHIAS:  Yes, sir.

21         THE COURT:  OK.  Unless there's anything else,

22    hopefully we'll see you at 9:30.

23         (Recess)

24         THE COURT:  Last count we were missing one or two

25    jurors.

J4N9DAW1

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, good morning.  Thank

3    you all for being so prompt.  We're going to begin today by

4    having you sworn.

5          Ms. Rivera.

6          (A jury of twelve and two alternates was impaneled and

7    sworn)

8          THE COURT:  Ladies and gentlemen, you are now a jury

9    and there is no higher function in our legal system.  From now

10   on whenever you enter or leave the courtroom as a jury the

11   parties in the audience will rise because you are every bit as

12   important to this process as any judge.

13         I want to give you some preliminary instructions now

14   and I will likely give you some instructions during the course

15   of the trial so that you will be guided as the evidence comes

16   in.

17         First, about the role of the judge and the jury.  In

18   the American system of justice, the judge and the jury have

19   separate roles.  My job is to instruct you as to the law that

20   governs the case.  I will give you some instructions now and

21   others from time to time during the trial.  At the end of the

22   trial I will give you detailed instructions about the law you

23   will need to apply when you deliberate.

24         Your job as jurors is to determine the facts based on

25   the evidence presented at the trial.  You are the only triers

J4N9DAW1

of fact and your decisions on the factual issues will determine the outcome of this case.

You must not take anything I may say or do during the trial as indicating what my opinion is or what your verdict should be.  It's not my job to even have such an opinion.  And if I did, it should not influence you in any way.

You must play close attention to all of the evidence presented.  Evidence consists of the testimony of the witnesses, exhibits that are admitted as evidence and any stipulations agreed to by the attorneys.  A stipulation is simply an agreement between the lawyers about facts or testimony.

Certain things are not evidence in the case and you must not consider them as evidence.  For example, the statements and arguments by the lawyers are not evidence.  They are simply arguments in which they will tell you what they think the evidence proves and how they think you should analyze the evidence.  My statements are not evidence either.

Questions by the lawyers are not evidence.  Only answers given by the witness are evidence.  So, for example, if a witness is asked:  It was raining that day, wasn't it?  And the witness says:  No, it wasn't.  Then, based on that question and answer, there is no evidence in the case that it was raining that day no matter how convinced the lawyers sounded when he or she was asking the question.

J4N9DAW1

1          Objections to questions are not evidence.  The lawyers

2     are obligated to make an objection when they believe evidence

3     being offered is improper under the rules of evidence.  You

4     should not be influenced by the objection or my ruling on it.

5          If the objection is sustained, ignore the question and

6     any answer that may have been given.  If the objection is

7     overalled, then treat the answer like any other.

8          Any testimony that I exclude or strike or tell you to

9     disregard is not evidence and you must not consider it.  If I

10    instruct you that some evidence is only to be considered for a

11    certain purpose, you must follow that instruction.

12          And, of course, anything you may see or hear outside

13    of the courtroom is not evidence and should be disregarded by

14    you.

15          Now, in deciding the facts of the case you will have

16    to decide the credibility of the witnesses; that is, how

17    truthful and believable they are.  Now, how do you decide what

18    to believe and what not to believe?  Well, you're going to

19    listen to the witnesses, observe them, and then decide just as

20    you would decide such questions every day in your ordinary

21    life.

22          Did they know what they were talking about?  Were they

23    honest, open, and truthful?  Did they have a reason to falsify,

24    exaggerate, or distort their testimony?  Is there any reason to

25    think they might be mistaken about what they're telling you?

J4N9DAW1

How did their testimony square with the other evidence in the case?

So what a witness says, the way the witness says it, and the rest of the evidence in the case will play important roles in your reaching a judgment as to whether or not you can accept the witness's testimony as reliable.

As the trial proceeds, you may have impressions of a witness or a subject but you must not allow these impressions to become fixed or hardened because if you do in a sense you foreclose consideration of testimony of other witnesses or other evidence that may be presented after the witness you heard.  And this would be unfair to one side or the other. Please remember that there may be another side to any witness's story and there may be more to come on any particular issue. You should not reach any conclusions until we have all the evidence before you.

Now, I just want to go over some of the rules that we went over yesterday before we left, some rules of conduct.  As I indicated, you should not discuss this case with anyone while the trial is going on, including with your friends and family members.  And this also includes not discussing the case even amongst yourselves until after all the evidence is in and you are charged and you begin to deliberate.

Next, you are not to read anything in the newspapers or anywhere else in the media about this case if that should

J4N9DAW1

occur.  You're not to listen to or view any reporting about
this case over the radio, on TV or on the internet.

         Next, don't do any research about the case.  Don't
Google anyone or go to any place concerning this case that you
may hear about during the course of the trial.

         Also, you are not to allow anyone to speak to you
about the case.  If that should happen, again, just politely
tell them that I have directed you not to discuss the case and
then tell Ms. Rivera that someone has approached you to attempt
to talk about the case and she will report that to me.

         Now let me just say a few words about the trial
procedure.  The trial has five parts.

         First, each side will have the opportunity to make
opening statements to you and they will do that shortly.  As
I've already told you, those statements are not evidence.
Their purpose is to give you an idea in advance of the evidence
that the lawyers expect you to hear from the witnesses.

         The government has the burden of proof so the
government will go first.  The defendant has no burden of proof
and does not have to do anything at this trial so the defendant
does not strictly speaking have to give an opening statement.
But if they wish to do so, they will go next.

         Second, after the opening statements you will hear the
testimony of the witnesses.  The government's witnesses go
first.  Each witness will first give direct testimony and then

J4N9DAW1                         Opening - Mr. Mark

1     he or she may be cross-examined by the other side.

2            Following the government's case the defendant may --

3     defendants may but need not present witnesses and other

4     evidence.  If the defendants do present witnesses, those

5     witnesses will be examined and cross-examined just as the

6     government's witnesses were.

7            If the defendant chooses to present evidence, it is

8     possible that the government would then present some rebuttal

9     to that evidence.

10           Third, after all the evidence has been received each

11    side will have an opportunity to make closing arguments.  These

12    arguments also are not themselves evidence.

13           Fourth, after these arguments or summations, as they

14    are called, I will give you detailed instructions as to the law

15    that applies and controls in this case.  And you must follow

16    those instructions.  These instructions to the jury are

17    referred to as the jury charge.

18           Fifth, and most importantly, after the jury charge,

19    you will go to the jury room to deliberate and discuss the

20    evidence in order to decide the facts and render a verdict.

21           We will now begin with the government's opening

22    statement.

23           Mr. Mark.

24           MR. MARK:  This is a case about money, bribes, and

25    basketball.  It's about the seedy underground of college sports

1    and two insiders who are looking to cheat to get ahead.  It's

2    about cash stuffed in envelopes that the defendant Christian

3    Dawkins stuffed -- put in the hands of basketball coaches in

4    some of the nation's top college programs.

5           Why did he do that?  He was setting up his own sports

6    agency.  Instead of landing clients the honest way, he was

7    willing to take shortcuts, to cheat, by bribing coaches so that

8    they would steer their best young student athletes to sign

9    contracts with him; young men, some of whom were only

10   teenagers, who were pawns in this scheme; kids who Dawkins

11   hoped would be worth millions of dollars to him when they later

12   became pros.

13          And who helped Dawkins in bribing these coaches?  This

14   man, Merl Code, a veteran of the sportswear giants Adidas and

15   Nike, a longtime mover and shaker in the basketball world with

16   deep connections.  Dawkins had recruited Code to help him land

17   new talent, including by bribing college coaches to gain access

18   to top players.  And as you will learn, Code got paid in

19   exchange for bringing dirty coaches to the table to get bribed.

20          But what the defendants and the coaches they were

21   bribing did not know was that many of their meetings were being

22   secretly recorded by the FBI and that's why we're here today.

23          Ladies and gentlemen, over the next few minutes I'm

24   going to give you a roadmap of the evidence that you're going

25   to see and hear in this case that proves the defendants' guilt

J4N9DAW1                          Opening - Mr. Mark

beyond a reasonable doubt.  And I'm going to do that in three

parts.  First, I'll tell you in a little more detail about how

this scheme to bribe college basketball coaches worked.

Second, I will talk about the different types of evidence that

you're going to see.  And third, I will give you a brief

description of what the charges are in this case.

        So all what will the evidence show?  You'll learn that

starting in 2015 Dawkins was working for one of the most

powerful basketball sports agents in the business and he was

responsible for recruiting top talent.  Even back then before

the FBI was ever on to him you'll learn that Dawkins was

successful because he cheated.  To influence young basketball

players to sign with him and his company, he paid.  He made

payments to the families of student athletes and he also paid

other people around those kids, like the player's college

coach, to encourage these student athletes to sign with him;

money to a college coach in exchange for the coach influencing

his player to sign a contract, a quid pro quo, a Latin term

that means this for that.

        You'll learn about a road trip Dawkins took in

March 2016 to South Carolina to meet with one of the coaches

that he was bribing.  During that meeting, which was secretly

recorded, Dawkins laid out how the whole scheme worked.  He

talked about how it was important to have access to young

college basketball players before they turned pro and how

J4N9DAW1                         Opening - Mr. Mark

1    college coaches had close relationships with their players so

2    they had a lot of influence over them.  During that meeting he

3    talked about how coaches could help deliver their kids to sign

4    with him and how the coaches could fend off or block out other

5    agents and advisers who wanted to work with those players.

6           In 2017 you'll learn that Dawkins went out on his own.

7    He formed a new sports management business, and Dawkins had

8    several partners in that business, including a financial

9    adviser and investors.  But while his business was new, his

10   playbook was the same:  Cheat.  Pay the families of student

11   athletes.  Bribe coaches.

12          To do this Dawkins recruited one of the most connected

13   people in all of college basketball, Merl Code, who was then a

14   consultant at Adidas.  Dawkins and his new business partners

15   brought in Code to introduce them to dirty coaches who would

16   steer their players to Dawkins's new company.  And Code got

17   paid for making these connections.  By this point, unbeknownst

18   to Dawkins and Code, the FBI was onto them and Dawkins' new

19   wealthy investors were, in reality, undercover agents.

20          In a series of meetings the bribes continued to flow.

21   They were paid to coaches from all around the country, coaches

22   at schools like the University of South Carolina, the

23   University of Arizona, the University of Southern California,

24   Creighton University, and at Texas Christian University.

25          Some of these bribes were a couple thousand dollars

1  and some of them were more than ten thousand dollars.  Some

2  were paid right here in New York and some were paid at a fancy

3  hotel suite in Las Vegas in the summer of 2017 when coaches

4  were then in town doing recruiting.

5           The coaches who were bribed in Las Vegas were part of

6  a list that was developed by Dawkins and Code together.  Code

7  had helped schedule meetings with these coaches in Las Vegas

8  and was paid for delivering some of them to Dawkins and his new

9  company.

10          Why was Code doing this?  Simple.  Greed.  You'll hear

11  a call where Dawkins asked Code how many coaches he can help

12  get them to meet.  And Code responds:  How many are you paying

13  me for?

14          Code also was concerned about an impression Dawkins's

15  new investors would make on the coaches Code was introducing.

16  Code didn't want the investors spooking the coaches they were

17  trying to bribe or the kids that they were looking to sign.

18          So Code and Dawkins tried to teach Dawkins's new

19  investors, the undercover agents, how to operate; that it's

20  better sometimes to not put cash right in the hand of a coach

21  but to have the coach tell you first how he wants to be helped;

22  not because they had any qualms about paying coaches but

23  because they wanted to do it strategically, as needed, such as

24  by supplying money to coaches who wanted it to recruit top high

25  school basketball players to play for their school even though

J4N9DAW1                         Opening - Mr. Mark

that was against the school's rules.

During the meetings with coaches in that Las Vegas
suite that Code helped set up, the coaches they met with
offered to steer kids to Dawkins's new business.  And Dawkins
and his partners offered, in return, to help the coaches in
whatever way they could.

What did it mean to help?  It meant money.  And some
of these coaches got paid right on the spot in envelopes
stuffed with thousands of dollars of cash.  And some of the
coaches they agreed to pay later when the coaches needed it.

Why did it make sense for Dawkins and Code to pay
these college coaches?  That was simple too.  Some of the most
talented, young, amateur basketball players play in college.
They can't go straight from high school to the NBA, the best
professional basketball league in the world.  So, instead, they
typically attend college for a year or two before turning pro.
And because these college kids, many of whom aren't even 21
years old and they were usually focused on playing what they
loved, basketball, Dawkins and Code knew they could be
influenced with the most important business decisions of their
lives if Dawkins and Code pulled the right levers.  And what
were the levers?  Well one of them was the coaches.

As the defendants will tell you themselves in their
own words during recorded calls and meetings, paying off the
people that those kids trusted, who served as mentors to them

1   and had enormous influence in their young lives was a key to

2   success.  In the words of one of the coaches whom Dawkins and

3   Code bribed, he could mold the players and put them in the lap

4   of you guys.  Those are the words of a college coach who was on

5   the list created by Code and who was paid bribes by Dawkins.

6            And you'll hear that after these coaches got paid they

7   worked to steer their best young, college basketball players to

8   Dawkins's company, just as the defendants wanted.  The coaches

9   identified some of these players for Dawkins as layups, which

10  is an easy shot in basketball.  And you'll hear one of these

11  coaches explain just why it would be so easy, because that

12  coach, who Dawkins had already paid, was going to be the one

13  making all of the decisions for his player when the student

14  athlete turned pro.  But, as you'll hear, before these coaches

15  could steer their players to actually sign with Dawkins and his

16  company, the defendants were arrested and their scheme was

17  exposed.

18           So that's a summary of the defendants' illegal

19  schemes.  How will you learn that's what happened?  In several

20  different ways.  Primarily by hearing the defendants tell you

21  all about it themselves.  You're going to hear the defendants'

22  own words recorded at numerous meetings and captured on dozens

23  of phonecalls intercepted during the course of the

24  investigation pursuant to court-authorized wiretaps.

25           You'll hear the defendants explain in detail the

J4N9DAW1                         Opening - Mr. Mark

1   scheme, plotting how to make payments, deliver them in person,

2   and in cash, to avoid a money trail, and how they hoped to make

3   millions by creating the most successful new sports management

4   company in the process.

5           You're going to also hear that several of the people

6   Dawkins and Code were dealing with were actually working with

7   the government, including, as I mentioned earlier, two

8   undercover FBI agents who were posing as Dawkins's investors.

9           You'll hear how the defendants and the coaches they

10  were bribing knew what they were doing was wrong.  So they were

11  suspicious of dealing with the new investors.  And how careful

12  they thought they needed to be to avoid getting caught.

13          You'll hear calls that they thought nobody was

14  listening to in which they outlined the steps they took to

15  avoid a trail of evidence; how one of the coaches didn't want

16  to touch the money and, instead, told Dawkins that he wanted to

17  all go through you; how concerned Code was that someone might

18  learn what they were doing or listen to his phonecalls; how

19  Code wanted to only receive money from Dawkins because he

20  trusted Dawkins and, like some of these coaches, never wanted

21  to get money from anyone else; and how the defendants tried to

22  avoid talking about corrupt payments in text messages and used

23  code or special words so that their under-the-table payments

24  could not be easily detected.  And you'll hear calls laying out

25  how even though Code was being paid thousands of dollars a

1    month for making introductions to coaches who would steer their

2    players to Dawkins's new company, Code wasn't satisfied.  He

3    wanted even more.  He didn't want his contribution to be, in

4    his own words, devalued.

5             You'll also hear in this trial from two cooperating

6    witnesses.  You'll hear from a financial adviser who made

7    payments to some of the college coaches with Dawkins and he did

8    that while he was working with the government in connection

9    with this investigation.  You'll hear that this financial

10   adviser had managed money for athletes and after the government

11   learned that he misused some of those clients' money, he agreed

12   to cooperate with the government by making recordings in the

13   world of college sports.  He will tell you about his dealings

14   with Dawkins while cooperating and you will hear recordings

15   that he made of those dealings.

16             You'll also hear from another financial adviser who

17   was a partner in Dawkins's new company and he was hoping to

18   make -- to manage college basketball players' money after they

19   turned pro.  Unlike the first financial adviser I just talked

20   about, this one was working with Dawkins before he started

21   cooperating with the government.  So he'll give you a firsthand

22   insider's account of how he engaged in this bribery scheme with

23   Dawkins and Code.

24             Both of those men have pled guilty to various crimes

25   and they're going to be testifying pursuant to agreements with

J4N9DAW1                        Opening – Mr. Mark

1    the government in the hope of receiving leniency for their

2    cooperation.  So you should keep that in mind as you evaluate

3    their testimony.  Ask yourselves whether it's corroborated or

4    backed up by all of the other testimony and evidence that

5    you're going to see in this case.  When you do that, you will

6    see that it's consistent with and backed up by all the evidence

7    I've just described.

8         Finally, you're going to hear from senior

9    representatives from the universities where some of these

10   college coaches worked.  They'll tell you about the duties and

11   obligations the college coaches owed to their schools and how

12   they were expected to run a clean program and help protect

13   players from being taken advantage of by unsavory business

14   advisers and agents like the defendants.  And they will tell

15   you how the bribes coaches received from these defendants harms

16   the schools and the kids.  And these coaches were supposed to

17   be mentors to these young athletes, some only teenagers, but

18   instead they treated these players as pawns to be exploited for

19   their own personal profit.

20        For what they did, Dawkins and Code are now charged

21   with multiple crimes.  For agreeing and working together to pay

22   various college men's basketball coaches to steer young men to

23   the defendants and their company and to reward them for doing

24   that, Dawkins and Code are charged with conspiring to commit

25   various bribery offenses.  Dawkins and Code are also charged

J4N9DAW1                        Haney - Opening

1    with conspiring to commit honest services fraud because, as you

2    will learn, it's a separate crime to deprive the college of the

3    honest services of their employees, here the coaches, by

4    agreeing to bribe them.  Dawkins is also charged with

5    committing various bribery offenses by actually putting cash

6    bribes in the hands of certain coaches.

7            Now, at the close of this case when all of the

8    evidence is in we're going to have an opportunity to talk with

9    you again.  But between now and then we ask that you do three

10   things.  First, listen closely to the evidence.  Second, follow

11   Judge Ramos's instructions on the law.  And third, use your

12   common sense, the same common sense you use in your everyday

13   lives.  And if you do those three things, the defendants will

14   get a fair trial and you'll reach the only conclusion that's

15   consistent with the evidence and the law, that the defendants

16   are guilty.

17           THE COURT:  Thank you, Mr. Mark.

18           Did Mr. Dawkins wish to make an opening statement?

19           MR. HANEY:  I do.  Thank you, your Honor.

20           Good morning, ladies and gentlemen.

21           Thank you for your time, your patience, and your

22   service for all you'll be doing for us over the next several

23   days.

24           Now, the intended objective of my opening statement

25   will be for me, as an officer of the court, to tell you as

J4N9DAW1                         Haney - Opening

1    honestly and forthrightly as I can what I expect the evidence

2    is going to show during the course of this trial; evidence that

3    at the end of the trial you all will be tasked with the very

4    important job of doing, of placing that evidence on a

5    figurative scale and weighing it and determining whether or not

6    the government proved their case beyond a reasonable doubt.

7               Now, it's not my job to explain to you or define what

8    reasonable doubt is.  The judge will do that at the end of the

9    trial in the instruction.

10              But I can tell you reasonable doubt is the highest

11   burden that exists in our system, our legal system.

12              And, ladies and gentlemen, my client, Christian

13   Dawkins, has no burden of proof.  That burden is the

14   responsibility and the obligation that rests solely and

15   squarely on the shoulders of the U.S. Government and the

16   prosecutors in this case.

17              So, we're going to embark upon this process of trial

18   with the evidence, not me, and I'm careful to use the word

19   story.  Because sometimes it opens the door for people to say

20   stories aren't true.  So I want to make it clear the story

21   you're going to hear today is not from me.  It's from the

22   evidence that you're going to hear during the course of this

23   trial.  And I submit to you all, in your lives on this planet,

24   it will be a story you will never forget.

25              We're going to start this story on June 6, 2017.  On

1    that date my client, Christian Dawkins, is only 22 years old.

2    And he's waiting for a friend to arrive, down at the North Cove

3    Marina in Lower Manhattan near Battery Park.  Some of you may

4    be familiar with where that is.  And on this date his friend

5    shows up, a man by the name of Munish Sood.  The government

6    didn't mention his name during their opening.  I'm going to.

7         Munish Sood is his friend.  You're going to find from

8    the evidence that Christian, my client, and Munish are an odd

9    paring.  My client is a 22-year-old kid who graduated from

10   Saginaw High School in Saginaw Michigan.  Munish Sood is a

11   40-something-year-old banker out of Princeton, New Jersey.

12        But you're going to find that Christian Dawkins and

13   Munish Sood are not just friends, they're also business

14   partners in a new business venture that brings them together on

15   this fateful day as they walk down the docks to board a

16   two-story yacht in the harbor.

17        I didn't hear anything about a yacht in the opening

18   statement either.

19        I don't know about you all.  I've never heard of a

20   story where two guys get on a yacht where it turns out good.

21   And we'll see if this one does.

22        Now, the evidence is going to show that Christian and

23   Munish, they board that yacht that day for the purposes of

24   meeting a young wealthy couple; now, not a couple that's

25   romantically involved but a couple of investors and their names

1    of Jeff D'Angelo and Jill Bailey.  And Jill, you're going to

2    find, she's a 30-something blond; very attractive, very nice

3    lady, very pleasant.  Jeff, not much older, maybe in his

4    mid 30s, looks like a guy that just got done with a round of

5    golf at the country club.  He's got the sweater tied around the

6    neck with the khaki pants on and the Sperry shoes, you know the

7    type.

8          And this young wealthy couple, Jeff D'Angelo and Jill

9    Bailey, they're looking to invest money in a company that

10   Christian Dawkins had just started up a month earlier.  Imagine

11   that.  He's 22 years old and he just started a company.  And

12   the company was called Lloyd Management.  Loyd.  Living Out

13   Your Dream.  Something like something a 22-year-old would do.

14         And Loyd management was going to be a sports agency.

15   And the plan was Christian Dawkins, he was going to be the

16   sports agent of Loyd Management because that was his dream:

17   One day to be a bigtime NBA basketball agent.  And Munish Sood,

18   the banker from Princeton, New Jersey, with the finance

19   background, he was going to be the financial planner.  He was

20   going the to invest all the multimillions of dollars that the

21   future clients were going to invest in Loyd Management.  See,

22   Christian and Munish, they had it all figured out.  The only

23   thing they didn't have was money.  And that's why they were on

24   the yacht that day down in Battery Park.

25         Now you're going to find from the evidence in this

1    case that this meeting with Christian Dawkins and his partner

2    Munish Sood on this yacht in Battery Park it wasn't by chance.

3    This meeting was set up -- appropriate words -- by a man by the

4    name of Louis Martin Blazer, III.  Goes by the name Marty

5    Blazer.  Sounds like something out of an action film.

6             And you're going to learn from the evidence that Marty

7    Blazer, you see, he's got all kinds of problems back in 2017.

8    He had been indicted by the federal government.

9             Marty is going to come in the courtroom and testify in

10   this case.  And Marty had been charged with all kinds of

11   federal crimes like securities fraud, wire fraud, aggravated

12   identity theft.  I don't know what that is.  Doesn't sound

13   good.

14            And Marty had a plan.  And the reason Marty was

15   charged with all these crimes, you're going to find from the

16   evidence is Marty had a company too called Blazer Capital.  And

17   in lay people's terms, Marty was stealing his clients' money,

18   money they were entrusting him to invest.

19            Ready for this?  He's stealing their money, in part,

20   to fund horror movies out in Hollywood.  Can't make it up,

21   ladies and gentlemen.

22            But Marty had is a solution to some of his problems.

23   I'm not going to give away the story but part of his solution

24   included getting Munish and Christian to get on that yacht that

25   day down in Battery Park.

1          Now you're going to find from the evidence that at

2     some point, as Christian and Munish and Marty is at the meeting

3     too, are on the yacht docked off the waters in Battery Park,

4     there's a point in time we're Jeff D'Angelo goes down into the

5     galley of the yacht.  I'm not a yacht guy.  I'm from Michigan,

6     and our water is frozen nine months out of the year so I'm not

7     sure what the lower level of the yacht is called, but Jeff

8     D'Angelo goes down to the lower level of the yacht.  And he

9     returns up the staircase with a duffel bag.  And he goes over

10    to the table where Christian Dawkins and others were all

11    congregated.  And he sets the duffel bag on the table, Jeff

12    D'Angelo does, and he unzips the duffel bag to reveal its

13    contents and presents it to Mr. Dawkins, the 22-year-old kid

14    from Saginaw.  And inside the duffel bag is tens of thousands

15    of dollars in cash.  I don't know exactly how much.  But tens

16    of thousands of dollars in the duffel bag.

17          Hit the pause button for a moment.  Do you think at

18    that point Christian Dawkins said, Wait a minute, Mr. D'Angelo.

19    I don't know if I'm comfortable with all that cash in that

20    duffel bag.  How about Munish Sood, the 45-year-old banker from

21    Princeton, New Jersey, presumably the voice of morality and

22    reason in the dynamic duo of Loyd Management?  Do you think he

23    said, Zip the duffel bag back up, and pushed it towards

24    Mr. D'Angelo and said, You know what, I don't feel real

25    comfortable with all that cash in that duffel bag.  How about

J4N9DAW1                          Haney - Opening

1    if I give you some wiring instructions, or perhaps you can make

2    out a certified check to Loyd Management?

3              No.  You're going to find from the evidence that

4    Christian Dawkins and Munish Sood, they were real comfortable

5    with that duffel bag full of cash on the yacht in Battery Park,

6    and the evidence will show Christian Dawkins picked up the

7    duffel bag, walked off the yacht, down the docks, into the

8    streets of New York.

9              Now, it's important that as you hear this case, and

10   the government explained to you some of the charges that are

11   facing my client, Christian Dawkins, and Mr. Code, that these

12   are crimes of specific intent.  Again, I'm not going to

13   instruct or talk to you about what that means.  However, you

14   are going to have to somewhat get into the mind of the young

15   man here and figure out what was going on.

16             As you're going to learn a little bit about Christian

17   Dawkins during the course of this trial, you're going to learn

18   that not only is he just 22 years old, he's from a town called

19   Saginaw, Michigan.  And I don't presume any of you know where

20   Saginaw, Michigan is.  It's a town of 70 miles northwest from

21   Detroit, economically underprivileged, dangerous little city;

22   affectionately known by us Michiganders.  I'm from Michigan.

23   I'm a Michigander.  That's what they call us.  Affectionately

24   known as Sag-Nasty.  Not in a bad way.  Not in a pejorative

25   manner.  They call it Sag-Nasty because you've got to be a

1    little nasty to come out of Saginaw, Michigan.  You've got to

2    be a little tough, a little resilient; you've got to be a

3    hustler, in the most complimentary of ways.  And people from

4    Saginaw, Michigan make the most of opportunities because they

5    don't come around very often.

6        Ladies and gentlemen, you're going to find that on

7    this day, on that yacht in Battery Park, when that young man

8    was facing that duffel bag with thousands of dollars of cash,

9    that represented an opportunity for him to take his sports

10   management company and make it a reality, to live out his

11   dreams of being an NBA agent.

12       Now you're going to find from the evidence that after

13   this meeting, immediately after this meeting, for the next

14   several months thereafter, the months of May, June, July,

15   August, end of September, Christian Dawkins spends the next

16   several months working side by side with his new business

17   partners, Jeff D'Angelo and Jill Bailey, and Mr. Sood and

18   others.  And they travel the country, as the government noted.

19   They have meetings in hotels, including Las Vegas.  And

20   Christian Dawkins begins introducing his sports network to his

21   business partners.

22       What you're going to find from the very beginning of

23   this business relationship between Christian Dawkins and Jeff

24   D'Angelo, they don't get along.  You see, Christian Dawkins

25   didn't know too many guys like Jeff D'Angelo when he grew up in

Saginaw, Michigan.  And he doesn't like Jeff D'Angelo.  And
you're going to find, like most business disagreements, their
disagreements are based on money.  You're going to find from
the evidence that some of it is a little offensive.  I'm going
to let you know.  Christian Dawkins, he calls Jeff D'Angelo
stupid.  He calls him an idiot.  He uses other pejorative terms
often preceded by the F word.

But you're going to find that Christian Dawkins
believes that Jeff D'Angelo, who he refers to often as the
young kid with the bread, or the young guy with the family
money, you're going to find from Christian Dawkins he believes
Jeff D'Angelo has one purpose and one purpose only, and that's
to fund Loyd Management; nothing more, nothing less.

You're also going to find, as the government
referenced, there was a good reason why Christian Dawkins had
very strong opinions about how Loyd Management should be
founded and how it should be structured.  Because, you see,
prior to launching this sports agency, Loyd Management,
Christian Dawkins, barely out of his teens, had landed his
first job working for one of the biggest sports agencies in the
world here in midtown Manhattan, a sports agency called ASM
that was run by a powerful agent, basketball agent by the name
of Andy Miller.  And ASM represented some of the most prominent
name in basketball.  And while at ASM, even though he was
young, in his early 20s out of high school, Christian Dawkins

1    was not the kid going down getting the bagel and the coffee in

2    the morning.  He, in fact, was a rainmaker at ASM.  He was

3    their top runner.  He was their top recruiter, their top

4    relationship guy; a guy barely, again, out of high school, who

5    was trained and mentored by some of the most powerful agents in

6    sports, many of these guys lawyers.

7         And Christian Dawkins, when he was at ASM, he was the

8    guy who did all the dirty work for these agents at ASM.  He did

9    the things that the attorneys there didn't want to do, were too

10   old to do -- and don't forget this one:  If they ever got

11   caught, they could say they didn't do it.

12        So young Christian Dawkins was very valuable to ASM,

13   so valuable the evidence will show that the government now

14   seeks to blame him for things he was doing for his bosses back

15   in 2015 and 2016.

16        And despite having no experience at all in the sports

17   management space, which he didn't, Jeff D'Angelo had his own

18   business model that he wanted to employ, his own business model

19   that he thought would be the best way to sign an employer,

20   future clients to Loyd Management.

21        And you see Christian Dawkins didn't want to do that

22   model.  He didn't like that model.  And Christian Dawkins

23   you'll find from the evidence made it very clear he thought the

24   model Jeff D'Angelo wanted to employ was a waste of money.

25        So what is the modeled that Jeff D'Angelo wants to do?

1    Well Jeff D'Angelo tells Christian Dawkins and others he

2    believes the best way for their new sports agency to acquire

3    clients is to pay college basketball coaches that the

4    government has characterized as bribes, to hopefully influence

5    the players on the college basketball teams that the coaches

6    were coaching to sign one day future management contracts with

7    Loyd Management.  This was Jeff D'Angelo's business model.

8    You'll hear it referred to during the course of the trial as

9    the coaches' model.  You'll hear Christian Dawkins and Merl

10   Code refer to it as the coaches' model during the trial.  Now,

11   you're going to find from the evidence undeniably Christian

12   Dawkins thought the coaches' model was a complete waste of

13   money.  And you'll learn from the evidence why he felt that

14   way.

15          Now don't get me wrong.  I'm not going to mislead you

16   and suggest that Christian Dawkins would have been morally

17   opposed necessarily to paying coaches.  You'll see from the

18   evidence while he was employed at ASM, working for his bosses,

19   they would pay pretty much whoever they needed to to get

20   clients.  That occurred.  Because that was his job.

21          But the evidence will overwhelmingly show that

22   Christian Dawkins believed paying coaches made no business

23   sense and that Christian Dawkins would have rather had the

24   money in his pocket to decide how to best use it to operate

25   Loyd Management.

J4N9DAW1                        Haney - Opening

1           And then on the date of June 28, ladies and gentlemen,

2    in 2017, I submit the evidence will show a seminal moment

3    occurs in the relationship between Jeff D'Angelo and Christian

4    Dawkins.  For those who aren't familiar with what a seminal

5    moment is, think back on any relationship you may have had in

6    your past, a relationship, perhaps a marriage or a job or a

7    first love that didn't work out.  Usually over the passage of

8    time you can look back and point at a particular instance that

9    occurred where that relationship wasn't going to work out.

10          And on June 28, 2017 there's a seminal moment between

11   the relationship with Jeff D'Angelo and Christian Dawkins when

12   Jeff D'Angelo tells Christian Dawkins that he is funding Loyd

13   Management and Christian Dawkins is to follow the coaches'

14   model and pay college basketball coaches.

15          So what does Christian Dawkins do?  And you're going

16   to find, if you remember that date of June 28, 2017, the very

17   day that seminal moment occurs, Christian Dawkins does

18   something, ladies and gentlemen, wildly immature, admittedly

19   dishonest, and I submit probably not too unpredictable.  That

20   very day, the dude with the bread, the young guy with the

21   family money, the guy that he can't get along with tells him

22   he's going to do what he wants him to do.  Christian Dawkins,

23   you're going to find from the evidence, he contacts his friends

24   and he vents to them about his disgust of Jeff D'Angelo and the

25   idiocy of the coaches' model.  And one of the first people

J4N9DAW1                          Haney – Opening

1    Christian Dawkins is going to call on that same day, on

2    June 28, 2017, is his good friend, Mr. Merl Code.

3              And he calls up Mr. Code and he tells Mr. Code, The

4    coaches' model doesn't make any sense.  And then he tells

5    Mr. Code, I ain't going to pay no coaches.  I know what I'm

6    going to do.  And Mr. Code knows Mr. Dawkins so he finishes his

7    thought.  And he says, We're going to take these fools' money.

8    And Christian Dawkins says, Exactly.  I try to do things the

9    right way but they won't listen.  So I'm going to take their

10   money.

11             And ladies and gentlemen, that's what he did.

12   Christian Dawkins is going to teach the young dude with the

13   bread a lesson.  And, in fact, you're going to be presented

14   with evidence, overwhelming evidence that's exactly what he

15   did.  There's going to be evidence that, yes, Jeff D'Angelo, he

16   did give Christian Dawkins money, tens of thousands of dollars

17   to pay coaches.

18             Yes, Christian Dawkins told Jeff D'Angelo he was going

19   to go pay those coaches, but he didn't.  And I'm going to show

20   you he didn't.  I'm going to show you on one occasion the

21   evidence is going to show that on one occasion he got cash from

22   Jeff D'Angelo in Las Vegas, told Jeff D'Angelo he was going to

23   go out in the hallway and pay a coach.  And he took the

24   elevator downstairs and went out onto the streets and went down

25   to the Bank of America and he starts feeding the ATM machine

J4N9DAW1                        Haney - Opening

with thousands of dollars.

         Honest?  No.  Did he bribe a coach?  The evidence is
going to show he absolutely did not.

         And if that isn't crazy enough, Christian Dawkins
doesn't stop there.  He wants everyone to teach Jeff D'Angelo a
lesson.  You're going to be presented with evidence that
Christian Dawkins calls up his good buddy, Book Richardson, the
associate head coach at the University of Arizona, a coach that
Christian Dawkins is charged with bribing in this case.  And he
calls up Coach Richardson.  And he gives Coach Richardson a
little playbook how to hustle the money right out of Jeff
D'Angelo too.  Actually says to him, Look, here's what the play
is going to be.

         Now, I'm from Detroit, Michigan.  If I hear somebody
say this is what the play is going to be, that means somebody
is about to lose some money and get hustled.

         And you're going to hear from the evidence when
Christian Dawkins calls Book Richardson and tells him what the
play is going to be, Book laughs and says to Christian Dawkins,
What do I got to do to make sure you and I are good?

         Quid pro quo.  You heard those words, right?  Sounds
like there's going to be some promise or return or agreement.

         Christian Dawkins says in response to, What do I got
to do to make sure you and I are good, Christian Dawkins said,
I am Gucci.

1          Now I don't know if any of you know what that means.

2     I have a feeling they don't know what that means.  But the

3     evidence is going to show that "I'm Gucci" means I'm good, I

4     don't need anything from you.  And the evidence is going to

5     show Christian Dawkins goes on and tells Book Richardson, I

6     don't care what you do with the money.  I don't need anything.

7     Go on vacation if you want.

8          So what does Book Richardson do, the coach of Arizona?

9     He gets $20,000 too out of Jeff D'Angelo, just like Christian

10    told him the play was going to be.  And you're going to see

11    evidence Tony Bland, coach from USC; Lamont Evans, coach of

12    Oklahoma State; Preston Murphy, coach of Creighton; Corey

13    Butler, another college basketball coach from Texas Christian;

14    and others, including the government's own cooperating witness,

15    they all take the school's money.

16         In fact, the government's own cooperating witness,

17    Munish Sood, is going to testify in this case, you're going to

18    find evidence that he's telling Christian Dawkins, calling Jeff

19    D'Angelo an idiot.  And at one point when Christian Dawkins and

20    Munish Sood are laughing about why would Jeff D'Angelo have

21    paid Book Richardson, Munish Sood says, Hey, he's asleep.

22    Don't wake him up.

23         Ladies and gentlemen, my client, the young kid from

24    Saginaw, Michigan, he's loving every minute of it.  In fact,

25    you're going to find they all are.  They're all laughing about

1  how easy it is to take Jeff D'Angelo's money.

2          Here is the greatest part of the story at all, ladies

3  and gentlemen.  The guy with the bread, the young dude with the

4  family money, the guy with thousands of dollars in cash on the

5  yacht in Battery Park, the guy who Merl Code and Christian

6  Dawkins are laughing about taking the school's money, the guy

7  who is getting hustled out of his money, every step of the way,

8  he is not an investor after all.  He is an undercover FBI

9  agent.  And Christian Dawkins, Munish Sood, and others have no

10 idea.

11         Now, ladies and gentlemen, in closing, I want you to

12 remember the most important thing I can impress upon you in

13 this opening statement.  This is not a case of whether or not

14 Christian Dawkins was wrong about teaching Jeff D'Angelo a

15 lesson.  This is not a case of whether or not Christian Dawkins

16 was wrong about hustling a bumbling, fumbling FBI agent out of

17 his money.  This is not a case of whether Christian Dawkins was

18 wrong about defrauding an investor.  This case is simply a case

19 of whether or not my client took that money from Jeff D'Angelo

20 with the intent of bribing coaches.  And, ladies and gentlemen,

21 I submit to you based on the evidence that you're going to see

22 that simply did not happen.  And I submit that after you hear

23 the evidence in this case that I promise you're going to hear

24 during this trial, you will all not just come back, you will

25 race back with a verdict of not guilty to tell the government

J4N9DAW1                    Opening - Mr. Mathias

1     that you are not going to condemn a man for something he did

2     not do no matter how embarrassing it may have been.

3              Thank you.

4              THE COURT:  Thank you, Mr. Haney.

5              MR. HANEY:  Thank you, your Honor.

6              THE COURT:  Did Mr. Code wish to make an opening

7     statement?

8              MR. MATHIAS:  Yes, your Honor.

9              THE COURT:  Mr. Mathias.

10             MR. MATHIAS:  May it please the Court, counsel, and

11    ladies and gentlemen of the jury.  My client, Merl Code, his

12    story is not inconsistent with Christian Dawkins's store but he

13    is not the star of this show.  He is not the star of the show.

14             Merl Code had no problem getting paid to introduce

15    coaches to Jeff D'Angelo but he did not get paid to bribe

16    coaches.  On June 20, 2017 Merl Code flew here, New York City,

17    from his home in Greenville, South Carolina.  He was here to

18    meet his friend, Christian Dawkins, and people who he thought

19    were investors in Loyd Management.  Well, there were additional

20    people in the room.  We now know that two of those folks in

21    that room, Jeff D'Angelo and Jill Bailey, were undercover FBI

22    agents and a third was the long-term fraudster named Marty

23    Blazer.  He was working undercover for the FBI to try and keep

24    himself out of jail.  You've heard about some of the crimes to

25    which he's pled guilty.  Some of them -- some of them included

fraud, identity theft, and creation of false documents to

deceive government agents.  He is not just someone who misused

investor funds.

        In that room the FBI agents and Blazer were trying to

trap Mr. Code, Mr. Dawkins, a guy named Munish Sood, who you

heard about, and others in the alleged conspiracy that we're

here talking about.  This conspiracy was dreamed up by the FBI

and Blazer.  It was their idea to pay bribes to college coaches

in exchange for the coaches sending topnotch future NBA players

as clients to Loyd Management.

        As the evidence will show, Merl Code did a lot of

listening and some talking at that meeting on June 20.  He

explained how the business side of basketball worked.  When the

idea of sponsoring colleges or paying coaches came up, Merl

said it was a bad idea and unnecessary.  And he's got a lot of

experience in basketball.  The evidence will show, in Merl's

mind, if the goal is to get clients for Loyd Management, paying

coaches was not the way to go.

        Also, the evidence will show that on multiple

occasions Merl resisted the proposal cooked up by the

undercover FBI agents and Blazer who were pushing the plan to

pay coaches so that they could try and rack up convictions for

the FBI and a favorable plea deal for Mr. Blazer.

        You'll also hear evidence that there were meetings

between various assistant coaches, D'Angelo, and Marty Blazer

1     in Las Vegas the last week end in July of 2017.  Merl was not

2     at those meetings.  He has no firsthand knowledge of what took

3     place at those meetings.

4              You will hear evidence that before and after these

5     meetings Merl told Christian, Blazer, Munish Sood that no one

6     was to pay his guys.  No one was to pay his coaches.

7              And you'll hear evidence that when arranging the

8     meetings in Las Vegas he told his guys, his coaches, do not

9     take money.  He was getting paid to introduce coaches to

10    D'Angelo, not to get coaches to D'Angelo who were willing to

11    take bribes.  Nonetheless, Merl Code is sitting in this

12    defendant's chair today because the government says that he was

13    part of the conspiracy to bribe college coaches.

14             The government has to prove each and every element of

15    the crime with which Merl is accused beyond a reasonable doubt.

16    I submit the government will be unable to carry its burden for

17    one simple reason.  The evidence will show that Merl Code did

18    not want to bribe coaches.

19             So who are the people with me today?  I'm Andrew

20    Mathias from Greenville, South Carolina where Merl is from.

21    Also with me are Mark Moore and Allen Chaney.  You'll see us up

22    here at various parts of the trial.

23             Who are the judges in this courtroom?  Might be not a

24    question.  Obviously, Judge Ramos is the presiding judge.  But

25    all of you are judges.  You are the judges of the facts.  You

J4N9DAW1                    Opening - Mr. Mathias

1   and you alone collectively decide whether the government has

2   met its burden of proof and you will do so based on the

3   application of your own good common sense to the evidence

4   admitted in this case.

5          As Judge Ramos told you earlier, Merl cannot being

6   convicted unless and until the government, that is his accuser,

7   proves the charges against him to each and every one of you by

8   the highest standard in our legal system, beyond a reasonable

9   doubt.

10         That is the government's job.  It is not our job to

11  disprove their guilt.  It is the government's job to prove

12  beyond a reasonable doubt, and you have the ability to do that

13  based on the facts.  You decide that based on the facts.  And

14  yes, I did say common sense.  At the end of this case after

15  you've heard all of the testimony we're definitely going to ask

16  you to use your common sense in your role as judges in

17  considering whether or not the government has met its burden of

18  proof.  This is based both on the evidence they do present but

19  also the evidence they do not present.

20         So who is Merl Code?  Merl was born in Greenville,

21  South Carolina in 1974 to Merl, Sr. and Denise Code.  He has

22  one sister.  He lives in Washington, D.C. and a wife Candace,

23  who lives with him in Greenville, South Carolina; two sons,

24  Layton and August.

25         Merl was a high school, college, and professional

J4N9DAW1                          Opening - Mr. Mathias

basketball player.  He retired from basketball in 2001.  And

after retiring Merl needed to find a job.  He got a job with

Nike and he worked there from 2001 to 2014.  At first he lived

in Chicago and he was a representative to NBA teams on behalf

of Nike, working with shoe deals, getting to know coaches,

players, executives.

        In 2010 Merl transitioned into a different position.

He was the director of Elite Youth Basketball for Nike.  That's

the EYBL, as they call.  It's essentially AAU basketball.  A

lot of the shoe companies have their own:  Nike, Under Armour,

Adidas.  The Nike version is the EYBL.  And he lived in Oregon

for that.

        In both those roles, Merl got to know everyone in

college basketball.  It's undoubtable that he had a vast

network.

        And in 2014 he moved back to South Carolina when his

father fell ill with cancer and he went back to help.

        Then in 2015 after his father recovered he took the

position as a consultant with Adidas to help with their

basketball program, their youth basketball program that they

call Adidas Nation.

        And as I've said, over Merl's career in basketball, he

made many friends and contacts.  One of these contacts was

Christian Dawkins.

        Merl first met Christian in approximately 2015 when

J4N9DAW1                          Opening – Mr. Mathias

1    Christian was, as Mr. Haney said, working for a prominent NBA

2    agent, Andy Miller, and his company ASM Sports.  The two

3    quickly developed a friendship and Christian looked up to Merl.

4               In May of 2017 Christian started the company you've

5    already heard about, Loyd Management.  Loyd was going to

6    provide professional services such as handling marketing deals

7    and managing financial affairs of athletes alongside financial

8    professionals.  You might hear evidence that Merl was at one

9    point talking with Christian about becoming an owner and

10   investor in Loyd Management.  That never happened.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. MATHIAS:  During the time period that Merl was a

2      consultant for Adidas, he was free to have other jobs and other

3      consulting relationships.  He was a consultant for companies

4      and other industries, such as wealth management, apparel, and

5      the energy industry.  And in each of these roles, Merl used his

6      vast network connections in the basketball world to help each

7      and every client develop relationships that were beneficial to

8      them.

9              In the summer of 2017, Christian asked Merl if he'd be

10     interested in coming to a meeting where potential Loyd

11     Management investors would be and talk to them about the

12     basketball business.  At first he declined.  He was with his

13     family.  It was the summer.  His son was out of school.  But

14     later Christian came back to Merl and invited him to talk to

15     the investors.  This time he was a bit more specification.

16     There's a meeting here in New York on June 20, as I said, and

17     Christian would pay Merl $5,000 in a consulting fee for

18     attending.  So there was a time, there was a place, he knew who

19     was there, and he would be paid.

20             Merl agreed to come.  What Christian did not tell Merl

21     is that two weeks earlier he had been on a yacht with Munish

22     Sood, Jeff D'Angelo, Joe Bailey, and there were tens of

23     thousands of dollars in cash that were given to him on that

24     yacht.  Merl didn't know that.  Merl thought he was simply

25     showing up and meeting with a group of investors.  When Merl

1    arrived at the meeting on June 20 he was introduced to four

2    supposedly Loyd Management investors.  Two, as we've said, were

3    undercover agents, Jeff D'Angelo and Joe Bailey.  The others

4    were Marty Blazer and Munish Sood.  You will hear from them.

5    The government has also indicated to us that they will call

6    only Blazer and Sood but not the undercover agent.

7         Even on the day of the meeting, Merl didn't really

8    know what he was supposed to do or what he was supposed to say.

9    He was Christian's friend and was being paid for his time.

10   During the meeting, which only lasted a couple of hours, the

11   evidence will show that Merl explained the basketball business,

12   and he was paid the promised fee.  Also during the meeting,

13   D'Angelo expressed a desire to build a network of assistant

14   coaches in order to build a client base for Merl –– for Loyd

15   Management.  Well, Merl was interested in acting as a

16   consultant for Loyd and being paid for his services.  As the

17   evidence will show, he was never on board with paying coaches,

18   and in fact, he took concrete steps to make sure coaches, his

19   coaches, his friends, did not take bribes.

20        During the course of the trial, pay close attention

21   and be on the lookout for evidence presented by the government

22   that indicates Merl wanted to pay coaches or even thought it

23   was a good idea.  I submit you will not find any.  I expect

24   what the evidence will show is that after the meeting on

25   June 20, Merl and Christian had a conversation on the 21st, and

1     Merl and Christian talked about how Jeff's idea of sponsoring

2     30 colleges didn't make sense.  The evidence will also show

3     that it didn't make sense because if the goal was to get

4     clients, or players, for Loyd Management, by the time the good

5     players are in college, they already have people that they

6     listen to.  They're not listening to their college coaches.

7             I also anticipate that the evidence will show that one

8     week later, on June 28, Merl and Christian talk again about how

9     paying coaches was a bad idea, but they wanted to get paid for

10    making introductions if that's what Jeff D'Angelo wanted to do.

11    Merl did not agree to make bribes.  He wanted to get paid for

12    making introductions.

13            I also expect the evidence will show that on July 5,

14    Merl told Christian again he was willing to set D'Angelo up

15    with coaches, but he was going to tell coaches not to take any

16    money.  Merl took it one step further.  He tells Christian this

17    is what he's going to do so long as D'Angelo knows.

18            Then I believe the evidence will show that on July 8

19    Christian again -- Merl tells Christian again that Jeff needs

20    to understand he can't go into these meetings, the meetings in

21    Las Vegas, with the attitude of, hey, I'm going to put some

22    money in their pocket.  At this point Merl has told Christian

23    multiple times that he's not introducing coaches to be bribed.

24            Finally and very, very importantly, on July 10 Merl

25    actually has a conference call with Munish Sood and Jeff

1    D'Angelo where Merl emphasized to D'Angelo in no uncertain

2    terms, the coaches I'm going to put in contact with you are not

3    going to take money.  In between June 20, 2017, when Merl was

4    here in New York meeting with the investors and the meetings in

5    Las Vegas where Merl wasn't in attendance but Christian was

6    with Blazer and D'Angelo and the coaches, Merl called his

7    coaches, Merl called his friends, and said:  You're going to be

8    in Las Vegas recruiting at this tournament anyway.  Will you,

9    as a favor to me, go meet with these guys, show up.  They're

10   going to pay me a $5,000 fee for making the introduction.  And

11   do not take money.

12        Now one critical fact here is that while Merl's phone

13   was tapped in this investigation, it was not tapped until the

14   first week of August.  So any of those conversations between

15   June 20 and the meetings in Las Vegas were not recorded.

16        Merl did not want to go to Las Vegas, as I said,

17   because he and his family were in Orlando.  Christian agreed to

18   facilitate the meetings, but he arranged -- Merl arranged the

19   meetings knowing that he had told Christian and D'Angelo his

20   guys weren't going to be paid, and he had told his guys, do not

21   take money from them.  And after the meetings, again Merl had

22   no idea what happened.  He continued telling people that my

23   guys aren't going to be paid.  The evidence will show that on

24   August 8, 2017, Merl and Munish talk again, and Merl tells

25   Munish:  No, no, you're not paying my guys.

J4NDaw2                           Opening - Mr. Mathias

1           Now, during the course of this trial, you're going to

2     hear from Marty Blazer and Munish Sood.  In fact, I believe the

3     government is going to rest its entire case, as I said, on

4     their testimony and their version of events interpreting the

5     recordings that you are going to hear.  As you've heard, part

6     of your job as jurors is to determine the credibility of all

7     witnesses.  And with these in particular, you should pay very

8     close attention to what motive they have to testify and

9     particular attention to the reasons they might have to say what

10    they think the government wants them to say.

11          You're going to hear that both Blazer and Sood have

12    pled guilty to multiple crimes.  In fact, you've already heard

13    that.  With respect to Blazer, you're going to hear, despite

14    the fact the government caught him stealing from his clients

15    and then stealing from other clients to pay back those clients

16    and then lying to the government about it, they didn't arrest

17    him.  What they did was fund him traveling across the country

18    setting up people in this conspiracy to expose corruption in

19    college basketball, but in a way that they came up with.

20    You're also going to hear about Blazer and Sood's cooperation

21    with the government can buy them a lenient sentence.  You

22    should question whether that gives them a motive to testify

23    again in a way that they believe best suits their interest and

24    the interest of the government.

25          I've talked about what the evidence is going to show,

J4NDaw2                        Opening - Mr. Mathias

1   but you should also be thinking about what it doesn't show, as

2   I've said.  For instance, pay attention to who doesn't testify

3   and think about what they could have told you.  See if the

4   government calls the undercover agents or whether they call the

5   coaches that took bribes.  Remember, it is the government's

6   burden to prove Merl guilty beyond a reasonable doubt, and

7   consider whether their failure to call these coaches in and of

8   itself creates reasonable doubt in your mind.

9            MR. MARK:  Objection.

10           THE COURT:  Overruled.

11           MR. MATHIAS:  Ladies and gentlemen, that's essentially

12   a preview of Merl's perspective of the evidence that we believe

13   will be presented at trial.  The government is the only one, as

14   I said, with the burden of proof in this case, and it's the

15   highest standard of proof in our legal system.  The government

16   has to prove all of the charges in this case beyond a

17   reasonable doubt, and to do so, they must prove that Merl Code

18   knowingly and intentionally entered a conspiracy to bribe --

19   for the specific purpose of bribing college coaches.

20           Listen carefully to the evidence presented during the

21   trial as you consider both Merl Code's specific words and his

22   specific actions.  The government bears the burden of proving

23   Merl's intent, but what they have brought you today is a man

24   who told every coach he talked to, don't take money, and told

25   the FBI and the government's cooperating criminals, you're not

J4NDaw2                          Opening – Mr. Mathias

1    paying my guys.  It is your job and your duty to hold the

2    government to their burden of proof.  And at the end of this

3    case, I will ask you to do just that and render a verdict which

4    speaks the truth in this case, a verdict of not guilty.

5                Thank you.

6                THE COURT:  Thank you, Mr. Mathias.

7                Will the government please call its first witness.

8                MR. BOONE:  Yes, your Honor.  Although we do have a

9    stipulation we'd like to read first.

10               THE COURT:  Very well.

11               MR. BOONE:  Is it all right if I go to the podium?

12               THE COURT:  Absolutely.

13               Ladies and gentlemen, as I told you earlier, a

14   stipulation is simply an agreement amongst the lawyers.

15               Mr. Boone.

16               And as I told you yesterday, we'll be going until

17   about 11 o'clock, approximately, and then taking our first

18   break.

19               MR. BOONE:  It is hereby stipulated and agreed by and

20   between the United States of America by Geoffrey S. Berman,

21   United States Attorney, Robert L. Boone, Noah Solowiejczyk, and

22   Eli J. Mark, Assistant United States Attorneys, of counsel,

23   Christian Dawkins, the defendant, by and with the consent of

24   his attorney, Steve Haney Sr., and Merl Code, the defendant, by

25   and with the consent of his attorneys, Mark Moore, Andrew

1   Mathias, Allen Chaney, and Darren Haley.

2           If called as a witness at trial, a custodian of

3   records with the University of Southern California would

4   testify that Government Exhibits 701 through 712, including all

5   parts and subdivisions thereof, are true and correct copies of

6   records obtained from the University of Southern California;

7   that the original records were all made at or near the time by,

8   or from information transmitted by, a person with knowledge of

9   the matters set forth in the records; that they were kept in

10   the ordinary course of the University of Southern California's

11   regularly conducted business activity; and that it was the

12   regular practice of that business activity to make the records.

13           If called as a witness at trial, a custodian of

14   records from the Oklahoma State University would testify that

15   Government Exhibits 801 through 814, including all parts and

16   subdivisions thereof, are true and correct copies of records

17   obtained from the Oklahoma State University; that the original

18   records were all made at or near the time by, or from

19   information transmitted by, a person with knowledge of the

20   matters set forth in the records; that they were kept in the

21   ordinary course of Oklahoma State University's regularly

22   conducted business activity; and that it was the regular

23   practice of that business activity to make the records.

24           If called as a witness at trial, a custodian of

25   records from the University of Arizona would testify that

J4NDaw2                         Opening - Mr. Mathias

Government Exhibits 901 through 906, including all parts and
subdivisions thereof, are true and correct copies of records
obtained from the University of Arizona; that the original
records were all made at or near the time by, or from
information transmitted by, persons with knowledge of the
matters set forth in the records; that they were kept in the
ordinary course of the University of Arizona's regularly
conducted business activity; and that it was the regular
practice of that business activity to make the records.

        If called as a witness at trial, a custodian of
records from the University of South Carolina would testify
that Government Exhibits 1001 through 1006, including all parts
and subdivisions thereof, are true and correct copies of
records obtained from the University of South Carolina; that
the original records were all made at or near the time by, or
from information transmitted by, a person with knowledge of the
matters set forth in the records; that they were kept in the
order course of the University of South Carolina's regularly
conducted business activity; and that it was the regular
practice of that business activity to make the records.

        If called as a witness at trial, a custodian of
records from Creighton University would testify that
Exhibits 1101 through 1106, including all parts and
subdivisions thereof, are true and correct copies of records
obtained from Creighton University; that the original records

J4NDaw2                          Opening - Mr. Mathias

1   were all made at or near the time by, or from information

2   transmitted by, a person with knowledge of the matters set

3   forth in the records; that they were kept in the ordinary

4   course of Creighton University's regularly conducted business

5   activity; and that it was the regular practice of that business

6   activity to make the records.

7          If called as a witness at trial, a custodian of

8   records from Texas Christian University would testify that

9   Government Exhibits 1201 through 1208, including all parts and

10  subdivisions thereof, are true and correct copies of records

11  obtained from Texas Christian University; that the original

12  records were all made at or near the time by, or from the

13  information transmitted by, a person with knowledge of the

14  matters set forth in the records; that they were kept in the

15  ordinary course of the Texas Christian University's regularly

16  conducted business activity; and that it was a regular practice

17  of that business activity to make the records.

18         It is further stipulated and agreed that this

19  stipulation may be received into evidence as a government

20  exhibit at trial.

21         At this time, your Honor, the government moves to

22  admit Government Exhibit 1907 and, obviously, the exhibits

23  referenced within that exhibit.

24         THE COURT:  I take it there's no objection to the

25  stipulation?

J4NDaw2                        Miller - Direct

1             MR. MOORE:  None for Mr. Code, your Honor.

2             MR. HANEY:  None for Mr. Dawkins, your Honor.

3             (Government's Exhibits 701 to 712, 801 to 814, 1001 to

4    1006, 1101 to 1106, 1201 to 1208, and 1907 received in

5    evidence)

6             THE COURT:  Very well.  Ladies and gentlemen just to

7    summarize, because your ears haven't yet gotten used to

8    legalese, this is a stipulation that certain documents can come

9    into evidence from various universities.

10            Does that podium go back a little further?  Very well.

11            MR. BOONE:  Your Honor, the government calls

12   Christopher Chance Miller.

13            THE COURT:  Mr. Miller, please step all the way

14   forward, step up to the witness stand and remain standing, and

15   please look out on the floor for any wires.

16   CHRISTOPHER CHANCE MILLER,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. BOONE:

21   Q.  Good morning, Mr. Miller.

22   A.  Good morning.

23   Q.  How old are you?

24   A.  Thirty-five.

25   Q.  How far did you go in school?

J4NDaw2                        Miller - Direct

1   A.   I graduated New York Law School with my JD in 2008.

2   Q.   Where did you go to college?

3   A.   Went to the University of Tennessee for undergrad.

4   Q.   What did you study there?

5   A.   Sport management and business administration.

6   Q.   Are you currently employed?

7   A.   I am.  I'm employed as the senior associate athletics

8   director at the University of South Carolina athletics

9   department.

10  Q.   How long have you held that position?

11  A.   I've been there since April of 2013.

12  Q.   What are your responsibilities in that position?

13  A.   It varies.  I oversee our compliance department, which is a

14  department that is entrusted with enforcing and educating on

15  NCAA; our conference, Southeastern Conference; and

16  institutional rules and policies and procedures.  I also

17  oversee a few sports, football and swimming and diving.  That

18  entails hiring coaches, overseeing the budget process,

19  scheduling games, and any issues that may come up.  And then I

20  also oversee our nutrition and dining for the whole athletics

21  department.

22  Q.   How long have you held your current position?

23  A.   I've been the senior associate athletics director for about

24  a year and a half now.

25  Q.   Have you held any other positions at the University of

J4NDaw2                          Miller - Direct

1   South Carolina?

2   A.   Yes.   When I came into South Carolina in April 2013, I was

3   the assistant athletics director for compliance.   In that

4   position, I oversaw our certification department which worked

5   with keeping student athletes and incoming prospective student

6   athletes, high school students that were going to enroll,

7   eligible, and then also overseeing their financial aid and

8   scholarships.   I held that title for about three years until I

9   was promoted to the associate athletics director where I

10  oversaw all the day-to-day operations for our compliance

11  office.

12  Q.   Prior to working at the University of South Carolina, where

13  did you work?

14  A.   I worked at the NCAA, which is the national governing body

15  for college athletics in Indianapolis, Indiana.

16  Q.   How long did you work for the NCAA?

17  A.   I worked there from 2009 until March of 2013 when I

18  accepted the job at South Carolina.

19  Q.   Could you explain, sort of in layman's terms, what is the

20  purpose of the NCAA.

21  A.   The NCAA is the governing body that governs all college and

22  university athletics departments.   The NCAA is broken up into

23  several different departments, but the purpose of it is to

24  enforce the rules that colleges and universities vote on to

25  govern itself and also to host championships.

J4NDaw2                         Miller - Direct

Q.   So these rules, I take it, are governing athletics

competition?

A.   Yes, they govern athletics competition.  They govern

personnel and how you can and cannot operate under the guidance

of the NCAA.

Q.   What was your position with the NCAA?

A.   When I first started, I was an assistant director of

enforcement in the agent, gambling, and amateurism department.

It was a small department within the overall broader

enforcement department.  I was tasked with investigating and

educating agent-related inquiries and investigations, sports

wagering investigations, and high-profile amateurism

investigations as it related to football, basketball, and

baseball.

Q.   So taking a step back, what's the purpose of the

enforcement division in general?

A.   The enforcement department is created by the NCAA to really

enforce the rules that colleges and universities vote on.  As

part of the governing structure, colleges, universities, such

as South Carolina, we have voting privileges to be able to put

forward new legislation that would govern our activities.  And

then we and other institutions vote on those when they go into

what we call our legislation.  The enforcement department is

tasked with enforcing those rules and make sure that if they're

violated, they work with the university and the college's

1    compliance office to determine whether or not those rules were

2    violated and, if they were, what type of penalties will be put

3    in place going forward.

4    Q.  Now, you said within that division you worked specifically

5    on what exactly?

6    A.  It was called the agent, gambling, and amateurism

7    department.  I really focused on agent-related investigations,

8    sports wagering investigations, and any high-profile amateurism

9    cases.

10   Q.  What's an agent?

11   A.  An agent is someone who represents an athlete in their

12   professional endeavors.  An agent -- what we looked at were the

13   agents that were certified by the players associations for

14   professional leagues, such as the NFL Players Association, the

15   NBA Players Association.  We were looking at anybody trying to

16   recruit a student athlete to represent them in their

17   professional career outside of college.

18   Q.  Why was the NCAA concerned with that?

19   A.  The NCAA and its member institutions, all the universities

20   and colleges, have voted to put forward bylaws that regulate

21   what a student athlete and his or her family members can

22   receive from outside entities, including agents or anyone who

23   works with an agent, and that is to maintain what we consider

24   their amateurism status.  We are an amateurism organization and

25   an amateurism governing body, and we want to maintain that by

J4NDaw2                         Miller - Direct

 1   not allowing student athletes to receive any type of

 2   impermissible, or what we have voted on as impermissible,

 3   benefits that come from any outside sources.

 4   Q.  How long did you hold that position with the NCAA?

 5   A.  I was an assistant director and AGA for about three, three

 6   and a half years, and then the NCAA enforcement department went

 7   through a restructuring where I was put back into the overall

 8   enforcement area.  It was just an internal restructuring, but I

 9   still focused on a lot of the agent and high-profile amateurism

10   cases.

11   Q.  I want to focus now specifically on the University of South

12   Carolina for a moment.  Where is the University of South

13   Carolina located?

14   A.  Columbia, South Carolina.

15   Q.  Is it a public or private institution?

16   A.  It is a public.

17   Q.  Approximately how many students attend?

18   A.  It's around 34,000, and that includes graduate,

19   undergraduate, and commuters.

20   Q.  You testified earlier you obviously work in the athletics

21   department.  How many athletic teams does the university field?

22   A.  We have 19 sports.

23   Q.  Does that include men's and women's sports?

24   A.  Yes, it does.

25   Q.  What are some of the sports?

J4NDaw2                         Miller - Direct

A.   We have football, men's and women's basketball, baseball,

softball, women's volleyball, women's beach volleyball, men's

and women's tennis, men's and women's swimming and diving,

men's and women's indoor and outdoor track and field, and men's

and women soccer, and equestrian.

Q.   Is South Carolina considered to be a member of the NCAA?

A.   Yes, it is.

Q.   What does it mean to be a member of the NCAA?

A.   To be a member of the NCAA, we're actually part of Division

I.   The NCAA is broken up into three divisions.  Division I is

really your larger institutions that have larger athletics

department budgets and attendance at some of your football and

basketball games.  To be a part of the NCAA just means that we

have agreed to abide by the governing body's legislation and

its activities and how it conducts its championships and

day-to-day activities.

Q.   Are there NCAA rules that are specific to Division I

universities?

A.   Yes, there are.  There are several different sections of

the rule book that pertain to Division I.  You have everything

from what we call Bylaw 11, which is a lot of legislation that

governs personnel decisions, how many coaches and staff members

you can hire for each sport, what they can and cannot do in

terms of coaching limitations.  You have Bylaw 12, which is a

lot of legislation that regulates amateurism activities for

J4NDaw2                       Miller - Direct

student athletes.  Bylaw 13 has to do with recruiting high

school prospective student athletes and what coaches and staff

members can and cannot do in terms of recruiting and contacting

those high school-aged prospects.  And then Bylaw 14 and 15

really relates to eligibility and scholarship limitations and

what type of scholarships and financial aid a student athlete

can receive.  And then Bylaw 16 is really your extra benefits

and what can and cannot be provided to a student athlete from

either a staff member, such as myself or a coach, or some

outside entity.

Q.  What happens if a school violates one of the NCAA's rules?

A.  It depends on what type of level violation that is.

There's a structure in the NCAA in terms of violations.  Level

I is your most egregious violations.  Those are your

intentional actions.  Level II are also serious violations, but

maybe you have some mitigation that mitigates it down from a

Level I to a Level II.  And then Level III violations are

really violations that are accidental or violations that just

did not know the rules correctly and aren't as serious, and we

as an institution can put our own penalties in place and

educate to try to prevent those from going forward.

        If one of those violations do occur, the compliance

offices at the universities and colleges will look into those.

Depending on the severity, if it's a Level I or Level II,

usually you'll work jointly with the NCAA's enforcement staff

J4NDaw2                         Miller - Direct

1   to investigate those potential violations.  And if there is a

2   violation, it usually -- either we agree with the NCAA

3   enforcement staff on the violation and the type of penalties to

4   put in place and then there's a public report that is issued

5   and those penalties are detailed, or if there's a disagreement

6   or not an agreement to all the facts and violations, we have to

7   go in front of the committee on infractions, which is a

8   quasi-judicial branch made up of other member institutions,

9   athletic directors, coaches that will determine whether or not

10  those violations have occurred; and then they will put in

11  penalties based on those violations.

12  Q.  So breaking that up a little bit, what's an example of a

13  Level I violation?

14  A.  Level I violation would be intentionally paying a high

15  school prospect to come to your institution.  Any type of

16  intentional benefits that are trying to sway -- persuade a

17  prospect or their family members to attend your institution.

18  Q.  What are some examples of the types of penalties that can

19  be imposed for a Level I violation?

20  A.  Depending on the severity of the Level I, you have

21  penalties that range from -- you'll have an institutional fine

22  where the NCAA will fine the institution a certain amount of

23  money.  You will have a reduction in scholarships or could have

24  a reduction in scholarships that you can offer to incoming

25  student athletes.  You could have a reduction in how many days

J4NDaw2                          Miller - Direct

1   you can go out to recruit.  You could have staff members be
2   terminated from their employment or have a show cause issued on
3   them, which means that you have to show the NCAA good cause on
4   why you want to still retain that staff member.  And then you
5   could also have student athletes that are ineligible, and you
6   could also have to forfeit any contests that you played an
7   ineligible student athlete in.
8   Q.  Do the NCAA rules also govern the conduct of family members
9   of student athletes?
10  A.  They do, yes.
11  Q.  How so?
12  A.  There are certain rules that pertain to student athletes on
13  what they can and cannot accept in terms of what the NCAA has
14  considered impermissible benefits, and some of those rules do
15  pertain to family members and friends of those student
16  athletes.
17  Q.  Now, you've addressed this a little bit in some of your
18  other answers, but are there particular rules that govern the
19  conduct of college coaches?
20  A.  Yes, there are.  There are a lot of rules that pertain to
21  governing coaches and what they can and cannot do on and off
22  the field in terms of coaching, what they can and cannot do in
23  terms of recruiting high school student athletes, and then what
24  they can and cannot provide the student athletes.
25  Q.  What happens if a coach commits a Level I infraction?

J4NDaw2                         Miller - Direct

1   A.   If a coach commits a Level I infraction, the university

2   will work with the enforcement staff at the NCAA to determine

3   that level of the Level I, whether or not it's an aggravated or

4   a mitigated Level I.  And then there will be penalties put in

5   place, and then the institution will have to determine at that

6   point in time whether or not they are going to terminate --

7   terminate the coach from their employment.

8   Q.   Now, based on your experience with the NCAA and at USC,

9   University of South Carolina, do you know if a coach taking

10  cash from a sports agent or a financial adviser in exchange for

11  directing that coach's players to retain the services of that

12  adviser or agent would be considered a Level I infraction?

13  A.   Yes, in my experience.

14  Q.   Are you familiar with someone named Lamont Evans?

15  A.   I am.

16  Q.   How are you familiar with him?

17  A.   He was the assistant men's basketball coach at the

18  University of South Carolina when I came on staff in 2013.

19  Q.   Do you know, approximately when was he a coach at South

20  Carolina?

21  A.   He was on staff in 2013 when I got there.  I don't know

22  when he started at South Carolina, but he remained at South

23  Carolina when I was there until after our Final Four season in

24  2017.

25  Q.   Do you know why Evans left South Carolina?

J4NDaw2                        Miller - Direct

A.  Yes.  He took a position at Oklahoma State University.

Q.  How are coaches like Evans hired at the University of South
Carolina?

            MR. HANEY:  Objection, your Honor.

            THE COURT:  Is there an objection to that question?

            MR. HANEY:  Yes, there is, your Honor.

            THE COURT:  It's overruled.

            MR. HANEY:  Thank you.

A.  For hiring a coach, when we go to hire a head coach, the
sport administrator, such as myself, and the athletics director
will work to determine what head coach we're going to hire.
That head coach will go through a vetting process.  We'll do a
criminal background check.  We do a check with the NCAA and our
Southeastern Conference to determine if there are any prior
investigations or inquiries into those coaches.

            And then once we determine the head coach and hire the
head coach, we meet with that coach, and we'll give the head
coach a salary pool to be able to go out and fill his or her
staff with assistant coaches and personnel.  When the head
coach is looking to hire someone and has a name or some
background, they will provide that to myself and the compliance
staff, and then we will do our own inquiry, whether it's a
criminal background check or calling the NCAA and our
Southeastern Conference to determine whether they have any
prior issues within college athletics.

J4NDaw2                        Miller - Direct

1    Q.  Are coaches at South Carolina given contracts with the

2    university once they are hired?

3    A.  They are, yes.

4    Q.  Why is that?

5    A.  We give them a contract that lays out the compensation

6    terms, the years that the agreement will be in place.  It also

7    details out what type of benefits they receive as a state

8    employee and as an athletics department employee, and then it

9    also has language in there that details out what our

10   expectations are of that coach and what policies and rules that

11   they need to follow moving forward.

12   Q.  What benefit, if any, is there in having a written

13   contract?

14   A.  Well, it's -- written contract's twofold.  It's to lay out

15   those terms and those expectations for the coach so that the

16   coach is aware of them, and then it also allows us to be able

17   to either renegotiate those terms at the end of the contract if

18   we want to keep the coach or if something happens where the

19   coach has provided us with cause to terminate that employment,

20   that for cause language is in the contract.

21              THE COURT:  Mr. Boone, it's 11 o'clock, so we're going

22   to take our first break.

23              Ladies and gentlemen, 15 minutes.  So please be

24   prepared to come back out at 15 minutes after the hour.  Do not

25   discuss the case.  (Jury excused)

J4NDaw2

1            (Jury not present)

2            THE COURT:  People can be seated.

3            Any work for me?

4            MR. HANEY:  No, your Honor.

5            MR. BOONE:  Your Honor, should the witness stay on the

6     stand?

7            THE COURT:  No, he can step down, absolutely.  Don't

8     be late.

9            (Recess)

10           THE COURT:  There's something the parties wanted to

11    bring up very quickly?

12           MR. SOLOWIEJCZYK:  Yes, your Honor.  We objected to

13    this during opening statement.  Mr. Mathias said during his

14    opening the following:  I've talked about what the evidence is

15    going to show, but you should also be thinking about what it

16    United States -- there might be some typos in this because it's

17    a draft -- didn't show.  As I said, for instance, pay attention

18    to who doesn't testify and think about what they could have

19    told you.  See if the government calls the undercover agents or

20    whether they call the coaches that took bribes.  Remember, it's

21    the government's burden to prove that Merl Code is guilty

22    beyond a reasonable doubt, and consider whether their failure

23    to call these coaches in and of itself creates reasonable doubt

24    in your mind.

25           So (1) your Honor, it's a pretty standard jury

1    instruction in this district that uncalled witnesses are

2    equally available to both sides, but (2) what makes this

3    argument particularly egregious is we're talking about coaches

4    who are going to be sentenced before your Honor who continue to

5    have Fifth Amendment rights.  And to put the thought in the

6    jury's mind that somehow these coaches were perfectly happy to

7    testify, and the reason they didn't is somehow related to the

8    burden, it's totally inappropriate.

9             At this point we're not currently seeking a curative

10    instruction because, frankly, we're worried it's going to

11    further drive the point home with the jury.  We may come back

12    to your Honor and seek one, but we just wanted to make sure we

13    don't see cross-examination or other arguments along those

14    lines during this trial.

15             THE COURT:  The fact that I overruled the objection

16    did not mean that I agreed with the argument that was being

17    made and I actually believe that.  Let's just get past this

18    because it's opening statements.  There's a lot to go.  And,

19    obviously, if that argument is made at the end of the day, it

20    would be very inappropriate.

21             With that, as soon as the jury's ready, they're going

22    to be walked out.  I'm sorry, Mr. --

23             MR. MOORE:  I would simply say if we intend to do

24    anything anywhere like that, we will alert your Honor to it

25    beforehand.  We will seek permission.  But I don't necessarily

J4NDaw2

1    agree with everything that Mr. Solowiejczyk said, and we'll

2    deal with that at the appropriate time.

3              THE COURT:  Very well.  Where's Mr. Miller?

4              Is the jury ready to come out?

5              THE DEPUTY CLERK:  They are.

6              THE COURT:  Let's bring out the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Mr. Miller, you want to step forward and

3    retake the witness stand.

4          The room can be seated.

5          Mr. Boone.

6    BY MR. BOONE:

7    Q.  Now, Mr. Miller, just to refresh the jury's mind on where

8    we left off, I think you had just explained what the benefit,

9    if any, was in having a written contract with a college coach.

10   Could you just explain that briefly again.

11   A.  Yeah.  The benefits to having a written contract with a

12   coach is to really lay out the terms of the agreement, the

13   compensation, and any type of bonus structures that might be in

14   place for that coach in terms of wins or winning championships,

15   but it also details out the expectations that a coach, he or

16   she, has to follow in terms of the NCAA rules or our

17   institutional rules.  And then if they weren't to follow those,

18   it could lead to termination, with or without cause, and that's

19   detailed out into our employment agreements.

20   Q.  What role, if any, do you play in drafting employment

21   contracts for South Carolina's coaches?

22   A.  Right now in my current title, I actually work -- I have a

23   dual reporting line with the athletic directors and the office

24   of general counsel, and I work with both AD and the office of

25   general counsel to draft the contracts and to also review those

J4NDaw2                        Miller - Direct

1    contracts with the coach and/or his her representative and then

2    get the contracts executed by the coach, their representative,

3    and the board of trustees for the University of South Carolina.

4    Q.  What does the process of drafting those contracts typically

5    entail?

6    A.  We have a standard draft contract that has a lot of the

7    boilerplate language already in it, but it's really working on,

8    if it's going to be a one-year or multiyear contract, what type

9    of compensation structure is going to be in place, whether or

10   not there are going to be any bonuses for any special

11   achievements with that sport or with that coach.  And it's

12   working with the representative to make sure everybody's in

13   agreement with those terms and then going forward and getting

14   that fully executed.

15   Q.  Now, you testified that there are certain boilerplate

16   standard terms in the contracts.  What are some of the standard

17   terms?

18   A.  Some of the standard terms detail out what an employee at

19   the University of South Carolina receives in terms of moving

20   expenses, what our policy is related to that, whether or not

21   that individual will get a courtesy car as part of their state

22   employment, but then it also has language that specifically

23   refers to specific NCAA Southeastern Conference and

24   institutional rules and policies and procedures and what they

25   have to abide by.  It also details out what termination for

J4NDaw2                        Miller - Direct

1   cause and without cause would be and if there are any type of

2   liquidated damages for that type of termination.

3   Q.  So you just testified that one of the standard terms is a

4   term requiring the coach to comply with NCAA rules, is that

5   right?

6   A.  Yes, that is correct.

7   Q.  Why is that a standard term?

8   A.  It's to put the coach on notice that our expectation as a

9   member of the NCAA is that all coaches, staff members such as

10  myself, and student athletes have to abide by those NCAA

11  Southeastern Conference and institutional rules, and that a

12  violation of those could lead to a termination of that coach's

13  or that staff member's employment.  It's important that we make

14  the coaches aware of that because the institution and the

15  athletics department is liable for any of the coach's or

16  student athlete's actions that could be a violation of NCAA

17  rules and could lead to the institution and the athletics

18  department receiving some type of penalty for those actions or

19  an institutional fine.

20  Q.  Based on your experience in this field, do you know if it's

21  standard practice for Division I universities to require that

22  their coaches apply with NCAA rules?

23  A.  Yes.

24  Q.  Do you know if that requirement is standard in the

25  contracts of Division I coaches?

J4NDaw2                          Miller - Direct

1    A.  Yes.  Within the larger five conferences, that's been a

2    standard practice for a while now.

3    Q.  What are the larger conferences?

4    A.  That's the Southeastern Conference, which South Carolina is

5    a part of; the Atlantic Coast Conference, which is your schools

6    such as Duke, North Carolina, NC State; your Big Ten Conference

7    which Ohio State and Michigan are part of; Pac-12, which would

8    be your Southern California, UCLA, Stanford; and then the Big

9    12 Conference, which is Texas, Oklahoma, and schools such as

10   that.

11   Q.  Now, in front of you should be a binder of documents.  They

12   will also show on your screen.

13          Your Honor, these are documents that were a part of

14   the stipulation.  They're already admitted into evidence.

15          I want to start with Government Exhibit 1004, if we

16   could.  Yes, thank you.

17          Let me know when you've had a chance to look at it.

18   A.  I'm ready.

19   Q.  So what is this document?

20   A.  This document is our employment agreement with Lamont

21   Evans.  And it was entered into April 4, 2012, between Lamont

22   and the University of South Carolina.

23   Q.  Does it say that at the very top of the document?

24   A.  Yes.

25   Q.  Does it appear -- does this document appear to have been

J4NDaw2                              Miller - Direct

1    signed by anyone?

2    A.   It was.  It was signed by Amy Stone, who is the secretary

3    for the board of trustees, and Lamont Evans, who was the

4    then-assistant men's basketball coach.

5    Q.   If we could just go to the last page of the document.

6         Does a member of the board of trustees typically sign

7    employment contracts on behalf of the university?

8    A.   Yes, all contracts on behalf of the university and the

9    athletics department have to be signed by the board of trustees

10   or the secretary of the board of trustees.

11   Q.   Generally speaking, what are some of the key terms of this

12   contract?

13   A.   If you look at the key terms, you have in Section 2 is the

14   coach's duties, which lays out the compliance with both

15   university rules and NCAA and SEC rules.  In Section 3 you have

16   the term of employment, and that details out whether or not it

17   is a year, yearly, or a multiyear contract.  Section 4 really

18   lays out the compensation and benefits.  Section 6 is the

19   outside income requirements that a coach or staff member has to

20   detail out any income they receive outside of the athletics

21   department or the university.  And then Section 7 would be the

22   requirement that the staff member has to abide by the NCAA

23   enforcement procedures.  And then Section 8 is your termination

24   clauses that details out how a coach or staff member may or may

25   not be terminated and then gives some of the examples.

J4NDaw2                         Miller - Direct

1    Q.  I want to focus on a few of those terms.  So if we could

2    start off by looking at page 2, under Section 2, "Duties."  And

3    if we could blow up for -- yes, for the jury, 2.03.

4           Mr. Miller, if you could read that paragraph to the

5    jury, please.

6           THE COURT:  Please read slowly.

7    A.  "Section 2.03:  Compliance with NCAA and SEC rules.

8    Employee agrees to abide by and comply with the constitution,

9    bylaws, rules, regulations, and interpretations (collectively

10   referred to as legislation) of the National Collegiate Athlete

11   Association and the Southeastern Conference relating to the

12   conduct and administration of the men's basketball program,

13   including recruiting and eligibility rules as now constituted

14   or as any of the same may be amended during the term hereof.

15   In the event employee becomes aware or has reasonable cause to

16   believe that violations of such legislation may have taken

17   place, he shall report the same promptly to the associate

18   athletics director for compliance services."

19   Q.  So what's being discussed in this paragraph?

20   A.  That is making the coach, in this case, aware that they

21   have to abide by all NCAA and Southeastern Conference rules and

22   that if at any point in time they know of a violation, have

23   become aware of a violation, or involved in a violation, that

24   they have to report that immediately to the compliance office.

25   Q.  Why did Evans have to agree to abide by NCAA rules?

J4NDaw2                        Miller - Direct

A.   Because as a staff member of the athletics department, we

are governed by the NCAA, and failure to abide by those rules

would cause a violation for the athletics department, the staff

member, and the university.

Q.   If we could now take a look at page 3, under Section 6,

heading "Outside Income," and I want to focus on 6(b).  If you

could read that section to the jury, please.

A.   Section 6.  Outside Income, (b) and it's NCAA, SEC and

university rules control.  It states:  "In no event shall

employee accept or receive, directly or indirectly, any moneys,

benefits, or any other gratuity whatsoever from any person,

corporation, booster club, or alumni association or other

benefactor if such action would violate NCAA or SEC

legislation, university rules and regulations, or South

Carolina law as now or hereafter enacted.  Changes in any such

legislation, rules and regulations, or laws shall automatically

apply to this employment agreement without necessity of a

written modification."

Q.   What's being discussed in the section you just read?

A.   That's alerting the coach that they cannot receive any type

of benefits, whether that is cash, transportation, trips,

clothing, or gratuities, from anyone outside of the university

and the athletics department that could potentially be -- could

potentially be or would be a violation of both NCAA rules,

Southeastern Conference rules, or our state of South Carolina

1    ethics laws.

2    Q.  What's meant by benefits?

3    A.  Benefits, again, is anything such as cash, trips,

4    transportation, clothing, anything that they are receiving

5    because of their status as the coach that would be outside of

6    the income that the athletics department or university

7    provides.

8    Q.  Why did Evans have to agree not to receive outside income

9    that would violate NCAA rules?

10   A.  Because if Evans or any other staff member receives

11   anything, any type of benefits that are outside of the

12   athletics department income that would violate an NCAA rule, we

13   as a university and athletics department would be subject to

14   those violations and penalties for it.

15   Q.  Why is this particular prohibition highlighted in the

16   contract?

17   A.  This is highlighted just to make them aware that any type

18   of outside income that they receive they should be checking

19   first with the compliance office and the athletics department

20   to make sure it is a permissible source.

21   Q.  If we can now take a look at the next page, same section,

22   6(d).  The heading is "Annual Report," and if you could read

23   that section for the jury, please.

24   A.  Subsection (d) Annual Report.  "Pursuant to NCAA by law

25   11.2.2, employee shall provide to the president annually, on or

1   before January 15, a written detailed account of all

2   athletically related income and benefits received by employee

3   from sources outside the university during the previous

4   twelve-month period, including but not limited to the following

5   sources: income from annuities, sports camps, housing benefits,

6   country club memberships, complimentary ticket sales,

7   television and radio programs, an endorsement or consultation

8   contract with athletics shoe, apparel, or equipment

9   manufacturers.  The university shall have access to all records

10  of employee necessary to verify such report."

11  Q.  So in plain English, what's being discussed in this

12  section?

13  A.  In plain English, it basically requires all staff members

14  and coaches each year to provide a detailed list of any income

15  that they receive outside of their compensation as an athletics

16  department employee.  It's an exhaustive list that we require

17  them to put it all down on paper so that the compliance office

18  can review all that outside income to make sure that it is a

19  permissible source and that they've disclosed it correctly.

20  Q.  Why did Evans need to report outside income?

21  A.  We require all staff members and coaches to report that so

22  we can review the outside income to make sure that we don't

23  have a potential conflict or a violation either moving forward

24  or one that we need to investigate at that time.

25  Q.  If we can now look at the very bottom of the same page,

J4NDaw2                          Miller - Direct

1    NCAA Enforcement Procedures, Section 7, which goes onto the

2    next page.  Could you read that section for the jury, please.

3    A.  Yes.  "Section 7.  NCAA Enforcement Procedures.  Pursuant

4    to NCAA bylaw 11.2.1, the employee understands and agrees that

5    if he is found in violation of NCAA legislation, he shall be

6    subject to disciplinary or corrective action as set forth in

7    the provisions of the NCAA enforcement procedures, including

8    suspension without pay or termination of employment for

9    significant or repetitive violations.  Any such disciplinary or

10   corrective action shall be in addition to and in no way limit

11   or restrict any actions the university may take pursuant to

12   paragraph 8 herein."

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  What's being discussed there?

2    A.  That is making the coach that signs this contract aware

3    that they are subject to the NCAA enforcement procedures for

4    any type of violations or investigations and that their

5    employment could be subject to termination based off of those

6    actions, findings.

7    Q.  Why is this in Evans's contract?

8    A.  That is in all staff members' contracts, all coaches, staff

9    members, to clearly articulate that are subject to the NCAA

10   investigative procedures and that they have to abide by those.

11   Q.  We can now take a look at page five, the very next page.

12   And I want to focus on 8.01(a).

13   A.  8.01(a)  "The university may terminate for cause.  The

14   university shall have the right to terminate this employment

15   agreement prior to its expiration date if there is cause for

16   terminating employee's employment.  In addition to, and as an

17   example of its normally understood meaning in employment

18   contracts, the term termination for cause shall be understood

19   to include, but not limited to, any of the following:"

20   Q.  If we could highlight no. 4 right below (a).  If you could

21   read that.

22   A.  Subsection (4).  "Committing a major violation of NCAA

23   legislation, or a series or pattern of secondary violation of

24   NCAA legislation, while at the university, or knowingly

25   committing any violation of NCAA legislation."

J4N9DAW3                         Miller – Direct

Q.  Why did the university retain the right to terminate Evans

if he committed any NCAA violations?

A.  We, as the athletic department in the university, want to

retain that right so that if a coach either continually

violates rules or violates an egregious rule, that we can

remove that coach for cause in this employment -- in this

employment agreement, in the compensation agreement, and be

able to move forward without that coach.

Q.  Now, if Lamont Evans were to have taken cash from a sports

agent or financial adviser in exchange for directing his

players to retain the services of that agent or adviser, would

that conduct have violated any of the terms of the agreement we

just went over?

        MR. HANEY:  Your Honor, I object.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, it would have.

Q.  Which terms would that conduct have violated?

A.  That would have violated 8.01(a) subsection (4).

Q.  Any others?

A.  If the coach also failed to report that information to the

compliance office or the athletics director, it would have

violated subsections (5) and (6).

Q.  Now I want as to switch gears and focus on a different

document.  If you could take a look at Government Exhibit 1003.

A.  OK.

J4N9DAW3                          Miller - Direct

1   Q.  Do you recognize this document?

2   A.  I do.

3   Q.  I believe it's -- there are multiple documents.  Do you

4   recognize those?

5   A.  Yes, I do.

6   Q.  And what are they?

7   A.  These are extensions of the employment agreement that we

8   just covered for Lamont Evans.

9   Q.  And what relationship do these documents have with the

10  contract we just went over?

11  A.  These actually relate to just the term of the agreement and

12  that it is being extended for a 12-month period.  But all

13  other -- all other parts of the employment agreement originally

14  covered are still in place.

15  Q.  And where does it say that the terms of the agreement we

16  just went over are incorporated in these extensions?

17  A.  If you look at the first paragraph, the second sentence

18  where it states, "All of the terms, conditions, and provisions

19  of your employment agreement shall remain in full force and

20  effect during the period of the extension granted herein."

21          MR. BOONE:  If we could highlight for the jury the

22  last sentence in the first full paragraph.

23          If we could flip through the pages contained in this

24  exhibit.

25  Q.  What years do those documents cover in terms of granting

J4N9DAW3                         Miller - Direct

1    extensions?

2    A.  It extended his employment agreement the first time from

3    April 1, 2013 through March 31, 2014.  And then, again, on

4    April 1, 2014 through March 31, 2015.  And then, again, for the

5    third time on April 4, 2015 through March 31, 2016.

6    Q.  Do these extensions appear to have been signed?

7    A.  Yes, they were.  They're signed by our athletics director,

8    Ray Tanner; Amy Stone, the Secretary of the U.S.C. Board of

9    Trustees; and Lamont Evans, the assistant men's basketball

10   coach.

11   Q.  If we could now take a look at Government Exhibit 1005.

12            Do you recognize the documents in this exhibit?

13   A.  I do.

14   Q.  What are they?

15   A.  This is an internal human resources document that just

16   notifies Lamont Evans of the salary increase for a specific

17   fiscal year.

18   Q.  And so focusing on the page on the screen now, where did it

19   indicate what the salary increase was?

20   A.  If you look at the new base salary, it states that it is

21   $140,000.

22   Q.  OK.

23   A.  And that's towards the top.

24   Q.  And if we could look at the next page in this exhibit.

25   Where does it indicate on this page what the salary increase is

J4N9DAW3                          Miller - Direct

for the year 2014-2015?

A.   Again, if you look at the new base salary, it states it is
$178,500.

Q.   Now, stepping away from the documents for a moment.  What,
if anything, does the University of South Carolina do to ensure
that its coaches comply with NCAA rules?

A.   We at the University of South Carolina, especially in the
compliance office, have a very extensive education program that
we provide to our student athletes, our coaches and our staff.
When I first joined South Carolina's athletics department in
the compliance office we had a full-time staff of eleven
members.  I think we have now eight full-time staff members.

        Each one of those staff members is tasked with being a
liaison to a specific sport or multiple sports.  And their job
as a liaison is to be the direct contact for coaches and
student athletes and parents or family members of those student
athletes for that specific sport.

        As a liaison, they are there to answer questions in
terms of NCAA rules and what the coach of a student athlete can
or cannot do.  If there is a discrepancy with that rule, in
terms of the facts just don't really apply to that rule nice
and neatly, the liaison will then work with the Southeastern
Conference in the NCAA to issue an interpretation, which is a
binding agreement of what they're going to go forward and how
the rule would be applied.  They would cover that with the

1    student athletes and coaches.

2         And then we educate multiple times a year, I try to

3    have our staff educate our coaches and our student athletes at

4    least two to three times a month on certain NCAA rules that may

5    relate to the time period of what is going on at that period of

6    time or that month.

7         But we review everything from extra benefits to what

8    they can and cannot do in recruiting, what a student athlete

9    can and cannot receive.  We cover pretty much all the NCAA

10   rules within that year.  And that's a continual education

11   process that we do.

12        We also travel with the teams so that we are there if

13   any questions arise on the road for away games, that they're

14   able to ask us at that point in time.  And then we also have,

15   each staff member, coach, and student athlete fill out

16   beginning-of-the-year forms that details all of their

17   obligations under NCAA rules.  And we cover that in a more

18   extensive education program.

19   Q.  Now, we've talked a lot about Lamont Evans.  What

20   involvement, if any, did you have in training Evans on the NCAA

21   rules?

22   A.  I actually worked as a liaison to the men's basketball

23   program when I first started at South Carolina and I would

24   educate the coaches, including Lamont Evans, on NCAA rules.

25   Q.  And you just testified that coaches have to fill out

J4N9DAW3                         Miller - Direct

1    documentation certifying they've been educated on the rules.

2    Did you say that was annually?

3    A.   Yes.  At the beginning of every year.

4    Q.   And is that a continuing obligation?

5    A.   That is a continuing obligation.  Anytime something is

6    updated or they become aware of an issue, they have to alert

7    the compliance office at that time.

8    Q.   Now if we could take a look at Government Exhibit 1001.

9          Do you do you recognize the document in Government

10   Exhibit 1001?

11   A.   I do.

12   Q.   What are they?

13   A.   This is the University of South Carolina's compliance

14   office form 10.1 which is the ethical conduct and certification

15   of compliance form.

16          This is a form that we have all student athletes,

17   staff members, and coaches sign at the beginning of every year.

18   And this form details out that they understand that anytime

19   they become aware of or were involved in an NCAA issue they

20   have to alert the compliance staff at that time.

21   Q.   And what's the purpose of having coaches fill out this

22   form?

23   A.   This is to make them aware when they're signing it that if

24   they know of any type of violations or potential violations or

25   issues that they need to make us aware at that time and that

J4N9DAW3                        Miller - Direct

1   they have an ongoing obligation to continue that duty.

2   Q.  Are South Carolina's coaches required to fill out this

3   form?

4   A.  Yes, they are.

5   Q.  So let's just go over some of the terms in the form.  I

6   want to highlight first the very first full paragraph that

7   begins "as an employee," if you could read that section for the

8   jury please.

9   A.  "As an employee the University of South Carolina athletics

10  department, I understand that I am required to adhere to all

11  NCAA, Southeastern Conference and institutional rules, policies

12  and procedures.  Per NCAA bylaw 10.1, I am also aware that

13  unethical conduct by a prospective or enrolled student athlete

14  or a current or former institutional staff member may include,

15  but is not limited to."

16  Q.  So what is that paragraph explaining?

17  A.  That is just stating that they have an obligation, anyone

18  who signs this, has an obligation to adhere to all NCAA, SEC,

19  and institutional rules.

20  Q.  If we could look at a couple of these numerous rules, if we

21  could start with number one.

22         If you could read that?

23  A.  "1.  Withholding information from the NCAA or the

24  institutional compliance office or senior staff members,

25  relevant to a violation of NCAA or Southeastern Conference

1   regulations."

2   Q.  So what does this section discuss?

3   A.  That is discussing that if that staff member knows of or is

4   aware of any type of violations or potential violations, they

5   should not withhold that information and they must report that

6   immediately.

7   Q.  If we could now look at no. 4.

8   A.  "No. 4.  Knowing involvement in offering or providing a

9   prospective or enrolled student athlete an improper inducement

10  or extra benefit or improper financial aid."

11  Q.  So what is being discussed there?

12  A.  It's being discussed that a coach or staff member cannot

13  knowingly provide any type -- anything of value to a high

14  school prospective student athlete or an enrolled student

15  athlete that would be considered an inducement to either enroll

16  with that school or to continue playing.

17  Q.  And if we could take a look at no. 6.

18  A.  "Receipt of benefits by an institutional staff member for

19  facilitating or arranging a meeting between a student athlete

20  and an agent, financial adviser or representative of an agent

21  or adviser (e.g. runner)."

22  Q.  What's being discussed there?

23  A.  That is alerting the staff member or coach that signs this

24  form that as an institutional staff member they cannot receive

25  any type of benefits to arrange or facilitate meetings with a

J4N9DAW3                    Miller - Direct

student athlete and anyone that is trying to represent the

student athlete in their professional career.

Q.   The word "runner" is used there.   What is a runner?

A.   A runner in terms of NCAA speak is anyone who works for an

agent or a financial adviser that is a -- acting as a

go-between, between that agent and financial adviser and that

student athlete.

Q.   And were these forms signed by Lamont Evans?

A.   They were, yes.

Q.   What years?

A.   It looks like Lamont signed this on August 13, 2014.   And

August 17, 2015.

Q.   If we could now look at the last set of documents,

Government Exhibit 1006.

         Do you recognize the documents in Government Exhibit

1006?

A.   I do.

Q.   What are they?

A.   These are, again, compliance forms that we have each staff

member, student athlete, and coach fill out -- I'm sorry, not

student athlete -- coach and staff member fill out that asks

for their annual outside income.

         Basically what we are asking for is any income that

they have received in a given year or plan to receive in a

given year that is outside of the compensation that they

J4N9DAW3                         Miller - Direct

1  receive from the athletics department or university for their

2  employment.

3  Q.  And what's the purpose of having a coach fill out this

4  form?

5  A.  The purpose of this is to determine whether or not they

6  have or will receive any type of outside income that could

7  potentially be an NCAA Southeastern Conference or institutional

8  violation and so that we can do our due diligence to vet that

9  outside income and make a determination of whether or not a

10 violation has or could occur.

11 Q.  And does it appear Evans reported any outside income?

12 A.  He did not.

13 Q.  You mentioned earlier the concept of having a

14 continuing obligation.  What was that again?

15 A.  Yes.  We require, and when we have these forms filled out

16 at the beginning of the year, we do the education with the

17 coaches, that they are required to continually update either

18 the outside income form or they have a continual obligation to

19 bring forward any potential violations to the compliance staff.

20 Q.  And that would apply to forms like this as well?

21 A.  Yes.

22 Q.  In 2015 and 2016 what, if anything, did you know about

23 Lamont Evans accepting money from a financial adviser or an

24 agent in exchange for his agreement to steer players at South

25 Carolina to that adviser or agent?

1          MR. HANEY:  Objection, your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  I didn't know anything.

4    Q.  Had you become aware of such an arrangement between Evans

5    and outside adviser, what effect, if any, would it have had on

6    Evans's employment?

7    A.  If we would have become aware of Evans receiving any type

8    of impermissible benefits in relation to an agent or steering a

9    player to an agent, we would have likely terminated Evans's

10   contract at that point in time.

11   Q.  What if you learned that Evans gave the money that he

12   received to a current student athlete or a student athlete he

13   was recruiting, would that have made a difference in your

14   decision?

15         MR. HANEY:  Objection, your Honor.  Perhaps we could

16   be heard.

17         THE COURT:  OK.  Continue.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. HANEY:  It seems to me they're trying to elicit

3    hearsay testimony from Mr. Miller about things he may have no

4    personal knowledge of by asking him this line of questioning

5    that it seems they're going into and they're already into.

6          MR. BOONE:  Your Honor, we didn't ask him to recall

7    any statements made outside of the courtroom.  He's simply

8    stating based on his knowledge as someone who works in the

9    athletic department and is pretty high up in the athletic

10   department what the university would have done had they learned

11   certain facts.  We haven't asked him to discuss certain

12   conversations with others that have not happened.

13         MR. MOORE:  In addition, it's speculative.  They're

14   asking him to speculate on facts that have not been proven to

15   this jury or presented to this jury.  They've decided to call

16   him first.  That's their decision to call him first.  But they

17   can't call him first and ask him to speculate on evidence that

18   might come through another witness.

19         MR. HANEY:  My point to that point, I believe he's

20   already asked him a few questions causing him to speculate but

21   now, more specifically, he's asking questions to speculate on

22   matters concerning Lamont Evans that's going to get into some

23   hearsay.

24         MR. SOLOWIEJCZYK:  He's not actually being asked to

25   speculate as to anything.  He's just being asked if certain

J4N9DAW3                         Miller - Direct

1    things are true, what would the university have done in

2    response to them.  It goes directly to materiality, which is

3    one of the elements of honest services wire fraud.

4              I will let your Honor know we engaged in very similar

5    lines of questioning with NCAA compliance officers at the Gatto

6    trial and were permitted to do so.  It's plainly relevant to

7    materiality.  If you want, I can cite you some cases that say

8    what are known as guilt-assuming hypotheticals are permissible

9    but it goes directly to materiality.

10             He's not being asked to say whether it's true or not.

11   He's just being asked what would the university have done if it

12   turns out these facts weren't borne out.

13             THE COURT:  They certainly are hypothetical questions.

14   I don't know that they're speculative because they are asked to

15   apply a particular set of facts to the rules that were just

16   read.

17             I understand the basis for the objections.  I'm going

18   to overrule them.

19             MR. HANEY:  Thank you, your Honor.

20             MR. MOORE:  Yes, sir.

21             (Continued on next page)

22

23

24

25

1           (In open court)

2    Q.  I believe where we left off was you had just testified that

3    had you known Evans had received money in exchange for steering

4    players he coached to an agent, financial adviser, it would

5    have likely resulted in his termination.

6           My next question was:  In making that determination,

7    would it have made a difference if you learned that the money

8    he accepted he gave to players on the team or players he was

9    trying to recruit to the team?

10   A.  Based on that scenario we would have still terminated his

11   employment because if he would -- if he were to have provided

12   that money to a student athlete at that point in time, that

13   student athlete would also be ineligible.  And if we would have

14   competed that student athlete while ineligible, we would

15   probably be forced to vacate any of those wins that we had

16   while that student athlete competed.

17   Q.  What penalties, if any, could South Carolina incur if a

18   determination is made that a coach at a university accepted

19   money -- excuse me, a determination had been made by the NCAA

20   that a coach at the university accepted money from a financial

21   adviser or an agent in exchange for steering his players to

22   attain the services of that agent or adviser?

23           MR. CHANEY:  Objection, your Honor.

24           THE COURT:  Overruled.

25           THE WITNESS:  We as the institution could face an

J4N9DAW3                      Miller - Direct

1   institutional fine from the NCAA.  If the student athlete

2   received impermissible benefits from the coach and competed

3   while ineligible, we could be forced to vacate the wins in

4   which the student athlete participated.  If we won a

5   championship or reached, in this case, the Final Four, we could

6   be forced to vacate that and erase that -- erase those records

7   from our history books.  We could be forced to lose recruiting

8   days, reduction of scholarships.  It really just varies based

9   on the severity and the amounts.

10  Q.  What efforts, if any, does South Carolina make to help its

11  student athletes choose agents and advisers?

12  A.  Again, we have an extensive education program with our

13  student athletes.  That also includes student athletes' family

14  members in certain sports.  For football and in the men's and

15  women's basketball prior to a lot of our home games -- this

16  doesn't happen every home game but the majority of them we have

17  the parents and family and friends education session where a

18  lot of those times we are covering what a student athlete or

19  those family members can and cannot receive.  And we also talk

20  about the agent selection process and interview process and

21  what they can and cannot do with agents going forward.

22          The student athletes that we believe have the

23  potential to go professional in their sport, we meet with those

24  student athletes regularly and are doing either formal or

25  informal education with them.  And then we require all agents

1    or those that work for an agent to register with us, to inform

2    us of who they may be recruiting so that we can educate our

3    student athletes on that process.

4            We have even gone so far as to sit in with some of our

5    student athletes when they're interviewing agents or potential

6    representatives.  And we also will provide them questions that

7    they can ask or help ask those questions for them.  And we also

8    provide our conference rooms or our offices to be able to do

9    that.

10   Q.  And why does South Carolina make those efforts for student

11   athletes?

12   A.  Well, it's twofold.  One is to help the student athlete

13   make the right selection and have the student athlete be

14   comfortable in that selection that they have fully vetted it.

15           Two, it's to protect the university and the student

16   athlete's eligibility to make sure that either the student

17   athlete or the family member is not accepting anything that

18   could put their eligibility at risk.

19           MR. BOONE:  One moment, your Honor.

20           No further questions.

21           THE COURT:  Cross-examination.

22           MR. HANEY:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MR. HANEY:

25   Q.  Mr. Miller, good morning?

1    A.  Good morning.

2    Q.  Now, Mr. Miller, you testified that from 2009 to

3    approximately 2013 you worked for the NCAA; is that correct?

4    A.  That's correct.

5    Q.  Why was it that you left the NCAA?

6    A.  I received the offer from the University of South Carolina

7    Athletics Department.

8    Q.  Thank you.

9         During that time at the NCAA you testified that you

10   were an assistant director of enforcement staff.  Is that a

11   fair recollection of your testimony?

12   A.  That is correct.

13   Q.  And is it fair to say that while working for the NCAA you

14   handled issues that included issues that related to agents?

15   A.  That is correct.

16   Q.  And as you've testified, also agent runners, as you called

17   them, correct?

18   A.  Correct.

19   Q.  And at one point you were involved with an enforcement

20   division that dealt with agents gambling and amateurism; is

21   that right?

22   A.  That is correct.

23   Q.  Am I also correct in saying that during your time with the

24   NCAA you were even a lead investigator on a number of Division

25   I committee on infraction cases; is that correct?

J4N9DAW3                         Miller - Cross

1   A.  That's correct.

2   Q.  Would it be fair to say some of those Division I infraction

3   committee investigation cases included improper athlete/agent

4   contact?

5   A.  That is correct.

6   Q.  And during your time with the NCAA you also served on a

7   committee dealing with ethical conduct?  Fair to say?

8   A.  Yes.  That is correct.

9   Q.  And you actually had emphasis to NCAA football issues,

10  right?

11  A.  Yes, that is correct.

12  Q.  And NCAA and NFL agent regulation working group?

13  A.  Yes.  That is correct.

14  Q.  So you worked for the NCAA approximately three-and-a-half

15  years; is that right, doing my math?

16  A.  It was a little over four years.

17  Q.  Thank you.

18          Then around 2013 is the point in time when you became

19  employed at the University of South Carolina, correct?

20  A.  Yes.

21  Q.  And then from the years of 2013 through 2017 you were

22  assigned specifically to the men's basketball department; is

23  that correct?

24  A.  No.  I was in the compliance office and men's basketball

25  was one of my sports that I was a liaison to.

J4N9DAW3                          Miller - Cross

1   Q.   Fair enough.  So the men's basketball department was one of

2   the programs under your purview, fair to say?

3   A.   Yes.

4   Q.   Fair to say, sir?  I'm sorry.  I cut you off.

5   A.   Yes.  That is correct.

6   Q.   And in that capacity you would monitor a number of things

7   associated with the men's basketball program, would you agree?

8   A.   That is correct.

9   Q.   You would monitor the vehicles they would drive?

10   A.   That is correct.

11   Q.   And it would be important to do that to make sure that a

12   basketball player wasn't driving a vehicle that perhaps would

13   seem a little out of sorts?

14        Is that a fair characterization?

15   A.   We have all of our student athletes register their vehicles

16   with us to make sure that either they or a family member has

17   provided those vehicles and they've not come from an

18   impermissible source.

19   Q.   Thank you.

20        An impermissible source could include an agent,

21   correct?

22   A.   Yes.

23   Q.   And it could also include an agent runner, as you've

24   stated, correct?

25   A.   Yes.

J4N9DAW3                          Miller - Cross

1    Q.  And you would also monitor their housing situation?  Is
2    that a fair statement?
3    A.  That is correct.
4    Q.  You would go to the practices?
5    A.  That is correct.
6    Q.  And I think you noted you even on occasion would travel
7    with the basketball team, fair to say?
8    A.  Yes.
9    Q.  And part of that job is monitoring coaches' telephone
10   calls?
11   A.  That is correct.
12   Q.  And text messages, correct?
13   A.  That is correct.
14   Q.  Because, as you're familiar in compliance, there are what
15   are called dead recruiting periods in the compliance world of
16   college athletics, fair to say?
17   A.  That is fair to say.
18   Q.  You know what I mean by that, dead recruiting periods in
19   terms of the recruiting calendar, correct?
20   A.  Correct.
21   Q.  And you've testified that there was a point in time when
22   Lamont Evans was one of the men's basketball staff during this
23   period of time when you were monitoring the men's basketball
24   program?  Is that a fair statement?
25   A.  Yes.

1   Q.  Thank you.

2        And you knew Mr. Evans well; is that right?

3   A.  I mean I knew him in a working relationship, yes.

4   Q.  Thank you.

5        And you've testified that you personally on occasion

6   trained him in NCAA rules compliance?

7   A.  Yes.  He would be a part of the educational sessions we

8   would do with the coaches and staff.

9   Q.  How long did those educational sessions last?  Was it a

10   training period of a particular month or two or was it an

11   ongoing program?

12   A.  That's an ongoing program.

13   Q.  And Mr. Evans's phonecalls also would have been monitored

14   by the compliance department, including you?

15   A.  That is correct.

16   Q.  And any rules violations would have been reported to the

17   NCAA, I would assume, correct?

18   A.  That is correct.

19   Q.  You didn't ever report any rules violations associated with

20   Mr. Evans, did you?

21   A.  Not during my time at South Carolina, no.

22   Q.  You never contacted the FBI to report any crimes that

23   occurred involving Mr. Evans, did you?

24   A.  No.

25   Q.  You're a lawyer, right?

J4N9DAW3                          Miller - Cross

1    A.  I am.  Yes, sir.

2    Q.  Would you agree with me as an attorney that in your

3    position at the University of South Carolina, you never would

4    have considered an NCAA rules violation a federal crime, would

5    you?

6              MR. BOONE:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Can you repeat the question.

9    Q.  Yes.  You as an attorney in your time at the University of

10   South Carolina, you never would have considered an NCAA rules

11   violation a federal crime, would you have?

12   A.  No.  I mean not --

13   Q.  That's a yes-or-no answer.  Yes or no?

14   A.  No.

15   Q.  Because you, as a lawyer working in compliance for the

16   NCAA, you never considered NCAA rules violations federal

17   crimes, right?

18             MR. BOONE:  Objection.

19             THE COURT:  Overruled.

20             THE WITNESS:  At my time during a NCAA investigator I

21   was investigating NCAA cases.

22   Q.  Sir, that's not what I asked you.

23             MR. HANEY:  May I ask the question again, your Honor?

24             THE COURT:  One last time.

25             MR. HANEY:  Thank you.

J4N9DAW3                        Miller - Cross

1   Q.  You, as an attorney working for compliance at the

2   University of South Carolina, you never considered an NCAA rule

3   violation to be a federal crime, right or wrong?

4   A.  That is correct.  No, I did not.

5   Q.  Now, you have some awareness, correct, that my client was

6   associated with Lamont Evans while at the University of South

7   Carolina?

8   A.  I've become aware of that now.

9   Q.  Did you know back then at that time?

10  A.  No.

11  Q.  Given your experience, which you've testified includes

12  serving on an NFL agent regulation working group, you know the

13  difference between an agent and a runner, don't you?

14  A.  Yes.

15  Q.  And you've testified today that a runner is one that would

16  work under the direction of a sports agency, correct?

17  A.  Either a sports agent or someone trying to represent a

18  student athlete.

19  Q.  Or even a marketing company, right?

20  A.  Correct.

21  Q.  And would you agree with me that a runner is also one who

22  recruits future talent for the company they work for?

23  A.  Yes.

24  Q.  And that would include recruiting talent on college

25  campuses such as yours?  Fair to say?

J4N9DAW3                          Miller - Cross

1    A.  Yes.

2    Q.  And you know with all your experience that you've testified

3    to today that the runner may do things that the agent doesn't

4    want to get caught doing on campus?  Fair to say?

5    A.  I would have no idea what that agreement between an agent

6    and a runner is.

7    Q.  I'm not asking you what the agreement is.

8           I'm asking what your personal knowledge is in all your

9    experience you testified to with your understanding of

10   agent/athlete world, would you agree with me that runners are

11   on campus doing things that the agents don't want to get caught

12   doing?

13          MR. BOONE:  Objection.

14          THE COURT:  Sustained.

15   Q.  Would you agree that runners are well known to pay -- is he

16   going to let me finish the question?

17          THE COURT:  Why don't you finish the question.

18   Q.  Would you agree with me your experience that you've

19   testified to that runners would also pay players on campus?

20          MR. BOONE:  Objection.

21          THE COURT:  Overruled.

22          THE WITNESS:  In my experience I have seen runners

23   that have paid or that have been alleged to have paid student

24   athletes.

25   Q.  That's not unfamiliar to you at all, is it?

J4N9DAW3                        Miller - Cross

1   A.  No.  During my time at the NCAA I did see that.

2   Q.  In fact, wouldn't you agree that perhaps you investigated

3   hundreds of occasions where runners were paying student

4   athletes on campuses?

5   A.  No.  Not hundreds.

6   Q.  Numerous?

7   A.  A few, yes.

8   Q.  Give me your best estimation of how many.

9   A.  Ten to fifteen.

10  Q.  And isn't it true that you know based on your experience

11  with both the NCAA and the University of South Carolina that a

12  sports agent needs to be licensed by the respective players

13  associations?

14  A.  Yes.

15  Q.  And you know that would include an NBA agent being required

16  to be licensed by an NBA players association, correct?

17  A.  That is correct.

18  Q.  And you also know with your experience in this space in

19  this world that an NCAA student Division I student athlete,

20  they can't sign with a runner, can they?

21  A.  They can sign an agreement with a runner but it would not

22  be certified by the players association, no.

23  Q.  You know that to sign an NBA player/agent contract the

24  student athlete has to sign with a NBA certified licensed

25  agent, correct?

J4N9DAW3                         Miller - Cross

1    A.  Yes.  That's correct.

2    Q.  And as you sit here today do you know that Christian

3    Dawkins was never a licensed NBA player agent?

4              MR. BOONE:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  I don't know Christian Dawkins.

7    Q.  I didn't ask you if you knew Christian Dawkins.  I asked if

8    you knew sitting here today if Christian Dawkins was ever a

9    licensed NBA player agent?

10   A.  I have no idea.

11   Q.  Do you know as you sit here today if Christian Dawkins was,

12   in fact, a runner for a licensed NBA player agent?

13   A.  I have no idea.

14   Q.  Are you familiar with an individual by the name of Andy

15   Miller?

16   A.  I am.

17   Q.  How are you familiar with Andy Miller?

18             MR. BOONE:  Objection, scope.

19             THE COURT:  Overruled.

20             THE WITNESS:  I knew -- I heard of Andy Miller's name

21   and his company when I was working at the NCAA in the

22   enforcement division.

23   Q.  I bet you did.  You didn't hear anything good about Andy

24   Miller, did you, when you were with the NCAA enforcement

25   division?

1              MR. BOONE:  Objection.

2              THE COURT:  Sustained.

3    Q.  While you were at the NCAA enforcement division isn't it

4    true you heard Andy Miller was violating NCAA rules, didn't

5    you?

6              MR. BOONE:  Objection.

7              THE COURT:  Sustained.

8    Q.  What was your involvement at the NCAA as it related to Andy

9    Miller?

10   A.  I didn't have any involvement with Andy Miller.

11   Q.  What was your personal knowledge of the involvement of the

12   NCAA's involvement with Andy Miller?

13             MR. BOONE:  Objection.

14             THE COURT:  Sustained.

15             MR. HANEY:  I'll move on, your Honor.  Thank you.

16   Q.  Are you familiar with a former University of South Carolina

17   basketball player by the name of PJ Dozier?

18   A.  I am.

19   Q.  Would you agree with me that PJ Dozier was a great

20   basketball player?

21             MR. BOONE:  Objection.

22             THE COURT:  Overruled.

23   Q.  At South Carolina?

24   A.  Yes.  He was a good basketball player for us.

25   Q.  Good enough to be part of the team that went to the Final

J4N9DAW3                         Miller - Cross

1    Four at South Carolina, right?

2    A.  That's correct.

3    Q.  In fact, he was a starter on that team?

4    A.  That's correct.

5    Q.  One of your top players at South Carolina, would you agree?

6    A.  He was one of them, yes.

7    Q.  And would you also agree with me that that Final Four

8    appearance of the University of South Carolina, the first one

9    in school history, resulted in hundreds of thousands of dollars

10   of revenue for South Carolina?

11              MR. BOONE:  Objection.

12              THE COURT:  Sustained.

13   Q.  Would you agree that if a college basketball team Division

14   I goes to the Final Four there will be a lot of revenue

15   generated?

16              MR. BOONE:  Objection.

17              THE COURT:  Sustained.

18   Q.  You are aware that back in 2015 and 2016 PJ Dozier was an

19   NBA draft prospect, fair to say?

20   A.  That is fair.

21   Q.  It's also fair to say that PJ Dozier would be the type of

22   player at the University of South Carolina who would be

23   recruited by NBA agents, correct?

24   A.  Yes.  That is correct.

25   Q.  Mr. Miller, you're an attorney, as we've established?

J4N9DAW3                          Miller - Cross

1    A.  Yes.

2    Q.  And you're very familiar with the term of firsthand

3    knowledge then, correct?

4    A.  Yes.

5    Q.  And as you sit here today, you don't have any firsthand

6    knowledge at all, do you, that my client ever paid former South

7    Carolina basketball coach Lamont Evans, do you?

8    A.  I do not.

9            MR. HANEY:  Thank you.  Nothing further.

10           THE COURT:  Mr. Chaney.

11   CROSS-EXAMINATION

12   BY MR. CHANEY:

13   Q.  Good morning, Mr. Miller.

14   A.  Good morning.

15   Q.  I've got a few more questions.  You testified already that

16   basketball coaches at University of South Carolina, they get

17   paid a salary, right?

18   A.  That is correct.

19   Q.  But they're also allowed to generate outside income?

20   A.  Yes.  As long as it is a permissible source.

21   Q.  And their permission to do so is actually explicit in their

22   employment contract?

23   A.  I would have to go back and read the employment contract.

24   Q.  And Mr. Miller, you would agree with me, specifically in

25   part 6 which is entitled outside income, the mention of outside

J4N9DAW3                          Miller - Cross

1   income necessarily includes permission to generate outside

2   income?

3   A.  Again, yes.  They can generate outside income as long as it

4   is from a permissible source.

5   Q.  I'm going to ask you yes-or-no questions, OK.  They're

6   allowed to generate outside income, correct?

7   A.  Yes.

8   Q.  It's actually not uncommon for coaches at Division I

9   schools to generate outside income, right?

10  A.  That is correct.

11  Q.  They get paid for speaking engagements?

12  A.  That is correct.

13  Q.  They get paid for appearance fees?

14  A.  Correct.

15  Q.  They get paid -- they have actually their own sponsorship

16  arrangements, correct?

17  A.  Correct.

18  Q.  Getting paid outside money including a sponsorship and

19  speaking fee arrangements does not violate University of South

20  Carolina policy?

21  A.  That is correct.  Yes.  As long as they are abiding by

22  the --

23  Q.  That's a yes, right?

24  A.  Yes.

25  Q.  And it also does not violate NCAA laws, correct?

1    A.   If it is from a permissible source, correct.

2    Q.   That's a yes, right?

3    A.   Yes.

4    Q.   University of South Carolina generates a tremendous amount

5    of revenue from their athletics department, correct?

6              MR. BOONE:   Objection.

7              THE COURT:   Sustained.

8    Q.   You would agree with me, Mr. Miller, that South Carolina is

9    paid directly by the company Under Armour to sponsor the

10   athletics department?

11             MR. BOONE:   Objection.

12             THE COURT:   Overruled.

13             THE WITNESS:   We do receive -- we have a contract with

14   Under Armour and receive compensation from Under Armour, yes.

15   Q.   How much money annually do you receive from Under Armour?

16             MR. BOONE:   Objection.   Relevance.

17             THE COURT:   Sustained.

18   Q.   Part of your arrangement with Under Armour is that they pay

19   you compensation in exchange for your student athletes wearing

20   their brand?

21   A.   It's in exchange to provide our student athletes with

22   apparel and then also to have the staff members and the coaches

23   wear sideline apparel as well too.

24   Q.   So your testimony today is that Under Armour does not get

25   an advertising benefit from your student athletes wearing their

J4N9DAW3                         Miller - Cross

 1   apparel?

 2              MR. BOONE:  Objection.  Misstates.

 3              THE COURT:  Sustained.

 4   Q.  In addition to the advertising benefit that Under Armour

 5   receives, they also receive an advantage in recruiting talented

 6   pro level student athletes from the University of South

 7   Carolina?

 8              MR. BOONE:  Objection.

 9              THE COURT:  Sustained as to the form.

10   Q.  You would agree with me, Mr. Miller, that Under Armour, in

11   exchange for the money they are providing University of South

12   Carolina, reaps a benefit to themselves in the form of

13   advantages in recruiting top talent that comes out of the

14   University of South Carolina?

15              MR. BOONE:  Objection.

16              THE COURT:  Overruled.

17              THE WITNESS:  In terms of what Under Armour views as a

18   benefit, I don't know.  We receive the benefit of having

19   apparel provided and compensation provided by Under Armour to

20   the athletics department.

21   Q.  To be clear, you don't just get apparel.  You also get

22   monetary compensation, right?

23   A.  Yes.  We do, yes.

24   Q.  To the tune of millions of dollars?

25              MR. BOONE:  Objection.

J4N9DAW3                           Miller - Cross

| | |
|---|---|
| 1 | THE COURT:  Sustained. |

Q.  Mr. Miller, you're in charge of NCAA compliance at
University of South Carolina, right?

A.  Yes.

Q.  And before that you actually had several years of
experience in the same field, NCAA compliance in amateurism at
NCAA?

A.  That is correct.

Q.  And you testified somewhat at length about these NCAA
so-called amateurism rules, right?

A.  That is correct.

Q.  And you told this jury on direct that the standard policy
is for schools to demand and maintain compliance with the NCAA
rules regarding amateur players and the involvement of coaches,
right?

A.  That is correct.

Q.  But isn't it also true that the Rice Report revealed that
compliance NCAA amateurism rules is, in fact, the exception and
not the rule?

        MR. BOONE:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  Can you repeat the question?

Q.  Isn't it true, Mr. Miller, that the Rice Report actually
revealed that compliance with NCAA amateurism rules at large
universities is the exception and not the general rule?

J4N9DAW3                          Miller - Cross

1   A.  I don't remember seeing that in the Rice Report.  I can't

2   specifically refer to that.

3   Q.  You would agree with me that on cross-examination by

4   Mr. Haney you had testified to multiple instances of runners

5   paying student athletes with university knowledge?

6           MR. BOONE:  Objection.

7           THE COURT:  Overruled.

8           THE WITNESS:  In my investigations at the NCAA I did

9   see either agents or runners or people associated with them

10  provide impermissible benefits to student athletes.

11  Q.  Not just that they provided those benefits, but your

12  investigations revealed that those universities knew that that

13  conduct was occurring?

14          MR. BOONE:  Objection.

15          THE COURT:  Sustained.

16  Q.  You mentioned on direct and cross-examination both, that

17  you did not have contemporaneous knowledge of Mr. Evans

18  accepting any form of illicit payment, correct?

19  A.  That is correct.

20  Q.  To the degree that you know anything about that, you have

21  received it after the fact, right?

22  A.  That is correct.

23  Q.  But you would agree with me that no one, not even the

24  government, is contending that Merl Code had anything to do

25  with those payments?

1           MR. BOONE:  Objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  I have no idea.

4   Q.  You're not aware of any allegation whatsoever that Merl

5   Code was involved in paying Lamont Evans at all?

6           MR. BOONE:  Objection.

7           THE COURT:  Overruled.

8           THE WITNESS:  I have no knowledge.

9           MR. CHANEY:  That's all I have, Judge.  Thank you.

10          THE COURT:  Any redirect?

11          (Counsel confer)

12          MR. BOONE:  Brief, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. BOONE:

15  Q.  Mr. Miller, I just want to ask you a few more questions.

16  You were asked questions on cross-examination about your

17  knowledge of outside income.  Does that sound familiar?

18  A.  That is correct.

19  Q.  And while you've worked -- when you worked at the

20  University of South Carolina in 2015, in 2016, you were not

21  aware whether or not Evans had received money from an agent or

22  an adviser to steer players on his team to that agent or

23  adviser, correct?

24  A.  I was not aware.

25          MR. BOONE:  No further questions, your Honor.

1          THE COURT:  Mr. Miller, you may step down.

2          THE WITNESS:  Thank you.

3          (Witness excused)

4          THE COURT:  You may call your next witness.

5          MR. BOONE:  Yes.  Although, your Honor, we have

6     several stipulations we'd like to read before.

7          THE COURT:  Very well.  Whenever you're ready.

8          MR. BOONE:  It is hereby stipulated an agreed by and

9     between the United States of America and Geoffrey S. Berman,

10    United States Attorney, Robert L. Boone, Noah Solowiejczyk, and

11    Eli J. Mark, Assistant United States Attorneys, of counsel,

12    Christian Dawkins, the defendant, by and with the consent of

13    his attorney, Steven Haney, Sr., and Merl Code, the defendant,

14    by and with the consent of his attorneys, Mark Moore, Andrew

15    Mathias, Allen Chaney and Darren Haley, from June 19, 2017 to

16    August 7 -- to August 18, 2017 and August 22, 2017 to September

17    25, 2017 there is a court-authorized wiretap on a cellular

18    phone associated with call number (989)493-4317 belonging to

19    Christian Dawkins, the defendant.  Government Exhibits 101

20    through 144 --

21         THE COURT:  I'm sorry, Mr. Boone.  Could I ask you to

22    just slow down just a bit.

23         MR. BOONE:  Yes.  Sorry.

24         Government Exhibits 101 through 144 are true and

25    accurate copies of recordings of calls or portions of calls

J4N9DAW3                          Redirect - Miller

 1    that were intercepted pursuant to the court-authorized wiretap

 2    of the 4317 phone.

 3          Government Exhibits 101T through 144T are true and

 4    accurate transcripts of recorded conversations contained in

 5    Government Exhibits 101 through 144 respectively.

 6          The identities of the participants, voice

 7    attributions, dates and times reflected on the Government

 8    Exhibits 101T through 144T are accurate.

 9          From September 7, 2017 through September 26, 2017

10    there was a court-authorized wiretap on a cellular phone

11    associated with call number (708)314-3402 belonging to Merl

12    Code, the defendant.

13          Government Exhibits 1 through 23 are true and accurate

14    copies of recordings of calls or portions of calls that were

15    intercepted pursuant to the court-authorized wiretap of the

16    3402 phone.

17          Government Exhibits 1T through 23T are true and

18    accurate transcripts of the recorded conversations contained in

19    Government Exhibits 1 through 23 respectively.

20          The identities and participants, voice attributions,

21    dates and times reflected on Government Exhibits 1T through 23T

22    are accurate.

23          From April 7, 2017 to June 2, 2017 there was a

24    court-authorized wiretap on a cellular phone associated with

25    call number (609)933-7246 belonging to Munish Sood.

J4N9DAW3                              Redirect - Miller

1          Government Exhibits 201 through 205 are true and

2     accurate copies of recordings of calls or portions of calls

3     that were intercepted pursuant to the court-authorized wiretap

4     of the 7246 phone.

5          Government Exhibits 201T through 205T are true and

6     accurate transcripts of recorded conversations contained in

7     Government Exhibits 201 through 205 respectively.

8          The identities of the participants, voice

9     attributions, dates and times reflected on Government Exhibits

10    201T through 205T are accurate.

11         There was a court-authorized consensual wiretap of the

12    cellular phone belonging to an FBI agent acting in an

13    undercover capacity, the undercover one phone.

14         Government Exhibits 301 through 303 are true and

15    accurate copies of recordings of calls or portions of calls

16    that were intercepted pursuant to the court-authorized

17    consensual wiretap of the undercover one phone.

18         Government Exhibits 301T through 303T are true and

19    accurate transcripts of the recorded conversations contained in

20    Government Exhibits 301 through 303 respectively.

21         The identities of participants, voice attributions,

22    dates and times reflected on Government Exhibits 301T through

23    303T are accurate.

24         There was a court-authorized consensual wiretap of a

25    cellular phone belonging to an FBI agent acting in an

1    undercover capacity, the undercover two phone.

2           Government Exhibits 351 through 354 are true and

3    accurate copies of recordings of calls or portions of calls

4    that were intercepted pursuant to the court-authorized

5    consensual wiretap of the undercover two phone.

6           Government Exhibits 351T through 354T are true and

7    accurate transcripts of recorded conversations contained in

8    Government Exhibits 351 through 354 respectively.

9           The identities of the participants, voice

10   attributions, dates and times reflected on Government Exhibits

11   351T through 354T are accurate.

12          Government Exhibits 401 through 415 are true and

13   accurate copies of recordings of calls or portions of calls

14   that were consensually recorded by Louis Martin Blazer, III.

15          Government Exhibits 401T through 415T are true and

16   accurate transcripts of the recorded conversations contained in

17   Government Exhibits 401 through 415 respectively.

18          The identities of participants, voice attribution,

19   dates and times reflected on Government Exhibits 401T through

20   415T are accurate.

21          It is further stipulated and agreed that this

22   stipulation may be received into evidence as a government

23   exhibit at trial.  This stipulation has been marked as

24   Government Exhibit 1902.

25          THE COURT:  Very well.

J4N9DAW3                          Redirect - Miller

1           MR. BOONE:  And we'd ask the stipulation be received.

2           THE COURT:  Without objection, it will be received.

3           MR. HANEY:  Thank you, your Honor.  No objection.

4           MR. MOORE:  No objection.

5           (Government's Exhibit 1902 received in evidence)

6           MR. BOONE:  I have two more stipulations to read.

7           It is hereby -- sorry, your Honor, I can skip the

8      preamble.

9           THE COURT:  Please do.

10          MR. BOONE:  During the period of April 2015 through

11     March 2017 Christian Dawkins, the defendant, was the user of

12     the e-mail account Loyd MGMT at Gmail.com maintained on the

13     servers of Google, Incorporated.

14          Government Exhibits 1310 through 1313 are true and

15     accurate copies of certain e-mails and attachments sent or

16     received from that e-mail account.  The dates, times, and

17     identifying information of senders and recipients in these

18     documents are accurate.

19          Government Exhibits 1601 through 1611, including all

20     parts and subdivisions thereof, are true and accurate copies of

21     text messages and related content sent or received using

22     cellular phones associated with the call numbers (708)314-3402

23     and (912)401-8240 respectively and belonging to Merl Code, the

24     defendant.

25          Government Exhibits 1613 through 1618, including all

1    parts and subdivisions thereof, are true and accurate copies of

2    text messages and related content sent or received using a

3    cellular phone belonging to Emanuel Richardson, the defendant.

4          Government Exhibits 1619 through 1633, including all

5    parts and subdivisions thereof, are true and accurate copies of

6    text messages and related content sent or received using a

7    cellular phone associated with the call number (989)493-4317

8    and belonging to Christian Dawkins, the defendant.

9          Government Exhibits 1634 through 1638, including all

10   parts and subdivisions thereof, are true and accurate copies of

11   text messages and related content sent or received using a

12   cellular phone belonging to an FBI agent acting in an

13   undercover capacity, the undercover one phone.

14         Government Exhibits 1638 through 1639, including all

15   parts and subdivisions thereof, are true and accurate copies of

16   text messages and related content sent or received using a

17   cellular phone belonging to an FBI agent acting in an

18   undercover capacity, the undercover two phone.

19         It is further stipulated and agreed that this

20   stipulation may be received into evidence as a Government

21   Exhibit at trial.  This stipulation, your Honor, is Government

22   Exhibit 1904.  We ask it be moved into evidence.

23         MR. HANEY:  No objection your Honor.

24         MR. MOORE:  No objection.

25         THE COURT:  There being no objection, it will be

J4N9DAW3                        Redirect - Miller

1    received.

2              (Government's Exhibit 1904 received in evidence)

3              MR. BOONE:  The next stipulation, I'll skip the

4    preamble.  Government Exhibits 501A through 501F and any

5    excerpts therefrom are true and accurate copies of a recording

6    of a meeting that took place on March 3, 2016 in South Carolina

7    and that was consensually recorded by one or more of the

8    meeting participants.

9              Government Exhibits 501A through T and through --

10   sorry.  Government Exhibit 501AT through 501FT are true and

11   accurate transcripts of recorded conversations contained in

12   Government Exhibits 501A through 501F respectively.

13             The identities of the participants, voice

14   attributions, dates and times reflected on Government Exhibits

15   501AT through 501FT are accurate.

16             Government Exhibits 506A through 506F and any excerpts

17   therefrom are true and accurate copies of a recording of a

18   meeting that took place on May 16, 2017 in New York and that

19   was consensually recorded by one or more of the meeting

20   participants.

21             Government Exhibits 506AT through 506FT are true and

22   accurate transcripts of recorded conversations contained in

23   Government Exhibits 506A through 506F respectively.

24             The identities of the participants, voice

25   attributions, dates and times reflected on Government Exhibits

J4N9DAW3                          Redirect - Miller

1    506AT through 506FT are accurate.

2             Government Exhibit 507 and any excerpts therefrom is a

3    true and accurate copy of a recording of a meeting that took

4    place on March 24, 2017 in New Jersey and that was consensually

5    recorded by one or more of the meeting participants.

6             Government Exhibit 507T is a true and accurate

7    transcript of the recorded conversations in Government Exhibit

8    507.

9             The identities of the participants, voice

10   attributions, dates and times reflected on Government Exhibit

11   507T is accurate.

12            Government Exhibits 50A through -- sorry.  508A

13   through 508D and any excerpts therefrom are true and accurate

14   copies of a recording of a meeting that took place on June 6,

15   2017 in New York and that was consensually recorded by one or

16   more of the meeting participants.

17            Government Exhibit 508AT through 508DT are true and

18   accurate transcripts of recorded conversations contained in

19   Government Exhibits 508A through 508D respectively.

20            The identities of the participants, voice

21   attributions, dates and times reflected on Government Exhibits

22   50AT -- 508AT through 508DT are accurate.

23            Government Exhibits 509A1 through 509A4 and 509B1

24   through 509B5 and any excerpts therefrom are true and accurate

25   copies of a recording of a meeting that took place on June 20,

J4N9DAW3                        Redirect - Miller

1   2017 in New York and that was consensually recorded by one or

2   more of the meeting participants.

3           Government Exhibits 509A1T through 509A4T and 509B1T

4   through 509B4T are true and accurate transcripts of recorded

5   conversations contained in Government Exhibits 509A1 through

6   509A4 and 509B1 through 509B4 respectively.

7           The identities of participants, voice attributions,

8   dates and times reflected on Government Exhibits 509A1T through

9   509A4T and 509B1T through 509B4T are accurate.

10          Government Exhibits 510A1 through 510A3 and 510B1

11  through 510B6 and any excerpts therefrom are true and accurate

12  copies of a recording of a meeting that took place on June 20,

13  2017 in New York and that was consensually recorded by one or

14  more of the meeting participants.

15          Government Exhibits 510A1T through 510A3T and 510B1T

16  through 510B6T are true and accurate transcripts of recorded

17  conversations contained in Government Exhibits 510A1 through

18  510A3 and 510B1 through 510B6 respectively.

19          The identities of the participants, voice

20  attributions, dates and times reflected on Government Exhibits

21  510A1T through 510A3T and 510B1T through 510B6T are accurate.

22              (Continued on next page)

23

24

25

J4NHDaw4

1          MR. BOONE:  Government Exhibits 511A1 through 511A7

2     and 511B1 through 511B7, and any excerpts therefrom, are you

3     true and accurate copies of a recording of a meeting that took

4     place on July 20, 2017, in New Jersey, and that was

5     consensually recorded by one or more of the meeting

6     participants.

7          Government Exhibits 511A1T through 511A7T and 511B1T

8     through 511B7T are true and accurate transcripts of recorded

9     conversations contained in Government Exhibit 511A1 through

10     511A7 and 511B1 through 511B7 respectively.  The identities of

11     the participants, voice attributions, dates, and times

12     reflected in Government Exhibits 511A1T through 511A7T and

13     511B1T through 511B7T are accurate.

14          Government Exhibits 513A through 513N, and any

15     excerpts therefrom, are true and accurate copies of a recording

16     of a meeting that took place on July 27, 2017, in Las Vegas,

17     Nevada, and that was consensually recorded by one or more of

18     the meeting participants.

19          Government Exhibits 513AT through 513NT are true and

20     accurate transcripts of the recorded conversations contained in

21     Government Exhibits 513A through 513N respectively.  The

22     identities of the participants, voice attributions, dates and

23     times reflected on Government Exhibits 513A2 through 513N --

24     sorry, 513AT through 513NT are accurate.

25          Government Exhibits 514A through 514C, and any

J4NHDaw4

1    excerpts therefrom, are true and accurate copies of a recording

2    of a meeting that took place on July 28, 2017, in Las Vegas,

3    Nevada, and that was consensually recorded by one or more of

4    the meeting participants.

5         Government Exhibits 514AT through 514CT, are true and

6    accurate transcripts of the recorded conversations contained in

7    Government Exhibits 514A through 514C respectively.  The

8    identities of the participants, voice attributions, dates and

9    times reflected on Government Exhibits 514AT through 514CT are

10   accurate.

11        Government Exhibits 516A through 516B, and any

12   excerpts therefrom, are true and accurate copies of a recording

13   of a meeting that took place on July 29, 2017, in Las Vegas,

14   Nevada, and that was consensually recorded by one or more of

15   the meeting participants.

16        Government Exhibits 516AT through 516BT are true and

17   accurate transcripts of the recorded conversations contained in

18   Government Exhibits 516A through 516B respectively.  The

19   identities of the participants, voice attributions, dates and

20   times reflected on Government Exhibits 516AT through 516BT are

21   accurate.

22        Government Exhibits 518A through 518F, and any

23   excerpts therefrom, are true and accurate copies of a recording

24   of a meeting that took place on August 30, 2017, in Arizona,

25   and that was consensually recorded by one or more of the

J4NHDaw4

1    meeting participants.

2            Government Exhibits 518AT through 518FT are true and

3    accurate transcripts of the recorded conversations contained in

4    Government Exhibits 518A through 518F respectively.  The

5    identities of the participants, voice attributions, dates and

6    times reflected on Government Exhibits 518AT through 518FT are

7    accurate.

8            Government Exhibits 521A through 521D, and any

9    excerpts therefrom, are true and accurate copies of a recording

10   of a meeting that took place on August 31, 2017, in California,

11   and that was consensually recorded by one or more of the

12   meeting participants.

13           Government Exhibits 521AT through 521DT are true and

14   accurate transcripts of the recorded conversations contained in

15   Government Exhibits 521A through 521D respectively.  The

16   identities of the participants, voice attributions, dates and

17   times reflected on Government Exhibits 521AT through 521DT are

18   accurate.

19           Government Exhibits 523A through 523G, and any

20   excerpts therefrom, are true and accurate copies of a recording

21   of a meeting that took place on July 28, 2017, in Las Vegas,

22   Nevada, and that was consensually recorded by one or more of

23   the meeting participants.

24           Government Exhibit 523T is a true and accurate

25   transcript of the recorded conversations contained in

J4NHDaw4

1    Government Exhibits 523A through 521G -- sorry, 523G.  The

2    identities of the participants, voice attributions, dates and

3    times reflected on Government Exhibit 523T are accurate.

4         Government Exhibits 524A through 524G, and any

5    excerpts therefrom, are true and accurate copies of a recording

6    of a meeting that took place on July 28, 2017, in Las Vegas,

7    Nevada, and that was consensually recorded by one or more of

8    the meeting participants.

9         Government Exhibit 524T is a true and accurate

10   transcript of the recorded conversations contained in

11   Exhibits 524A through 524G.  The identities of the

12   participants, voice attributions, dates and times reflected on

13   Government Exhibit 524T are accurate.

14        Government Exhibit 525A through 525B, and any excerpts

15   therefrom, are true and accurate copies of a recording of a

16   meeting that took place on July 28, 2017, in Las Vegas, Nevada,

17   and that was consensually recorded by one or more of the

18   meeting participants.

19        Government Exhibit 525T is a true and accurate

20   transcript of the recorded conversations contained in

21   Exhibits 525A through 525B.  The identities of the

22   participants, voice attributions, dates and times reflected on

23   Government Exhibit 525T are accurate.

24        Government Exhibits 526A through 526C, and any

25   excerpts therefrom, are true and accurate copies of a recording

J4NHDaw4

1   of a meeting that took place on July 28, 2017, in Las Vegas,

2   Nevada, and that was consensually recorded by one or more of

3   the meeting participants.

4           Government Exhibit 526T is a true and accurate

5   transcript of the recorded conversations contained in

6   Government Exhibits 526A through 526C.  The identities of the

7   participants, voice attributions, dates and times reflected on

8   Government Exhibit 526T are accurate.

9           Government Exhibits 527A through 527E, and any

10  excerpts therefrom, are true and accurate copies of a recording

11  of a meeting that took place on July 28, 2017, in Las Vegas,

12  Nevada, and that was consensually recorded by one or more of

13  the meeting participants.

14          Government Exhibit 527T is a true and accurate

15  transcript of the recorded conversations contained in

16  Government Exhibits 527A through 527E.  The identities of the

17  participants, voice attributions, dates and times reflected on

18  Government Exhibit 527T are accurate.

19          Government Exhibits 528A through 528D, and any

20  excerpts therefrom, are true and accurate copies of a recording

21  of a meeting that took place on July 28, 2017, in Las Vegas,

22  Nevada, and that was consensually recorded by one or more of

23  the meeting participants.

24          Government Exhibit 528T is a true and accurate

25  transcript of the recorded conversations contained in

J4NHDaw4

 1    Government Exhibit 528A through 528D.  The identities of the

 2    participants, voice attributions, dates and times reflected on

 3    Government Exhibit 528T are accurate.

 4            Government Exhibits 529A through 529H, and any

 5    excerpts therefrom, are true and accurate copies of a recording

 6    of a meeting that took place on July 28, 2017, in Las Vegas,

 7    Nevada, and that was consensually recorded by one or more of

 8    the meeting participants.

 9            Government Exhibit 529T is a true and accurate

10    transcript of the recorded conversations contained in

11    Government Exhibits 529A through 529H.  The identities of the

12    participants, voice attributions, dates and times reflected in

13    Government Exhibit 529T are accurate.

14            It is further stipulated and agreed that this

15    stipulation may be received into evidence as a government

16    exhibit at trial.

17            At this point the government moves to admit the

18    stipulation, Government Exhibit 1906.

19            MR. HANEY:  No objections, your Honor.

20            MR. CHANEY:  No objection.

21            THE COURT:  There being no objection, that stipulation

22    will be received.

23            (Government's Exhibit 1906 received in evidence)

24            THE COURT:  Ladies and gentlemen, I know that took a

25    little while and it wasn't the most scintillating testimony,

J4NHDaw4

1    but you have no idea how much time we just saved, and the Court

2    is greatly appreciative of the parties' willingness to enter

3    into these type of stipulation so we can present this testimony

4    to you and present this case to you in the most efficient way

5    possible.

6              What we're going to do, we're five minutes short of

7    the time for the break.  Let's take the break now.  So we'll

8    take 15 minutes.  We'll bring you back at five minutes before

9    the hour.  Please be prepared to come out then.  Do not discuss

10   the case.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J4NHDaw4

1              (Jury not present)

2              THE COURT:  You're welcome.

3              Anything for me?

4              MR. MARK:  Your Honor, I just wanted to raise that the

5    majority of the defendants' cross-examination of Chance Miller

6    appeared to be directed towards essentially putting the NCAA on

7    trial, basically the business of college basketball on trial.

8    I know your Honor sustained a few objections, overruled a

9    number of them, but largely this was our concern with our

10   motion *in limine* that we filed, that what the defendants -- and

11   I have just sort of a list of ten-plus questions that were just

12   geared, we would just say, completely towards putting the NCAA

13   on trial as opposed to the critical issue here, which they seem

14   to say is there's no dispute about certain payments being made,

15   but what was their intent on doing it?  None of those are at

16   all relevant to determining what appear to be the key issues

17   during this case.

18             THE COURT:  Is there an application?

19             MR. MARK:  I think, once again, there might be an

20   appropriate curative instruction that we would propose to your

21   Honor to do that.  We'd like to probably just consider a little

22   bit how to phrase that, but as you see, we really -- we want to

23   both tee this up, but we're very concerned if there continues

24   to be cross-examinations that are bringing in things that are

25   completely extraneous, after the fact, things like the Rice

J4NHDaw4

1    Commission report.  I mean, the Rice Commission report was, in

2    fact, a report that NCAA took upon itself to look inside and to

3    really scrutinize the business of what's happening in college

4    basketball because of the indictments in this case.

5            So there's a lot of potential prejudice by these

6    questions.  We'd like to consider a proposed curative

7    instruction, and we really would like to prevent continued

8    cross-examination of certain witnesses along these lines.

9            THE COURT:  I don't know if you want to respond.

10           MR. HANEY:  I want to respond briefly, if I may, your

11   Honor.  I don't agree with the characterization that he's

12   broadly calling the defense's cross-examination.  I don't agree

13   that my cross-examination was.  The majority of it, very

14   limited mention of NCAA rules.  My cross-examination dealt with

15   my client, dealt with Lamont Evans, dealt with his knowledge of

16   the athlete-agent dynamics on campus.  I don't agree with Mr.

17   Mark's characterization as it relates to my cross-examination

18   of Mr. Miller that the majority of it was focused on the NCAA

19   rules for amateurs.  Thank you.

20           MR. CHANEY:  Your Honor, to the extent that those

21   questions were gone into by myself on cross-examination, it was

22   because we were responding to issues injected into this trial

23   by the government's questioning of this witness.  They chose to

24   call a witness exclusively because of his participation in

25   compliance at the NCAA and injected those issues into the case

J4NHDaw4

1    to the degree that a limiting instruction is appropriate.  It's

2    potentially limiting in both senses for both parties because

3    simply allegations that either of the defendants in this case

4    committed NCAA rules is not the basis of a criminal

5    prosecution.  So injecting issues of NCAA compliance is harmful

6    to us, and we felt it appropriate to respond in kind.

7              THE COURT:  Well, let me tell you, I did give you a

8    little bit of leeway because of Mr. Miller's testimony

9    concerning his background with the NCAA and conducting

10   investigations and the types of things that could be violative

11   of NCAA rules.  I thought it was appropriate to allow you some

12   leeway to make the point that violating an NCAA rule is not

13   necessarily the equivalent of violating a federal law.

14             But having allowed you to make those points, I do

15   think that you went a little bit further, and I do want to put

16   the defense on notice that we are not going to be trying the

17   NCAA in this case.  There are a lot of facts to deal with, and

18   you'll have plenty of opportunity to deal with the facts that

19   deal with Mr. Dawkins and with Mr. Code, but we're not going to

20   go much beyond that.

21             MR. HANEY:  Thank you, your Honor.

22             MR. CHANEY:  Understood.

23             THE COURT:  Thank you.  Don't be late.

24             MR. MOORE:  Your Honor, may I make one brief point?

25             THE COURT:  Absolutely, Mr. Moore.

J4NHDaw4

1          MR. MOORE:  With respect to Mr. Solowiejczyk's

2    comments before the jury came back in, I decided to go back and

3    look at PACER.  And Mr. Solowiejczyk made the comment that the

4    government can't really compel these coaches to come in and

5    testify.

6          I have been told throughout my discussions with the

7    Southern District in both cases that their policy is that you

8    always make everyone plead guilty to everything that they did.

9    In this case they had -- they took guilty pleas from Lamont

10   Evans, from Mr. Bland, and from Mr. Richardson to Count One of

11   indictments where they charged them with multiple counts.  They

12   could have done that with the reservation or stipulation that

13   those gentlemen cooperate.  They did not do that.

14         I would also note for the record that while the

15   defense has no ability to strip away someone's Fifth Amendment

16   privilege and compel them to testify under a grant of immunity

17   after they plead guilty to certain crimes, the government does

18   have that power.  And so to suggest that the government has no

19   ability to compel those three coaches to come in or to suggest

20   that the government has no ability to bring in those three

21   undercovers and that they should not be perhaps held to account

22   for that is, in my view, erroneous.  I simply wanted to make

23   that statement.

24         THE COURT:  Solowiejczyk, did you want to respond?

25         MR. SOLOWIEJCZYK:  Your Honor, I don't think it

J4NHDaw4

1    requires much response because it's, frankly, an utterly

2    frivolous argument.  Number one, what the terms of the plea

3    agreement were with these coaches is not the point.  The point

4    is that these are coaches who've pled guilty to crimes.

5    They're going to be sentenced before your Honor.  They have

6    Fifth Amendment rights up through sentencing, your Honor.  And

7    to imply to the jury that by not calling them, that's something

8    that they should hold against the government in meeting its

9    burden, it makes absolutely no sense.  And it particularly

10   makes no sense because, as your Honor is aware, a standard jury

11   instruction in this district is that uncalled witnesses are

12   equally available to both sides.

13          So the notion that every time the government doesn't

14   go around immunizing everybody who could potentially provide

15   any testimony, that that should somehow be an argument that the

16   defense can now make to the jury is just utterly, frankly,

17   illogical.

18          THE COURT:  Also, as I understand the Southern

19   District's policy, it's not that everyone who pleads guilty

20   pleads to everything, it's cooperators plead to everything.

21          MR. SOLOWIEJCZYK:  That's true, too, your Honor.  I

22   didn't even feel like it was worth getting into the merits of

23   that assertion.

24          THE COURT:  I'm sorry.  Mr. Moore, did you want to say

25   something else?

J4NHDaw4

1          MR. MOORE:  I think I've made my point.  My point,

2     however, again, is that to suggest that all witnesses are

3     equally available, that is not correct.  They have the

4     authority to compel these witnesses to testify.  And I would

5     note that the record here indicates that they asked your Honor

6     to postpone sentences of at least one of these cooperators,

7     when your Honor had scheduled a sentencing pretrial, to after

8     the trial.  They could have had that sentencing go forward and

9     then they could have compelled that witness to testify and

10     taken away that person's Fifth Amendment privilege.  So

11     Mr. Solowiejczyk, I believe, is incorrect.

12          With respect to -- again, we'll get to the *Touhy* issue

13     and our ability to call these undercovers at an appropriate

14     point in the case, but, again, to suggest that we're on the

15     same footing with them with respect to those two types of

16     witnesses, law enforcement and cooperators, is in my view

17     incorrect.

18          THE COURT:  Well, there are a lot of legal and factual

19     issues involved in the arguments that are being made here.  I'm

20     not aware of all of the facts concerning this, but certainly

21     the individuals that pled guilty before me, the three coaches,

22     they do maintain their Fifth Amendment rights through

23     sentencing.  There's a lot of law concerning whether or not the

24     government can or should or should be made to grant those

25     individuals immunity with respect to the other aspects of the

J4NHDaw4

1    areas where they face jeopardy, but, again, that's not going to

2    be resolved today and that's going to have to be -- I would

3    encourage the parties to have conversations about what it is

4    exactly that you want to do, and then I'll be happy to settle

5    any disputes that you have.

6              MR. MOORE:  Yes, sir.

7              THE COURT:  OK.  Don't be late.

8              MR. HANEY:  Thank you, your Honor.

9              (Recess)

10             THE COURT:  Please get your witness or have him to

11   take the witness stand.

12             So there's no confusion going forward, the 15 minutes

13   starts to run when the jury goes out.

14             MR. MARK:  We're sorry, your Honor.

15             THE COURT:  Let's get the jury.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

J4NHDaw4                         Blazer - Direct

1              (Jury present)

2              THE COURT:  Everyone can be seated.

3              You want to call your next witness?

4              MR. BOONE:  Yes, your Honor.  The government calls

5    Louis Martin Blazer.

6              THE COURT:  Mr. Blazer, please step up into the

7    witness stand and remain standing.

8    LOUIS MARTIN BLAZER,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. BOONE:

13   Q.  How old are you?

14   A.  I am 49 years old.

15   Q.  How far did you go in school?

16   A.  I received my bachelor's from Carnegie Mellon University in

17   Pittsburgh.

18   Q.  What did you study at Carnegie Mellon?

19   A.  I studied industrial management, which is like business

20   management economics.

21   Q.  When did you graduate?

22   A.  I graduated in 1992.

23   Q.  Since graduating, have you been employed?

24   A.  Yes.

25   Q.  How have you spent most of your professional life?

J4NHDaw4                          Blazer - Direct

1   A.   Most of my professional life was spent as a financial

2   adviser, investment adviser.  I handled stocks, bonds, mutual

3   funds, annuities, life insurance products primarily for

4   retirees, business owners, wealthy individuals.

5   Q.   Are you currently providing financial services to

6   individuals?

7   A.   No, I'm not.

8   Q.   Where do you currently work?

9   A.   Currently, I am working for a recruitment firm, headhunter

10  kind of which finds jobs for people primarily in the tech

11  industry.

12  Q.   Why are you no longer providing financial services to

13  individuals?

14  A.   Well, in 2016 I settled a civil case with the Securities

15  and Exchange Commission, and as part of that civil settlement,

16  I was banned from the securities industry.

17  Q.   You said you settled a civil case with the SEC.  What was

18  the case about?

19  A.   The case was about from 2010, approximately, to 2012.  I

20  misappropriated funds for a number of my clients, which means I

21  took money from their accounts without their authorization or

22  knowledge and put them in movie and music investments.  And

23  then when one of the clients found out, I moved money from a

24  separate client into his account to cover it and at the same

25  time moved money into a music investment for him without his

1    knowledge or authorization.

2    Q.  Did your clients lose their money?

3    A.  Yes, they lost money.

4    Q.  Were you investigated by any other federal agency for that

5    conduct?

6    A.  Yes, I was investigated by the United States Attorney's

7    Office.

8    Q.  Did you ultimately cooperate with the United States

9    Attorney's Office?

10   A.  Yes, ultimately, I cooperated with the U.S. Attorney's

11   Office.

12   Q.  What does it mean to cooperate with the U.S. Attorney's

13   Office?

14   A.  My understanding of cooperation with the U.S. Attorney's

15   Office meant that I was to provide substantial assistance in

16   the form of really three things: meeting with the U.S.

17   Attorney's Office wherever, whenever, and for how many ever

18   times I was asked to; two, I was asked to tell the truth in any

19   of those meetings that we had; and, three, I was asked to not

20   commit any more crimes.

21   Q.  In cooperating with the U.S. Attorney's Office, did you

22   discuss other criminal conduct you had committed?

23   A.  Yes, I did.

24   Q.  Why'd you do that?

25   A.  Well, because when I met with the U.S. Attorney's Office,

J4NHDaw4                        Blazer - Direct

1    as part of the cooperation agreement, I had to basically be

2    100 percent truthful about anything that I had done in my past

3    that was inappropriate or illegal or may have been illegal.  So

4    I discussed everything that I had ever thought I did wrong.

5    Q.  What was the nature of the conduct you discussed?

6    A.  The nature of the conduct was from about the near 2000 --

7    just to go back, when I had -- I was a financial adviser for

8    basically regular people, retirees, business owners, like I

9    said, up until about the year 2000.  From 2000 on, I started to

10   work with professional athletes, managing their investments,

11   primarily NFL players.  And I managed their investments, but in

12   addition to that, I handled a lot of the lifestyle management,

13   business management responsibilities that they needed like

14   handling their bill pay, their budgets, helping them with their

15   house, their cars, family issues.  So it was sort of overall

16   business management.

17           And as a result of that, I -- from approximately 2000

18   until I stopped being a financial or business adviser, I worked

19   with a number of college football players, primarily college

20   football players.  And from time to time I would pay them, make

21   payments to these players, and in exchange in the hopes when

22   they turn pro, they would sign with me as their financial

23   adviser.

24   Q.  We'll get into that in more detail later.

25           In cooperating with the government, did you record

1   certain conversations you had with others?

2   A.  Yes.

3   Q.  Why did you do that?

4   A.  Because I was asked to do that by the federal government by

5   investigators.

6   Q.  What types of people did you record?

7   A.  I recorded really individuals that I had had any --

8   basically were connected with anything in the direction of the

9   sports athletes, that kind of thing, the conduct that I was

10  exposed to with paying athletes and that sort of thing.

11  Q.  For how long did you make recordings at the direction of

12  law enforcement?

13  A.  I made recordings for approximately three years.

14  Q.  During the course of your cooperation, did you meet someone

15  named Christian Dawkins?

16  A.  Yes, I did.

17  Q.  Do you see him in the courtroom today?

18  A.  Yes, he is behind the monitor with the glasses on.

19         MR. BOONE:  Your Honor, let the record reflect that

20  the witness has identified the defendant Christian Dawkins.

21         THE COURT:  The record will so reflect.

22  Q.  How did you meet Christian Dawkins?

23  A.  One of the individuals that I was asked to record

24  conversations with by investigators early on was an old

25  football agent that I had done a lot of business with named

J4NHDaw4                        Blazer - Direct

1    Safarrah Lawson.  And Law introduced me to a guy.  Law was from

2    Atlanta, introduced me to a guy named Rashan Michel, who was

3    also from Atlanta and did a lot of work in the basketball

4    space.  He worked with -- he made suits for basketball players

5    and did a lot of business with basketball players.  Rashan

6    introduced me to Christian, set up a meeting between Christian

7    and I in September of 2015.

8    Q.  When you met Dawkins, did you know if he had a job?

9    A.  I was -- I was under the understanding, yes, that he did.

10   I was told by Rashan that he had a job as well.

11   Q.  What did you understand his job to be?

12   A.  I understood that he was a sports agent with Andy Miller

13   Sports.

14   Q.  What's Andy Miller Sports?

15   A.  Andy Miller Sports is a sports agency.  It's kind of at the

16   time was renowned as one of the top sports agents in the

17   business that handled NBA basketball players.

18   Q.  And in layman's terms, what's a sports agent?

19   A.  A sports agent is an individual who is sort of a legal

20   representative of an athlete typically and is charged with

21   procuring and negotiating contracts on behalf of that athlete.

22   Typically, I would say they are registered or licensed with

23   a -- whatever sport, like in the NBA or NFL or Major League

24   Baseball.

25   Q.  Referring to professional sports leagues?

J4NHDaw4                          Blazer - Direct

1    A.   Professional sports leagues, yes.

2    Q.   Did there come a time when you learned whether or not

3    Dawkins was, in fact, a sports agent?

4    A.   Yes.

5    Q.   What did you learn?

6    A.   I learned that he was not a sports agent.  He was more of,

7    what is termed in the -- in the business that I was in, as a

8    runner.

9    Q.   What's a runner?

10   A.   A runner is an individual who is sort of a liaison between

11   the sports agent and an athlete.  They help the agent to -- to

12   sort of develop relationships with athletes and maintain the

13   relationships with athletes, but they don't do any of the

14   contracts or they're not technically a legal representative on

15   behalf of the athlete.

16   Q.   Generally speaking, what were the nature of your recorded

17   conversations with Dawkins?

18   A.   Initially, Christian asked me to consider being an

19   additional resource for him and the basketball players that he

20   was recruiting at colleges; meaning, he asked me to provide

21   money to him so that he could pay these players and their

22   families.  And then the conversations evolved into there was

23   one particular player at South Carolina that he was paying he

24   talked to me about, and at South Carolina -- at the same time

25   there was a coach at South Carolina that he was paying as well,

J4NHDaw4                              Blazer - Direct

1    and he asked me if I would be interested in taking over

2    payments to that coach so that I could have a relationship with

3    that coach as well and his players.  Then the conversation

4    evolved into numerous coaches and doing the same thing with

5    numerous coaches at different schools.

6    Q.  To be clear, at this point in time when you're recording

7    conversations, you're recording them at the direction of law

8    enforcement?

9    A.  Absolutely at the direction of law enforcement.

10   Q.  So are you posing as a financial adviser?

11   A.  Yes, I'm posing as a financial manager or business manager.

12   Q.  What did you understand to be the purpose for these

13   payments?

14   A.  The purpose of the payments varied, but my understanding

15   initially was that to the South Carolina coach, they would --

16   they were payments to basically do what I was doing, you know,

17   in my career with NFL players, which was to pay them certain

18   amounts of money to help them out with whatever they needed at

19   the time, and then they would turn to me and consider me as

20   their financial adviser when they turned pro.  It was the same,

21   same type of situation here, where if I was helping him to pay

22   a player or helping him to pay a coach, that that player or

23   coach would in turn hire Christian as his agent and would hire

24   me as the financial adviser.  So the payments were to develop

25   relationships with those players or coaches.

J4NHDaw4                          Blazer - Direct

1   Q.  Focusing specifically on the payments to coaches --

2   A.  Yes.

3   Q.  -- what specifically was the purpose in paying a coach?

4   A.  The purpose --

5          MR. HANEY:  Objection, your Honor, to foundation.  I

6   don't think he's laid a foundation for this.

7          THE COURT:  Mr. Boone, ask another question.

8   Q.  You testified earlier that Dawkins initially talked to you

9   about paying a coach at South Carolina.  You recall that?

10  A.  Yes.

11  Q.  Who was that coach?

12  A.  Lamont Evans.

13  Q.  You testified earlier that Dawkins then later talked with

14  you about paying other coaches at other universities?

15  A.  That's correct.

16  Q.  What was the purpose of paying those coaches?

17         MR. HANEY:  Objection as to foundation, your Honor.

18         THE COURT:  Overruled.

19         MR. HANEY:  Thank you.

20  Q.  You can answer.

21  A.  The purpose of paying the coaches was to establish a

22  relationship with the coach so that the coach would send the

23  players, either the players that they were recruiting for their

24  schools or had at their schools at the time, to me for

25  financial or business advisory services.

1  Q.  What did you understand Dawkins would get, if anything, out

2  of this arrangement?

3  A.  At the time -- well, initially, it would have been the

4  agent work.  He was working as -- for Andy Miller's sports

5  agency and -- when we were working on the Lamont situation.  So

6  it would be representation, the representation piece, and then

7  later on it would be business advisory services as well.

8  Q.  During the course of your cooperation, did you meet someone

9  named Merl Code?

10  A.  Yes, I did.

11  Q.  Do you see him in the courtroom today?

12  A.  Yes.  He is second from the left over there.

13  Q.  In the back table?

14  A.  Yes, in the back table, yes.

15        MR. BOONE:  Your Honor, let the record reflect that

16  the witness has identified the defendant Merl Code.

17        THE COURT:  The record will so reflect.

18  Q.  How did you meet Merl Code?

19  A.  I was introduced to Merl Code through Christian Dawkins at

20  a meeting that we had in New York in June of 2017.

21  Q.  When you met him, did you know if he was employed?

22  A.  Yes, I did.

23  Q.  What did you understand his job to be?

24  A.  I understood his job to be he worked at Adidas.  He worked

25  with basically grass roots programs in basketball and with

J4NHDaw4                        Blazer - Direct

1    college coaches as well.

2    Q.   When you say "grass roots programs in basketball," what are

3    you referring to?

4    A.   Grass roots is high school-aged travel basketball, usually

5    really good players from all over a certain area from which

6    college coaches usually recruit for their schools.

7    Q.   This meeting you had with Merl Code, was it recorded?

8    A.   Yes, it was.

9    Q.   Generally speaking, what was the nature of what was

10   discussed with code in that meeting?

11   A.   Generally speaking, it was about what Merl's -- Merl's work

12   history.  He worked at Nike and then came over to Adidas.  And

13   generally speaking, we were using Merl to connect us with coach

14   and school relationships that he had that he could help us

15   procure through his influence at Adidas.

16   Q.   When you say "we," who are you referring to?

17   A.   It was me and the undercover agents from the FBI.

18   Q.   We'll discuss that in more detail later.  I want to first

19   talk a little bit more about your background.

20            You mentioned earlier that you were investigated by

21   both the Securities and Exchange Commission and the U.S.

22   Attorney's Office for misappropriating client funds?

23   A.   Yes.

24   Q.   Can you describe that in more detail.  What exactly did you

25   do?

J4NHDaw4                        Blazer - Direct

A.  Well, back in -- as I said, back in 2010-ish, a business
partner of mine introduced me to a guy who was a movie producer
in Pittsburgh.  He did kind of small budget movies, and he had
an idea for a -- well, he didn't have an idea.  He got a script
for a movie, and he approached me about it.  It was a movie, a
mafia movie starring Ving Rhames, and he came to me and said if
I was interested in having some of my clients invest in this
movie.  He felt that he could make the movie for a million
dollars.  So I agreed and I went out and started to talk to
some of my clients about it, and a few of them agreed to do it.
And so I started -- I put money into the movie project for
them, into the movie account, but I was nowhere near the
million dollars, and I knew I wasn't going to get there.

        So the producer started to spend money in the -- on
the movie project, and the money was coming close to running
out.  I panicked because I didn't want to see it fail, so I
just started moving funds from some of those clients' accounts
into the movie account.  And around -- just around the same
time, that producer came to me and said that he had another
movie project, and he needed to finish it.  It was almost done,
but he needed about $200,000 to finish the project and wanted
to see if those same investors, my NFL player clients, would be
interested in investing in that.  He said it was a horror
movie.  It was starring Mischa Barton and Michael Clark Duncan,
and it was different from the mafia movie.  And he said that

1   both of them combined would add diversification and greater

2   chance for success.

3         So I agreed to that as well, and I just started doing

4   the same thing.  I just funded the movie account with funds

5   from my clients without their knowledge or authorization in

6   hopes that it would succeed and I could kind of fix it.  And

7   then around 2013, one of my clients, client A, found out how

8   much I put into the movie project, into the movie investment,

9   and he freaked out and threatened me.  And I panicked again and

10  I took money from a different client, client B, and I moved it

11  into client A's account to make him whole.  And at the same

12  time, I took money from client B and I invested in this for

13  him, in this movie -- or music project, this music label

14  project, hundred thousand dollars.  So I know -- but that's the

15  gist of what I did.

16  Q.  Even the investment in the music project was also without

17  the client's knowledge?

18  A.  Yeah, without that client's knowledge or authorization as

19  well.

20  Q.  When did all this occur?

21  A.  This occurred between 2010 and 2013.

22  Q.  Where were you working at the time?

23  A.  I was -- I had my own firm.  It was called Blazer Capital

24  Management.  It was sort of the business advisory side of

25  things that I described.  And then I had an investment advisory

J4NHDaw4                          Blazer – Direct

1   arm called Blazer Investment Advisors.

2   Q.  How many people worked in those places?

3   A.  About half a dozen people.

4   Q.  Were other employees involved in your fraud?

5   A.  No.

6   Q.  How did you learn you were being investigated by the

7   Securities and Exchange Commission?

8   A.  Well, at the time I had moved Blazer Investment Advisors, I

9   had partnered with a guy in Princeton named Munish Sood, and

10  Munish handled the investment advisory arm of the firm.  And

11  the Securities and Exchange Commission was doing an audit of

12  the investment advisory, and the SEC had questions about one of

13  the transfers that was done for one of my clients.

14  Q.  Did you respond to questions about that or did you direct

15  someone in your office to respond?

16  A.  There was a compliance manager in Munish's office in

17  Princeton, New Jersey, and I talked to her about it.  She asked

18  me the question, where -- what the transfer was for.  And I

19  didn't lie about what the transfer was for.  I said it was for

20  a movie and to take this other -- this other client out.  But

21  what I did lie about was that he knew anything about it or knew

22  what it was for.  So I lied to her, and she told that to the

23  SEC.

24  Q.  And she obviously was unaware that you were lying to her?

25  A.  Oh, yeah, she was unaware that I was lying to her.

J4NHDaw4                        Blazer - Direct

1   Q.  Did the SEC have any follow-up questions or requests?

2   A.  Yes.  They -- initially they wanted to see -- they wanted

3   to see any supporting materials or anything that I had that the

4   client knew what it was for and knew where the money was going.

5   Q.  Were you truthful in your interactions to answer their

6   requests?

7   A.  No.  In addition to lying to them about him knowing where

8   or that I did this or what it was for, the client, I falsified

9   documents to support the lie, and I sent them to the SEC, like

10  an authorization and a deal memo for the movie.  I falsified

11  documents and sent them to the compliance officer at the

12  investment adviser, and then she gave them to the SEC.

13  Q.  Did you provide an explanation to the SEC regarding this

14  transaction?

15  A.  Yes.  I mean, I said -- again, I lied to the SEC and told

16  them that he was, the client was, aware of the transfer and

17  was -- and knew what it was for and knew that he did it, which

18  he did not know.

19  Q.  Why did you lie?

20  A.  Because I was hoping it would go away, and I didn't want to

21  get caught.

22  Q.  What happened after you told all these lies?

23  A.  The SEC probed further, and they sent a subpoena to me.

24  And they wanted to -- in that subpoena they wanted to know more

25  about the movie investment and more about all of my clients

J4NHDaw4                          Blazer - Direct

1     and, you know, what had happened with the -- with the

2     investments.

3     Q.  What did you do in response to the subpoena?

4     A.  I immediately hired a securities attorney to answer the

5     subpoena and kind of went through everything with him.

6     Q.  Did there come a time when you learned the U.S. Attorney's

7     Office may also be involved in investigating you?

8     A.  Yes.  I learned from my securities attorney that the

9     attorneys from the SEC -- the attorneys from the SEC told him

10    that I should probably talk to a criminal attorney because the

11    U.S. Attorney's Office was investigating this whole thing.

12    Q.  What did you do after you learned that?

13    A.  Well, I -- first thing I did was panic, but the second

14    thing I did was I talked to a criminal attorney.  I hired a

15    criminal attorney.

16    Q.  Did there come a time when you decided to meet with both

17    the SEC and the U.S. Attorney's Office?

18    A.  Yes.  In meetings and conversations that I had with my

19    criminal attorney, I spoke with him about what was going on and

20    everything.  And I was just tired of the lies.  I knew I was

21    caught and I knew it was over.  I knew it was just a matter of

22    time, and I wanted to just stop the lying.  So I asked my

23    criminal attorney to try to set a meeting with the U.S.

24    Attorney and the SEC.

25    Q.  Who was present for that meeting?

J4NHDaw4                              Blazer - Direct

A.   There were approximately seven people from both the SEC and

the U.S. Attorney's Office, and on my side was my securities

attorney and my criminal attorney.

Q.   Where was the meeting held?

A.   The meeting was held at the U.S. Attorney's Office in New

York.

Q.   What did you discuss at that meeting?

A.   Well, going into that meeting, before I went in, my

attorneys basically said, whatever you do, whatever happens,

whatever has happened or whatever you've done, when you go into

this meeting, you need to tell the truth, nothing -- nothing

but the truth in this meeting.  So what I did when I was

questioned was I spoke with the -- with the U.S. Attorney's

Office and the SEC, and I went over everything that happened.

I answered all their questions, everything that happened with

the movie/music investments, the transfer of funds from one

client to another, and then we discussed anything else that I

may have done in my career that was inappropriate or illegal.

Q.   Were you truthful in this meeting?

A.   Yes, I was truthful in that meeting.

Q.   Did you discuss the fact that you had previously lied to

the SEC?

A.   Yes, I discussed that and told them what I did and I lied

to the SEC and falsified documents and everything.

Q.   Did you have additional meetings with the U.S. Attorney's

J4NHDaw4                          Blazer - Direct

1    Office?

2    A.   Yes, I did.

3    Q.   Were you truthful in those meetings?

4    A.   Yes, I was truthful in those meetings.

5    Q.   Now, you referenced just now that you also discussed

6    conduct other than the movie and music investment fraud?

7    A.   That's correct.

8    Q.   What other conduct did you tell them about?

9    A.   I told them, again, I had worked with a number of

10   professional athletes, and when they were in college, I would

11   make payments to them, to them or to their families, so that

12   they would consider hiring me as their financial adviser.

13   Q.   When did you pay college athletes?

14   A.   I paid them between the years 2000 and 2013, 2014.

15   Q.   Typically, how much did you pay them?

16   A.   Typically, I would pay them anywhere from -- you know, from

17   time to time it would be 100, 200, $300 when I would see them.

18   Anywhere upwards of, depending upon the situation, 2,000 to

19   $3,000 a month.

20   Q.   How did you pay them?

21   A.   Typically, mostly it was in cash, nothing that could ever

22   be tracked back to the individual.  I would send them cash or

23   hand them cash if I saw them.  And in addition to that, I did a

24   lot of Western Unions.  I would send Western Union funds to

25   them.

Q.  When you would send them funds through Western Union, would
you address it to the athlete?

A.  No, I would never send it to the athlete.  I would never
send it in their name or any way that it could be tracked back
to them.  Most of the time it would be they would give me the
name of their girlfriend or friend or family member, something
like that, and then that person would pick it up and give it to
them and then I would just confirm that they got it.

Q.  What was the purpose of making these payments again?

A.  The purpose was to build a relationship with them and
secure the possibility that they were going to hire me as their
financial adviser when they turned pro.

Q.  What universities did these players attend?

A.  Some of them were Pitt, Penn State, Michigan, Notre Dame,
Northwestern, North Carolina, Alabama.

Q.  Were you ever investigated by a government agency for
paying college athletes?

A.  Yes.

Q.  What agency?

A.  I was investigated by the Secretary of State's office in
the state of North Carolina.

                    (Continued on next page)

J4N9DAW5                          Blazer - Direct

1    Q.  Approximately when was this?

2    A.  This was around 2010, '11.

3    Q.  Did you discuss this with the U.S. Attorney's Office?

4    A.  I did.

5    Q.  So what was the nature of the investigation of the

6    Secretary of State of North Carolina?

7    A.  Well, back in 2009, '10, somewhere in there, I was

8    financial adviser to the New York Giants' first round pick who

9    had gone to school at North Carolina and he had a lot of his

10   old teammates this year who, maybe half a dozen of them were

11   projected to go very high in the NFL draft.  And so he made an

12   introduction of me to them.  And I went down to North Carolina

13   and built a relationship with a number of those guys and

14   started paying them, started paying them the way I had done

15   before.

16        I was later to find out that I wasn't the only person

17   paying these guys.  There were other financial advisers and

18   other agents paying them as well.  And the NCAA found out and

19   suspended a number of players and put sanctions on the school

20   and the coach.

21        And then the Secretary of State's Office in North

22   Carolina got involved with the investigation and I think

23   charged a few of the agents or people around it and they

24   questioned me on a couple different occasions as well.

25   Q.  Why did they question you?

1    A.  The line of questioning with me was about sort of my

2    involvement in this whole thing, what -- who I paid and how

3    much.  And then primarily it was about the -- because I had

4    relationships with a number of different agents, they

5    questioned me about me paying the players on behalf of an

6    agent, which I didn't do.  I was paying the players for me

7    because I wanted their business and I didn't need, necessarily

8    need the agent to, at the time, to -- to secure a relationship

9    with the players.

10   Q.  Were you truthful in your interviews with the Secretary of

11   State of North Carolina?

12   A.  Yes.  Again, because I really didn't think that I was --

13   and she actually told me that the investigation wasn't directed

14   at me.  It was more agents or people affiliated with the

15   agents.  And, as I said, I wasn't working on behalf of any

16   agent so I didn't really feel I had any reason to lie to her.

17   Q.  Who is she?

18   A.  She was the investigator I think it was Dede Smith or

19   Williams or something like that from the Secretary of State's

20   Office in the State of North Carolina.

21   Q.  So were you ultimately arrested or charged with any crimes?

22   A.  No.

23   Q.  Have you ever paid a college coach other than at the

24   direction of law enforcement?

25   A.  No.

1   Q.  Have you ever worked with a college coach to provide money

2   to an athlete's family?

3   A.  Yes.  On one occasion.

4   Q.  Can you describe that occasion.

5   A.  Well, back in 2008, 2009 I had a very close relationship

6   with a college football coach, an assistant coach at Penn State

7   University.  And I was financial adviser to his son who was in

8   the NFL.  This coach had a projected really high NFL draft pick

9   on his team.  And despite just being a sophomore and finishing

10  up his sophomore year, the player was eligible to come out in

11  the NFL draft.  And the coach wanted the player to consider

12  staying, thought it was a good idea to stay in school and not

13  come out for a variety of different reasons.

14        The player was leaning towards coming out in the NFL

15  draft.  Amongst other reasons, as well, his family was dealing

16  with some financial hardships.  And so he felt that if he came

17  out he would be able to take care of that, those financial

18  problems.

19        The coach, in an effort to convince or to have the

20  player consider to stay in school, set up a meeting between me

21  and the player's dad.  And at that meeting the coach asked me

22  to provide ten thousand dollars to the player's family to help

23  with their problems that they were having.  And in exchange for

24  that he would consider hiring me as his financial adviser

25  whenever the player turned pro.

J4N9DAW5                          Blazer - Direct

1   Q.  Where did this meeting occur?

2   A.  This meeting occurred at the coach's home in State College,

3   Pennsylvania.

4   Q.  Who was there?

5   A.  It was the coach, the player's father, and me.

6   Q.  And did you, in fact, provide ten thousand dollars?

7   A.  I did.

8   Q.  In what form?

9   A.  It was a check, I believe.

10  Q.  And what ultimately happened with the player?

11  A.  The player ended up entering the 2009 draft.  I think he

12  was the 11th pick overall in the draft.  So he ended up

13  coming out anyway.

14  Q.  And what happened to the loan?

15  A.  It was paid back.  The father paid the ten thousand back to

16  me.

17  Q.  And did you inform the U.S. Attorney's Office about this

18  incident?

19  A.  I did.

20  Q.  Now, after discussing your criminal history with the U.S.

21  Attorney's Office, did the U.S. Attorney's Office offer you a

22  cooperation agreement?

23  A.  Yes.

24  Q.  And if we could show just for the witness Government

25  Exhibit 1811.  You should also have a binder in front of you if

J4N9DAW5                           Blazer - Direct

1   you want to see a paper copy.

2   A.  Should I just look on --

3   Q.  You can look on the screen if you want.

4          Do you recognize this document?

5   A.  Do I just page up with this or do I have to -- OK.  Yes, I

6   do.

7   Q.  What do you recognize it to be?

8   A.  This looks like my cooperation agreement with the U.S.

9   Attorney.

10  Q.  And is that your signature on the last page of the

11  agreement?

12  A.  It is.

13          MR. BOONE:  Your Honor, the government offers

14  Government Exhibit 1811 into evidence.

15          THE COURT:  Any objection?

16          MR. HANEY:  No objection your Honor.

17          MR. CHANEY:  No objection.

18          THE COURT:  1811 received.

19          MR. BOONE:  Right now it's for the witness.

20          Right now it's been admitted.  We will publish it to

21  the jury.

22          THE COURT:  Very well.

23          (Government's Exhibit 1811 received in evidence)

24  Q.  So this is your agreement.

25          If we could just go to the back page.

1          That's your signature?

2     A.  Yes, it is.

3     Q.  What are your obligations under this agreement?

4     A.  My obligations under this agreement were to, number one,

5     meet with the U.S. Attorney's Office or investigators wherever,

6     whenever and for how many ever times I was asked to do that.

7          Two, I was to tell the truth to them when asked any

8     questions or in any discussions or meetings that I had with

9     them.

10         And three, to not commit any further crimes.

11    Q.  Are you testifying here today as a part of this agreement?

12    A.  Yes, I am.

13    Q.  As a part of your agreement did you plead guilty to certain

14    crimes?

15    A.  Yes, I did.

16    Q.  What crimes?

17    A.  Two counts of wire fraud; one count of securities fraud;

18    one count of lying to the SEC; and one count of aggravated

19    identity theft.

20         MR. BOONE:  And Ms. Bustillo if you could go to the

21    first page, please.

22    Q.  So what do those charges relate to?

23    A.  Those charges relate to my conduct regarding the movie and

24    music investments and the transfer of funds in addition to the

25    payments made to college athletes.

1    Q.   And does it also relate to the lying you discussed --

2    A.   Oh, yes, and the lying to the investigators from the SEC.

3    Q.   When did you plead guilty?

4    A.   I pled guilty in I believe June of 2017.

5    Q.   It may help to look at the date.

6    A.   It was actually September 15, 2017.

7    Q.   Have you been sentenced yet?

8    A.   I have not.

9    Q.   What is your understanding of what the government will do

10   for you if you comply with this agreement?

11   A.   If I comply with the cooperation agreement the government

12   has said they will write what's called a 5K1 letter for me at

13   the time of sentencing which will outline in detail my

14   cooperation with them.   And in addition to that any other

15   crimes that I've committed.   And that letter will be given to

16   my sentencing judge.

17   Q.   What is the maximum sentence you face with or without this

18   agreement?

19   A.   67 years.

20   Q.   What sentence do you hope to receive by testifying?

21   A.   (No response).

22   Q.   And cooperating?

23   A.   Hopefully something much less than 67 years.

24   Q.   Has anyone from the government promised you what your

25   sentence will be?

J4N9DAW5                          Blazer - Direct

1   A.  No.

2   Q.  Has anyone else made you any promises about what your

3   sentence will be?

4   A.  No.

5   Q.  As far as you know is the government going to recommend any

6   specific sentence to the judge?

7   A.  No.

8   Q.  As far as you know, will the outcome of this trial have any

9   effect on whether the U.S. Attorney's Office sends a 5K1 letter

10  to your sentencing judge?

11  A.  It will not.

12  Q.  Will the outcome of this case have any effect on what

13  sentence you will receive?

14  A.  It will not.

15  Q.  You mentioned an obligation to tell the truth.  What

16  happens if you lie here today?

17  A.  If I lie today here this is -- the cooperation agreement is

18  void.

19  Q.  So will the government still write that letter for you?

20  A.  They will not.

21  Q.  If you lie and the government doesn't write that letter,

22  will you be able to take your guilty plea back?

23  A.  No, I won't.

24  Q.  And if you lie, what's your understanding about whether you

25  can separately be charged with perjury?

J4N9DAW5                          Blazer - Direct

1   A.  My understanding is I could be charged with perjury

2   separately.

3   Q.  What happens if the government finds out about any crimes

4   that you haven't already disclosed to them?

5   A.  This cooperation agreement would be voided as well.

6   Q.  Now, you obviously mentioned earlier that the SEC is also

7   initiating an investigation into you for the mismanagement of

8   client funds?

9   A.  Yes.

10  Q.  What ultimately happened to the SEC's investigation?

11  A.  We settled a civil suit and in addition to being banned

12  from working in the securities industry I was fined like close

13  to $2 million.

14  Q.  And did the SEC file civil fraud charges against you?

15  A.  Yes, they did.

16  Q.  I want to switch gears and focus now on the recordings you

17  mentioned earlier that you made.  When did you begin making

18  recording at the direction of the government?

19  A.  Back in I think November of 2014.

20  Q.  And approximately when did you stop?

21  A.  August of 2017.

22  Q.  What did you record?

23  A.  I recorded both phone conversations and meetings.

24  Q.  What federal agency, if any, assisted you in making

25  recordings?

1   A.  The U.S. Attorney's Office and the FBI.

2   Q.  Now, I want to focus on the phonecalls you recorded.  How

3   would you make a phone recording?

4   A.  Well early on I was given a number to call into and I would

5   call in that number, hear a tone, and then I would call the

6   individual that I was directed to call.  And then we -- my

7   phone was tapped eventually so anything that was done on that

8   phone was recorded.  And then anything that I did, meetings I

9   was given --

10  Q.  Let's slow down a little bit.

11  A.  OK.

12  Q.  So you just testified there are two different ways you

13  recorded phonecalls?

14  A.  Correct.

15  Q.  What was the first one?

16  A.  The first way was I was given a telephone -- a number to

17  call into and I would call into that number and then I would

18  call out to the individual that I was directed to make a

19  phonecall to.

20  Q.  And then a system would record that phonecall?

21  A.  Then a system would record that phonecall, yes.

22  Q.  What was the second way you recorded phonecalls?

23  A.  My telephone was tapped, telephone number that I had was

24  tapped by investigators so anything that was done on that phone

25  I didn't have to call out to a system or anything like that, it

1    was just on my phone.  The phone was tapped.

2    Q.  And you were aware of that?

3    A.  I was aware of that, yes.

4    Q.  Now, how was it determined what conversations, what phone

5    conversations you would record?

6    A.  Well, at the direction, discussions that I would have with

7    investigators about who we would -- who was to be recorded,

8    they would tell me that -- to these individuals or who you're

9    going to speak with and then there was a basic outline or

10   discussion about the nature of what those calls was going to

11   be.

12   Q.  Who would give you that basic outline?

13   A.  The investigators.

14   Q.  Did you ever send or receive text messages?

15   A.  Yes.

16   Q.  How did that work?

17   A.  Well, from that phone I would -- sometimes early on when I

18   was still working on that system where I would call in and then

19   call somebody up, I was sending -- I would send text messages

20   to the individual -- individuals that I was directed to and

21   then I would just send those text messages to the investigator.

22          And then when I was -- later on when my phone was

23   tapped, any text messages in or out they would kind of what's

24   called dumping my phone which was I guess all of the data from

25   my phone was captured.

J4N9DAW5                         Blazer - Direct

1   Q.  Now, you said you also recorded in-person meetings?

2   A.  Yes.

3   Q.  How was that handled?

4   A.  I would -- I was given a device that I would either put in

5   my pocket or wear and then I would go into the meetings and the

6   device was a recorder and I would -- I would be recording while

7   I was in the meeting.  And as soon as I was finished with the

8   meeting I would give the device back to the investigators when

9   I was done.

10  Q.  So you got the device initially from the investigators?

11  A.  I got the device from the investigators.  I would go into

12  the meeting, record the meeting, leave the meeting, give the

13  device back to the investigators.

14  Q.  When recording an in-person meeting, were recording devices

15  sometimes placed in the room itself?

16  A.  Yes.

17  Q.  What involvement, if any, did you have in that?

18  A.  None.  I didn't even know where they were.

19  Q.  How was it determined what meetings you would record?

20  A.  It was determined by the U.S. Attorney's Office, my

21  investigators, FBI, it was determined -- not by me.  It was

22  determined by them.

23  Q.  Were you given instructions on what to say before the

24  meetings?

25  A.  I was given -- yeah, I mean an outline of what to say and

1    we would just discuss the nature of the meeting and everything

2    and I would be given certain things to make sure were conveyed

3    in the meeting, yes.

4    Q.  Who would give you this outline of instructions?

5    A.  The investigators.

6    Q.  Do you know how many recordings you made over the course of

7    the investigation?

8    A.  Hundreds.  Hundreds of recordings.

9    Q.  Do you know how many different people you recorded?

10   A.  Probably in the dozens of people.

11   Q.  What role did the government want you to play in the

12   conversations you recorded?

13   A.  I was posing as a financial adviser, business adviser, just

14   what I had done prior to all of my troubles.

15   Q.  Did you have an understanding of what the government's

16   goals were for the investigation?

17   A.  No.  I didn't.  I was not privy to those discussions.

18   Q.  Did you know when the investigation would end?

19   A.  I had no idea when it was going to end or where -- or

20   really where it was going.  I was just -- I wasn't involved in

21   those discussions.

22   Q.  Did you travel to make any recordings?

23   A.  Yes.

24   Q.  How was your travel typically handled?

25   A.  Early on, before I started working with the FBI, I was -- I

J4N9DAW5                      Blazer - Direct

1   would book my own travel and I wasn't reimbursed for anything

2   so I would just pay for whatever I was doing and I would do my

3   own travel and pay for it.

4            Later on -- sometimes my travel was arranged for me

5   and it was paid for upfront.  On other occasions I would book

6   my own travel and then I would submit receipts to the FBI

7   agents and they would reimburse me.

8   Q.  When you say sometimes your travel would be arranged for

9   you, who would -- what agency would be arranging it?

10  A.  I'm referring to the FBI.  When I started working with the

11  FBI they on many occasions would book my flights for me or a

12  hotel, something like that.

13  Q.  Were there times when the government directed you to give

14  cash to certain individuals?

15  A.  Yes.

16  Q.  For what purpose?

17  A.  For the purpose of paying those individuals for whatever

18  influence or -- whatever they needed to send clients or to

19  develop clients for the business that I was posing to be in.

20  Q.  Could you explain that.  What were you posing to be?  What

21  were the clients?

22  A.  I was posing to be in the financial or business advisory

23  services business.  And I would make payments to most -- most

24  of the payments that were made were to either people who were

25  involved in the sports side of things.

J4N9DAW5                          Blazer - Direct

1    Q.  What was the purpose of you making those payments?

2    A.  To build a relationship with those individuals so that they

3    would in turn refer players, clients, athletes to me for

4    business.

5    Q.  And when you had to give cash to an individual, how was

6    that handled?

7    A.  I would meet with the investigators.  They would give me

8    the cash.  I would go into a meeting with whoever we were

9    meeting and I would give the cash to that individual and then I

10   would come back after the meeting and meet with the

11   investigators.

12        Another way was sometimes I did wires to these

13   individuals.  And the investigators would deposit that cash

14   into my bank account.  And I would do a wire to the individual.

15   And then I would send the investigators a receipt that I did

16   the wire.

17   Q.  Were you ever paid for making a recording?

18   A.  No.

19   Q.  Now, you mentioned earlier that one of the individuals you

20   recorded was at the direction of the government was Christian

21   Dawkins.  Can you explain in a little more detail how you met

22   Christian Dawkins?

23   A.  Well, as I said there was -- one of the guys I was asked to

24   record was a football agent in Atlanta.  And he introduced me

25   to a guy named Rashan Michel, who was also in Atlanta.  And

J4N9DAW5                        Blazer - Direct

1    Rashan did a lot of business in the basketball space.

2             And, again, I was posing as a person interested in

3    getting these athlete clients for business advisory services.

4    So Rashan set up a meeting, said that he wanted me to meet this

5    guy who was an agent for Andy Miller Sports and thought that it

6    would be a great connection for me in what I was -- for both of

7    us, for Rashan and for me in what I was trying to do with

8    basketball players in the basketball space, similar to working

9    with football players.

10            So, Rashan set up a meeting in a lobby bar of a hotel

11   in Atlanta.  And Christian and I met and discussed background

12   and a lot of the sort of basketball stuff with Rashan.  Rashan

13   was there as well.

14   Q.  You mentioned -- you testified, rather, earlier that at

15   that time your understanding was that Dawkins was a sports

16   agent?

17   A.  That's correct.  I thought he was --

18            MR. HANEY:  Objection, your Honor.

19            THE COURT:  Overruled.

20            MR. HANEY:  Thank you.

21            THE WITNESS:  I thought he was a sports agent with

22   Andy Miller Sports.

23   Q.  Prior to cooperating with the government had you ever heard

24   of Christian Dawkins?

25   A.  No.

J4N9DAW5                        Blazer - Direct

 1    Q.  You never talked to him before?

 2    A.  Never talked to him before.

 3    Q.  So what did the two of you discuss at this meeting?

 4    A.  At the initial meeting, it was like September of 2015 we

 5    discussed a little bit about each other's background.  He was

 6    from Saginaw.  I had some old football clients from Saginaw.

 7    We talked about sort of mutual friends.  Then kind of got into

 8    his background and dealing with or working with basketball

 9    players.  And discussed -- discussed, again, his needs, me

10    being a resource and helping him to make payments to these

11    players.  And, in addition, to him steering those players to

12    his agency for representation he would send the players my way

13    for business financial services.

14    Q.  How did the meeting end?

15    A.  The meeting ended and we decided that we would reconnect at

16    some time, we would follow up and that was really it.  We

17    didn't really make any substantial plans to talk again.

18    Q.  Do you recall when you next heard from Dawkins?

19    A.  After that my next contact with Christian was in early

20    December 2015.  He sort of out of the blue sent me a text

21    message.  And that was the next time I heard from him.

22    Q.  So approximately how much time had passed between the

23    meeting you just described and when you received the text

24    message?

25    A.  Well the meeting, if I recall, was mid to late September of

J4N9DAW5                          Blazer - Direct

1    2015.  And then it was December.  So, a good, maybe two months.

2    Early December of 2015 we reconnected.

3    Q.  I want you to take a look at and for right now just for the

4    witness's eyes what's been marked for identification as

5    Government Exhibit 1812.

6    A.  OK.  Just look at it on -- it's not in the book?

7    Q.  Whatever is easier for you.  It should also be in the book.

8    A.  Yeah, this is good.

9    Q.  Do you recognize this document?

10   A.  I do.

11   Q.  What is it?

12   A.  This is a -- an e-mail that I sent to myself that was

13   copied from a text message like I did early on that reflects

14   the conversation, the text chain between me and Christian, sort

15   of the reconnect text message that he sent me.

16   Q.  Does it accurately reflect the text exchange between you

17   and the defendant?

18   A.  It does.

19            MR. BOONE:  Your Honor, the government offers

20   Government Exhibit 1812.

21            THE COURT:  Any objection?

22            MR. HANEY:  No objection, your Honor.

23            MR. BOONE:  If we could publish it for the jury,

24   please.

25            THE COURT:  There is no objection on the --

1          MR. CHANEY:  We have no position, Judge.  No

2    objection.

3          THE COURT:  So that exhibit will be received.

4          (Government's Exhibit 1812 received in evidence)

5    Q.  Now, you said you just sort of as background you said this

6    is a text exchange you received on your phone but you e-mailed

7    it to yourself; is that correct?

8    A.  Yes.

9    Q.  Why did you do that?

10   A.  Well, because I -- when I was -- initially when I was

11   receiving text messages they weren't captured on my phone so

12   what I did to send the text message to investigators at that

13   time, my investigator at that time, was I just copied the text

14   chain and then from my phone e-mailed it to myself so that I

15   could send it off to the investigator.

16   Q.  And is that what this reflects, you e-mailed to yourself?

17   A.  Yeah.  It's from Blazer Cap to Blazer Cap and then I would

18   send it to the investigator.

19   Q.  What is Laval Jackson?

20   A.  Yeah.  Laval Jackson.  Oh, Laval Jackson was the

21   investigator for the U.S. Attorney's Office.

22   Q.  Now if you could walk us through -- this is fairly long

23   chain.  If you could walk us through the part of the chain you

24   just described; in other words, you said Dawkins reached out to

25   you and there's an exchange, what part of this represents that?

J4N9DAW5                          Blazer - Direct

1   A.  Really the first couple paragraphs -- I mean I could read

2   it or --

3   Q.  If you could read, and if you could be clear on who is sort

4   of saying what?

5   A.  OK.  So Christian sends to me, Marty:  This is Christian

6   Dawkins, from ASM Sports.  We sat down briefly in Atlanta.  I

7   wanted to reach out to you to see if you had any interest in

8   working together on a few prospects.  Let me know if you have

9   any time to talk.  Thank you.

10          Then I say:  Yeah, for sure.  Thanks for reaching out.

11  Let's talk Monday if that works.

12          And then Christian says:  What time do you have time

13  on Monday?

14          And then I say:  Around 11 a.m.

15          And then he says:  I've got a flight at 11:45 so do

16  you have any time around 10:30?

17          And then I say:  Yeah, that's perfect.

18          Then he says:  OK.  I will call you.  Looking forward

19  to reaching out.

20          I say:  Great.  Thanks.  Me too.

21  Q.  And so after that exchange it looks like there is another

22  exchange.  Is that what's reflected below what you just read?

23  A.  Yes.

24  Q.  So if we could go back to that first page and if you could

25  pickup where you left off.

J4N9DAW5                        Blazer - Direct

1   A.  Christian says:  Do some research on PSA Cardinals AAU

2   program.  They produced Chris McCullough who signed with us

3   last year; Thomas Bryant, Indiana; Cheick Dallio, Kansas; Terry

4   Larrier, UConn; Omari Spellman, Villanova; Mohamed Bamba (next

5   Kevin Garnett type) loaded program; Bennie Boatwright, USC,

6   first round pick of the year; Danuel House, Texas A&M, late

7   first round guy for this year; Jon Isaac, Florida State lottery

8   level player; PJ Dozier, South Carolina first round level

9   player.

10              Then I say:  Perfect.  Thanks.  I'm on it.

11  Q.  Let's back out of that for a minute.

12              Now, initially you say Dawkins sent an exchange

13  discussing prospects and working together.  What did you

14  understand him to mean by that?

15  A.  Christian had individuals like the ones listed in the text

16  message who were prospects, in other words, potential clients

17  for him and ASM Sports and he, when he meant working together,

18  my understanding was he was paying these prospects, making

19  payments to these prospects to encourage them to hire him on

20  the agency side for representation and me working with him to

21  provide resources or payments to help him, I would be

22  considered for the financial or business management side of

23  things for these players as well.

24  Q.  And now looking at the paragraph where it begins "Do some

25  research on PSA Cardinals AAU program," what did you understand

1    him to means by Cardinals AAU program?

2            MR. HANEY:  Objection, your Honor.  Foundation.

3            THE COURT:  Overruled.

4            MR. HANEY:  Thank you.

5            THE WITNESS:  PSA Cardinals AAU program meaning a

6    grassroots basketball program of a high level.

7    Q.  What is that again?

8    A.  Grassroots again is a high school age travel basketball,

9    relatively -- usually high level basketball players from a

10   certain area and college coaches typically recruit their

11   players for their colleges from these AAU type elite basketball

12   grassroots programs.

13   Q.  And so what was your understanding as to why Dawkins was

14   asking you to do research on this program and listing the names

15   of the individuals listed here?

16   A.  My understanding of it was that he had great contacts with

17   that AAU program; that there were bigtime players, basketball

18   players or basketball recruits who came out of that AAU

19   program, and that they had dealt with some of those players in

20   the past and there were more players in the pipeline, recruits

21   that they were working on.

22   Q.  OK.  And if we could go on to sort of the rest of the

23   chain.  I think you ended on "Perfect.  Thanks.  I'm on it."

24            So what came next?

25   A.  This is, in reference to a meeting that we had and/or

1   meeting that we were setting up.  We had a discussion about

2   meeting in Atlanta, I believe, on the 10th was a Thursday,

3   December 10th, 2015.  And we were just discussing

4   coordinating when we were going to meet and where we were going

5   to meet.

6   Q.  If you could look at the next page.

7       What's being discussed here?  Is this continued

8   coordination?

9   A.  It was Christian saying:  Just wanted to confirm.  Does

10  7 p.m. meeting at the Westin by the airport on Best Road work

11  for you tomorrow?

12      And then I said:  Yeah.  That time should work, better

13  if we could do at my hotel Courtyard Sullivan Road.  Please let

14  me know.

15      He says:  OK I can come there.  See you tomorrow.

16      I say:  Perfect.  Thanks.

17  Q.  Sort of fast forwarding to the bottom of this chain, if you

18  could describe, it looks like the logistics sort of stop -- you

19  stopped discussing.  What's being discussed after that?

20  A.  Where?

21  Q.  "This is your boy?

22      "Yeah, that's Scott."

23  A.  "This is your boy?

24      "Yeah, that's Scott.  He has so much leverage now."

25  Q.  Do you know what you're referring to?

J4N9DAW5                         Blazer - Direct

1  A.  I can't -- I can't remember.

2  Q.  And what about the part below that question:  Do you have

3  any private lenders?

4  A.  He -- Christian is asking me, "Do you have any private

5  lenders or banks who will extend money to the parent of a

6  potential first rounder right now?  He will sign off on

7  everything."

8          So he's asking me if I can procure, if I've got any

9  relationships with any either private individuals looking to

10  lend money or a bank who will lend money to a parent of a

11  potential first round basketball player.

12  Q.  Now, this term, "first rounder," also is mentioned earlier.

13  What is a first rounder?

14  A.  There are in the NBA there are two rounds of -- in the NBA

15  draft there are two rounds.  Each team picks a player in the

16  first round and then each team picks a player in the second

17  round.

18          So "first rounder," he means somebody of a higher

19  caliber, a first round pick.  And there are only a limited --

20  each team picks one player in the first round typically.  So

21  first rounders are a really good player.  And their contracts

22  are guaranteed as well.  Second rounders in the NBA, their

23  contracts are not typically guaranteed.  So the money for a

24  first rounder is much bigger.

25  Q.  And this may be obvious but is the NBA draft the way in

J4N9DAW5                          Blazer - Direct

1    which the NBA selects players to play in the NBA?

2    A.  Yes.

3           MR. HANEY:  Objection, your Honor.  Foundation.  He's

4    testing how contracts are structured in the NBA.  I don't think

5    he has any knowledge of that.

6           THE COURT:  Objection is overruled.

7    Q.  Now, I want to now take a look at -- one second, your

8    Honor.

9           (Counsel confer)

10   Q.  Your Honor, I'd now like to offer, pursuant to one of the

11   stipulations we read earlier, Government Exhibit 401.  It's a

12   consensual phonecall.

13          THE COURT:  Very well.

14          MR. BOONE:  And the related transcript as well, your

15   Honor.  Government Exhibit 401T.

16          THE COURT:  Very well.

17          (Government's Exhibits 401 and 401T received in

18   evidence)

19          MR. BOONE:  Ms. Bustillo, when you're ready if we

20   could start from the beginning of that recording.

21          (Audio played)

22          MR. BOONE:  If we could pause it there.

23   Q.  Do you recognize this recording?

24   A.  Yes.

25   Q.  Is it a recording that you made?

1    A.  Yes.

2    Q.  What is it a recording of?

3    A.  It is a recording of the conversation between Christian

4    Dawkins and I in December of 2015.

5    Q.  And who is talking?

6    A.  Christian, Christian Dawkins and me.

7    Q.  And Dawkins references a meeting with Michel.  What did you

8    understand him to be referring to?

9    A.  That was the initial meeting that Rashan Michel set up

10   between Christian Dawkins and I.

11          MR. BOONE:  And your Honor I think we might need

12   assistance in turning up the volume on the recording.

13          THE COURT:  You're looking at the wrong guy.

14          MR. BOONE:  Why don't we start from the beginning so

15   we can hear it more clearly.

16          (Audio played)

17   Q.  So what are you discussing at this point in time in the

18   call?

19   A.  What we're discussing is essentially I think both Christian

20   and I were on the same page and Christian asks why has it been

21   so long since we've -- since that initial meeting, why haven't

22   we -- what was your take on why we did not continue to

23   communicate from September to December.

24          And we both kind of agreed.  But I said I think we had

25   had maybe another conversation somewhere in there or my

J4N9DAW5                         Blazer - Direct

1    conversations with Rashan and Rashan was -- and, again, under

2    the direction of my investigators when I'm cooperating, Rashan

3    was saying send the money to me that Christian needs.  And then

4    I will get it to Christian.  And Christian will then give it to

5    the players.

6         And my investigators, in our discussions, we basically

7    said this isn't really real, this guy, Rashan is probably --

8    just whatever we would do is going to take the money and it

9    will never get to Christian or anyone else.

10        And I think Christian on his behalf felt kind of the

11   same way.  And this -- the way we were introduced through

12   Rashan, we both kind of felt Rashan was a little more than a

13   little bit crazy and we kind of both said this probably isn't

14   the best way to be introduced.

15        So, Christian is asking why haven't we kept in touch.

16   And I'm basically saying it was because Rashan was the

17   intermediary.  Neither one of us felt comfortable with that.

18   And Christian agreed about that.  So that's kind of what we're

19   talking about there.

20             MR. HANEY:  Your Honor, I would object to what -- he's

21   characterizing what my client felt and understood.  He doesn't

22   know that.

23             THE COURT:  Mr. Haney, do not make any speaking

24   objections.

25             MR. HANEY:  Thank you, your Honor.

J4N9DAW5                          Blazer - Direct

1         THE COURT:  The objection is overruled.

2         MR. BOONE:  Please continue playing the recording.

3         (Audio played)

4   Q.  Let's pause here.  When you say "Andy," who are you

5   referring to?

6   A.  Andy Miller.

7   Q.  Who is that?

8   A.  Sports agent, the guy that was the owner of Andy Miller

9   Sports.

10  Q.  That's where you thought Christian was --

11  A.  I thought Christian -- at the time I thought Christian was

12  an agent at Andy Miller Sports.

13        MR. BOONE:  OK.  You can continue.

14        (Audio played)

15  Q.  What did you understand Dawkins to mean by "buffer"?

16        MR. HANEY:  Same objection, your Honor.

17        THE COURT:  Overruled.

18        MR. HANEY:  Thank you.

19        THE WITNESS:  Rashan Michel, the individual who

20  introduced me to Christian and set up the initial meeting with

21  Christian.  And, again, kind of what I was saying before.

22  Christian was on the same page with me that maybe it's best if

23  we just talk to one another as opposed to having Rashan

24  involved in our discussions.  We both agreed to that.

25        MR. BOONE:  You can continue.

1        (Audio played)

2   Q.  What did you understand Dawkins to be talking about in this

3   section?

4   A.  Well this section he's talking about sort of the nature of

5   the basketball agency industry and just explaining to me that

6   Andy Miller Sports, the firm that he worked for, was a big firm

7   and was poised to have a lot of really high level basketball

8   players and that he was in need of my help in the form of

9   resources, money, to get things done for individuals that he

10  was recruiting to hopefully sign with Andy Miller Sports.

11       And he mentions that I know you're not a rookie in the

12  business.  He knows that I was -- had -- checking my background

13  or from Rashan or other sources he knew that I had been in the

14  football space for a while and I'm -- and I had to make

15  payments to those players as well.

16       So he was just in this piece saying I'd like to

17  consider you as an additional resource to help us with these

18  recruits that we're trying to sign.

19  Q.  What did you understand by what he meant when he said

20  "resource, as many resources as I possibly can"?

21  A.  Funds.  Money.

22       MR. BOONE:  You can continue.

23       (Audio played)

24  Q.  So what did you understand Dawkins to be explaining there?

25  A.  He is asking me to consider being an additional resource

J4N9DAW5                         Blazer - Direct

1    for him to help recruit potential players for his agency and

2    then mentioning that my -- my understanding his boss at Andy

3    Miller Sports, Andy, was providing some of these resources, but

4    not enough for what Christian needed to recruit these players.

5    So Christian was coming to me to say, OK, provide these

6    resources.  I will give you the financial advisory business but

7    I don't -- because -- I don't want to have to go back to Andy

8    all the time and ask him for resources, ask him for money to

9    pay these recruits.  So that's what he's talking about there.

10              MR. BOONE:  OK.  We can continue.

11              (Audio played)

12   Q.  So earlier in that section there is discussion of football.

13   What did you understand Dawkins to be making in discussing

14   football versus basketball?

15   A.  Christian was aware that my background was more with NFL

16   players and football than it was with basketball so I think

17   what he was -- what he was saying there was -- drawing the

18   comparison and saying that he's recruiting both college players

19   and players in high school, on the grassroots side.  Because in

20   basketball these players are one and done as compared to

21   football where they have to be in college for three years

22   before entering the NFL draft two or three years.

23   Q.  What do you mean, one and done?

24   A.  One and done is an NBA rule whereby a basketball player has

25   to play in college for at least one year before entering the

J4N9DAW5                        Blazer - Direct

1    NBA draft.

2            So he was saying that you -- if you're recruiting high

3    school players have to be considered in this situation too

4    because if a high school player that you're working on as a

5    recruit for financial services or for representation, if you're

6    paying the high school recruit, that high school recruit is

7    going to perhaps go to college for one year and then they're

8    going to be eligible for the draft.  So it's different from

9    football.  You need to get at these players much earlier.

10   Q.  And there was also discussion of a cushion, a monthly

11   cushion.  What did you understand to be meant by that?

12   A.  I -- by that I meant that he was recruiting a lot of

13   players and he had already had commitments out there to a

14   number of different players that he was recruiting and he

15   needed to have extra funds so if something came up he'd have

16   what he needed to get through, if anything else came up.

17           MR. BOONE:  If we could continue the call, please.

18           (Audio played)

19           (Continued on next page)

20

21

22

23

24

25

1           MR. BOONE:  Pause that.

2   Q.  You mention having guys overseas.  What are you referring

3   to?

4   A.  Basketball players who were playing basketball in Europe or

5   outside the United States.

6   Q.  And as you were saying, they were your clients?

7   A.  Yes.

8   Q.  Is that true?

9   A.  No, that was not true.  I didn't have any clients who were

10  playing basketball overseas.

11  Q.  So why did you say that?

12  A.  As part of my sort of cooperation, in discussing I wanted

13  Christian to feel more comfortable that I had some experience

14  dealing with basketball players so he would feel a little more

15  comfortable in talking to me about that.

16          MR. BOONE:  OK.  We can continue.

17          THE COURT:  Actually, it's 2:30, so that brings us to

18  the end of today.

19          Ladies and gentlemen, that does it for today.  Please

20  do not discuss the case.  Please do not read anything about

21  this case.  If you should come across it, please do not listen

22  or watch anything about this case if you should come across it.

23          Have a wonderful evening.  Please try to be here

24  tomorrow so we get started at 9:30.  So if you can be here at

25  9:15, 9:20, give you an opportunity to grab a cup of coffee or

J4NHDaw6                        Blazer - Direct

1   pastry, that would be helpful.  I'm doing everything I can to

2   make sure we get started on time and get you out of here on

3   time.  Have a good night.

4            (Jury excused)

5            THE COURT:  Sir, you can step down.

6            Everyone can be seated.

7            Any work for me from the government?

8            MR. MARK:  No, your Honor.

9            THE COURT:  From the defense?

10           MR. HANEY:  No, your Honor.

11           THE COURT:  So we'll see you tomorrow at -- be here by

12   9 o'clock.  Have a good night.

13           MR. HANEY:  Thank you, sir.

14           (Adjourned to April 24, 2019, at 9 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3   CHRISTOPHER CHANCE MILLER

 4   Direct By Mr. Boone  . . . . . . . . . . . . .88

 5   Cross By Mr. Haney . . . . . . . . . . . . . 130

 6   Cross By Mr. Chaney  . . . . . . . . . . . . 143

 7   Redirect By Mr. Boone  . . . . . . . . . . . 149

 8   LOUIS MARTIN BLAZER

 9   Direct By Mr. Boone  . . . . . . . . . . . . 173

10                        GOVERNMENT EXHIBITS

11   Exhibit No.                              Received

12    701 to 712, 801 to 814, 1001 to 1006, . . . . .88

13           1101 to 1106, 1201 to 1208,

14             and 1907

15    401 and 401T  . . . . . . . . . . . . . . . 216

16    1811     . . . . . . . . . . . . . . . . . 196

17    1812     . . . . . . . . . . . . . . . . . 210

18    1902     . . . . . . . . . . . . . . . . . 154

19    1904     . . . . . . . . . . . . . . . . . 156

20    1906     . . . . . . . . . . . . . . . . . 164

21

22

23

24

25
```