J4OHDaw1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                          17 CR 684 (ER)

CHRISTIAN DAWKINS AND MERL
CODE ,

           Defendants.          Trial
------------------------------x

                             New York, N.Y.
                             April 24, 2019
                             9:00 a.m.

Before:

                    HON. EDGARDO RAMOS

                             District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ROBERT L. BOONE
NOAH D. SOLOWIEJCZYK
ELI J. MARK
     Assistant United States Attorneys

HANEY LAW GROUP PLLC
     Attorney for Defendant Dawkins

CHANEY LEGAL SERVICES, LLC
BY:  DAVID A. CHANEY, JR.
          -and-
NEXSEN PRUET, LLC
BY:  ANDREW A. MATHIAS
     MARK C. MOORE
     Attorneys for Defendant Code

ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
               YOLANDA BUSTILLO, Paralegal Specialist USAO
               EMILY GOLDMAN, Paralegal Specialist USAO

J4OHDaw1

1              (Trial resumed)

2              THE COURT:  Are you folks ready, or are we waiting for

3      Mr. Solowiejczyk?

4              MR. BOONE:  No, your Honor.  We're not waiting.

5              THE COURT:  OK.  I got the government's letter

6      yesterday evening requesting that I strike certain questions

7      and answers and I give a curative instruction.  Has the defense

8      had an opportunity to review that letter?

9              MR. MOORE:  We have, your Honor.

10             MR. HANEY:  We have, your Honor.

11             THE COURT:  Do you have any objection to it?

12             MR. MOORE:  We do have an objection to it, your Honor.

13     A number of questions that the government wishes to strike are

14     questions that were posed, were objected to, and your Honor

15     overruled those objections.  I see no reason for your Honor to

16     revisit those rulings now.  The government seeks to sanitize

17     their alleged victims in this case and not have any inquiry,

18     not even a limited inquiry, about the fact that these alleged

19     victims make a lot of money from college basketball.  And we

20     think that all of the questions that were asked were

21     appropriate, were not in violation of any rulings that your

22     Honor has made with respect to motions *in limine*.

23             I know that what your Honor told us yesterday was you

24     were giving us a limited window.  You gave us a limited window.

25     I think that your Honor's rulings were appropriate yesterday.

J4OHDaw1

1      We, obviously, accept the rulings when we made -- we asked

2      questions and your Honor sustained those objections, and,

3      obviously, those sustained questions were not answered by the

4      witness.  So I see no reason -- the government's motion strikes

5      me as a little whiny, frankly.

6              MR. HANEY:  Your Honor, I would only add that the

7      questions that were asked on cross-examination were a

8      derivative of what was asked on direct examination when

9      Mr. Boone asked hypothetical questions of the witness, what

10     would happen if these particular occurrences were known, what

11     kind of NCAA sanctions could occur, what kind of money could be

12     lost, what kind of banners could be removed from the Final

13     Four.  All those questions were asked of the witness on direct

14     examination, which opened the door to ask those questions and

15     explore that information on cross-examination.  We didn't just

16     jump into that line of questioning without the prompting that

17     occurred by Mr. Boone on the direct examination.  I don't even

18     agree in theory in what they're even suggesting occurred, not

19     to mention the cross-examination was clearly based on what the

20     direct examination offered.

21              Thank you.

22              THE COURT:  Does the government wish to respond?

23              MR. MARK:  I mean, just briefly.  Beyond the fact, as

24     we said, that this line of questioning was objectionable, and

25     really, as you see the cumulative nature -- and we've laid this

J4OHDaw1

1    out in our letter -- of what they were trying to do, we do

2    argue, as we've laid out, seeks just purely to irrelevant,

3    prejudicial matters that seek to inject the business of college

4    basketball into this case in a way that has an inappropriate --

5    or at least can have an inappropriate effect.

6              To the sense that they are saying that we -- well,

7    one, their argument that the schools make a lot of money from

8    college basketball, my understanding was that that wasn't

9    somewhere they were going to go.  That's why we filed that

10   motion *in limine*, and we understood that we had an agreement

11   from them.  So I think that was an area that we all understood

12   was not going to be part of this case, so I think that was

13   directly inappropriate.

14             In the sense that what Mr. Haney said was derivative

15   of the government's direct, just isn't so.  If you look at

16   these questions, there's questions about the University of

17   South Carolina sponsorship agreement with Under Armour.  Those

18   things weren't even discussed during direct.  While there was a

19   hypothetical question posed about what are the potential

20   consequences to the school, there was specifically no

21   discussion about the exact amounts of money or anything like

22   that because those issues would be irrelevant.  The fact that

23   there are consequences to NCAA rules violations is, obviously,

24   part of the milieu of this case and part of the fact that why

25   these schools do have these rules and why they follow those

J4OHDaw1

1    rules and make their coaches follow them in connection with

2    their contracts.

3            So we do think all of these were irrelevant,

4    prejudicial and, particularly in their cumulative effect,

5    require a curative instruction.

6            THE COURT:  Here's where I come down.  I reviewed,

7    obviously, the questions and answers, and they fall into three

8    categories:  One category is, essentially, does the University

9    of South Carolina benefit from its relationship with Under

10   Armour?  I allowed that particular question to be answered on

11   two occasions.  I did not allow the defense to go into the

12   actual monetary amount that they benefit by, but the fact that

13   there was an economic relationship with Under Armour and the

14   University of South Carolina strikes me as incredibly

15   noncontroversial.  It's something that was previewed with the

16   venire when they came in.  In fact, a vast majority of the

17   jurors indicated that they had some view of the financial

18   relationship between the various parties and college

19   basketball.  A vast majority, or at least a clear majority,

20   indicated that they were uncomfortable with the amount of money

21   that universities made and with the fact that the student

22   athletes were not compensated.  So they are well aware of this,

23   and it would not have caused any surprise to learn that there

24   is a financial relationship between Under Armour and South

25   Carolina.  And that's as far as that went.

J4OHDaw1

1            Secondly, the second area has to do with runners and

2    whether or not Mr. Miller, in his capacity as a NCAA compliance

3    officer, investigated runners during the course of his

4    employment with the NCAA.  He indicated that he had.  He

5    indicated that on ten to 15 occasions, approximately, he

6    investigated instances of alleged improper payments made by

7    runners to college athletes.  That, to me, also strikes me as

8    incredibly noncontroversial and certainly, I don't think,

9    prejudices the government in any way.

10           The third area was the Rice report, and that is a

11   question that I should have sustained the objection to.

12   However, there was no substantive answer, so all we have is the

13   question.  And as this jury's been told many times already,

14   questions are not evidence, so I'm not going to strike the

15   questions.

16           I also want to point out, I believe that everyone in

17   the jury, including the alternates, has some level of college.

18   There are at least a couple that have master's degrees.  There

19   are two that are trained as lawyers and who practiced as

20   lawyers for some period of time.  This is a smart jury.  They

21   know what the milieu is that we're talking about.

22           The testimony that came in yesterday, again, aside

23   from the Rice report, which I didn't even know what it was, so

24   I should have sustained that objection, again, I think is

25   noncontroversial.  The fact that the university profits is a

J4OHDaw1

1  fact and it is true, and I don't think the government is

2  prejudiced in any way.

3       Now, having said that, the defense did indicate in

4  connection with the motions *in limine* that it would not go into

5  these areas.  I think that the extent to which they've entered

6  these areas is very, very minimal, but they are put on notice

7  that they should not go into these areas anymore, unless

8  appropriate on cross-examination.

9            MR. HANEY:  Understood, your Honor.

10           THE COURT:  OK.

11           MR. MOORE:  Thank you, Judge.

12           THE COURT:  Now, the second question that we need to

13 discuss is do you want a curative instruction, and if so,

14 what's the defense view on it?

15           MR. HANEY:  Your Honor, our view would be that it's

16 unnecessary for the reasons the Court stated, the reasons we've

17 stated on the record.

18           MR. MOORE:  And as I think what the Court has

19 indicated, the Court believes that the only really improper

20 question, from the Court's view, was this question about the

21 Rice report which was not answered.  I don't know why we would

22 give a curative instruction with respect to that.

23           MR. MARK:  Your Honor, given your Court's ruling, we

24 understand your thinking through that.  We would not request a

25 curative instruction at this time.  We expect the defense will

J4OHDaw1

1  follow your Honor's order here and reaffirmation that, while

2  these questions right now may not be that controversial, if we

3  keep going there with witness after witness after witness, we

4  do think it would be a different situation.  We might come back

5  to your Honor at that point in time.

6          THE COURT:  I agree.  By the way, the defense has

7  indicated that they will follow my instruction.  I'm sure that

8  in the heat of battle they will overstep, and then we'll deal

9  with that when it comes.

10         MR. MOORE:  We will try -- at least I will speak for

11  myself.  I will try to approach if I think I'm going to

12  overstep.

13         I will also say that we spent an awful lot of time

14  yesterday with Mr. Blazer without really ever getting to the

15  issues that are here in this case.  With respect to a lot of

16  talk about payment of players, etc., if we continue to spend a

17  lot of time on that, I understand that some limited information

18  about that is relevant here, but this case is not about paying

19  players.

20         MR. HANEY:  Your Honor, I'd be remiss if I did not on

21  behalf of my client follow up on that.  I do not want to engage

22  in speaking objections.  I'm going to follow the Court's

23  directive.  I'm very careful not to do that because I know the

24  influence that could have on a jury.

25         But we spent a good part of the day yesterday talking

J4OHDaw1

1      about my client three or four years ago when he was working for

2      a sports management company engaged in illegal payments or

3      illicit payments to student athletes.  That's not what this

4      case is about.  Effectively, seems like they're trying to retry

5      the Gatto case that they already won back on October six months

6      ago.  This isn't a case about paying student athletes.  This is

7      a case very specifically about whether or not my client and

8      Mr. Code paid cash bribes to coaches.

9              Now, I understand they get some 404(b) latitude, and I

10     think they got their shots in.  The jury's understanding it.

11     But it falls into our theory, in a certain way, that that's

12     what my client was doing.  But to spend several hours, they're

13     talking eight to ten hours with this guy, to testify to just

14     present my client in a negative light, I think it's becoming

15     prejudicial.  It's becoming clearly cumulative at this point to

16     further show my client was paying four years ago, potentially

17     trying to pay student athletes.

18              Thank you, your Honor.

19              MR. BOONE:  Your Honor, just a couple of points on

20     that.  Obviously, the government can put on their case however

21     the government wants to put on its case.  I don't think I heard

22     a relevance objection to the testimony that I now hear

23     complaints about.

24              But maybe more importantly, obviously, one of the

25     issues the defendants have raised is an entrapment defense, and

J4OHDaw1

1    there's even in opening statements the suggestion that the

2    government was pushing their clients to do things it didn't

3    really want to do.  So the government is trying to show the

4    relationship between the defendants and our cooperator and

5    others involved in the case to show how that relationship

6    started, and it started with Christian Dawkins, obviously,

7    reaching out to him to seek his help in paying players.  That's

8    relevant to the case, particularly relevant as I understand the

9    defense wants to point out that some of those payments went to

10   players.  This is explaining sort of that process and how it

11   is.

12            So it's clearly relevant.  They are not even saying

13   it's not relevant.  They're, frankly, just saying they're sort

14   of tired of hearing of it.  That's fine.  Maybe we could --

15   they could put it on in a different way, but this is the way

16   we're choosing to put it on.

17            THE COURT:  Can I ask you, how many cooperators will

18   the government be putting on?

19            MR. BOONE:  Just two, your Honor.

20            THE COURT:  Who's the other one?

21            MR. BOONE:  Munish Sood is the other one.

22            THE COURT:  OK.

23            MR. BOONE:  So they're, essentially, the only fact

24   witnesses in the entire trial.  So they're, obviously,

25   important, and we're going to take a lot of time getting

1    testimony out of them.

2              THE COURT:  Mr. Haney.

3              MR. HANEY:  I'd just briefly respond.  One's

4    predisposition, which I know they're trying to establish

5    through this line of questioning, one's predisposition to pay

6    players does not satisfy one's predisposition to pay coaches.

7    Their own witness testified that in all his years of all his

8    dirty deeds as a dirty football agent, he never paid a coach.

9    That's what their own witness said.  There's a reason why he

10   didn't pay coaches.  It's the same reason why my client didn't

11   pay coaches.  It doesn't make sense.  Their own witness is

12   supportive of the theory that we have of why paying bribes to

13   coaches doesn't make sense.  I think the Court can even

14   understand from Mr. Blazer's testimony, clearly, he would have

15   paid anybody to get a client.  He testified he didn't pay

16   coaches.  The fact that my client was predisposed to paying a

17   player or family members, that doesn't support a predisposition

18   to then pay coaches.

19             MR. MOORE:  I would certainly add, your Honor, that

20   there are two defendants on trial here.  As I understand it,

21   we're going to be treated to another almost two full days of

22   Mr. Blazer, and he didn't meet my client until June of 2017,

23   well into his career as an undercover FBI operative.  Much of

24   this information may be unduly prejudicial to my client.

25   Frankly, I would have filed a severance motion if I thought

J4OHDaw1

that your Honor would have entertained it, but I've had a lot

of experience with severance motions, particularly when I was a

prosecutor.  But I think the government would concede, for

example, if we were trying a case against Merl Code, we'd try

this case, even with these cooperators, in about two days.  So

some of this information can become more prejudicial with

respect to my client, and so that is the reason why I raised

it.

THE COURT:  Well, you've raised the issue.  Again, I

didn't -- I personally did not see anything in Mr. Blazer's

testimony that I considered to be cumulative.  The reason I

asked whether or not he was the only cooperator or one of a

couple of cooperators is because the government is entitled,

because I assume that it's -- you guys are going to come after

him and the government is entitled to have Mr. Blazer tell the

jury through the government's questioning everything bad that

he's ever done.  Now, hopefully that will not take another

couple of days, but I think the government is entitled to do

that.  Obviously, all of you should be aware of the amount

of -- I have no idea how much evidence you have or how you

intend to put it on.  All I know is the parties told me on any

number of occasions that this case would take two weeks.  So be

conscious of that.

Anything else?

MR. MOORE:  Just two brief points, your Honor.  First

J4OHDaw1

1    of all, I got an abbreviated response to the two issues that I

2    raised yesterday, either late last night or this morning.  I

3    don't consider it sufficient, but I am going to respond in

4    writing.  I don't think we're going to need to deal with the

5    issue until next week when we get to the defense case.  So we

6    will get your Honor some briefing on that issue if need be.  So

7    that's the first point I wish to raise.

8           The second point I would -- it's a question.  Does

9    your Honor require all three lawyers to be in the courtroom all

10   at the same time, even if you're not cross-examining the

11   witness?  Because I just want to make sure of that because we

12   might do some dividing and conquering later in this trial if

13   that is --

14          THE COURT:  That's fine.

15          MR. MOORE:  -- acceptable to the Court.

16          THE COURT:  That's absolutely fine.

17          MR. MOORE:  I guess the third question I have, also

18   for informational purposes, assuming that we get this case to

19   the jury next week, and Lord knows I hope we do, what is your

20   Honor's schedule with respect to the jury as they deliberate?

21   Is it the same schedule, or do we go longer?

22          THE COURT:  I am guided by the jury.  I tell them from

23   now on our time is yours or your time is ours.  So if you want

24   to stay after 2:30, if you think that you're getting close and

25   you want to stay after 2:30, we'll stay as long as you want.

J4OHDaw1

1            MR. MOORE:  OK.  Thank you.

2            MR. BOONE:  Just minor housekeeping, your Honor.

3     Yesterday, obviously, read a lot of stipulations.  Those

4     stipulations were authenticity stipulations.  So we will need

5     to move into actual evidence the recordings that we're going to

6     go over today.  We already started on one, Government

7     Exhibit 401.  I just want to make sure that's clear.

8            THE COURT:  Is there any dispute as to any of those

9     tapes?

10           MR. HANEY:  No, your Honor.

11           THE COURT:  So if you could do that in a summary

12    fashion --

13           MR. HANEY:  Yes.

14           THE COURT:  -- that would be helpful.  Given you tapes

15    1 through 15, have you seen these before, are they accurate,

16    you know.

17           MR. BOONE:  OK.

18           THE COURT:  Any objection to that?

19           MR. MOORE:  No, sir, your Honor.  I guess the only

20    other point Mr. Chaney reminded me, and perhaps I should say it

21    now, I understand that Mr. Blazer had a lot more contact with

22    Mr. Dawkins than he has with my client.  And Mr. Dawkins --

23    Mr. Blazer was allowed to sort of testify about exactly what he

24    believed the other party was thinking when he said this or he

25    said that.  I'm going to have issues with that when we get to

J4OHDaw1

1    Mr. Code because of his very limited involvement with Mr. Code

2    who he barely knows.

3              THE COURT:  I think that the question was not what was

4    he thinking, what was your understanding?

5              MR. MOORE:  What was your understanding?

6              THE COURT:  And that's perfectly appropriate in order

7    to put those conversations in context.

8              MR. MOORE:  And I also -- I would understand that when

9    we get to the defense case and we present tapes, what's good

10   for the goose is good for the gander, is that right, your

11   Honor?

12             THE COURT:  If the question is what was your

13   understanding of what the counterparty was saying, absolutely.

14             MR. MOORE:  Right.  Thank you.

15             THE COURT:  OK.  Anything else?

16             MR. BOONE:  Your Honor, for Chance Miller, the witness

17   who already testified, may it make sense to just go ahead and

18   offer officially the exhibits that he went over?  Those were

19   Government Exhibits 1001, 1003, 1004, 1005, and 1006.  I think

20   those actually were already admitted, because I think we put in

21   the stip that admitted sort of the bulk, all of the business

22   records documents.  My understanding is that we are now going

23   to ask to admit particular documents as we are discussing them.

24             THE COURT:  I thought that was the purpose of the

25   stipulation.  I mean, because you published before the jury at

J4OHDaw1

1    least one document that was brought in pursuant to those

2    stipulations, so I just assumed they were all admitted.

3              MR. BOONE:  And they were all admitted.  I guess what

4    I want to make clear, it sounds like what we intended to do was

5    to not admit all of them, but to admit them sort of as we

6    approach them, as the stip was sort of overinclusive.  You were

7    right that those documents were admitted.  I guess what we're

8    trying to say is going forward, we will be more specific about

9    which ones actually are going to be before the jury.

10             THE COURT:  I am officially confused.

11             MR. SOLOWIEJCZYK:  If I could just clarify very, very

12   briefly, your Honor.  It's an authenticity stip; it's not an

13   admissibility stip.

14             THE COURT:  Then how did we put that one before the

15   jury?

16             MR. BOONE:  We offered it.

17             MR. SOLOWIEJCZYK:  We did offer it.  We read the

18   transcript.  It's a little unclear.  So we're trying to have a

19   clean record that exhibits that Mr. Boone just read out are

20   officially admitted.  We are hoping for that.  And going

21   forward, because it's an authenticity stip not an admissibility

22   stip, we are going to be saying to your Honor, we offer

23   Government Exhibit Y, Government Exhibit X, just because the

24   defense -- that's what they wanted to sign, and we don't want

25   to overstep.

J4OHDaw1

1          THE COURT:  Very well.  By the way, I depend on the

2     parties to keep track of what's in evidence and what's not in

3     evidence.  So please have someone or several people dedicated

4     to making sure that somebody knows what's in.

5          MR. MOORE:  We would also like to -- while the

6     government doesn't have a ton of witnesses, we would like to

7     invoke the rule of sequestration.  And I know that

8     Mr. Vourderis is an exception to that rule.  I don't know who

9     UC-1 is and UC-2 is, although we spotted one who folks may

10     think was UC-1 yesterday.  So I would ask the government to

11     police that and to keep out those folks.

12          MR. BOONE:  UC-1 and UC-2 are not going to be here and

13     have not been here.

14          THE COURT:  I don't imagine that any other potential

15     witness has been in the courtroom during the trial, at least

16     not during the testimony yesterday.

17          MR. BOONE:  There's been a potential summary witness,

18     who's an FBI agent, who's been helping sort of moving witnesses

19     back and forth.  He's been in occasionally, that's it.

20          THE COURT:  OK.

21          MR. MOORE:  I would ask that he be excluded.

22          THE COURT:  He's a summary witness?

23          MR. MARK:  Yeah, he's a summary witness.  He was the

24     same summary witness who also sat at counsel table in the Gatto

25     trial.  He's not going to be testifying other than as a summary

J4OHDaw1

1     witness, not about his particular factual involvement in this

2     case.  We don't think that it's necessary to sequester him.

3             THE COURT:  It's my understanding a summary witness is

4     someone who somehow summarizes evidence that's already --

5     testimony and documents that are already in evidence?

6             MR. MARK:  Correct, your Honor.

7             THE COURT:  That application is denied.

8             MR. MOORE:  Yes, your Honor.

9             MR. MARK:  Your Honor, I'm just going to note for the

10    record, as Mr. Moore referenced, after defense raised the issue

11    of what they thought was the government's failure to comply

12    with their responses to their *Touhy* request, which, as we know,

13    your Honor, on the record we thought we had fully complied

14    prior to, we discussed that with both the FBI and the civil

15    AUSA who is outside the case and made a more formal response in

16    light of the Court's ruling precluding what we understood was

17    the vast majority of the requested testimony.

18             In that response, we asked them to particularly lay

19    out and identify the specific areas of testimony that they

20    think is admissible and remain appropriate in light of your

21    Honor's ruling.  And we said that once they identify those

22    specific areas of testimony, we would then promptly evaluate

23    their request.  And if they did seek to obtain any admissible

24    testimony, we would work to make those FBI agents available.

25             If what they're actually seeking is further

J4OHDaw1

1   inadmissible testimony, I think there was some references from

2   Mr. Moore before that the crux of what they were wanting to do

3   is sort of why did agents take particular actions.  That would

4   be inadmissible testimony, and then we would further seek to

5   preclude that, which is exactly the function that *Touhy* serves,

6   to flesh out exactly what is the testimony so that if there's a

7   proper application to preclude it, that we can put that before

8   your Honor.

9            THE COURT:  OK.

10           MR. MOORE:  I will tell your Honor that I'll probably

11   be better suited to do what they're asking me to do after we

12   hear the testimony of Mr. Blazer in its entirety.

13           THE COURT:  OK.  It's five minutes to 9:30, so let's

14   check in on the jury, and if the jury is here, we'll get

15   started at 9:30.

16           Is Mr. Blazer close by?

17           MR. BOONE:  Yes, he's in the hallway, your Honor.

18           THE COURT:  OK.

19           (Recess)

20           THE COURT:  Mr. Boone, I have just one small

21   recommendation for you.

22           MR. BOONE:  Yes, your Honor.

23           THE COURT:  When you go back and forth from the

24   transcript to the testimony, when you go back to the

25   transcript, can you say approximately what line so that it's a

J4OHDaw1

little easier to follow.

MR. BOONE:  Yes.  And, your Honor, what we would like to ask your permission on is we have prepared binders of the transcripts for the jury.

THE COURT:  Wonderful.

MR. BOONE:  Are we permitted to put them in the jury box?

THE COURT:  Absolutely.

MR. BOONE:  That also will make it easier.

THE COURT:  Did someone put this up here for me?

MS. BUSTILLO:  Yes.

THE COURT:  The jury is here, so let's bring Mr. Blazer in.

(Continued on next page)

J4OHDaw1

1              (Jury present)

2              THE COURT:  Everyone please be seated.

3              Ladies and gentlemen, you're going to find a binder in

4      your chairs.  Those are the transcripts of some of the

5      conversations that we're going to be going over.  I would ask

6      that you not read ahead, that you go only to the tab that we're

7      considering and not read ahead with respect to any later

8      transcripts.

9              I hope you all had a pleasant evening.  I thank you,

10     as always, for being so prompt.  I apologize about this

11     morning.  It won't happen again.

12             We will now continue with the direct examination of

13     Mr. Blazer.

14             Mr. Boone.

15             MR. BOONE:  Thank you, your Honor.

16             Pursuant to what we discussed this morning, I'd like

17     to offer into evidence the following exhibits that we will

18     cover today:

19             Government Exhibit 401, Government Exhibit 401T,

20     Government Exhibit 402, Government Exhibit 402T, Government

21     Exhibit 413, Government Exhibit 413T, Government Exhibit 1637,

22     Government Exhibit 501A and 501AT, Government Exhibit 501B and

23     501BT, Government Exhibit 501C and 501CT, Government

24     Exhibit 501D and 501DT, Government Exhibit 501E and 501ET,

25     Government Exhibit 508A and 508AT, Government Exhibit 508D and

J4OHDaw1

1    508DT, Government Exhibit 510A1 and 510A1T, Government

2    Exhibit 510A2 and 510A2T, Government Exhibit 510A3 and 510A3T,

3    Government Exhibit 510B1 and 510B1T, Government Exhibit 510B2

4    and 510B2T, Government Exhibit 510B3 and 510B3T, Government

5    Exhibit 510B5 and 510B5T, and Government Exhibit 510B6 and

6    510B6T.

7              THE COURT:  Any objection?

8              MR. HANEY:  May we approach, your Honor?

9              (Continued on next page)

J4OHDaw1

1          (At sidebar)

2          MR. HANEY:  Your Honor, our understanding wasn't

3     moving all these exhibits into evidence.  Is he moving for

4     admission?

5          MR. BOONE:  Yes.

6          MR. MOORE:  We did not believe that that was our

7     discussion.  We agreed to the admissibility of the exhibits

8     from yesterday.  I thought that's what he was doing.  We've

9     agreed to authenticity.  We have not agreed to relevance with

10    respect to all of these calls.

11         MR. HANEY:  Our stips are to authenticity.  They're

12    not to admissibility.

13         MR. MOORE:  I think he has to move them in item by

14    item, tape by tape.

15         THE COURT:  Do you have -- what were your objections?

16    Do you have real objections to these things going forward?  I

17    don't care whether or not you do.  I'm just trying to make this

18    as easy as possible for the jury.

19         MR. MOORE:  I guess if I'd known this was about to be

20    done, we could have gone over this and had an answer, a quicker

21    answer, for you.  I think many of these tapes are Mr. Haney's

22    tapes, not mine, but the bottom line is some of these tapes we

23    might contend are overly prejudicial, we my might contend there

24    are hearsay portions.  So, again, I thought we were doing this

25    tape by tape, exhibit by exhibit.

J4OHDaw1

1          THE COURT:  And I would have thought this would have

2     been done before trial.

3          MR. MARK:  Your Honor, we gave them notice.  They

4     actually asked for notice of what tapes we were going to be

5     playing with Mr. Blazer, we expect for that exact reason, so we

6     wouldn't have to waste time going through testimony.  So we've

7     given this to them with plenty of advance notice, and we

8     haven't heard anything --

9          MR. HANEY:  Our agreement was authenticity.  We've

10    also done the same with you with some of our phone calls, and

11    you've never -- you haven't agreed to admissibility on those

12    calls either.  You've agreed to authenticity only.

13         THE COURT:  Why don't we do this.

14         MR. BOONE:  One by one.

15         THE COURT:  One at a time, and then if there's any

16    further argument, we can do it at the break.

17         MR. MOORE:  We can try to deal with this at break,

18    yes, sir.  I was just surprised, frankly.

19         THE COURT:  OK.

20         MR. MOORE:  Caught off guard.

21         (Continued on next page)

22

23

24

25

J4OHDaw1                      Blazer - Direct

1                  (In open court; jury present)

2                  THE COURT:  I will reserve on the admissibility of the

3        tapes that have been offered thus far.

4                  MR. BOONE:  Thank you, your Honor.

5                  If we could queue up for the witness Government

6        Exhibit 401.  And to help refresh the jury's memory from

7        yesterday, if we could start from the beginning of that

8        recording.

9                  (Audio played)

10                 THE COURT:  Could I ask you to stop.

11                 Does the jury have 401T?

12                 MR. BOONE:  It's on the screen, and it should also be

13       in the binders.

14                 THE COURT:  OK.  I just wanted to let them know the

15       transcript that's being played now -- or call that's being

16       played now should be in your binders, 401T.  If you want to

17       read along, you can read along on the transcript.  If you want

18       to look at it on the screen, you can look at it on the screen,

19       whatever makes you most comfortable.  OK.

20                 You can continue.

21                 (Audio played)

22                 MR. BOONE:  You can pause here.

23       LOUIS MARTIN BLAZER, Resumed.

24       DIRECT EXAMINATION CONTINUED

25       BY MR. BOONE:

J4OHDaw1                         Blazer - Direct

1    Q.  Mr. Blazer, just to sort of orient ourselves, what's been

2    talked about up to this point in this call?

3    A.  Well, there's a lot there, so I'll try to explain the best

4    I can.  I was introduced to Christian by way of another

5    individual that I was introduced to.  As I said yesterday, it

6    was an old football agent that I've been dealing with for

7    years, introduced me to a guy in Atlanta named Rashan Michel

8    who did a lot of business in the basketball space.  And I

9    didn't know Rashan very well, and I make reference to that in

10   the -- in the call.  And Rashan connected me with Christian and

11   set up a meeting in September of 2015 where we had just kind of

12   laid out -- introduced each other and laid out kind of what we

13   did.  And Christian was in the basketball space, and I had come

14   from football, interested in being -- in working with some

15   basketball players, at this time, again, working, cooperating

16   with the federal government.

17          And so we left that meeting in September of 2017 --

18   2015 and just didn't reconnect for -- until early December of

19   2015.  The reason that we both kind of agreed to was that --

20   and, again, this was in conversations that I had with

21   investigators with the federal government as well,

22   cooperating -- that Rashan Michel was kind of confusing the

23   whole situation because when he was talking to me about it and

24   Christian needed money for these players, Rashan wanted

25   everything to go through him.  So later in the call, I say,

J4OHDaw1                       Blazer - Direct

1    5,000, 7,500, Rashan was asking me to give him money and then

2    get it to Christian, which nobody was very comfortable with.

3            So Christian sent that text that we had spoken about

4    yesterday, just trying to reconnect with me, and so we did.

5    And this call happened, and what's going on later on in the

6    call is that Christian is basically saying, I kind of felt the

7    same way you felt as far as Rashan confusing the whole

8    situation, so I wanted to come to you directly and see if we

9    can work together.  And then he recognizing the fact that I had

10   worked more in the football space and I was more familiar with

11   that, he goes into Andy Miller Sports, which was the agency

12   that he was working for, and a lot of the recruits and

13   prospects that he was working on and the money that he needed

14   for those prospects and trying to enlist me to come in with him

15   and provide money for those individuals.

16           What he was talking about was that there were just --

17   there was a lot.  There were a lot of recruits.  They were

18   really trying to build their business up to a certain number of

19   high-level NBA players.  And he was looking for other

20   resources, meaning money from individuals to try to spread out

21   over these individuals that he was recruiting.  And he would

22   compare it to football, something that I was aware of, where in

23   football you would have a good two or three years when a client

24   was in -- when a player was in college that you could develop

25   that relationship with them before they -- meaning, develop a

1   relationship, part of that, in my experience, was paying them

2   to build that relationship.

3          And so he was comparing that to football, saying that

4   basketball, it wasn't the same.  You had a situation where you

5   really needed to get into high school aged basketball players

6   because they would be coming into the pros, especially the very

7   elite ones, they would be coming into the pros for one year and

8   then they were coming out.  So you needed to make a decision to

9   invest in them very early on.

10          So the gist of the phone call was to come to me and

11   say, I know Rashan confused the situation.  I'm looking for

12   some help.  I'm looking for some money to invest in these

13   potential recruits.  I will get the representation end, meaning

14   he will get the representation end, he'll be their agent at

15   Andy Miller Sports, and I'll give you the business on the

16   financial or business management side.

17          MR. BOONE:  Before we play the next part, just to

18   orient the jury, I believe we're around line 24 on page 6, and

19   if we could continue with the call, please.

20          (Audio played)

21          MR. BOONE:  We can pause here.

22   Q.  What are you explaining to Dawkins in this segment?

23   A.  This was -- this was December of 2015, and at that time

24   I -- and, again, the way Rashan was introduced to me through a

25   football agent, it was a -- it's a very small community,

1    especially the football agents and financial advisers and that

2    whole -- and just really very, very competitive, as is

3    basketball when it comes to the business of working with these

4    elite athletes.  So December of 2015, I wasn't sure how much

5    Christian knew, even though no SEC charges had been filed or

6    anything like that on me yet, but there were whispers out there

7    about the movie stuff and what had happened with that and that

8    there were some clients that were not happy and -- and I wasn't

9    sure how much at the time Christian knew about that.

10            So what I was saying in this piece is that -- and we

11   had actually discussed a little bit of it when we met in

12   Atlanta that time -- is that I didn't need to be their

13   financial adviser.  I didn't need to handle their investments.

14   I could do more of the business management side of things for

15   them where I would pay their bills or create budgets or help

16   them with their houses or coordinate their tax stuff and -- or

17   if it was just maybe an insurance investment type situation.

18            So what we had discussed there was that there were a

19   variety of ways that we could work together, and it wouldn't

20   necessarily be the financial adviser end because, again, I

21   wasn't sure how much Christian knew about my problems with

22   that, with that movie/music investment situation.  So I was

23   just telling him there.

24            Then there's one point whenever I say about having

25   some basketball players overseas, and I really didn't have

1    anybody overseas.  But when you were talking to somebody, you

2    never really admitted that you didn't have, so that was not

3    true either.

4              MR. BOONE:  I believe we left off around line 13 of

5    page 8.  If we could continue.

6              (Audio played)

7              MR. BOONE:  We could pause here.

8    Q.  Now, Mr. Blazer, you just said in this phone call you

9    referred to having someone on the investment side.  What did

10   you mean by that?

11   A.  There was a -- my partner who handled the investment

12   management side at the time was Munish Sood in Princeton, New

13   Jersey.  So I was referring to Munish could handle the

14   investment management piece.

15   Q.  Did you know if Munish wanted to be involved?

16   A.  Yes, Munish wanted to be involved.  Munish had already been

17   working with a number of my athletes on the NFL side, so I was

18   pretty sure Munish wanted to be involved in handling the

19   investments.

20   Q.  You testified earlier that Munish Sood was a part of Blazer

21   Capital earlier, correct?

22   A.  Yes.  Well, it was actually Blazer Investment Advisers was

23   the investment advisory arm, and when I met Munish and forged a

24   relationship and partnership with him, Blazer Investment

25   Advisors became Princeton Blazer Advisers.  So Munish was the

J4OHDaw1                          Blazer - Direct

1    person who kind of handled the investment advisory piece.

2    Q.   Was he at all involved in your fraud regarding the

3    mismanagement of client funds?

4    A.   No.

5             MR. BOONE:   If we could continue.

6             (Audio played)

7             MR. BOONE:   Pause here.

8    Q.   There's a mention of getting a 1 percent on insurance.

9    What did you understand that to mean?

10   A.   Well, it was -- what I understood, it was two different

11   pieces.  The business management, what Christian was referring

12   to, would be, say, 1 percent.  So if a client made a million

13   dollars, then to manage the business end of it, the business

14   management, typically in the business it would be, to pay the

15   bills and to manage the whole lifestyle side of things,

16   1 percent.  You'd make $10,000 a year.  So that was the

17   business management side.  Then I think he was referring to

18   maybe doing an investment, like an insurance policy that was an

19   investment insurance policy.

20             So there were two different things.  One was the

21   business management at 1 percent, and then the other was the

22   insurance investment.

23   Q.   These are potential fees you can make off of a client?

24   A.   Potential fees, yes.

25             MR. BOONE:   I believe we're around line 13 of page 10.

J4OHDaw1                      Blazer - Direct

1    If we could continue.

2              (Audio played)

3              MR. BOONE:  Pause here.

4    Q.  What did you understand Dawkins to mean when he asked you

5    what you would be comfortable doing on a monthly basis?

6    A.  What I would be comfortable paying to him on a monthly

7    basis to give to players or their families in exchange for them

8    coming back to me for the business management or financial

9    business management services basically.

10             MR. BOONE:  I believe we're around line 17.  If we

11   could continue.

12             (Audio played)

13             MR. BOONE:  Pause there.

14   Q.  What are you explaining to Dawkins in this segment?

15             MR. HANEY:  Your Honor, I would object to relevancy.

16   This will be my only objection to this whole line of

17   questioning.

18             THE COURT:  Overruled.

19             MR. HANEY:  Thank you.

20   A.  What I was explaining to him was I just sort of -- at the

21   time I was using my own money on -- to do this.  And,

22   basically, I was just saying if I could, if we could pick out a

23   couple situations where we could sort of mitigate those costs

24   and that we were looking for players who were ready to -- ready

25   to give you a return on investment; in other words, committing

J4OHDaw1                          Blazer - Direct

1   the money to certain situations where the players were not

2   in -- not of high school age, where they were ready to come out

3   in the NBA draft quicker.

4   Q.  And you said you were using your own money.  What did you

5   mean by that?

6   A.  Well, before I started working with the FBI and they would

7   give me money to make payments, I -- at the direction of the

8   investigators with the U.S. Attorney's Office, I would -- I was

9   using my own funds to do that.

10          MR. BOONE:  I believe we're on line 5 of page 12.  If

11  we could continue.

12          (Audio played)

13          MR. BOONE:  We can pause there.

14  Q.  What did you understand Dawkins to mean when he said

15  towards the end that he was going to take a look at his

16  recruiting list and shoot you some names?

17  A.  Just in line with what we had discussed and what I had

18  requested, that we try to pinpoint a number of individuals who

19  were worth giving money to and who were close to coming out

20  into the NBA draft, who were close to turning pro.  Christian

21  was going to look at the list of recruits that he had, the

22  people that he was working on that sort of fit that

23  description.

24  Q.  What happened after this call?

25  A.  After this call, we did meet in Atlanta, I believe on the

J4OHDaw1                          Blazer - Direct

1    10th of December.

2    Q.  Did you continue to talk with Dawkins about what you just

3    testified to, helping fund money for players?

4    A.  Yes, I did.

5    Q.  Did you have a call with Dawkins on or about December 31?

6    A.  Yes, I did.

7    Q.  What did you discuss?

8    A.  On that call we discussed continuation of what we had

9    discussed here, some of the recruits that he was working on,

10   and also sort of making a plan to get together again and money

11   that he needed that we had discussed.  And, also, we had

12   discussed him speaking with a coach at South Carolina, Lamont

13   Evans, and me taking over payments that he was making to

14   Lamont.

15   Q.  Did you record that call?

16   A.  I did.

17            MR. BOONE:  Your Honor, the government offers that

18   call, which is Government Exhibit 402, and the related

19   transcript, which is 402T.

20            THE COURT:  Any objection?

21            MR. HANEY:  No objection, your Honor.

22            THE COURT:  OK.  That exhibit will be received.

23            (Government's Exhibits 402 and 402T received in

24   evidence)

25            THE COURT:  Does the jury have it?

1          MR. BOONE:  The jury should have 402T in their

2    binders, yes.

3          THE COURT:  Very well.

4          MR. BOONE:  Ms. Bustillo, when you're ready, if you

5    could play that call, please.

6          (Audio played)

7          MR. BOONE:  You can pause right here.  Thank you.

8    Q.  What did you understand Dawkins to be discussing with you

9    at this point?

10   A.  So at this point Christian is talking to me about what he

11   has going on from a recruiting standpoint.  And kind of in line

12   with the previous discussion, he is discussing something that

13   might fit into what we had talked about, in other words, a

14   player who would be ready to come into the NBA relatively soon

15   and that was worth me investing in, paying money to him to get

16   to this player.  He's explaining the situation where the

17   player, Diamond Stone from Maryland, was working with a

18   different financial adviser, in other words, a different

19   financial adviser was already paying this player, and that kind

20   of fell through.  Something happened and they had kind of had a

21   falling out.  So there might be an opportunity for Christian to

22   meet with this player, see what's going on there, step in and

23   we could start paying him, and then Christian could turn his

24   business or financial relationship over to me.

25         MR. BOONE:  I believe we left off around line 13 of

1    page 3.  If we could begin from there, please.

2               (Audio played)

3               MR. BOONE:  You could pause here.

4    Q.  What did you understand Dawkins to be referring to when he

5    mentioned going to South Carolina?

6    A.  We had had discussions beforehand about the fact that he

7    was paying a coach from South Carolina, Lamont Evans, for the

8    relationships that he had with players, one of which was a

9    South Carolina player named PJ Dozier.  And the coach was

10   Lamont Evans.  And Christian had suggested that if we -- if I

11   wanted to take over payments that he was making to the coach,

12   that he would make that introduction.  And he says that he

13   basically told the coach that the money now, from now on, would

14   be coming from me, and we just needed to try to get down to

15   South Carolina at some point and memorialize the deal and meet

16   the coach.

17   Q.  What was your understanding as to why he was paying the

18   coach?

19   A.  He was paying the coach for -- for the relationship and to

20   get the coach's players, whether players the coach was

21   recruiting or current players on the South Carolina basketball

22   roster, to be directed to his agency, to be directed to Andy

23   Miller Sports.

24   Q.  You mentioned a player at South Carolina by the name of PJ

25   Dozier, is that correct?

J4OHDaw1                        Blazer - Direct

1    A.  Yes.

2    Q.  Earlier in your testimony, we went over a text exchange

3    between you and Dawkins.  Do you recall if PJ Dozier was

4    mentioned in that text exchange?

5    A.  Yes, PJ Dozier was mentioned in that text exchange.

6    Q.  And what was your understanding of why Dawkins was going to

7    stop paying and was giving you an opportunity to sort of pick

8    up where he left off?

9               MR. HANEY:  Your Honor, objection to foundation.

10              THE COURT:  Overruled.

11   A.  My understanding was that Christian thought that it would

12   be a good opportunity for me on the business and/or financial

13   advisory end to build a relationship with this coach so that,

14   in addition to the coach sending the players to him on the

15   representation end as agent, that I would now have a

16   relationship with the coach so he could send PJ Dozier and

17   players like PJ Dozier who came through South Carolina my way

18   for the business and financial advisory services.

19              MR. BOONE:  I believe we stopped around line 18 of

20   page 4.  If we could continue from there.

21              (Audio played)

22              MR. BOONE:  If you could pause here.

23   Q.  Now, there are some numbers being tossed around, 25.  What

24   do you understand Dawkins to be referring to?

25   A.  This was in reference to a discussion, and I think there

J4OHDaw1                          Blazer - Direct

1    was a text in there as well, but we had talked about that

2    budget that Christian had proposed me working with across the

3    board sort of for the year.  And the total number was $40,000

4    for the year that I was going to commit to Christian to help

5    him with recruiting to pay these players and/or their families

6    or coaching relationships like he had with Lamont Evans.  And,

7    basically, so what we broke it down to is 20 or 25, which was

8    $8,000 a month, roughly, 24, $25,000, for the first part of the

9    year, and then that would help him with recruiting that he

10   needed.  And then we did discussed an additional $15,000 in

11   addition to the 25, which came up to $40,000, for grass roots,

12   for the grass roots, investment in the grass roots, the paying

13   the coaches and players on the grass roots level for those

14   relationships.

15   Q.  And, again, what do you mean by grass roots?

16   A.  Again, grass roots is -- grass roots basketball is high

17   school-aged travel basketball, really good players, all from

18   all around a certain area.  And college coaches typically

19   recruit those players for their colleges from grass roots.

20   Q.  So, just to be clear, you were talking about spending a

21   portion of money towards college players and college coaches

22   and another portion towards high school-aged players, is that

23   correct?

24   A.  That is correct.

25            MR. BOONE:  If we could continue, I believe we're on

1    line 8, around line 8, page 5.

2                 (Audio played)

3    BY MR. BOONE:

4    Q.  What happened after this call?

5    A.  After -- after this call, I believe our next meeting was in

6    Atlanta, and we drove to South Carolina to meet with Lamont

7    Evans.

8    Q.  Do you remember when, approximately, you drove with Dawkins

9    to South Carolina?

10   A.  Yes, I believe it was early March, I think March 5 of 2016.

11   Q.  Other than Dawkins and yourself, who, if anybody else, went

12   with you?

13   A.  My old partner, my partner on the financial management

14   side, investment advisory, Munish Sood.

15   Q.  Why was he going?

16   A.  I sort of asked Munish to come along because I -- I knew

17   Munish would be interested in this, in the business of dealing

18   with the potential NBA players as clients on the investment

19   advisory side, in addition to the fact that Munish had capital,

20   Munish had money, that he could help with the payment of the

21   coach and some of the other things that Christian was

22   discussing, like the payment of players.  So I made the

23   introduction of Munish to Christian, and we decided to all go

24   to this meeting in South Carolina.

25   Q.  Just to sort of clear what you've referenced earlier, when

J4OHDaw1                        Blazer - Direct

1    you first started cooperating with the government, were you

2    working solely with the U.S. Attorney's Office?

3    A.   I was working solely with the U.S. Attorney's Office, yes.

4    Q.   Did at some point that change?

5    A.   Approximately October/November of 2016.

6    Q.   Then who were you working with?

7    A.   Then I was working with the U.S. Attorney's Office and the

8    FBI.

9    Q.   You testified earlier that once the FBI came on board is

10   when you then had funds to make the payments you've discussed?

11   A.   That's correct.

12   Q.   What was the purpose of the trip to South Carolina?

13   A.   The purpose of the trip to South Carolina was Christian was

14   going to make the introduction of Lamont Evans, who was an

15   assistant basketball coach at South Carolina, to Munish Sood

16   and me.

17   Q.   What ultimately happened on the trip?

18   A.   We ultimately met with Lamont Evans and discussed a number

19   of different things and came away with a good relationship with

20   Lamont where we agreed to take over -- Munish and I agreed to

21   take over the payments that Christian was making to Lamont.

22   Q.   Had you previously met Evans?

23   A.   No, I'd never heard of Lamont Evans prior to Christian

24   introducing us.

25             MR. BOONE:   If we could show, just for the witness for

J4OHDaw1                         Blazer - Direct

1    identification purposes, Government Exhibit 2105.

2    Q.  Do you recognize this document?

3    A.  Yes.

4    Q.  What is it?

5    A.  That is Lamont Evans.

6    Q.  Is that a picture of Lamont Evans?

7    A.  Yes, it's a picture of Lamont Evans, yeah.

8    Q.  It's a fair and accurate depiction of Lamont Evans?

9    A.  It is, yes.

10          MR. BOONE:  Your Honor, the government offers

11   Government Exhibit 2105.

12          THE COURT:  Any objection?

13          MR. HANEY:  No objection, your Honor.

14          THE COURT:  2105 will be received.

15          (Government's Exhibit 2105 received in evidence)

16          MR. BOONE:  If we could publish for the jury, please?

17          THE COURT:  You may.

18   BY MR. BOONE:

19   Q.  Now, the meeting you took in South Carolina, did you record

20   that meeting?

21   A.  I did, yes.

22          MR. BOONE:  Your Honor, the government offers a

23   recording of that meeting.  It's Government Exhibit 501A and

24   the transcript is 501AT.

25          THE COURT:  Any objection?

J4OHDaw1                        Blazer - Direct

1              MR. HANEY:  No objection, your Honor.

2              THE COURT:  501A and AT will be received.

3              (Government's Exhibits 501A and 501AT received in

4     evidence)

5              MR. BOONE:  Ms. Bustillo, if you could play that for

6     us, please.

7              (Audio played)

8              MR. BOONE:  We could pause here.

9     Q.  First of all, where are you during this recording?

10    A.  We are in a restaurant in a hotel in Columbia, South

11    Carolina.

12    Q.  Who has been talking so far in the portion we played?

13    A.  So far, basically, Christian and Lamont Evans.

14             MR. BOONE:  I believe we're around line 21.  If you

15    could go back just a little bit and then continue playing.

16             (Audio played)

17             MR. BOONE:  If we could pause here.

18    Q.  Who's talking in this portion?

19    A.  Lamont Evans.

20    Q.  What did you understand him to be talking about?

21    A.  I -- from that I gathered that Lamont was saying there are

22    some programs, like Michigan State with Tom Izzo, where those

23    head coaches, those coaches are there for a long time, 20

24    years.  They're there forever.  He was saying -- and then there

25    are schools like South Carolina and others where it's not like

1   that.  The coaches are in and out.  Four years in, four years

2   out.  So he was making the distinction, in my opinion, between

3   some of the elite college basketball programs and some that

4   weren't as -- as traditionally elite.

5           MR. BOONE:  I believe we're around line 9, if we could

6   continue.

7           (Audio played)

8           MR. BOONE:  If we could pause here.

9   Q.  What do you understand Dawkins and Evans to be discussing

10  here?

11          MR. HANEY:  Your Honor, object to what he knows Evans

12  to be discussing on foundational grounds.

13          THE COURT:  Ask another question, Mr. Boone.

14          MR. BOONE:  Sure.

15  Q.  The recording we're going over is a conversation you had

16  with Lamont Evans, correct?

17  A.  Correct.

18  Q.  Approximately how long did that conversation last?

19  A.  The whole conversation?

20  Q.  The whole conversation.

21  A.  Probably an hour, 45 minutes to an hour, hour and a half,

22  somewhere in there.

23  Q.  Subsequent to this meeting, did you have further

24  conversations with Lamont Evans?

25  A.  Before, no.  Afterwards, yes.

J4OHDaw1                        Blazer - Direct

1   Q.  Did you have meetings with Lamont Evans or calls with

2   Lamont Evans that lasted over the course of, say, over a year?

3            MR. HANEY:  Objection.  Leading.

4            THE COURT:  Overruled.

5   A.  Yes, afterwards, yes.

6   Q.  So based on those conversations with Lamont Evans that

7   you've had, which sounds like several conversations, what did

8   you understand him to be referring to here when he and Dawkins

9   are talking?

10           MR. HANEY:  Objection as to foundation, your Honor.

11           THE COURT:  Overruled.

12           MR. HANEY:  Thank you.

13  A.  I mean, can I --

14  Q.  Sorry.  Just to orient you where we are, there's talk of

15  Georgetown, Tennessee, North Carolina, and recruiting.

16  A.  Yes.

17           MR. HANEY:  Objection to the form of the question.

18  That's not a question.  He's testifying.

19           THE COURT:  He's just orienting him to where in the

20  transcript he wants him to focus.

21           MR. HANEY:  Thank you.

22  A.  Lamont in that piece was talking about how difficult it is

23  to recruit at South Carolina because you have so much talent.

24  There's so much talent in that area, but there are so many

25  really high-level schools like North Carolina and Duke and NC

J4OHDaw1                          Blazer - Direct

1   State and even schools like Georgetown coming in and trying to

2   recruit the same players that Lamont is trying to recruit for

3   South Carolina.

4           MR. BOONE:   I believe we're around line 8 of page 3.

5   If we could continue, please.

6           (Audio played)

7           MR. BOONE:   Pause here.   Thank you.

8   Q.   In this segment, what did you understand Evans to be

9   discussing?

10  A.   Again, sort of a continuation of the recruiting side of

11  things and some of the individuals that he was -- that he was

12  trying to recruit, and he names a few of those individuals.

13  And then at the end of that piece, he talks about how one

14  recruit, how one -- bringing one player into a program, one

15  high-level recruit can really change the program.   And at the

16  same time, Christian is trying to explain as well the

17  significance of that with a coach like Lamont, how Lamont can

18  influence that.

19  Q.   What was your understanding, if any, as to why Evans was

20  telling you this?

21          MR. HANEY:   Objection.   Speculation, your Honor.

22          THE COURT:   Sustained.

23          MR. HANEY:   Thank you.

24          MR. BOONE:   If we could go back a little bit, and if

25  we could begin, I believe we're around line 20.

J4OHDaw1                          Blazer - Direct

1              (Audio played)

2              MR. BOONE:  Pause here.

3   Q.  You mentioned that's great to you to Evans.  What did you

4   mean by that?

5   A.  Well, Lamont, prior to me saying that, was basically saying

6   and Christian was talking about South Carolina's record the

7   year before, and they had -- basically were 500.  They didn't

8   do all that well.  Lamont recruits a player like PJ Dozier.  PJ

9   Dozier comes in, and all of a sudden the -- the record is much,

10  much greater and the team's doing much better.

11             And so what I'm saying in this piece is that Lamont is

12  basically selling me on the value of him as a recruiter and a

13  coach to get me to understand how -- how he can change things

14  by recruiting the right player, and he's using it as an example

15  here that he recruited PJ Dozier.  That he brought this recruit

16  in, and it did some great things for the program.  And I say,

17  well, that's great for you because of sort of upward mobility.

18  If he recruited this player and this player changed the program

19  for the better, then that's going to be a great reflection on

20  Lamont's job that he's doing in South Carolina and that would,

21  hopefully, propel him to a higher level in college basketball

22  coaching ranks.

23             (Continued on next page)

24

25

J4O9DAW2                          Blazer - Direct

1          MR. BOONE:  I believe around line 20, or around line

2    23, page 5, just go back a little bit to catch where we just

3    left off.

4          (Audio played)

5    Q.  Now, in this segment Dawkins says, "Agents obviously have

6    influence.  You got to get the college coaches too."  What did

7    you understand him to mean by that?

8    A.  Well, kind of prior to that Christian is talking about the

9    fact that Lamont brought in PJ and they know that and kind of

10   to my point that saying, Lamont, that's good for you.

11   Christian is basically reinforcing that, saying, The people

12   here know that you did that.

13          And then to answer your question, Christian is saying

14   for me, for us, in the -- what I was posing as a business

15   financial adviser with Munish Sood with me, Christian is

16   basically saying you guys want the financial management and the

17   business management side, dealing with me as an agent is great

18   but you have to be dealing with the college coaches too.  And

19   if you're not, then it's like you're skipping a step.  Like

20   you've got to be dealing with college coaches.  You're skipping

21   over a crucial step in trying to establish relationships,

22   business relationships with these players if you're not dealing

23   with the college coach.

24   Q.  And Dawkins also mentions on coming to him, talking to him

25   about PJ, "Well fuck you need to be talking to him."

J4O9DAW2                          Blazer - Direct

1           What did you understand him to mean by that?  This is

2     lines 15 to 17 on page 6.

3     A.   Basically if Christian as the agent is talking to Lamont

4     Evans about PJ Dozier, a player at South Carolina, then we too,

5     Munish, the financial adviser, business adviser need to be

6     talking to Lamont Evans too about PJ.

7           MR. BOONE:  Please continue from there.

8           (Audio played)

9     Q.   What did you understand Evans to be saying there?

10    A.   Lamont is saying this relationship that he has with

11    Christian is not a casual fly-by-night, just met him in a club

12    and introduced himself.  The relationship that Lamont had with

13    Christian is one of trust, that he trusts Christian and that

14    they've got a long-standing, great relationship.  So making me

15    feel more comfortable with the relationship that Christian and

16    Lamont had.

17    Q.   Before we move on, if we could go back to page 6 of the

18    transcript.  I'm looking at the very last lines, 23, 24.

19    Dawkins says, "You know what I'm saying?  We can help."

20          What did you understand him to mean by "we can help"?

21          If anything?

22    A.   Pardon me?

23    Q.   I just said if anything.

24    A.   Just in the context I just had to -- from what I remember

25    is well, he's saying you -- agents, we can help but you've got

J4O9DAW2                           Blazer - Direct

1    to -- the college coach relationship is important.  He's

2    saying, you know what I'm saying, we can help, meaning agents

3    can help you.  But Lamont Evans can help you more or the -- the

4    same or more.

5    Q.  What we just went over, is that just a portion of the

6    conversation you had with Lamont Evans?

7    A.  It is, yes.

8    Q.  And you said earlier you believe your conversation with him

9    lasted, I think you said over an hour-and-a-half; is that

10   correct?

11   A.  Somewhere around there, yes.  It was a fairly long lunch,

12   over lunch.

13             MR. BOONE:  Your Honor, the government wants to offer

14   other portions of that conversation starting with Government

15   Exhibit 501C and the related transcript which is 501CT.

16             THE COURT:  Any objection?

17             MR. HANEY:  No objection.

18             THE COURT:  Very well 501C and 501CT will be received.

19             (Government's Exhibits 501C and 501CT received in

20   evidence)

21             MR. BOONE:  Ms. Bustillo, when you're ready you can

22   begin playing that for us, please.  Thank you.

23             (Audio played)

24   Q.  Now, what -- during what time period of the meeting was

25   this segment occurring?

J4O9DAW2                     Blazer - Direct

1   A.   I think we had finished or were wrapping up lunch and sort

2   of heading out and we had gotten up and we kind of walked

3   towards the entrance/exit of the restaurant.

4   Q.   In that portion Dawkins mentioned there being like five

5   PJs.  What did you understand him to mean by that?

6   A.   That dealing with -- at South Carolina and dealing with a

7   coach like Lamont Evans who had PJ Dozier right now as a

8   recruit in a player was great, but Lamont and South Carolina,

9   Lamont was going to have five players come through like PJ

10  Dozier, of that caliber.  So building a long-term relationship

11  with Lamont, you got PJ now but there was a pipeline of players

12  like PJ that were going to come through.  And that was the

13  benefit of dealing with Lamont Evans, giving money to Lamont

14  Evans.  That was the benefit of doing that.  Because you had a

15  pipeline of players that was going to come through and they

16  were going to come your way for -- my way for the business

17  management, financial management.

18  Q.   And what did you understand Dawkins to mean when he said,

19  "the good thing about fucking with college coaches is good

20  players every year, buddy"?

21  A.   It's in line with the five PJs.  The good thing about if

22  you're paying a college coach like Lamont and you're building

23  that relationship with him, then you're going to have, at a

24  school like South Carolina, you're going to have players like

25  PJ Dozier every year that Lamont is going to have influence

J4O9DAW2                         Blazer - Direct

1   over and he's going to turn your way for business.

2                   MR. BOONE:  If we can continue to play the recording.

3                   (Audio played)

4   Q.  What did you understand Dawkins to be discussing in this

5   segment of the conversation?

6   A.  Well, it was really Christian and Lamont talking about --

7   and I came from the football space so this wasn't really -- so

8   it was being explained to me, in my opinion, that he was

9   talking about the -- one particular recruit that they had had

10  referenced that Lamont was working with or had signed for South

11  Carolina.  And what Christian was sort of adding the value to

12  me in and explaining was that not only does a coach like Lamont

13  Evans have the ability to help you identify and will take these

14  recruits and turn them your way for the business management

15  services but also a guy like Lamont is in a position to

16  identify, almost mitigate the costs of what you might need to

17  give to the player, the money that you might need to give to

18  the player or the family.  And he references a really good

19  player who doesn't understand the value, his value yet.

20                  So Lamont was going to be able to, per Christian,

21  bring us into situations like that and say you guys can pay me

22  and then I can tell you this player over here just needs

23  $5,000, pay his phone bill, pay a little bit here or there and

24  I could really save you money because he doesn't understand

25  what his value is.  He doesn't know what the return on

1  investment to you is going to be at this point.  I can identify

2  as a coach -- I can identify those type situations and not only

3  bring that relationship back to you but whatever you need to

4  invest money in that situation, that family, that player, I can

5  save you money there as well, so increase your potential return

6  on that investment.  That's what I took that to mean.

7           MR. BOONE:  I believe we stopped around line 22.  If

8  we could just backup a little bit to orient ourselves and then

9  move forward.

10          (Audio played)

11 Q.  Who was just talking?

12 A.  Munish Sood.

13 Q.  And what was he discussing?

14 A.  He was making -- he was just reinforcing the point that

15 Christian and Lamont just discussed and in reference to

16 basically saying that he used to fly coach whenever he would go

17 somewhere and then when he started flying first class it was

18 very difficult for him to go back to coach because he knew what

19 flying first class was like.  And it was just in reference to

20 Dwayne Huell and the recruit that they were talking about not

21 being -- not really understanding what his value was and not

22 being exposed to what else was out there.  So we were in a

23 position dealing with Lamont Evans to be able to take advantage

24 of that.  And Munish was just referencing that in an analogy.

25          MR. BOONE:  I believe we stopped around line 10, page

1    3.  If we could continue.

2              (Audio played)

3    Q.  What did you understand Dawkins to be explaining here?

4    A.  In the first part of that piece of dialogue he's just

5    referencing, again, the fact that he can -- in dealing with

6    being involved with coaches, paying the coaches you can, again,

7    mitigate the risks or mitigate the amount of money that you

8    have to commit to a situation before it gets out of hand.

9              And then Christian talks about the difference between

10   head coaches in college basketball and the assistant coaches.

11   And he makes reference to with head coaches getting involved

12   with this payment situation, one, they won't do it because

13   they're making too much money; the head coaches are making way

14   too much money in a major college basketball program and, also,

15   it's too risky for them.  So it's not the college coaches --

16   it's not the head coaches in college basketball that you want

17   to focus on paying.  Like Lamont Evans, it's the assistant

18   coaches, like Lamont Evans, you want to focus on the assistant

19   coaches who aren't making as much money and who are more

20   hands-on with the players and are willing to take the risk more

21   than the head coach at South Carolina, Frank Martin, I believe.

22             MR. BOONE:  If we could backup a little bit and go

23   forward, please.

24             (Audio played)

25   Q.  What did you understand Dawkins to mean, "It falls on the

1    assistants and if they don't deliver then they're fired"?

2    A.   He's meaning, to me meaning that he -- again, the head

3    coaches versus assistant coaches.  Head coaches aren't willing

4    to take money for a variety of reasons.  But the business of

5    recruiting players and bringing players to the program and

6    taking money to do whatever is needed to be done falls on the

7    assistant coaches to do that.  And if those assistant coaches

8    don't recruit the players to bring to that program and elevate

9    that college basketball program, then they just get fired.

10   Q.   What do you mean by "do what needs to be done"?

11   A.   What I mean by that is paying the recruits, the assistant

12   coach is making payments or payments or taking care of whatever

13   financial needs a recruiter, his family asks for, to come to

14   that -- to come to that program -- to make a decision to come

15   to that program.  To incentivize that recruiter/player to come

16   to the program.

17            MR. BOONE:  If we could continue.

18            (Audio played)

19   Q.   What did you understand Evans to be talking about there?

20   A.   There he's, again, making a reference to the elevation of

21   an assistant coach to a head coach and the money.  And in that

22   piece he's referencing all you got to do is look in the media

23   guide and take a look at the coach's wife and when that coach

24   is there for a couple of years look at how his wife changes.

25   And he means that -- he's saying that the coach's wife maybe

1    has more expensive clothes or got surgery or something like

2    that and he's just referencing an assistant coach's role and

3    then the money when you elevate from an assistant coach to a

4    head coach and how that life changes financially for a college

5    coach at that level.

6          MR. BOONE:  I believe we're at line 10, page 5.  If we

7    could continue.

8          (Audio played)

9    Q.  What did you understand Dawkins to mean when he said

10   "That's the grind you have to go through"?

11   A.  He's explaining in reference to someone like Lamont Evans

12   who was an assistant coach and is just actively, actively

13   recruiting players and needs money to recruit those players and

14   has to find people like me and like Christian at the time to

15   give him or provide him with the money that he needs to

16   incentivize these recruits to make a decision to strongly

17   consider coming to South Carolina.

18         So he's saying that that recruiting and what that

19   recruiting entails financially, paying these recruits to

20   incentivize to come is the grind that an assistant coach needs

21   to go through in hopes that he will become a head coach and

22   then he really won't have to do that anymore.

23   Q.  What did you understand Dawkins to mean from line 12 where

24   he said, "You got to shoulder that burden and kind of take it

25   in chip"?

J4O9DAW2                          Blazer - Direct

1   A.   It's the burden that an assistant coach in college

2   basketball needs to take, the burden of recruiting and finding

3   the monetary resources needed to bring top recruits to the

4   program.  And they have to do it.  If they don't want to be

5   fired or they have any hopes of being a head coach at a

6   program, they've got to shoulder the burden and take it on the

7   chin for a certain number of years until they can elevate to

8   that position hopefully.

9           MR. BOONE:  If we could continue.

10          (Audio played)

11  Q.   What did you understand Dawkins to be explaining in

12  reference to PJ?

13  A.   He's referencing PJ Dozier there, the player at South

14  Carolina.  And what he's explaining to Munish and I was that if

15  you had PJ Dozier in here right now and we asked him, PJ, who

16  should I talk to about your stuff, meaning your business, he's

17  not going to say Frank Martin, the head coach of South

18  Carolina, he's going to say Lamont Evans, the assistant coach

19  because Lamont is the guy that's brought him and Lamont

20  financially or otherwise has taken care of everything that PJ's

21  needed.

22          So Christian is referencing, in my opinion, the

23  difference between who has influence over a player like PJ

24  Dozier.  Is it the head coach or the assistant coach?  And he's

25  saying it's the assistant coach, Lamont Evans.

J4O9DAW2                        Blazer - Direct

1    Q.  And what did you understand Dawkins to mean -- I'm looking

2    at lines 2 and 3 of page 7, "Your head coach, he's just a

3    figurehead basically"?

4    A.  I think by that he meant that the head coach is not really

5    in touch with the players necessarily and isn't privy to what

6    has to happen, how the cake is baked or I think he's -- he's

7    basically saying it's not the head coach that really knows what

8    is going on, it's assistant coaches who really are in touch

9    with the players.  And, again, as Christian said, that grind,

10   what needs to be done to recruit top players at a program.  The

11   head coach is kind of hands off with that stuff.

12            MR. BOONE:  OK.  If we can continue.

13            (Audio played)

14   Q.  What did you understand Evans to mean when he said he feels

15   like he's done people's job for them?

16            MR. HANEY:  Objection to foundation, your Honor.

17            THE COURT:  Overruled.

18            MR. HANEY:  Thank you.

19            THE WITNESS:  First, he's complimenting Christian and

20   just saying that Christian works really, really hard and,

21   again, kind of establishing the trust and mentions that

22   Christian, again, is somebody that he trusts and works really

23   hard.  But Lamont is saying I've done other people in

24   Christian's business, which is the agent management

25   representation, he's saying that I've been the one that has to

J4O9DAW2                          Blazer - Direct

1    come out-of-pocket to pay these recruits and recruit these

2    players with no assistance, with no help and then they go and

3    are represented by some agent who really hasn't done anything

4    to help me.  So I've been doing the job for them.

5           He meant by that that Christian has done the work and

6    has paid him and has built a relationship with him and sort of

7    earned that trust.  That's what I got out of that.

8           THE COURT:  It's now eleven o'clock, ladies and

9    gentlemen, so we're going to take our first break.  It will be

10   fifteen minutes.  So please be prepared to come out at quarter

11   after the hour.  Do not discuss the case.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.  Any issues for me?

3          Mr. Blazer, do you want to step down.

4          (Witness excused)

5          MR. CHANEY:  We don't have any issues.

6          MR. HANEY:  No, your Honor.

7          THE COURT:  OK.  Fifteen minutes.  Don't be late.

8          (Recess)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Mr. Boone.

3          MR. BOONE:  Thank you.

4          I believe where we left off, we were going through

5     Government Exhibit 501C and if we could start back the

6     recording at the minute mark of 4 minutes and 13 seconds.

7          (Audio played)

8     Q.  What did you understand -- what point did you understand

9     Dawkins to be making in his comparison of football to

10    basketball?

11    A.  He's saying that that's why I want you to meet the college

12    coaches because in basketball it's different than it is in

13    football.  The football player he references, Jadeveon Clowney,

14    was a big football draft pick.  And the NFL, the college

15    players typically stay in school a lot longer -- they have

16    to -- than the college basketball players.  So to be building

17    relationships, paying college coaches to help them with their

18    recruiting or whatever they need is important because they get

19    the players from the grassroots program and they bring them to

20    their school, recruit them for their school.  And then those

21    players, they might be there one year and then they're gone

22    because of the one and done that we discussed before.

23          Christian is explaining to me in the space that we're

24    accustomed to, football, the difference between college

25    football and college basketball, and when you have to get

1    involved and why being involved with college coaches, assistant

2    coaches in basketball on the college level is so important

3              MR. BOONE:  I believe we stopped around line 9, page

4    9.  If we could continue, please.

5              (Audio played)

6    Q.  What did you understand Evans to mean when he says, "let me

7    tell you," this is line 13 at page 10, "let me tell you, my

8    shit be here.  It be done"?

9    A.  Lamont is basically -- I meant -- I understood that to mean

10   that Lamont was kind of selling his value to us, to me, and to

11   Munish Sood and saying that if I have the money that I need, I

12   get the recruits that I want.  And so you should be -- I'm

13   worth dealing with, I'm worth paying this money because if the

14   money is in my hands I get the recruits.

15             MR. BOONE:  I believe we left off around line 15, if

16   we can continue.

17             (Audio played)

18   Q.  Now, looking at lines 2 and 3 at page 11.  What did you

19   understand Dawkins to mean by "and if he don't have it.  I can

20   only get so far"?

21   A.  Saying if Lamont is a useful guy, if Lamont doesn't have

22   the money needed, the money for Lamont, he can only get so far.

23   He can't -- his hands would be tied with his ability to recruit

24   because if he doesn't have the money, he could only go so far.

25   So that's why we were going to pay Lamont.

J4O9DAW2                        Blazer - Direct

1          MR. BOONE:  If we could go forward, please.

2          (Audio played)

3          MR. BOONE:  I'm sorry.  If we could actually skip to

4   minute mark 8.

5          (Audio played)

6   Q.  Just to orient the jury, we're now on page 12 of the

7   transcript around lines 15 and 16.

8          What did you mean by being able to "mitigate those

9   needs"?

10  A.  I was just referencing what was talked about before in the

11  conversation and that if -- and kind of reinforcing or

12  reiterating what Lamont was saying and Christian was saying

13  about the -- Lamont being in a position to, if there was money

14  that was needed to recruit a player or when the player was with

15  Lamont on the team, Lamont would be in a great position to save

16  us money because, as I said before, they were able to better

17  understand the expectations of the player and really reduce the

18  costs that we would need to incur in addition to paying Lamont.

19         MR. BOONE:  If we could continue around line 15 at

20  page 12.

21         (Audio played)

22  Q.  What did you understand Dawkins to be explaining in that

23  segment?

24  A.  He was explaining that in addition to mitigating the cost

25  that Lamont would be able to do for us with players, Lamont as

1  the assistant coach and the coach that recruited a player like

2  PJ Dozier, he was there everyday.  He was in front of him

3  everyday.  So if we made the investment in Lamont, if we were

4  paying Lamont, Lamont was going to be with that player everyday

5  so that there would be no surprises.

6       As far as PJ Dozier's business coming back our way, he

7  was going to be able to keep, like he mentions his cousin Ricky

8  not letting anybody get into the situation that we weren't --

9  we wouldn't be aware of.  So Lamont was with PJ Dozier all the

10 time and he was going to be able to control who was around PJ

11 Dozier for us.

12      MR. BOONE:  I believe we stopped around lines 10, 11

13 on page 13.  Continue, please.

14      (Audio played)

15 Q.  What point, if any, did you understand Dawkins to be making

16 when he says "timing is everything"?

17 A.  Well, and I actually mentioned too from my experience in

18 paying football players as well that timing is everything.  If

19 somebody -- if a player were to make a request or a family

20 member were to ask you to pay them, to get them something that

21 they needed and you weren't in a position or didn't do it, then

22 that relationship could be lost.  And Christian is talking

23 about the same thing on this end that the -- when something

24 needs to be done, it needs to be done, stepping up and taking

25 over the payments for Lamont and whatever would be needed for

J4O9DAW2                        Blazer - Direct

1   players, timing was everything.  Timing in these things is

2   everything because if you don't take advantage of what -- of

3   what -- that somebody is asking at that moment, they're just

4   going to move on to somebody else who is going to do it for

5   them.

6   Q.  Now, you testified earlier that this portion of the

7   conversation was at the end when you were leaving the

8   restaurant; is that right?

9   A.  That's correct.

10  Q.  What happened after you left the restaurant?

11  A.  We left the restaurant and we all got in the car, Munish,

12  Christian Dawkins and I, and we drove back to Atlanta from

13  Columbia, South Carolina.  I was driving.  Christian was in the

14  passenger's seat.  And Munish was in the back to start.

15  Q.  On a general level what, if anything, did you discuss with

16  those individuals while you were driving back to Atlanta?

17  A.  We discussed the nature of the meeting with Lamont, that it

18  was good.  And we discussed the logistics of how Christian and

19  what Christian was paying Lamont Evans, and then discussed a

20  little bit more -- Christian had brought up some other coaches

21  and relationships and, again, just reinforced why it was so

22  important to be paying these coaches.

23  Q.  Did you record this conversation?

24  A.  I did.

25          MR. BOONE:  Your Honor, the government offers a

J4O9DAW2                        Blazer - Direct

1    recording of that conversation.  It is Government Exhibit 501D

2    and we also offer the related transcript which is 501DT.

3              THE COURT:  Any objection?

4              MR. HANEY:  No objection, your Honor.

5              THE COURT:  OK.  Those exhibits will be received.

6              (Government's Exhibits 501D and 501DT received in

7    evidence)

8              MR. BOONE:  Ms. Bustillo, when you have a moment you

9    can begin playing the recording, please.

10             (Audio played)

11   Q.  What did you understand -- Dawkins references someone named

12   Tony Bland.  Who is Tony Bland?

13   A.  Tony Bland was the associate head basketball coach as USC.

14   Q.  And what did you understand Dawkins to be explaining to you

15   about Tony Bland?

16   A.  He -- we were referencing the fact that the meeting with

17   Lamont was good and Christian brought up another coach that he

18   had a relationship with similar to that of Lamont and he

19   mentioned Tony Bland.  And that's another person, another coach

20   that we should meet, Munish and I should meet, and just said

21   that he just got off the phone with him and explained a little

22   bit about how -- what Tony was like and that he was a great

23   person that we should -- we should get involved with like

24   Lamont Evans.

25   Q.  What do you mean "get involved with like Lamont Evans"?

J4O9DAW2                    Blazer - Direct

1    A.  Pay.  Pay Tony Bland the same way we were working out the

2    arrangement to pay Lamont Evans.

3            MR. BOONE:  I believe we were around line 20.  If we

4    could go forward, please.

5            (Audio played)

6    Q.  What do you understand Dawkins to be explaining in this

7    segment?

8    A.  Well, Christian is explaining that he has a lot of coaches,

9    a lot of coaches -- a lot of coaching relationships like Lamont

10   and Tony Bland.  And he is explaining to us that he kind of

11   grew up with that, with college coaches coming through.

12           The reference to Draymond and LaMarr is LaMarr Woodley

13   was an NFL client that I was financial adviser to and Draymond

14   is Draymond Green.  And Christian and I talked about --

15   Q.  Who is Draymond Green?

16   A.  Draymond Green is an NBA basketball player.  He plays for

17   Golden State Warriors.  And he was -- he was -- Draymond and

18   LaMarr Woodley were very close friends as well.  And Christian

19   just was referencing people that we both knew in Saginaw,

20   because Christian had grown up in Saginaw, Michigan.  And

21   Draymond and LaMarr both grew up in Saginaw as well.

22           And then he was wrenching the fact that Tom Izzo, the

23   head coach of Michigan State, was in Christian's house crying

24   because Christian's dad directed Draymond or didn't help Tom

25   Izzo initially send Draymond Green to Michigan State and he was

J4O9DAW2                          Blazer - Direct

1    initially going to go to Kentucky but then chose to go to

2    Michigan State to play basketball.

3    Q.   What, if anything, did Dawkins say about his father?

4    A.   His father was also an assistant or a coach at Northern

5    Illinois.

6              MR. BOONE:   We can continue around line 13 on page 3.

7              (Audio played)

8    Q.   What did you understand Dawkins to be explaining in this

9    portion?

10   A.   Well there was a lot there but essentially what Christian

11   was discussing is, again, selling the coaching -- the idea of

12   paying college coaches and like we were going to do with Lamont

13   and how beneficial that would be for us and he references the

14   fact that it's even more of a value and almost a sure thing in

15   that if you're paying the college coach and that college coach

16   doesn't, for one reason or another, send his player your way,

17   then you pretty much have leverage over that college coach

18   because you've been paying that college coach.  And if it ever

19   got out that you were paying that college coach, that college

20   coach could get in trouble too, whether it was by the NCAA or

21   by the -- by the NCAA or what's happening -- what happened now

22   to the college coaches being paid.  But if it ever got out they

23   could be fired, they could be in trouble too.  So they have a

24   very vested interest -- you have a ton of leverage over the

25   college coach.  And even if there's a situation where it

J4O9DAW2                    Blazer - Direct

1    doesn't work out and they can't send that particular player

2    your way, again, like we were thinking, there's a pipeline of

3    other players.

4              MR. HANEY:  Your Honor, I'd object.  He's narrating a

5    lot about what he claims my client said and we can read the

6    transcript of what my client said, your Honor.  Thank you.

7              THE COURT:  The objection is sustained.

8              Mr. Boone, why don't you direct him more specifically.

9    Q.  When Dawkins says on line 13, "He's going to block

10   everybody from coming around," what did you understand him to

11   mean by that?

12   A.  That Lamont Evans will keep anybody else who is in the

13   business or financial or anybody else who would have influence

14   over the player, Lamont Evans will be in a position to block

15   them, not let them anywhere near the player.

16   Q.  And on the next line, line 14 when Dawkins says, "He's

17   going to bring, give you access to the situation, the parents,

18   whatever," what did you understand him to mean by that?

19   A.  If we are paying Lamont Evans, Lamont Evans will give us

20   access to the player directly and, again, keep everybody else

21   out and will give us access to the parents or anybody else who

22   is involved with the player.

23   Q.  And when he says in the next sentence, "You know, when a

24   time is right, like everything will be lined up because that's

25   his job to," what did you understand him to mean by that?

J4O9DAW2                        Blazer - Direct

1   A.  When the player was ready to make the decision or was about

2   to enter the -- turn professional, that Lamont would make sure

3   that everything was in order for that player to sign with us as

4   their financial adviser or business adviser and that was part

5   of the arrangement that was involved in paying Lamont as well.

6   Q.  And finally when Dawkins says, "That's what like you almost

7   got him by the balls so to speak," what did you understand him

8   to mean by that?

9   A.  By paying Lamont Evans and Lamont Evans taking that money

10  you had incredible leverage over Lamont Evans.

11              MR. BOONE:  OK.  We can go forward with the recording,

12  please.

13              (Audio played)

14  Q.  There's a reference to someone named Duffy.  Do you know

15  who that is?

16  A.  Yes.  It's a reference to Bill Duffy who is a sports agent

17  who represents a number of NBA players, high-end NBA players.

18  He has an agency that was similar, competitive to Andy Miller

19  Sports.

20  Q.  On line 2 of page 5 Dawkins says, "Duffy got about five

21  schools," what did you understand him to be referring to?

22  A.  Similar to what we were doing or what was being proposed

23  that we do with Lamont Evans at South Carolina, Bill Duffy was

24  doing the same thing with coaches at those five schools and he

25  had mentioned Syracuse and a couple of other ones.

J4O9DAW2                        Blazer - Direct

1   Q.  What do you mean, "doing the same thing"?

2   A.  Paying the college coaches for that leverage so that those

3   coaches would refer their clients back to Bill Duffy for agent

4   representation.

5   Q.  Did you know Duffy personally?

6   A.  No, I didn't.

7          MR. BOONE:  And if we could continue, please.

8          (Audio played)

9   Q.  What did you understand Dawkins to be explaining when he

10  says, "You got direct access, you're the one controlling the

11  kids in regards to the assistant coach?"

12         I'm looking at lines 1 and 2 on page 6.

13  A.  Meaning that Lamont Evans in his position had -- the

14  assistant coaches, we said before -- had direct access to the

15  players.  He was more involved with the players that he

16  recruited and that he coached.

17  Q.  And when Dawkins says, "If he's the head coach and he's

18  just telling his assistants, his assistants, these are my guys,

19  they don't necessarily have to fuck with your guys," what did

20  you understand him to mean?

21  A.  Well, he was explaining about Lamont's next move, Lamont's

22  upward mobility; if Lamont was going to be a head coach or if

23  he was going to be an assistant coach at a more powerful

24  program.  And what he's saying there is that the head coach,

25  the assistant coach has direct access but a head coach is --

J4O9DAW2                        Blazer - Direct

1    and that's why he'd rather Lamont be an assistant coach at a

2    more powerful basketball school because the head coach really

3    doesn't get involved as much in where the representation or the

4    business management, financial management decisions from the

5    players go, that direction.   The head coach isn't as hands-on.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. BOONE:  If we could continue playing.  We're

2      around line 8 on page 6.

3              (Audio played)

4              MR. BOONE:  Pause here.

5      Q.  What did you understand Dawkins to be explaining in that

6      segment?

7      A.  So, again, it kind of leads off, and Christian's talking

8      about the difference between a head coach and an assistant

9      coach and really trying to sell or help us understand the value

10     in paying Lamont Evans as an assistant coach.  And he just

11     reinforces, once again, the fact that Lamont Evans as an

12     assistant coach can also dictate when you are -- you're paying

13     the coach and then the coach introduces you to one of the

14     players that he recruited, that assistant coach can dictate

15     and, again, mitigate the costs needed, the money that needs to

16     be paid to the player and his family while they're in South

17     Carolina.

18             And Christian says, basically, he can tell you what

19     needs to be done so that you can get in there and start paying

20     the family.  The assistant coach can tell you what money needs

21     to be paid to the player and the player's family before the

22     player really gets to a level where his value is going to go up

23     much more and it's going to cost you more to get involved in

24     the player's relationship.

25             MR. BOONE:  If we could play the rest of the

J4OHDaw3                          Blazer - Direct

1    recording.

2              (Audio played)

3    BY MR. BOONE:

4    Q.  We've talked about this a little bit before, but what did

5    you understand to be the comparison made between football and

6    basketball?

7              MR. HANEY:  Object, your Honor.  It's asked and

8    answered.

9              THE COURT:  Overruled.

10             MR. HANEY:  Thank you.

11   A.  Christian is just explaining my experience in football,

12   that football -- recruiting college football players is

13   different than recruiting college basketball players.  You have

14   to get in -- you have to get in when the college basketball

15   players are still in the grass roots level when the college

16   coaches are recruiting those players because they will make the

17   jump from juniors -- well, seniors in high school to freshmen

18   in college, and then they'd be eligible for the NBA.

19   Q.  Now, did the recording we just went over, did that capture

20   the entirety of the conversation you recorded in the car ride?

21   A.  No.  No, there was more to the call or the conversation.

22             MR. BOONE:  Your Honor, the government would like to

23   offer Government Exhibit 501E, which is a continuation of a

24   recorded conversation we just went over, as well as the related

25   transcript, which is Government Exhibit 501ET.

1          THE COURT:  Any objection?

2          MR. CHANEY:  No objection, your Honor.

3          THE COURT:  501E and 501ET will be received.

4          (Government's Exhibits 501E and 501ET  received in

5     evidence)

6          (Audio played)

7     BY MR. BOONE:

8     Q.  What did you understand Dawkins to be referring to when he

9     mentioned giving $2,500 a month?

10    A.  That Christian was giving Lamont Evans $2,500 a month.

11    Q.  Did you have an understanding as to how he had been paying

12    Lamont Evans?

13    A.  Well, yes, I asked him how he had been paying him, and he

14    said -- he said cash.  He said he would come down, drop down to

15    South Carolina once a month and give him $2,500 cash because

16    there are no -- don't have any paper trail on it.  He also said

17    maybe they would meet in Atlanta because Lamont recruited in

18    Atlanta, so sometimes he would give him the $2,500 there.

19    Q.  If we could go to the next page of the transcript.  There

20    was also a reference to PJ.  What did you understand that

21    reference to be?

22    A.  The reference to PJ Dozier and Christian was just saying

23    that if we -- if we came into -- if Munish and I came into

24    Columbia, South Carolina, to pay Lamont the $2,500 a month,

25    that we would also be able to probably see PJ Dozier and his

1    mom as well, so it would be a good idea, in addition to seeing

2    Lamont and paying Lamont.

3    Q.   Now, we can step away from the recording, the transcript

4    for a moment.

5          How did your trip to South Carolina end?

6    A.   Munish Christian and I drove back about four hours from

7    Columbia, South Carolina, to Atlanta, and I believe Munish and

8    I dropped Christian off at Atlanta Hartsfield airport, and it

9    was late and he caught a flight.  And I believe I went back to

10   my hotel in Atlanta and then flew out the next day.

11   Q.   After your trip to South Carolina, did you ever talk to

12   Evans again?

13   A.   Yes, I did.

14   Q.   How often?

15   A.   Quite often.  I'm not sure how many times.  We talked quite

16   a bit.

17   Q.   How did you typically communicate with him?

18   A.   Either via telephone call or text message.

19   Q.   Were those telephone calls recorded?

20   A.   Yes, they were.

21   Q.   Just generally speaking, what was the nature of your

22   communication?

23   A.   The nature of the communication was typically business

24   oriented.  It was about players that he was recruiting or

25   players that he had and, more importantly, about money that I

J4OHDaw3                              Blazer - Direct

1    was going to give to him and when we would be able to set it up

2    so that I could get him money.

3    Q.   Did you ultimately pay Evans?

4    A.   I did.

5    Q.   Do you remember when, approximately, you began paying

6    Evans?

7    A.   Not a hundred percent sure, but I believe it started one

8    time in New York and then we did -- and then I paid him in Fort

9    Lauderdale or in Miami, but I think it was shortly after the --

10   this March meeting.

11   Q.   This March meeting, what year was that?

12   A.   March of 2016.

13   Q.   Do you remember for approximately how long did you pay him?

14   A.   I paid Lamont up until the end of July 2017.

15   Q.   How often did you pay him?

16   A.   I tried to pay him every month, every other month, just

17   like we had -- we had agreed.

18   Q.   How did you typically pay him?

19   A.   Typically, I would give him cash.  I would pay him in cash

20   or I would send him wires from my bank account, money that was

21   put into that bank account by the investigators, the agents

22   from the FBI.

23   Q.   Now, you just mentioned traveling to New York.  I think you

24   said also Florida.  Did you ever travel to pay Lamont Evans?

25   A.   Yes, I did.

J4OHDaw3                          Blazer - Direct

1    Q.   Where'd you travel?

2    A.   New York; Morgantown, West Virginia; I think Atlanta one

3    time; Orlando; Miami; Las Vegas.   I think that's -- I think

4    that's all the different places I met him.

5    Q.   When you traveled to Florida to pay him, do you recall

6    recording any conversations over the telephone you had with

7    him?

8    A.   Yes.

9             MR. BOONE:   Your Honor, the government wants to offer

10   or does offer Government Exhibit 413, which is a recording of a

11   phone call between Marty Blazer and Lamont Evans around one of

12   the trips he just testified to.

13            MR. MOORE:   Your Honor, could we approach for just a

14   moment, please?

15            THE COURT:   Sure.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2                MR. MOORE:  Your Honor, we haven't been objecting

3      because none of this information relates to our client, but at

4      this point I think we're going to have a whole lot of

5      information that -- of conduct by this guy and conversations

6      with this guy that are well before the date in which my client

7      is alleged to have joined in this particular conspiracy.  I

8      think the government alleges that my client joined this

9      conspiracy at the June 20, 2017, meeting.  So.

10                I'm going to ask for an instruction that all of the

11     testimony that has been provided thus far and any testimony up

12     to and including the date of June 20, 2017, cannot be

13     considered by the jury in debating its case with respect to my

14     client.

15                MR. BOONE:  Your Honor, this happens quite often in

16     conspiracy cases.  I don't think the instruction can be that

17     you cannot consider it.  It's certainly relevant background.

18     There are sometimes instructions given to remind the jury that

19     they have to find guilt as to the defendants individually,

20     consider them sort of separately, but in terms of not

21     considering at all the events of the conspiracy that happened

22     beforehand is not proper, frankly.

23                THE COURT:  You're not asking that they be instructed

24     as to that now, are you?

25                MR. MOORE:  I'm asking that they be instructed at some

point while Mr. Blazer's on the stand.  So if you want me to

give you a proposed instruction, I can give you a proposed

instruction.  My concern is that we're going to sit through --

by my estimation, we're not going to finish Mr. Blazer's direct

tomorrow and we may not even get to my client by tomorrow, and

all of this evidence they're hearing, they're not hearing a

word about Merl Code.  And I am going to want an instruction at

the appropriate time.  Whenever your Honor deems it most

appropriate, you want me to just give you a proposed

instruction?

            THE COURT:  Sure.

            MR. SOLOWIEJCZYK:  Can I make one point, your Honor?

There is going to be evidence in this trial that Merl Code

became aware of the fact that these other members of the

conspiracy and that Mr. Blazer had been making payments to

Lamont Evans in the past.  That's something to consider when

assessing the relevance of this as to Mr. Merl Code.

            THE COURT:  No one is saying it's not relevant,

because the conspiracy alleged is broader than that in which

Mr. Code is alleged to have participated in.  So I think, on a

relevance basis, it comes in.  But the point is well-taken that

the jury ought to understand that Mr. Code, I guess, cannot be

held responsible for anything that happened before he entered

the conspiracy.

            MR. MOORE:  Yes, sir.

J4OHDaw3                          Blazer - Direct

1           THE COURT:  Whether we do that now or some other

2    point, I think it's immaterial quite honestly but I'm happy to

3    consider any language that you give.

4           MR. MOORE:  Thank you, Judge.

5           THE COURT:  Thank you.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              MR. BOONE:  I think where we left off, your Honor, we

3    offered Government Exhibit 413 and the related transcript,

4    Government Exhibit 413T.

5              THE COURT:  Any objection?

6              MR. MOORE:  No objection, your Honor.  Just subject to

7    my comments at the sidebar, your Honor.

8              THE COURT:  Yes, sir, subject to that, 413 will be

9    received.

10             (Government's Exhibits 413 and 413T received in

11   evidence)

12             MR. BOONE:  Ms. Bustillo, when you have it ready, if

13   you could play the recording, please.

14             (Audio played)

15             MR. BOONE:  If we could just pause here.

16   Q.  Mr. Blazer, do you recall making this recording?

17   A.  Yes.

18   Q.  Who are you speaking with on this recording?

19   A.  Lamont Evans.

20   Q.  Where were you at the time you made this recording?

21   A.  I was in a -- I think I was in a hotel in Miami, Florida.

22   Q.  Why were you in Miami, Florida?

23   A.  I was to meet Lamont Evans to pay Lamont Evans his monthly

24   amount.

25   Q.  At this point had you already met with Lamont Evans, or

J4OHDaw3                          Blazer - Direct

1    were you about to meet with Lamont Evans?

2    A.  I -- I believe I met with him there already, yes.

3           MR. BOONE:  If we could just continue with the

4    recording, please.

5           (Audio played)

6           MR. BOONE:  Pause here for a moment.  I believe we're

7    around line 11 of page 2 of the transcript.

8    Q.  If you could help the jury provide context, what are you

9    talking about here?

10   A.  What I'm talking about is we -- Lamont, we agreed to pay

11   Lamont on a monthly basis, Munish and I, Munish Sood.  And

12   Munish and I were both down in Miami to meet with Lamont, and

13   part of Lamont's payment was to come from me and part of

14   Lamont's payment was to come from Munish.  And I believe prior

15   to this I had given Lamont my piece, what I had committed to

16   paying him, money, and Munish was supposed to have met with

17   Lamont.  And Lamont drove down from Fort Lauderdale to Miami,

18   which is about a 30-minute drive, and Munish either didn't -- I

19   think he showed up, but I don't think he had the money for

20   Lamont.  So Lamont was -- Lamont and I were talking, and Lamont

21   was upset that he drove down from Fort Lauderdale to Miami and

22   Munish didn't have the money.

23   Q.  How much had you paid him?

24   A.  I -- I think on that visit I paid him, I believe it was,

25   $1,500.  $1,500, I believe.

J4OHDaw3                          Blazer - Direct

1   Q.  And that was at the direction of law enforcement?

2   A.  That was at the direction of law enforcement, yes.

3           MR. BOONE:  OK.  If we could continue, please.

4           (Audio played)

5           MR. BOONE:  If you could pause here.

6   Q.  You reference someone named Aaron.  Who is that?

7   A.  It was a friend of mine in -- that was down in Miami with

8   us.  His name is Aaron Killington.

9   Q.  And you said you ran everything through him.  Can you

10  explain what you meant by that.

11  A.  I meant I explained to him the situation in paying Lamont,

12  and Lamont -- Lamont helping us out with the business

13  management side with referring players to us.

14  Q.  So had you discussed Aaron with Evans, Lamont Evans,

15  before?

16  A.  Just in that conversation when we were down there, but

17  nothing -- nothing about what we were doing, no.

18  Q.  Doing in terms of what?

19  A.  Paying Lamont Evans.

20  Q.  So why are you telling -- why are you mentioning Aaron to

21  Evans?

22  A.  Just to keep Evans -- just to keep Lamont knowing that I

23  was trying to get him the money and looking for different

24  resources to get him the money that Munish said he was going to

25  pay him, but he didn't pay him.

1           MR. BOONE:  We can continue.

2               (Audio played)

3           MR. BOONE:  You can pause here.

4    Q.  What did you understand Evans to mean when he said, "I

5    could easily get a bag from someone else"?

6    A.  Lamont was saying that he -- instead of us paying him,

7    instead of me and Munish paying him, he was saying that he

8    could easily find another financial adviser or business adviser

9    to step in our place and do the same thing and make those

10   payments to him if we didn't come through and pay him.

11          MR. BOONE:  OK.  We can continue.

12              (Audio played)

13          MR. BOONE:  If we could pause there.

14   Q.  Line 16 and 17, Evans references "paying for a service."

15   What did you understand him to mean by that?

16   A.  Just in our discussions when we met with him sort of

17   referencing the fact that if we were making payments to him, he

18   was going to be referring clients that he was recruiting or

19   clients that he had on his team to us for the business and

20   financial services.

21          MR. BOONE:  OK.  We can continue, please.

22              (Audio played)

23          MR. BOONE:  Pause here.

24   Q.  What did you understand Evans to be explaining?

25   A.  There's a couple of things there.  I mean, Lamont was

J4OHDaw3                          Blazer - Direct

1    pretty upset that Munish hadn't gotten the money to him.  And,

2    basically, he's saying that when I go in and recruit a player,

3    that player is yours even if you -- even if you don't know him,

4    and it's not like I'm going to bring you in and say, these are

5    the guys who are going to handle the financial or business

6    management.  You're part of the financial management; you're

7    part of the recruitment package.  If you're paying me, these

8    guys come in, and you're part of the recruitment package.

9    There's no -- there's no "these are the people that I want you

10   to talk to for your financial or business management."

11           And then he goes on to say in this same piece that --

12   that basically if anybody else comes around and tries to work

13   with the player or talk to the player about those services,

14   he'll keep them out.  He'll crush him.  He won't let them in.

15           MR. BOONE:  I believe we stopped around line 22 on

16   page 5 of the transcript.  If we could continue, please.

17           (Audio played)

18           MR. BOONE:  We could pause here.

19   Q.  There's reference to a lot of sort of number figures.

20   A.  Yes.

21   Q.  What do you understand --

22           MR. MOORE:  Your Honor, could we approach for a

23   moment, please?

24           THE COURT:  OK.

25           (Continued on next page)

J4OHDaw3                          Blazer - Direct

1            (At sidebar)

2            MR. MOORE:  For my client I'm going to make a 403

3    objection to this witness explaining in exhaustive detail what

4    he believes another member of the conspiracy who is not

5    participating in this trial means.  This is evidence that

6    relates to conduct that occurred prior to my client's joining

7    the conspiracy.  I understand that the government is offering

8    this as coconspirator statements, but what the government's

9    really doing here is they're offering a coconspirator's

10   statement of a non-testifying coconspirator and then letting

11   Mr. Blazer explain what he believes that coconspirator was

12   intending or means.

13           So I believe that under 403 that is overly prejudicial

14   to my client.  I don't see the probative value of it.  So I

15   must object.

16           MR. BOONE:  Your Honor, it's permissible under

17   Rule 803.  It's obviously relevant because one of the charges

18   is a charge against Dawkins specifically regarding the Evans

19   scheme.  So we have to prove that scheme, and obviously we have

20   to prove -- in proving that scheme, we are trying to show that

21   the scheme actually worked to some extent.  They talked about

22   paying coaches; they paid the coach.  The coach is

23   acknowledging the situation and explaining in detail what he

24   intends to do.  In every case in which there is a conspiracy,

25   it is common for a witness to explain what the members of the

1    conspiracy are talking about.  They don't have to be sitting at

2    the trial table in order for them to be able to do that.  The

3    jury needs to be able to understand what's going on,

4    particularly when it's not entirely clear and there's often

5    coded language used.

6              MR. MOORE:  With all due respect, I've tried a lot

7    more conspiracy cases than I think Mr. Boone has.  I have never

8    seen this done this way before, but I understand I'm in a

9    different place, OK?  I understand that.

10             My point is that this evidence is not admissible

11   against my client pursuant to 801 or 802 or 803 because he is

12   not a conspirator at this point.  So this evidence is

13   completely inadmissible against my client.  He was not an

14   alleged member of this conspiracy at the time these statements

15   were made, and so I'm asking your Honor to either stop this or

16   instruct the jury now that this testimony cannot be considered

17   against Mr. Code.

18             THE COURT:  I don't have to do it now.  Just under 403

19   objection, the testimony, as I understand it, it's clear to me

20   from the transcript it's just more of the same of what we've

21   been hearing, that coaches are getting paid, that they're

22   getting paid thousands of dollars, and that they're getting

23   paid by individuals like Mr. Blazer and other financial

24   advisers.  So from a 403 perspective, it's simply more of the

25   same.  I don't think it's overly prejudicial to Mr. Code, and

1    at the appropriate time, the jury will be instructed that they

2    cannot hold anything -- that they can't hold him accountable

3    for anything that happened before he entered the conspiracy.

4              MR. HANEY:  I would note at this particular time,

5    though, Blazer and Code don't have a partnership formed or

6    anything.  Dawkins is working for ASM.  Blazer's now taken over

7    this relationship with Lamont Evans for his own benefit.  He

8    and Munish Sood are financial planners.  There's no association

9    at this point.  That occurs later, this relationship that

10   occurs between Munish Sood and Christian Dawkins, later.  At

11   this point, Christian Dawkins' still working for Andy Miller.

12             So whatever Marty Blazer is doing at this point down

13   in Miami with Lamont Evans, there's no nexus necessarily to

14   that and Dawkins.  So what they're doing is they're proving

15   Lamont Evans' guilt.  I don't see how this relates to Christian

16   Dawkins who's now passed this guy off to Marty Blazer to hustle

17   money out of him.  I don't see how it's relevant to either

18   defendant in this case.

19             MR. BOONE:  Your Honor, if you want me to address

20   this, number one, Christian Dawkins, as we've sort of gone over

21   in exhaustive detail, obviously wanted Blazer to get involved

22   so that they could both be successful in this arrangement.

23   There will be testimony later that Dawkins does inquire about

24   Blazer what's going on with Lamont.  I think maybe we may not

25   get to it today, but certainly tomorrow there will be

discussions between Blazer and Dawkins about Lamont Evans and

what's happening with him and how are things working out with

him past this point.  So the argument that he's sort of -- it's

not relevant anymore doesn't fit.

MR. HANEY:  Your Honor, it's not a partnership with

somebody.  That's somebody -- that guy I told, that coach you

should get a relationship with.  At this point Munish Sood and

Martin Blazer have their independent company, this management

company, this financial planning outfit.  There's no

association with ASM.  Christian Dawkins is working for an

agency here in New York, for Andy Miller Sports.  He's not

broken off yet at this point in time.

THE COURT:  As I understand the government's theory in

the conspiracy alleged, Mr. Dawkins conspired with Mr. Blazer

in order to bring Mr. Blazer in to provide finances so that

subsequently, ultimately, Mr. Dawkins will have the benefit of

having established that relationship through the coaches so

that he can then represent the players, as I understand it.

MR. BOONE:  Yes, your Honor.  And it, frankly, doesn't

matter where he works.  The charge is they had an agreement to

pay coaches, whether he's working for ASM or ABC, or whoever,

the point is those two individuals had a meeting of the minds

regarding paying Lamont Evans.  Lamont Evans was a part of that

conspiracy, clearly, and that's what he's been charged with and

that's what we're proving up.

1           MR. HANEY:  We, obviously, don't agree.

2           MR. MOORE:  And I would simply make the point that I

3    think there are multiple conspiracy issues here in this case.

4    We will be asking for a multiple conspiracy charge at the

5    conclusion of the case.  But at this point, I would ask your

6    Honor to instruct the jury that this testimony that they have

7    heard thus far cannot be considered against Mr. Code.  I would

8    also ask your Honor -- I will be objecting or we will be

9    objecting to any more of these Lamont Evans calls that are just

10   between Lamont Evans and Mr. Blazer and that do not involve

11   Mr. Dawkins or Mr. Code.

12          MR. BOONE:  This is the last one.

13          MR. HANEY:  And I would agree.

14          THE COURT:  This is the last one?

15          MR. BOONE:  And the only one.

16          THE COURT:  Very well.

17          MR. BOONE:  First and last.

18          THE COURT:  It will be admitted over your objections.

19          MR. MOORE:  Thank you.

20          (Continued on next page)

21

22

23

24

25

1           (In open court; jury present)

2           THE COURT:  Mr. Boone.

3           MR. BOONE:  If we could, just so we can reorient the

4    jury where we left off, go back and play maybe the last 15

5    seconds.

6           (Audio played)

7           MR. BOONE:  You can pause here.

8    Q.  What did you understand Dawkins to be explaining in this

9    segment?

10   A.  Lamont Evans was -- Lamont was saying that he was just,

11   again, sort of venting about the dynamic of what we're paying

12   him and the value that he can bring in a player.  And he was

13   just explaining to me, again, if you're -- if I have a recruit

14   that comes in and you're already in there and I say that the

15   player and his family need $5,000 for whatever their needs

16   might be, and you can do that early on and pay me the $2,000

17   and that's $7,000, then you've got a guy who is a potential

18   first round NBA first round draft pick and you've got that

19   player for $7,000, and then maybe you need a little bit more.

20   Just going over some of the other numbers that might need to be

21   invested in that player relationship.  But, essentially, he's

22   saying, again, paying me $2,000 a month, and then I can sort of

23   get the player for you and I can drive and dictate what the

24   costs to you to further handle that player's needs are going to

25   be.

1          MR. BOONE:  If we could continue, please.

2          (Audio played)

3          MR. BOONE:  Pause here.

4  Q.  There's, again, a lot of numbers referenced.  What did you

5  understand Evans to be saying here?

6  A.  To me, remembering it when it was said reminded me of what

7  Christian said about skipping a step.  When you're dealing just

8  with the agents, you're -- you've got to be dealing with the

9  coach.  And I think Lamont was pointing that out in this, that

10 if you're -- if you're in with this player that I'm recruiting

11 now and I -- you're paying me and I can tell you what it takes

12 to secure the player, to take care of what the player needs,

13 and you're doing that, then when the agent steps in, the

14 agent's not going to be able to dictate terms to you because I

15 already dictated terms to you.  I already told you what the

16 player needs, and you already got that moving forward.  So no

17 agent now is going to step in and say, OK, Marty, Munish,

18 financial business advisers, this is what you need to come up

19 with to help out the situation.  It wasn't the agent that was

20 going to dictate it.  It was the -- it was him; it was the

21 coach.

22          That's kind of what Lamont was saying was just that

23 value, and he was putting together the numbers in reference to

24 what he had known how big that could be when it gets to those

25 levels with the potential elite basketball player.

1          MR. BOONE:  I believe we're around line 5 of page 8 of

2     the transcript.  If we could continue with the recording,

3     please.

4          (Audio played)

5          MR. BOONE:  Pause here.

6     Q.  What did you understand Evans to be referring to when he

7     says, "I know what I can do with the seven right now, the

8     eight, whatever," and goes on to say, "it locks in two guys"?

9     A.  That was reference to money that he wanted to get from

10     myself and from Munish Sood.  And he said, I know what that

11     seven or 8,000, that seven or $8,000 can -- guys that he can

12     recruiting, can go to those guys, and then he -- or those

13     players, and then he locks those players in for his school,

14     recruiting.

15          MR. BOONE:  If we can continue, please.

16          (Audio played)

17          MR. BOONE:  Pause there.

18     Q.  What did you understand Evans to mean that it will be

19     locking it in for you guys?

20     A.  Meaning that if he -- if we gave the money and he secured

21     the recruits with that money, that he would be referring those

22     players back to Munish and I for the business and financial

23     services.

24          MR. BOONE:  We can continue with the recording.

25          (Audio played)

1           MR. BOONE:  Pause here.  Thank you.

2    Q.  What did you understand Evans to mean by "shit-bringing

3    conversation"?

4    A.  Meaning that if he had people around him that he brought

5    from Fort Lauderdale to Miami with him, then they would start

6    asking questions about what was going on, what the relationship

7    was between Lamont and Munish and I.

8    Q.  And there's a reference to a World Wide Wes.  Do you know

9    what that is?

10   A.  Yes, he's a -- he's kind of a consultant for an agency,

11   consultant for CAA.  He's been around basketball and football

12   quite a bit, and from the -- all the way from the grass roots

13   in basketball up to NBA.  He's been around brands like Nike and

14   Adidas.  Sort of a public figure, but he's very well-known out

15   there as somebody that is very visible.  And Lamont was saying,

16   I'm not World Wide Wes.  I don't want to have those

17   conversations.  I don't want to have a lot of people around me

18   or draw attention to myself.

19           MR. BOONE:  OK.  If we could continue.

20           (Audio played)

21   BY MR. BOONE:

22   Q.  How did you typically pay Evans?

23   A.  In cash.

24   Q.  And how much?

25   A.  Typically, it was roughly $2,000.  It was -- I'd piece it

1    together, but it would be 500 here, like I said, 1,500 there.

2    But it was roughly $2,000, and it got all the way up to

3    approximately 4,000, 4,500 a month at the end when I stopped

4    paying him.

5    Q.  How did you determine the amount to pay him?

6    A.  By the investigators.

7    Q.  Where did the money come from?

8    A.  The money initially, as I said, came from me.  It was just

9    savings that I had.  And then eventually, when the FBI got

10   involved, it was FBI moneys.

11   Q.  Was all the money you paid at the direction of law

12   enforcement?

13   A.  Yes, it was.

14   Q.  Did you ever provide Evans with gifts?

15   A.  Yes, I did.

16   Q.  What type of gifts?

17   A.  I believe -- I believe it was just -- I'd given him a

18   couple of sets of headphones, earphones.  One was a brand

19   called Sol Republic that I just had, I had at my home, and I

20   gave them -- I sent them to him.  And another one he had asked

21   me if I had any connections with Dre Beats.  He wanted a

22   specific pair of Dre Beats headphones, and so FBI got those for

23   him, and I gave those to him when we met in Morgantown, West

24   Virginia.

25   Q.  Do you remember how much they cost?

1  A.  The Dre Beats were maybe, I don't know, $300, $350 pair of

2  headphones.  I'm not a hundred percent sure.

3  Q.  What was the purpose of giving Evans these gifts along with

4  the money?

5  A.  To strengthen the relationship, and he asked for them.  I

6  mean, he asked for the headphones, but to -- the ones that I

7  gave him were to strengthen the relationship between us.

8  Q.  And what was your understanding as to what Evans would do,

9  if anything, in exchange for the money and gifts?

10  A.  My understanding, 100 percent, was that he was going to

11  refer his players or recruits to me for business management

12  services.

13  Q.  Now, did there come a time when Evans left his coaching job

14  at South Carolina?

15  A.  Yes.  He left his coaching job at South Carolina and took,

16  what I understood to be, an associate or assistant head coach

17  position at Oklahoma state.

18  Q.  Do you remember when he left?

19  A.  I'm not sure, but I believe it was -- I believe at the time

20  of that call, which was August of 2016, he was at Oklahoma

21  State, yes.

22  Q.  Do you know why he left South Carolina for Oklahoma State?

23  A.  No, I don't, but I was assuming that it was for a better

24  position.

25  Q.  When he left, you were still paying him money at that time?

J4OHDaw3                         Blazer - Direct

1   A.  Correct.

2   Q.  So what effect, if any -- did his move from one job to

3   another affect your arrangement?

4   A.  It really had no effect on it.  Our relationship was still

5   the same.

6   Q.  Did you continue to pay him while he was at Oklahoma State

7   University?

8   A.  Yes, I did.

9   Q.  Now, you testified earlier that in exchange for paying

10  Evans, your understanding was Evans was going to steer players

11  towards you.  What players, if any, did Evans introduce you to?

12  A.  Me personally or --

13  Q.  You personally.

14  A.  Me personally, just one.  When he was at Oklahoma State, he

15  introduced me to a player, Jeffrey Carroll, and we met in

16  Morgantown, West Virginia.

17  Q.  When, approximately, did you meet Jeffrey Carroll with

18  Evans?

19  A.  February of 2017.

20  Q.  Where did you meet?

21  A.  We met in the Oklahoma State basketball team's hotel, and

22  we met in -- we met in Lamont Evans' room.

23  Q.  You said that was in West Virginia?

24  A.  Yes, they were -- Oklahoma State was playing West Virginia

25  University in a basketball game, and we met the night before

J4OHDaw3                        Blazer - Direct

1    their game.

2    Q.  Who was present in the room?

3    A.  It was me, Lamont Evans, and Jeffrey Carroll.

4    Q.  Was that meeting recorded by law enforcement?

5    A.  Yes, yes, it was.

6    Q.  And what was the purpose of that meeting?

7    A.  Well, the purpose was, number one, I gave Lamont $2,000 in

8    cash and the headphones, the Dre Beats, and Lamont made the

9    introduction of Jeffrey Carroll to me to introduce me as his

10   guy and the person that would handle Jeffrey's business

11   advisory services when he turned pro.

12   Q.  What reaction, if any, did Carroll have to what was said at

13   the meeting?

14   A.  He was completely open and in agreement with everything

15   that Lamont said.

16   Q.  How did the meeting end?

17   A.  We had -- the meeting with Jeff was really good.  We had

18   just agreed to continue to talk, and Jeff left the room.  And

19   then Lamont and I continued to talk for a little bit longer,

20   and then Lamont walked me out to my car.

21   Q.  Did you ever meet with Carroll again?

22   A.  No.

23   Q.  Do you know if he ultimately became a professional

24   basketball player?

25   A.  No, he did not, I believe.

1   Q.  Earlier in your testimony, you mentioned PJ Dozier.  You

2   said it was a player at the University of South Carolina.  Did

3   Evans ever introduce Dozier to you?

4   A.  Not to me, not to me personally, no.

5   Q.  Do you know if Evans ever introduced Dozier to Sood or

6   Dawkins?

7   A.  He introduced him.  I'm not sure about Christian, but I

8   know he introduced him to Munish and PJ's mother.

9   Q.  How do you know that?

10  A.  Munish told me and Lamont told me as well.

11  Q.  Now, after Dawkins introduced you to Evans -- I'm talking

12  about the trip in South Carolina we went over -- did there come

13  a time when you and Dawkins stopped speaking regularly to each

14  other?

15  A.  Yes, the meeting in -- the meeting in Columbia, South

16  Carolina, was March of 2016, and we kind of stopped talking to

17  each other around May of 2016.

18  Q.  For how long were you not speaking to each other directly,

19  approximately?

20  A.  We would a little bit here and there, but we really kind of

21  picked up the conversation again in almost a year, around May

22  of 2017.

23  Q.  Why did you stop speaking?

24  A.  Christian kind of stopped speaking, didn't kind of, but

25  stopped speaking to me because May 2016 was when the SEC civil

J4OHDaw3                              Blazer - Direct

1    suit was settled, and the information about what I had done in

2    the movies and music investments came out and was it

3    everywhere.  So those SEC charges were all over the place, and

4    so Christian just kind of stopped talking to me.

5    Q.  Did you continue to pay Evans during this time period?

6    A.  Yes, I did.

7    Q.  Were you paying any other coaches during this time period?

8    A.  I believe one other coach.

9    Q.  Who was that?

10   A.  Chuck Person.  I believe it was around that time.  I'm not

11   a hundred percent sure, but I believe it was somewhere in the

12   fall of 2016, maybe.

13   Q.  And that was at the direction of law enforcement?

14   A.  It was, yes.

15   Q.  Where did Chuck Person work?

16            MR. HANEY:  Your Honor, I'd object.  This is entirely

17   irrelevant to this case.

18            THE COURT:  Overruled.

19   A.  He was at the University of Auburn.

20   Q.  Now, during this time period in which you and Dawkins

21   aren't speaking, which you testified was around May -- correct

22   me if I'm wrong, but around May 2016 to May -- why don't you

23   tell me.

24   A.  May 2016 was when the charges were -- when the settlement

25   with the SEC came out, and we really didn't talk -- any of our

1   conversation was kind of through Munish Sood, but we really did

2   not have any meaningful conversations until around early May of

3   2017.

4   Q.  What was your relationship like with Sood around this time?

5   A.  Well, Munish knew that the charges were coming, so it was

6   not a big surprise to Munish.  We maintained a good

7   relationship.  We, Munish and I, talked quite a bit still.

8   Q.  Do you know what the status was of Sood and Dawkins'

9   relationship during this time period in which you and Dawkins

10  aren't talking?

11          MR. HANEY:  Objection.  Foundation, your Honor.

12          THE COURT:  Overruled.

13  A.  From Munish I was -- they were communicating and actually

14  working together on one, at least one, recruit, one player that

15  I knew of.

16  Q.  How do you know they were working together and their

17  relationship was good?

18  A.  Because Munish, Munish had told me.

19          MR. HANEY:  Your Honor, I'd object to the hearsay that

20  he's getting into.

21          MR. BOONE:  Coconspirator.

22          THE COURT:  Overruled.

23          MR. HANEY:  Thank you.

24  Q.  Now, you mentioned that you ultimately did start talking to

25  Dawkins again.  What led to you and Dawkins speaking again?

J4OHDaw3                            Blazer - Direct

A.  Well, in approximately October/November of 2016, I started

working with -- the FBI got involved in what we were doing, and

I -- they had a partner investor that was working with me.  And

Munish was aware, Munish Sood was aware of this investor who

was willing to work in the direction of the basketball stuff.

And in addition to that, around early May of 2017, Christian

was fired from his job at Andy Miller Sports.

Q.  Now, just to sort of be more clear, you said the FBI had a

partner investor working for you.  Would you explain that a

little bit more.

A.  The FBI was starting to get involved in this investigation,

and they brought an undercover agent along to work with me.

And he was posing as an investor who was interested in

committing moneys to paying the basketball coaches, paying the

basketball players, and just the overall program that we had

initiated back when we started with Lamont.  And he was -- and

it was known by Munish that I had this partner investor.

Q.  So after you and Dawkins resumed speaking again, did there

come a time when you, Dawkins, Sood, and this undercover FBI

agent posing as an investor decided to meet?

A.  Yes.  We met in early June 2017 on a yacht in Manhattan.

Q.  What was the purpose of the meeting?

A.  The purpose of the meeting was a couple-fold.  One was that

Munish, the undercover agent, and Christian were -- had set up

this business management company, and at this meeting they were

J4OHDaw3                         Blazer - Direct

1  going to sign the paperwork, the documentation, to memorialize

2  and finalize the details of the company.  The undercover agent

3  was going to fund the account with $25,000 in cash, and

4  Christian was going to -- Christian was talking about the

5  potential clients and coaches.  He had sent a list of different

6  assistant coaches that would be willing to work with us the

7  same way as Lamont was, to be paid to refer us players, and we

8  went over that list as well and where and when we would meet

9  them.

10              THE COURT:  Before you ask your next question, it's

11  12:45, so we're going to take our second break.  Please be

12  prepared to come back at 1 o'clock.  Please do not discuss the

13  case.

14              (Jury excused)

15              (Continued on next page)

J4OHDaw3

```
 1                (Jury not present)
 2                THE COURT:  Mr. Blazer, you may step down.
 3                THE WITNESS:  Thank you.
 4                THE COURT:  You can be seated.
 5                Anything for me?
 6                MR. MOORE:  Yes, your Honor.
 7                THE COURT:  Yes, sir.
 8                MR. MOORE:  At this point, given the prejudicial
 9      spillover issue, I'm constrained to move for a severance.  If
10      your Honor chooses to deny that, we have prepared a proposed
11      instruction which we would ask your Honor to give at this
12      point.
13                MR. MARK:  Your Honor, it's well settled, and I'm
14      quoting here, that a coconspirator's hearsay statements made
15      before a person joins the conspiracy are admissible against
16      that person.  There's no basis for this.  This is not what 803
17      says, and we would object to any such request for any
18      instruction.  Obviously, since it's admissible, there's no
19      basis for a severance motion.
20                THE COURT:  Mr. Moore.
21                MR. MOORE:  Your Honor, I don't agree that it's well
22      settled that coconspirator statements made two years before
23      someone allegedly joins a conspiracy can be admissible against
24      the person.  So I disagree with Mr. Mark's statement of the
25      law.
```

J4OHDaw3

1        THE COURT:  Well, I don't think Mr. Mark was arguing

2   that it's admissible and it could be held -- that Mr. Code can

3   be held responsible for.  I think the argument is that it's

4   admissible at this trial, and I believe what your argument is,

5   really, is a prejudicial spillover argument --

6        MR. MOORE:  That's correct, your Honor.

7        THE COURT:  -- and not a relevance argument or

8   admissibility argument.

9        MR. MOORE:  It's certainly admissible against

10  Mr. Dawkins, I concede that.  And we're joined together, so

11  that's the point of my severance motion, which is because of

12  the prejudicial spillover, because I don't believe that that

13  evidence is properly admissible against Mr. Code or that the

14  jury can consider it against Mr. Code.

15       THE COURT:  I think that you're probably right on both

16  grounds, but it's not a basis to sever this case.  And I think

17  it's something that can be addressed by an instruction to the

18  jury, so I'm happy to consider whatever language you have.

19       MR. MOORE:  Yes, sir.  How would you like us to submit

20  that?  Would you just like us to email it to chambers with

21  copies to the government?  How would you propose we do that?

22       THE COURT:  As soon as you can in writing, absolutely.

23       MR. MOORE:  We can do it right now.

24       THE COURT:  Great.

25       MR. MOORE:  Thank you, Judge.

J4OHDaw3

1            THE COURT:  Yes.  1 o'clock, don't be late.

2            MR. MOORE:  Yes, sir.

3            (Recess)

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4O9DAW4                        Blazer - Direct

1          THE COURT:  Has the government received the proposed

2     language?

3          MR. MARK:  We got it just a minute ago.  We would --

4     noticeably, there is no case law in support of this proposed

5     limiting instruction.  We think this misstates the law.  We

6     think this is inappropriate at this time.

7          To the extent the Court wants to consider such an

8     instruction, we think that this is:  A, not the time for it;

9     and B, we would respectfully request the time to actually fully

10    respond to this request.

11         THE COURT:  I will give you that opportunity.  So we

12    won't give them the instruction now.

13         I think it is the case that -- and I don't know that

14    you'll want to disagree -- that the evidence that has been

15    provided thus far at least with respect to Mr. Blazer does not

16    implicate Mr. Code and nothing that he says -- that he has said

17    can be held against Mr. Code.

18         MR. MARK:  Well I mean I think Mr. Code joins the

19    conspiracy as he finds it.  There's going to be evidence that

20    Mr. Code understood what was going on even though he wasn't

21    personally involved with Mr. Blazer during this time but he

22    understood the relationship and the bribes that were being paid

23    to Lamont Evans including with respect to what we suggest is

24    one of the particular players that's being discussed here,

25    Jeffrey Carroll.  So this is definitely relevant evidence and

J4O9DAW4                        Blazer - Direct

1    we do think this evidence can be used against Mr. Code.

2              THE COURT:  I don't know the evidence as well as you

3    guys so we'll wait to hear.

4              MR. MOORE:  Yes, sir.  It looks like we'll perhaps be

5    briefing that this evening.

6              THE COURT:  OK.  Always happy to get here early.

7              So we can bring out the jury.

8              If we could have Mr. Blazer come back in.

9              LOUIS MARTIN BLAZER, resumed.

10             MR. MOORE:  Based on your Honor's instruction or your

11   Honor is allowing us not to be present for the full time, I'm

12   going to depart at two.  I'm going to do so in a very

13   inobtrusive fashion, in fact.

14             THE COURT:  OK.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J4O9DAW4                         Blazer - Direct

1          (Jury present)

2          THE COURT:  Mr. Boone.

3   BY MR. BOONE:

4   Q.  Mr. Blazer, I believe when we took the break you had just

5   finished explaining that Dawkins, Sood and an undercover agent

6   from the FBI posing as an investor were forming a company

7   together.  Could you explain who did you understand to be

8   involved in this new company?

9   A.  It was just Munish Sood, Christian Dawkins, and the

10  undercover FBI agent.

11  Q.  And what -- for each person involved do you have an

12  understanding of what their role was going to be in the

13  company?

14  A.  Jeff was the -- the undercover agent was going to be the

15  investor.  Munish was going to be the financial adviser, handle

16  the financial end of it.  And Christian was going to be the

17  business manager.  That's the way I understood it to be.

18  Q.  Were you going to have a role in the company?

19  A.  I was not going to have a role in the company, no.

20  Q.  Why not?

21  A.  I was under the understanding that because of what had

22  happened with me with the SEC and everything we were -- I was

23  just going to stay on the outside and not be involved with the

24  company.  I was going to pose as I'd get a piece of whatever

25  was going on with the business and we would figure that out

J4O9DAW4                          Blazer - Direct

1    later.

2    Q.   You're saying your name wouldn't be associated?

3    A.   My name would not be associated with the company, no.

4    Q.   And you testified earlier that ultimately there was a

5    meeting that was had between, Dawkins, Sood, yourself and the

6    undercover.   Where did that meeting occur?

7    A.   That meeting occurred on a yacht, a boat in Manhattan that

8    the undercover agents had arranged.

9    Q.   And do you remember approximately when this was?

10   A.   It was June of 2017.

11   Q.   And was that meeting recorded by law enforcement?

12   A.   Yes, it was.

13   Q.   What happened at the meeting?

14   A.   Well, the -- everybody agreed that they were going to sign

15   the paperwork -- Munish, Christian, and the undercover agent --

16   the paperwork to finalize the details of the business that they

17   were forming.   The undercover agent funded the account for the

18   business by giving Munish $25,000 in cash and we all went over

19   a list of coaches that Christian had sent that for the purposes

20   of trying to arrange when, where, and if we would be meeting

21   with them for the purposes of doing the same thing we were

22   doing with Lamont Evans, paying those coaches.

23        MR. BOONE:   Your Honor at this time the government

24   offers a recording of that meeting and a related transcript.

25   It's Government Exhibit 508A and 508AT.

1          THE COURT:  Any objection?

2          MR. HANEY:  No objection, your Honor.

3          THE COURT:  508A and 508AT will be received.

4          (Government's Exhibits 508A and 508AT received in

5   evidence)

6          MR. BOONE:  If we could play the recording when you're

7   ready, Ms. Bustillo.

8          (Video played)

9   Q.  Where are you?

10  A.  We are actually on the boat, on the yacht in Manhattan.

11  Q.  Could you identify who we're seeing on the scene?

12  A.  Sure.  The person with his back to the screen is -- and --

13  the back of his head is redacted is the undercover agent for

14  the FBI.  I am sitting to his left.  And to my left is Munish

15  Sood.  To Munish's left is Munish's assistant, Alicia Carroll.

16  And to her left is Christian Dawkins.

17         MR. BOONE:  OK.  We can continue.

18         (Video played)

19  Q.  Do you know what Dawkins is talking about in this segment?

20  A.  I believe he was talking about a college combine type camp

21  but I wasn't sure exactly which one but it was in Vegas, it was

22  in Las Vegas.

23         MR. BOONE:  We can continue.

24         (Video played)

25  Q.  Who is talking -- who just spoke?

J4O9DAW4                          Blazer - Direct

1   A.   That was the undercover FBI agent.

2   Q.   Do you know what name the undercover went by?

3   A.   Yes.   Jeff D'Angelo.

4   Q.   That was --

5   A.   That was the undercover's name.

6   Q.   And the undercover, Jeff D'Angelo, referenced a coaching

7   list.   Did you understand what he was referring to?

8   A.   Yes.   It was a list of coaches that Christian sent and on

9   that list was a number of different schools and coaches and in

10  parentheses he had certain words to describe the coaches.

11  Q.   And the undercover, Jeff D'Angelo, also references a

12  business model.   Do you know what he was referring to?

13  A.   The business model was the business model that we had

14  established with Lamont Evans; basically paying the coach for

15  the coach's relationship with their players.

16            MR. BOONE:   Continue, please.

17            (Video played)

18  Q.   What did you understand the undercover to be explaining in

19  that segment?

20  A.   The undercover was explaining the -- basically just

21  reiterating the model that we had established and discussed

22  with Lamont Evans in that meeting in Columbia, South Carolina,

23  and then on the way back where Christian was discussing the

24  very meaningful nature of paying the college coaches and

25  helping them to recruit even on the grassroots level because

1   getting those players at that level was the most important

2   thing because they were basically one and done.

3           So Jeff is just reiterating that model that had been

4   established back then and saying that we were interested in

5   continuing with that model.

6   Q.  Now, you testified earlier that when the undercover

7   referenced coaching list, your understanding was he was

8   referencing a list of coaches Dawkins had sent around earlier;

9   is that right?

10  A.  That's correct.

11          MR. HANEY:  Your Honor, I object to what the reference

12  is to the undercover.  The undercover is not a conspirator in

13  this case.

14          THE COURT:  Overruled.

15          MR. MOORE:  Your Honor, can we approach for a moment

16  on another issue.  I hate to do this again but I just need to

17  make one more issue.

18          THE COURT:  Come on up.

19          (Continued on next page)

20

21

22

23

24

25

J4O9DAW4                          Blazer - Direct

1              (At sidebar)

2              MR. MOORE:  I apologize for not bringing it up before

3      this exhibit.  But in the Gatto case the government

4      specifically requested that Judge Kaplan allow pixillation and

5      hiding the faces of these undercovers.  We agreed to it.

6              I don't recall any such request made to this Court.

7      We do not recall agreeing to it, and we don't agree to it.

8              MR. MARK:  Your Honor, we discussed this with defense

9      counsel.  Our understanding was they explicitly agreed to it.

10     There were multiple conversations.  We produced this all to

11     them as exhibits with the pixillation.

12             We have no objection if your Honor wants to give an

13     instruction as to -- so that it doesn't in any way prejudice

14     them thinking -- so the jury shouldn't infer anything negative

15     about their clients.  But at this moment for them to be raising

16     this we find it, I've got to say, a little bit ridiculous here,

17     your Honor.

18             THE COURT:  This is the first time this issue has ever

19     been brought before me.  I was communicating with my clerk.  I

20     have never seen it.  I don't know what the law is with respect

21     to it.  So I'm happy to consider whatever language you propose.

22             MR. MOORE:  I frankly don't recall -- if there was

23     such a discussion, I was not a party to it.  That's why I asked

24     Mr. Mathias and Mr. Haney if they recalled such a discussion.

25             I know that this is how the government produced this

1    to us, but we did have a lot of discussions, just for the

2    record, about agreeing to all exhibits, both government and

3    defense exhibits upfront, and we never got anywhere in that

4    regard because the government continued to tell us that they

5    couldn't give us answers with respect to all of the calls that

6    we wanted to play.

7         THE COURT:  This is a fight that we don't need to

8    have.

9         MR. MOORE:  Yes, sir.

10         MR. MARK:  Is there anything you want to say?

11         MR. HANEY:  I will say that we don't have a

12    stipulation on this.  I know we've had conversation, we've had

13    a lot of conversation about trying to arrive at some

14    understanding on evidence over the last several months.

15         MR. MARK:  You specifically agreed on the --

16         MR. HANEY:  No, we won't --

17         MR. MARK:  On the redactions?

18         THE COURT:  This is not a fight that we're going to

19    have during the jury's time.

20         (Continued on next page)

21

22

23

24

25

J4O9DAW4                        Blazer - Direct

1                  (In open court)

2       Q.  I think where we left off was I think I had asked a

3       question regarding the list that the undercover referred to.

4       A.  Correct.

5       Q.  My question is:  Had you seen that list; and if so, in what

6       form did you see it?

7       A.  I saw the list.  It was sent to me -- it wasn't sent to me

8       by Christian.  It was sent by either the undercover, Jeff, or

9       Munish, I believe.  But I had it in a text message form.

10                 MR. BOONE:  I'd like to show the witness only for

11      identification purposes Government Exhibit 1637.

12      Q.  Take a look and if you could scroll to show the whole

13      thing.

14      A.  Yes.  That is the coach list.  That's the list.

15      Q.  And is this a picture, screen shot of that list?

16      A.  Yes.  That's a screen shot of the text message.

17      Q.  Does it accurately reflect the text message you remembered

18      receiving?

19      A.  It does, yes.

20                 MR. BOONE:  Your Honor, the government offers

21      Government Exhibit 1637.

22                 THE COURT:  Any objection.

23                 MR. HANEY:  No objection, your Honor.

24                 MR. CHANEY:  No.

25                 THE COURT:  1637 will be received.

1          MR. BOONE:  If we could now publish that for the jury.

2          THE COURT:  You may.

3          (Government's Exhibit 1637 received in evidence)

4   Q.  Now if you could, Mr. Blazer, if you could walk us through

5   what this list shows.

6   A.  This list is -- it says right in the top of the list "These

7   are my main guys."

8          These are Christian's coaching contacts.  And what it

9   shows is it breaks down by school.  And then coaches at the

10  school.  And then in parentheses he puts notes on each of the

11  coaches.

12  Q.  And it looks like there's a designation as superstar.  Do

13  you have an understanding of what was meant by that?

14  A.  Superstar means a very good recruiter, a very good contact

15  for us as well, somebody that we wanted to be working --

16  somebody that -- like Lamont that we wanted to be paying, in my

17  opinion, somebody that was moving in the right direction as a

18  coach.

19  Q.  And did you ever meet any of the coaches on this list?

20  A.  Yes, I did.

21  Q.  How did you meet them?

22  A.  At a meeting that we would have later on in June in Vegas,

23  in Las Vegas.

24  Q.  Who is we?

25  A.  At the meeting was Christian Dawkins, Jeff D'Angelo, the

1    undercover agent, and me.

2    Q.  And we'll talk about that meeting in more detail later but

3    could you identify from this list which of those coaches you

4    met through Dawkins at that meeting?

5    A.  Yes.  At that meeting I met Jordan Fair from Louisville.

6              I met Preston Murphy from Creighton.

7              I met Tony Bland from USC.

8              I met Yasir Rosemond from Alabama.

9              I meant Anthony Coleman from Arizona State

10             I met Amir Abdur-Rahim from Texas A&M.  And that's it

11             MR. BOONE:  If we could go back to the video,

12   Government Exhibit 508A, and if we could continue playing.

13             (Video played)

14   Q.  You mentioned Lamont.  Who are you referring to?

15   A.  Lamont Evans.

16   Q.  And why are you mentioning Lamont Evans?

17   A.  Well, because to reference with Christian and, again, it

18   had been quite some time since we had really had a meaningful

19   discussion.  I was speaking and for what the undercover, Jeff

20   D'Angelo, was saying, is talking to Christian about that model

21   that he had initially introduced us to in Columbia, South

22   Carolina with Lamont Evans and saying to him that it was a --

23   it was a model that worked.  It was a model that if I paid

24   Lamont Evans and helped him out with what he needed with

25   recruits or whatever, Lamont has stuck by me even in the time

1   that Christian and I were kind of distanced from one another,

2   Lamont was still in the fold because I was paying him, Lamont

3   was still willing to work with me and refer players to me,

4   whatever the structure of my business would have been, even

5   after the SEC settlement.

6          MR. BOONE:  We can continue, please.

7          (Video played)

8   Q.  You mentioned Creighton.  What are you referring to?

9   A.  University of Creighton basketball.

10  Q.  And you mentioned sort of a situation involving Creighton.

11  Can you explain what you're referring to?

12  A.  Well, Lamont had talked to me about the fact that he and

13  Christian were kind of on the outs and weren't really --

14  weren't really talking very much and he was upset about that

15  and he told me it was because Christian had helped to send a

16  recruit, instead of sending a recruit to Oklahoma State and

17  help Lamont out, Lamont Evans, he decided to sent the recruit

18  to Creighton and to help the coach out at Creighton.

19         MR. BOONE:  If we could continue playing.

20         (Video played)

21  Q.  So, Dawkins says, "Brian Bowen ain't going to Stillwater,

22  Oklahoma."  What did you understand him to be referring to?

23  A.  A player, a recruit, a highly sought-after grassroots

24  basketball recruit.  And Christian references the fact that he

25  went to Louisville.  He says that Lamont Evans wanted to

J4O9DAW4                         Blazer - Direct

1   recruit him to go to Oklahoma State and Christian says Brian

2   Bowen was just not going to go to Stillwater, Oklahoma.  He

3   just wasn't going to live and play in Stillwater, Oklahoma and

4   go and play for Lamont.

5   Q.  And relationship, if any, did this have to do with

6   Creighton?

7   A.  Well, Christian also says that don't be -- he shouldn't be

8   upset, Lamont shouldn't be upset because Brian Bowen ended up

9   not going to Creighton anyway.  He ended up going to

10  Louisville.  Creighton didn't get him either.

11  Q.  There's mention of a Preston Murphy.  Who is that?

12  A.  Christian -- Preston Murphy was an assistant coach at

13  Creighton.  He was one of the individuals on the list that

14  Christian provided.

15           MR. BOONE:  If we could continue, please.

16           (Video played)

17  Q.  So in that segment what are you explaining to Dawkins and

18  the group?

19  A.  I'm just kind of, number one, I was speaking to the nature

20  of the business that they were setting up and I said it's -- to

21  me it was much easier, it was much better to be a business

22  manager than it was to try to handle the representation of

23  everything.  Because that gives you flexibility to make --

24  maneuver to make payments or do whatever you needed to do on

25  the grassroots end.  And then I reiterate to everybody in the

J4O9DAW4                    Blazer - Direct

1   room about the idea of what we did with Lamont Evans and if

2   you've got a handful of coaches that you are paying like we

3   were Lamont for the relationships that Lamont is going to be

4   able to send us, then if you've got a situation like Brian

5   Bowen or Collin Sexton where you've got a recruit that chooses

6   to go to Louisville under whatever circumstances instead of

7   Stillwater, Oklahoma you've got a Collin Sexton behind him that

8   you've got so many relationships with those coaches that

9   somebody is going to be happy.  The more that he had, the more

10  flexibility he had, the less you're really burning any bridges.

11  Q.  What did you understand Dawkins's response to be?

12  A.  He said that -- and definitely in agreement that if you

13  support the college coaches that's the direction to go with it

14  and basically said that there is not many college coaches, even

15  head coaches out there that he didn't have access to.

16  Q.  Access meaning what?

17  A.  The ability to communicate and discuss this plan that we

18  were -- this business plan that was formed.

19        MR. BOONE:  And we're around line 22, page 10, if we

20  can continue, please.

21        (Video played)

22  Q.  There is mention or you mentioned someone named Book --

23  sorry.  Dawkins mentions someone named Book.  Do you know who

24  that is?

25  A.  Yes.

J4O9DAW4                        Blazer - Direct

1    Q.  Who is that?

2    A.  That's Emanuel Richardson.  He was assistant coach at

3    Arizona University.

4    Q.  Is Book a nickname?

5    A.  Yes.  Book is his nickname.

6    Q.  Had you heard of him before this conversation?

7    A.  No.  I don't -- yes, I have.  I heard -- he actually met

8    with Munish Sood in Vegas maybe a couple of weeks prior to

9    that -- Christian set up a meeting when Arizona was at their

10   conference championships in Las Vegas and he set up a meeting

11   between Munish and Book Richardson and another of Arizona's

12   assistant coaches.

13   Q.  How do you know this?

14   A.  Well, I talked to Munish about the meeting, when the

15   meeting was going on, I was speaking with Munish about him

16   meeting with Book Richardson.

17   Q.  And you said he met with Richardson and someone else.  Do

18   you know who that other person was?

19   A.  No, I don't.  That assistant coach, I forget what his name,

20   but he ended up taking a head coaching job shortly after

21   meeting with Munish he ended up taking a coaching job in

22   California.

23   Q.  And based on your conversations with Sood did you have an

24   understanding of what the purpose of that meeting was?

25   A.  The purpose of the meeting in Vegas?

J4O9DAW4                          Blazer - Direct

1    Q.  Yes.

2    A.  Well the purpose was for them to -- for them to have an

3    initial introduction and then for Munish to try to find out

4    along the lines of Lamont Evans what Book wanted, what he was

5    going -- what amount of money he was going to need and how he

6    would need it for us to initiate that kind of relationship with

7    him.

8    Q.  And there is also a mention by Dawkins of someone named

9    Sean Miller.  Do you know who that is?

10   A.  Yes.

11   Q.  Who is that?

12   A.  Sean Miller is the head coach at Arizona of basketball.

13   Q.  And Dawkins says, "Miller will talk on the phone about

14   stuff he shouldn't talk on the phone about."

15          What was your understanding of what he meant by that?

16   A.  I understood him to mean by that that Sean Miller would

17   talk about inappropriate things regarding recruiting and

18   players like paying the money and taking payments and that sort

19   of thing.

20          MR. BOONE:  Continue, please.

21          (Video played)

22   Q.  You referred to buckets.  What are you trying to say there?

23   A.  There I'm saying that they -- the establishment of their

24   business entity for business management, there would be a

25   bucket of money to be deposited in that entity for the purpose

J4O9DAW4                        Blazer - Direct

```
1    of running that business.  And then there was -- I was thinking
2    a separate bucket that would be for the purposes of the
3    Lamont-type deals; in other words, paying coaches like Lamont
4    Evans to do further relationships that Lamont was to bring to
5    the table.
6    Q.  What relationships were those?
7    A.  Player relationships, relationships with basketball players
8    that he was either recruiting or had on his team.
9            MR. BOONE:  Continue, please.
10           (Video played)
11   Q.  So what is Dawkins -- what did you understand Dawkins to be
12   explaining in this segment?
13   A.  Well, it started, if I recall, about Christian was
14   asking -- because he had been -- he had not been privy for a
15   little while to the dealings that I was doing with Lamont
16   Evans, how much we were paying Lamont.  So he asked, you know,
17   if you're going to work with these coaches, how much are you --
18   what's the budget for that, just to get an idea, what are we
19   talking about?  And I said sort of Lamont-esque.  And he asked
20   how much that was.  And I told him what we were paying Lamont
21   at that time.  And then he starts to talk about, well if you're
22   doing that for Lamont --
23   Q.  What did you say?  How much were you paying?
24   A.  I was paying him -- what we worked out with Lamont was
25   three thousand dollars from me, from the undercover from the
```

J4O9DAW4                      Blazer - Direct

1   FBI, and then one thousand dollars a month was coming from

2   Munish Sood.

3   Q.  Continue.

4   A.  So Christian said Lamont is good but Lamont's not an elite

5   guy.  But if you're going to be paying a coach like Book

6   Richardson or Kenny Johnson who was assistant coach at

7   Louisville, then you need to be prepared to pay a lot more.  We

8   need to figure that we're going to have to pay a lot more.

9           And then he gets into a certain dynamic at Arizona --

10  I don't know if you want me to elaborate or explain what I

11  understood that to be.

12  Q.  Well, first, what did you understand about him to mean when

13  you just said an elite guy?

14  A.  That was a coach that was either a better recruiter or a

15  coach that was in a position at one of the elite, kind of blue

16  bloodish schools.

17  Q.  What is a blue blood school to you?

18  A.  A blue blood school to me is -- was a college basketball

19  program that was kind of really steeped in tradition, that

20  year-in and year-out they had a lot of success and they would

21  bring through their program elite players that went into the

22  NBA at very high draft picks.

23  Q.  Is it your understanding that some college basketball

24  programs are better than others?

25  A.  Yes.

J4O9DAW4                        Blazer - Direct

1   Q.  Towards the very end of that segment there's mention of

2   Sean Miller.  What did you understand Dawkins to be saying

3   about Sean Miller?

4   A.  He tells a story about the relationship between Book

5   Richardson, Sean Miller's assistant, and Sean Miller.  And he

6   mentions a player that -- and a relationship that Sean Miller

7   had discussed with Christian.  I think this meeting was like

8   June 6th.  And Christian said that he received a phonecall

9   from Sean Miller and Sean Miller discussed the fact that he had

10  been taking care of payments for DeAndre Ayton who was a

11  grassroots basketball player at the time and Sean Miller was

12  taking care of everything for DeAndre Ayton and his family.

13  And he had spoken with Christian about the fact that DeAndre

14  Ayton had committed to play at Arizona and that DeAndre Ayton

15  would be on campus June 10.  And Sean Miller told Christian if

16  you're here on June 10, I'll turn over everything that I've

17  been paying to DeAndre Ayton over to you and you can takeover

18  and build a relationship and start paying DeAndre Ayton.

19          MR. BOONE:  I believe we're around line 12 of page 14

20  of the transcript, if we could continue.

21          (Video played)

22  Q.  What did you understand Dawkins to mean when he says if we

23  could fund those types of guys we'd be running college

24  basketball?

25  A.  Speaking to -- speaking about funding Book Richardson or

1    Sean Miller but I was thinking more along the lines of Book

2    Richardson or Kenny Johnson from Louisville that he had

3    mentioned before.  And if we would fund -- if we would pay

4    those coaches and had a number of different coaches that we

5    would pay, the same way we were doing with Lamont Evans, that

6    they would be sending us so many of their players of DeAndre

7    Ayton, Collin Sexton caliber that we would -- we would takeover

8    college basketball.  We would have -- we would basically have

9    every significant elite player that came through major college

10   basketball.

11              MR. BOONE:  Continue.

12          (Video played)

13              MR. BOONE:  If we could go to transcript page 16.

14   Q.  What did you understand Dawkins to mean when he says, "Let

15   me speak to them when they need it"?

16   A.  By that I meant him to mean let Christian speak to the

17   college coaches when they needed money.

18   Q.  Money for what?

19   A.  Money for -- I understood it to be money for a certain

20   player that they were recruiting or whatever they would need to

21   recruit a player to their school or it could be for a player

22   that they had at the school that had certain needs that they

23   were going to refer back to us.

24   Q.  And so what point, if any, did you understand Dawkins

25   trying to make here?

J4O9DAW4                          Blazer - Direct

1    A.   I think that he was saying that --

2              MR. HANEY:   Objection to what he thinks he's saying.

3    He's pausing.   Clearly he's making things up right now.

4              THE COURT:   I'll strike that last comment.

5              MR. HANEY:   Thank you, Judge.

6              THE COURT:   Your objection is sustained.

7    Q.   Where Dawkins says, "I say to do this to make it smarter

8    and get the most bang so everybody can make money.  If you're

9    going to just give the guy four grand a month, I just don't

10   know what you're giving him four grand a month for."

11             What did you understand him to mean by that statement?

12   A.   I took that in reference to Lamont Evans, that Lamont was

13   not of the level that he felt deserved four thousand dollars a

14   month and he would rather see it directed to something and

15   somebody that was going to be able to produce higher

16   level elite players.

17   Q.   So what did you understand was the reason Lamont was not

18   viewed on that level?

19   A.   Because Lamont was at Oklahoma State at the time and

20   Oklahoma State was not a basketball school like Louisville or

21   Arizona was.

22             MR. BOONE:   We can continue.

23             (Video played)

24   Q.   What did you understand Dawkins to mean when he says, "Like

25   a Book, OK, that makes sense to give him four grand a month"?

J4O9DAW4                        Blazer - Direct

A.   Well, to the previous point in reference to Lamont Evans at

Oklahoma State, Christian was saying that a coach like Book

Richardson was worthy of paying four thousand dollars a month

because he was an assistant coach at Arizona and they had

basically top-ten picks coming every year out of Arizona.  He

was an assistant coach at an elite basketball program so he was

worthy of four thousand dollars a month.

          MR. BOONE:  Continue.

          (Video played)

Q.   There is discussion regarding Las Vegas.  What did you

understand Dawkins and others to be talking about in regards to

Las Vegas?

A.   It would make a good -- it would be a good idea for us to

meet these coaches and do this with them in Las Vegas.

Q.   Was a plan set to meet in Las Vegas?

A.   The plan was -- at the time, no, the plan was not set to

meet in Las Vegas but we established that now.

Q.   Ultimately the plan was?

A.   Ultimately, yes, the plan was to meet in Las Vegas.

Q.   And what was the purpose of -- what was going to be the

purpose of meeting in Las Vegas?

A.   The purpose of the meeting in Las Vegas was to be

introduced to these coaches and to initiate or find out what

they -- what money they wanted or needed and then start to

establish the process of paying them for -- in return for the

J4O9DAW4                      Blazer - Direct

1   players they were recruiting or had at their schools.

2          MR. BOONE:  Continue.

3          (Video played)

4   Q.  The recording we just went over, did that capture the

5   entire discussion you had on the boat that day?

6   A.  No.

7          MR. BOONE:  Your Honor, the government offers another

8   portion of another recording of another portion of that

9   conversation.  It's Government Exhibit 508D and the transcript

10  we'd also like to offer is Government Exhibit 508DT.

11         THE COURT:  Any objection?

12         MR. HANEY:  No objection, your Honor.

13         THE COURT:  508D and 508DT will be received.

14         (Government's Exhibits 508D and 508DT received in

15  evidence)

16         (Video played)

17  Q.  The undercover mentions signing a contract.  What did you

18  understand him to be referring to?

19  A.  That was the paperwork for the business entity that

20  Christian, Munish, and the undercover Jeff were establishing.

21         MR. BOONE:  Continue, please.

22         (Video played)

23  Q.  What is Dawkins holding in his hand?

24  A.  That is an expensive bottle of Scotch.

25  Q.  And do you know where that bottle came from?

J4O9DAW4                        Blazer - Direct

1    A.   The undercover agent, the FBI agents got a bottle for

2    Christian and a bottle for Munish to celebrate or to

3    memorialize the signing of the business entity.

4                MR. BOONE:   Continue.

5                (Video played)

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. BOONE:  If we could pause here for a moment.

2      Q.  This kid Dawkins is referring to, do you know who he's

3      referring to?

4      A.  No, no, it was just a -- somebody that he was going to

5      have -- have an assistant work with him who was the brother of

6      a -- of a high, projected high college basketball player.

7           MR. BOONE:  OK.  Continue.

8           (Video played)

9           MR. BOONE:  You could pause right there.

10     Q.  What did the undercover just hand Munish Sood?

11     A.  He handed him an envelope with $25,000 cash in it.

12          MR. BOONE:  If we could continue playing.

13          (Video played)

14     BY MR. BOONE:

15     Q.  Mr. Blazer, who was just speaking there?

16     A.  That was Munish Sood.

17     Q.  In addition to Jeff D'Angelo, was there any other

18     undercover agents at this meeting?

19     A.  There was.  To Jeff D'Angelo's right, there was another

20     undercover agent.  Jill Bailey was her name.

21     Q.  What was your understanding as to what role she was

22     playing?

23     A.  She was just there to -- I mean, I didn't really know what

24     her role.  She was just involved as a business partner of

25     Jeff's just to kind of make the whole situation more

1    comfortable.

2                  MR. BOONE:  OK.  If you'd continue.

3                  (Video played)

4    BY MR. BOONE:

5    Q.  Now I want to switch gears a little bit.  At the beginning

6    of your testimony, you testified that you had met the defendant

7    Merl Code through Christian Dawkins.  You recall that?

8    A.  Yes.

9    Q.  Before meeting Merl Code, had you heard of him before?

10   A.  No.

11   Q.  Approximately when did you meet him?

12   A.  I met Merl in June of 2017, probably about two weeks after

13   the meeting on the yacht.  It was around NBA draft.

14   Q.  And prior to meeting the defendant Merl Code, what

15   discussions, if any, did you have with Dawkins about Code?

16   A.  Prior to meeting Merl, there were -- I don't believe I had

17   many, if any, conversations with Christian about Merl.

18   Q.  Did you have an understanding as to why you were meeting

19   Merl Code?

20   A.  Yes.

21   Q.  What was your understanding?

22   A.  My understanding was that Merl was an employee at Adidas,

23   and he had connections on all three levels of basketball, but

24   that he had tremendous connections with a lot of the college

25   coaches and grass roots coaches.

1    Q.   Where did you meet him?

2    A.   We met -- I met him in a hotel suite at the, I believe,

3    Conrad Hotel in New York.

4    Q.   Who attended that meeting?

5    A.   At that meeting it was me; Merl Code; Christian Dawkins;

6    the two undercover FBI agents, Jeff and Jill; and Munish Sood

7    and his assistant Alicia Carroll.

8    Q.   Who set up that meeting?

9    A.   Christian Dawkins set up that meeting.

10   Q.   Why was the meeting in New York?

11   A.   The meeting was in New York because it was -- we had

12   discussed it on the yacht, but it was around the NBA draft, and

13   there would be a lot of people around.  That's what I

14   understood it to be.

15   Q.   Where was the NBA draft?

16   A.   The NBA draft was in New York, New York City.

17   Q.   Were there other meetings scheduled in New York around that

18   time?

19   A.   Yes.

20   Q.   What other meetings?

21   A.   There was a meeting set up with Book Richardson from -- the

22   assistant coach at Arizona.  There was a meeting set up with

23   Preston Murphy, the assistant coach at Creighton, and I believe

24   there was a meeting set up with Shane Heirman from DePaul.  I'm

25   not a hundred percent sure, but I think there was a meeting set

J4OHDaw5                          Blazer - Direct

1    with him or discussed with him as well.

2    Q.  So let's go through those one by one.

3    A.  OK.

4    Q.  Starting with the meeting with Emanuel "Book" Richardson,

5    who set up that meeting?

6    A.  Christian.  My understanding, Christian Dawkins set that

7    meeting up.

8    Q.  Did you have an understanding as to who Dawkins wanted to

9    meet Book Richardson?

10   A.  Who he wanted to meet Book Richardson?

11   Q.  Right, who was going to be involved in that meeting.

12   A.  Well, it was going to be Jeff D'Angelo, the undercover

13   agent, and Munish Sood.

14   Q.  What was your understanding as to the purpose of that

15   meeting?

16   A.  The purpose of that meeting was, in conjunction with what

17   we had discussed on the yacht, was to make a payment or start

18   the process of making payments to Book Richardson, and in

19   return, Book Richardson would start to steer his clients or his

20   players, recruits our way for the business management.

21   Q.  Did that meeting take place?

22   A.  Yes, that meeting took place.

23   Q.  Do you know when?

24   A.  It was in June of 2017, sort of late morning.

25   Q.  Let me ask you differently.  Do you know when that meeting

1  occurred in relation to the meeting with Code you attended?

2  A.  Oh, yes, it was right before the meeting with Merl Code.

3  Q.  Where was it?

4  A.  The meeting in New York, it was in -- it was in the hotel

5  room, the hotel suite in New York.

6  Q.  Why didn't you attend the meeting with Book Richardson?

7  A.  I mean, my understanding was that the meeting got moved up

8  because Book Richardson had to do -- Book had to leave or he

9  was doing something else, and my flight came in a little later.

10  I also think that it was probably Christian might not have

11  wanted me at that meeting because of if my name came out, but I

12  wasn't a hundred percent sure of that.

13  Q.  Do you know what happened at that meeting?

14  A.  Yes.

15  Q.  How do you know what happened?

16  A.  Well, both from the undercover agent and from Munish Sood

17  and Christian, we all kind of talked about it after Book had

18  left and before the meeting with Merl.

19  Q.  So are you saying the group discussed it in the meeting

20  with Merl?

21  A.  Group discussed it, yes, in the meeting.

22  Q.  What was your understanding as to what happened in the

23  meeting with Book Richardson?

24  A.  Book was paid by Jeff, the undercover agent, was given, I

25  believe, $5,000.  And he was -- he had agreed to start to take

1    money in exchange for referring his players and relationships

2    to them, us, on the business management side.

3    Q.  Have you ever met Book Richardson?

4    A.  No, I never met Book Richardson.

5    Q.  I want to now focus on the meeting you said was scheduled

6    with Preston Murphy.  Who is Preston Murphy again?

7    A.  Preston Murphy was assistant coach at Creighton basketball.

8    Q.  Do you know what the purpose was of setting up the meeting

9    with Preston Murphy?

10   A.  The purpose of setting up the meeting with Preston Murphy

11   was the same as the meeting with Book Richardson.  We were

12   going to start to make payments to Preston Murphy in exchange

13   for relationships that he could send our way for business.

14   Q.  Do you know if that meeting occurred?

15   A.  That meeting did not occur.

16   Q.  Do you know why?

17   A.  Well, Christian had told everybody that Preston couldn't

18   make it because at the time, I think the night before he was

19   supposed to be in New York.  His son was in the emergency room,

20   and he just -- something happened, and he stayed and did not

21   make it to New York that time.

22   Q.  Did there come a point when you later met Preston Murphy?

23   A.  Yes.

24   Q.  When was that?

25   A.  That was late June in Las Vegas.

J4OHDaw5                       Blazer - Direct

1    Q.  And who set up that meeting?

2    A.  Christian Dawkins.

3    Q.  What happened at that meeting?

4    A.  We met with Preston Murphy, and Preston was paid $6,000.

5    Q.  Why was he paid $6,000?

6    A.  He was paid $6,000.  He was going to be one of the -- there

7    was no real person, to my knowledge, that he was recruiting at

8    the time.  Preston Murphy was going to be a monthly retainer.

9    In other words, he was like Book Richardson.  He was going to

10   get paid on a monthly basis, and then he would be paid as

11   needed.  So he was paid that money on a monthly basis, and in

12   exchange for that, he was going to refer his relationships, his

13   players and recruited players, our way for business.

14   Q.  Do you know someone by the name of Raymond Brothers?

15   A.  Yes, I know that name, yes.

16   Q.  Who is that?

17   A.  Raymond Brothers is an NBA agent.  And, right, there was a

18   meeting set up with Raymond Brothers as well in New York at

19   that time.

20   Q.  Do you know why there was a meeting set up with Raymond

21   Brothers in New York?

22   A.  Raymond Brothers was agent for Markelle Fultz, who was a

23   draft prospect.  He ended up being the first pick overall in

24   the -- I believe it was the 2017 NBA draft.  And I was not in

25   that meeting, but in conversations, just it was about perhaps

1    helping Raymond Brothers with some money and, in exchange, he

2    would direct some of Markelle Fultz's business for the business

3    management side.

4    Q.  Why were you not in that meeting?

5    A.  Again, I think it was and I was kind of told by Munish that

6    Christian thought it would be a good idea if I wasn't in that

7    meeting because, I think -- well, not I think, I had met

8    Raymond before, years and years ago, and he knew who I was.

9    And I believe if he had known my name and that I was in that

10   meeting, probably wouldn't have been a good thing because he

11   would have thought I was involved in it, and he knew my past.

12   Q.  Your past being your --

13   A.  Right, the misappropriation and movies and music and the

14   SEC settlement.

15   Q.  Now I want to focus back on your meeting with Code.  Who

16   was there for that meeting?

17   A.   In that meeting it was me, Merl Code, the two undercover

18   agents, Christian Dawkins, Munish Sood, and Munish's assistant,

19   Alicia Carroll.

20   Q.  Was that meeting recorded by law enforcement?

21   A.  Yes, it was.

22   Q.  What happened at the meeting?

23   A.  At the meeting, we were introduced to Merl, and Merl gave

24   us a background on his work experience at both Nike and Adidas

25   and a little bit about what he did at Adidas.  And then we

J4OHDaw5                         Blazer - Direct

1  talked about his relationships with both grass roots and

2  college coaches that he had relationships with.

3  Q.  How did that meeting end?

4  A.  That meeting ended with the idea that Merl was -- Merl was

5  willing to work with us.  Merl -- Jeff, the undercover agent

6  gave Merl, I think, $2,000, and Merl agreed to set up some of

7  the meetings with the college coaches.

8           MR. BOONE:  At this time, your Honor, the government

9  wants to offer a recording of that meeting.  It's Government

10  Exhibit 510A1, and the related transcript is Government

11  Exhibit 510A1T.

12           THE COURT:  Any objection?

13           MR. CHANEY:  No, your Honor.

14           THE COURT:  510A1 and 510A1T will be received.

15           (Government's Exhibits 510A1 and 510A1T received in

16  evidence)

17           MR. BOONE:  If we could begin, please.

18           (Video played)

19           MR. BOONE:  Can we pause here.

20  Q.  What are we looking at on the screen?

21  A.  We are looking at the meeting that was held in New York in

22  June of 2017.  And the participants of the meeting, all the way

23  to the right, redacted is his face, the undercover agent Jeff

24  D'Angelo.  Next to him is the undercover agent Jill Bailey.

25  And then there were other people there.  Merl Code is in the

1    chair sort of in the middle of the screen.

2    Q.  Where were you?  Where are you sitting?

3    A.  I was sitting directly to Merl's right.  You can't really

4    see me at this time.  I think I was sitting in a chair directly

5    to Merl's right.

6    Q.  There's a reference to meeting with Book.  What did you

7    understand that reference to be referring to?

8    A.  That was the meeting that happened earlier with Book

9    Richardson from Arizona.

10   Q.  And the undercover, Jeff D'Angelo, references Book leaving

11   happy.  What did you understand that to mean?

12   A.  I understood that to mean that Book left happy because Jeff

13   had given him the $5,000.

14   Q.  Then Code says he did.  If we could continue playing.

15            (Video played)

16            MR. BOONE:  We could pause here.

17   Q.  So Dawkins mentions that Code is involved in all three

18   levels of basketball.  What did you understand him to mean by

19   that?

20   A.  The three levels of basketball Merl -- it really starts

21   with the grass roots, the high school-age travel basketball

22   players, so Merl had some influence in that area.  And then the

23   second level was from grass roots to college, the college

24   basketball players and the coaches and everybody involved in

25   the college level.  And then he had some influence on the

J4OHDaw5                         Blazer - Direct

1    players after they leave college in the NBA.  So he was

2    influential and had contacts on all three levels.

3              MR. BOONE:  OK.  If we can continue.  I believe we're

4    around line 6.

5              (Video played)

6              MR. BOONE:  You could pause it.

7    Q.  What did you understand Code to be explaining in regards to

8    his background?

9              MR. CHANEY:  Your Honor, I'm going to object and ask

10   to approach.

11             THE COURT:  OK.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           MR. CHANEY:  The issue, I think Mr. Moore actually

3    raised this earlier, specifically with respect to Mr. Code,

4    Mr. Blazer has no prior dealings with Mr. Code, does not have a

5    relationship with Mr. Code, did not obtain a relationship with

6    Mr. Code after this meeting.  This is, in fact, the only time

7    they ever spoke at all.  And so the degree to which the

8    government can lay a foundation for Mr. Blazer to opine as to

9    what Mr. Code meant or did not mean in any of the statements in

10   that meeting is improper.

11          THE COURT:  I think that the question posed was why

12   was Mr. Code telling you about his background, and to that

13   extent, the objection will be sustained.  To the extent that

14   Mr. Blazer has an understanding of what Code meant by certain

15   words or phrases, that will be allowed.  But the question as to

16   why he was saying what he was saying is sustained.

17          MR. BOONE:  Your Honor, to be clear, the question was

18   what did you understand him to be saying about his background,

19   not why was he explaining his background.

20          THE COURT:  OK.

21          MR. BOONE:  Is that permissible?

22          THE COURT:  Yes.

23          MR. CHANEY:  Your Honor, just to let the Court know,

24   opposing counsel know, since I think we're pretty close to

25   running out of time, I think our position would be we would try

J4OHDaw5                         Blazer - Direct

1   to put something in writing to the Court on this issue

2   overnight so we can potentially address this.

3             THE COURT:  That's fine.  I'm going to send the jury

4   home now.

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Folks, it's almost 2:30, so we're stopping

3       now.  We'll pick up again tomorrow with Mr. Blazer.

4              Until then, have a safe trip home.  Please do not read

5       anything that you may see about this case.  Please do not look

6       at anything or listen to anything that you may see in the media

7       about this case.  Please do not discuss the case.  And please

8       do try to be prompt tomorrow morning so we can get you started

9       at 9:30.

10             Have a very good evening.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  You can be seated.

 3                So, Mr. Chaney, if the --

 4                MR. CHANEY:  May the witness be excused?

 5                THE COURT:  I'm sorry.  Mr. Blazer, you can step out.

 6                THE WITNESS:  Thank you.

 7                (Witness excused)

 8                THE COURT:  Mr. Chaney, do I understand the objection

 9      to be that Mr. Blazer ought not be allowed to testify at all as

10      to what his understanding was about what was being discussed?

11                MR. CHANEY:  To a certain degree, I think that's an

12      accurate statement of our objection.  And to kind of supplement

13      what we were speaking about at the bench, Mr. Blazer's personal

14      opinions, his personal understanding of what Mr. Code meant by

15      certain statements really isn't relevant to the material issues

16      in this case.  It's not separately relevant as the effect on

17      him as a listener or anything sort of in that vein.  The jury

18      is specifically tasked with interpreting what Mr. Code meant or

19      did not mean by certain statements and whether or not those

20      statements reflected a guilty mind, the specific intent to

21      participate in a conspiracy to pay college coaches in exchange

22      for funneling players back to this Loyd Inc.

23                So to the degree that Mr. Blazer, a witness who has no

24      prior knowledge or dealing with Mr. Code, who would necessarily

25      be speculating as to what Mr. Code meant or did not mean, can
```

J4OHDaw5

get to supplant his opinion in the form of evidence for what is
necessarily a jury determination, I think, would be
inappropriate.

          MR. BOONE:  Your Honor, Mr. Code is obviously charged
with being a member of the conspiracy.  Mr. Blazer is going to
be testifying about conversations made in furtherance of that
conspiracy.  He has context to provide that because he was
involved in this from the beginning to the end.  He mentioned
already the fact that through Dawkins he had an understanding
of why they were meeting with Code and sort of what Code was
going to be providing.  He'll later testify about how Code was
involved in the meeting in Vegas, his understanding being
gained from those also in the conspiracy.

          So he certainly has the ability to talk about what
Code meant in regards to conversations involving the
conspiracy.  In particular, in this meeting, it's not some sort
of five-minute meeting.  It's a very long meeting.  Obviously,
as a participant in a very detailed, very thorough meeting, he
can explain what was discussed in the meeting.  And they were
having a conversation, so what he was saying to him and what he
meant by that and what Merl Code's responses were to his
questions, just like anyone sort of can when they're talking to
someone.

          But it's particularly irrelevant, as I said earlier,
because he is a member of the conspiracy, and there are things

J4OHDaw5

1    happening in the conspiracy, including Code, outside of Code,

2    that inform his view as to statements that, we offer, are

3    statements made in furtherance of the conspiracy.

4         Also, just to be clear, there's also a lot of sports

5    lingo and lingo that's sort of common in their industry that

6    will not be understandable to the jury, frankly, without him

7    explaining what is meant by that.  There's been a little of

8    that already in terms of "one and done," things of that nature.

9    At least the government doesn't feel everyone sort of

10   automatically knows what they mean.  He's testified about he

11   spent majority of his life, professional life, involved in

12   sports in the sense of being a financial representative of

13   those in sports.  He knows that lingo.  He knows sort of what

14   these terms mean, and so he's going to be asked to sort of

15   explain that to the jury again, which he's clearly capable of

16   doing.  He testified he spent 20-some-odd years doing that.

17        THE COURT:  I guess, to that point, I was going to

18   mention it at an appropriate time, but the jury, as I mentioned

19   earlier this morning, it's a smart jury.  So at this point you

20   don't have to ask Mr. Blazer, or anyone else, what do you mean

21   by grass roots?  The jury's gotten that at this point.  The

22   jury has gotten the three levels: the grass roots, college, and

23   the NBA.  So a lot of those things that once you go over it

24   once or twice, I think this jury gets it.

25        The reason -- well, with respect to the particular

J4OHDaw5

1    objection, the reason why I thought you asked why was because

2    Mr. Code was being perfectly clear he was simply giving,

3    essentially, a résumé.  Therefore, what was your understanding

4    of what he was doing, he was telling us his experience.  What I

5    thought you were getting at was why was he giving you that

6    experience, and that, I think, would be an inappropriate road

7    for Mr. Blazer to go down, period.

8           MR. CHANEY:  Your Honor, could I follow up one thing

9    Mr. Boone mentioned because I don't know if I understood him

10   appropriately?  He said -- Mr. Boone, I mean, said it was

11   relevant what Mr. Blazer -- what Mr. Blazer's understanding was

12   because he is a member of the conspiracy.  If that's the

13   government's position, I don't think that that comports with

14   the law.

15          MR. BOONE:  I said Code was a member of the

16   conspiracy.

17          MR. CHANEY:  OK.  That's why I was asking to clarify.

18          THE COURT:  But, again, particularly with that section

19   of the transcript, I mean, I don't know that -- at least to my

20   eyes, and I was reading it with an eye as to what the jury

21   would be reading, I mean, it seemed perfectly clear to me that

22   Mr. Code was simply going over his experience.  There may be a

23   phrase in there or two, perhaps, that needs some further

24   clarification, but I didn't see much, at least as far as I

25   read.

J4OHDaw5

1          But to the extent that the question is, what was your

2      understanding about what Mr. Code meant by one phrase or

3      another, I think that that's perfectly appropriate.

4          MR. CHANEY:  And, your Honor, on the point that

5      Mr. Boone made that Mr. Blazer has all of this experience and

6      can decipher coded basketball language, that's, in fact, not

7      the testimony of Mr. Blazer.  He had certainly a history

8      dealing with football players, but he expressed under oath

9      today that he had very limited knowledge of the basketball

10     world until getting involved here and was largely relying on

11     other people's knowledge.  So he's not an appropriate vehicle

12     for the jury to get their understanding of the inner workings

13     of basketball.

14         THE COURT:  He's an appropriate vehicle to tell the

15     jury his understanding and to put in context, therefore,

16     whatever statements he made in response.

17         MR. BOONE:  Yes, and just not to belabor the point,

18     but, obviously, at this point in time, Mr. Blazer had been

19     cooperating for quite some time in the world of basketball.

20     And so to the extent he wasn't an expert before, he certainly

21     was much more informed about the inner workings of basketball

22     at this point.

23         THE COURT:  I'm so much more informed about the inner

24     workings of basketball at this point.

25         OK.  Anything else?

J4OHDaw5

1              MR. HANEY:  No, your Honor.

2              MR. CHANEY:  Not at this time.

3              THE COURT:  Anything from the government?

4              MR. BOONE:  No, your Honor.

5              THE COURT:  OK.  Folks, be here no later than

6    9 o'clock tomorrow morning.  It sounds like we've got work to

7    do.

8              (Adjourned to April 25, 2019, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

LOUIS MARTIN BLAZER

Direct By Mr. Boone  . . . . . . . . . . . . . 250

                     GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 501C and 501CT  . . . . . . . . . . . . . . 274

 501D and 501DT  . . . . . . . . . . . . . . 290

 508A and 508AT  . . . . . . . . . . . . . . 336

 508D and 508DT  . . . . . . . . . . . . . . 355

 402 and 402T   . . . . . . . . . . . . . . 259

 413 and 413T   . . . . . . . . . . . . . . 306

 501A and 501AT   . . . . . . . . . . . . . 267

 501E and 501ET   . . . . . . . . . . . . . 299

 510A1 and 510A1T   . . . . . . . . . . . . 365

 1637    . . . . . . . . . . . . . . . . . 342

 2105    . . . . . . . . . . . . . . . . . 266