J4Q9DAW1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
            v.                          17 CR 684 (ER)
4
    CHRISTIAN DAWKINS AND MERL
5   CODE,
6               Defendants.
    ------------------------------x
7
                                        New York, N.Y.
8                                       April 26, 2019
                                        9:00 a.m.
9
    Before:
10                  HON. EDGARDO RAMOS
11                                      District Judge
12
                          APPEARANCES
13
    GEOFFREY S. BERMAN
14       United States Attorney for the
         Southern District of New York
15   ROBERT L. BOONE
    NOAH D. SOLOWIEJCZYK
16   ELI J. MARK
         Assistant United States Attorneys
17
    HANEY LAW GROUP PLLC
18       Attorney for Defendant Dawkins
    BY:  STEVEN A. HANEY
19
    CHANEY LEGAL SERVICES, LLC
20   BY:  DAVID A. CHANEY, JR.
                 -and-
21   NEXSEN PRUET, LLC
    BY:  ANDREW A. MATHIAS
22       MARK C. MOORE
         Attorneys for Defendant Code
23
    ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
24   YOLANDA BUSTILLO, Paralegal Specialist USAO
    EMILY GOLDMAN, Paralegal Specialist USAO
25

J4Q9DAW1

1           (Jury not present)

2           THE COURT:  Good morning everyone.  It's nine o'clock.

3    Any housekeeping matters or any issues that the parties wish to

4    bring up?

5           MR. HANEY:  None that I'm aware of, your Honor.

6           MR. CHANEY:  Not from the defense, your Honor.

7           MR. BOONE:  No, your Honor.

8           THE COURT:  Let's talk scheduling.  How are we doing

9    in terms of our two-week prediction?

10          MR. BOONE:  I think we're still on pace, from the

11   government's side at least, to rest either Tuesday or

12   Wednesday.  We have one more sort of long witness, Mr. Sood.

13          THE COURT:  I take it he won't be as long as

14   Mr. Blazer.

15          MR. SOLOWIEJCZYK:  Less than Mr. Blazer.  Probably

16   about a day.  Maybe a little more than a day on direct but not

17   as long as Mr. Blazer.

18          MR. BOONE:  And then some relatively short witnesses.

19          THE COURT:  And any other -- are the defense attorneys

20   in a position to let me know whether there will be and to what

21   extent there will be a defense case?

22          MR. HANEY:  Your Honor, at this point we have not made

23   a decision yet with my client relative to testimony.  I believe

24   that cocounsel has other witnesses that perhaps they may call

25   that would not include their client but I'll let them speak for

J4Q9DAW1

1   themselves on that issue.

2              MR. MOORE:  We certainly intend to seek to play some

3   phonecalls and, as I've informed Mr. Solowiejczyk, at least

4   three of them I would intend to play through the cross of

5   Mr. Sood.  But there is a possibility that we could have up to

6   four witnesses and if we do three of them would be short.

7              MR. HANEY:  Your Honor, I would also note we do have a

8   number of phonecalls, not an inordinate number of phonecalls, I

9   would say far less than what the government has even put on

10  through Mr. Blazer, but our number of calls are state-of-mind

11  calls that we have identified to the Court and to the

12  government.

13             MR. SOLOWIEJCZYK:  Just to give your Honor a preview,

14  we're still talking to the defense about some of those

15  phonecalls.  Some have been agreed to, but we may be coming to

16  your Honor at some point to say that we think some of these

17  calls are not admissible as state-of-mind calls, but we're

18  still trying to work that out between the parties.

19             MR. HANEY:  For about two weeks we have been doing the

20  best we can and we do have an agreement on a number of those

21  phonecalls.

22             THE COURT:  That is much appreciated.

23             MR. MOORE:  I would I also say that the government

24  indicated to us that with respect to some of their shorter

25  witnesses that they may call next week they may propose to do

J4Q9DAW1

1    those by stipulation, the folks from universities, and we're

2    certainly amenable to that.  We want to move this case as

3    expeditiously as possible.

4                THE COURT:  OK.

5                Mr. Chaney.

6                MR. CHANEY:  I'm sorry.  I'm just grabbing this

7    binder.

8                THE COURT:  On the jury instructions, I'm guessing

9    they're likely to be on the longer side.  There have been a lot

10   of recent Second Circuit decisions on the types of instructions

11   that are relevant to this case so I don't assume that there

12   will be an awful lot of controversy and I'm sure that I will be

13   disappointed in that regard.  And these are complex

14   instructions so I don't want to put it off to the last minute.

15   So I'm thinking that maybe Monday after we finish if we could

16   just have a brief initial discussion about the parties'

17   anticipated approach to the instructions.

18               MR. HANEY:  Thank you, your Honor.

19               THE COURT:  OK.  We'll await the jury, if there's

20   nothing else.

21               (Recess)

22               THE COURT:  I think we may still be waiting on a

23   juror.

24               The jury is here.  Is Mr. Blazer close by?

25               MR. VOURDERIS:  Yes, he's right outside.

J4Q9DAW1

1              THE COURT:  Please bring him in.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4Q9DAW1                         Blazer - Cross

1           (Jury present)

2           resumed

3    LOUIS MARTIN BLAZER, resumed.

4           THE COURT:  Good morning, ladies and gentlemen.  I

5    trust you all had a pleasant evening and thank you, as always,

6    for being prompt.

7           We will now continue with the cross-examination of

8    Mr. Blazer by Mr. Chaney.

9           MR. CHANEY:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. CHANEY:

12   Q.  Good morning again, Mr. Blazer.

13   A.  Good morning.

14   Q.  I want to start our time today by circling back through

15   just a couple of the things you told the jury yesterday, OK?

16          THE COURT:  Mr. Chaney, can you move the microphone

17   closer?

18          MR. CHANEY:  Is that better, Judge?

19          THE COURT:  Yes.

20   Q.  Mr. Blazer, you told the jury yesterday that it was not

21   your role to gather evidence for the FBI and the U.S.

22   Attorney's Office.  Do you remember saying that?

23   A.  Yes.

24   Q.  You would agree with me that while you were acting as a

25   cooperating criminal you were making recordings at the

J4Q9DAW1                          Blazer - Cross

1   direction of the FBI, correct?

2   A.  Yes.

3   Q.  And the FBI's role is to investigate crime, correct?

4   A.  Yes.

5   Q.  And you were also making recordings at the direction of the

6   United States Attorney's Office, correct?

7   A.  Yes.

8   Q.  And their role is to prosecute crime?

9   A.  Yes.

10  Q.  This is your fourth day of testimony, right?

11  A.  That's correct.

12  Q.  You would agree with me that this is a criminal trial?

13  A.  Yes.

14  Q.  And that those are prosecutors?

15  A.  Yes.

16  Q.  And these are defense attorneys and defendants?

17  A.  Yes.

18  Q.  For the last three days we've been listening to the

19  recordings that you made, right?

20  A.  I didn't make the recordings.

21  Q.  You did not make --

22  A.  I was there for them.  I made some of the recordings.

23  Q.  You made some of the recordings, correct, Mr. Blazer?

24  A.  Yes.

25  Q.  You testified during your direct examination by Mr. Boone

J4Q9DAW1                         Blazer - Cross

 1    that your phone was tapped, correct?

 2    A.  Yes.

 3    Q.  And before it was tapped you were calling in to a different

 4    number to make sure that you could record these phonecalls,

 5    correct?

 6    A.  Yes.

 7    Q.  So you made some of these recordings?

 8    A.  Yes.

 9    Q.  And those recordings were introduced as evidence in this

10    criminal trial, correct?

11    A.  Correct.

12    Q.  So when you told this jury that your role was not to gather

13    evidence for a criminal case that was not true, was it?

14              MR. BOONE:  Objection.

15              THE COURT:  Sustained.

16    Q.  You also testified yesterday that you did not lie to the

17    IRS about your taxes.  Do you remember testifying to that?

18    A.  Yes.

19    Q.  You remember you made that statement under oath, correct?

20    A.  Yes.

21    Q.  Now you met with Mr. Solowiejczyk and Mr. Boone before,

22    correct?

23    A.  Yes.

24    Q.  And that was at your proffer meeting?

25    A.  Yes.

J4Q9DAW1                         Blazer - Cross

1    Q.  And that was the proffer meeting where you said you were

2    there to tell the whole truth.  Do you remember saying that?

3    A.  Yes.

4    Q.  You told Mr. Boone and Mr. Solowiejczyk that you lied about

5    your deductions.  Do you remember saying that?

6    A.  I didn't say that.  I said that I may have.  It was sort

7    of -- an example of it would be if I -- when I gave my

8    information to my CPA, to my accountant, and I would give him a

9    credit card statement.  And there would be maybe three thousand

10   dollars worth of charges on there for my cellphone.  And my

11   accountant would say what percentage of those cellphone charges

12   were used for business.  And I would say 60 percent, just going

13   through and saying 60 percent of that was -- and that -- what

14   we discussed, what I discussed with the U.S. Attorney's Office

15   is that perhaps it wasn't 60 percent, maybe it was 55 percent.

16   But we discussed -- and as part of my cooperation agreement

17   I -- the way I understood it was that if there were

18   discrepancies in those years that before I'm sentenced I have

19   to go through those tax returns and have them amended to be

20   reflected correctly, whether it was cellphone charges or

21   restaurant charges.  That's what I understood that to mean.

22          MR. CHANEY:  Your Honor, permission to approach the

23   witness with 3561-43, Mr. Boone's notes from Mr. Blazer's

24   proffer?

25          THE COURT:  Very well.

J4Q9DAW1                          Blazer - Cross

1            MR. BOONE:  Objection.

2            THE COURT:  You may approach.

3  Q.  Mr. Blazer, I'm showing you Mr. Boone's notes.

4            THE COURT:  Just show him the notes.

5            MR. BOONE:  Is there a question?

6            MR. CHANEY:  I'm giving Mr. Blazer an opportunity to

7  look at notes.

8  Q.  Mr. Blazer you would agree with me that it says has filed

9  taxes?

10            THE COURT:  Don't read --

11            MR. BOONE:  Objection.

12            THE COURT:  Don't read the notes.  Just show him the

13  notes.

14            THE WITNESS:  I didn't take those notes.  I wasn't

15  taking notes in that proffer.

16  Q.  Mr. Blazer, you testified that you went to a proffer

17  meeting with the United States Attorney's Office, correct?

18  A.  Yes.

19  Q.  But you testified yesterday that you were not given legal

20  protection for what you said there.  Do you remember saying

21  that?

22  A.  Yes.

23            MR. CHANEY:  Your Honor with permission from the Court

24  I'd like to approach Mr. Blazer with a copy of his proffer

25  agreement?

J4Q9DAW1                          Blazer - Cross

1          THE COURT:  You can approach.  Don't characterize or

2     describe the document.

3     Q.  Mr. Blazer, do you recognize this document?

4     A.  Yes.

5     Q.  This is your signature on the document, correct?

6     A.  Yes.

7     Q.  This is a copy of the proffer agreement?

8          MR. BOONE:  Objection.

9          THE COURT:  Overruled.

10    Q.  This is a copy of the proffer agreement you made with the

11    United States Attorney's Office, correct?

12    A.  Yes.

13    Q.  If you would, please, read paragraph two to yourself.

14    A.  I am not sure what that means.  I'm not a lawyer.

15    Q.  Mr. Blazer, did you have an opportunity to review this

16    document before you signed it?

17    A.  Yes.

18    Q.  And is this a clear and accurate copy of the proffer

19    agreement you reached with the United States Attorney's Office?

20    A.  Yes.

21         MR. CHANEY:  The defense would move to admit the

22    proffer agreement.

23         THE COURT:  Any objection?

24         MR. BOONE:  Objection.  Hearsay.

25         THE COURT:  Overruled.

J4Q9DAW1                          Blazer - Cross

1           There is no exhibit number as yet.

2           MR. CHANEY:  Your Honor, with permission from the

3    Court we'd like to mark it after cross-examination.

4           THE COURT:  OK.

5    Q.  Now, Mr. Blazer, you testified that Mr. D'Angelo paid

6    Mr. Code $2,000 at the end of his meeting in New York.  Do you

7    remember testifying to that?

8    A.  Yes.

9    Q.  And your testimony was that your understanding was that

10   that $2,000 was for future services?

11   A.  Yes.

12   Q.  And that was in spite of the fact that nobody said that it

13   was for future services, correct?

14   A.  Nobody said that explicitly at the time, no.

15   Q.  Mr. Code does not and did not at the time live in New York,

16   right?

17   A.  I don't know that.  I don't know that he did or did not.

18   Q.  Does it sound accurate if I tell you that he lived at the

19   time in Greenville, South Carolina?

20           MR. BOONE:  Objection.

21           THE COURT:  Overruled.

22           THE WITNESS:  I'm not sure.  Like I said I don't know

23   where he lived.

24   Q.  Now, you testified already that you took a number of

25   flights, booked a number of hotels while cooperating with the

J4Q9DAW1                          Blazer - Cross

1    government, right?

2    A.   Yes.

3    Q.   And flying across the country takes money, does it not?

4    A.   Yes.

5    Q.   Staying in a hotel takes money, does it not?

6    A.   Yes.

7    Q.   Eating food in a city you don't live in takes money, does

8    it not?

9    A.   Yes.

10   Q.   And so $2,000 really is hardly enough to cover a trip to

11   New York?  Fair to say?

12   A.   I would say $2,000 more than covers a trip to New York.

13   Q.   So $2,000 at the end of a meeting in New York where

14   Mr. Code does not even live really doesn't hardly cover his

15   cost of being there?  Fair to say?

16           MR. BOONE:  Objection.

17           THE COURT:  Sustained.

18   Q.   Do you have any close friends, Mr. Blazer?

19   A.   Yes.

20   Q.   What's your relationship with them like?

21           MR. BOONE:  Objection.  Vague.

22           THE COURT:  I'm sorry.  Was there a name at the end of

23   that?

24           MR. CHANEY:  There was not a name.  Mr. Blazer did not

25   name someone.

1          I'll ask a new question, Judge.

2     Q.  Are those people that would do something on your behalf if

3     you asked them to?

4          MR. BOONE:  Objection.  Relevance.

5          THE COURT:  Overruled.

6          THE WITNESS:  It depends on what I would ask them to

7     do, I would think.

8     Q.  Would you have to pay them in order for them to do

9     something on your behalf?

10    A.  It depends on what I ask them to do.

11    Q.  Do you have anyone in your life that would do something on

12    your behalf without you having to pay them?

13         MR. BOONE:  Objection.

14         THE COURT:  Overruled.

15         THE WITNESS:  It depends on what I would ask them to

16    do.

17    Q.  Now, you testified that Merl Code said, "Relationships are

18    everything," I'm sorry -- that he said that in a meeting.  Do

19    you remember that part of the recording?

20    A.  I remember that, yes.

21    Q.  So Mr. Code said, "Relationships are everything," correct?

22    A.  Yes.

23    Q.  And you testified that that meant relationships mean paying

24    for loyalty and that when he was saying relationships are

25    everything what he meant was you have to pay everybody?  Do you

J4Q9DAW1                      Blazer - Cross

1   remember testifying generally to that understanding what

2   Mr. Code meant?

3   A.  Could you repeat what --

4   Q.  Sure.  Mr. Code made the comment in New York,

5   "Relationships are everything."

6           Do you remember being asked what your understanding of

7   what Mr. Code meant by that?

8   A.  Yes.

9   Q.  And your testimony was that Mr. Code was talking about

10  paying people for loyalty.  You testified to that, right?

11  A.  Yes.

12  Q.  Now, you would agree with me that paying for loyalty is not

13  what most people mean when they mean relationships?

14          MR. BOONE:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  In the context of that meeting it was my

17  understanding that that's what that meant.

18  Q.  That's not my question for you.  My question for you is the

19  common understanding of the word "relationships" is not paying

20  somebody for their loyalty, correct?

21          MR. BOONE:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  It depends on what you're asking them to

24  do, I think, or what the definition of their loyalty would

25  mean.

J4Q9DAW1                          Blazer - Cross

1    Q.  So, you're not aware of a common definition of the word

2    "relationships" that does not include paying somebody for their

3    loyalty to you?

4    A.  Yes.  There is -- a relationship doesn't need to be paid

5    for, to pay for someone's loyalty.  Yeah.  I agree with that.

6    Q.  Mr. Blazer, would it change your understanding of any of

7    Mr. Code's statements if you found out that Mr. Code actually

8    told coaches not to take money in Las Vegas?

9                MR. BOONE:  Objection.

10               THE COURT:  Overruled.

11               THE WITNESS:  No.

12   Q.  So if you found out that Mr. Code left that meeting and

13   affirmatively told coaches, "Do not take money," that would not

14   change the way you understand Mr. Code's statements in

15   New York?

16               MR. BOONE:  Objection.

17               THE COURT:  Overruled.

18               THE WITNESS:  No.  Because when I was in New York what

19   I understood those to be was, was what it was, that we were

20   going to -- that he was going to arrange for coaches' meetings

21   and that some of those coaches would be paid.

22   Q.  So, just to be clear, you didn't know Mr. Code, right?

23   A.  Correct.

24   Q.  You had no prior dealings with Mr. Code, correct?

25   A.  Correct.

1   Q.  And your testimony is that if you knew that Mr. Code was

2   taking actions to keep coaches from taking money, that would

3   not have affected your interpretation of what he was saying?

4               MR. BOONE:  Objection.

5               THE COURT:  Overruled.

6               THE WITNESS:  Again, I didn't know that at the time.

7   And my understanding was that that was the -- what was meant by

8   those statements and, to answer your question, even if I had

9   known that, I still would have been under the understanding

10   when we had that meeting that not all coaches were worth

11   paying.  So, if he was to say to some coaches, "Don't take

12   money," that to me wouldn't change my understanding of what he

13   was saying in that meeting, no.

14   Q.  Mr. Blazer, if you found tout that Mr. Code was telling

15   Mr. Dawkins not to pay any coaches, would that have changed

16   your understanding?  Of what Mr. Code was saying in New York?

17   A.  I can't answer that because I wasn't privy to or I wasn't

18   aware of anybody saying that to anybody.  So I can't answer

19   what I would have thought because at the time my understanding

20   of it is what it is.  I don't -- I was not involved in any of

21   those conversations.  I can't speak to what will --

22   Q.  Mr. Blazer --

23   A.  -- what my understanding would have been if something else

24   had happened that didn't happen prior to or when I was there

25   for the meeting.  That's all I'm -- that's all I can say about

1    it.

2    Q.  Mr. Blazer, fair to say your interpretation of Mr. Code's

3    statements is shaped by your role as a cooperating criminal for

4    the United States Attorney's Office?

5    A.  Not fair to say.

6    Q.  OK.

7    A.  Not fair to say.

8    Q.  I want to talk about recruiting really quickly.

9         Recruiting involves identifying talented players,

10   right?

11   A.  Yes.

12   Q.  And not just identifying players with talent but players

13   that are going to fit into your school's system, right?

14             MR. BOONE:  Objection.

15             THE COURT:  Overruled.  Can you answer that question?

16   Do you understand the question?

17             THE WITNESS:  Well, yeah, but I mean I'm not a -- yes.

18   I would agree with that.  Yeah.  I would agree with that.

19   Q.  It also involves, once you identify those players,

20   persuading those players to actually sign with your school,

21   right?

22             MR. BOONE:  Objection.

23             THE COURT:  Overruled.

24             THE WITNESS:  Well, yes.  Yes.

25   Q.  Mr. Code told you in New York that relationships are key,

J4Q9DAW1                          Blazer - Cross

1    correct?

2    A.   Yes.

3    Q.   You would agree with me that there is more to recruiting

4    than writing checks to players and players' families?

5                MR. BOONE:  Objection.

6                THE COURT:  Overruled.

7                THE WITNESS:  I would agree that that's not

8    everything.

9    Q.   There is a component of recruiting that includes access to

10   players, right?

11               MR. BOONE:  Objection.

12               THE COURT:  Overruled.

13               THE WITNESS:  I don't understand the question.

14   Q.   In order to persuade the player -- in order to identify the

15   player you need to know about the player, right?  To be able to

16   answer the question:  Is this player going to be a good player

17   for my team, you need to know that they exist, correct?

18   A.   The coach needs to know that the player exists?

19   Q.   Right.

20   A.   Sure.  Yes.

21   Q.   So assistance with recruiting could mean assistance with

22   identifying talented players, right?

23               MR. BOONE:  Objection.

24               THE COURT:  Overruled.

25   Q.   So assistance with recruiting could mean helping persuade a

J4Q9DAW1                         Blazer - Cross

1    player because of your relationship with that player to go to a

2    particular school?

3                MR. BOONE:  Objection.

4                THE COURT:  Overruled.

5                THE WITNESS:  Yes.

6    Q.  And relationship does not necessarily mean a paid

7    relationship, correct?

8    A.  It is one component of the relationship.

9    Q.  Now, you testified on direct that you spoke to FBI agents

10   and federal prosecutors whenever they wanted to speak to you,

11   right?

12   A.  When they did or I would obviously initiate some of that

13   conversation as well.

14   Q.  It was part of your agreement, your proffer agreement, and

15   your cooperation agreement, correct?

16   A.  Yes.

17   Q.  You testified that you were supposed to be available

18   whenever, wherever, and however often that they wanted you,

19   right?

20   A.  Yes.

21   Q.  And that turned out to be pretty frequent, right?

22   A.  Yes.

23   Q.  You met with members of the FBI and the U.S. Attorney's

24   Office over 50 times?

25   A.  I'm not sure but that probably sounds about right.

J4Q9DAW1                           Blazer - Cross

1   Q.  Now, some of the federal prosecutors you were meeting with

2   are actually the gentlemen at that table, correct?

3   A.  Yes.

4   Q.  You've been meeting with Mr. Boone, right?

5   A.  Yes.

6   Q.  You've been meeting with Mr. Solowiejczyk, right?

7   A.  No.

8   Q.  You've not met --

9   A.  I haven't met with him recently, no.

10  Q.  What about Mr. Mark?

11  A.  Yes.

12  Q.  Mr. Vourderis?  I'm sorry.

13  A.  Yes.

14  Q.  So the gentlemen at this table are people that you have

15  relationships with, right?

16  A.  Yeah.  I've met with them, yes.

17  Q.  You've met with them a lot, right?

18  A.  I would say yes.

19  Q.  Including while this trial has been progressing?

20  A.  Up until when they finished yesterday with direct I was --

21  I didn't have any contact with them, no.

22  Q.  What about when you finished direct, did you then meet with

23  any of the prosecutors here at this table?

24  A.  No.  No.  I've had no communication after yesterday.

25  Q.  Now, while you were cooperating you were giving both the

J4Q9DAW1                         Blazer - Cross

1    FBI and the U.S. Attorney's Office real time updates about the

2    people you were recording, correct?

3    A.  Yes.

4    Q.  You were keeping them informed so that they could give you

5    instructions on what to do next, right?

6    A.  Yes.

7    Q.  You were not leading this investigation, fair to say?

8    A.  That's correct.

9    Q.  They were?

10   A.  Yes.

11   Q.  You were just taking orders, as you testified?

12   A.  Yes.  I mean we would have discussions but the discussions

13   would be about what was going on or what my thoughts were about

14   things as well.  But then they would say this is what we're

15   going to do next and these are the calls to make and that sort

16   of thing.

17   Q.  They decided who you were supposed to record, right?

18   A.  With some input from me but, yes, they would say this is

19   who we should be talking to.

20   Q.  And as you testified on direct they were the ones telling

21   you what to say in those meetings, right?

22   A.  Not exactly what to say but an outline of what to -- not

23   verbatim but certain things that were to be discussed.

24   Q.  Once they told you to go make a particular recording or

25   speak to a particular person, you carried out those

J4Q9DAW1                          Blazer - Cross

1    instructions, right?

2    A.  Yes.

3    Q.  If they told you to do it, then you did it, right?

4    A.  Yes.

5    Q.  So if they said call Christian Dawkins and talk to him

6    about paying Lamont Evans, then you called Christian Dawkins

7    and talked to him about paying Lamont Evans?

8    A.  I did not call Christian Dawkins about paying --

9    Q.  I'm saying hypothetically if they tell you to do that then

10   you go do that?

11   A.  Well if they said -- yeah, yeah, if they said call

12   Christian Dawkins, I called Christian Dawkins.  And this is

13   what to -- this is the -- what you kind of want to talk about,

14   yes.

15   Q.  And if they said call Munish Sood and talk about paying

16   coaches, you called Munish Sood and talked about paying

17   coaches, right?

18            MR. BOONE:  Objection.  Speculation.

19            THE COURT:  Overruled.

20            THE WITNESS:  Again, same thing.  It's not about

21   calling Munish Sood to pay coaches.  But if they said call

22   Munish Sood or Munish Sood was one of the individuals to call

23   or if Munish called me about a certain thing or Christian

24   called me about a certain thing and we talked, we would have a

25   discussion about that and then they would give direction on

J4Q9DAW1                          Blazer - Cross

1    what to do from there.

2    Q.  If they told you to call Merl Code, you would have called

3    Merl Code, right?

4    A.  Sure.

5    Q.  But you did not call Merl Code, did you?

6    A.  No.

7    Q.  Not a single time?

8    A.  Nope.

9    Q.  Because you were never asked to?

10   A.  By -- not just by the prosecution but I was never asked to

11   by Christian or Munish or anybody else.  It wasn't something

12   that -- he wasn't somebody that even they asked me to speak to

13   him about anything.

14   Q.  So Mr. Code had so little to do with what you've been

15   testifying about that no one involved ever asked you to follow

16   up with him?

17               MR. BOONE:  Objection.

18               THE COURT:  Sustained.

19   Q.  It's fair to say you were a part of a number of

20   conversations with Mr. Dawkins, Mr. Sood, and Mr. D'Angelo,

21   right?

22   A.  Yes.

23   Q.  And then the one meeting with Mr. Code, right?

24   A.  Yes.

25   Q.  You would agree with me that there was never any discussion

1   of wanting to defraud any universities?

2   A.  Could you repeat that.

3   Q.  You would agree with me that there was never a discussion

4   of wanting to defraud a university?

5            MR. BOONE:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  Those words directly, no, but.

8            MR. CHANEY:  OK.

9   Q.  Before you met with Mr. Dawkins and Mr. Sood on the yacht

10  on June 6, Mr. Dawkins circulated a list of coaches, did he

11  not?

12  A.  Yes.

13  Q.  And that was a list of coaches to be discussed on the

14  yacht?

15  A.  Yes.

16  Q.  It was a list of what I think you referred to on your

17  direct as his main guys?  Right?

18  A.  That was what he put on the top of the list.

19  Q.  And that would include Mr. Bland, Tony Bland, right?

20  A.  Yes.

21  Q.  Which he called his close, close friend?

22  A.  Yes.

23  Q.  And that would include Mr. Murphy as well, right?  Preston

24  Murphy?

25  A.  Yes.

J4Q9DAW1                          Blazer - Cross

1   Q.   Who he called like his brother?

2   A.   Yes.

3   Q.   Mr. Dawkins also told you that he grew up with all the

4   assistant coaches, right?

5   A.   At one point, yes.

6   Q.   That he had access to all of them?

7   A.   Yes.

8   Q.   Now, Mr. Boone talked to you during your direct examination

9   about which coaches from Christian's list you actually managed

10  to meet up with in Las Vegas.  Do you remember that line of

11  questioning?

12  A.   Yes.

13  Q.   And you answered that from Christian's list you met up with

14  Preston Murphy, right?

15  A.   Yes.

16  Q.   Tony Bland?

17  A.   Yes.

18  Q.   Yasir Rosemond?

19  A.   Yes.

20  Q.   Anthony Coleman?

21  A.   Yes.

22  Q.   And Amir Abdur-Rahim, right?

23  A.   Yes.

24  Q.   And those were guys that Mr. Dawkins had been telling you

25  and Mr. Sood and Mr. D'Angelo about even before Mr. Code was

J4Q9DAW1                         Blazer - Cross

1   involved?

2   A.  Well, those were the coaches that were on the list.

3   Q.  And that list was from before June 6, right?

4   A.  Yes.  Yeah.  Before the meeting on the boat.

5   Q.  Now, you testified already that Mr. Evans, even before that

6   list, was already being paid, right?

7   A.  Yes.

8   Q.  And that Book Richardson accepted money on June 20 in

9   New York but before Mr. Code arrived?

10  A.  Correct.

11  Q.  You also testified that Christian Dawkins decided which

12  coaches to pay and how much to pay?  Right?

13  A.  Yes.

14  Q.  Mr. Blazer, you were charged with committing five federal

15  crimes between 2009 and 2013, right?

16  A.  Yes.

17  Q.  And those -- each of those five charges involved various

18  forms of lying to and stealing from the people around you?

19  A.  Yes.

20  Q.  Now, in September of 2017 you pled guilty to each of those

21  crimes, right?

22  A.  Yes.

23  Q.  Which meant that you appeared in open court, right?

24  A.  Yes.

25  Q.  Swore to tell the truth, right?

J4Q9DAW1                        Blazer - Cross

1    A.  Yes.

2    Q.  And admitted that you committed each one of those crimes?

3    A.  Yes.

4    Q.  The first crime was securities fraud, right?

5    A.  Yes.

6    Q.  Which is a serious felony offense?

7    A.  Yes.

8    Q.  Carries up to 20 years in prison?

9    A.  Yes.

10   Q.  Count Two was wire fraud, right?

11   A.  Yes.

12   Q.  Also a felony offense?

13   A.  Yes.

14   Q.  Count Three was aggravated identity theft, right?

15   A.  Yes.

16   Q.  Also a felony offense?

17   A.  Yes.

18   Q.  Count Four was making false statements to the SEC, right?

19   A.  Yes.

20   Q.  And that's a felony offense?

21   A.  Yes.

22   Q.  Count Five was another count of wire fraud, right?

23   A.  Yes.

24   Q.  Which is also a felony offense?

25   A.  Yes.

1    Q.  You're 49 years old, aren't you, Mr. Blazer?

2    A.  Yes.

3    Q.  You have a family, don't you, Mr. Blazer?

4    A.  Yes.

5    Q.  You have three kids, don't you, Mr. Blazer?

6    A.  Yes.

7    Q.  Now you're looking at 67 years in a federal prison, right?

8    A.  Yes.

9    Q.  And you know there is no early parole in the federal

10   system?

11   A.  Yes.

12   Q.  You were told by the judge that you would have to serve at

13   least 85 percent of your prison sentence?

14   A.  Yes.

15   Q.  And more likely the entire sentence?

16   A.  Yes.

17   Q.  It's fair to say that 49 years old, a 67-year sentence

18   would be a life sentence for you?

19   A.  Yes.

20   Q.  You made an agreement with Mr. Boone, didn't you?

21   A.  I entered into a cooperation agreement with the U.S.

22   Attorney's Office.

23   Q.  And it was Mr. Boone who signed that document, correct?

24   A.  Mr. Boone signed the document.

25   Q.  You went over that agreement with your attorney, didn't

J4Q9DAW1                        Blazer - Cross

1    you?

2    A.   Yes.

3    Q.   And you discussed it in open court with the judge when you

4    pled guilty?

5    A.   I'm not sure that I discussed the cooperation agreement

6    with the -- but I -- I think there was knowledge of a

7    cooperation agreement, yes.

8    Q.   And the agreement was that if you provide substantial

9    assistance, then Mr. Boone would tell your sentencing judge

10   about that assistance, right?

11   A.   Again, the U.S. Attorney's Office would, my understanding

12   was, write a letter on my behalf to the judge just outlining my

13   assistance and then any other crimes or anything that I

14   committed.

15   Q.   And your understanding is that that letter or motion as it

16   is would give the Court authority to impose a sentence lower

17   than the Court would otherwise have permission to impose?

18   A.   That's entirely up to the sentencing judge.

19   Q.   But it would give the judge authority to give you a lower

20   sentence, correct?

21             MR. BOONE:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  It would give the judge information that

24   would be -- my understanding is that it would give the judge

25   information for him to consider a lesser sentence, yes.

1    Q.   Now, your attorney helped you understand this cooperation

2    agreement, correct?

3    A.   Yes.

4    Q.   And he advised you that if the government, if Mr. Boone

5    writes this motion to the Court, the Court shall have authority

6    to impose a sentence below a level established by statute as a

7    minimum sentence to reflect the defendant's substantial

8    assistance in the investigation or prosecution of another

9    person?

10             MR. BOONE:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  Could you read that again, please.

13             MR. CHANEY:  Of course.

14             THE COURT:  Slowly.

15             THE WITNESS:  Slowly.

16   Q.   Your attorney advised you that what Mr. Boone was agreeing

17   to do on your behalf is file a motion which would give the

18   Court permission to impose a sentence below a level established

19   by statute as a minimum sentence to reflect your substantial

20   assistance in the investigation?

21             MR. BOONE:  Objection to what his attorney advised

22   him.

23             MR. CHANEY:  Goes to effect on the listener.

24             THE COURT:  Overruled.

25             THE WITNESS:  If by that you mean that my

J4Q9DAW1                         Blazer - Cross

1   understanding of it was that the U.S. Attorney's Office, if I
2   fulfilled my obligations as part of the cooperation agreement
3   would be to write a letter to the judge detailing my
4   cooperation and any other crimes that I committed, then -- and
5   the judge would take that into consideration, then, yes, that's
6   what I was -- I understood it to be.
7   Q.  Part of your cooperation agreement is giving testimony in
8   this case, correct?
9   A.  Yes.
10  Q.  And part of the evaluation of whether or not you have
11  rendered substantial assistance is your testimony in this case?
12  A.  That's not the way I understand it to be.
13  Q.  OK.  Now, you testified, I think it was on Tuesday, that
14  you hope your cooperation gets you a more lenient sentence,
15  right?
16  A.  Yes.
17  Q.  What you actually hope, Mr. Blazer, is to avoid prison,
18  right?
19  A.  That would be -- that would be great, but.
20  Q.  You're hoping to get probation, right?
21  A.  I'm hoping, yes.
22  Q.  You're hoping that instead of going to prison for 67 years
23  you get probation?
24  A.  That's my hope.
25  Q.  Probation is when you live in your own home, right?

1    A.  Yes.

2    Q.  You spend time with your family and on your own terms,

3    right?

4    A.  Yes.

5    Q.  Now, Mr. Blazer, you've never actually been arrested as

6    part of all the crimes you've committed, right?

7    A.  Correct.

8    Q.  You never had to go into handcuffs and get booked into a

9    jail, right?

10   A.  Correct.

11   Q.  In fact, you were never actually indicted, right?

12   A.  I don't believe so because I pled.

13   Q.  You had foreknowledge that you were going to be indicted

14   and so you went ahead and cooperated, correct?

15   A.  That's when I pled -- if that means I pled guilty, yes.

16   Q.  Now, Mr. Blazer, you can't withdraw your guilty plea, can

17   you?

18   A.  No.

19   Q.  No matter what happens you're going to get sentenced,

20   right?

21   A.  Correct.

22   Q.  And you're going to get sentenced on all five of those

23   charges?

24   A.  Correct.

25   Q.  By contrast, the government is not required to write that

J4Q9DAW1                      Blazer - Cross

1   letter on your behalf, right?

2   A.  That's my understanding.

3   Q.  They haven't done anything to help you out yet, right?

4   A.  That's correct, yes.

5   Q.  So you're still in limbo?

6   A.  I'm still waiting to be sentenced.

7   Q.  And as you said your testimony here is part of that

8   cooperation agreement, right?

9   A.  Yes.

10  Q.  And your understanding is that part of what the

11  government's waiting for is to evaluate what your testimony was

12  in this case?

13  A.  That's not my understanding.  My understanding is that I

14  need to be truthful and testify.  The content or context of my

15  testimony is not -- is not something that's taken into

16  consideration when or if that letter is written.  It's that I'm

17  here and I'm speaking truthfully.  And that's part of the

18  cooperation agreement.  Not what I am saying or the language of

19  what I'm -- what my testimony is.

20  Q.  You would agree with me, Mr. Blazer, that you have lied on

21  a number of occasions to get yourself out of trouble?

22  A.  Yes.  But I'm trying to do better.

23  Q.  You've lied to clients, right?

24  A.  Yes.

25  Q.  You've lied to coworkers, right?

J4Q9DAW1                        Blazer - Cross

1    A.   Yes.

2    Q.   You've lied to the Securities and Exchange Commission,

3    right?

4    A.   Yes.

5    Q.   You lied to the -- well we disagree about whether you lied

6    to the IRS, fair to say?

7            You lied to Mr. Dawkins, right?

8    A.   Yes.

9    Q.   You lied to Mr. Sood?

10   A.   Yes.

11   Q.   You lied to Mr. Code?

12   A.   Yes.

13   Q.   In fact, you testified on Tuesday that while you were

14   truthful with the North Carolina Secretary of State in their

15   investigation you only did so because you didn't feel you had

16   any reason to lie to them.  Do you remember testifying to that?

17   A.   Yes.

18   Q.   Mr. Blazer, it's fair to say that you have a reason today,

19   don't you?

20   A.   I have every reason in the world to tell the truth today,

21   on the contrary.  I have every reason to not lie.  And every

22   reason in the opposite direction to say anything but the truth.

23   Q.   All right.

24            MR. CHANEY:  I don't have any other questions.

25            THE COURT:  Mr. Haney.

J4Q9DAW1                         Blazer - Cross

1                MR. HANEY:  Thank you your Honor.

2       CROSS-EXAMINATION

3       BY MR. HANEY:

4       Q.  Mr. Blazer, you stated and testified numerous times during

5       this trial that during the years of 2010 through 2012 you were,

6       as you called it, misappropriating funds from your clients; is

7       that correct?

8       A.  Yes.

9       Q.  And would you agree with me that that's just a more

10      pleasant way of saying you were stealing your clients' money?

11      A.  I would say that misappropriating was taking their money

12      without their authorization or knowledge.

13      Q.  And that's stealing, isn't it, Mr. Blazer?

14      A.  Yes.

15      Q.  Then why are you trying to make it seem like it's not right

16      now, sir?

17      A.  It's stealing.

18      Q.  And you testified that some of those clients were even

19      retirees, weren't they?

20      A.  No.  Not the ones that I stole from.

21      Q.  So you didn't steal money from NFL clients who were

22      retired?

23      A.  No.  The clients at the time were not -- well I think one

24      of them was out of the league, so.

25      Q.  So you're not really sure, are you, Mr. Blazer?

J4Q9DAW1                          Blazer - Cross

1    A.  No.  I'm sure.

2    Q.  You know what it means to be a retired pro football player?

3    A.  Yes.

4    Q.  You know it means you're not playing anymore, right?

5    A.  Correct.

6    Q.  And that means that you stole money from NFL players who

7    risked their lives every Sunday, didn't you?

8    A.  I'm trying to think if any of the players were retired.

9    Q.  You represented pro football players, didn't you?

10   A.  Yes.

11   Q.  That's your background, isn't it?

12   A.  Part of it, yes.

13   Q.  And you know pro football players every Sunday risk their

14   lives, don't they?

15             MR. BOONE:  Objection.

16             THE COURT:  Sustained.

17   Q.  You're aware of the risks as a former football financial

18   planner that a football player incurs while playing the game of

19   football, don't you?

20   A.  I do.

21   Q.  You know that could include literally dying on the field,

22   couldn't it?

23             MR. BOONE:  Objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  It could.

```
1    Q.  And men that were risking their lives on the field were
2    giving you their money to invest; isn't that right?
3    A.  Yes.
4    Q.  And you were stealing it, weren't you?
5    A.  Yes.  I'm not proud of that.
6    Q.  I didn't ask you if you were proud about it.  I don't care
7    if you are.  I asked you if you stole their money.
8    A.  I did.
9    Q.  And on some occasions you stole life savings, didn't you?
10   A.  I don't believe so, but.
11   Q.  Well you stole over $2.3 million from your clients, didn't
12   you?
13   A.  Yes.
14   Q.  You testified that back around 2010 a business partner was
15   introduced -- introduced you to a movie producer who wanted a
16   script or a movie he wanted to fund, right?  Was that your
17   testimony?
18   A.  Yes.
19   Q.  And that when the producer needed a million dollars to fund
20   his movie project you stole a million dollars of your clients'
21   money to fund that project, didn't you?
22   A.  Yes.
23   Q.  And money that people earned so you could fund two movies;
24   is that right?
25   A.  Yes.
```

J4Q9DAW1                         Blazer - Cross

1    Q.  One movie called Mafia?

2    A.  Yes.

3    Q.  And that was a box office flop, wasn't it, Mr. Blazer?

4    A.  Yes.

5    Q.  A lot of things in your life have flopped, haven't they,

6    Mr. Blazer?

7              MR. BOONE:  Objection.

8              THE COURT:  Sustained.

9    Q.  And then when the client found out that you stole his money

10   to help fund the movie deal he threatened you, didn't he?

11   A.  Yes.

12   Q.  That's what you testified to, correct?

13   A.  Yes.  Yes.

14   Q.  And your solution was to simply steal another client's

15   money to pay him back.  Isn't that what you said?

16   A.  Yes.

17   Q.  And then you noted on direct examination that you did the

18   same thing with the music project, correct?

19   A.  Yes.

20   Q.  You stole another client's investment money to fund a music

21   project, right?

22   A.  It was the same client that I moved money to the client who

23   was upset.  It was the same client.

24   Q.  And as all this was transpiring at some point the SEC

25   intervened and investigated you, didn't they?

J4Q9DAW1                           Blazer - Cross

1    A.  Yes.

2    Q.  And you know the SEC to be the Securities and Exchange

3    Commission?

4    A.  Correct.

5    Q.  You hesitated.  You're a former certified financial

6    planner, right?

7    A.  I knew it was the Securities and Exchange Commission.

8    Q.  These are not trick questions.

9        The SEC is a federal regulatory body that investigates

10   matters, including questionable securities transactions, would

11   you agree?

12   A.  I would agree.

13   Q.  And when the SEC investigated you and your involvement in

14   these matters you even lied to them too, didn't you?

15   A.  I did, yes.

16   Q.  Lied to a federal regulatory agency, correct?

17   A.  Yes.

18   Q.  And you lied to the SEC so you could stay out of trouble;

19   isn't that right?

20   A.  Yes.

21   Q.  But even worse than that, Mr. Blazer, you falsified

22   documents to the SEC, didn't you?

23   A.  Yes.

24   Q.  And then some innocent woman who worked for your business

25   partner, Munish Sood, you had her submit those falsified

J4Q9DAW1                          Blazer - Cross

1   records to the SEC, didn't you?

2   A.  Yes.

3   Q.  Exposing her to potential criminal penalties because of

4   your dishonesty; isn't that right?

5   A.  Yes.

6   Q.  Would you agree that many of your former professional

7   athlete clients were from a disadvantaged background?

8   A.  I would.

9   Q.  Many of them minorities, who were first generation wealth,

10  weren't they?

11  A.  Yes.

12          MR. BOONE:  Objection.

13          THE COURT:  Overruled.

14  Q.  Do you understand what that means?  Would you agree that

15  many of your clients were minorities who were first generation

16  wealth?

17  A.  Yes.

18  Q.  People whose entire family legacy and future generations

19  trusted you to protect?  Right?

20          MR. BOONE:  Objection.

21          THE COURT:  Sustained.

22  Q.  You understand that many of these clients of yours that

23  were first generation wealth were trusting you with their

24  money?

25  A.  Yes.

J4Q9DAW1                          Blazer - Cross

1    Q.   But you didn't care, did you?

2    A.   No.

3    Q.   In fact, one former NFL player, Kevan Barlow he accused of

4    stealing his money too, didn't he?

5    A.   He didn't accuse me of stealing his money, no.

6    Q.   You were sued, weren't you?

7    A.   Yes.

8    Q.   And Kevan Barlow sought $4 million of compensatory damages,

9    didn't he?

10   A.   Yes.

11   Q.   And $12 million in punitive damages against you for

12   stealing his money too, right?

13   A.   Not for stealing his money, no.

14   Q.   For doing what, then?  What would you call it?

15   Misappropriating it?

16   A.   It was mismanaging is what the claim was.

17   Q.   So you call it mismanaging.  When I say it is stealing, you

18   don't agree?  Is that your testimony?

19   A.   I don't agree.  No.

20   Q.   Then on another occasion in 2000 and 2014 you were sued by

21   a New Jersey bank for defaulting on loans you secured on behalf

22   of former college basketball players; is that right?

23   A.   I don't recall.

24   Q.   Well do you recall pleading guilty to securities fraud in

25   2017?

J4Q9DAW1                          Blazer - Cross

1    A.  Yes.

2    Q.  Do you recall pleading guilty to wire fraud in 2017?

3    A.  Yes.

4    Q.  Do you recall pleading to aggravated identity theft in

5    2017?

6    A.  Yes.

7    Q.  And you understand aggravated identity theft carries a

8    two-year mandatory minimum prison term, don't you?

9    A.  I do.

10   Q.  You've been told that, haven't you?

11   A.  Yes.

12   Q.  You're going to prison, aren't you, Mr. Blazer?

13   A.  That I don't know.

14   Q.  Mr. Blazer, would you agree with me that you have a history

15   of being a morally corrupt individual?

16          MR. BOONE:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  I have a history of doing some things

19   that I'm not proud of.  Yes.

20   Q.  You know what it means to be morally corrupt?

21   A.  Yes.

22   Q.  Wouldn't you agree that stealing people's money is a

23   morally corrupt thing to do?

24   A.  It is.

25   Q.  Mr. Blazer, with your background of lying, stealing, and

J4Q9DAW1                        Blazer - Cross

1   being dishonest, can you give one reason why anybody would

2   believe anything you say?

3            MR. BOONE:  Objection.

4            THE COURT:  Sustained.

5   Q.  Well, let me ask you this, Mr. Blazer, would you agree with

6   me that people who steal money are thieves?

7   A.  Yes.

8   Q.  So you are a thief, aren't you?

9   A.  Yes.

10  Q.  And you didn't just steal money one time from a client, did

11  you?

12  A.  No.

13  Q.  You stole money on numerous occasions from your clients,

14  right?

15  A.  Correct.

16  Q.  Have you ever heard the word habitual before?

17  A.  Yes.

18  Q.  Would you agree with me that the word habitual means you

19  have a habit of doing things?

20  A.  Yes.

21  Q.  Over and over?

22  A.  Yes.

23  Q.  So you weren't just a thief?  You're a habitual thief,

24  aren't you, Mr. Blazer?

25  A.  Yes.

J4Q9DAW1                          Blazer - Cross

1    Q.  Because you steal over and over, right?

2    A.  Yes.

3    Q.  Would you agree that stealing $2 million of your clients'

4    money is not an honest thing to do?

5    A.  I would agree.

6    Q.  Would you agree that most people don't even make $2 million

7    in their entire lifetimes?

8    A.  I would agree.

9    Q.  And isn't it true as you're sitting here today had you not

10   been caught you'd still be stealing people's money, wouldn't

11   you?

12   A.  I don't believe I would still be stealing people's money

13   but I was caught and I knew it was over.

14   Q.  You're sorry about getting caught, aren't you?

15   A.  No.  I'm not sorry about getting caught.  I'm not.

16   Q.  Now, you provided days of testimony as to your involvement

17   in the sports management world, correct?

18   A.  Yes.

19   Q.  And you were very familiar with what it takes to sign a

20   client in the sports management space?  Is that a fair

21   statement?

22   A.  Yes.

23   Q.  And at one time you had over 21 clients who were

24   professional athletes that you represented, right?

25   A.  Yes.

J4Q9DAW1                              Blazer - Cross

1    Q.  And managed over $15 million of their money?  Is that an
2    accurate estimate?
3    A.  It's an accurate estimate, yes.
4    Q.  And you testified on direct that you used to work
5    frequently with licensed player agents; is that correct?
6    A.  Yes.
7    Q.  In the process of you recruiting your financial planning
8    clients?  Fair to say?
9    A.  Yes.
10   Q.  And that on occasion with your role as a financial planner
11   you would assist the licensed player agent in the recruiting
12   efforts?  Isn't that right?
13   A.  We would work in sort of a parallel fashion.  He would --
14   you know the agent would work the representation and I would
15   work the financial side of things.  Never really together but
16   more of parallel fashion.
17   Q.  That's what I said.  You'd work in tandem often with
18   licensed player agents to the benefit of both of you, correct?
19   A.  Correct.
20   Q.  And you would assist, for instance, by perhaps getting a
21   credit line or establishing a banking relation for a future
22   client, right?
23   A.  In certain cases, yes.
24   Q.  And you'd work in tandem with these licensed NBA player
25   agents and NFL guys, correct?

J4Q9DAW1                         Blazer - Cross

1   A.  It was NFL primarily, yes.

2   Q.  Isn't it true that in all your years in the sports

3   management business you knew very well of the competitive

4   nature of that business?

5   A.  Yes.  Very competitive.

6   Q.  Because you were in the business for decades?  Fair to say?

7   A.  A decade or so, yes.

8   Q.  And during that time that you were in that business you

9   were aware that numerous agents in sports management companies

10  have long engaged in illegal recruiting of future clients,

11  agreed?

12          MR. BOONE:  Objection.

13          THE COURT:  Overruled.

14  A.  Could you repeat that, please.

15  Q.  Yes.  You're aware that in all your decades or your decade

16  in the business that agents in sports management companies

17  would engage in illegal recruiting efforts, correct?

18  A.  I was aware of that, yes.

19  Q.  And more specifically break NCAA rules during the

20  recruiting process, correct?

21  A.  Yes.

22  Q.  Would it be fair for me to say that in your experience most

23  of the top agents and agencies would cheat?

24          MR. BOONE:  Objection.

25          THE COURT:  Sustained.

J4Q9DAW1                        Blazer - Cross

1    Q.  Were you aware that many agents and sports management

2    companies would make payments to people they shouldn't?  You've

3    testified to that, correct?

4              MR. BOONE:  Objection.

5              THE COURT:  Sustained.

6    Q.  Mr. Blazer, you've testified that NFL agents and NBA agents

7    would pay family members of future clients; isn't that right?

8              MR. BOONE:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11   Q.  And, in fact, you testified that you engaged in that same

12   rule breaking, didn't you?

13   A.  Yes.

14   Q.  That you too on occasion would pay student athletes and

15   their families, right?

16   A.  Yes.

17   Q.  And you also testified that when recruiting a potential

18   client it's very important to establish a relationship with

19   them and their families early on, as you've said, correct?

20   A.  Yes.

21   Q.  And you stated on your direct examination as early as high

22   school or when they are in what you called the grassroots AAU;

23   is that right?

24   A.  Could you repeat that.

25   Q.  Yes.  You testified that including establishing this early

J4Q9DAW1                        Blazer - Cross

1   relationship was when they were in high school or when they

2   were in the grassroots programs like AAU, correct?

3   A.  Yes.

4   Q.  And you also testified it was your understanding that AAU

5   loosely meant travel basketball teams that high school kids

6   play on; is that correct?

7   A.  Grassroots not the -- not just the AAU.  Grassroots

8   basketball.

9   Q.  So you don't know that grassroots and AAU basketball are

10  synonomous, Mr. Blazer?

11  A.  I was educated that they're not synonomous.  AAU is just

12  one area of grassroots basketball.

13  Q.  You do agree that AAU is a generic form of a name that's

14  used for grassroots basketball, Mr. Blazer?

15  A.  Sure.

16  Q.  And these teams that you've testified have been sponsored

17  by shoe apparel companies like Adidas, Nike, and Under Armour,

18  correct?

19  A.  Yes.

20  Q.  And as you've testified on direct examination establishing

21  the relationship before these kids get to college is extremely

22  important, right?

23  A.  Yes.

24  Q.  And you've also testified that establishing those

25  relationships early on with basketball players is especially

J4Q9DAW1                         Blazer - Cross

1   important because they are what you called one-and-dones; is

2   that right?

3   A.  Yes.

4   Q.  So as you said on your direct testimony it's more important

5   to get to the basketball prospects earlier than NFL prospects,

6   would you agree?

7           MR. BOONE:  Objection.

8           THE COURT:  Overruled.

9           THE WITNESS:  That was my testimony as it related to

10  what I was doing, cooperating.

11  Q.  And that was your testimony, correct, yes or no?

12  A.  Yes.

13  Q.  Because, as you've testified on direct examination, the NFL

14  players are required to stay in school or college three years

15  out of high school; isn't that right?

16  A.  Yes.  NFL college players had to stay in school longer than

17  basketball was my understanding.

18  Q.  Mr. Blazer, you're familiar with NFL rules, with all your

19  years of working with NFL players, right, with respect to how

20  long they've got to stay in college, correct?

21  A.  Yes.

22  Q.  You know they can't come out one and done, the football

23  prospects, right?

24  A.  Correct.

25  Q.  You also testified on direct that the one-and-dones were

J4Q9DAW1                         Blazer - Cross

1   the elite college basketball players that left after one year

2   of college, correct?

3   A.  Yes.

4   Q.  But you would agree with me that it's not really one and

5   done because the elite players are really leaving school as

6   soon as the college basketball season is over, right?

7   A.  Could you ask that again, please.

8   Q.  Well you testified to what a one and done was and you gave

9   the jury your understanding of what that meant.  Do you

10  remember that?

11  A.  Yes.

12  Q.  And you'd agree with me that one and done isn't really one

13  and done because the elite players that are going into the NBA

14  draft, they're leaving school as soon as the basketball season

15  is over; isn't that right?

16              MR. BOONE:  Objection.  Relevance.

17              THE COURT:  Overruled.

18              THE WITNESS:  What my understanding was and what I

19  meant --

20              MR. HANEY:  Your Honor, I asked him a very direct

21  question -- you know, I'm trying to move through this, your

22  Honor.

23              THE COURT:  Can you answer the question that Mr. Haney

24  asked?

25              THE WITNESS:  Could you ask it again, please.

J4Q9DAW1                          Blazer - Cross

1    Q.  Yes.  You would agree with me, yes or no, that the elite

2    level NBA prospects leave school as soon as the college

3    basketball season is over?  You know that, don't you?  To get

4    ready for the NBA draft?

5    A.  I would assume some do, yes.

6    Q.  Thank you.

7         So you know it's not really one and done?  They're

8    only on campus for a couple of months, right?

9    A.  I take that to mean one season of basketball.

10   Q.  I'm not asking you what you took it to mean.  You just

11   testified that they leave at the end of basketball season,

12   correct?

13   A.  Yes.

14        MR. BOONE:  Objection.

15   Q.  And you know the basketball season is over in some

16   instances as soon as the end of February if they don't go to

17   the tournament, right?

18   A.  Yes.

19   Q.  So you know the college basketball player may only be on

20   campus from say July to February which is a few months,

21   correct?

22        MR. BOONE:  Objection.  Relevance.

23        THE COURT:  Sustained.

24   Q.  Fair to say, Mr. Blazer, that you know that the college

25   basketball players are on campus far less than the elite level

J4Q9DAW1                        Blazer - Cross

1  football players, agreed?

2           MR. BOONE:  Objection, relevance.

3           THE COURT:  Sustained.

4  Q.  You understand that the football players have more time to

5  interact with the college coaches on campus than the basketball

6  players, correct?

7  A.  On the college campus, if they are one and done, yes, they

8  are on campus less than -- typically less than the football

9  players.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4QHDaw2                            Blazer - Cross

 1  BY MR. HANEY:
 2  Q.  And therefore would have less time to interact with their
 3  coaching staff, fair to say?
 4  A.  On the college campuses, yes.
 5  Q.  That would include the assistant coaches, wouldn't it?
 6  A.  Yes.
 7  Q.  You know this having recruited athletes for several years,
 8  don't you?  You have person knowledge of this, correct?
 9  A.  Not up until recently the basketball side, but I know
10  football, and football was the players were on the college
11  campuses typically for a few years.
12  Q.  Because they had to be there for a few years, didn't they?
13  It was required by the NFL rule, right?
14  A.  Yes.
15  Q.  And you knew that as an NFL financial planner, correct?
16  A.  Yes.
17  Q.  Because you had to get certified by the league office to be
18  a financial planner by the NFL, didn't you?
19  A.  Yes, by the players association.
20  Q.  So you're aware of all these rules I'm talking about,
21  correct?
22  A.  I'm aware of the football rule, yes.
23  Q.  You also testified you're aware of the basketball rule
24  where they can leave before one year, isn't that right?
25  A.  Yes.

J4QHDaw2                          Blazer - Cross

1    Q.  And you recruited NFL prospects at primarily high major

2    Division I schools, isn't that right?

3    A.  Yes.

4    Q.  Explain to the jury what a high major school is.

5    A.  It's more of a higher Division I school, Division I college

6    program that's sort of -- has a good football program or

7    basketball program.

8    Q.  And those are the type of players you recruited, correct?

9    A.  Yes, I recruited --

10   Q.  Top five schools, fair to say?

11   A.  Some of those, yes.

12   Q.  Players that were hopefully going to be high draft picks,

13   right?

14   A.  Correct.

15   Q.  You weren't recruiting any football players from the MAC

16   Conference, were you?

17   A.  If they were good, then, yes, but it depended on who the

18   player -- who the player was.

19   Q.  So we established from your testimony that you agree that

20   NFL draft prospects would be on campus years longer necessarily

21   than the NBA one-and-done prospect, right?

22   A.  Yes.

23   Q.  So these football players would have more opportunities to

24   share meals with their coaches, correct?

25              MR. BOONE:  Objections.

J4QHDaw2                              Blazer - Cross

1                 THE COURT:  Sustained.

2                 MR. HANEY:  Your Honor, I have a direct line of

3      questioning that relates.  May I be heard?

4                 THE COURT:  OK.

5                 MR. HANEY:  To his prior testimony.

6                 (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4QHDaw2                         Blazer - Cross

1          (At sidebar)

2          MR. HANEY:  Very simply, this goes to the whole theory

3    of the government case that the coaches had influence on the

4    kids.  He testified on direct examination he never once paid a

5    college football assistant coach money, which would be curious

6    since they would have far more influence on the players, in

7    theory, because they're around them for years longer.  So I

8    believe it's relevant to that point.  I can get through it

9    pretty quickly.

10         THE COURT:  The point is made as far as I'm concerned.

11         MR. HANEY:  The jury isn't aware of that, Your Honor.

12   I'm going to follow this up with, "You never once paid an

13   assistant coach at a college to get an NFL client," which goes

14   against the entire theory of the government case that if the

15   kids were there for three years, they would have been around

16   these coaches, sharing meals, traveling on road trips, after

17   engaging in perhaps personal conversation.  And he never, this

18   guy, right, who cheats, never thought it was worthy to pay a

19   football coach any money.

20         MR. BOONE:  Your Honor --

21         MR. HANEY:  That goes against the whole government

22   theory of this case of coaching influencing kids.  And it's a

23   big part of our defense, and I'm not going to spend a lot of

24   time on it.

25         THE COURT:  Mr. Boone.

J4QHDaw2                    Blazer - Cross

1          MR. BOONE:  Yes, your Honor, just briefly.  Our case
2     is not about whether college football coaches have influence on
3     players.  Obviously, it's about college basketball.  He has no
4     personal knowledge, frankly, of what influence, if any, college
5     basketball coaches have on their players.  He was simply
6     following directions of Dawkins and Code on that subject matter
7     and recording conversations.  He's testified he doesn't even
8     watch basketball.  So he's not going to be able to say one way
9     or the other what influence college basketball coaches have on
10    their players.  That, frankly, wasn't his concern.  He learned
11    that and was educated by Dawkins and Code.
12          MR. HANEY:  Your Honor, it's my strong belief that
13    this has already been presented to the jury in their opening
14    statement that the theory is that the assistant coaches could
15    influence these kids who were barely on campus to even get to
16    know the assistant coaches names.  So that point is highly
17    relevant, especially when you have a guy like this, a notorious
18    cheat who never thought it was worthy enough to pay a college
19    football coach.
20          MR. BOONE:  But the question is does he have personal
21    knowledge to answer that question?
22          MR. HANEY:  I think he does.
23          MR. BOONE:  He doesn't have personal knowledge.
24          MR. HANEY:  I think he spent a lot of time --
25          THE COURT:  The questions that you've asked,

J4QHDaw2                        Blazer - Cross

1   Mr. Haney, and the answers that you've gotten is that football

2   players are on campus for at least three years and, therefore,

3   have a greater opportunity to establish relationships with

4   their assistant coaches.  That point has already been made,

5   so --

6              MR. HANEY:  I wanted to follow up with a couple

7   questions.

8              THE COURT:  You can ask a couple questions, but you

9   can also right now ask the question, the ultimate question,

10  that you indicated you wanted to ask.  But I'll give you a

11  little bit of leeway.

12             MR. HANEY:  I was going to in two seconds.  I was

13  almost there, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J4QHDaw2                          Blazer - Cross

1              (In open court; jury present)

2              THE COURT:  Mr. Haney, you may proceed.

3              MR. HANEY:  Thank you, your Honor.

4    Q.  So, Mr. Blazer, you would agree with me, then, if a coach

5    has years more time to be around a student athlete, he would be

6    better positioned to influence that student athlete in such

7    decisions as who to hire as an agent or financial planner;

8    would you agree with that?

9    A.  Overall --

10   Q.  Would you agree?  That's a pretty simple question to

11   answer, Mr. Blazer.

12   A.  No, I would agree that it's not a simple question to

13   answer.

14   Q.  So if you spent three years with somebody, you don't

15   believe that somebody may have greater influence over you than

16   somebody you've barely been around for a couple months,

17   Mr. Blazer?

18             MR. BOONE:  Objection.

19             THE COURT:  Overruled.

20   A.  To me it would depend on the nature of the relationship.

21   Q.  Because you're answering this question the way the

22   government wants you to answer this obvious question, aren't

23   you, Mr. Blazer?

24             MR. BOONE:  Objection.

25             THE COURT:  Sustained.

J4QHDaw2                          Blazer - Cross

1   Q.  So, Mr. Blazer, let me ask you this question:  In all the

2   years you recruited NFL draft prospects, you testified you

3   never once paid an assistant coach at a university to influence

4   a college athlete to sign with you, didn't you?

5   A.  That's correct.

6   Q.  Not one time?

7   A.  Not one time.

8   Q.  You also know, because you've testified to this fact, that

9   by the time the top professional basketball prospects are on

10  campus, sports agencies have already built relationships with

11  them, haven't they?

12  A.  No, not all the time, no.

13  Q.  I didn't say all the time.  Was that your testimony or not,

14  sir?

15  A.  Ask that again, please.

16  Q.  By the time the college basketball prospects get on campus,

17  sports agencies have already built relationships with many of

18  these players, correct?

19  A.  My answer to that is not all the time.

20  Q.  I didn't say all the time.  I said many of the times that

21  happens, doesn't it?

22  A.  Many times, yes.

23  Q.  Agents and financial planners, right?

24  A.  As well, yes.

25  Q.  Guys like what you used to do, correct?

1  A.  Correct.

2  Q.  Then on numerous occasions, you would pay college athletes

3  and their parents to break the NCAA rules, right?

4  A.  Yes.

5  Q.  And you did so for the purpose of trying to get them to

6  sign with you as a financial planner in the future, isn't that

7  right?

8  A.  Correct.

9  Q.  So you had no problem breaking the rules to try to

10  influence a college athlete and family to one day sign a

11  financial planning agreement with you.  Is that a correct

12  statement?

13  A.  That's correct.

14  Q.  But in all those years of this competitive sports

15  management space, as you've noted, you've never paid a college

16  coach because you knew that would be a waste of money, isn't

17  that right, Mr. Blazer?

18          MR. BOONE:  Objection.

19          THE COURT:  Sustained.

20          There's no question before you.

21          THE WITNESS:  I know.  I wasn't going to answer.

22  Q.  Mr. Blazer, you testified you're familiar with what the

23  term "runner" is, correct?

24  A.  Yes.

25  Q.  And you know that a runner is an individual who works under

J4QHDaw2                           Blazer - Cross

1   the direction of a licensed player agent, whether NFL or NBA,

2   correct?

3   A.  Yes.

4   Q.  And you know that licensed agents in both the NBA and NFL

5   employ runners to do their dirty work; would you agree with

6   that?

7   A.  Some agents do their own dirty work.

8   Q.  Some hire runners to do their own dirty work, don't they?

9   A.  Yes.

10  Q.  By "dirty work," you know I mean to make illicit payments

11  to a student athlete and their families, isn't that right?

12  A.  Yes.

13  Q.  Isn't it true that certified player agents, whether NFL or

14  NBA, often would select younger men to act as runners so they

15  can blend in better on the campuses, isn't that right?

16          MR. BOONE:  Objection.

17          THE COURT:  Overruled.

18  A.  Yes.  It depended on the situation.  Some were young and

19  some were not so young.

20  Q.  My question to you is, isn't it true that certified player

21  agents would often select younger men to act as runners so they

22  can blend in better on a college campus?  Is this foreign to

23  you?  You know this is true, don't you?

24          MR. BOONE:  Objection.

25          THE COURT:  Overruled.

J4QHDaw2                         Blazer - Cross

1    A.  Often they would ask young men, yes.

2    Q.  Would you also agree often they would particularly ask

3    young African men -- African-American men to make these illicit

4    payments to their student athletes and their families?

5              MR. BOONE:  Objection.

6              THE COURT:  Overruled.

7    A.  Often, yes.

8    Q.  Isn't it true the vast majority of the elite level American

9    basketball talent is African American, born in America,

10   correct?

11             MR. BOONE:  Objection.

12             THE COURT:  Sustained.

13   Q.  So this concept of hiring young kids or young men to be

14   runners is not a foreign concept to you, is it?

15   A.  It's not a foreign concept, no.

16   Q.  Wouldn't you agree that one of the reasons that the

17   certified agents would have their runners make these illicit

18   payments was so the agents would not get caught making those

19   payments, isn't that right, one of the reasons?

20             MR. BOONE:  Objection.

21             THE COURT:  Overruled.

22   A.  One of the reasons.

23   Q.  If the runners got caught making the illicit payments, the

24   agent could avoid the potential consequences of those payments,

25   correct, in your experience in the industry?

J4QHDaw2                       Blazer - Cross

1    A.  It depended on who the runner worked for and what that

2    relationship was like.

3    Q.  I'm asking you in your general sense of the business of

4    sports, which you've clearly told the jury you have vast

5    knowledge of, would you agree that if runners got caught making

6    illicit payments, the agents could avoid the consequences of

7    those payments, yes or no?

8                MR. BOONE:  Objection.

9                THE COURT:  Overruled.

10   A.  The agents wouldn't necessarily be responsible for those

11   payments, no.

12   Q.  Thank you.

13               Consequences like player association investigations,

14   right?

15   A.  I've known cases where agents were --

16   Q.  I didn't ask you that, sir.

17               Are you familiar with what a player association

18   investigation is?

19   A.  Yes.

20   Q.  Are you familiar with what an NCAA investigation is?

21   A.  Yes.

22   Q.  Would you agree that one of the reasons the certified agent

23   would send a runner, a young man, on the campus would be to

24   avoid those types of investigations?

25   A.  That would be a reason to do that.

J4QHDaw2                          Blazer - Cross

1   Q.  Thank you.

2           Or apparently, as we see now, getting set up by FBI

3   stings by guys like you too, right?

4   A.  I don't understand.

5           MR. BOONE:  Objection.

6           THE COURT:  Rephrase the question, Mr. Haney.

7   Q.  Or apparently, as we see now, getting set up by the FBI in

8   sting operations like this one, correct?

9           MR. BOONE:  Objection.

10          THE COURT:  Sustained.

11  Q.  You'd agree with me, Mr. Blazer, that runners are often

12  used by licensed agents to be the fall guys?  Yes or no?

13          MR. BOONE:  Objection.

14          THE COURT:  Sustained.

15  Q.  Now, you've testified that Christian Dawkins was allegedly

16  making payments to Lamont Evans back in and around 2015 to

17  2016, correct?

18  A.  Yes.

19  Q.  You also testified that he did so, to your belief at least,

20  when he worked for the super agent Andy Miller, isn't that

21  right?

22  A.  Yes, when he worked for Andy Miller Sports.

23  Q.  And you do understand that Christian Dawkins is in this

24  courtroom on federal trial in part for allegedly paying cash

25  bribes to Lamont Evans, isn't that correct?

J4QHDaw2                         Blazer - Cross

1    A.  Yes.

2    Q.  For which you are now testifying against him, isn't that

3    right?

4    A.  Correct.

5    Q.  Would you also agree that Christian Dawkins is sitting

6    there and not Andy Miller, yes or no?

7              MR. BOONE:  Objection.

8              THE COURT:  Sustained.

9    Q.  Would you consider Christian Dawkins to be a fall guy for

10   Andy Miller?

11             MR. BOONE:  Objection.

12             THE COURT:  Sustained.

13   Q.  Let me ask you this, Mr. Blazer:  You knew, undeniably,

14   that Andy Miller was one of the most powerful agents in the

15   NBA, didn't you?

16             MR. BOONE:  Objection.

17             THE COURT:  Sustained.

18   Q.  Did you have a familiarity with Andy Miller's standing in

19   the sports world?

20   A.  Only from what Christian had talked to me about.  I didn't

21   know Andy Miller Sports prior to meeting Christian and

22   Christian educating me on where Andy Miller was in relation to

23   Bill Duffy.  I knew who Bill Duffy was, but I did not know who

24   Andy Miller was.

25   Q.  You do now, don't you?

J4QHDaw2                         Blazer - Cross

1    A.  I do now.

2    Q.  And you undeniably know Andy Miller was one of the most

3    powerful agents in basketball, correct?

4    A.  I know that now, yes.

5    Q.  So why didn't you help the government go after Andy Miller

6    instead of his runner, Christian Dawkins?

7            MR. BOONE:  Objection.

8            THE COURT:  Sustained.

9    Q.  Isn't it true when you first met Christian Dawkins, he was

10   in his early 20s?

11           MR. BOONE:  Objection.  Relevance.

12           THE COURT:  Overruled.

13   A.  I wasn't sure how old Christian was.

14   Q.  Would it be fair to say that you believed he was in his

15   early 20s?

16           MR. BOONE:  Objection.

17           THE COURT:  Overruled.

18   A.  I actually thought he was in his late 20s.

19   Q.  And, again, you've testified you knew he was a runner for

20   NBA agent Andy Miller, isn't that right?

21   A.  I didn't hear the question.  I'm sorry.

22   Q.  Isn't it true you knew he was a runner for NBA agent Andy

23   Miller, correct?

24   A.  Initially, I didn't know he was a runner for Andy Miller.

25   I found that out in May of 2017.  I wasn't aware -- I thought

1    he was a registered licensed agent with Andy.

2    Q.  But you know now he wasn't, correct?

3    A.  I know now he wasn't.

4    Q.  And you knew he wasn't back in 2016 when you allege he was

5    making payments to Lamont Evans, correct?

6    A.  No, I found out.

7    Q.  I'm asking what you know now, sir.  Do you know now that he

8    wasn't?

9    A.  Yes, I know now that he was not.

10   Q.  And you know now that ASM was one of the largest sports

11   agencies in professional basketball, correct?

12            MR. BOONE:  Objection.

13            THE COURT:  Sustained.

14   Q.  Mr. Blazer, you testified on direct examination that you

15   knew ASM was one of the most prominent agencies in basketball,

16   did you not?

17   A.  Yes, I was to find that out later, yes.

18   Q.  When you first met Christian Dawkins, he seemed very proud

19   of the accomplishments at ASM, didn't he?

20   A.  Yes.

21   Q.  In fact, there were wiretap phone conversations with

22   Christian Dawkins telling you how ASM is one of the top

23   agencies in all of professional basketball, right?

24   A.  Yes, and that he was trying to get them to --

25   Q.  That's not what I asked you, Mr. Blazer.

1              There were wiretap phone calls where Christian Dawkins

2    is telling you ASM is one of the top agencies in basketball,

3    yes or no?

4    A.  Yes.

5    Q.  And even boasted to you about all the players his boss,

6    Andy Miller, had in the draft, didn't he?

7    A.  He didn't say Andy Miller had them in the draft.

8    Q.  He said ASM had them in the draft, correct?

9    A.  He said he had them in the draft.

10   Q.  Fair to say he seemed to be proud to be employed by ASM?

11             MR. BOONE:  Objection.

12             THE COURT:  Overruled.

13   A.  Yes.

14   Q.  And you know now that Christian Dawkins was nothing other

15   than an employee for ASM, isn't that right?

16   A.  I know that now, yes.

17   Q.  You also, as you've testified, came to a point where you

18   understood that Christian Dawkins was not a licensed NBA player

19   agent, correct?

20   A.  Yes.

21   Q.  That he was simply recruiting NBA basketball players for

22   his bosses at ASM, isn't that right?

23   A.  Yes, he was not a licensed agent.

24   Q.  And you know now, as you sit here today, that his boss was

25   Andy Miller, correct?

J4QHDaw2                         Blazer - Cross

1    A.  Correct.

2    Q.  And you know Andy Miller, as you sit here today, must be a

3    multimillionaire, right?

4              MR. BOONE:  Objection.

5              THE COURT:  Sustained.

6    Q.  But you did testify that you knew Andy Miller to be an

7    agent who had a history of breaking NBA rules, didn't you?

8              MR. BOONE:  Objection.

9              THE COURT:  Overruled.

10   A.  Could you repeat that, please.

11   Q.  You've testified during this trial that you have personal

12   knowledge, as you sit here today, that Andy Miller was an NBA

13   agent who had a reputation of breaking the rules, didn't you?

14   A.  Yes.

15   Q.  You also know, with all your experience in the business,

16   that a student athlete cannot sign a player-agent contract with

17   a runner, right?

18   A.  Correct.

19   Q.  And that any player-agent contract would have to be signed

20   with a licensed player agent, fair to say?

21             MR. BOONE:  Objection.

22             THE COURT:  Overruled.

23   A.  Could you repeat that, please.

24   Q.  Any player-agent contract that would be signed would

25   necessarily have to be signed with a licensed player agent,

J4QHDaw2                          Blazer - Cross

1   correct, not a runner?

2   A.   Yes.

3   Q.   Like a licensed NBA player agent, would you agree?

4   A.   Yes.

5   Q.   So when you've testified, as we've heard for three days

6   now, that when Christian Dawkins was trying to get players to

7   sign with him, you really meant with Andy Miller, didn't you?

8             MR. BOONE:  Objection.

9             THE COURT:  Sustained.

10  Q.   You know that no players could have signed player-agent

11  contracts with Christian Dawkins, right?

12            MR. BOONE:  Objection.

13            THE COURT:  Overruled.

14  A.   I didn't know that at the time.

15  Q.   I'm asking you what you know now, sir.

16  A.   I know that now, being that --

17  Q.   Because they couldn't because he was a runner, correct?

18  A.   I know that now.

19  Q.   And if he was running for Andy Miller, they would have had

20  to sign with Andy Miller, yes or no?

21  A.   I know that now.

22  Q.   Did you know that while you were doing your federal

23  investigation?

24  A.   Not until May of 2017 when I found out that Christian was

25  not an agent.

J4QHDaw2                        Blazer - Cross

1   Q.  So that's a no, then, correct?

2           Let me ask you this question, Mr. Blazer:  You know

3   now, as you sit here, it would have been factually impossible

4   for any NBA or future NBA player to sign an agent contract with

5   Christian Dawkins, yes or no?

6   A.  Unless Christian was an agent, he was not --

7   Q.  But he's not an agent, and you know that?

8           THE COURT:  Can you stop stepping on his answer.

9           MR. HANEY:  I'm sorry, your Honor.  I'm just trying to

10  get him to answer a simple question.  I apologize, your Honor.

11          MR. BOONE:  Objection.

12          MR. HANEY:  I'll ask the question one more time and

13  move forward, your Honor.

14  Q.  Mr. Blazer, you know, as you sit here today, it was

15  factually impossible for that young man ever to sign a prospect

16  to an NBA agent contract, yes or no?

17  A.  Today I know that he couldn't sign -- he couldn't sign a

18  player because he was not an agent.

19  Q.  Thank you.

20          And you know that beyond any doubt, don't you?

21          MR. BOONE:  Objection.

22          THE COURT:  Sustained.

23  Q.  Let me ask you this, Mr. Blazer:  If Christian Dawkins

24  could have never signed any future NBA basketball players to

25  player-agent contracts, then you agree he could have never

J4QHDaw2                          Blazer - Cross

1   directly benefited financially from the NBA contracts either,

2   right?

3               MR. BOONE:  Objection.

4               THE COURT:  Sustained.

5   Q.  Mr. Blazer, during the course of this trial, you've been

6   asked numerous times to tell the jury what Christian Dawkins

7   understood, is that right?

8   A.  I don't believe so.

9   Q.  You have not -- so you disagree with me for the last three

10  days you have not been asked the question:  Mr. Blazer, what

11  did you understand Christian Dawkins to have meant by that?

12  Are you telling this jury right now that hasn't happened for

13  three days?

14  A.  I'm not sure that I was asked what Christian Dawkins

15  understood something to be.  I think it was more what I

16  understood something to be.

17  Q.  Just so we're clear, that's a no, then?  Your testimony is

18  for the last three days, you haven't been asked repeatedly:

19  Mr. Blazer, what did Mr. Dawkins mean?  What did you understand

20  he meant when he said that?  You're telling the jury for three

21  days you have spent that time and they didn't hear that?

22  A.  If you're asking if I -- if I was asked what my

23  understanding of what was being said or what was going on while

24  we were in a meeting or on a call, then the answer to that is

25  yes, but it was my understanding of what was going on being

1   said.

2   Q.  It was your understanding of what Christian Dawkins meant

3   by certain things and certain exhibits that he had shown you

4   during that investigation, right?

5              MR. BOONE:  Objection.

6              THE COURT:  Sustained.

7   Q.  Would you agree with me you do not have the ability to read

8   my client's mind, Mr. Blazer?

9              MR. BOONE:  Objection.

10             THE COURT:  Sustained.

11  Q.  Would you agree with me that whatever you told the jury was

12  your understanding of what Christian Dawkins meant about a

13  particular statement was just your understanding, fair to say?

14  A.  That's fair to say.

15  Q.  Because you can't speak for Christian Dawkins, can you?

16  A.  My understanding was my understanding.  I cannot speak for

17  someone else.

18  Q.  Isn't it true that you want the jury to believe what the

19  government wants you to make them believe, isn't that right?

20             MR. BOONE:  Objection.

21             THE COURT:  Sustained.

22  Q.  Would you agree that you will characterize what you believe

23  or understand Christian Dawkins to mean to fit the government's

24  narrative of this case?

25             MR. BOONE:  Objection.

1          THE COURT:  Sustained.

2    Q.  Mr. Blazer, are you here testifying to try to help

3    Christian Dawkins?

4    A.  I'm neither trying to help Christian Dawkins or hurt

5    Christian Dawkins.

6    Q.  You're testifying against him in this case, aren't you?

7          MR. BOONE:  Objection.

8          THE COURT:  Sustained.

9    Q.  Well, you did testify around 2015 and 2016, when Christian

10   Dawkins made payments to assistant coach Lamont Evans, Lamont

11   Evans was the assistant basketball coach at the University of

12   South Carolina, is that right?

13   A.  That's correct.

14   Q.  Would you agree with me that would have been at least three

15   or four years ago?

16   A.  Yes.

17   Q.  And you testified that at that time, you were working with

18   the federal government, targeting a number of people in the

19   sports business, is that correct?

20   A.  I was working with the federal government in cooperation

21   agreement to contact or record conversations and meetings with

22   certain people.

23   Q.  In the sports management world, correct, and coaching

24   world?

25   A.  Yes, but target is not -- you said target.

J4QHDaw2                        Blazer - Cross

1    Q.  Well, you can call it what you want.  I'll move on.

2           During the course of this multiyear investigation, you

3    have met with the FBI investigators and the U.S. Attorney's

4    Office on multiple occasions, is that right?

5    A.  That's correct.

6    Q.  Now, you've testified in March of 2016, you, Munish Sood,

7    and my client met in South Carolina for the purposes of

8    Christian Dawkins introducing you and Munish Sood to Lamont

9    Evans, is that right?

10   A.  Yes.

11   Q.  You testified the purpose of that meeting was so that you

12   and Munish Sood could take over the payments that you claim

13   Christian Dawkins was making to Lamont Evans, is that right?

14   A.  Well, claim?  I was told by Christian that he was making

15   the payments to Lamont Evans.

16   Q.  But, as you sit here today, you know Christian Dawkins was

17   making the payments, if there were any, to Lamont Evans on

18   behalf of his bosses at ASM, isn't that right?

19           MR. BOONE:  Objection.

20           THE COURT:  Sustained.

21   Q.  Now, we heard a recorded call on the date of March 3, 2016,

22   where you, Lamont Evans, Munish Sood, and Christian Dawkins

23   were all in a restaurant talking with Lamont Evans of South

24   Carolina, is that correct?

25   A.  That's correct.

J4QHDaw2                         Blazer - Cross

Q.  And during that phone call, you've testified that's when

Christian Dawkins first introduced you to Lamont Evans, is that

right?

A.  Could you repeat that, please.

Q.  During that phone call, that meeting in March 3, 2016, was

this the point in time when you first met Lamont Evans?

A.  Correct.

Q.  You've testified that Christian Dawkins was telling you at

that meeting that you needed to have a relationship with Lamont

Evans so you could be the financial planner for Lamont Evans'

players in South Carolina, is that correct?

A.  Yes.

Q.  You and -- Munish Sood was your partner at that time,

right?

A.  Correct.

Q.  And at that meeting, you testified that Christian Dawkins

was telling you all that you should do business with Lamont

Evans and pay him, isn't that right?

A.  Yes.

Q.  And you knew that Christian Dawkins and Lamont Evans were

friends, didn't you?

A.  Yes.

Q.  Because that's why you were there; Christian was

introducing you to Lamont, correct?

A.  That's correct.

J4QHDaw2                              Blazer - Cross

1   Q.  Would you agree that Christian Dawkins seemed very close to

2   Lamont Evans?

3   A.  Yes.

4   Q.  Prior to this occasion on March 3, 2016, you had never met

5   Lamont Evans before, did you?

6   A.  That's correct.

7   Q.  So the first time you meet with this guy, Lamont Evans, who

8   we've heard on the wiretaps, you were at a restaurant with

9   another guy you don't really know that well either, right,

10  Christian Dawkins?

11  A.  Right, I didn't know Christian very well.

12  Q.  I mean, you didn't know how old he was.  You thought he was

13  late 20s; he's, like, 22, correct?

14          MR. BOONE:  Objection.

15          THE COURT:  Overruled.

16  A.  Could you repeat that, please.

17  Q.  You didn't even know how old my client was, did you?

18  A.  I didn't ask him how old he was.

19  Q.  Do you know how many brothers and sisters he had?

20          MR. BOONE:  Objection.

21          THE COURT:  Sustained.

22  Q.  So you were at this restaurant March 3, 2016, in South

23  Carolina with a guy you've never met before, Lamont Evans,

24  right?

25  A.  Correct.

J4QHDaw2                         Blazer - Cross

1    Q.  And another guy you don't know that well, Christian

2    Dawkins, correct?

3    A.  Correct.

4    Q.  The guy you didn't know that well or at all, Lamont Evans,

5    was trying to persuade you to give him some money, wasn't he?

6    Yes or no?  That's why you were there, weren't you?

7    A.  I was there to take over payments that Christian was making

8    to Lamont.

9    Q.  You're not just going to take over payments unless you

10   think there's a reason to do so, are you?

11   A.  I was doing what I was asked to do.

12   Q.  That was a yes-or-no question.

13   A.  By -- I was asked to do what I was directed to do by law

14   enforcement.

15   Q.  And Lamont Evans was doing his best to persuade you that he

16   was worth some money, isn't that right?

17   A.  I would agree to that, yes.

18   Q.  Just like those Hollywood movie producers, right,

19   Mr. Blazer?  He was just pitching you, wasn't he, Lamont?  You

20   know what that means, to get pitched?

21   A.  I --

22   Q.  Do you know what it means to get pitched, yes or no?

23   A.  Yes.

24   Q.  He was pitching you, wasn't he, at the meeting?

25            MR. BOONE:  Objection.

J4QHDaw2                          Blazer - Cross

1              THE COURT:  Overruled.

2   A.  He was pitching me, yes.

3   Q.  You tell me what it means to get pitched.

4   A.  Somebody proposes a -- an idea to you to go along with

5   their idea.

6   Q.  Yeah, like investing a million dollars in a horror movie,

7   right, Mr. Blazer?  That's a pitch too, wasn't it?

8   A.  That was a pitch, yes.

9   Q.  Here we are in South Carolina, and Lamont Evans is pitching

10  you why you should give him some money, isn't that right?  Yes

11  or no?

12  A.  Again, I was working on behalf of the federal government.

13  Q.  Mr. Blazer, I don't care who you were working with.  I'm

14  asking you simply was Lamont Evans at that restaurant on

15  March 3, 2016, pitching you to give him some money, yes or no?

16  A.  Yes.

17  Q.  In all your years of being around dishonesty, pitching,

18  lying, cheating, and stealing, as you sat there with Lamont

19  Evans to hear his pitch, you didn't think for one minute this

20  guy's just trying to get money out of me, honestly?

21  A.  No.

22  Q.  So you believe Lamont Evans was telling you the truth, is

23  that what you're telling us?

24  A.  Yes.

25  Q.  You trusted Lamont Evans, didn't you, if you were going to

J4QHDaw2                              Blazer - Cross

1   give him money, right?

2   A.  That was not up to me.

3   Q.  Now, you also testified that after meeting Lamont Evans,

4   there was another occasion where you and Christian Dawkins met

5   again, and Christian Dawkins was bragging about his coaching

6   network, isn't that right?

7   A.  Yes.

8   Q.  And he mentions some other coaches that were friends of

9   his, like Tony Bland from USC, isn't that right?

10  A.  Yes.

11  Q.  And he mentioned a number of other coaches and bragged

12  about his coaching network; fair statement?

13  A.  Yes.

14  Q.  And he told you he had all these networks in coaching

15  because he grew up in the business, isn't that right?

16  A.  Yes.

17  Q.  Then Christian Dawkins in a wiretap we heard starts talking

18  about a guy named Bill Duffy, and Christian Dawkins says Bill

19  Duffy has five schools that he's associated with.  Did I hear

20  that phone call correct?  Is that your recollection?

21  A.  My recollection, yes.

22  Q.  Including Syracuse University?

23  A.  Yes.

24  Q.  You've testified that you knew long before you met

25  Christian Dawkins that Bill Duffy was one of the biggest agents

J4QHDaw2                         Blazer - Cross

1    in basketball, isn't that right.

2    A.  I knew who Bill Duffy was, yes.

3    Q.  You also testified that you knew Bill Duffy had a

4    reputation of paying kids and their families to sign future NBA

5    player contracts with his company, isn't that right?  You know

6    that, right?

7              MR. BOONE:  Objection.

8              THE COURT:  Sustained.

9    Q.  You were familiar with the company Bill Duffy & Associates,

10   weren't you, well before you met Christian Dawkins?

11             MR. BOONE:  Objection.

12             THE COURT:  Overruled.

13   A.  I had heard of them before, yes.

14   Q.  And you had heard of it because you were aware that Bill

15   Duffy was accused of paying a player named OJ Mayo with USC?

16   You remember that, don't you?

17   A.  I don't remember that, no.

18   Q.  You don't have any familiarity with that issue regarding

19   Calvin Andrews, OJ Mayo, Bill Duffy, is that your testimony

20   under oath, in the business of sports?  You don't remember

21   that?

22   A.  I wasn't in the basketball space at that time.  So, no, I

23   don't.

24   Q.  You were a sports fan, weren't you?

25   A.  No, I wasn't really.

1    Q.  You weren't?

2    A.  No, I'm not.  I wasn't really.

3            THE COURT:  Mr. Haney, it's now 11 o'clock.

4            MR. HANEY:  Thank you.

5            THE COURT:  We're going to take our first break.

6            Ladies and gentlemen, please be prepared to come back

7    at a quarter after the hour.  Do not discuss the case.

8            (Jury excused)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4QHDaw2                              Blazer - Cross

1              (Jury not present)

2              THE COURT:  Mr. Blazer, you may step down.

3              THE WITNESS:  Thank you.

4              THE COURT:  Folks can be seated.

5              Any issues?

6              MR. BOONE:  Yes, your Honor.  We'll wait till the

7    witness...

8              THE COURT:  Mr. Boone.

9              MR. BOONE:  Your Honor, there was a clear line of

10   questioning by Mr. Haney that was completely inappropriate,

11   frankly.  He clearly tried to inject the race of individuals

12   into this trial.  This is something that we had an agreement on

13   beforehand.  We teed this up before the trial.  He clearly and

14   blatantly violated that.  It appears his strategy is to

15   continue to violate that and to seek to win by doing things,

16   frankly, impermissible.

17             I don't know Mr. Haney very well.  I've gotten to know

18   him a little bit since we started this trial.  I think he's

19   much better than what we just saw, because that was clearly

20   inappropriate.

21             MR. HANEY:  May I respond?

22             THE COURT:  You may respond.

23             MR. HANEY:  Thank you.

24             I don't know how Mr. Boone can predict what I'm going

25   to continue to do, and I don't believe the point that I made is

J4QHDaw2                        Blazer - Cross

anything that would be anything other than relevant to this
particular case, which is that sports agents hire runners so
they can blend in on a college campus.

                MR. BOONE:  That was not --

                MR. HANEY:  I'm not done, please.

                Certainly going to look a little odd, your Honor, if
you send a 45-year-old guy into a dorm room to drop an
envelope.  And the fact that Christian Dawkins was hired by
Andy Miller to do that, to blend in with basketball clients
that are largely African American, including their families,
that's not race baiting, that's not inappropriately injecting
or interjecting anything into this trial.

                I don't plan to continue to go along those lines.  If
I did, your Honor, if I did continue to do that, I would
reference the fact that we have 12 African Americans that have
been implicated in this federal bribery case and no white
coaches.  We have a coach, your Honor, who on wiretap literally
talking about he could pay his players more than the NBA can,
and he's not charged in this case.  So I'm not raising those
points.  If I really wanted to make race an issue in this case,
I would love to, but I'm not going to do that because I did
make an agreement not to do that.  And one benign question
point that I referenced with respect to why my client was hired
to go and do the things he was doing on behalf of the agents,
that's a mischaracterization of my intentions.

J4QHDaw2                              Blazer - Cross

1           THE COURT:  Well, there were two questions that were

2     asked.  The first one was whether the runners that were hired

3     to blend in, whether sometimes they were African-American

4     runners.  I allowed that question.  The second question -- and

5     I allowed that question, by the way, because there was clear

6     direct testimony yesterday on one of the telephone calls that

7     they, these agents, they hire young folks who can blend in.

8     And I was struck by the testimony that they walk around with

9     backpacks as though they were students.  So I did allow that.

10    I did not allow the question, which does go to Mr. Boone's

11    point of an improper line of questioning, concerning the elite

12    players being primarily, if not exclusively, African American.

13          There appears to be an agreement in place.  I'm not

14    going to comment on whether or not that agreement was violated,

15    because I don't know what you all discussed.  But, Mr. Haney,

16    obviously, that would be an inappropriate line, and I expect

17    that you will not venture down that road again.

18          MR. HANEY:  I certainly will not, your Honor.  Thank

19    you.

20          THE COURT:  OK.  Anything else?

21          MR. BOONE:  A few more matters, your Honor.  There

22    also is a line of questioning that continues to raise the

23    question as to why these defendants are on trial and other

24    people are not on trial.  That's, obviously, inappropriate.

25    Andy Miller was an example of that, Bill Duffy, other coaches.

J4QHDaw2                         Blazer - Cross

Obviously, that's not relevant for the jury to consider.

Previously there was cross -- and this is particularly sort of

relevant because there will be another cooperator testifying --

there was cross about a proffer agreement and cooperation

agreement.  One, there seemed to be confusion about the

difference between a proffer agreement and a cooperation

agreement.  Oftentimes the questions were sort of meshed

together as if they are the same agreement.  They are clearly

not.  But, also, to the extent that there's going to be

questions regarding what our witnesses' lawyers have told them

about their agreement, we again raise the issue that that,

obviously, is seeking to get privileged information that's not

appropriate.  If you want to ask someone sort of what their

understanding was when they sat down with the government in

terms of their protections, fine, but if you then want to go

into, what did your lawyer tell you about this, we would again

object to that.

          MR. CHANEY:  And, your Honor, to the degree that

that -- the effect of that statement on these witnesses as

they're seeking to understand the legal ramifications of their

conduct is certainly relevant for this jury to hear about

because it goes directly to their credibility, their motive,

and bias to testify.  And our clients have a Sixth Amendment

right to inquire as to that understanding when those witnesses

take the witness stand.

J4QHDaw2                         Blazer - Cross

1          THE COURT:  I think that's right, which is why I

2    allowed the questions regarding the proffer and the proffer

3    itself.

4          On the question of other individuals not being

5    prosecuted, obviously, there was a lot of discussion on direct

6    examination about Andy Miller and some discussion about

7    Mr. Duffy.  It's in the tapes.  He was questioned about them.

8    To the extent the questions by Mr. Haney was, did you testify

9    yesterday concerning X, I allowed those questions because I

10   believe that's perfectly appropriate cross-examination.  To the

11   extent he went further to talk about how much money Mr. Miller

12   made, etc., that's when I cut it off.  That was the line that I

13   was drawing.

14         So I understand the concern, but a lot of these issues

15   were put into play by the direct examination, and I think they

16   should be allowed to explore it to some extent.  And the way it

17   was being done, by and large, was appropriate.  But, obviously,

18   I'm listening very carefully, and I think that the defense is

19   well aware that, as I've indicated on any number of occasions,

20   we are not here to try anyone other than these defendants.

21         Anything else?

22         MR. BOONE:  No, your Honor.

23         MR. HANEY:  No, your Honor.  Thank you.

24         THE COURT:  OK.  Quarter after.

25         (Recess)

J4QHDaw2                          Blazer - Cross

1              (Jury present)

2              THE COURT:  Everyone, please be seated.

3              Mr. Haney.

4              MR. HANEY:  Thank you, your Honor.

5    Q.  Now, Mr. Blazer, you testified on direct examination that

6    it was your understanding at one point in time Christian

7    Dawkins paid Lamont Evans $2,500 for a couple of months as you

8    said, correct?

9    A.  Yes.

10   Q.  And you testified, as we've seen from the government

11   exhibit as well, that the transcript, that Christian Dawkins

12   told you he gave Lamont Evans that money when the kid first got

13   here.  Do you remember that?

14   A.  Yes.

15   Q.  Isn't it true that you would understand that to mean, "when

16   the kid first got here," that would mean on campus at South

17   Carolina, logically, right?

18   A.  Yes.

19   Q.  In fact, if I can recall the exact quote of the recording,

20   and it's an exhibit in this case, Christian Dawkins said, "He's

21   needing shit when the kid first gets here."  Was that your

22   recollection of that quote?

23   A.  I'm not sure.

24   Q.  Would you agree with me that many of the student athletes

25   that go on to play Division I and -- Division I football and

1    basketball, they are extremely poor, is that a fair statement?

2              MR. BOONE:  Objection.

3              THE COURT:  Sustained.

4    Q.  Would you agree that Christian Dawkins, by giving Lamont

5    Evans $2,500 when the kid first got there, that would mean he

6    was giving Lamont Evans things to help the kid as he was

7    transitioning to campus?

8              MR. BOONE:  Objection.

9              THE COURT:  Overruled.

10   A.  I wasn't sure what the money was for.

11   Q.  It would be a logical conclusion, would you not agree?

12   A.  No.

13   Q.  So --

14   A.  Not in my mind.

15   Q.  If Christian Dawkins is saying the kid needs shit when he

16   first got here, you're not saying that would mean when he first

17   got on campus?

18   A.  I was -- I was -- my understanding was there were separate

19   moneys for the player and for Lamont.  I wasn't sure what the

20   $2,500 that he was giving Lamont was for.

21   Q.  So if my client is saying he's giving Lamont Evans money

22   because the kid needs shit when he first gets there, it's your

23   testimony that you could not assume that that would mean

24   that -- or you couldn't understand that to mean it was to help

25   give the kid stuff when he got to campus?

J4QHDaw2                          Blazer - Cross

1              MR. BOONE:  Objection.

2              THE COURT:  Sustained.

3  Q.  Mr. Blazer, you never saw Christian Dawkins give Lamont

4  Evans a penny, did you?

5  A.  No.

6  Q.  Isn't it true that it's possible that if Christian Dawkins,

7  who you saw never pay Lamont Evans a penny, he may have been

8  lying to you just so you'd give Lamont Evans some money?  Is

9  that possible?

10 A.  That's possible.

11 Q.  Isn't it also possible that Lamont Evans may have been

12 hustling money out of you, right, Mr. Blazer?

13             MR. BOONE:  Objection.

14             THE COURT:  Overruled.

15 A.  That's possible.

16 Q.  Because you already know this is a dirty business, right?

17             MR. BOONE:  Objection.

18 Q.  You testified to that, correct?

19             THE COURT:  Overruled.

20 A.  Yes.

21 Q.  And you know people in the sports management world, they're

22 hustling people out of money all the time, aren't they,

23 Mr. Blazer?

24 A.  Yes.

25 Q.  Guys like you even are hustling people out of money, right?

J4QHDaw2                              Blazer - Cross

1    A.  Yes.

2    Q.  And Lamont Evans didn't know that you were working

3    undercover for the FBI, did he?

4    A.  No.

5    Q.  Isn't it true that Christian Dawkins never told you that he

6    was paying Lamont Evans cash bribes to steer players to sign

7    with him, isn't that right?

8    A.  He did tell me that.

9    Q.  Well, you also testified that he couldn't sign anybody

10   because he wasn't an agent, correct?

11   A.  Yes.

12   Q.  So he didn't tell you that because that's not possible, is

13   it?

14   A.  He could sign clients for the agency.

15   Q.  That my client worked for, right?

16   A.  That he worked for.

17   Q.  Not with my client, correct?

18   A.  Not sure how Christian would have benefited from that,

19   but --

20   Q.  I didn't ask you that.  I asked you a very direct question.

21   The players could not sign with Christian Dawkins, could they?

22   A.  They couldn't sign the contract to represent them, no.

23   Q.  Now, I want to go to -- turn your focus, if you can, to

24   Miami, Florida, in August of 2016.  And you testified that in

25   August of 2016, you and your financial planning partner, Munish

1    Sood, met Lamont Evans when you all were down in South Florida,

2    correct?

3    A.   Yes.

4    Q.   But you also testified earlier that in May of 2016,

5    Christian Dawkins had distanced himself from you over all the

6    problems that you were having from stealing your clients'

7    money, right?

8    A.   Yes, he was.

9    Q.   He didn't want to be around you, did he?

10   A.   He was aware of the movie and music investments and the SEC

11   charges, yes, he was aware of those.

12   Q.   He didn't want to be around you, correct?

13   A.   That was my understanding.

14   Q.   A lot of people didn't want to be around you, is that also

15   your understanding?

16   A.   Yes.

17   Q.   Because you had a horrible reputation in the sports

18   industry, and nobody wanted to be you around, isn't that right,

19   Mr. Blazer?

20   A.   Yes.

21   Q.   So correct me if I'm wrong, but you testified that from May

22   of 2016 through May of 2017, you and Christian Dawkins didn't

23   have any contact, isn't that right?

24   A.   We had limited contact.

25   Q.   So you would agree that August of 2016 would be after May

J4QHDaw2                          Blazer - Cross

1    of 2016?

2    A.  Yes.

3    Q.  So whatever you were doing with Munish Sood and Lamont

4    Evans down in South Florida in August of 2016, that had nothing

5    to do with Christian Dawkins, did it?

6    A.  It was what Christian had set up for us to do.

7    Q.  But you hadn't seen him in almost a year, had you?

8    A.  May of 2016 was when the SEC charges came out.  March of

9    2016 is when we met Lamont.  August of 2016 --

10   Q.  That's not what I asked you.

11            THE COURT:  Mr. Haney, please stop stepping on his

12   answer.

13            MR. HANEY:  Yes, your Honor.

14   A.  March of 2016 was when we met Lamont Evans for the first

15   time and Christian set up the -- for us to take over the

16   payments.  May of 2016 was when the SEC charges came out.

17   August of 2016 is when Munish Sood, Lamont Evans, and I were in

18   Miami.

19   Q.  So you were down there with Munish Sood, your business

20   partner, for the purposes of meeting with Lamont Evans with

21   regards to the financial planning company you and Munish Sood

22   had, correct?

23   A.  Yes.

24   Q.  That was in no way associated with anything Christian

25   Dawkins was doing at that time in August of 2016, was it?

J4QHDaw2                        Blazer - Cross

1    A.  Christian was not involved in that business, no.

2    Q.  So whatever you were doing down there in August of 2016 was

3    for the benefit you of you and Munish Sood and not Christian

4    Dawkins, fair to say?

5    A.  That's my understanding, yes.

6    Q.  You also testified that you were down there and apparently

7    Lamont Evans was upset because Munish Sood failed to come up

8    with some money down in Miami, is that right?

9    A.  Yes.

10   Q.  And Lamont Evans had drove down from Fort Lauderdale to get

11   some money from Munish Sood, and Munish Sood didn't come

12   through, fair to say?

13   A.  Yes.

14   Q.  And you testified that Lamont Evans was -- Lamont Evans was

15   so upset with Munish Sood that he threatened to go get the bag

16   from someone else, isn't that right, Mr. Blazer?

17   A.  Yes.

18   Q.  And you understood "get the bag from someone else" was

19   Lamont Evans threatening to go to some other guys like you and

20   Munish Sood, correct?

21   A.  Yes.

22   Q.  So just like the first time you met Lamont Evans a couple

23   months earlier in South Carolina, he's pitching you to get

24   money out of you, isn't he?

25   A.  He's discussing with me the plan that we had set up

1   initially, yes.

2   Q.  You're paying Lamont Evans in South Florida, and Christian

3   Dawkins isn't even aware of it, is he?

4   A.  I'm not sure if he was aware of it or not.

5   Q.  You've testified that around May of 2017, you and Christian

6   Dawkins reconnected after a year of not having much contact,

7   fair to say?

8   A.  Yes.

9   Q.  Is it fair to say you didn't even see him during that year

10  period of time between May of 2016 and May of 2017?

11  A.  I don't believe we saw each other, no.

12  Q.  And, in fact, in early June 2017, Christian Dawkins, Munish

13  Sood, and you boarded a yacht in a Manhattan marina, is that

14  correct?

15  A.  Could you repeat that.

16  Q.  In early June, more specifically, June 6, 2017, you,

17  Christian Dawkins, Munish Sood, and others boarded a yacht?

18  A.  Boarded.  OK.  Yes.

19  Q.  Located in the marina --

20  A.  We were on a yacht, yes.

21  Q.  -- in Manhattan, correct?

22          And it was for the purposes of, according to your

23  testimony, Christian Dawkins, Jeff D'Angelo, and Munish Sood to

24  consummate their business relationship of a company that they

25  were forming called Loyd Management.  Is that your

1  understanding?

2  A.  Yes.

3  Q.  Now, on --

4  A.  I didn't know what the name of the company was, though;

5  but, yes, it was to form the company.

6  Q.  Now, on the cross-examination of Mr. Chaney, you minimized

7  the utility of meeting on a yacht, suggesting it was for

8  marketing purposes only, is that right?

9  A.  It was primarily for marketing purposes is what was

10  discussed.

11  Q.  So you, the FBI, and the U.S. government just wanted to

12  show young Christian Dawkins what a yacht would look like for

13  marketing purposes, is that your testimony?

14  A.  That's what was discussed, yes.

15  Q.  Are you telling me under oath, Mr. Blazer, that the

16  intention of using that yacht on that day was not to make an

17  impression on a 22-year-old kid?

18  A.  In part, it was to make an impression on everybody, yes.

19  Q.  I don't care about everybody.  I care about Mr. Dawkins.

20         So that would have included to make an Christian

21  Dawkins, right or wrong?

22  A.  That would have included Christian, yes.

23  Q.  Why did you say yesterday that the purpose of the yacht was

24  for marketing reasons?

25  A.  I said primarily it was for marketing reasons and to show

(212) 805-0300

1    them what we had access to for potential clients or coaches or

2    whoever we were trying to direct to the business.

3    Q.  But today --

4    A.  It was primarily for -- it was primarily for -- I don't

5    think anybody ever, ever said, you know, wow, this is my yacht,

6    and you could have this as well, Christian, if you -- I don't

7    think that was the -- I would say primarily it was that we had

8    access to that yacht for marketing, entertaining clients, and

9    it was brought up in the meeting numerous times.

10   Q.  And as you've testified today, another reason was to make

11   an impression on a kid in his 20s, right?

12            MR. BOONE:  Objection.

13            THE COURT:  Sustained.

14   Q.  Mr. Blazer, you testified on direct examination that you

15   knew Christian Dawkins came from a city in Michigan called

16   Saginaw, is that right?

17   A.  Yes.

18   Q.  You even testified on direct examination that you were

19   familiar with Saginaw and had some former clients from Saginaw,

20   is that right?

21   A.  Yes.

22   Q.  Including a client named LaMarr Woodley, is that right?

23   A.  Yes.

24   Q.  Being that you stated you were familiar with Saginaw, then

25   isn't it true you're also familiar that Saginaw is one of the

J4QHDaw2                          Blazer - Cross

1   poorest cities in America?

2            MR. BOONE:  Objection.  Relevance.

3            THE COURT:  Sustained.

4   Q.  You've been to Saginaw?

5            MR. BOONE:  Objection.  Relevance.

6            THE COURT:  Sustained.

7   Q.  On that date on June 6, 2017, isn't it true that the

8   undercover agents had food and alcohol on that yacht too,

9   didn't they?

10  A.  Yes.

11  Q.  They even bought and gave Christian Dawkins an expensive

12  bottle of Scotch, right?

13  A.  Yes.

14  Q.  We saw that on the video, didn't we?

15  A.  Yes.

16  Q.  Mr. Blazer, you testified that on that yacht that day, at

17  least at some point, Christian Dawkins provided a list of

18  coaches that he said were his guys, is that a fair statement?

19  A.  Yes.

20  Q.  We saw that list.  It was marked as Government

21  Exhibit 1637.  And you testified yesterday that that list you

22  understood to represent coaches that Christian Dawkins meant he

23  could get to pay cash bribes to, didn't you?

24  A.  Yes, after the Lamont Evans model.

25  Q.  Yes or no, sir?

J4QHDaw2                        Blazer - Cross

1    A.   After the Lamont Evans model, yes.

2    Q.   The list that was marked as Government Exhibit 1637, you

3    testified yesterday was a list of coaches that Christian

4    Dawkins submitted with the understanding, in your mind, of

5    coaches that could be paid cash bribes, right?

6    A.   Yes.

7    Q.   But isn't it true that that list included his own dad at

8    Cleveland State?

9    A.   It did.

10   Q.   Well, let's go with the ridiculous suggestion that he was

11   going to bribe his own dad for a minute, OK.  You know that

12   Cleveland State university has hadn't a top 25 draft pick in

13   over a hundred years, don't you?

14          MR. BOONE:  Objection.

15          THE COURT:  Sustained.

16   Q.   But you testified that it was your understanding that list

17   of coaches were the coaches that Christian Dawkins said were

18   subject to being bribed, isn't that right?

19   A.   Some of them.

20   Q.   Isn't it true you offered that testimony to the benefit of

21   the bribe narrative that is now being presented by the

22   government, isn't that right?

23   A.   That's not --

24          MR. BOONE:  Objection.

25          THE COURT:  Sustained.

1    Q.  Mr. Blazer, are you actually suggesting that Christian

2    Dawkins was saying he would have to bribe his own father to get

3    players from Cleveland State University?

4                MR. BOONE:  Objection.

5                THE COURT:  Sustained.

6    Q.  Would you agree with me that on the yacht that day, there

7    was not one single licensed NBA player agent?

8    A.  I would agree there was no agent on the yacht, no.

9    Q.  There were a lot of agents, including the FBI agents,

10   weren't there?

11   A.  I thought you meant licensed NBA agents.

12   Q.  That's what I said.

13               So you weren't a licensed NBA player agent, were you?

14   A.  No.

15   Q.  Munish Sood wasn't a licensed NBA player agent, was he?

16   A.  He was a financial adviser.

17   Q.  That's not what I asked you.  Munish Sood wasn't a licensed

18   NBA player agent, correct?

19   A.  He wasn't.

20   Q.  Jeff D'Angelo, the undercover FBI agent, he wasn't a

21   licensed NBA player agent, was he?

22   A.  Correct.

23   Q.  Jill Bailey wasn't a licensed NBA player, was she?

24   A.  Correct.

25   Q.  Christian Dawkins wasn't a licensed NBA player agent, was

J4QHDaw2                           Blazer - Cross

1    he?

2    A.  Correct.

3    Q.  Let me ask you this question, Mr. Blazer:  How is a company

4    allegedly going to pay cash bribes to college coaches to

5    represent NBA players when nobody could have?

6    A.  I don't understand the question.

7    Q.  There were no licensed NBA agents on the boat, correct?

8    A.  Correct.

9    Q.  So how are any of these people on the yacht going to

10   represent future clients if none of them had the ability to do

11   so?

12   A.  They were going to represent the clients from a business

13   management and financial standpoint, not from a representation

14   standpoint.  And we actually discussed that that was a better

15   way of doing it, of working with the agents, and there was

16   potentially more money in that area.

17   Q.  You have that on wiretap too?  I didn't hear it.

18   A.  We did.

19   Q.  Where is it?

20   A.  I don't believe I said that -- it was telling Christian at

21   one point that the business management side was a better

22   direction to go.

23   Q.  Would you agree we haven't heard anything like that during

24   the course of this trial in the last three days?

25   A.  My understanding is that --

J4QHDaw2                          Blazer - Cross

1    Q.  Would you agree, yes or no, there's been no evidence of

2    that?

3              MR. BOONE:  If he could let the witness testify, your

4    Honor.

5              THE COURT:  Let him finish, Mr. Haney.

6              MR. HANEY:  Thank you.

7    Q.  Would you agree there's been no evidence presented to this

8    jury what you just offered, yes or no?

9    A.  My understanding is that at one point I --

10             MR. HANEY:  Your Honor, he's not answering the

11   question.  I really don't like to interrupt.

12             THE COURT:  Mr. Blazer, if you can answer the question

13   yes or no, answer yes or no, OK?

14   Q.  I'll ask it one more time.  Would you agree with me there's

15   been no evidence presented during the course of this trial as

16   to what you just stated?

17   A.  I would not agree with that.

18   Q.  In fact, at this meeting on the yacht in New York City,

19   Christian Dawkins even told you that he felt Lamont Evans

20   shouldn't be paid, didn't he?

21   A.  He said paying Lamont that amount was too much.

22   Q.  And you testified that Christian Dawkins told everyone that

23   he would be the one to pay the coaches when they needed the

24   money, right?  That's what you said repeatedly during this

25   testimony.

J4QHDaw2                          Blazer - Cross

1    A.  Could you repeat that again.

2    Q.  Yes.  You repeatedly testified that Christian Dawkins told

3    everyone that he would be the one to pay the coaches, how much,

4    and when they needed it, right?

5    A.  He might have said that.  I don't -- I don't know.  He

6    might have said that.

7    Q.  Did you say that?  Did you testify that Christian Dawkins

8    is the one deciding who was going to get paid, how much, and

9    when?

10   A.  Oh, yes, yes, yeah, yes.

11   Q.  Because Christian Dawkins wanted you all to give him the

12   money and let him figure out who should have it, right?

13   A.  He was going to make the decision on who was paid and how

14   much.

15   Q.  The 22-year-old, right?

16              MR. BOONE:  Objection.

17              THE COURT:  Sustained.

18   Q.  Mr. Blazer, we've well established you have a history of

19   stealing money, lying, and being deceptive, don't we --

20   A.  Yes.

21   Q.  -- correct?

22              With all that experience of being a con man, you

23   weren't aware that Christian Dawkins was actually hustling all

24   of you?

25              MR. BOONE:  Objection.

J4QHDaw2                         Blazer - Cross

1              THE COURT:  Overruled.

2   A.   No.

3   Q.   You are now, though, aren't you, because you know he took

4   some of that money he said he was going to give to coaches and

5   he kept it?  You know that as you sit here?

6   A.   I don't know that.

7   Q.   And Christian Dawkins during the meeting told everyone it

8   would be a good idea for all the coaches to meet in Las Vegas

9   at the end of July, isn't that right?

10  A.   Either the draft in New York or the -- or Las Vegas, yes.

11  Q.   So is that a yes, Mr. Blazer, he told everyone on the yacht

12  that day it would be a good idea for all the coaches to meet

13  out in Las Vegas at the end of July, yes or no?

14  A.   For some of them, yes.

15  Q.   And on cross-examination by Mr. Chaney, you testified that

16  you believed college coaches could freely watch high school and

17  AU players anytime they wanted to at their games.  Isn't that

18  what you said yesterday on your cross-examination?

19  A.   Yes, I wasn't aware that there was any other kind of rule.

20  Q.   Is it fair to say that in this undercover operation, you

21  are the brains of the operation when it comes to the sports

22  world, right?

23             MR. BOONE:  Objection.

24             THE COURT:  Sustained.

25  Q.   Did anyone other than you in the operation have any

1  background in sports management?

2          MR. BOONE:  Objection.

3          THE COURT:  Sustained.

4  Q.  Would you agree that the FBI undercover Jeff D'Angelo,

5  posing as the investor, he had no business background in the

6  sports management world?

7          MR. BOONE:  Objection.

8          THE COURT:  Overruled.

9  A.  I wasn't sure what Jeff's background was prior to FBI or

10  when he was with the FBI.

11  Q.  Would you agree that part of your value to this

12  investigation was your background in sports management and

13  knowledge?

14  A.  Yes.

15  Q.  Despite this knowledge you claim to have value and possess,

16  you had no idea, did you, that college coaches were limited in

17  their ability to watch high school basketball players during

18  the summer, did you?

19  A.  I didn't know.  I didn't really operate in the basketball

20  space prior to this.

21  Q.  And you had no idea that college basketball coaches were

22  limited to a recruiting calendar with open and dead recruiting

23  periods, did you?

24          MR. BOONE:  Objection.

25          THE COURT:  Overruled.

1   A.  Could you repeat that, please.

2   Q.  You had no idea that college basketball coaches were

3   limited to a recruiting calendar with open and dead recruit

4   periods, did you?

5   A.  I didn't know that at the time, no.

6   Q.  And you weren't aware that one of the live recruiting

7   periods happened to be the last weekend in July, were you?

8   A.  I wasn't aware of that.

9   Q.  Were you aware that the reason all the coaches were out in

10  Las Vegas at the end of July for those meetings was because

11  they were there for the final July NCAA evaluation period?

12          MR. BOONE:  Objection.  Relevance.  Not sure what he's

13  doing here.

14          THE COURT:  Overruled.

15  A.  I was aware that the coaches were out there for some grass

16  roots event.

17  Q.  In fact, all the coaches that were in Las Vegas at the

18  meeting in the hotel.  Isn't it true they were in town anyway

19  for an AU tournament?

20  A.  Yes, I think most of them said that they were in town to

21  watch the games.

22  Q.  So those coaches weren't in Las Vegas to meet with you and

23  the FBI; they were there to recruit, right?

24  A.  Yes, they were there to recruit as well as meet with us.

25  Q.  Isn't it true that you knew Christian Dawkins, as you've

1   testified on direct and cross-examination, he had close
2   personal friendships with many of those coaches that were out
3   there in Las Vegas, isn't that right?
4   A.  Yes, I knew he had the relationships with them, yes.
5   Q.  In fact, one of those coaches, Preston Murphy, Christian
6   Dawkins even grew up with in Saginaw Michigan, right?  You know
7   that?
8   A.  I'm not sure that I knew that.
9   Q.  You know that now, don't you?
10  A.  Knew they were close.
11  Q.  I didn't ask you that.
12  A.  I didn't know that, that they grew up together in Saginaw.
13  Q.  You know it now before today?
14  A.  I know because you're telling me that.
15  Q.  I said before today, not before ten seconds ago.  Did you
16  know that?
17  A.  What was the question?
18  Q.  Did you know Christian Dawkins and Preston Murphy grew up
19  together, have known each other since they were young in
20  Saginaw?
21  A.  I did not know that.
22  Q.  And Tony Bland, the coach from the University of Southern
23  California, you knew he and Christian Dawkins were close
24  friends too, right?
25  A.  Yes.

J4QHDaw2                           Blazer - Cross

1   Q.  We know that from the wiretap phone calls we've heard,

2   right?

3   A.  Yes.

4   Q.  And as well as Corey Barker from Texas Christian

5   University, correct?

6   A.  Yes.

7   Q.  And Book Richardson from the University of Arizona, you

8   were aware that he and Christian Dawkins were good friends too,

9   am I right?

10  A.  Yes.

11  Q.  You've testified that the coaches meeting, as it's been

12  called, in Las Vegas occurred at the end of July and was set up

13  by Christian Dawkins, is that right?

14  A.  Yes.

15  Q.  It was your understanding that some of the coaches were

16  attending the meetings so they could get paid, is that right?

17  A.  Yes.

18  Q.  Including Preston Murphy from Creighton, to get paid

19  $6,000, am I right?

20  A.  Yes.

21  Q.  And a coach from Texas Christian named Corey Barker, also

22  to get paid $6,000, correct?

23  A.  Yes.

24  Q.  And Coach Tony Bland from USC, to get paid $13,000,

25  correct?

J4QHDaw2                          Blazer - Cross

1    A.  Yes.

2    Q.  Mr. Blazer, would you agree with me that 6,000, 6,000, and

3    $13,000 equals $25,000?

4    A.  Yes.

5    Q.  Would you agree with me that day on the yacht, $25,000 was

6    the amount of money the undercover FBI agent told Christian

7    Dawkins he would get to fund the company, yes or no?

8    A.  Could you repeat that.

9    Q.  Would you agree on the yacht that day in the marina on

10   June 6, $25,000 was the amount of money Christian Dawkins was

11   told he would get to fund his sports agency?

12   A.  He handed Munish $25,000 to fund the -- to fund the

13   company.

14   Q.  With the promise of another $25,000 too, right?

15   A.  I'm not sure.

16   Q.  That would be the exact same amount of money that these

17   three coaches, his friends, were paid, would you agree,

18   Mr. Blazer, $25,000?

19   A.  Six and six and 13 is, yeah, that's $25,000.

20   Q.  Again, it was Christian Dawkins who was going to decide who

21   got what and how much money, was that your testimony?

22   A.  Yes, Christian would decide who got money and how much.

23            (Continued on next page)

24

25

1   Q.  And those three particular coaches I just mentioned were to
2   receive a total of $25,000 as you've noted, correct?
3   A.  There was also Brad Augustine.
4   Q.  That's not what I asked you, sir.  I'm asking you very
5   straightforward questions.
6        The three coaches I just mentioned were to receive a
7   total of $25,000; is that correct?  6, 6 and 13, Mr. Blazer?
8   A.  Correct.  Yes.
9   Q.  Just so we're clear.  Those three coaches were Corey
10  Barker, Preston Murphy and Tony Bland, Christian's closest
11  friends, correct?
12       MR. BOONE:  Objection.
13       THE COURT:  Sustained.
14  Q.  And then the $4,500 to Lamont Evans was going to be paid by
15  you and Munish Sood; isn't that right?
16  A.  As set up by Christian, yes.
17  Q.  That's not what I asked you.
18       The $4,500 was to be paid to Lamont Evans by you and
19  Munish Sood, correct?
20  A.  It was to be paid to Lamont Evans, yes.
21  Q.  For the purposes of your financial planning relationship
22  you were in theory trying to have with Lamont Evans, yes or no?
23  A.  Well at the time --
24  Q.  Yes or no, sir.
25  A.  Munish and Christian's --

```
 1              MR. HANEY:  Your Honor, I would ask that the
 2   witness --
 3              THE COURT:  Ask him -- he's answering the question.
 4   Let him finish.
 5              THE WITNESS:  Could you please ask that again.
 6   Q.  The $4,500 being paid to Lamont Evans was being paid by you
 7   and Munish Sood, right?
 8   A.  Munish Sood wasn't at this meeting in Vegas.
 9   Q.  The purpose of the $4,500 was to pay Lamont Evans for what
10   you had agreed is the financial planning partners of Lamont
11   Evans; is that right?
12   A.  No.  Lamont was going to refer business back to this
13   business entity.
14   Q.  The business entity that you had no involvement in because
15   you weren't allowed to, correct?
16   A.  Correct.
17   Q.  You testified you were in the room in Las Vegas when Corey
18   Barker showed up for his meeting?
19   A.  Yes.
20   Q.  We saw a video of it, didn't we?
21   A.  Yes.
22   Q.  And when Corey Barker showed up, he pitched you on his
23   value as a potential referral source of future clients; isn't
24   that right?
25   A.  Yes.
```

1   Q.  And that he even apparently referenced a cousin that he had

2   in Kentucky that was a potential NBA draft pick; isn't that

3   right?

4   A.  Yes.

5   Q.  That was all part of his pitch, wasn't it?

6   A.  Yes.

7   Q.  That Coach Barker told you at the meeting he had other

8   potential suitors that were also inquiring about his services;

9   isn't that right?

10  A.  Yes.

11  Q.  That would be part of his pitch too, wouldn't it, to make

12  you worry a little bit so you hurry up and pay him before

13  somebody else did, right?

14          MR. BOONE:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  I'm not sure.

17  Q.  What do you think?  You've been pitching your whole life,

18  haven't you, Mr. Blazer?

19          Wouldn't you agree with me that if somebody is telling

20  you, you know you don't give me the money I might go get it

21  from another guy, you'd agree with me that's a pitch, wouldn't

22  you?

23  A.  Well at the time it was already established that Corey was

24  going to receive $6,000 so there wasn't much to be determined

25  as far as what he was going to pitch and what we were going to

1    do.  It was established already.

2    Q.  That's what he told you though, didn't he?  I could take my

3    business elsewhere, didn't he?

4    A.  He said he's looking for a group to work with and settle in

5    with, yes.

6    Q.  Wouldn't you agree that that would be with the intent of

7    trying to get money out of somebody logically, right?

8    A.  I don't think so because, again, it was already established

9    and he had the close relationship with Christian.

10   Q.  You were present in the hotel room when Corey Barker

11   received the $6,000 cash in the envelope we saw in the video,

12   weren't you, Mr. Blazer?

13   A.  Yes.

14   Q.  Did you happen to follow Corey Barker out when he left?

15   A.  No.

16   Q.  You don't know where Corey Barker went when he left that

17   hotel room, do you?

18   A.  No.

19   Q.  You don't know where Christian Dawkins went when he left

20   that hotel room, do you?

21   A.  I don't recall.

22   Q.  Isn't it true you have no personal knowledge as you sit

23   here today of where Corey Barker left when he left the hotel

24   room, correct?

25   A.  Correct.

J4Q9DAW3                          Blazer - Cross

Q.   And you have no personal knowledge, you can't deny that
Corey Barker gave that $6,000 back to Christian Dawkins, can
you?

A.   Correct.  I don't know what he did with it.

Q.   And that could have happened, couldn't it have?

         MR. BOONE:  Objection on what could have happened.

         THE COURT:  Sustained.

Q.   Wouldn't you agree with me you don't know if Corey Barker
gave that $6,000 back to his friend Christian Dawkins?

         MR. BOONE:  Objection.

         THE COURT:  Sustained.

Q.   Well let's talk about Tony Bland for a minute.  You
testified that he showed up to the meeting in Las Vegas and he
flew in on a private jet?  Is that your testimony?

A.   Yes.

Q.   You also testified, and correct me if I'm wrong, it was
your understanding from Christian that Coach Tony Bland made
upwards of $400,000 a year as an assistant coach at the
University of Southern California; is that correct?

A.   Yes.

Q.   And that Tony Bland told you, Jeff D'Angelo and others that
he needed $13,000 because he had a recruit on campus that he
was hosting either that day or the day before; is that right?

A.   Yes.  That was my understanding.

Q.   So he could provide some financial assistance to the family

J4Q9DAW3                        Blazer - Cross

1   of a recruit?

2   A.  That was my understanding, yes.

3   Q.  By the name of Marvin Bagley you testified to, right?

4   A.  Yes.

5   Q.  And you testified that you saw the undercover FBI investor,

6   or posing as an investor, Jeff D'Angelo, give Christian Dawkins

7   an envelope of $13,000 to Tony Bland; isn't that right?

8   A.  Yes.

9   Q.  And, again, you knew Tony Bland and Christian Dawkins were

10  close friends, correct?

11  A.  Yes.

12  Q.  Well let me ask you this:  Did you follow Tony Bland out of

13  the hotel room down onto the casino floor?

14  A.  No.

15  Q.  Did you follow Christian Dawkins out of the hotel room down

16  onto the casino floor?

17  A.  No.

18  Q.  Were you present down on the floor when Coach Bland gave

19  the money back to his friend Christian Dawkins?

20          MR. BOONE:  Objection.

21          THE COURT:  Sustained.

22  Q.  You've been familiar with this case as an undercover

23  operative, right?

24  A.  Cooperating witness, yes.

25  Q.  So you're familiar with the facts of this case of what's

1   occurred because you've been a part of them; isn't that right?

2   A.   Like?

3   Q.   Like what people have done, what people have said, what

4   they've texted to people, what they've e-mailed, all those

5   things?

6            MR. BOONE:  Objection.

7            THE COURT:  Sustained.

8   Q.   As you sit here today do you have personal knowledge that

9   Christian Dawkins that same weekend deposited $9,000 in cash --

10           MR. BOONE:  Objection.

11  Q.   -- into an ATM machine?

12           MR. BOONE:  Objection.

13           THE COURT:  Sustained.

14  Q.   Mr. Blazer, do you really think a coach -- I haven't asked

15  the question, your Honor.  He's interrupted me the last

16  question that --

17           MR. BOONE:  I haven't objected.

18           THE COURT:  He hasn't objected yet.

19           MR. HANEY:  He did it the prior question before I

20  asked it.

21           Thank you, your Honor.

22  Q.   Mr. Blazer, do you really think a coach at the University

23  of Southern California making $400,000 a year who flies around

24  on a private jet could be bribed by a few thousand dollars?

25           MR. BOONE:  Objection.

1          THE COURT:  Sustained.

2     Q.  You are familiar with the University of Southern California

3     during your football days, aren't you?

4     A.  I'm familiar with the -- yes.  The school.  Yes.

5     Q.  And would you agree that USC is another name of the

6     University of Southern California?

7     A.  Yes.

8     Q.  Would you agree that USC has some of the wealthiest

9     boosters in the entire nation?

10          MR. BOONE:  Objection.

11          THE COURT:  Sustained.

12    Q.  You understood from what Christian Dawkins said, as we saw

13    in the evidence, that Tony Bland was the king of L.A.  Isn't

14    that what he said?

15    A.  Yes.  That's what he said.

16    Q.  So you thing the King of L.A. had to fly all the way out to

17    Las Vegas to get some money from a guy like you?

18          MR. BOONE:  Objection.

19          THE COURT:  Sustained.

20    Q.  Less talk about Preston Murphy for a minute, Mr. Blazer.

21    You also testified when you were -- that you were present when

22    Preston Murphy showed up in the hotel room in Las Vegas too;

23    isn't that right?

24    A.  Yes.

25    Q.  Another coach and friend of Christian Dawkins that was

1    there to get paid some money; isn't that right, Mr. Blazer?

2    A.  Yes.

3    Q.  And, in fact, you testified that at this meeting with

4    Preston Murphy he impressed upon you and Jeff D'Angelo his

5    potential investor his value as a potential referral source of

6    future prospects at Creighton University; is that right?

7    A.  That's right.

8    Q.  So he was making the pitch too, wasn't he?

9    A.  Again, it was already determined what Preston was to be

10   paid.

11   Q.  That's not what I asked you.  Was he there selling his

12   influence or his value to you all, yes or no?

13   A.  He was talking about his players that he had there and his

14   recruiting, yes.

15   Q.  You think he was doing that just for smalltalk or was it

16   for you all to see what value he could offer the company?

17   A.  I think to show us the value he could add.

18   Q.  And one of the components of the value, at least that I saw

19   on Government Exhibit 526T, which the jury can look at, is

20   Preston Murphy was telling you how, for instance, he could

21   deliver a top prospect he had on his team, a senior ready for

22   the NBA draft named Marcus Phillips; isn't that right?

23   A.  Yes.

24   Q.  Now Marcus Phillips was a really good player; had an NBA

25   ceiling, right, Mr. Blazer?  That's what he was saying?

J4Q9DAW3                          Blazer - Cross

1    A.  Yes.

2    Q.  You know what an NBA ceiling is, don't you?

3    A.  No.

4    Q.  OK.  Would you agree with me that Marcus Phillips,

5    according to Preston Murphy, he was a kid that was going to

6    play in the NBA and sign with his sports agency?  That's what

7    he was telling you, right, to get his money?

8    A.  I didn't hear the question.

9    Q.  Isn't it true Preston Murphy was selling the fact that he

10   had a kid on campus named Marcus Phillips that could be a

11   future NBA basketball player?

12   A.  Yes.

13   Q.  And that this kid Marcus Phillips that Coach Murphy could

14   deliver to you was the type of player that would be worth the

15   cash bribe of $6,000 because he was a certain NBA draft pick,

16   right?

17   A.  I think that was the caliber of player he was going to.

18   Q.  That in exchange for $6,000 cash Coach Murphy could make

19   you all and deliver Marcus Phillips; isn't that right?

20   A.  (No response).

21   Q.  That was the pitch?

22   A.  Sure.

23   Q.  Well, Mr. Blazer, would you be surprised if I told you

24   there is nobody named Marcus Phillips who has ever played at

25   Creighton University?

1               MR. BOONE:  Objection.

2               THE COURT:  Overruled.

3               MR. MOORE:  Your Honor could we approach for just one

4       moment.

5               THE COURT:  Yes.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MR. MOORE:  I think you were seeing the same thing

3      that I was seeing.  This cross-examination is rivetting.  I

4      don't know how anyone can sleep.  And juror number three keeps

5      nodding off and she's not listening to what Mr. Haney is

6      saying.

7              I'm not asking you to do anything about it now because

8      I don't want to call attention to the fact that I called your

9      attention to it, Judge, but I'm concerned about that.

10             THE COURT:  I was about to call for like a five-minute

11     break and say, you know, I see some heavy lids in the jury box

12     and let's just take a five-minute break, it's very important.

13             MR. HANEY:  I wish it would have been a little bit

14     before Marcus Phillips.

15             MR. MOORE:  I'm sorry.  I'm sorry.  I think -- I think

16     you made your point.

17             MR. HANEY:  I wanted to let it percolate a little bit,

18     Mr. Moore.

19             THE COURT:  But I'm aware of the situation.

20             MR. MOORE:  Do you think that perhaps you could let

21     Mr. Haney ask a few more questions and then take a break.

22             THE COURT:  Absolutely.

23             MR. MOORE:  So it doesn't look like I'm alerting you

24     to it.  I don't want you to snitch me out, Judge.

25             THE COURT:  I won't.  I won't.

J4Q9DAW3                              Blazer - Cross

1          (In open court)

2                MR. HANEY:  May I proceed, your Honor?

3                THE COURT:  Your may, Mr. Haney.

4     Q.  So, Mr. Blazer, now we realize that there's never been a

5     player named Marcus Phillips ever to pay at Creighton.  How

6     does that make you feel?

7                MR. BOONE:  Objection.

8                THE COURT:  Sustained.

9     Q.  Would it surprise you if I told you that Preston Murphy and

10    Christian Dawkins left that hotel room and laughed all the way

11    down the hall?

12               MR. BOONE:  Objection.

13               THE COURT:  Sustained.

14    Q.  You don't have any personal knowledge at all, do you, that

15    Christian Dawkins received that $6,000 back from his friend

16    Preston Murphy who was laughing beside himself, do you?

17               MR. BOONE:  Objection.

18               THE COURT:  Sustained.

19               MR. HANEY:  Your Honor, did the Court wish to take --

20               THE COURT:  I'm sorry?

21               MR. HANEY:  Does the Court wish to take a break, your

22    Honor?

23               THE COURT:  Yes.  Ladies and gentlemen, why don't we

24    take a five-minute break.  I see some heavy lids in the jury

25    box and it's very important that everyone pay as much attention

J4Q9DAW3                          Blazer – Cross

1     as possible to the testimony.  So we're going to take a

2     five-minute break, do some stretching, and please come back

3     ready to listen further.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. BOONE:  We have a brief issue, your Honor, if the

3    witness could be --

4          THE COURT:  OK.  Mr. Blazer, step down.

5          (Witness excused)

6          THE COURT:  Don't go far.

7          THE WITNESS:  OK.

8          MR. CHANEY:  I need to use the restroom.

9          THE COURT:  OK.

10         MR. BOONE:  Your Honor, we're concerned that the way

11   in which Mr. Haney is conducting his cross is ultimately him

12   just testifying to facts that he knows the witness doesn't

13   know.  So far his style has been to put forth a lot of facts he

14   knows our witness doesn't know, ask him if he knows them.  And

15   then he'll say no.  Then he says now you know and sort of

16   continue.  That's not a proper way to do cross-examination.

17         MR. HANEY:  May I respond briefly, your Honor?

18         THE COURT:  Sure.

19         MR. HANEY:  I will cross-examine the witness in

20   whatever way your Honor directs me to cross-examine the

21   witness.  I would submit this is a cross-examination.  This is

22   what it is.  I don't believe anything I do is inappropriate in

23   any jurisdiction I've ever practiced in for 20 years.  If the

24   Court feels that I am doing something improper, I will alter

25   that particular style.  I would submit it's cross-examination

1    and I am in large asking Mr. Blazer about things he's already

2    testified to.  I would submit almost everything.

3              THE COURT:  But the line of questioning that Mr. Boone

4    is complaining about is you asking him questions about facts

5    about which presumably you know he knows nothing about like

6    what Mr. Dawkins did with Mr. Preston, or I forget all the

7    names now, you know, once they left the hotel room.  Of course,

8    Mr. Blazer is not going to know the answer to that.  And while

9    we always give more leeway on cross-examination than on direct

10   examination, generally speaking the rule of thumb is that

11   you're allowed to ask questions if you have a good faith basis

12   for asking.

13             I should add, by the way, that I think I've sustained

14   all of the objections to those questions and the jury will be

15   told that what Mr. Haney says is not evidence.

16             MR. MOORE:  Could I make one point, your Honor?

17             THE COURT:  Yes, sir.

18             MR. MOORE:  I believe that several days ago, and I'm

19   losing track of days, but the government pointed out that they

20   believe that they had the opportunity to ask guilt-assuming

21   hypotheticals and they believe that the law allowed them to ask

22   guilt-assuming hypotheticals which they proceeded to do with

23   their first witness, Mr. Chance Miller.

24             I believe that if the government can ask

25   guilt-assuming hypotheticals the defense ought to be allowed to

1    ask innocence-assuming hypotheticals.

2                MR. BOONE:  Your Honor, obviously those questions were

3    not asked of someone who was a fact witness.  And as we

4    discussed I think at sidebar and also in open court,

5    materiality is at issue here and that's why those particular

6    questions were relevant to that witness because the government

7    has to prove that the breach of contract specifically as it

8    relates to a violation of NCAA rules is material and so that's

9    why we asked those questions.

10               To ask, as your Honor already correctly noted, to ask

11   the witness questions knowing the witness doesn't know the

12   answer to the questions and then proffering an answer and then

13   sort of saying now you know that fact is improper and they're

14   sort of apples and oranges.

15               MR. HANEY:  Can I make a brief response.

16               I don't know what Mr. Blazer does or doesn't know or

17   what he did or didn't do that day.  I don't think he does

18   either.  I'm asking him if he has personal knowledge if

19   something occurred.  Who knows?  Maybe he did follow him out of

20   the hotel room.  Maybe he'll say that tomorrow.

21               But I certainly don't believe that I'm limited to at

22   least ask him if he's aware if something occurred.

23               But, again, I will follow the judge's mandate and stay

24   within the boundaries of the court as articulated.

25               Thank you, your Honor.

J4Q9DAW3                          Blazer - Cross

1              THE COURT:  OK.  Let's get the jury.  And let's get

2   Mr. Blazer.

3              (Continued on next page)

J4Q9DAW3                           Blazer - Cross

 1              (Jury present)

 2              THE COURT:  Everyone please be seated.

 3              Ladies and gentlemen of the jury, let me just say that

 4    I think you all have been wonderful.  You've been prompt and

 5    attentive.  I appreciate that.  But I did see some heavy lids.

 6    It's very important that we pay very serious attention to the

 7    testimony.  Obviously it's very important for both sides and,

 8    don't worry, I won't cheat you out of your fifteen-minute

 9    second break at 12:45.

10              Mr. Haney.

11              MR. HANEY:  Thank you, your Honor.

12    BY MR. HANEY:

13    Q.  Mr. Blazer, when you were out in Las Vegas the end of

14    July 2017 you were drinking alcohol, weren't you?

15    A.  Yes.

16    Q.  Did you ever drink alcohol with any of the FBI agents in

17    this case?

18              MR. BOONE:  Objection.

19              THE COURT:  Sustained.

20    Q.  Were you ever reimbursed for the alcohol you were drinking?

21              MR. BOONE:  Objection.

22              THE COURT:  Overruled.

23              THE WITNESS:  I didn't pay for the alcohol.

24    Q.  So you were drinking alcohol that was paid for by the

25    federal government then; is that right?

1    A.   Yes.

2    Q.   Would you agree that the federal government is funded by

3    taxpayers' dollars?

4    A.   Yes.

5    Q.   So the taxpayers were paying for you to drink alcohol out

6    in Las Vegas in July of 2017, right?

7              MR. BOONE:   Objection.

8              THE COURT:   Overruled.

9              THE WITNESS:   It wasn't a lot of alcohol.

10   Q.   I didn't ask you if it was a lot of alcohol.  Let's say it

11   was a drop of alcohol.  My question is:   The taxpayers were

12   paying you to drink alcohol in Las Vegas in July 2017, weren't

13   they?

14   A.   Yes.

15   Q.   I think there's a question from the cross-examination about

16   whether you're an honest taxpayer, isn't there?

17   A.   Yes.

18   Q.   How would you feel if you were paying for somebody else to

19   get drunk or drink alcohol in Las Vegas as a taxpayer?

20             MR. BOONE:   Objection.

21             THE COURT:   Sustained.

22   Q.   You were staying at the Cosmopolitan Hotel, weren't you?

23   A.   No.

24   Q.   Where were you staying?

25   A.   I believe I was staying at the Venetian.  I was not at the

1    Cosmopolitan.

2    Q.  Oh, the Venetian.  You'd agree that's even better than the

3    Cosmo.

4            You've been out to Vegas a few times, right?

5    A.  No.  But I -- I wouldn't really know the difference really.

6    Q.  You know the difference of a really nice hotel and a not

7    really nice hotel, don't you, Mr. Blazer?

8            MR. BOONE:  Objection.

9            THE COURT:  Sustained.

10   Q.  Would you agree with me that the Venetian was a really nice

11   hotel?

12           MR. BOONE:  Objection.

13           THE COURT:  Sustained.

14   Q.  You have your own suite there at the Venetian?

15           MR. BOONE:  Objection.  Relevance.

16           THE COURT:  Sustained.

17   Q.  Isn't true that the government was also paying for your

18   hotel accommodations in Las Vegas?

19   A.  Yes.

20   Q.  At the Venetian, correct?

21   A.  Yes.

22   Q.  You were gambling too, weren't you, when you were out in

23   Las Vegas?

24           MR. BOONE:  Objection.

25           THE COURT:  Can I see the parties at sidebar.

J4Q9DAW3                        Blazer - Cross

1                (At sidebar)

2                THE COURT:  Mr. Haney.

3                MR. HANEY:  Yes, sir.

4                THE COURT:  Is he alleged to have been gambling in

5       connection with the investigation?

6                MR. BOONE:  I don't know where he's going with this.

7                MR. HANEY:  Your Honor, it goes to the integrity of

8       the entire investigation.  If he's out in Las Vegas and he is

9       being paid for by the government to drink and gamble and I

10      think the jury should at least be aware that that's part of

11      this case.  That goes to the credibility of the investigation.

12               THE COURT:  First of all, it's not illegal to gamble

13      in Las Vegas.  But was he reimbursed for any gambling?

14               MR. BOONE:  Not that I'm aware.

15               MR. MOORE:  Again, we haven't seen expense

16      reimbursements.  I understand that's been your Honor's ruling.

17      But I believe your Honor's ruling was that we could examine

18      with him what expenses he incurred.

19               And he just testified that he was out drinking alcohol

20      and he didn't pay for it, someone else did.  The next logical

21      question is:  Were you drinking alcohol with agents.  OK.  Who

22      were you drinking alcohol with?  And that -- I think that's an

23      appropriate line of questioning.  If an agent --

24               THE COURT:  What does it have to do with the

25      investigation?

J4Q9DAW3                          Blazer - Cross

1          MR. MOORE:  It has to do with how much leeway these

2     agents were giving this guy.  And they're basically turning him

3     into their own government agent.  The jury has a right to know

4     that.  The jury, I believe, has a right to know how much the

5     FBI is paying for him to stay at the Venetian.  I've stayed at

6     the Venetian.  It's a really nice hotel.  It's nicer than the

7     Cosmo.  Mr. Haney is correct.

8          MR. BOONE:  Your Honor, to address the alcohol point,

9     what has not been made clear is that the suite that was set up

10    for the coaches had alcohol in it for the coaches to drink.  I

11    assume that's what Mr. Blazer is referring to.  He wasn't out

12    sort of at the gambling tables drinking with the agents and

13    gambling money, if that's the suggestion.

14         THE COURT:  That's what my assumption was, that in

15    connection with the undercover meetings that were at a hotel

16    suite, they were drinking, there was food.  And to the extent

17    that he wasn't paying for that, that's fine, which is why I

18    allowed you to ask that.

19         MR. HANEY:  I understand.

20         My point to that is that we don't know what they were

21    doing after hours.  They could have been down at the Spearmint

22    Rhino, dare I say.

23         MR. MOORE:  We should be allowed to explore that.

24    Mr. Boone has an opportunity, as the Court knows, to come back

25    on redirect and clarify any point that he believes is not

1    appropriately clarified.  But we, because the government hasn't

2    called these agents, we don't have the opportunity to

3    cross-examine these agents about what -- the way they did and

4    did not give their witness.

5              And I would note for the record that the government's

6    primary case is built on the back of this witness, Mr. Blazer,

7    and his interpretations of conversations that he had.  And,

8    obviously, I'm sure your Honor knows that they're going to

9    hear -- we're going to talk about that in a closing statement,

10   for sure.

11             But we ought to be allowed to explore -- and I know

12   you're not going to give us a ton of leeway -- but we ought to

13   be able to explore he's drinking alcohol on the taxpayer dime.

14   Is he drinking alcohol only during the time period when he is

15   in the hotel room with those agents as apart from the

16   undercover; or is he also, after hours, having a beverage,

17   gambling, doing anything.  And I understand it's not illegal to

18   gamble in Las Vegas.  But most people when they go to Las Vegas

19   take advantage of the fact that it's not illegal to gamble.  I

20   certainly do.

21             THE COURT:  Or to do a lot of things.

22             MR. MOORE:  But I think this is an appropriate line of

23   examination and I would ask you give Mr. Haney a little bit of

24   leeway.

25             MR. SOLOWIEJCZYK:  Your Honor, respectfully, what

1    matters is what happened in the room on these tapes.  The

2    premise of all of this is basically that these defense

3    attorneys want to put the investigation on trial and that's

4    exactly what they're not allowed to do.  What the question is

5    what was the meaning of the words that happened in that room.

6    This is all really just totally immaterial.

7            THE COURT:  I agree with that.  I mean I think to the

8    extent that they went out -- they went to a casino and gambled

9    after hours I take it that he wasn't reimbursed for any of

10   that.

11           MR. BOONE:  I have never heard he did it.

12           MR. MOORE:  I don't know that the government knows the

13   answer to that question.

14           MR. BOONE:  We have no knowledge he gambled, period.

15           MR. MARK:  I have reviewed the reimbursement records

16   the FBI gave and there is no evidence of that whatsoever.

17           THE COURT:  To the extent that he used the per diem

18   money to -- for whatever he wanted to do, that's fine.  This is

19   as relevant to this case as the fact that he went to an art

20   museum when he wasn't meeting with them.  I mean it has no

21   relevance whatsoever.

22           Now, I mean to the extent that there was alcohol that

23   impeded his ability to remember, that's one thing, and I'm

24   happy to give you some leeway on that.  But what he did when he

25   wasn't meeting with these guys, what he did in his spare time,

J4Q9DAW3                          Blazer - Cross

1   I'm not going to allow you to go into that.

2            MR. MOORE:  Can we simply ask this one question?

3            You just said that you're having alcohol and you

4   weren't being paid for it.  When was it?  When did you have

5   alcohol when you weren't paid -- when you weren't paying the

6   bill?  Was it in the room or elsewhere?

7            Ask that question.  See what he says.  Is that an

8   appropriate question?

9            THE COURT:  Yes.

10           MR. HANEY:  I won't go much further with it.  I

11  understand the Court's position.

12           (Continued on next page)

J4Q9DAW3                        Blazer - Cross

 1                (In open court)

 2                THE COURT:  Mr. Haney.

 3                MR. HANEY:  Thank you, your Honor.

 4   Q.  Mr. Blazer when was it that you were drinking alcohol when

 5   you were in Las Vegas?

 6   A.  Only whenever I was in the suite.

 7   Q.  What about when you weren't in the suite?  Were you

 8   drinking alcohol?

 9   A.  No.

10   Q.  Never?

11   A.  Never.

12   Q.  Now, you've testified that you have decided to cooperate

13   with the government because you wanted to come clean.  That's

14   what you said on your direct examination I believe on day one;

15   is that right?

16   A.  Yes.

17   Q.  But aren't you testifying here and you have for the last

18   week not because you're just a really good guy and want to help

19   the government fight crime, right, Mr. Blazer?  Is that what

20   you are, a crime fighter?

21   A.  I don't understand the question.

22   Q.  You're not here testifying because you were just a really

23   good guy wanting to help the government fight crime, are you?

24   A.  I am testifying as part of my cooperation agreement.

25   Q.  In fact, you're here because you're what's called a

J4Q9DAW3                        Blazer - Cross

1   confidential informant, right?

2   A.  Yes.

3   Q.  A cooperator, as they say?

4   A.  Yes.

5   Q.  In fact, as you noted on prior occasions you met with the

6   government numerous times to discuss what you were going to say

7   here today; isn't that right?

8   A.  To discuss my testimony, yes.

9   Q.  That's what I just said.  They prepared you for this

10  testimony?  Is that a fair statement?

11  A.  We reviewed the transcripts and the video and audio

12  recordings.

13  Q.  On numerous occasions, right?

14  A.  Yes.  On numerous occasions.

15  Q.  Would you say more than ten times?

16  A.  I don't think more than ten times, less than ten, but

17  somewhere in there.

18  Q.  And that would have included even this week, right?

19  A.  Yes.  Even this week.

20  Q.  In fact, you even met with the attorneys that are in this

21  courtroom represented by the government in the front row in the

22  last few days, haven't you?

23  A.  Only up until yesterday.  After yesterday I was -- I

24  haven't had any interaction, any contact with them.

25  Q.  Which lawyers for the government have you met with to

J4Q9DAW3                          Blazer - Cross

 1   discuss your testimony here during this trial?

 2   A.  Primarily Mr. Boone.

 3   Q.  Mr. Boone would be the gentleman directly before me on the

 4   end of the table; is that correct?

 5   A.  Yes.

 6   Q.  And isn't it true that Mr. Boone made it real clear what he

 7   expected you to testify to; isn't that right?

 8   A.  No.

 9   Q.  Well you went over your notes to make sure that they would

10   be consistent here during the course of this trial, would you

11   agree?

12   A.  I didn't take any notes during our discussions.

13   Q.  Would you agree that you would rather not be doing this

14   here today, testifying under oath in a federal courtroom?

15   A.  Yes.  It's not pleasant.

16   Q.  Would you agree that the reason you're sitting in that seat

17   where you're sitting is because you made a lot of bad

18   decisions?

19   A.  Yes.  That's why.

20   Q.  You've admitted to the FBI, the U.S. Attorney's Office, and

21   others that you have committed numerous federal crimes, haven't

22   you?

23   A.  Yes.

24   Q.  I'm not going to go over all of them again, but wire fraud,

25   right?

1    A.   Yes.

2    Q.   Securities fraud?

3    A.   Yes.

4    Q.   Aggravated identity theft, right?

5    A.   Yes.

6    Q.   Mr. Blazer, you have told us you do not want to go to jail.

7    You're pretty clear about that, right?

8    A.   I don't know anybody that would want to go to jail.

9    Q.   Well that includes you I hope, correct?

10   A.   Yes.

11   Q.   And you understand that the aggravated identity theft count

12   alone carries a two-year mandatory minimum; isn't that right?

13   A.   That's not up to me.  I think that's up to the judge.

14        But yes, that's my understanding.

15   Q.   That no matter what, unless the government does something,

16   you've got to serve those two years on that aggravated identity

17   theft, correct?  That's your understanding?

18   A.   Again, I'm just here as part of the cooperation agreement

19   telling the truth.  I am not sure what the fate of that letter

20   or the outcome with my particular judge is going to be.  That's

21   not what I'm concerned with today.

22        It's to testify as to what my understanding of

23   everything that happened, not as to any outcome or -- I don't

24   know what is going to be determining factors on that letter, if

25   a letter will be submitted to the judge at my sentencing.

J4Q9DAW3                        Blazer - Cross

1    Q.   But what you do know is that the only way the judge can go

2    under that two-year minimum is if the government files a letter

3    stating that you provided substantial assistance; is that

4    right?

5    A.   Yes.

6    Q.   And you remember pleading guilty in this Court on

7    September 15, 2017 before Judge Broderick; isn't that right?

8    A.   Yes.

9    Q.   And you remember when you were in this courtroom on that

10   date, September 15, 2017, that Judge Broderick told you that if

11   the government determines in its sole discretion that you have

12   not complied with the terms of the agreement that it is relied

13   for making a motion on your behalf -- for relief for making a

14   motion on your behalf, that you cannot withdraw your guilty

15   plea?  Isn't that what he said?

16   A.   I remember him saying I cannot withdraw my guilty plea,

17   yes.

18   Q.   So you know that's the only way that you could avoid going

19   to prison for those two years is if they file that motion;

20   isn't that right?

21   A.   That's why I'm here telling the truth today and that's why

22   I've done what I've done.

23   Q.   And the Assistant U.S. Attorney who was in the courtroom

24   that day with you representing the government was Mr. Boone;

25   isn't that right?

J4Q9DAW3                          Blazer - Cross

1    A.   That's correct.

2    Q.   The same Mr. Boone who has asked you repeatedly during the

3    course of this trial to explain what you understood Mr. Dawkins

4    and Mr. Code to mean by comments they made during recorded

5    conversations; isn't that right?

6    A.   On the video and audio conversations, yes.

7    Q.   And you understand the only way you could get a probation

8    is if Mr. Boone files that letter; isn't that right?

9    A.   That's not up to me.  I'm not worried about that.  I'm

10   worried about today and doing what I have to do as part of

11   this -- that cooperation agreement.  I'm not worried about what

12   Mr. Boone or anybody else is going to do later on down the

13   line.  I'm hopeful, but I focused on telling the truth

14   throughout this.

15   Q.   You know when you gave your -- pleading guilty to these

16   crimes in front of Judge Broderick he told you that the

17   government has the sole discretion to determine whether or not

18   you've complied with that agreement; is that right or not?

19   A.   Yes.  The government has discretion over that.

20   Q.   Sole discretion is what the judge told you; isn't that

21   right?

22   A.   Yes.  Sole discretion.

23   Q.   And you know that that means you need to please Mr. Boone

24   and his cocounsel if you want that letter and the possibility

25   of probation; isn't that right?

1  A.  No.  That's not right.  That's not -- that's not what --

2  I -- if that means lying or doing something that's contrary to

3  what I did or understand something to be, then anything on that

4  cooperation agreement is out the window.

5  Q.  Mr. Blazer, all these federal crimes that you have

6  committed were done by you knowingly and voluntarily?  Is that

7  a fair statement?

8  A.  Yes.

9  Q.  You committed all these crimes because of your greed; isn't

10 that right?

11 A.  Yes.

12 Q.  Selfish too, right?

13 A.  Yes.

14 Q.  Didn't think about your family, did you?

15 A.  No.

16 Q.  You'd admit you are a greedy, selfish criminal?

17 A.  No.  I wouldn't agree that I'm a greedy selfish -- I've

18 done some greedy and selfish things.

19 Q.  You stated you are how old?

20 A.  49 years old.

21 Q.  You are decades older than Christian Dawkins, aren't you?

22 A.  Yes.

23 Q.  But as you're sitting here today testifying during this

24 trial, pointing the finger at the young kid over there so you

25 can get a break for all the criminally greedy things you did,

J4Q9DAW3                         Blazer - Cross

1    right?

2    A.  I'm not pointing a finger at anybody.  I didn't make the

3    decisions that Christian made and it wasn't my job to point a

4    finger or indict anybody.  That's not --

5    Q.  The decisions that you've interpreted for the jury to serve

6    your own interests; isn't that right?

7    A.  I cooperated with the federal government wherever that led

8    me to go.  I didn't text Christian in December of 2015.  He

9    texted me.  I didn't ask him to pay Lamont Evans.  He asked me.

10   Q.  Are you testifying today here under oath, Mr. Blazer, that

11   you are not hoping that Christian Dawkins gets convicted?

12   A.  That's not my job to hope either way.

13   Q.  So you're testifying that you're not here to convince this

14   jury that Christian Dawkins gave money to Lamont Evans for a

15   bribe?

16   A.  I don't believe I have to do that.  There is evidence and

17   text messages or texts and video and audio.  I don't believe I

18   have to -- I just have to tell the truth in what my part in it

19   was and what my understanding of things were as well.  I don't

20   think I have to -- I don't think I have to convince anybody of

21   anything.

22   Q.  In fact, you testified that you could be facing as long as

23   67 years in prison; isn't that right?

24   A.  Yes.  That's correct.

25   Q.  And, as Mr. Chaney noted, 67 years with your current age

J4Q9DAW3                        Blazer - Cross

1    would effectively be a life sentence to you potentially; isn't
2    that right, Mr. Blazer?
3    A.   Sure.
4    Q.   So would you agree with me that your life literally depends
5    on how your performance is in this courtroom during this trial?
6    A.   No.  As I said before --
7    Q.   That's a yes or no, sir.  I'm trying to move this along for
8    everyone's sake.  Yes or no.
9         Do you believe your life is on the line in this
10   courtroom, yes or no?
11   A.   I believe my telling the truth --
12        MR. HANEY:  Your Honor, he's not answering the
13   question.  I guess I could ask that he be directed to answer a
14   very simple question.  I don't know what else to do, your
15   Honor.
16        THE COURT:  Mr. Blazer, can you answer that question
17   yes or no.
18        MR. HANEY:  I'll ask it again, please, your Honor.
19        THE COURT:  You may.
20   Q.   Would you agree with me as you sit in that chair your life
21   is literally on the line based on what your testimony is in
22   this room?
23   A.   No.  I won't -- I don't agree with that.
24   Q.   Is it fair to say you don't want to go to prison?
25   A.   That's fair to say.

J4Q9DAW3                          Blazer - Cross

```
 1   Q.  Is it fair for me to say that your mind you believe that by

 2   testifying against Christian Dawkins you are going to help that

 3   from becoming a reality, yes or no?

 4   A.  By testifying here today I'm cooperating.

 5   Q.  You've never been to prison before have you, Mr. Blazer?

 6   A.  No.

 7   Q.  And I'd bet you've thought about it, haven't you, for the

 8   last year, what it would be like?

 9   A.  I've thought about it.

10   Q.  Fair to say you might have nightmares about going to prison

11   don't you, Mr. Blazer?

12   A.  Fair to say.

13   Q.  You don't want to live in prison for the rest of your life,

14   do you?

15            MR. BOONE:  Objection.

16            THE COURT:  Overruled.

17            THE WITNESS:  No.

18   Q.  And you would say anything to make sure that didn't happen,

19   wouldn't you?

20   A.  I would not say anything to make sure that that happened.

21            MR. HANEY:  Thank you, your Honor.  I have nothing

22   further.

23            THE COURT:  Redirect.

24            (Continued on next page)

25
```

J4Q9DAW3                      Blazer - Redirect

1    REDIRECT EXAMINATION

2    BY MR. BOONE:

3    Q.  Mr. Blazer, I'm going to bounce around a little bit on

4    different topics.  I want to first talk about you were asked on

5    cross-examination whether you were testifying against Christian

6    Dawkins.  Do you recall that?

7    A.  Yes.

8    Q.  Now, based on your recollection of your testimony is it

9    fair to say that most of your testimony related to recorded

10   conversations and videotapes?

11              MR. CHANEY:  Objection, your Honor.  Leading.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yes.

14   Q.  And so, is it fair to say you were, generally speaking,

15   shown a tape, shown a recording, and asked questions based off

16   of that?

17   A.  Yes.

18   Q.  And some of those recordings involved defendants talking

19   about paying coaches?

20   A.  Yes.

21   Q.  And there was a video of Christian Dawkins handing cash to

22   a coach?

23   A.  Yes.

24   Q.  You were asked about that?

25   A.  Yes.

J4Q9DAW3                              Blazer - Redirect

1    Q.  And there is an audio recording of Merl Code having a

2    conversation with you and others?

3           MR. CHANEY:  Your Honor, I'm going to object.  These

4    are all leading questions.

5           THE COURT:  Overruled.

6           THE WITNESS:  Yes.

7    Q.  And you talked about essentially what happened in that

8    meeting?

9    A.  That's correct.

10   Q.  And that included Code talking about his value to the

11   group, the group being the newly formed company we've

12   discussed?

13   A.  Yes.

14   Q.  And that value being his connection to college coaches and

15   others in the basketball space?

16   A.  Yes.

17   Q.  And in that conversation there are discussions of paying

18   college coaches?

19          MR. HANEY:  Your Honor, I would join that objection.

20   These are all leading questions.

21          THE COURT:  Speak over here.

22          (Continued on next page)

23

24

25

1          (At sidebar)

2          MR. HANEY:  Your Honor, I would join in the objection.

3    He just asked a string of fifteen leading questions.  I

4    understand that there's ability to lay a foundation in a

5    leading manner but not just to testify for the witness is what

6    he's doing.  This is cross-examination.

7          MR. BOONE:  Your Honor, it's fairly common in this

8    district to allow leading questions on redirect.  That's the

9    practice.

10          MR. HANEY:  I will follow the rules of the district.

11          THE COURT:  It is a common that prosecutors are given

12    a substantial amount of leeway on redirect examination

13    obviously because they haven't had a chance to prepare the

14    witness.

15          I will say, however, Mr. Boone, that you are going a

16    little far with the substance.  I thought that you were going

17    to say isn't it true that you were asked the questions -- the

18    questions that you were asked essentially were all from these

19    tape recorded conversations and you would have made your point

20    but you went very deep into the substance of those

21    conversations and I would ask that you peel back a little bit.

22          MR. BOONE:  Yes, your Honor, I will.

23          MR. MOORE:  Your Honor, could I ask one question.  Do

24    you allow recross after redirect limited to specific points

25    that are made?

J4Q9DAW3                          Blazer - Redirect

1              THE COURT:  I will give you a little bit of recross if

2       you think you want recross.

3              MR. MOORE:  Thank you, Judge.

4              (Continued on next page)

J4Q9DAW3                        Blazer - Redirect

1              (In open court)

2    Q.  Now I want to switch gears a little bit.  You were asked on

3    cross questions regarding Lamont Evans.  Do you remember that?

4    A.  Yes.

5    Q.  And I believe you were asked questions about whether or not

6    Evans was pitching you.  Do you recall that?

7    A.  Yes.

8    Q.  Now, how did you meet Lamont Evans again?

9    A.  Christian Dawkins introduced me to Lamont Evans.

10   Q.  And I think you testified that you had an understanding

11   that Christian Dawkins had been paying Lamont Evans; is that

12   correct?

13   A.  Yes.  He told me he had been paying Lamont Evans.

14   Q.  And then you subsequently started paying Lamont Evans,

15   correct?

16   A.  Yes.  At Christian's request.

17   Q.  And after paying Lamont Evans did there come a time when he

18   actually introduced you to a basketball player?

19   A.  Yes.

20   Q.  And who was that?

21   A.  Jeffrey Carroll at Oklahoma State.

22   Q.  And you also testified that Munish Sood was involved in

23   these payments to Lamont Evans; is that correct?

24   A.  That's correct.

25   Q.  And based on your conversations with Munish Sood did there

1    come a time when Lamont Evans introduced him to a basketball

2    player?

3    A.  Yes.

4    Q.  Who was that?

5    A.  PJ Dozier.

6            MR. HANEY:  Objection, your Honor, exceeding the

7    scope.

8            THE COURT:  Overruled.

9    Q.  Do you know if Evans introduced Sood to anyone else in the

10   basketball space?

11   A.  I don't know.

12   Q.  Do you know if -- based on your conversations with Sood if

13   Evans also introduced Sood to PJ Dozier's mother?

14   A.  Oh, yes.  Yes.  PJ Dozier and his mother.

15   Q.  Now, you were also asked some questions about Christian

16   Dawkins' employment particularly as a runner.  Do you recall

17   that?

18   A.  Yes.

19   Q.  You're familiar with what a runner is, obviously, right?

20   A.  Yes.

21   Q.  And just to refresh the jury's memory, what's a runner

22   again?

23   A.  A runner is an individual who works for a registered agent

24   and helps develop relationships with athletes and brings them

25   back for the agency, develops the relationships, cultivates the

1    relationships, initiates the relationships a lot of times.

2    Q.  Now based on your experience in the sports industry do

3    runners work for free?

4    A.  No, they do not.

5    Q.  Who do they get paid by?

6    A.  The agent.

7    Q.  And your understanding at some point became that you

8    understood Dawkins to be a runner for the agency, right?

9    A.  Yes.

10   Q.  Did you understand it to be a voluntary position?

11   A.  No, it was not.

12   Q.  Now, you also testified to the fact that ultimately

13   Christian Dawkins was fired and then he started his own

14   company, right?

15   A.  Yes.

16   Q.  And you testified that that company -- well let me ask you.

17   What did you understand was going to be the purpose of that

18   company?

19   A.  The purpose of that company was going to be for the

20   business and financial management for the athletes.

21   Q.  And is that different than being an agent of an athlete?

22   A.  It is, yes.

23   Q.  And based on your experience in the sports industry, is

24   that work that you would charge for or is that work you would

25   give away for free?

1           MR. HANEY:  Objection to the form, your Honor.

2           THE COURT:  Overruled.

3           THE WITNESS:  Could you repeat the question, please.

4   Q.  Sure.  Let me try to be more clear.

5           I believe you just testified that your understanding

6   was that the new company Dawkins was forming was going to do

7   business management services for its clients, right?

8   A.  Yes.

9   Q.  And did you have an understanding that they were going to

10  be paid, they were going to expect their clients to pay them

11  for that service?

12          MR. HANEY:  Objection.  Foundation, your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.  The clients were going to be

15  paying them for those services.

16  Q.  It was not your understanding it was going to be a

17  nonprofit?

18  A.  That is correct.

19  Q.  It was not your understanding it was going to be a free

20  service?

21  A.  No.  They were going to make a lot of money.

22          MR. HANEY:  Objection, your Honor.  Now he's

23  speculating.  He doesn't know how much they are getting paid.

24          THE COURT:  Overruled.

25          MR. HANEY:  Thank you.

J4Q9DAW3                         Blazer - Redirect

```
 1    Q.  Now you were also asked a few questions about Las Vegas.
 2    There was a question in particular regarding how much money
 3    certain coaches were paid.  To help the jury, can you remind us
 4    who got paid in Las Vegas?
 5    A.  Brad Augustine on behalf of -- Brad Augustine who was a
 6    grassroots coach on behalf of Jordan Fair who was an assistant
 7    coach as Louisville.
 8              Preston Murphy from Creighton.
 9              Tony Bland from USC.
10              Corey Barker from TCU.
11              And Lamont Evans from Oklahoma State.
12    Q.  And to the extent you can remember, if you could tell the
13    jury how much each of those individuals got paid?
14    A.  Brad Augustine got paid $11,700 on behalf of Jordan Fair.
15              Preston Murphy was $6,000.
16              Tony Bland was $13,000.
17              Corey Barker was $6,000.
18              And Lamont Evans was $4500.
19    Q.  Now, not requiring you to do too much math on the stand but
20    is it fair to say the total amount is more than $25,000?
21    A.  Yes, it is.
22    Q.  Now I want to ask a little bit about, you were asked some
23    questions about the basketball business.  I believe you
24    testified earlier you don't watch basketball; is that right?
25    A.  That's correct.
```

1   Q.  And when you were a financial adviser to athletes did you

2   represent basketball players?

3   A.  No, I did not.

4   Q.  Did you represent college coaches?

5   A.  No, I did not.

6   Q.  And I'm referring specifically to college basketball

7   coaches?

8   A.  No, I did not.

9   Q.  Did you interact with college basketball coaches?

10  A.  I didn't.

11  Q.  Were you friends with college basketball coaches?

12  A.  I wasn't.

13  Q.  You've testified a lot about grassroots and what that

14  means.  Prior to your cooperation with the government were you

15  familiar with grassroots basketball?

16  A.  No.

17  Q.  Were you familiar with apparel companies' affiliations with

18  grassroots basketball?

19  A.  No.

20  Q.  You testified that the meeting in Vegas occurred in Vegas

21  in part because there was some sort of basketball event

22  happening that weekend; is that correct?

23  A.  Correct.

24  Q.  And I think you testified that your understanding was that

25  some coaches would be there for that event, right?

1    MR. HANEY:  Your Honor, I would object to the leading
2    form of the question.
3    THE COURT:  Overruled.
4    MR. HANEY:  Thank you.
5    THE WITNESS:  That's correct.
6    Q.  Do you -- did you know what the event was?
7    A.  I didn't know specifically what the event was, no.
8    Q.  Do you know if Dawkins knew what the event was?
9    A.  I understood that he did know what the event was.
10   Q.  Now, you testified earlier also that when you -- in the
11   beginning stages of your relationship with Christian Dawkins,
12   he had informed you about the fact that he had been paying
13   Lamont Evans; is that correct?
14   A.  That's correct.
15   Q.  Prior to him informing you that, did you know anyone who
16   was paying college basketball coaches?
17   A.  No.
18   Q.  And you testified earlier that obviously in Vegas you met a
19   lot of coaches, right?
20   A.  Correct.
21   Q.  And payments were made to those coaches?
22   A.  Yes.
23   Q.  So I want to go through some of those coaches.
24       You met Corey Barker?
25   A.  Yes.

1    Q.  Did you know Corey Barker before that meeting?

2    A.  No.

3    Q.  Do you know if Dawkins knew him?

4    A.  I believed he did, yes.

5    Q.  You met Tony Bland?

6    A.  Yes.

7    Q.  Did you know him before that meeting?

8    A.  No.

9    Q.  Did you know if Dawkins knew him?

10   A.  I believe he did, yes.

11   Q.  You met Preston Murphy?

12   A.  Yes.

13   Q.  Did you know him before that meeting?

14   A.  No, I didn't.

15   Q.  Do you know if Dawkins knew him?

16   A.  Yes.

17   Q.  You met Jordan Fair?

18   A.  Yes.

19   Q.  Did you know him before that meeting?

20   A.  No.

21   Q.  Did you know if Dawkins knew him?

22   A.  Yes.

23   Q.  You met Lamont Evans?

24   A.  Yes.

25   Q.  Prior to meeting Lamont Evans through Dawkins, did you know

1    him?

2    A.   No.

3    Q.   You met Steve Smith?

4    A.   Yes.

5    Q.   Prior to that meeting did you even know who he was?

6    A.   Didn't know who he was.

7    Q.   Do you know if Dawkins knew who he was?

8    A.   Yes, he did.

9    Q.   You met an Anthony Coleman?

10   A.   Yes.

11   Q.   Prior to that meeting had you met Anthony Coleman?

12   A.   No.

13   Q.   Did Dawkins know him?

14   A.   Yes, he did.

15   Q.   You met Yasir Rosemond?

16   A.   Yes.

17   Q.   Prior to that meeting, had you met Yasir Rosemond?

18   A.   No.

19   Q.   Do you know if Dawkins knew him?

20   A.   Yes.

21   Q.   You met Amir Abdur-Rahim?

22   A.   Yes.

23   Q.   Prior to that meeting had you met him?

24   A.   No.

25   Q.   Do you know if Dawkins knew him?

J4Q9DAW3                        Blazer - Redirect

1   A.  Yes.

2   Q.  You met Raphael Chillious?

3   A.  Yes.

4   Q.  Prior to that meeting had you met him?

5   A.  No.

6   Q.  Had you even heard the name?

7   A.  No.

8   Q.  Do you know if Dawkins knew him?

9   A.  Yes.

10          MR. BOONE:  No further questions.

11          THE COURT:  Any brief redirect?

12          MR. HANEY:  Not on behalf of my client, your Honor.

13          THE COURT:  Mr. Chaney.

14          MR. CHANEY:  One moment, Judge.

15          THE COURT:  Recross I meant.

16          MR. CHANEY:  No questions, Judge.

17          THE COURT:  Mr. Blazer, you may step down.

18          (Witness excused)

19          THE COURT:  Does the government have the next witness?

20          MR. MARK:  Your Honor, before we call the next witness

21   there are a couple text message, wiretap calls we would plan to

22   play.

23          THE COURT:  Very well.

24          MR. MARK:  The first exhibit the government would

25   offer would be Exhibit 1619C which is pursuant to the

J4Q9DAW3                        Blazer - Redirect

1     stipulation 1904 that covers text messages from Christian

2     Dawkins' phone.

3               We offer that exhibit.

4               THE COURT:  Any objection?

5               MR. HANEY:  No objection, your Honor.

6               THE COURT:  1619C was it?

7               MR. MARK:  Correct, your Honor.

8               THE COURT:  Will be received.

9               (Government's Exhibit 1619C received in evidence)

10              MR. MARK:  Ms. Bustillo, if you my publish.

11              THE COURT:  You may.

12              MR. MARK:  As I said, this is a text message from

13    Christian Dawkins' phone.  The top message says it's to Merl

14    Code.  The date is June 28, 2017.

15              And the message says:  Yup.  He texted me early

16    morning.  I spoke to Jeff too.  I will call you when I get

17    around from Justin.  He is willing to do 3K a month retainer

18    for you and 5K for each coach you refer that we can do business

19    with.  So essentially if you introduce him to one guy who

20    needed help a month you could take an 8K cash a month.

21              And from Merl Code in response, on June 28, 2017 at

22    6:30 is the response:  OK.  Cool.  Yeah.  Call me because we

23    need to discuss.

24              The next text message that we would offer pursuant to

25    that same stipulation is Government Exhibit 1619A.  We offer

J4Q9DAW3                        Blazer - Redirect

1    that exhibit.

2              THE COURT:  Any objection?

3              MR. CHANEY:  No objection.

4              THE COURT:  That exhibit will be received.

5              (Government's Exhibit 1619A received in evidence

6    received in evidence)

7              MR. MARK:  As I said, this is another text message

8    from Christian Dawkins' phone.  It starts out -- a text message

9    from Merl Code on the date July 25, 2017 to Christian Dawkins.

10             It reads:  Let's discuss once you've reviewed.  Have

11   not spoken to them about the time slots.

12             And it continues from Merl Code.  It says:  My

13   prioritized list of schools, and then lists a number of names,

14   Preston Murphy, Rafael Chillious, Shawn Forrester, Steve Smith,

15   Jamil Jones, Scotty Thurman, Rahim Lockart, Yasir Rosemond,

16   Amir Abdur-Rahim, Anthony Coleman, Tony Bland, and Kenya

17   Hunter.

18             And then Merl Code writes:  That schedule works.

19   We'll call you in a second.

20             Continue on to the next page.

21             And we'll just highlight a few of these.  On July 25

22   of 2017 Merl Code writes:  OK just sent to all the coaches.

23   You can tell T Bland he's scheduled at 2:30 p.m. Friday.

24   Continues:  OK is everyone good with that?

25             Merl Code continues:  Everyone has responded by saying

J4Q9DAW3                        Blazer - Redirect

1   cool.  I'll let you know if something comes up.

2            If we could go to the next page.  Just highlighting on

3   July 25 from Merl Code.  I met with Louisville and Balsa

4   Koprivica people at 10:30.

5            Sorry.  That's from Christian Dawkins to Merl Code.

6            At the bottom of this text message from Merl Code to

7   Christian Dawkins, July 25:  Make sure you're keeping up with

8   this shit.  Anthony Coleman can meet at midnight Thursday.

9            If we can go to the next page.

10           If we could flip to the next page, Ms. Bustillo.  As

11  these continue.

12           Turn to the next page.  And the next one.  I'm sorry.

13  If you could just go back.  One more page back.

14           If you could highlight 665 from Merl Code on July 28

15  to Christian Dawkins:  How did it go last night?

16           And further down at 670 from Merl Code to Christian

17  Dawkins:  It was good.  I'm sorry.  From Christian Dawkins to

18  Merl Code:  It was good.  We kept it short with AC.  So

19  everyone is on schedule.  I'm going to do Preston at 9:30.

20           And can we continue.

21           (Counsel confer)

22           MR. MARK:  If you could continue to what's at line 677

23  from Merl Code to Christian Dawkins:  Preston now.  10:30

24  Forrester.  11 Steve.  11:30 Chill.

25           Then you can continue to line 684.  From Merl Code to

1    Christian Dawkins on July 28:  AC called me too.  Said Marty

2    was cool.  Jeff weirded him out.

3            If we could go down to 691.  From Merl Code to

4    Christian Dawkins:  Shit show.  Yasir is a good dude.

5            If we could go to line 697.  From Merl Code to

6    Christian Dawkins:  Updates?

7            And if we could go down to 702 from Merl Code to

8    Christian Dawkins on July 29:  Do we need to do Kenya?  I think

9    we have done enough for them to see value.  Can Kenya really

10   get dudes?  Jamil I believe is leaving town as well.

11           And Merl Code continues:  We probably should.  Not

12   knowing where he'll end up after this season.  I agree we've

13   shown enough value.  But my money we're associated with the

14   number of meetings, correct?

15           And it continues.  From Christian Dawkins to Merl

16   Code:  Let me confirm for you tonight but we should be OK.

17           OK.  Let me know is the response from Merl Code.

18           and pursuant to the same stipulation the government

19   will now offer Government Exhibit 1627E which is a text message

20   chain between Christian Dawkins and Lamont Evans.

21           THE COURT:  Any objection?

22           MR. HANEY:  No objection, your Honor.  Thank you.

23           THE COURT:  OK.  1627E will be received but we will

24   look at it at 1 o'clock.  It's time for our second break.

25   Please be prepared to come out at 1.  Don't discuss the case.

J4Q9DAW3                          Blazer - Redirect

1            (Government's Exhibit 1627E received in evidence)

2            THE COURT:  OK.  Fifteen minutes.

3            (Recess)

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4QHDaw4

1          (Jury present)

2          THE COURT:  Everyone please be seated.

3          Mr. Mark.

4          MR. MARK:  Thank you, your Honor.

5          As I mentioned, this is an excerpt of a text message

6    chain from Christian Dawkins' phone with Lamont Evans.

7          Ms. Bustillo, could we just highlight the section on

8    the first page or, I guess, the second page of this exhibit on

9    July 8.  It's about the first four lines.

10          The first is an outgoing text from Christian Dawkins'

11    phone asking a question:  "Is Jeffrey Carroll a first rounder?"

12          The response from Lamont Evans on July 8:  "Is a bit

13    better than advertised.  Josh Hart was in heavy draft.  He is,

14    with what's out there, shoot it better, more athletic."

15          Outgoing from Christian Dawkins' phone to Lamont

16    Evans:  "Who's involved?  Can we get him?"

17          Lamont Evans' reply:  "We gonna mofo swap this year."

18          Now, pursuant to the wiretap stipulation, the

19    government would offer Government Exhibit 118 and the

20    corresponding transcript of 118T.

21          May we publish, your Honor?

22          THE COURT:  You may.

23          MR. MARK:  Thank you.

24          (Government's Exhibit 118T received in evidence)

25          MR. MARK:  This is a wiretap call from Christian

J4QHDaw4

1    Dawkins' phone dated July 13, 2017.

2              Ms. Bustillo, if you can play.

3              (Audio played)

4              MR. MOORE:  Your Honor, could we pause a second?

5              THE COURT:  Pause for a second.

6              MR. MOORE:  Could we approach for a second?

7              THE COURT:  Yes.

8              (Continued on next page)

J4QHDaw4

1           (At sidebar)

2           MR. MOORE:  I'm going to file a late -- I'm going to

3    have to withdraw my agreement to admit this exhibit and move

4    that we strike it.  There is a lot of information in here about

5    Brian Bowen which really has almost nothing to do with this

6    case.  In addition, I understand that the government seeks to

7    introduce the statements of Christian Dawkins.  And their

8    purpose in putting the information, the quotations from the

9    agent who is not testifying into evidence, is to put

10   Mr. Dawkins' testimony into context or statements that he

11   makes, but here, this isn't Mr. Dawkins saying something and

12   the agent is putting this into context.  This is they were

13   seeking to elicit, through the use of exhibits like this,

14   testimony from this agent who was unsworn, not here.  He's a

15   silent witness.

16          So I move -- I withdraw my previous consent to allow

17   this document into evidence, and I move to strike it.

18          MR. MARK:  Your Honor, first, I mean, these are

19   Christian Dawkins' own statements.  They can be used against

20   him.  Any of the statements that the agent are making are not

21   for the truth at all.  They're just to put them in.

22          Second, Christian Dawkins' statements are statements

23   in furtherance of this conspiracy, and then they are also

24   admissible, as a result, against Mr. Merl Code.

25          MR. HANEY:  Your Honor, I would note that part of this

J4QHDaw4

1    conspiracy does not include evidence of Brian Bowen.  That was

2    in a trial we had six months ago, and there's a lot of

3    references in this particular conversation about Brian Bowen.

4    I don't believe there's any factual reason for that in this.

5    It's overly prejudicial.

6            MR. MARK:  There's no reference to the name Brian

7    Bowen whatsoever.  It goes to the fact how these guys know to

8    communicate about these types of payments that deal with money

9    and not to put those in text messages.  There's -- Brian

10   Bowen's not referenced.  They know because they know from

11   context.  We're not going to go there.  Just playing this call.

12           MR. MOORE:  I would just also state, your Honor, for

13   the record oftentimes there's a 10- to 12-line quote from this

14   agent who allegedly put a two-word or three-word comment from

15   Mr. Dawkins in context, and I believe that what the government

16   is telling you, that they're not offering this for the truth of

17   the matter asserted, but in point of fact, they are offering it

18   for the truth of the matter asserted and --

19           THE COURT:  The guy was an undercover.  He was lying

20   the entire time.

21           MR. MOORE:  The government hasn't established that he

22   was lying the whole time because the government hasn't put him

23   on the witness stand and put him in front of the jury, but he

24   is explaining on this tape what he is doing with this money

25   that he allegedly was sending to my client, Mr. Code.  And I

J4QHDaw4

1     think, for 403 purposes as well, this is excludable.

2              MR. MARK:  I mean, this is directly relevant evidence.

3     I don't understand what prejudicial value this has at all.

4              THE COURT:  The objection is overruled.  I will allow

5     them to play the tape.  I don't see how they're being -- how

6     the defendants are being prejudiced in any way by this.  It is

7     a coconspirator testimony.  It's admissible in that regard, and

8     to the extent that one agent is saying more words in the

9     conversation than Mr. Dawkins is of no particular moment.

10             MR. CHANEY:  Your Honor, if I may, would the Court be

11    willing to read a limiting instruction to the jury to simply

12    instruct them that the agent's statements that they hear are

13    not evidence of anything; they're admitted only for the limited

14    purpose of giving context; they cannot be relied upon to prove

15    any material issue?

16             THE COURT:  Draft some language, and I'll consider it.

17             MR. MOORE:  Thank you, Judge.

18             THE COURT:  Yes.

19             (Continued on next page)

20

21

22

23

24

25

J4QHDaw4

1                    (In open court; jury present)

2                    MR. MARK:  Ms. Bustillo, you can continue playing the

3       recording.

4                    (Audio played)

5                    MR. MARK:  Ms. Bustillo, could you publish again

6       Government Exhibit 1627E now.  And if we could go to the second

7       page on the bottom, just highlight the last two lines.

8                    From July 23, 2017, outgoing from Mr. Dawkins' phone

9       to Mr. Lamont Evans:  "What day you get into Vegas?"

10                   And the response from Mr. Invest Evans:  "Wednesday.

11      You got hotel connect?"

12                   If we could go to the next page, and if you could

13      highlight on the third line, outgoing from Mr. Dawkins to

14      Mr. Evans:  "Let's connect."  And if we could now highlight

15      from 5:53 and those couple lines.

16                   And on July 28, from Lamont Evans:  "You got what you

17      on?"

18                   And the response from Mr. Dawkins' phone:  "With ur

19      guy MB!"

20                   Then if you could go down a little bit to just

21      highlight everything on July 29 at 4:27, about 3 p.m. down.

22      Outgoing from Mr. Dawkins' phone:  "You will be at Cosmo at

23      ten?"

24                   Response from Mr. Evans:  "Yeah."

25                   If we could scroll down to August 1 at 8:54.  From

J4QHDaw4

1   Mr. Dawkins to Lamont Evans:  "I got a suite at the Players

2   Hotel at Adidas nation.  Can I meet with Jeffrey there?"

3           If we could go to the next page, Ms. Bustillo.

4           You see on the third line, August 3, 2017, at 9:06

5   outgoing from Mr. Dawkins' phone to Mr. Evans:  "Can I get with

6   JC tonight?  I'm about to take off, but I'm in the same

7   building as him."

8           And if we go down, Ms. Bustillo, to August 6, 2017, at

9   4:18 a.m, you can highlight incoming from Mr. Evans:  "Dude

10  wanted to meet.  Don't know why.  Goof troop didn't hit back."

11          And a couple lines below, outgoing from Mr. Dawkins'

12  phone:  "Any word back?"

13          Then, further, a question from Mr. Dawkins:  "He hit

14  you?"

15          Then if we could just highlight on the next page, the

16  last four lines, and you see Lamont Evans incoming to

17  Mr. Dawkins' phone on August 7:  "Asked for your number?"

18          Mr. Dawkins' reply:  "What's his number?"

19          And incoming is a contact card for Jeffrey Carroll

20  OSU.

21          The government now offers, pursuant to the text

22  message stipulation, Government Exhibit 1619B.

23          THE COURT:  Any objection?

24          MR. HANEY:  No objection, your Honor.

25          MR. MOORE:  No objection.

J4QHDaw4

1          THE COURT:  1619B will be received.

2          (Government's Exhibit 1619B received in evidence)

3          MR. MARK:  Ms. Bustillo, could you just publish the

4     top half first.

5          This is a text message between Mr. Dawkins and

6     Mr. Code.  First on August 8 from Mr. Code, a list of names,

7     and the bottom you can just highlight "Jeffrey Carroll."

8          If you could continue down, it says "Guys to watch"

9     from Mr. Code and -- sorry, that's from Mr. Dawkins to

10    Mr. Code.  It says "Guys to watch," and then continue down on

11    August 8, 2017, "of that group," list of names, "last one

12    Carroll are guys I want to target."

13         And response from Mr. Code, "OK.  Cool.  Call you in

14    45."

15         The government now offers, pursuant to the wiretap

16    stipulation, an excerpt of a call from the wiretap of Merl

17    Code's phone, and that is Government Exhibit 3A and the

18    corresponding transcript, 3T.  Just so the record's clear,

19    that's an excerpt of a call from between Merl Code and Lamont

20    Evans.

21         THE COURT:  Very well.

22         MR. MARK:  This has been received in evidence, your

23    Honor, correct?

24         THE COURT:  You tell me.

25         MR. MARK:  I didn't hear any objection.

J4QHDaw4

1          MR. MOORE:  I don't believe it's been moved in, but I

2     have no objection.

3          THE COURT:  OK.  3 and 3T will be received.

4          (Government's Exhibits 3 and 3T received in evidence)

5          MR. MARK:  Ms. Bustillo, may we just -- can you pause

6     it one second.  Could we just go to the cover.

7          This is a call from August 13, 2017, at 8:10 between

8     Lamont Evans and Merl Code.  Just now play that excerpt.

9          (Audio played)

10          MR. MARK:  The government now offers, pursuant to the

11     wiretap stipulation, a call from Christian Dawkins' phone with

12     Corey Barker, which is marked as Government Exhibit 139, and

13     the corresponding transcript, 139T.

14          THE COURT:  Any objection?

15          MR. HANEY:  No objection, your Honor.

16          MR. MOORE:  No objection.

17          THE COURT:  Those exhibits will be received.

18          (Government's Exhibits 139 and 139T received in

19     evidence)

20          MR. MARK:  This is a call from September 16, 2017, at

21     8:25 p.m., as I said, between Christian Dawkins and Corey

22     Barker.  May we play this.

23          (Audio played)

24          MR. MARK:  All right.  Your Honor, that completes the

25     portion of the text messages and wiretap calls, and the

J4QHDaw4                        Sood - Direct

1    government will call its next witness, Munish Sood.

2              THE COURT:  Sir, please step all the way forward.

3    Please watch your step.  Step up into the witness box next to

4    me and remain standing.

5    MUNISH SOOD,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8              MR. SOLOWIEJCZYK:  May I inquire, your Honor?

9              THE COURT:  You may.

10   DIRECT EXAMINATION

11   BY MR. SOLOWIEJCZYK:

12   Q.  Good afternoon, Mr. Sood.  How old are you?

13   A.  Forty-six.

14   Q.  In what industry have you worked for the majority of your

15   professional life?

16   A.  Investments.

17   Q.  Do you invest money on behalf of clients?

18   A.  Yes.

19   Q.  What types of clients do you work with?

20   A.  It ranges from institutional, wealthy families, and

21   professional athletes.

22   Q.  Mr. Sood, I want to direct your attention to July 20 of

23   2017.  Do you recall a meeting that took place in your office

24   that day?

25   A.  Yes.

J4QHDaw4                              Sood - Direct

1    Q.  Who did you meet with?

2    A.  Emanuel Richardson, assistant coach at University of

3    Arizona, and Jeff D'Angelo.

4    Q.  At the time, who did you understand Mr. D'Angelo to be?

5    A.  A partner, investor.

6    Q.  An investor in what?

7    A.  In a company we had formed.

8    Q.  Who else was part of forming that company?

9    A.  Christian Dawkins.

10   Q.  What did you later learn about Mr. D'Angelo?

11   A.  That he was an undercover FBI agent.

12   Q.  Now, Mr. Sood, what happened at that meeting?

13   A.  Just Emanuel Richardson came in, met with us for about an

14   hour, and then just kind of gives us an update on his business.

15   When he left, Jeff D'Angelo gave him an envelope of $15,000.

16   Q.  Had Richardson previously requested that money?

17   A.  Yes.

18   Q.  Did he request that money directly through -- did he

19   request that money directly or did he ask through somebody

20   else?

21   A.  Through someone else.

22   Q.  Who was that?

23   A.  Christian Dawkins.

24   Q.  Do you see Mr. Dawkins here today in the courtroom?

25   A.  Yes.

J4QHDaw4                              Sood - Direct

```
 1   Q.  Can you please identify where he's seated and an article of
 2   clothing that he's wearing.
 3   A.  Second row, white shirt.
 4              MR. SOLOWIEJCZYK:  Your Honor, let the record reflect
 5   that the witness has identified the defendant Christian
 6   Dawkins.
 7              THE COURT:  The record will so reflect.
 8   Q.  Mr. Sood, what was the purpose of the payment that you were
 9   making to Richardson?
10   A.  I believe the payment was for Emanuel Richardson to recruit
11   a specific player.
12   Q.  Why were you willing to give him this $15,000?
13   A.  So we may have the -- we, as a company, may have an
14   opportunity to work with the player if he goes pro.
15   Q.  Was this payment the only time that your company made
16   payments to coaches?
17   A.  No.
18   Q.  Were there other coaches that got paid?
19   A.  Yes.
20   Q.  Did your company pay anyone to make introductions to
21   coaches that you then paid?
22   A.  Yes.
23   Q.  Who was that?
24   A.  Merl Code.
25   Q.  Do you see Mr. Code here in the courtroom today?
```

1   A.  Yes.

2   Q.  Can you please identify where he's seated and an article of

3   clothing that he's wearing.

4   A.  Second row, gray sports coat.

5           MR. SOLOWIEJCZYK:  Your Honor, let the record reflect

6   that the witness has identified the defendant Merl Code.

7           THE COURT:  The record will so reflect.

8   Q.  Mr. Sood, have you pleaded guilty to federal crimes as a

9   result of your involvement in paying these coaches?

10  A.  Yes.

11  Q.  Generally, what types of crimes did you plead guilty to?

12  A.  Bribing a coach and wire fraud.

13  Q.  All right.  Mr. Sood, we'll talk about the details of that

14  later.  I want to turn back now to your background,

15  educationally and professionally.

16          How far did you go in school?

17  A.  Undergraduate degree in finance.

18  Q.  Where'd you go to college?

19  A.  Rider University.

20  Q.  Have you ever obtained any certifications or licenses in

21  the field of finance?

22  A.  Yes.

23  Q.  What sorts of licenses and certifications?

24  A.  The Series 7, 63, and 24.

25  Q.  Generally, what do those allow you to do?

J4QHDaw4                          Sood - Direct

1   A.  Manage money and trade securities.

2   Q.  Did you have to take any exams to get those certifications?

3   A.  Yes.

4   Q.  Where do you currently work?

5   A.  Firm called Princeton Advisory Group.

6   Q.  What kind of company is Princeton Advisory Group?

7   A.  Investment firm.

8   Q.  Where is Princeton Advisory Group based?

9   A.  Princeton, New Jersey.

10  Q.  Who owns the company?

11  A.  I do.

12  Q.  When did you found it?

13  A.  2002.

14  Q.  Approximately how many employees do you currently have?

15  A.  Just two.

16  Q.  In approximately 2017, how many employees did you have?

17  A.  Five.

18  Q.  Before Princeton Advisory, were you employed at other

19  firms?

20  A.  Yes, at several different banks.

21  Q.  Mr. Sood, you mentioned that your company manages money

22  for, among others, professional athletes, is that right?

23  A.  Yes.

24  Q.  How did you first get involved in working with athletes?

25  A.  Back in 2011 through a gentleman named Marty Blazer.

J4QHDaw4                         Sood - Direct

1   Q.  Who was Marty Blazer?

2   A.  At that time, he had his own firm that used to handle money

3   for professional football players.

4   Q.  Did there come a time when you started a company with

5   Mr. Blazer?

6   A.  Yes, in late 2011.

7   Q.  What was that called?

8   A.  Princeton Blazer.

9   Q.  What did Blazer specifically want you do to for his athlete

10  clients at that time?

11  A.  Handle the portfolio management.

12  Q.  Initially, what types of athletes did you work with?

13  A.  Football players.

14  Q.  For approximately how many years did you work together with

15  Blazer?

16  A.  Two years.

17  Q.  Approximately how many professional football players did

18  you work with during that time?

19  A.  We had approximately five.

20  Q.  At the time you were initially working with Blazer during

21  this period, what involvement did you have, if any, in

22  recruiting athletes as clients?

23  A.  None.

24  Q.  Did there come a time when you eventually stopped working

25  with Mr. Blazer?

1    A.   Yes.

2    Q.   Why was that?

3    A.   In 2013, we discovered during a normal SEC exam that he was

4    stealing money from his -- several of his clients.  So at that

5    time, we separated from him.

6    Q.   Prior to the SEC audit, were you aware that Blazer was

7    stealing the money?

8    A.   No.

9    Q.   What did you do after you learned that Blazer had been

10   misappropriating his clients' funds?

11   A.   Our attorney advised that we buy him out of his ownership.

12

13   Q.   Is that what happened?

14   A.   Yes, for one dollar.

15   Q.   What happened to the company Princeton Blazer?

16   A.   We ended up changing the name.

17   Q.   At the time you were working with Blazer during this

18   initial period, what, if anything, did you know about him

19   making payments to college players or their families?

20   A.   Nothing about it.

21   Q.   Now, Mr. Sood, after you separated from Mr. Blazer and

22   bought him out from the company, did you continue to have some

23   level of contact with him after that?

24   A.   We did.

25   Q.   Were you providing any services for him at that time?

J4QHDaw4                         Sood - Direct

1    A.  Yeah, we -- once we separated, he asked that we can manage

2    his family's money, which we ended up doing for a few years

3    after.

4    Q.  Now, Mr. Sood, did there come a time when you became

5    involved with Mr. Blazer in trying to recruit basketball

6    players as clients?

7    A.  Yes.

8    Q.  How did that first come about?

9    A.  You know, he had -- since we had maintained some level of

10   contact, he had reached out and said he had addressed his SEC

11   issues, and he was looking to rebuild his business.  And at

12   that time, he approached me about getting involved.  And since

13   we had some football clients, we decided to see if it made

14   sense to get involved in basketball as well.

15   Q.  What sorts of players was Blazer focused on recruiting at

16   this time?

17   A.  Both college and professional.

18   Q.  What sport?

19   A.  Basketball.

20   Q.  How did Blazer propose that you would be involved in these

21   efforts?

22   A.  Similar to the first time where we would be responsible for

23   the investment portfolios.

24   Q.  Did Blazer introduce you to anyone else that was involved

25   in working with basketball players?

J4QHDaw4                          Sood - Direct

1   A.  Yes.

2   Q.  Who was that?

3   A.  Christian Dawkins.

4   Q.  Do you recall approximately when that was, Mr. Sood?

5   A.  Early 2016.

6   Q.  When you first met Mr. Dawkins, who was he working for?

7   A.  A firm called ASM.

8   Q.  Did you know who owned that firm?

9   A.  Gentleman named Andy Miller.

10  Q.  What was ASM?

11  A.  It was a sports agency focused on basketball players.

12  Q.  What did you know about Andy Miller?

13  A.  That he was a top three, four basketball agent in the

14  business.

15  Q.  What did Dawkins tell you he did for ASM?

16  A.  He said he was responsible for recruiting new clients.

17  Q.  Was Dawkins himself a registered sports agent?

18  A.  No.

19  Q.  Are you familiar with the term that's frequently used for

20  somebody that did the kind of work Dawkins did?

21  A.  Yes.

22  Q.  What's that?

23  A.  I believe it's called a runner.

24  Q.  The basketball players that Dawkins was seeking to recruit,

25  at what stage of their career were they in?

J4QHDaw4                          Sood - Direct

1    A.  Primarily -- primarily college.

2    Q.  Was Dawkins interested in working with you to recruit these

3    players as clients?

4    A.  Yes.

5    Q.  Did Dawkins say how, if at all, you could be of assistance

6    in these recruitment efforts?

7    A.  That from time to time these players need money, so if I

8    could help with that, that could help him recruit these

9    players.

10   Q.  What, if anything, did you think at the time you could gain

11   from providing that money to Dawkins?

12   A.  Access to these potential players.

13   Q.  Generally speaking, were some of the payments Dawkins

14   requested from you intended for the players themselves or their

15   families?

16   A.  Both.

17   Q.  Did you ultimately agree to make certain of the payments

18   that Dawkins requested?

19   A.  Yes.

20   Q.  Now, Mr. Sood, besides making payments to players and their

21   families, was there anyone else that Dawkins recommended that

22   you pay?

23   A.  Coaches.

24   Q.  Any specific coach?

25   A.  College coaches.

J4QHDaw4                         Sood - Direct

1    Q.  Did there come a time when he introduced you to a college

2    coach?

3    A.  Yes.

4    Q.  Who was that?

5    A.  Gentleman named Lamont Evans from University of South

6    Carolina.

7    Q.  What was his position at the school?

8    A.  Assistant -- I believe he was an assistant coach.

9    Q.  Did there come a point when you had an in-person meeting

10   with Lamont Evans?

11   A.  Yes.

12   Q.  Who else was there?

13   A.  Christian Dawkins and Marty Blazer.

14   Q.  Had you ever met with Dawkins in person before this meeting

15   with Evans?

16   A.  No.

17   Q.  Where did the meeting with Lamont Evans occur?

18   A.  It was in Columbia, South Carolina.

19   Q.  Going into the meeting, what was your understanding of the

20   purpose of the meeting?

21   A.  Initial meeting, get to know him, meet him, and see how we

22   can potentially work with him.

23   Q.  Had you ever met a college basketball coach before this?

24   A.  No.

25   Q.  Were you interested in meeting with Evans?

J4QHDaw4                         Sood - Direct

1    A.   Yes.

2    Q.   Why were you interested in meeting him?

3    A.   He could potentially refer us clients.

4    Q.   What was your understanding about who had arranged the

5    meeting?

6    A.   Christian Dawkins.

7    Q.   What were you told, if anything, in advance of the meeting

8    about Evans?

9    A.   That he had access to at least one potential -- one player

10   that could potentially be a client.

11   Q.   What were you told about what, if anything, was going to be

12   expected from you?

13   A.   Money.

14   Q.   Who told you that?

15   A.   I believe it was both Christian Dawkins and Marty Blazer.

16   Q.   Now, Mr. Sood, at the time you met with Lamont Evans,

17   Christian Dawkins, and Marty Blazer, were you aware that that

18   meeting was being recorded?

19   A.   No.

20   Q.   Mr. Sood, in preparing to testify, did you review a

21   recording of that meeting?

22   A.   Yes.

23   Q.   During the meeting, were there any specific South Carolina

24   players that were discussed?

25   A.   Yes.

J4QHDaw4                          Sood - Direct

1   Q.   Who was that?

2   A.   Player by the name of PJ Dozier.

3   Q.   At the time, who was PJ Dozier?

4   A.   He was a player on the team.

5   Q.   During the meeting, what did Dawkins tell you, if anything,

6   regarding the importance of working with a college coach like

7   Evans?

8   A.   That the college coaches were valuable.  They provided us

9   access to players, they had influence over the players, and

10  they could also keep other agents and advisers away from --

11  from the players.

12  Q.   You mentioned keeping other agents and advisers away from

13  the players.  Why was that relevant to you?

14  A.   It will increase our ability, our success to -- to work

15  with the player when the time came.

16  Q.   Before that conversation with Dawkins that day, did you

17  have knowledge about the role college players -- withdrawn.

18          Before the conversation that day, were you aware of

19  the role that college coaches could play in helping you recruit

20  clients?

21  A.   No.

22  Q.   During the meeting, did Lamont Evans offer to do anything

23  for you?

24  A.   Yes.

25  Q.   What did he offer to do?

J4QHDaw4                          Sood - Direct

1    A.  Set up a meeting with PJ's mom.

2    Q.  Based on that initial meeting, what was your overall

3    impression of the nature of the relationship between Dawkins

4    and Evans?

5    A.  That it was a good relationship; that they had known each

6    other for a while.

7    Q.  Based on the meeting, what impression did you have, if any,

8    regarding whether Evans could be of assistance to you?

9    A.  That with -- that he was open to setting up a meeting for

10   me, at least with the mom, in the near future.

11   Q.  After that meeting with Evans concluded, where'd you go

12   from there?

13   A.  We drove back to Atlanta, Georgia.

14   Q.  Was anyone else in the car with you?

15   A.  Yes, both Christian Dawkins and Marty Blazer.

16   Q.  Did you know that was being recorded?

17   A.  No.

18   Q.  Mr. Sood, we're going to talk about a lot of conversations

19   during your testimony.  Did you know any of them were being

20   recorded?

21   A.  No.

22   Q.  Now, during the car ride back, did Dawkins mention any

23   other coaches to you?

24   A.  He mentioned a coach by the name of Tony Bland.

25   Q.  Who did he say Tony Bland was?

J4QHDaw4                           Sood - Direct

1   A.   He was assistant coach at University of Southern

2   California.

3   Q.   Did there later come a point when you met Tony Bland?

4   A.   Yes.

5   Q.   Who introduced you to him?

6   A.   Christian Dawkins.

7   Q.   Based on the conversation in the car ride, what was your

8   understanding of Dawkins' connections with various college

9   coaches?

10  A.   That it seemed to be pretty strong and he had multiple

11  relationships with various coaches.

12  Q.   Did that matter to you at the time?

13  A.   Seemed like it was a great idea to get access to these

14  coaches.

15  Q.   Mr. Sood, at the time of these discussions that you were

16  having, what was your understanding of what consequences, if

17  any, could occur to Lamont Evans if you gave him money?

18  A.   He could be fired.

19  Q.   Now, during that car ride back to Atlanta, what, if

20  anything, did Dawkins tell you about his own prior dealings

21  with Lamont Evans?

22  A.   That he's known Lamont for a while, and then he had been

23  giving -- he had been paying Lamont money over at least a few

24  months.

25  Q.   Did he tell you during that car ride how he was paying

J4QHDaw4                              Sood - Direct

1    Lamont Evans?

2    A.   That he was paying him -- he used to meet Lamont in Atlanta

3    and pay -- give him cash.

4    Q.   What, if anything, did you understand Dawkins to be

5    requesting of you and Mr. Blazer at that point?

6    A.   At that point, to take over the payments.

7    Q.   The payments to Lamont Evans?

8    A.   Yes.

9    Q.   Mr. Sood, based on your first meeting with Christian

10   Dawkins, what was your overall impression of him?

11   A.   That he -- he was well connected in college sports, he knew

12   a lot of coaches, and he knew players.

13   Q.   Now, Mr. Sood, after your first in-person meeting with

14   Christian Dawkins in March of 2016, did you continue to be in

15   contact with him?

16   A.   Yes.

17   Q.   Did you begin to develop a relationship with him separate

18   and apart from Marty Blazer?

19   A.   Yes.

20   Q.   Why did you begin to cultivate a relationship with

21   Christian Dawkins?

22   A.   You know, I liked him.  I thought he'd be a good partner

23   and someone that could help us grow the business.

24   Q.   Grow the business how?

25   A.   By having access to coaches and players so we can get

J4QHDaw4                        Sood - Direct

1    clients at the end of the day.

2    Q.  Now, soon after that meeting in South Carolina, did there

3    come a point when Dawkins requested financial assistance from

4    you and Mr. Blazer?

5    A.  Yes.

6    Q.  I want to just -- if we could just publish just for the

7    witness what's been marked for identification as Government

8    Exhibit 616.

9           Do you recognize this document, Mr. Sood?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's an email from Christian.

13   Q.  To who?

14   A.  From Christian Dawkins to myself and Marty Blazer.

15          MR. SOLOWIEJCZYK:  Your Honor, the government offers

16   Government Exhibit 616.

17          THE COURT:  Any objection?

18          MR. HANEY:  No objection, your Honor.  Thank you.

19          MR. MOORE:  No objection.

20          THE COURT:  616 will be received.

21          (Government's Exhibit 616 received in evidence)

22          MR. SOLOWIEJCZYK:  So if we could just zoom in on the

23   heading.

24   BY MR. SOLOWIEJCZYK:

25   Q.  Mr. Sood, who's this email from?

1    A.   Christian Dawkins.

2    Q.   Who's it to?

3    A.   To myself and Marty Blazer.

4    Q.   What's the date on the email?

5    A.   April 10, 2016.

6    Q.   I would just ask, if you could, if you could just read the

7    first paragraph starting with the second sentence that starts

8    "I want to have my own support system."  Do you see that?

9    A.   Yes.  OK.  "I want to have my own support system, and I

10   want to be able to facilitate things on my own, independent of

11   ASM.  I will sign elite guys, that isn't the issue.  I just

12   have to have the resources to continue.  I will make sure you

13   guys get Beasley and Isaiah Whitehead this year, and both could

14   be first round picks.  Moving forward, I need confirmation on

15   certain things to know how I will be able to operate.  It can't

16   be much gray area anymore.  The business is nonstop, and I have

17   to be able to sustain things and have a clear picture if I can

18   do things with you guys or take opportunities elsewhere.  I

19   took care of these situations all the way through, and there's

20   a lot of money out."

21   Q.   When Mr. Dawkins said to you, "I took care of these

22   situations all the way through, and there's a lot of money

23   out," what did you understand that to mean at the time?

24   A.   That he was paying players, their families, coaches from

25   his personal funds.

J4QHDaw4                          Sood - Direct

1    Q.   Take a look at -- there's a mention a couple lines up of
2    somebody named Beasley.
3    A.   Yes.
4    Q.   Do you know who that is?
5    A.   He was a player at Florida state, full name is Malik
6    Beasley.
7    Q.   At the time he was in college, is that right?
8    A.   Yes.
9    Q.   Did Dawkins ever facilitate a meeting for you with Malik
10   Beasley or his family?
11   A.   Yes.
12   Q.   What was the point of that meeting?
13   A.   To introduce -- introduce me to the family to see if they
14   would be interested in retaining me as a financial adviser.
15   Q.   What, if anything, did Dawkins tell you the family of Malik
16   Beasley was looking for from a financial adviser?
17   A.   They would be looking for a loan.
18   Q.   Do you remember the amount?
19   A.   50,000.
20   Q.   Did you provide that loan?
21   A.   Yes.
22   Q.   Did Beasley ever enter the NBA draft?
23   A.   He did.
24   Q.   Does he now play in the NBA?
25   A.   Yes.

J4QHDaw4                          Sood - Direct

1   Q.  Was this loan provided before or after Malik Beasley

2   entered the draft?

3   A.  After.

4   Q.  Mr. Sood, what was the interest rate on many of the loans

5   that you provided to athletes?

6   A.  They were between zero and 5 percent.

7   Q.  What, if anything, did Dawkins tell you about how the money

8   you were providing in this loan to the Beasley family was going

9   to be used?

10  A.  That some of it would go back -- some of it go to pay him

11  back.

12  Q.  Did Malik Beasley ever become a client of yours?

13  A.  For a short term he was, yes.

14  Q.  Is he still a client?

15  A.  No.

16  Q.  There's a mention of, right next to that, somebody named

17  Isaiah Whitehead.  Do you know who that is?

18  A.  Yes.  He again played in college for Seton Hall.

19  Q.  Did he later enter the NBA draft?

20  A.  He did.

21  Q.  Was he ultimately selected?

22  A.  Yes.

23  Q.  Did you ever provide any funds to Isaiah Whitehead?

24  A.  I did, 5,000.

25  Q.  Was that a loan?

J4QHDaw4                          Sood - Direct

1    A.  Yes.

2    Q.  Was that loan provided before or after the NBA draft?

3    A.  After.

4    Q.  Did Whitehead ever become a client of yours?

5    A.  No.

6    Q.  Did you ever get the $5,000 back?

7    A.  Not yet.

8            MR. SOLOWIEJCZYK:  We can zoom out.

9    Q.  In the middle of the page, there's a reference to somebody

10   named Edmond Sumner.  Do you know who that is?

11   A.  He was a college player.

12   Q.  Generally speaking, what was Dawkins seeking with respect

13   to Edmond Sumner in this email?

14   A.  He was looking for $75,000 over the -- over the coming

15   year.

16   Q.  Did you ever provide those funds to Dawkins?

17   A.  No.

18   Q.  Do you know if Mr. Sumner entered the NBA draft?

19   A.  Yes.

20   Q.  Did he become a client of yours?

21   A.  For a short term, yes.

22   Q.  After the draft, did you ever provide him a loan?

23   A.  I did.

24   Q.  Other than that loan, did you have to expend any additional

25   funds in connection with recruiting Sumner as a client?

J4QHDaw4                              Sood - Direct

1    A.  Yes.

2    Q.  Can you explain that.

3    A.  So we had to -- my understanding was that there was money

4    out to a different adviser.  So in order to work with Sumner,

5    we had to pay the other adviser back.

6    Q.  Did you do that?

7    A.  Yes.

8    Q.  Going a little further down the page, Ms. Bustillo, there's

9    a mention to somebody named Markelle Fultz.  Who is that?

10   A.  Again, a player, highly rated college player.

11   Q.  And what did Dawkins propose, generally, with respect to

12   Markelle Fultz in this email?

13   A.  Providing money to his -- this gentleman named Keith, who

14   was his AAU coach through his foundation.

15   Q.  Did you ever provide any funds to Dawkins in an effort to

16   recruit Markelle Fultz as a client?

17   A.  Yes.

18   Q.  What did you provide Dawkins?

19   A.  I believe it was 30,000.

20   Q.  What did you understand he was going to do with that

21   30,000?

22   A.  That he was going to be sending it to Keith.

23   Q.  What were you hoping you'd get as a result of that payment?

24   A.  An opportunity to work with Fultz.

25   Q.  Did Fultz enter the NBA?

J4QHDaw4                         Sood - Direct

1    A.  Yes.

2    Q.  Did he ever become a client?

3    A.  No.

4    Q.  Mr. Sood, other than the players that are referenced in

5    this email that you've already testified about, around this

6    time were you involved in making any other payments to the

7    families or others associated with college or high school

8    basketball players?

9    A.  Yes.

10   Q.  Did you have contact with anyone else that was employed by

11   ASM sports at that time?

12   A.  Yes.

13   Q.  Who was that?

14   A.  Sports agent by the name of Steve Pina.

15   Q.  What was Steve Pina's role at ASM?

16   A.  He was an agent.

17   Q.  Did Mr. Pina ever request any funds from you?

18   A.  Yes.

19   Q.  Did he tell you what he needed that money for?

20   A.  For -- one was for the business manager of a player.

21   Q.  What players were you trying to recruit through the

22   payments to Pina?

23   A.  Kyle Kuzma and Davon Reed.

24   Q.  Let's take that one at a time.  Who was Kyle Kuzma at the

25   time?

J4QHDaw4                         Sood - Direct

1    A.   Coming out of college, out of Utah State.

2    Q.   And at the time Pina was requesting the money, who did you

3    understand the money was going to go to?

4    A.   His business manager.

5    Q.   Did you provide those funds?

6    A.   Yes.

7    Q.   And these payments, were they while Mr. Kuzma was in

8    college or after college?

9    A.   At college.

10   Q.   Did Mr. Kuzma eventually enter the NBA?

11   A.   Yes.

12   Q.   Did he become a client of yours?

13   A.   Yes.

14   Q.   Is he still a client of yours today?

15   A.   Yes.

16   Q.   What, if anything, did you tell Mr. Kuzma about the fact

17   that you pleaded guilty to federal charges?

18   A.   That I pled guilty to bribing a coach and wire fraud.

19   Q.   You mentioned somebody named Davon Reed, I believe, is that

20   right?

21   A.   Yes.

22   Q.   You ever provide any funds to Davon Reed or his family in

23   connection with an effort to recruit him?

24   A.   Yes.

25   Q.   When was that?

J4QHDaw4                        Sood - Direct

1    A.  After he graduated.

2    Q.  What, if anything, did you tell Mr. Reed about the fact

3    that you pled guilty to federal charges?

4    A.  Same thing.

5    Q.  Is he still a client?

6    A.  Yes.

7    Q.  Now, Mr. Sood, prior to being introduced to Christian

8    Dawkins, had you ever been involved in making payments to

9    players or their families?

10   A.  No.

11   Q.  What, if anything, did Dawkins tell you about how making

12   these payments might assist you in recruiting future client?

13   A.  It will go a long way in getting an opportunity to meet

14   them and work with them.

15   Q.  You referenced certain loans that you made to players after

16   they had entered the NBA draft.  What was your understanding at

17   that time about whether loans of that sort were permissible

18   under NCAA rules?

19   A.  They were permissible.

20   Q.  You also mentioned making certain payments to families or

21   others associated with college players while those players were

22   still in college.  What was your understanding of whether those

23   types of payments were permissible under NCAA rules?

24   A.  They were not.

25   Q.  What was your understanding at that time about what impact

J4QHDaw4                          Sood - Direct

1    that could have, if any, on the college player?

2              MR. HANEY:  Objection as to foundation, your Honor.

3              THE COURT:  Overruled.

4              MR. HANEY:  Thank you.

5    A.  That they could potentially lose their eligibility to play.

6    Q.  All right.  Switching gears, Mr. Sood, after you met for

7    the first time with Lamont Evans, Christian Dawkins, and Marty

8    Blazer in South Carolina, did you continue to be in touch

9    periodically with Lamont Evans?

10   A.  Yes.

11   Q.  How about Mr. Blazer?

12   A.  Yes.

13   Q.  Soon after your first meeting with Lamont Evans in South

14   Carolina, did you learn that he was switching universities?

15   A.  Yes.

16   Q.  Where had he been hired?

17   A.  He had been hired at Oklahoma State.

18   Q.  How did you learn about this?

19   A.  Just through media.  I believe it was Yahoo! or Yahoo!

20   article.

21   Q.  Mr. Sood, during 2016 did you attend multiple in-person

22   meetings with Lamont Evans?

23   A.  Yes.

24   Q.  Who else was there for that meeting?

25   A.  Marty Blazer.

J4QHDaw4                           Sood - Direct

1   Q.   Do you recall where those meetings occurred?

2   A.   Between New York and Miami.

3   Q.   Directing your attention to the Miami meeting, what, if

4   anything, did Mr. Blazer tell you at that point about the

5   nature of his relationship with Lamont Evans?

6   A.   That he was paying Lamont Evans a monthly retainer or

7   monthly -- monthly fee.

8   Q.   During that trip to Miami, was any money requested of you

9   for Lamont Evans?

10  A.   Yes.

11  Q.   Who requested the money?

12  A.   Lamont Evans.

13  Q.   Did Blazer also ask you for the money?

14  A.   Yes, both did.  Sorry.

15  Q.   Did you actually provide that money when it was requested?

16  A.   No.

17  Q.   Mr. Sood, why didn't you provide the money to Lamont Evans

18  during that trip to Miami?

19  A.   Well, one, because Marty was paying; and, two, I have

20  not -- I just met Lamont, and I hadn't seen any results from

21  him yet.

22  Q.   When you say "results," what do you mean by that?

23  A.   That he was supposed to set up a meeting with PJ's mom, and

24  he hadn't set one up yet.

25  Q.   Did there later come a point in 2017 when Evans directly

1    requested money from you again?

2    A.   Yes.

3    Q.   And on that occasion, did you pay him?

4    A.   Yes.

5    Q.   All right.  We'll come back to that a little later.

6            Now, Mr. Sood, during this time period when Christian

7    Dawkins was still working at ASM sports, did he introduce you

8    to any other college coaches in addition to Lamont Evans?

9    A.   Emanuel Richardson.

10   Q.   Where did Emanuel Richardson work?

11   A.   University of Arizona.

12   Q.   Where did your first meeting with Emanuel Richardson occur?

13   A.   In Las Vegas.

14   Q.   Why were you in Las Vegas at that time?

15   A.   I was there for a basketball tournament.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

J4Q9DAW5                           Sood - Direct

1    Q.   Where did you meet Emanuel Richardson in Las Vegas?

2    A.   I believe it was in a lounge I believe at the MGM Hotel.

3    Q.   Before the meeting what did Dawkins tell you, if anything,

4    about Emanuel Richardson?

5    A.   A good friend.  He had a good relationship with him.  He's

6    known him for a while.  And he was an assistant coach at a top

7    elite college program.

8    Q.   When you say "elite college program," what do you mean by

9    that?

10   A.   Top three in the country.

11   Q.   Was Dawkins present for the meeting with Richardson?

12   A.   No.

13   Q.   At the time were you interested in meeting with Richardson?

14   A.   Yes.

15   Q.   Why?

16   A.   Access to hopefully some of his top players.

17   Q.   Mr. Sood, can you just generally describe what happened

18   during your first meeting with Emanuel Richardson?

19   A.   Just it was an introductory meeting.  We told him what we

20   did, the things that we did for athletes, our services, he

21   shared --

22   Q.   Mr. Sood you said, "what we did."  Was anyone else present

23   besides you and Mr. Richardson?

24   A.   Yes.  My assistant was there.

25   Q.   Please continue.

J4Q9DAW5                          Sood - Direct

1    A.   So we just kind of exchanged ideas what we did.  He told us

2    about the -- his recruiting strategy, his relationship with

3    Christian and it was a short meeting but that was just an

4    introductory meeting.

5    Q.   After you met with Emanuel Richardson in Las Vegas did

6    there come a point when soon after that when you reached out to

7    him again?

8    A.   Yes.

9    Q.   How did you do that?

10   A.   By phonecall.

11   Q.   What prompted you to reach out to Emanuel Richardson at

12   that time?

13   A.   Just wanted to follow up, tell him thank you for taking the

14   time to meet with me.

15   Q.   At that time did you have any interest in developing a

16   relationship with Mr. Richardson?

17   A.   Yes.

18   Q.   Why?

19   A.   Again because he had access to potentially some high level

20   players that may be entering the NBA.

21           MR. SOLOWIEJCZYK:  At this time, your Honor, the

22   government would offer pursuant to the authenticity stipulation

23   Government Exhibit 201 and the corresponding transcript,

24   Government Exhibit 201T.

25           THE COURT:  Any objection?

J4Q9DAW5                         Sood - Direct

1          MR. HANEY:  No objection, your Honor.  Thank you.

2          THE COURT:  201 and 201T will be received.

3          (Government's Exhibits 201 and 201T received in

4     evidence)

5          MR. SOLOWIEJCZYK:  This is a call on April 24, 2017

6     between Munish Sood and Emanuel Richardson.  Before we play the

7     call.

8     Q.  Mr. Sood, at this time were you aware that your phonecalls

9     were being recorded?

10    A.  No.

11         MR. SOLOWIEJCZYK:  We can go ahead, Ms. Bustillo.

12         (Audio played)

13    Q.  Mr. Sood, I just want to ask you a couple of questions of

14    some of the things that you and Mr. Richardson said during that

15    call.  If you could go back to page three and focus your

16    attention on line 8.  You said, "You know, we're happy to be

17    supportive in any way we can."

18         What did you mean by "happy to be supportive,"

19    Mr. Sood?

20    A.  The resources like money that he may need in order to help

21    him to continue to recruit.

22    Q.  Recruit what?

23    A.  Players.

24    Q.  And then you went on to say, this is a couple of lines down

25    from that, "you know, my goal is you know a lot of -- you have

1   a lot of young talent coming."

2            Mr. Sood, why were you mentioning young talent at that

3   point?

4   A.   Because they were projected to have top -- a top five pick

5   potentially coming in the draft and we wanted to see if we can

6   get a meeting or access to that player.

7   Q.   And then you went on to say, Mr. Sood, a couple lines down

8   from that, at line 15, "And you know as you get more

9   comfortable with me and my team my hope is we can continue to,

10  you know, build a long-term relationship."

11           Mr. Sood were you, in fact, interested at that time in

12  building a long-term relationship with Emanuel Richardson?

13  A.   Yes.

14  Q.   Why was that?

15  A.   Because he worked for a great program and they're always

16  going to have access to good players.

17  Q.   What was your impression of Richardson's response to this?

18  A.   That, you know, that he was open to working with me or us.

19  Q.   At page 4, this was Mr. Richardson speaking.  And I'm

20  looking specifically at lines 7 and 8.

21           He said to you, "I'm going to honor, I'm going to

22  respect and I'm gonna over-deliver and under-promise."

23           Did you understand what he meant when he said this?

24  A.   I believe he was stating that if we're helping him with

25  money to recruit that he's going to deliver hopefully one or

1    two players to us.

2    Q.  Then finally, Mr. Sood, you said, a couple lines down from

3    that, line 10, "You know, you're always being asked for stuff.

4    You're always being looked at from all different types of

5    people."

6          What did you mean by that, Mr. Sood?

7    A.  That, you know, him as a coach, he's always being

8    approached, from my understanding was with players and their

9    families for money and then also from a regulatory perspective

10   he has the NCAA to I guess also monitoring him.

11   Q.  Now, Mr. Sood, I want to direct your attention to the

12   timeframe of May of 2017.

13   A.  OK.

14   Q.  Did there come a time when Christian Dawkins informed you

15   that he was leaving ASM Sports?

16   A.  Yes.

17          MR. SOLOWIEJCZYK:  Your Honor, at this time the

18   government would like to offer a stipulation.

19          THE COURT:  Very well.

20          MR. SOLOWIEJCZYK:  Government Exhibit 1905.  I'm going

21   to skip the preamble.

22          THE COURT:  OK.

23          MR. SOLOWIEJCZYK:  If called to testify, a

24   representative of the National Basketball Player's Association,

25   the NBPA, would testify that:

J4Q9DAW5                          Sood - Direct

1              "1.   The NBPA is a labor union representing

2      professional basketball players in the National Basketball

3      Association, the NBA.   Among other powers, the NBPA has the

4      authority to certify sports agents who wish to represent NBA

5      players and to conduct investigations into certain types of

6      alleged misconduct by NBPA certified sports agents.   While the

7      NBPA is not a law enforcement agency, and has no ability to

8      compel the production of documents from third parties, it can

9      require members, including sports agents certified by the NBPA,

10     to produce relevant materials as a condition of maintaining

11     their certified status.

12             "Beginning in or around the summer of 2016, the NBPA

13     conducted an investigation relating to Christian Dawkins.   At

14     the time of this investigation, Dawkins was not himself a

15     certified sports agent but was employed by ASM Sports, a sports

16     agency controlled by an NBPA-certified sports agent that

17     represented various NBA players.

18             "On May 4, 2017 the NBPA issued a memorandum

19     containing findings regarding alleged misconduct with respect

20     to Dawkins's employment while at ASM Sports.   Those findings

21     note that as of April 24, 2017 Dawkins was no longer employed

22     by ASM Sports.

23             "Thereafter, and during the summer of 2017, the NBPA

24     investigated other potential misconduct by additional employees

25     and principals of ASM Sports, including the certified sports

J4Q9DAW5                          Sood - Direct

1    agent responsible for the operation of ASM Sports.

2              "It is further stipulated and agreed what this

3    stipulation may be received in evidence as a government exhibit

4    at trial.  We would offer this stipulation, Government Exhibit

5    1905, at this time, your Honor.

6              THE COURT:  The stipulation will be received.

7              (Government's Exhibit 1905 received in evidence)

8    Q.  Now, Mr. Sood, around the time that Mr. Dawkins departed

9    from ASM Sports did you see any of that information reported

10   publicly?

11   A.  Yes.

12   Q.  Did the information you reviewed, did it generally relate

13   to alleged misconduct?

14   A.  Yes.

15   Q.  After that information became public, who, if anyone,

16   reached out to you at that point?

17   A.  Lamont Evans.

18   Q.  And at that point where was Lamont Evans coaching?

19   A.  Oklahoma State.

20   Q.  How did he reach out to you?

21   A.  Via phonecall.

22             MR. SOLOWIEJCZYK:  At this time, your Honor, the

23   government would offer Government Exhibit 204 and the related

24   transcript, 204T pursuant to the authenticity stipulation.

25             THE COURT:  Any objection?

1          MR. HANEY:  No objection, your Honor.  Thank you.

2          MR. CHANEY:  No objection.

3          THE COURT:  204 and 204T will be received.

4          (Government's Exhibits  204 and 204T received in

5    evidence)

6          MR. SOLOWIEJCZYK:  This is a May 8, 2017 call from

7    8:33 a.m. between Munish Sood and Lamont Evans.

8          (Audio played)

9    Q.  Just pausing there, Mr. Sood.

10         Based on this conversation you had with Lamont Evans

11   what was your understanding as to whether he had previously

12   introduced Christian Dawkins to any families of players.

13   A.  That he must have because Lamont was concerned about the

14   news that was released.

15         MR. SOLOWIEJCZYK:  We can play the next clip,

16   Ms. Bustillo.

17         (Audio played)

18         MR. SOLOWIEJCZYK:  One moment, your Honor.

19         We're picking up at page 12, Ms. Bustillo.

20         (Audio played)

21   Q.  All right, Mr. Sood.  I just want to go back a couple of

22   pages to page 13.  At line 20 you asked, "So PJ hasn't signed

23   an agent yet?"

24         Do you see that?

25   A.  Yes.

J4Q9DAW5                              Sood - Direct

1    Q.   Who is PJ again?

2    A.   PJ Dozier.

3    Q.   Why were you asking Evans about this?

4    A.   Just following up.

5    Q.   Following up about what?

6    A.   The previous conversations of having an opportunity to work

7    with him.

8    Q.   What did Evans tell you about PJ Dozier's intentions

9    regarding a sports agent?

10   A.   That he had signed one.  He had signed with an agent named

11   Bill Duffy.

12   Q.   What did Evans tell you regarding which financial adviser

13   Dozier had signed with?

14   A.   That hasn't happened yet.

15   Q.   During the call, what did Lamont Evans propose, if

16   anything, would be the next steps with respect to PJ Dozier?

17   A.   That he would follow up with his mom and try to arrange a

18   meeting for me.

19   Q.   A little later in that portion of the call there was a

20   discussion about getting some players home.  Did you understand

21   what Mr. Evans was referring to?

22   A.   Like he said, that there were two players out of the

23   country and made sense for them to go home but he didn't have

24   the money or the school wouldn't pay the fifteen hundred

25   dollars to send them home for the break.

1  Q.  Looking at page 16, you said, this at lines 9 to 11, "Well

2  you know, you know the relationship we have with Marty so you

3  know how to figure stuff out, right?"

4  A.  Yes.

5  Q.  What did you mean by this when you said it, Mr. Sood?

6  A.  That I was aware that Marty was paying him.  So if he

7  needed money to send these kids home, potentially Marty could

8  help him.

9  Q.  When you said, "You know the relationship we have with

10  Marty," what did you mean by that?

11  A.  Meaning as a team, myself, Christian, and Marty at that

12  time.

13  Q.  And when Blazer provided money to Lamont Evans how, if at

14  all, did you think that benefited you?

15  A.  Hopefully I can leverage that to work with Lamont and his

16  players on the investment side.

17  Q.  After this call, did Lamont Evans set up a meeting for you

18  with PJ Dozier's mother?

19  A.  He did.

20  Q.  When approximately did that occur?

21  A.  About a few weeks later.

22  Q.  Was it before the NBA draft?

23  A.  Yes.

24  Q.  Where did the meeting occur?

25  A.  Columbia, South Carolina.

J4Q9DAW5                       Sood - Direct

```
 1   Q.  And who was present for the meeting?
 2   A.  Just myself and PJ's mother.
 3   Q.  Can you generally describe what occurred at that meeting?
 4   A.  We met at a restaurant for lunch.  I shared our
 5   presentation, showed her -- I spoke to her about what we can do
 6   and how we can help her once he's in the NBA.  And then she
 7   said, you know, she trusted Lamont Evans' judgment.  So she
 8   would definitely be interested in continuing to discuss with
 9   us.  And she talked to her daughter to have a follow-up
10   meeting.
11   Q.  Did you see PJ Dozier's mother again after that point?
12   A.  Yes.
13   Q.  When was that?
14   A.  She invited my son and I to the -- their draft party.
15   Q.  Where was that?
16   A.  In Columbia, South Carolina.
17   Q.  To your knowledge were any other financial advisers invited
18   to that party that day?
19   A.  Not to my knowledge.
20   Q.  At that time what was your understanding regarding whether
21   PJ Dozier was going to hire you as a financial adviser?
22   A.  You know it would have depended on the where he was drafted
23   but we looked like we would have a good chance to get the
24   business.
25   Q.  What happened at the draft party?
```

J4Q9DAW5                          Sood - Direct

1   A.  He was not drafted that day.

2   Q.  So based on that, what conversations did you have with

3   Dozier's mother at that point?

4   A.  We had a couple of follow-up conversations.  Said that

5   we'll stay in touch and we'll -- she'll call me when she needs

6   help and figure out where he ends up if we're officially

7   working together.

8   Q.  The fact that he wasn't drafted, how did that impact you?

9   A.  We were not able to obtain him as a client.

10  Q.  Now after Lamont Evans facilitated this meeting with PJ

11  Dozier's mother, did he request money from you?

12  A.  He did.

13  Q.  Do you recall approximately how much money he requested?

14  A.  Ten thousand dollars.

15  Q.  Did you ultimately provide him with ten thousand dollars?

16  A.  No.

17  Q.  What did you give him?

18  A.  I sent him two thousand dollars.

19  Q.  And in what form?

20  A.  A check.

21       MR. SOLOWIEJCZYK:  If we could just publish for the

22  witness only what's been marked for identification as

23  Government Exhibit 657.

24  Q.  Do you recognize this document?

25  A.  Yes.

1    Q.  What is it?

2    A.  It's a check to Lamont Evans for two thousand dollars.

3    Q.  And who wrote the check?

4    A.  I did.

5            MR. SOLOWIEJCZYK:  Government offers Government

6    Exhibit 657.

7            THE COURT:  Any objection?

8            MR. HANEY:  No objection, your Honor.  Thank you.

9            THE COURT:  657 will be received.

10           (Government's Exhibit 657 received in evidence)

11           MR. SOLOWIEJCZYK:  Publish, that, Ms. Bustillo.

12   Q.  Mr. Sood -- first of all, who is this check made out to?

13   A.  Lamont Evans.

14   Q.  What's the date on the check?

15   A.  July 9, 2017.

16   Q.  Was this after you had had the meeting with PJ Dozier's

17   mother?

18   A.  Yes.

19   Q.  And what's the amount of the check?

20   A.  $2,000.

21   Q.  And then at the top left it says Moga Group LLC.  What's

22   that, Mr. Sood?

23   A.  That's one of my companies.

24   Q.  What does it say the check was for?

25   A.  Just cash.

1   Q.  Who signed the check?

2   A.  I did.

3   Q.  Now, Mr. Sood, you testified previously that at a meeting

4   in Miami when you had been asked for money for Lamont Evans you

5   had refused to provide it, right?

6   A.  Yes.

7   Q.  Why were you willing to provide money to Lamont Evans at

8   this point?

9   A.  A couple of reasons.  One, Marty Blazer was pretty much

10  harassing me to give him money; and then two was he did set up

11  the meeting so I wanted to, you know, thank him for that.

12  Q.  And based on the check you wrote, were you hoping to

13  continue to have a relationship moving forward with Mr. Evans?

14  A.  Yes.

15  Q.  Now, Mr. Sood, switching gears, after Christian Dawkins

16  left ASM Sports, what did he tell you he was planning to do at

17  that point?

18  A.  He wanted to set up his own firm.

19  Q.  And what did Dawkins tell you about his plans for the new

20  firm?

21  A.  That it will be like a -- a management firm.  It won't be a

22  sports agency.  But he would help players identify agents,

23  identify accountants, advisers, and then so he would be like

24  the nucleus for the players.

25  Q.  How would this business model work in terms of getting

J4Q9DAW5                          Sood - Direct

1   paid?

2   A.  He would get a fee.  He would get a portion of the fees

3   from the different parties such as agents and advisers.

4   Q.  And what did Mr. Dawkins tell you, if anything, regarding

5   what his relationship was going to be with ASM Sports going

6   forward?

7   A.  That he'd still be able to maintain his relationship and

8   the clients that he was already working with.

9   Q.  Now, when Mr. Dawkins told you about all this, how did he

10  propose that you would be involved in it?

11  A.  That if I was interested in being able to provide some

12  money or capital I could be one of the investment advisers.

13  Q.  What was the name of the company that Christian Dawkins was

14  starting?

15  A.  Loyd Management.

16  Q.  Does that company also go by the name, Loyd, Inc.,

17  Mr. Sood?

18  A.  Yes.

19  Q.  When Mr. Dawkins proposed this to you, were you interested

20  in the idea?

21  A.  Yes.

22  Q.  Why?

23  A.  I liked working with Christian and also the idea of getting

24  access to his players.

25  Q.  How would that help you ultimately?

J4Q9DAW5                        Sood - Direct

1    A.  Get new clients.

2    Q.  Now, did there come a point when you suggested to

3    Mr. Dawkins working with an additional business partner?

4    A.  Yes.

5    Q.  Who was that?

6    A.  Marty Blazer.

7    Q.  And did Marty Blazer introduce you to another individual he

8    was working with?

9    A.  Yes.

10   Q.  Who was that?

11   A.  A gentleman named Jeff D'Angelo.

12   Q.  What did Mr. Blazer tell you, if anything, about Jeff

13   D'Angelo?

14   A.  That he was a wealthy individual who was in the

15   restaurant/real estate business in New York and he was looking

16   to get into the sports management business.

17   Q.  Did you end up meeting with Mr. D'Angelo?

18   A.  Yes.

19   Q.  Where did you first meet him?

20   A.  Miami.

21   Q.  Do you recall approximately when that was, Mr. Sood?

22   A.  Around May.

23   Q.  Of 2017?

24   A.  Yes.  Sorry.  2017.

25   Q.  Who was there for that first meeting?

J4Q9DAW5                          Sood - Direct

1   A.  Just myself, Marty Blazer and Jeff D'Angelo.

2   Q.  What did Jeff D'Angelo generally tell you about his

3   background during that meeting?

4   A.  Similar.  He was in real estate.  He loved sports.  He

5   always wanted to be in the sports management business.  And he

6   was looking to find a way to get in.

7   Q.  And did there later come a point when you learned that

8   Mr. D'Angelo wasn't who he said he was?

9   A.  Yes.

10  Q.  When did you learn that?

11  A.  When I was arrested.

12          MR. SOLOWIEJCZYK:  Your Honor, this would probably be

13  a good point to break.

14          THE COURT:  It's actually almost 2:30.

15          So that wraps up the first week, ladies and gentlemen.

16  Have a wonderful weekend.  Please do not read anything about

17  the case that you may encounter.  Do not see anything or hear

18  anything about the case that you may encounter in the media.

19  Please try to be here on time so that we can get started at

20  9:30 Monday morning.  Have a wonderful, safe weekend.

21          (Continued on next page)

22

23

24

25

1              (Jury not present)

2              THE COURT:  Mr. Sood, you may step down.

3              (Witness excused)

4              THE COURT:  Is there anything that either side wants

5       to bring up?

6              MR. HANEY:  Not on behalf of Mr. Dawkins.  Thank you.

7              MR. MOORE:  Your Honor, the only point I wish to

8       raise, and I don't know exactly how to deal with it, frankly,

9       is juror no. 3 has nodded off again this afternoon a few times.

10      And she's been doing it throughout the first week of trial.  I

11      notice that your Honor has noticed it some too.  But I guess my

12      vantage point is like directly looking at them.  I know that

13      the government probably can't see it but it is happening with a

14      lot of regularity.

15             THE COURT:  It is.  So let's see what happens Monday

16      morning and if it continues to happen we'll have a heart to

17      heart.

18             MR. MOORE:  Yes, sir.

19             MR. MARK:  I'll just note that I have sort of checked

20      since Mr. Moore.  I also sort of realize, looks like sometimes

21      she closes her eyes but she's still listening to that.  So I'll

22      just note that, my personal observations, but I think it makes

23      sense to address this on Monday.

24             MR. CHANEY:  Your Honor, the only other issue that I

25      wanted to call to the Court's attention.  During direct

examination with Mr. Sood, when Mr. Solowiejczyk was asking

about his guilty plea regarding the bribery and wire fraud and

its connection to conduct that has already been testified to

about this case, I know the government is aware that another

codefendant's guilty plea can't come in as evidence of one of

these defendant's guilt.  And to the degree that we're going to

be getting into any facts concerning the underlying sort of --

the facts of those guilty pleas and the fact that either of

these defendants were involved in that case, I think the jury

should be instructed that one can't infer from a guilty plea of

Mr. Sood that a conspiracy existed or that it's more likely

that Mr. Code or Mr. Dawkins was involved in said conspiracy.

          THE COURT:  Mr. Solowiejczyk.

          MR. SOLOWIEJCZYK:  Your Honor, obviously, it's

standard for a cooperator to talk about the crimes they've pled

guilty to.  I think even in our proposed charge we've proposed

some language about how you have to consider the guilt of each

defendant individually and that sort of thing.  To the extent

they have some kind of additional language, because obviously

this is a circumstance that comes up extraordinarily regularly

and is dealt with regularly.

          MR. CHANEY:  I was just flagging it.  I'm going to get

something written and send it to the Court.

          THE COURT:  Very well.

          MR. HANEY:  One last thing I will add.  I will work

J4Q9DAW5                           Sood - Direct

1    with the government over the weekend hopefully to arrive at

2    some understandings on some of these phonecalls that we seek to

3    admit as well in our case in chief.  I believe to this point

4    we've had a good, cooperative relationship with one another.  I

5    hope that continues as we have been very cooperative with

6    stipulations and not objecting in front of the jury with a lot

7    of matters with respect to admissibility and hope the same

8    courtesy but I anticipate it will be fine this weekend.

9              THE COURT:  Very well.

10             MR. HANEY:  Thank you.

11             THE COURT:  And we will be having a preliminary

12   conversation Monday after we conclude about the jury charge.

13             OK.  Great weekend, folks.  Get some sleep.

14             (Adjourned to April 29, 2017 at 9 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    LOUIS MARTIN BLAZER

 4    Cross By Mr. Chaney  . . . . . . . . . . . . 524

 5    Cross By Mr. Haney . . . . . . . . . . . . . 554

 6    Redirect By Mr. Boone  . . . . . . . . . . . 666

 7    MUNISH SOOD

 8    Direct By Mr. Solowiejczyk . . . . . . . . . 694

 9                        GOVERNMENT EXHIBITS

10    Exhibit No.                              Received

11     201 and 201T . . . . . . . . . . . . . . . 724

12      204 and 204T  . . . . . . . . . . . . . . 729

13     3 and 3T   . . . . . . . . . . . . . . . . 693

14     118T   . . . . . . . . . . . . . . . . . . 685

15     139 and 139T   . . . . . . . . . . . . . . 693

16     616  . . . . . . . . . . . . . . . . . . . 710

17     657  . . . . . . . . . . . . . . . . . . . 734

18     1619C  . . . . . . . . . . . . . . . . . . 680

19     1619A  . . . . . . . . . . . . . . . . . . 681

20     1619B  . . . . . . . . . . . . . . . . . . 692

21     1627E  . . . . . . . . . . . . . . . . . . 684

22     1905   . . . . . . . . . . . . . . . . . . 728

23

24

25
```