J4THDaw1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3

            v.                    17 CR 684 (ER)
4
    CHRISTIAN DAWKINS and MERL
5   CODE ,

6              Defendants.        Trial
    ------------------------------x
7
                                   New York, N.Y.
8                                April 29, 2019
                                9:00 a.m.
9

10  Before:

11                  HON. EDGARDO RAMOS

12                                    District Judge

13
                      APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
        Southern District of New York
16  ROBERT L. BOONE
    NOAH D. SOLOWIEJCZYK
17  ELI J. MARK
       Assistant United States Attorneys
18
    HANEY LAW GROUP PLLC
19       Attorney for Defendant Dawkins

20  CHANEY LEGAL SERVICES, LLC
    BY:  DAVID A. CHANEY, JR.
21          -and-
    NEXSEN PRUET, LLC
22  BY:  ANDREW A. MATHIAS
       MARK C. MOORE
23       Attorneys for Defendant Code

24  ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
                YOLANDA BUSTILLO, Paralegal Specialist USAO
25              EMILY GOLDMAN, Paralegal Specialist USAO

J4THDaw1

1              (Trial resumed; jury not present)

2              THE COURT:  OK.  Folks, it's 9 o'clock.  Are we

3      waiting for Mr. Solowiejczyk?

4              MR. BOONE:  We can begin, your Honor.

5              THE COURT:  OK.  This morning I awoke to a bounty.

6      There were any number of emails from the parties.  Let me ask,

7      which of these have to be decided this morning?

8              MR. CHANEY:  Your Honor, I think the government's

9      request regarding statements made by -- some statements by

10     Mr. Dawkins, some by Mr. Code that would be introduced through

11     Mr. Sood I think would be appropriate for us to handle today.

12             MR. MOORE:  I don't agree.

13             MR. CHANEY:  I mean with respect to the calls that the

14     government intends to introduce.

15             MR. HANEY:  I would defer to the government.  I don't

16     know what they're going to put on and what order they're going

17     to put it on.  I have one issue, as the Court's aware, that one

18     particular call.

19             MR. MOORE:  I would say, for Mr. Code, I don't believe

20     that Mr. Solowiejczyk's letter motion needs to be decided this

21     morning.  As I noted in my perhaps inadvertent email to the

22     Court and then with a follow-up email, I believe that that

23     issue should be resolved after Mr. Sood testifies.  With

24     respect to Ms. Tutwiler, her testimony, and the testimony of

25     Mr. Mowery, we are not going to get to that until perhaps

J4THDaw1

1    Wednesday, I would think, at the earliest.  I don't know that

2    that needs to be decided either.

3              THE COURT:  Mr. Solowiejczyk?

4              MR. SOLOWIEJCZYK:  Your Honor, I apologize for being

5    tardy this morning.

6              Your Honor, we would respectfully request a ruling

7    from the Court before direct examination of Mr. Sood is

8    concluded because, if the Court actually does intend to allow

9    this stuff in, we'd like to ask Mr. Sood about it on direct,

10   understandably.  I anticipate Mr. Sood's direct will probably

11   take, it's hard to be precise, but probably the entire day or

12   close to it.  So we could go through most of it and then see

13   where we are, but the government does feel strongly that a

14   ruling is appropriate before his direct examination is

15   concluded.

16             THE COURT:  Just so we're clear, we're talking about

17   the two transcripts that you attached to your letter, right?  I

18   read the transcripts, but orient me.  I don't know what's going

19   on with respect to those conversations.

20             MR. SOLOWIEJCZYK:  So there's two different issues.

21   The recording that Mr. Code seeks to admit is a conversation, I

22   think -- I don't have the exact date in front of me -- early

23   August between Merl Code and Munish Sood.  And they want to,

24   really, admit one portion of that conversation, and that

25   portion is Merl Code recounting for Mr. Sood a prior

J4THDaw1

1  conversation that he purportedly had with Christian Dawkins in

2  which he said, in relevant part, that he basically told

3  Christian, Jeff, and those guys want to meet all these coaches:

4  OK.  Great.  Well, we can pay them.  No, no, you're not paying

5  my guys.

6          The problem with that, your Honor, is that this is not

7  a forward-looking statement.  Accordingly, it doesn't fall

8  under the state of mind exception.  It's merely Mr. Code

9  recounting a supposed prior conversation that he had with

10  Christian Dawkins.  And the defendants' ability to offer this

11  statement, as we briefed in the motions *in limine*, the state of

12  mind exception is a relatively narrow exception, and this does

13  not fall within it.  So, respectfully, we do not think the

14  defense should be permitted to admit this portion of the

15  recording.

16          Then with respect to what Mr. Haney is trying to get

17  in for Dawkins, we're admitting most of that recording already.

18  There's a small portion at the end that Dawkins would like to

19  admit, and that relates to the discussion between Sood and

20  Dawkins there about a meeting that's yet to come that day with

21  a sports agent Raymond Brothers.  And the pertinent quotes are

22  Mr. Dawkins saying -- I want to find the exact quote here.  "He

23  can stay in the room and F'ing get stroked off some more."

24          THE COURT:  I'm sorry.  What page?

25          MR. SOLOWIEJCZYK:  Of the transcript, I'm at page 6.

J4THDaw1

This is Exhibit B.  Line 9:  "He can stay in this room and

F'ing get stroked off some more," and then Sood's response of

"Let's stroke him off a little more."  Your Honor, this

pertains to a meeting with the sports agent Raymond Brothers.

It has nothing to do with the coaches.  Really, it's just -- on

top of that, I mean, these comments really don't add any value.

To the extent, I read Mr. Haney's response briefly,

but he wants to get in the statements from Mr. Sood, "let's

stroke him off a little more," the coconspirator exception does

not apply when the defense seeks to offer statements.  It only

applies when the government does.  We're happy to send your

Honor a couple of cases on that.  So we just don't think this

is relevant, and we also think it's hearsay.

THE COURT:  When are these coming in relative to

Mr. Sood's testimony, if you know?

MR. SOLOWIEJCZYK:  This call will come in probably by

the middle of the day, the second one.  And the first call that

I referenced we're not seeking to admit at all, so we would

only admit it if your Honor says that the defense would be able

to.

THE COURT:  OK.

MR. CHANEY:  Your Honor, could I just factually put

Mr. Code's statements into context?  I think the context is

really important.  As it pertains to Mr. Solowiejczyk's

argument that it's rear-looking, it's sort of a recounting of a

J4THDaw1

1   prior conversation between Mr. Code and Mr. Dawkins.

2          Mr. Code is speaking to Mr. Sood about another

3   gentleman, Seth, for really the entirety of that phone call.

4   And what he's saying is that this gentleman, Seth, doesn't know

5   what he's doing.  He just wants to throw money at problems.

6   That's not the way you build relationships.  That's not the way

7   you get loyalty.  That's not the way you get things done.

8          THE COURT:  Can you tell me who Seth is?  I don't need

9   a last name, but what does Seth do?

10          MR. CHANEY:  So Seth is another gentleman sort of in

11   this agency, financial space.  What we know now that Mr. Code

12   didn't know in that phone call is Mr. Sood actually

13   owned Mr. Cohen's company.  Mr. Code did not know that at the

14   time, but it's a business associate of Mr. Sood's that's a

15   mutual acquaintance of Mr. Code.

16          So Mr. Code and Mr. Sood are discussing Seth Cohen for

17   the large majority of this call.  Mr. Code is saying that this

18   Seth Cohen gentleman doesn't understand how the business works.

19   And to illustrate a point that he's trying to make with

20   Mr. Sood with respect to Mr. Cohen, he says:  "It's like the

21   conversation I had with Christian Dawkins where I said, 'Don't

22   pay my guys.'  Jeff wants to pay my guys.  I said, 'Don't pay

23   my guys.'"

24          So to the degree that that quote actually evinces for

25   the jury a present and then existing state of mind that

J4THDaw1

Mr. Code then, as we argue throughout the entirety of this
case, he then was not of the opinion that paying coaches was an
appropriate business model, that he didn't have a specific
intent to do so, that he hadn't joined an agreement to do so.
So while the conversation with Mr. Dawkins certainly is from a
point in time previous to the comment, it still is direct
evidence of his then-existing state of mind insofar as he's
relying on to explain his state of mind at that time during the
phone call.

MR. MOORE:  Your Honor, I'm going to pick up here on
the law for just a moment, if I may.  The statement from
Mr. Code is, "I'm telling you, you're not paying my guys."  The
government has introduced a transcript of a meeting in June of
2017, and they've used -- introduced certain portions of that
transcript and had Mr. Blazer, who had met Mr. Code that very
day, comment about Mr. Blazer's interpretations as to what
Mr. Code meant at various points with respect to that
conversation.

One of the points that I'm sure we're going to hear in
closing argument from the government is Mr. Code makes a
statement, which was discussed by Mr. Blazer and commented on
by Mr. Blazer, that you don't have -- that you don't pay
everyone now or you might not want to pay them now, but you pay
them later.  Part of our defense is going to be that Mr. Code
is listening to people that he's just met.  He's pitching them

J4THDaw1

1    on a business opportunity.  He is not going to completely

2    disagree with what they are saying, and he's not going to tell

3    them, for example, that day, in front of everyone in that room,

4    that their idea of paying coaches is stupid and no one does

5    that, frankly, if you're trying to get business from someone.

6              But I'm sure that the government is going to take the

7    position that Mr. Code had the intent that day and his intent

8    continued to pay coaches.  Mr. Code is saying to Mr. Sood, one

9    of his alleged coconspirators, "you're not paying my guys."

10   That can be interpreted that you're not paying them now and

11   you're not paying them in the future, and that is not a

12   statement from someone who has knowingly, willfully, and

13   unlawfully joined a conspiracy with knowledge of its purpose.

14   It is a forward-looking statement.  It is not a

15   backwards-looking statements.  So it is admissible, we contend,

16   under the state of mind exception.

17             It's also arguably admissible, depending on what

18   Mr. Sood says on direct, as impeachment of Mr. Sood.  It is

19   admissible, I believe, to show a statement by a party to an

20   alleged conspiracy to a conspirator that I am not down with, I

21   am not agreeing with your proposed plans to pay these coaches.

22             Finally, I believe it's admissible as under the

23   catchall exception of the hearsay rule because it has

24   circumstantial guarantees of trustworthiness.  I put

25   Mr. Solowiejczyk on notice yesterday, or last evening after I

J4THDaw1

1    got his letter motion, that I intended to rely on the catchall

2    exception to the hearsay rule.  And I recall that we crossed

3    this river a little bit, but not nearly to this extent, in

4    Gatto.  And I have read *DeMaria* and some of the other cases

5    that were mentioned in Mr. Solowiejczyk's memorandum, but I

6    reread them last night about 1 o'clock in the morning.  One of

7    the things that I note about *DeMaria* and the other cases that

8    are cited in Mr. Solowiejczyk's memorandum is that the

9    admission of most of the statements at issue there had to deal

10   with postarrest statements made by a defendant, self-serving

11   postarrest statements.  This is not a self-serving, postarrest

12   statement.  This is a conversation that is recorded by the

13   government at the time it is made, and it bears circumstantial

14   guarantees of trustworthiness.

15          These conversations that Mr. Solowiejczyk says --

16   these purported conversations between Mr. Code and Mr. Dawkins,

17   they aren't purported conversations.  They were intercepted by

18   the government.  The government may not want to introduce most

19   of them, but we will seek to introduce them in the defense

20   case.  And we would respectfully request that we have the

21   opportunity to play these calls during Mr. Sood's

22   cross-examination.  If your Honor decides not to allow us to

23   play those calls, then we may seek to offer them in the defense

24   case in chief.

25          But with respect to the circumstantial guarantees of

J4THDaw1

```
1    trustworthiness, if you look at the rule, Judge, and one of the

2    things I would note DeMaria talks about the, I guess,

3    exceptions to the hearsay rules in 803, and it also talks about

4    the catchall exception.  At the time DeMaria was decided, and I

5    am old enough to remember when the catchall exception was not

6    in Rule 807, but it was codified in Rule 803(24) and 804(b)(5),

7    declarant available, declarant nonavailable, it talks about --

8    the Court in DeMaria talks about the catchall exception of the

9    hearsay rules and talks about, to an extent, the reasons behind

10   the catchall exception of the hearsay rule.  And I understand

11   that we do have to show that it has circumstantial guarantees

12   of trustworthiness.  When you put that statement in context

13   with the other statements that we seek to offer and you note

14   that it is recorded by the government during the time period of

15   this alleged conspiracy -- and I would note, this is almost two

16   months before the government took down this case.  This is

17   almost two months before the government contends that this

18   alleged conspiracy ended, this alleged conspiracy to pay

19   coaches, and you have an alleged coconspirator telling his

20   supposed coconspirator, "you're not paying my guys," meaning

21   you and Jeff D'Angelo and whoever else is a party to your

22   little agreement to pay coaches, that you are not paying my

23   guys.

24           When you look at the codified exceptions to the

25   hearsay rule, the codified exceptions of the hearsay rule have
```

J4THDaw1

1    sort of built in circumstantial guarantees of trustworthiness.

2    So, for example, they allow present sense impression, excited

3    utterance, then-existing mental or emotional or physical

4    condition, records of regularly collected activity, recorded

5    recollection.  All of those categories, the exceptions to the

6    hearsay rule, have circumstantial guarantees of trustworthiness

7    because they relate to things that a declarant sees or does at

8    the time he sees or does it.  Here, this relates to something

9    that the declarant sees and says at the time and during the

10   time period of the conspiracy.

11            So I believe that all the cases cited by

12   Mr. Solowiejczyk are distinguishable, and I have not found a

13   single case that deals with wiretapped conversations

14   intercepted by the government which the government then seeks

15   to exclude.

16            THE COURT:  Are you agreeing, Mr. Moore, that the

17   statement that you're seeking to include does not, strictly

18   speaking, come within 803(3).

19            MR. MOORE:  No, sir, your Honor, I am not.  I do not

20   agree with that.  I'm making an alternate argument in case the

21   Court chooses not to accept my present sense impression or

22   state of mind argument.  That is an alternate theory of

23   admissibility.  As I said, I think there are other alternate

24   theories of admissibility.  To impeach Mr. Sood, depending on

25   what he says, and we don't know what he's going to say yet.  So

J4THDaw1

1    that's why I don't think a ruling at this time is appropriate.

2            I also believe, and I must say, that the government

3    knows this evidence exists.  The government knows that this

4    evidence is exculpatory.  The government seeks to exclude it,

5    but the government asks your Honor to rule either for them or

6    against them now, because if you rule against them now, they

7    seek to front it.  I think that's a little unseemly.

8            THE COURT:  Mr. Solowiejczyk.

9            MR. SOLOWIEJCZYK:  Your Honor, a couple of points in

10   response to that.  Number one, if there truly exists calls

11   between Merl Code and Christian Dawkins or Merl Code and Jeff

12   D'Angelo, actually, we're going to play one on direct, where

13   he's making a forward-looking statement about what's to come in

14   Las Vegas, we're not saying those may not fall under the state

15   of mind exception.  In fact, we agreed to play one of those

16   with the defense over the weekend.  It's going to come in under

17   direct.

18           What's happening here are the following:

19   Conversations that are actually forward-looking to that effect,

20   they don't really exist.  So what they're trying to do is take

21   a statement by Mr. Code after the fact to Mr. Sood in which he

22   claims to have told Christian Dawkins, don't pay any coaches --

23   it's actually a lot more complicated than that -- but if they

24   want to admit these statements that are actually

25   forward-looking that Mr. Code made to Mr. D'Angelo or

J4THDaw1

1    Mr. Dawkins saying, hey, when you guys go to Vegas, don't pay

2    coaches, that's a horse of a different color, but that's not

3    what we have here.

4           Your Honor, I think, respectfully, it requires a close

5    reading of the transcripts.  I'm not expecting your Honor to

6    rule right this second.  All we're saying is if the Court

7    actually is going to say this is admissible, the government

8    should have an opportunity to know that before it concludes its

9    direct examination of Mr. Sood.  There's nothing unseemly about

10   that.

11          As to the residual exception, we don't think that this

12   call would fall in under that, but we can -- we just received

13   Mr. Moore's letter on that last night, even though the rule

14   says that you're supposed to give notice before trial.

15          THE COURT:  Or hearing.

16          MR. SOLOWIEJCZYK:  Or hearing.  So, frankly, we don't

17   think it falls under that exception, but to fully respond to

18   that, we're going to need a little more time.  But the reality

19   is it definitely does not fall under the state of mind

20   exception.

21          MR. MOORE:  I would note that I gave the government

22   notice of the residual exception argument after -- shortly

23   after I received their letter motion seeking to exclude this.

24   We went back and forth with the government last week and over

25   the weekend, as we've been going back and forth with the

J4THDaw1

government for several weeks about what statements they would

agree to admit and what statements they would not.  I don't

believe that there's any lateness to my notice and intent to

rely on the residual exception.  I would note there are cases

in various circuits on the flexibility of the notice

requirement depending on the facts in the particular case.  I

litigated one in the Fourth Circuit years ago when I was a

prosecutor, and I can provide that citation to your Honor if

your Honor would like.

         I agree that perhaps your Honor needs to read the

transcript carefully.  I would simply note that the statements

by Mr. Code to Mr. Sood about what he has told Mr. Dawkins and

what he has told Mr. D'Angelo, that is to put the statement in

context that you're not paying my guys.  The statement "you're

not paying my guys" is a statement of Mr. Code's intention that

day and a statement of Mr. Code's intention going forward with

respect to his intention to join and be a part of this

conspiracy.

         MR. HANEY:  Your Honor, may I?  I understand, at least

from what Mr. Solowiejczyk said, my issue may be a little bit

more of an immediate issue.  I know I don't have the floor for

very long, but I would like to impress upon the Court the

context of the call that he's referencing that may be played

imminently is not being represented accurately.  The context of

the call originates out of Book Richardson at a meeting with

J4THDaw1

1    Munish Sood and Jeff D'Angelo where Jeff D'Angelo pays Book

2    Richardson, the coach, $5,000.  During the course of that phone

3    conversation, Munish Sood and Christian Dawkins are laughing

4    about why Jeff D'Angelo would have made that payment.

5          A later point of that phone call, Munish Sood suggests

6    they get Jeff D'Angelo back to the hotel so they can stroke him

7    off a little more, which is a forward-thinking act, obviously,

8    but they're in the context, still, of laughing about what had

9    happened earlier in the day.  And what the government seeks to

10   do is play a portion of a wiretapped recording and not the

11   complete portion of that recording, which they should under the

12   rule of completeness play the whole recording so the jury can

13   have the context of really what is going on with these two

14   gentlemen, which is they're both laughing at why Jeff D'Angelo

15   is paying coaches.  And Munish Sood, he's articulating to

16   Christian Dawkins, as Dawkins is to Sood, how it doesn't make

17   sense to pay coaches, and Sood suggests to get him back to the

18   hotel for a later meeting that afternoon to stroke him off a

19   little more, "more" being the operative word, which means

20   they've been stroking him off the whole time.

21         Your Honor, I don't see how they could suggest that

22   under the rule of completeness, under the effect on the

23   listener that that call should not be played in its entirety.

24   And it's a very short phone call.  It's a call that only lasts

25   maybe three minutes.  So I would submit that the whole call

1    should be played to the jury.  Let the jury be the one to

2    determine what the context of that conversation is, what did

3    Munish Sood mean by "let's get him back and stroke him off a

4    little more."

5           Thank you, your Honor.

6           THE COURT:  Mr. Solowiejczyk.

7           MR. SOLOWIEJCZYK:  Your Honor, briefly, to be clear,

8    we had extensive negotiations with the defense about this call,

9    and we're playing page 1, line 1, through page 4, line 24,

10   which actually makes all the points that Mr. Haney just said.

11   It's very -- that's because when we gave this call a close

12   look, we're reasonable people, and we said, you know what?

13   This one actually does fall under the state of mind exception

14   and is admissible.

15          But the way the rule of completeness works is not

16   that, well, since we're putting part of the call in, let's put

17   all of the call in.  That's not how it works.  There's nothing

18   about what follows that puts anything in context from what came

19   before.  The part of the conversation that we've excluded

20   relates to a player named Kyle Kuzma that Mr. Sood represents.

21   It relates to an upcoming meeting with Raymond Brothers.  And

22   the points that Mr. Haney just made, they're all covered in the

23   first part of the call.  So there really is very limited

24   relevance, other than trying to get in a rather inflammatory

25   quote at the end of the call that, at the end of the day, has

J4THDaw1

1    no bearing here.

2            THE COURT:  I guess I'm trying to understand

3    Mr. Haney's comment that it's Mr. Sood and Mr. Dawkins laughing

4    at the undercover.  I thought that the whole scheme here was to

5    pay off the coaches.

6            MR. HANEY:  Your Honor, you could listen to this one

7    phone call and determine very clearly that is not the scheme.

8    And Munish Sood, despite what he's going to testify to, he's on

9    a wiretap recording with my client laughing about why Jeff

10   D'Angelo's paying Book Richardson $5,000 when Book Richardson's

11   going to send players to them anyway.  Jeff D'Angelo -- I'm

12   sorry, Munish Sood actually says during that call:  He's dying

13   man.  He's dying.  Don't wake him up.  Don't wake up Jeff

14   D'Angelo because he's stupid enough to pay Book Richardson.

15   And then Munish Sood says:  Let's get him back to the hotel at

16   6 o'clock and stroke him off some more.

17           THE COURT:  Wasn't Munish Sood also paying coaches?

18           MR. SOLOWIEJCZYK:  Yes, yeah.  This is one call.

19   There's many events around it and that follow that make clear

20   their paying coaches and they actually expect something in

21   return for that.  But, obviously, that's going to be for the

22   jury to decide, ultimately.  So --

23           MR. HANEY:  Your Honor, Munish Sood and Marty Blazer

24   were paying coaches for their financial planning outfit.

25           MR. SOLOWIEJCZYK:  At the end of the day, these are

J4THDaw1

1    jury arguments.  We're letting the call in, so Mr. Haney's

2    going to be able to make whatever arguments he wants.  Yes,

3    it's true, during this call they made fun of Jeff D'Angelo.

4    Nobody' denying that.  The reason they're making fun of him,

5    Mr. Sood can explain that on direct examination.  He seems to

6    be head over heels that they've introduced him to a coach.

7              THE COURT:  I'm sorry.  Is the government objecting to

8    Mr. Haney's use of the latter portion of this tape during his

9    cross-examination?

10             MR. SOLOWIEJCZYK:  We don't think he should be allowed

11   to offer that part of the tape, no.  He can ask Mr. Sood on

12   cross-examination questions generally about what conversations

13   he had with Dawkins, but we don't think that that's a basis to

14   admit that portion of the tape.

15             THE COURT:  What's your objection to this portion of

16   the tape?  Is it relevance?

17             MR. SOLOWIEJCZYK:  It's a combination of relevance and

18   also hearsay.  Just because -- the defense is quite limited

19   under the Rules of Evidence in what recordings they can offer

20   themselves.  There's limited exceptions.  This part of the

21   recording doesn't fall under any of them.

22             MR. HANEY:  Just briefly, your Honor, without the word

23   "more," perhaps he has an argument, right?  If he says, "Let's

24   stroke him off," perhaps he has an argument.  When he says,

25   "Let's stroke him off a little more," he's referencing, like we

J4THDaw1

did earlier today when we stroked him off to give Book

Richardson, your buddy, $5,000 when it -- he's going to give

his coaches anyway.  So, clearly, "let's stroke him off a

little more" is coming out of Munish Sood's mouth, not

Christian Dawkins.  He's talking about getting D'Angelo back to

the hotel so they can continue to scam him like they did

throughout the entire scheme.

Thank you, your Honor.  Your Honor, I would simply

note, in closing, that when you look at Rule 106, I do not

believe that Mr. Solowiejczyk's interpretation of Rule 106 is

correct.  It says if a party introduces all or part of a

writing or recorded statement, an adverse party may require the

introduction at that time of any other part or any other

writing or recorded statement that, in fairness, ought to be

considered at the same time.  I actually think that all of the

recordings that we seek to show, seek to introduce here, not

only during the cross-examination of this witness but the

recordings that we seek to play in the defense case, are

covered by Rule 106.  Fairness ought to be considered is the

standard.

MR. SOLOWIEJCZYK:  Your Honor, there's a lot of law on

the rule of completeness, and what Mr. Moore just said is not

really a totally accurate statement.  But we're happy, if your

Honor's actually considering driving a bus through the hearsay

exception using the rule of completeness, we're happy to send a

J4THDaw1

1    letter that will make very clear that that's not what the

2    defense is allowed to do.  The Rules of Evidence exist for a

3    reason.

4           THE COURT:  Yes, at the end of the day, this decision

5    is not going to be driven by the rule of completeness because I

6    think, first of all, the jury now has been trained to learn

7    that these conversations are coming in piecemeal.  And if, at

8    the end of the day, the defense is going to be allowed to use

9    it, they can use it in their cross-examination, and I don't

10   think they would be prejudiced in the least by not having it

11   played during the the government's direct.  But I will reserve

12   for now so that I can read these things a little bit more

13   closely.

14          What about the instructions to the jury?

15          MR. CHANEY:  Yes.  Your Honor, we submitted those now,

16   instead of at the conclusion of the trial, because I think both

17   instructions are appropriate to be given to the jury sort of

18   contemporaneously with their receiving the evidence that we're

19   sort of -- that's being admitted for a limited purpose.  If I

20   had thought about it more in advance, I think it would have

21   been appropriate at the beginning of Mr. Sood's testimony,

22   contemporaneous with or immediately before Mr. Solowiejczyk

23   asked Mr. Sood whether or not he had pleaded guilty in

24   participation of the very conduct that we're talking about in

25   this case.

J4THDaw1

1          So I think the limiting instruction with respect to

2     the codefendant plea is ripe now and something that the jury

3     should be instructed about when they come in this morning.  I

4     think, additionally, to the extent -- and I believe that this

5     is going to happen -- that we go back through any of the

6     recordings that involve statements by Mr. D'Angelo or Ms.

7     Bailey, that a contemporaneous reading of the hearsay limiting

8     instruction would be appropriate at that time.

9          My sort of review of what the government's response to

10    the defense instructions were is that it really goes more to

11    the language choices, the phraseology of those instructions,

12    and not so much the content.  So I think the parties agree that

13    the content's appropriate.

14          THE COURT:  Mr. Mark?

15          MR. MARK:  I wouldn't say the parties agree.  There's

16    a lot of unnecessary language in the defendants' instructions.

17    These were obvious issues that were going to come up at trial.

18    Obviously, the defense just sort of sprung this in now at this

19    moment, which is quite late for sort of obvious issues that are

20    going to come up.  The government proposed these as part of its

21    request to charge.  It's standard in this district that this

22    sort of instruction would come in at a request to charge, not

23    sort of disjunctively in the middle of trial.  So we would

24    object to them being instructed at this point in time.  But to

25    the consideration the Court is considering whether to have any

J4THDaw1

1    instructions, we would sort of rest on our submission as to

2    what would be an appropriate instruction.

3              THE COURT:  I'm happy to use the government's

4    proposal, and I think it's appropriate to let the jury know

5    now.  So I will give the two instructions that the government

6    submitted.  I do agree the point is the same, but we'll go with

7    that.  I'll do that when the jury comes out.  OK.

8              MR. MARK:  Your Honor, the government has some other

9    matters, but I think we'll wait till a later break.

10             THE COURT:  If the jury's here, we're going to start.

11             Is Mr. Sood here?

12             MR. VOURDERIS:  Yes, your Honor.

13             THE COURT:  Can we bring him in.

14             MR. MOORE:  Your Honor, could I ask, because I'm going

15   to pay attention to Juror No. 3, could I ask that your Honor

16   keep an eye on her because at some point, if she continues to

17   fall asleep, we may have an application.

18             THE COURT:  Very well.  Are we good to go?

19             MR. CHANEY:  We are, Judge.

20             THE COURT:  OK.

21             (Continued on next page)

22

23

24

25

J4THDaw1

1          (Jury present)

2          THE COURT:  Everyone please be seated.

3          Ladies and gentlemen, good morning.  Thank you, as

4     always, for being prompt.  I trust you all had a restful and

5     pleasant weekend.  We're going to begin -- continue presently

6     with the direct examination of Mr. Sood.  However, before we do

7     that, there's just a couple of instructions that I need to give

8     you on the law so that you bear it in mind as you continue to

9     listen to the testimony.

10          First of all, you have heard testimony from Mr. Sood

11     that he pled guilty to charges arising out of the same facts as

12     this case.  You are instructed that you are to draw no

13     conclusions or inferences of any kind about the guilt of

14     Mr. Sood or about the guilt of any defendant on trial from the

15     fact that Mr. Sood pled guilty to similar charges.  Mr. Sood's

16     decision to plead guilty was a personal decision about his own

17     guilt.  It may not be used by you in any way as evidence

18     against or unfavorable to the defendant on trial here, OK?

19          Secondly, you have also heard and seen videotapes of

20     meetings involving undercover FBI agents.  You are instructed

21     that the statements by the undercover law enforcement witnesses

22     are being admitted not for the truth, but, rather, to put in

23     context statements by the defendants and by coconspirators.  We

24     couldn't redact the statements of the under undercovers out

25     even though they're not evidence because that way you would not

J4THDaw1                      Sood - Direct

1    be able to make sense of the conversation if you were only

2    hearing half of the conversation.  So these statements are

3    being provided simply so that you have the conversation in

4    could context.

5              With that, Mr. Solowiejczyk.

6              MR. SOLOWIEJCZYK:  Thank you, your Honor.

7    MUNISH SOOD, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MR. SOLOWIEJCZYK:

10   Q.  Good morning, Mr. Sood.

11   A.  Good morning.

12   Q.  Just to reorient the jury, I think when you testified on

13   Friday, Mr. Sood, you spoke about attending an NBA draft party?

14   A.  Yes.

15   Q.  What player was that for?

16   A.  PJ Dozier.

17   Q.  Who facilitated the introduction for you to PJ Dozier?

18   A.  Christian Dawkins.

19   Q.  Was there a coach involved in that introduction as well?

20   A.  Yes, Lamont Evans.

21   Q.  I believe you testified that PJ Dozier went undrafted, is

22   that right?

23   A.  Correct.

24   Q.  After the draft party, did you speak to Christian Dawkins

25   about it?

J4THDaw1                          Sood - Direct

1    A.  Yes.

2    Q.  Was that by phone?

3    A.  Yes.

4           MR. SOLOWIEJCZYK:  Your Honor, at this time the

5    government offers Government Exhibit 106 and 106T pursuant to

6    the authenticity stipulation.

7           THE COURT:  Any objection?

8           MR. HANEY:  No objection, your Honor.

9           MR. MOORE:  No objection, your Honor.

10          THE COURT:  106 and T will be admitted.

11          (Government's Exhibits 106 and 106T received in

12   evidence)

13          MR. SOLOWIEJCZYK:  This is a June 23, 2017, call

14   between Christian Dawkins and Munish Sood.

15          (Audio played)

16   BY MR. SOLOWIEJCZYK:

17   Q.  All right.  Mr. Sood, just a couple questions for you about

18   that recording.  If you could take a look back first, Mr. Sood,

19   and we're going to talk about this a few minutes, but by

20   June 23, 2017, had you started a new company with Christian

21   Dawkins?

22   A.  Yes.

23   Q.  Take a look at page 3, and I'm going to direct your

24   attention specifically to lines 6 through 9.

25          Mr. Sood, during this part of the conversation, what

J4THDaw1                     Sood - Direct

1    were you telling Christian Dawkins?

2    A.  That Lamont Evans had advised PJ Dozier to work with

3    Christian Dawkins and the new firm; but, rather, they went with

4    a different agent.

5    Q.  Did you have a conversation with Lamont Evans to that

6    effect?

7    A.  Yes.

8    Q.  Prior to the draft, Mr. Sood, had you had any discussions

9    with Christian Dawkins regarding recruiting PJ Dozier as a

10   client?

11   A.  Yes.

12   Q.  Now, Mr. Sood, at this time, June 23, 2017, what, if

13   anything, did you know about if anyone had previously paid

14   Lamont Evans?

15   A.  That Lamont Evans was paid by Christian Dawkins and Marty

16   Blazer.

17   Q.  And soon after this call did you, in fact, pay Lamont

18   Evans?

19   A.  I did.

20   Q.  Why'd you pay him?

21   A.  One of the reasons was because he helped set this meeting

22   up with the family, and then two was he was -- Marty had been

23   asking me to pay him for a while.

24   Q.  When you say "the family," who do you mean?

25   A.  Mother.

1    Q.  Of who?

2    A.  The mom.

3    Q.  Which player?

4    A.  PJ Dozier.

5    Q.  Mr. Sood, at page 4 you talked about a couple other

6    players.  You mentioned somebody named Kyle.  Who was that?

7    A.  Kyle Kuzma.

8    Q.  And you mentioned somebody made Davon.  Who that is?

9    A.  Davon Reed.

10   Q.  Then you mentioned someone named Patton.  Who was that?

11   A.  Justin Patton.

12   Q.  All right.  Mr. Sood, around this time in late June 2017,

13   did you see Mr. Evans again in person?

14   A.  Yes.

15   Q.  Do you recall where that occurred?

16   A.  New York.  Manhattan, New York City.

17   Q.  Mr. Sood, if I told you it might be Miami, Florida, would

18   that sound correct to you?

19   A.  Oh, yes, sorry.

20             MR. HANEY:  Objection.  Testifying.  Leading.

21             THE COURT:  Overruled.

22             MR. HANEY:  Thank you.

23   Q.  Did you inform Christian Dawkins about the fact you were

24   going to be seeing Lamont Evans?

25   A.  Yes.

1        MR. SOLOWIEJCZYK:  If we could just show the witness,

2   Ms. Bustillo, Government Exhibit 1632B.  If you could zoom in a

3   little bit.

4   Q.  You also have a binder in front of you, Mr. Sood, to the

5   extent that's easier.

6        Do you recognize this document?

7   A.  Yes.

8   Q.  What is it?

9   A.  It's a text message exchange between myself and Christian.

10        MR. SOLOWIEJCZYK:  Your Honor, the government offers

11   1632B.

12        THE COURT:  Any objection?

13        MR. HANEY:  No objection, your Honor.

14        THE COURT:  1632B will be received.

15        (Government's Exhibit 1632B received in evidence)

16   BY MR. SOLOWIEJCZYK:

17   Q.  All right.  Mr. Sood, when the messages say "direction

18   incoming," who are those messages from?

19   A.  They're from me.

20   Q.  When it says "outgoing," who are those messages from?

21   A.  Christian.

22   Q.  I want to start by directing your attention to the top

23   message.  I believe you -- could you just read that message,

24   actually.  This is from you, right?

25   A.  Oh.  "Good.  Just saw Lamont in Miami.  On my way to

J4THDaw1                         Sood - Direct

1   Bolivia.  You guys should sit down.  Jeff funding him, so we

2   may as well take advantage of it."

3              MR. SOLOWIEJCZYK:  Ms. Bustillo, could you zoom in on

4   that, on that one message, please.

5   Q.  Mr. Sood, when you said this, what did you mean by it?

6   A.  That Christian should sit down with Lamont to figure out

7   what players he can be recommending to us at the new company.

8   Q.  Mr. Sood, when you said, "Jeff funding him, so we may as

9   well take advantage of it," what did you mean by "take

10  advantage of it"?

11  A.  Since Jeff was giving money to Lamont Evans, we should be

12  seeing some results from this relationship.

13  Q.  What kind of results?

14  A.  Like access to players.

15             MR. SOLOWIEJCZYK:  All right.  You can zoom out,

16  Ms. Bustillo.

17  Q.  Going further down the page, if you could zoom in on that

18  middle portion.

19  Q.  Dawkins said to you, "I need my money back on PJ.  He's got

20  650.  Lamont has it."  Did you understand what Dawkins meant?

21  A.  That Lamont Evans owed Christian $650.

22  Q.  For what?

23  A.  More money he must have advanced him in -- previously.

24  Q.  For which player?

25  A.  For PJ Dozier.

J4THDaw1                        Sood - Direct

1          MR. SOLOWIEJCZYK:  You can zoom out, Ms. Bustillo.

2     Q.  Going down to the bottom of the page, starting with the

3     message that says, "No, Lamont can pay me back," when

4     Mr. Dawkins said to you, "No, Lamont can pay me back.  I

5     funneled the money through him," did you understand what he

6     meant?

7     A.  That he had given money to PJ or his family through Lamont

8     Evans, so he should pay him back, pay Christian back.

9          MR. SOLOWIEJCZYK:  OK.  You can take that down.

10    Q.  Mr. Sood, on Friday I think you had started to talk about

11    conversations you were having with Christian Dawkins about

12    starting a new company?

13    A.  Correct.

14    Q.  And around this time, I believe you said Mr. Dawkins had

15    left ASM Sports, right?

16    A.  Yes.

17    Q.  Can you generally describe, Mr. Sood, what the business

18    model was going to be for this new company?

19    A.  The business model was really to represent college players

20    who were turning pro, helping them identify sports agents,

21    financial advisers, accountants, marketing; and in return, we

22    would receive a portion of the fees from the service providers.

23    Q.  I believe you testified that you introduced a new potential

24    investor to Mr. Dawkins, right?

25    A.  Yes.

1    Q.  Who was that?

2    A.  Jeff D'Angelo.

3    Q.  And you met Mr. D'Angelo through Marty Blazer?

4    A.  Correct.

5    Q.  What did you -- who did you understand Jeff D'Angelo was at

6    the time you first met him?

7    A.  Wealthy businessman in real estate.

8    Q.  What did you later learn about him?

9    A.  That he was undercover FBI agent.

10   Q.  When did you learn that?

11   A.  When I was arrested.

12   Q.  Mr. Sood, when were you are arrested?

13   A.  September 26, '17.

14   Q.  On the day of your arrest, did you speak with law

15   enforcement voluntarily?

16   A.  Yes.

17   Q.  Were you questioned about your activities involving college

18   basketball?

19   A.  Yes.

20   Q.  Mr. Sood, during that interview, were you asked about

21   certain payments that you had made to coaches and others?

22   A.  Yes.

23   Q.  Were you truthful about those subjects at that time?

24   A.  No.

25   Q.  Mr. Sood, what sorts of things did you lie about on the day

J4THDaw1                          Sood - Direct

1   of your arrest?

2   A.   The number of coaches that were paid and the dollar amount

3   to family members.

4   Q.   Why did you lie, Mr. Sood?

5   A.   I was scared.  I didn't want to get caught.

6   Q.   After you were arrested, did you later decide to cooperate

7   with law enforcement?

8   A.   Yes.

9   Q.   Did you participate in meetings with the government?

10  A.   Yes.

11  Q.   Who else was present for those meetings?

12  A.   My attorney.

13  Q.   At those meetings, did you tell the government the truth

14  about what you did?

15  A.   Yes.

16  Q.   At those meetings, were you required to tell the government

17  about any other wrongdoing you were involved in?

18  A.   Yes.

19  Q.   As part of your cooperation with the government, have you

20  also met with another U.S. Attorney's Office regarding a

21  separate investigation?

22  A.   Yes.

23  Q.   Generally, what was the subject of those interviews?

24  A.   That was regarding commercial loans done during my tenure

25  as a director at a bank.

1    Q.  Mr. Sood, are you aware whether there's an ongoing SEC

2    investigation regarding your conduct?

3    A.  Yes.

4    Q.  What's your understanding regarding the status of that

5    investigation?

6    A.  That my attorneys are handling the discussions and the

7    negotiations.

8    Q.  Did there come a time when you pleaded guilty?

9    A.  Yes.

10   Q.  Generally, what conduct did your guilty plea cover?

11   A.  Bribing a coach and wire fraud.

12   Q.  What did the wire fraud relate to, generally?

13   A.  Paying players and coaches.

14   Q.  Who were some of the coaches that you either paid yourself

15   or that you agreed to pay?

16   A.  Tony Bland, Emanuel Richardson, and Lamont Evans.

17   Q.  Did you have an agreement with the government at the time

18   you pled guilty?

19   A.  Yes.

20   Q.  What kind of agreement did you have?

21   A.  A cooperation agreement.

22   Q.  Mr. Sood, what benefit were you hoping for as a result of

23   the cooperation agreement?

24   A.  To get the least sentence possible.

25   Q.  Have you met with the government in connection with your

J4THDaw1                        Sood - Direct

1   cooperation?

2   A.  Yes.

3   Q.  Fair to say you've met with the government many times at

4   this point?

5   A.  Yes, many times.

6           MR. SOLOWIEJCZYK:  If we could just show for the

7   witness only, Ms. Bustillo, Government Exhibit 658.

8   Q.  Do you recognize this document?

9   A.  Yes.

10  Q.  What is it?

11  A.  The cooperation agreement.

12  Q.  Could you turn to the last page.  Do you see your signature

13  on the agreement?

14  A.  Yes.

15          MR. SOLOWIEJCZYK:  Government offers Government

16  Exhibit 658.

17          THE COURT:  Any objection?

18          MR. HANEY:  No objection.

19          MR. MOORE:  No objection.

20          THE COURT:  658 will be received.

21          (Government's Exhibit 658 received in evidence)

22  BY MR. SOLOWIEJCZYK:

23  Q.  Mr. Sood, what's your understanding of what you are

24  required to do under this agreement?

25  A.  Required to tell the truth, provide information that's --

J4THDaw1                          Sood - Direct

1    that I have regarding the case, meet as required, and not

2    commit any -- any crimes.

3    Q.  If you live up to your obligations under the cooperation

4    agreement, what's your understanding of what the government

5    will do?

6    A.  They will give my judge a 5K letter.

7    Q.  What's your understanding of what information is contained

8    in a 5K letter?

9    A.  It contains the crimes I committed and also the help I

10   provided.

11   Q.  What are you hoping will happen as a result of the

12   government writing that letter to the judge?

13   A.  To get the least amount of sentence.

14   Q.  Will the government recommend a specific sentence to the

15   judge?

16   A.  No.

17   Q.  Mr. Sood, under this plea agreement, did you also receive

18   immunity for anything?

19   A.  Yes.

20   Q.  For what?

21   A.  Lying to the FBI.

22   Q.  Was that on the day of your arrest?

23   A.  Yes.

24   Q.  Does this agreement provide you any protection with respect

25   to the SEC investigation that you mentioned?

J4THDaw1                        Sood - Direct

1   A.   No.

2   Q.   What's the highest possible sentence that you can receive

3   for all of the crimes that you pleaded guilty to?

4   A.   Thirty-five years.

5   Q.   Is 35 years the maximum punishment even if the government

6   writes the 5K letter?

7   A.   Yes.

8   Q.   You also face financial penalties?

9   A.   Yes.

10  Q.   What's your understanding of who will ultimately decide

11  your sentence?

12  A.   Judge.

13  Q.   Is the judge required to give you a lower sentence if the

14  government writes the 5K letter?

15  A.   No.

16  Q.   If you violate the cooperation agreement, do you believe

17  that the government will still write that letter to the judge?

18  A.   No.

19  Q.   Have you been promised that you will get a lower sentence

20  as a result of your cooperation?

21  A.   No.

22  Q.   Have any promises been made to you about the sentence that

23  you're going to get in this case?

24  A.   No.

25  Q.   Do you believe the outcome of this trial will have any

J4THDaw1                        Sood - Direct

1   effect whatsoever on whether the government writes that letter

2   to the judge?

3   A.   No.

4   Q.   What's your understanding of what does matter under the

5   agreement?

6   A.   Tell the truth.

7   Q.   What happens if you're not truthful here today?

8   A.   The government will rip up the -- the cooperation letter.

9   Q.   Are you still bound by your guilty plea at that point?

10  A.   Yes.

11          MR. SOLOWIEJCZYK:  You can take that down,

12  Ms. Bustillo.

13  Q.   Mr. Sood, I want to turn back to the formation of this new

14  company with Christian Dawkins and others.  I think you were

15  talking about a new investor named Jeff D'Angelo.  Did there

16  come a time when you introduced Jeff D'Angelo to Christian

17  Dawkins?

18  A.   Yes.

19  Q.   Do you recall where that happened?

20  A.   I was in a restaurant in Manhattan, New York.

21  Q.   What was the purpose of that meeting?

22  A.   Just to introduce Christian to Jeff and then also discuss

23  the new company he wanted to create.

24  Q.   What were you hoping was going to be the outcome of that

25  meeting?

J4THDaw1                           Sood - Direct

1   A.  That Jeff would consider investing in the company.

2              MR. SOLOWIEJCZYK:  Your Honor, at this time the

3   government would offer Government Exhibits 506B through 506F

4   and 506BT through 506FT, which are recordings of a May 16,

5   2017, meeting and the associated transcripts.

6              THE COURT:  Any objection?

7              MR. HANEY:  No objection, your Honor.

8              MR. MOORE:  No objection, your Honor.

9              THE COURT:  Those exhibits will be received.

10             (Government's Exhibits 506B through 506F and 506BT

11   through 506FT received in evidence)

12   BY MR. SOLOWIEJCZYK:

13   Q.  Mr. Sood, prior to testifying here today, did you review a

14   recording of that meeting that you mentioned in Midtown

15   Manhattan?

16   A.  Yes.

17   Q.  At the time of the meeting, did you know it was being

18   recorded?

19   A.  No.

20             MR. SOLOWIEJCZYK:  All right.  If we could play,

21   Ms. Bustillo, Government Exhibit 506B.  And this is a portion

22   of the May 16, 2017, meeting between Christian Dawkins, Munish

23   Sood, and Jeff D'Angelo.

24             (Audio played)

25             MR. SOLOWIEJCZYK:  Pause for one second.

J4THDaw1                           Sood - Direct

1    Q.  Who's talking right now, Mr. Sood?

2    A.  Christian Dawkins.

3            MR. SOLOWIEJCZYK:  Ms. Bustillo, is it possible to

4    make it a little louder?  Thank you.

5            (Audio played)

6    BY MR. SOLOWIEJCZYK:

7    Q.  Mr. Sood, what was Mr. Dawkins generally describing during

8    that portion of the meeting?

9    A.  He was just outlining the business strategy, which is give

10   potential player clients an option of three to four

11   agents/advisers, so this way they have the ability to pick what

12   makes the best sense.  But we've done -- we've -- we would do

13   the sourcing so we can confirm which may be the best option for

14   them.

15   Q.  By doing the sourcing, how are you going to benefit from

16   that financially?

17   A.  Because then, regardless of the agents they choose, we

18   would get a piece of the fees.

19           MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could play the

20   next clip, which is another portion of the May 16, 2017,

21   meeting, Government Exhibit 506C.

22           (Audio played)

23   Q.  OK.  Mr. Sood, I just want to ask you a couple questions

24   about some of the conversation we just heard.

25           If you could go back to page 1, and specifically

J4THDaw1                           Sood - Direct

1   focusing you on lines 3 through 5, when Mr. Dawkins said, "The
2   key to all of this stuff is controlling the assets, that's what
3   it is.  It sounds negative.  It's the bottom up," did you
4   understand what that meant?
5   A.  He was referring to players.
6   Q.  And what specifically was he telling you?
7   A.  That if you can control the player, it will make it easier
8   for the player to work with us.
9   Q.  During this part of the conversation, what generally was
10  Dawkins discussing when it came to controlling the players?
11  A.  That based on his relationships, he can start controlling
12  them as early as high school.
13  Q.  Now, there was some discussion during this part of the
14  conversation regarding a player named Brian Bowen.  Who is
15  that?
16  A.  A high school player.
17  Q.  Did you understand generally what Mr. Dawkins was telling
18  you during this conversation regarding Brian Bowen's
19  recruitment process?
20  A.  That he was a highly -- a top prospect, but based on his
21  relationship with Brian and also his relationship with other
22  schools, he could leverage that relationship to secure a top 15
23  draft pick by sending that -- sending Brian Bowen to a
24  particular school.
25  Q.  When you said "he," who were you referring to?

1   A.  Christian.

2   Q.  What was the role, if any, of the college coaches in that?

3   A.  They would then direct a top 15 player to Christian and the

4   new firm.

5   Q.  All right.  Taking a look a little later in the

6   conversation at page 6, specifically referring to lines 11

7   through about 18 or so, Mr. Dawkins said to you:  "But some

8   coaches don't have nothing to do with it at all, and some

9   coaches have the guys with just exclusivity.  And it's like,

10  listen, you ain't -- if you ain't going with this guy, it's

11  going to make it a pretty F'ing fit, you know?  I'm sure

12  they're getting some not guilty return for that access."

13          Did you understand what Mr. Dawkins was referring to

14  here?

15  A.  That there were certain coaches who already had preexisting

16  relationships with agents and advisers, so it would be

17  difficult for us to work with them, and then some coaches did

18  not participate in taking money for referring players.

19  Q.  When Mr. Dawkins said, "I'm sure they're getting something

20  in return for that access," did you understand what that meant?

21  A.  Money.

22  Q.  Who was getting money?

23  A.  The coaches.

24          MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could now play

25  Government Exhibit 506D, which is another portion of the

J4THDaw1                         Sood - Direct

1   May 16, 2017, meeting between Christian Dawkins, Jeff D'Angelo,

2   and Munish Sood.

3            (Audio played)

4   BY MR. SOLOWIEJCZYK:

5   Q.  Mr. Sood, just looking back at page 1 of the transcript,

6   and specifically the statement by Mr. Dawkins, it starts at

7   line 23 and runs through the top of page 2, he said to you,

8   "You got a relationship with them.  Let's say, for instance,

9   someone's recruiting LeBron James and you're his guy.  He may

10  say, Look, and so I can get you LeBron.  I got the kid.  I need

11  to get some financing to get everything done.  You come in, you

12  take care of him, and it's your kid."

13           Did you understand what Mr. Dawkins was referring to

14  here?

15  A.  That he's giving example of how a coach may -- would

16  require money to pay a handler or a -- someone that's related

17  to him.  In this case, he used LeBron as an example, in order

18  to convince LeBron to go to the schools where the coach is

19  coaching.

20  Q.  If somebody provided that financing to the coach, what, if

21  anything, would be the result of that?

22  A.  Having access to that player.

23           MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could go to

24  Government Exhibit 506E, we can play this one.  Thank you.

25           (Audio played)

J4THDaw1                         Sood - Direct

1   Q.  Mr. Sood, there was some mention to Lamont.  Who were you

2   referring to there?

3   A.  Lamont Evans.

4   Q.  Where was he coaching at that time?

5   A.  He was at, sorry, Oklahoma State.

6   Q.  What, if anything, was Dawkins saying during this portion

7   of the meeting regarding how Lamont Evans had gotten the job at

8   Oklahoma State?

9   A.  That he, Christian, had helped use his relationship to help

10  Lamont get the job at Oklahoma State and a better salary.

11          MR. SOLOWIEJCZYK:  If we could go to 506F,

12  Ms. Bustillo.

13          (Audio played)

14  Q.  All right.  Mr. Sood, going back to page 2, when Dawkins

15  said to you, "If we're taking care of everybody and everything

16  is done, we control everything.  That's why I said it doesn't

17  make sense to -- what's the extra five grand when you can make

18  millions off of one kid?  That's what I'm saying," what did you

19  understand that to mean, Mr. Sood?

20  A.  That if we paid the -- if we provided money to the right --

21  the right people, coaches or family members or both, that would

22  position us to retain a client, retain a player when he goes

23  pro, and the returns were very -- were great.

24  Q.  Going to page 3, Mr. Sood, starting at line 4 of that page,

25  Mr. Dawkins says to you, "If we have the coaches, that means

J4THDaw1                          Sood - Direct

1    you can save us money and expenses having to F'ing go down

2    there and hold the guy's Dick.  If we don't have the coaches,

3    that means I have to be in that city every month or two weeks,"

4    what did you understand that to mean, Mr. Sood?

5    A.  With working with the coaches, they would have influence

6    over the player and they would keep other agents away.  And

7    then, also, it would be easier for us to maintain the

8    relationships since we can't be there every day.

9    Q.  Now, Mr. Sood, after this initial meeting with Jeff

10   D'Angelo and Christian Dawkins, did you have additional

11   discussions with Mr. D'Angelo about the possibility of

12   investing?

13   A.  Yes.

14   Q.  Soon after that did you have another meeting with him?

15   A.  Yes.

16   Q.  Where did that occur?

17   A.  In New York City.

18   Q.  Mr. Sood, was Mr. Blazer also present for that meeting?

19   A.  Yes.

20   Q.  Now, during that meeting, did there come a point when you

21   spoke to Christian Dawkins?

22   A.  Yes.

23   Q.  How did you do that?

24   A.  Via phone.

25   Q.  Were you holding the phone to your ear or did you have him

J4THDaw1                        Sood - Direct

1   on speakerphone?

2   A.  It was a conference call.  He was on speaker.

3           MR. SOLOWIEJCZYK:  At this time, your Honor, the

4   government would offer Government Exhibit 507.

5           THE COURT:  Any objection?

6           MR. HANEY:  No objection, your Honor.

7           MR. SOLOWIEJCZYK:  And the related transcript, 507T.

8   And government offers it at this time, your Honor.

9           THE COURT:  There being no objection, it will be

10  received.

11          (Government's Exhibits 507 and 507T received in

12  evidence)

13          MR. SOLOWIEJCZYK:  Ms. Bustillo, when you're ready, if

14  you could play Government Exhibit 507 and the associated

15  transcript, 507T.

16          (Audio played)

17          MR. SOLOWIEJCZYK:  Can you pause it.  You can keep

18  going, Ms. Bustillo, when you're ready.

19          (Audio played)

20  BY MR. SOLOWIEJCZYK:

21  Q.  All right.  Mr. Sood, if you could turn back to page 1 of

22  the transcript, and focusing your attention on lines 16 through

23  21, you said, "You know one of the things that we want to

24  confirm is that you work closely with, like, guys like Lamont,

25  Book, and they become a good resource for us and they -- you

J4THDaw1                          Sood - Direct

1  know, it's a good way to make sure that kids work for us."

2          Who is Lamont and who is Book?

3  A.  Lamont was Lamont Evans and Book was Emanuel Richardson.

4  Q.  Where did Emanuel Richardson coach at that time?

5  A.  University of Arizona.

6  Q.  During this phone call, what were you asking Dawkins for

7  specifically?

8  A.  List of his relationships and coaches that he'd want to

9  work with.

10  Q.  At that time why was that relevant to you, Mr. Sood?

11  A.  To figure out how much money he may require to -- for them

12  to recruit players.

13  Q.  Looking at page 4, specifically lines 2 through 9, you said

14  to Mr. Dawkins, "So part of the solution we want to provide is

15  like what we do with Lamont.  Is -- you know, you introduce us

16  to Lamont; you introduce me to Book.  We go to them and say,

17  how can we help you outside of, you know, what we're talking

18  about on the business side?"

19          What did you mean by that, Mr. Sood?

20  A.  That we were going to be providing them money for

21  recruiting if they will need any type of resources.

22  Q.  Why did you specifically mention Lamont and Book in that

23  context?

24  A.  Because those are two coaches that I had met with and had

25  spoken with.

J4THDaw1                              Sood - Direct

Q.  Mr. Sood, by this point, May 2017, what, if anything, did
you understand regarding the types of monetary needs that
assistance coaches might have?

A.  They had monetary needs to recruit.  Some of them were
using their own moneys, but if we could provide that, if we
could provide the money, then we get access to their players.

          MR. SOLOWIEJCZYK:  You can take that down,
Ms. Bustillo.

Q.  Mr. Sood, during these ongoing discussions with Jeff
D'Angelo about investing, were you in frequent contact with
Christian Dawkins during that time?

A.  Yes.

Q.  Did you keep him apprised of the discussions you were
having with D'Angelo about his investment?

A.  Yes.

Q.  Did you speak to him regularly by phone?

A.  Yes.

          MR. SOLOWIEJCZYK:  At this time, your Honor, the
government would offer Government Exhibit 203 and 203T.

          THE COURT:  Any objection?

          MR. HANEY:  No objection, your Honor.

          MR. MOORE:  No objection.

          THE COURT:  203 and 203T will be received.

          (Government's Exhibits 203 and 203T received in
evidence)

J4THDaw1                         Sood - Direct

1              MR. SOLOWIEJCZYK:  This is a May 31, 2017, phone call

2     between Munish Sood and Christian Dawkins.

3              (Audio played)

4     BY MR. SOLOWIEJCZYK:

5     Q.  All right.  Mr. Sood, turning back to page 2 of the

6     transcript, you said to Mr. Dawkins, this is at line 5, "While

7     you're sitting on the plane, can you send us a list of the

8     coaches, you know, that's most important to us, your top ten or

9     top 15 coaches that, you know, we could be working with going

10    forward, or whatever the number maybe."  What were you asking

11    Mr. Dawkins for at this point?

12    A.  A list of coaches that we would want to engage to recruit.

13    Q.  When you say "engage," what do you mean, Mr. Sood?

14    A.  That may require money to help them secure players.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J4T9DAW2                        Sood - Direct

1    Q.  You then went on to say at page 2, line 20, "We're helping

2    Lamont out right so we're helping Lamont with his recruiting."

3             What were you telling Dawkins here?

4    A.  That similar to Lamont Evans who was receiving money for

5    recruiting.

6    Q.  Similar to what, sorry?

7    A.  Sorry.  The coaches may want money as well to recruit.

8    Q.  And then at line -- page 2, line 24 you said, "So as Jeff

9    has mentioned, Marty has mentioned, we don't mind, we don't

10   mind helping coaches out if it helps the overall cause."

11            What did you mean by "overall cause," Mr. Sood?

12   A.  That in return we'll be receiving clients.

13   Q.  Now, when Mr. Dawkins said to you at -- further down on

14   that page, line 8, "Lamont is not even on the same stratosphere

15   as some of the other guys that I was just listing."  Did you

16   understand what he meant by that?

17   A.  That even though Lamont Evans worked for a good college

18   basketball program he had relationships with other coaches that

19   worked at better, high-rated programs.

20   Q.  Then finally, Mr. Sood, you said a little further down,

21   line 20, "But that's -- still we want to know.  So we want to

22   know where we want to use our money."

23            Do you see that?

24   A.  Yes.

25   Q.  What did that mean?

1   A.   Again, we wanted a list to know how much we should be

2   budgeting -- how much we required for the number of coaches he

3   was thinking of working with.

4   Q.   Mr. Sood, after this call, did Mr. Dawkins, in fact, send

5   you a list of coaches?

6   A.   Yes.

7          MR. SOLOWIEJCZYK:  And if we could just publish for

8   the witness only, Ms. Bustillo, Government Exhibit 655.

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   What is it?

12  A.   It's an e-mail from Christian.

13  Q.   To whom?

14  A.   To myself.

15         MR. SOLOWIEJCZYK:  Your Honor, the government offers

16  Government Exhibit 655.

17         MR. HANEY:  No objection, your Honor.

18         MR. CHANEY:  No objection, your Honor.

19         THE COURT:  655 will be received.

20         (Government's Exhibit 655 received in evidence)

21  Q.   So, Mr. Sood, if you could just walk us through the header

22  of the e-mail.  Who is it from?

23  A.   It's from Christian.  It's dated Wednesday, May 31, 2017.

24  The subject:  Coaches.  It's to my e-mail.

25  Q.   Mr. Dawkins said these are my main guys.  What does he list

1    underneath that?

2    A.  A list of coaches.

3    Q.  So I just want to walk through the list with you briefly,

4    Mr. Sood.

5            It says Arizona, Sean Miller.  Future hall of fame.

6    And then Emanuel Book Richardson superstar.

7            Did you know who Sean Miller was at that time?

8    A.  The head coach of the University of Arizona.

9    Q.  By this time had you met Emanuel Book Richardson?

10   A.  Yes.

11   Q.  What does it say about him?

12   A.  Superstar.

13   Q.  Going a little further down that first page there's a

14   reference to Creighton?

15   A.  Yes.

16   Q.  And there's someone named Preston Murphy?

17   A.  Yes.

18   Q.  Who did you understand that to be at the time?

19   A.  Another superstar.

20   Q.  Beyond that, what was his job?

21   A.  Assistant coach.

22   Q.  And a little further down it says USC?

23   A.  Yes.

24   Q.  Tony Bland.  What was your understanding of who he was at

25   that time?

1   A.  Also an assistant coach.

2   Q.  At which school?

3   A.  USC, University of Southern California.

4   Q.  Had Dawkins previously mentioned Bland to you?

5   A.  Yes.

6   Q.  And what did he say about Bland at that time?

7   A.  It was a good relationship of his, well connected, and

8   had -- and had a great recruiting class coming up.

9   Q.  Did you eventually meet with Mr. Bland in person?

10  A.  Yes.

11  Q.  Besides Tony Bland and Book Richardson, did you ever

12  personally meet with any of the other coaches on this list?

13  A.  No.

14  Q.  Mr. Sood, after receiving this list, what was your

15  reaction?

16  A.  Seemed like a very impressive list.

17  Q.  What did you do with the list after you received it?

18  A.  I forwarded it to Jeff D'Angelo.

19  Q.  Now, Mr. Sood, after this phonecall and after Mr. Dawkins

20  sent you this list, did there come a point soon after when

21  Mr. D'Angelo did agree to invest in the new company?

22  A.  Yes.

23  Q.  And did there come a time when you formalized an agreement

24  amongst yourselves with respect to that, his investment and

25  your investment?

J4T9DAW2                          Sood - Direct

1    A.  Yes.

2    Q.  And Mr. Sood, to be clear, you also invested in this

3    company, correct?

4    A.  I did.  I was a shareholder.

5            MR. SOLOWIEJCZYK:  So if you could publish just for

6    the witness Government Exhibit 623.

7    Q.  Do you recognize that document, Mr. Sood, once you've

8    turned to it.?

9            I think it's also on your screen.

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  It's the shareholder agreement between myself, Christian,

13   and Jeff D'Angelo.

14           MR. SOLOWIEJCZYK:  Your Honor, the government offers

15   Government Exhibit 623.

16           MR. HANEY:  No objection, your Honor.  Thank you.

17           MR. CHANEY:  No objection.

18           THE COURT:  623 will be received.

19           (Government's Exhibit 623 received in evidence)

20           MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could turn

21   to -- I think it's page 8 of 9 of the document, the second to

22   last page.

23   Q.  Who are the signatories to the agreement, Mr. Sood?

24   A.  Christian, Jeff, and myself.

25   Q.  And what were you and Jeff D'Angelo listed as?

J4T9DAW2                              Sood - Direct

1    A.   Shareholders.

2    Q.   Who did Mr. Dawkins sign on behalf of?

3    A.   The company, Loyd, Inc.

4    Q.   Did you meet in person to sign this agreement?

5    A.   Yes.

6    Q.   Where did that meeting occur?

7    A.   In Manhattan, New York.

8    Q.   And where in particular?

9    A.   It was on a boat in downtown.

10   Q.   Mr. Sood, if you could go back to I think it's the fourth

11   page of the document.  It's the one ending in 0601.

12           MR. SOLOWIEJCZYK:  If we could zoom in, Ms. Bustillo,

13   on the fifth provision, "Loan to Loyd, Inc."

14   Q.   Under the terms of this agreement, who, if anyone, was

15   going to be providing a loan to the new company?

16   A.   Jeff D'Angelo will provide $185,000 I would provide 40,000.

17   Q.   And at the time, Mr. Sood, did you agree to provide those

18   funds, what was your understanding about how they were going to

19   be used?

20   A.   They would be used to give money to players, coaches, and

21   then also for general expenses.

22   Q.   Directing your attention to the last page of the document.

23   There's a schedule here?

24   A.   Yes.

25   Q.   What percentage stake were you going to be receiving in the

1   company?

2   A.   Fifteen.

3   Q.   And what percentage stake was Mr. D'Angelo going to be

4   receiving?

5   A.   Thirty-five.

6   Q.   How about Mr. Dawkins?

7   A.   Fifty.

8   Q.   What was your understanding regarding why Dawkins was

9   getting the greatest percentage?

10  A.   Because he would be the president and also running the

11  company day-to-day.

12  Q.   If you could go back to the sixth page of the document

13  which is the document ending in 0603, the page ending in 0603.

14         Looking at the bottom of the page, what city was

15  correspondence to be sent to Christian Dawkins?

16  A.   Atlanta, Georgia.

17  Q.   Where did you understand he was living at that time?

18  A.   In Atlanta.

19  Q.   Looking at the next page, where was correspondence to be

20  sent to Jeff D'Angelo?

21  A.   New York.

22  Q.   Where did you understand that he resided at that time?

23  A.   New York.

24  Q.   Mr. Sood, did you end up putting up part of the money

25  that's described in this agreement?

J4T9DAW2                              Sood - Direct

1    A.  I did.  Ten thousand.

2    Q.  Mr. Sood, by putting up that money and signing this

3    agreement formally becoming a shareholder in the company what

4    was your ultimate goal?

5    A.  To recruit players as clients.

6    Q.  Now, at the time you signed this agreement you mentioned

7    you met on a boat.  Were you aware that that meeting was being

8    recorded?

9    A.  No.

10   Q.  Did you review a recording of that meeting before

11   testifying?

12   A.  Yes.

13   Q.  Generally, what was discussed at the meeting, Mr. Sood?

14   A.  Just the strategy of the company, the players, the coaches

15   that we were going to focus on and how we would grow the

16   company going forward.

17             MR. HANEY:  Your Honor, may we approach.

18             THE COURT:  Yes.

19             MR. HANEY:  Thank you, your Honor.

20             (Continued on next page)

21

22

23

24

25

J4T9DAW2                          Sood – Direct

1              (At the sidebar)

2              MR. HANEY:  My client has informed me if we don't take

3     a five-minute break something embarrassing is going to happen

4     to my client.

5              THE COURT:  OK.  We'll take a five-minute break.

6              MR. HANEY:  I apologize, your Honor.

7              THE COURT:  No problem.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4T9DAW2                        Sood - Direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, we're going to take

3      a five-minute break.  Don't discuss the case.

4              (Recess)

5              THE COURT:  Mr. Solowiejczyk.

6              MR. SOLOWIEJCZYK:  Thank you, your Honor.

7      Q.  Mr. Sood, I believe we were talking about the meeting on

8      the boat when you signed the shareholder agreement.  So, I was

9      asking you if you knew the meeting was being recorded?

10     A.  No.

11     Q.  Did you review a recording of the meeting before testifying

12     today?

13     A.  Yes.

14     Q.  Generally speaking, what was discussed during the meeting?

15     A.  Just the business strategy, where Christian -- what

16     players, coaches he wanted to focus on and really what the

17     outlook of the company would be.

18     Q.  Did you bring anyone with you to the meeting?

19     A.  Yes.

20     Q.  Who was that?

21     A.  It was my assistant.

22     Q.  What's her name?

23     A.  Alicia Carroll.

24     Q.  And did Mr. D'Angelo bring anyone to the meeting with him?

25     A.  Yes.

J4T9DAW2                         Sood - Direct

1    Q.  Who was that?

2    A.  One of his business partners named Jill Bailey.

3    Q.  And did you later learn anything about Ms. Bailey?

4    A.  Yes.

5    Q.  What did you learn?

6    A.  That she was an undercover FBI agent as well.

7    Q.  Was Mr. Dawkins at the meeting?

8    A.  Yes.

9    Q.  And was Mr. Blazer there?

10   A.  Yes.

11           MR. SOLOWIEJCZYK:  So this is already in evidence,

12   your Honor, but we're going to play a couple of short excerpts

13   from it again.

14           THE COURT:  Very well.

15           MR. SOLOWIEJCZYK:  This is Government Exhibit 508A but

16   we're actually going to start at page 5, line 1 of that

17   transcript.

18           I will just give the jurors a moment to get there.

19   It's 508A and we're starting at page 5, line 1.

20           Ms. Bustillo, you can go ahead.  Thank you.

21           (Video played)

22   Q.  Mr. Sood, during this portion of the meeting who was being

23   discussed specifically?

24   A.  PJ Dozier and Lamont Evans.

25   Q.  Looking at page 6, lines 6 through 10, when Mr. Blazer

1   said, "Because I just like when we were in Miami, I never

2   stopped.  When you set that into motion with him and doing what

3   he needed to have done and I never backed away from that," what

4   did you understand that to mean at the time?

5   A.   That Marty Blazer was paying Lamont Evans a monthly

6   retainer.

7   Q.   What was your understanding at that time regarding whether

8   the new company that you were forming was going to have a

9   relationship with Lamont Evans?

10  A.   It would.

11  Q.   And what would that relationship entail?

12  A.   Continue to pay that retainer to Lamont Evans.

13  Q.   And what did you understand would be -- you would get in

14  return for that?

15  A.   Access to his players.

16          MR. SOLOWIEJCZYK:  If we could do another short

17  portion from this same exhibit and we're going to be turning to

18  page 11, line 14.

19          I'm just going to give the jurors a moment to get

20  there, Mr. Sood.

21          OK.  Thank you, Ms. Bustillo.

22          (Video played)

23  Q.   Mr. Sood, just going back, if you could take a look at page

24  12, lines 16 through 17.  Mr. Dawkins asked, "what is he

25  getting Lamont?"

J4T9DAW2                           Sood - Direct

1           And Blazer responded, "We're -- we just -- we're going

2    to do three, and he's gonna do one."  What was that exchange

3    about?

4    A.  At that time Lamont was getting three thousand from Marty

5    Blazer and Jeff and I was supposed to be giving a thousand.

6    Q.  Had you spoken to Blazer and D'Angelo about that in advance

7    of the meeting?

8    A.  Yes.

9    Q.  Now, staying right around there, at page 12, lines 23 to

10   24, Mr. Dawkins said to you and the others, "Lamont is good,

11   but like he's not -- he's not the elite, elite dudes."

12           What did you understand Mr. Dawkins to be saying?

13   A.  That even though Lamont Evans was a good coach he wasn't

14   sure if he was worth four thousand dollars a month.

15   Q.  Did Dawkins provide you with any examples of coaches he

16   considered elite?

17   A.  Yes.

18   Q.  Who were those?

19   A.  Emanuel Richardson as one.

20   Q.  And what did you understand Dawkins was saying, if

21   anything, regarding the difference between a coach like Emanuel

22   Richardson and Lamont Evans?

23   A.  The difference is Emanuel Richardson would have access to

24   multiple top-tier players every year.

25   Q.  During this portion of the conversation was there any

J4T9DAW2                          Sood - Direct

1    discussion regarding specific players that Mr. Richardson was

2    seeking to recruit?

3    A.   A player by the name of DeAndre Ayton.

4    Q.   What was your general understanding of what Dawkins was

5    saying about the recruitment of these players?

6    A.   That it made more sense to pay Emanuel a retainer, monthly

7    fee, so we could get access to that caliber of a player.

8    Q.   Now, Mr. Sood, the conversation that we're listening to

9    right now, did that occur on the same day that you signed the

10   Loyd shareholder agreement?

11   A.   Yes.

12   Q.   And in that agreement you agreed to invest some of your own

13   money, right?

14   A.   Yes.

15   Q.   At that time what was your understanding of what the

16   strategy was going to be going forward to recruit clients for

17   the business?

18   A.   Provide money to coaches and families and the players as

19   needed.

20           MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could go to the

21   next clip of this exhibit which we're going to start at page

22   16, line 13 of the transcript.

23   Q.   Mr. Sood, if we could turn back to page 16 and focusing

24   your attention on lines 19 through 24.

25           When Mr. Dawkins said, "I say you do this to make it

1    smarter and get the most bang so everybody can make money.  If

2    you're just giving the guy four grand a month, I just don't

3    know what you're giving them four grand a month for.  You know

4    what I'm saying?"

5         When the Dawkins said, "make it smarter and get the

6    most bang," what did you understand that to mean?

7    A.  That he was really discussing instead of paying a monthly

8    retainer we should pay these coaches based on their potential

9    recruits and how those recruits can work with us.

10   Q.  Turning to page 17, Mr. Sood.  And at line starting at 6

11   Mr. Dawkins said, "So like a Book may need these two kids.  If

12   he may need a grand amount to get something done for you.  OK,

13   then you give it to them at that point."  First of all, who is

14   Book again?

15   A.  Emanuel Richardson.

16   Q.  What did you understand Dawkins to be saying with respect

17   to Richardson?

18   A.  That, again, if the -- if a coach needs money for a

19   particular recruit, then that's who we should be giving money

20   to.

21   Q.  So then at page 17, line 13, Mr. Blazer said in response,

22   "I might do a little bit of both, though."

23        Did you understand what was meant by that?

24   A.  Yeah.  He wanted to pay both, a monthly fee and per

25   opportunity.

J4T9DAW2                          Sood – Direct

1    Q.  Mr. Sood, taking a step back for a moment, what was your

2    understanding of what Mr. Dawkins and Mr. Blazer were debating

3    here?

4    A.  Really debating if, again, Marty seemed to be in favor of

5    wanting to pay both a monthly fee to a coach and/or specific

6    players whereas Dawkins -- Christian was saying let's be more

7    strategic and not just pay a monthly retainer to every coach

8    that we decide to work with.

9    Q.  Was it your understanding that either Mr. Dawkins or

10   Mr. Blazer were saying that they did not support paying

11   coaches?

12   A.  No.

13   Q.  Finally, Mr. Sood, at page 18, lines 11 through 15 Dawkins

14   said, to the group, "And listen, if -- like a Book, OK, that

15   makes sense to give him four grand a month because he's got the

16   number one pick, he's go -- every year they got a top-ten

17   pick."

18            What did you understand Dawkins to be telling you

19   here?

20   A.  That he could justify paying Emanuel Richardson four

21   thousand because of the caliber of players he has versus Lamont

22   Evans who may not.

23   Q.  Mr. Sood, at the end of this meeting did Mr. D'Angelo

24   provide anything?

25   A.  Yes.

J4T9DAW2                          Sood – Direct

1    Q.  What was that?

2    A.  $25,000.

3    Q.  And was that in cash?

4    A.  Yes.

5    Q.  What was your understanding of what that money represented?

6    A.  That was the initial -- that was his initial contribution

7    to the company.

8    Q.  Who took the money that day?

9    A.  I did.

10   Q.  What did you do with the money?

11   A.  I deposited at a Bank of America branch in New Jersey the

12   next day.

13   Q.  My apologies, Mr. Sood.  You may continue.  Sorry.

14   A.  No.  I deposited the money the next day in the Bank of

15   America branch in New Jersey.

16   Q.  What bank account did you deposit it into?

17   A.  Loyd, Inc.

18   Q.  Mr. Sood, once Loyd, Inc. was founded and a bank account

19   set up at Bank of America, did you have access to that account?

20   A.  Yes.

21   Q.  Could you see what transactions were occurring in the

22   account?

23   A.  Yes.

24   Q.  In real time?

25   A.  Yes.

J4T9DAW2                              Sood - Direct

1                THE COURT:  Why don't we do this, Mr. Solowiejczyk.

2        Let's take our morning break, fifteen minutes after the hour.

3                Ladies and gentlemen, don't discuss the case.  Please

4        be prepared to come back out at 18 after the hour.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4T9DAW2                              Sood - Direct

1              (Jury not present)

2              THE COURT:  Mr. Sood, you may step down.  Folks can be

3     seated.

4              (Witness excused)

5              THE COURT:  Anything for me?

6              MR. HANEY:  No, your Honor.

7              MR. SOLOWIEJCZYK:  Your Honor, just to let you know

8     that we're going to probably in the next hour-and-a-half going

9     to get to the call.

10             THE COURT:  I was going to tell you guys come out --

11    you have ten minutes.

12             (Recess)

13             (Jury not present)

14             THE COURT:  I see everyone is here.  With respect to

15    the letters that were submitted yesterday, the government seeks

16    to preclude that section from Exhibit A to their letter which

17    is the recorded conversation, Government Exhibit 2T that

18    Mr. Code wants to include from pages 5, line 9 to page 6, line

19    15.  With respect to that call between Mr. Sood and Mr. Code

20    I'm going to grant the government's motion to exclude the

21    portion of the call in which Mr. Code recalls a past

22    conversation he had with Mr. Dawkins.  I find that Mr. Code's

23    statements do not fall under the state-of-mind exception to

24    hearsay and Rule 803.3.  That rule specifically excludes from

25    its scope statements of memory to prove the fact remembered.

1   The statements at issue here plainly fall within this category

2   to my mind.  Mr. Code is recalling a past statement that he

3   made and offering the fact that he made the statement for its

4   truth, as recognized in Shepherd v. United States, reported at

5   290 U.S. 96 and United States v. DiMaria, reported at 727 F.2d

6   265 statements of memory face backwards, not forward.

7          I would also grant the government's motion to preclude

8   the portion of the testimony from recorded conversation 104T as

9   requested by Mr. Dawkins, a conversation between himself and

10  Munish Sood in which they discuss their relationship with

11  Mr. D'Angelo.  I find that the statements are hearsay and

12  irrelevant.

13         So that constitutes the judgment of the Court with

14  respect to those two issues.

15         Mr. Moore, I understand you may have some additional

16  bases that you want to --

17         MR. MOORE:  Yes, sir, your Honor.

18         First of all, I would respectfully disagree with the

19  Court's ruling but I understand the Court has ruled.  I believe

20  that if you read this language carefully it's very clear that

21  he is telling Mr. Sood exactly what he is and he is not willing

22  to do and he is continuing to tell him, as he has told other

23  people, that he does not believe this coach's model works.  I

24  believe that it is current as of the time of the making of the

25  statement and is forward-looking.

J4T9DAW2                              Sood - Direct

1              Alternately, your Honor has not addressed the issue of

2    whether or not it's admissible under the catch-all exception of

3    the hearsay rule, Rule 807 and -- and I understand that your

4    Honor is making a decision now.  Your Honor may revisit that

5    decision subsequent to other evidence that is offered later in

6    the case, correct?

7              THE COURT:  That's correct.  And the government

8    indicated a desire to put in some additional authority with

9    respect to the catch-all provision.

10             MR. MOORE:  So, as I understand it right now your

11   Honor is not ruling on the catch-all exception issue; is that

12   correct?

13             THE COURT:  That's correct.

14             MR. MOORE:  Thank you.

15             THE COURT:  OK.  Are we ready for the jury?  Can we

16   bring in Mr. Sood.

17             MR. HANEY:  Your Honor, may I briefly also note my

18   catch-all exception as well.

19             THE COURT:  Absolutely.

20             MR. HANEY:  Thank you, sir.

21             MUNISH SOOD, resumed.

22             (Continued on next page)

23

24

25

1           (Jury present)

2           THE COURT:  Mr. Solowiejczyk.

3           MR. SOLOWIEJCZYK:  Thank you, your Honor.

4    Q.  Mr. Sood, where we left off we were talking about taking

5    the $25,000 in cash that day and depositing it.

6    A.  Yes.

7    Q.  Directing your -- into the Loyd bank account?

8    A.  Yes.

9    Q.  Directing your attention to Government Exhibit 659.  Do you

10   recognize that document?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's a deposit -- it's a receipt from a deposit, the

14   $25,000 deposit.

15           MR. SOLOWIEJCZYK:  Your Honor, the government offers

16   Government Exhibit 659.

17           THE COURT:  Any objection?

18           MR. HANEY:  No objection, your Honor.

19           MR. MOORE:  No objection, your Honor.

20           THE COURT:  659 will be received.

21           (Government's Exhibit 659 received in evidence)

22           MR. SOLOWIEJCZYK:  Publish that briefly, Ms. Bustillo.

23           You can take that down.

24   Q.  Mr. Sood during the portion of the recording we just

25   watched what specific coaches, if any, did Mr. Dawkins propose

1    working with?

2    A.   Lamont Evans and Emanuel Richardson.

3    Q.   Did there come a time soon after this meeting when you met

4    with Mr. Richardson in person?

5    A.   Yes.

6    Q.   Where did that meeting occur?

7    A.   In Manhattan, New York.

8    Q.   Who set up the meeting?

9    A.   Christian.

10   Q.   Was Dawkins himself present for the meeting?

11   A.   No.

12   Q.   Mr. Sood, if you could take a look at what's been marked

13   for identification as Government Exhibit 1632A.

14   A.   OK.

15           MR. SOLOWIEJCZYK:  If you could zoom in, Ms. Bustillo,

16   a little bit.

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   What is it?

20   A.   It's an e-mail -- sorry, text message exchange between

21   myself and Christian.

22           MR. SOLOWIEJCZYK:  Your Honor, the government offers

23   Government Exhibit 1632A.

24           THE COURT:  Any objection?

25           MR. HANEY:  No objection, your Honor.

1          MR. MOORE:  No objection, your Honor.

2          THE COURT:  1632A will be received.

3          (Government's Exhibit 1632A received in evidence)

4          MR. SOLOWIEJCZYK:  Ms. Bustillo, if you could just

5    publish the top half of this, if you could zoom in on that.

6    Q.  So, Mr. Sood -- by the way when it says incoming who is

7    that?

8    A.  That's myself.

9    Q.  When it says outgoing?

10   A.  That's Christian.

11   Q.  So generally what do these text messages pertain to?

12   A.  Just the meetings that we were going to be having that day

13   or the next day in New York City.

14   Q.  And you said these texts are on June 19, right?

15   A.  Yes.

16   Q.  And the meetings occurred the next day?

17   A.  Yes.  The 20th.

18   Q.  Looking at the bottom message, the message from Dawkins,

19   what was the schedule of meetings that he proposed?

20   A.  10 a.m. with Emanuel Richardson from Arizona.  1 p.m. with

21   Merl Code.  And then 3 p.m. with Preston Murphy of Creighton.

22   Q.  You said he was of Creighton.  Was he a coach there?

23   A.  Yes.

24   Q.  Did the meeting with Preston Murphy end up happening that

25   day?

1    A.  No.

2    Q.  What was your understanding regarding why not?

3    A.  I believe either he was sick or a family member was sick.

4            MR. SOLOWIEJCZYK:  Then zooming out, Ms. Bustillo.

5    Q.  The bottom few messages of that page you said, "Should I be

6    there?"  And then Mr. Dawkins responded, "Yes."

7            Going to the next page, said, "Make it --

8            MR. SOLOWIEJCZYK:  Zoom in, Ms. Bustillo.

9    Q.  "Make it smoother.  You have already met Book.  I don't

10   land until noon in Minnesota today."

11           What did you understand Dawkins to mean by "make it

12   smoother"?

13   A.  That since I already met Emanuel Richardson I'd be able to

14   introduce him to Jeff D'Angelo at the meeting.

15   Q.  Did the meeting that you were discussing take place?

16   A.  Yes.

17   Q.  Can you generally describe what occurred at the meeting?

18   A.  Emanuel Richardson just talked about his position at

19   University of Arizona, the type of players on the current

20   roster and his recruiting, upcoming recruiting, his

21   relationship with Christian, and then how we could potentially

22   work together.

23   Q.  And besides you and Mr. Richardson, was Mr. D'Angelo there?

24   A.  Yes, he was.

25   Q.  And this other business partner of his, was she there as

1    well?

2    A.   Yes.

3    Q.   What was her name again?

4    A.   Jill Bailey.

5    Q.   Did you bring your assistant again?

6    A.   Yes.  She was there.

7    Q.   Mr. Sood, what happened at the end of the meeting with

8    Mr. Richardson?

9    A.   Jeff D'Angelo gave him an envelope of $5,000.

10             MR. SOLOWIEJCZYK:  Your Honor at this time the

11   government offers Government Exhibit 509B1, B2, B3, B4, and the

12   associated transcripts 509B1T, B2T, B3T and B4T.

13             THE COURT:  Any objection?

14             MR. HANEY:  No objection, your Honor.

15             MR. MOORE:  Can we approach just one moment, your

16   Honor?

17             THE COURT:  Sure.

18             (Continued on next page)

19

20

21

22

23

24

25

J4T9DAW2                          Sood - Direct

1           (At sidebar)

2           MR. MOORE:  Your Honor, I'm sure that Mr. Solowiejczyk

3     is going to argue that the statements of Mr. Richardson are

4     admissible as a coconspirator exception to the hearsay rule.  I

5     would note that my client is not present for this meeting.  My

6     client was not involved in this meeting.  My client was not

7     brought in until after this meeting.  And so I object under 403

8     grounds to the admissibility of this conversation against my

9     client.

10          MR. SOLOWIEJCZYK:  Your Honor, a couple of points.

11    One, the statements between coconspirators in furtherance of

12    the conspiracy, it comes in regardless of whether Mr. Code had

13    or had not joined the conspiracy at that point, which I'm not

14    even going to deal with the merits of right now.  But also,

15    importantly, your Honor, there's going to be evidence at this

16    trial that Mr. Code was made aware of specifically what

17    happened at this meeting, specifically that Mr. Richardson got

18    five thousand dollars.

19          THE COURT:  It comes in as a coconspirator statement

20    so the objection will be overruled.

21          MR. MOORE:  And I'll assume your Honor's ruling

22    against me on the 403 argument, because I believe the

23    prejudicial value of this evidence outweighs -- the prejudicial

24    nature of this evidence outweighs the probative value as it

25    pertains to my client, Merl Code.

J4T9DAW2                         Sood - Direct

1            THE COURT:  I am going to overrule that objection as

2    well.  Again, this is just more of the same conversations

3    concerning who was going to get paid what and what coaches

4    could do, etc.

5            MR. MOORE:  Thank you, your Honor.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Those exhibits will be received.

3              (Government's Exhibits 509B1, B2, B3, B4, 509B1T, B2T,

4    B3T and B4T received in evidence)

5              MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could play

6    509B1 starting at page 1, line 1.

7              This is a June 20 meeting between Jeff D'Angelo, Jill

8    Bailey, Munish Sood, and Book Richardson.  And I will just note

9    that to the extent that the transcript cover page says that

10   Christian Dawkins is there, that is incorrect.  We would

11   request the jury disregard that.

12             THE COURT:  Very well.

13             (Video played)

14             MR. SOLOWIEJCZYK:  Pause for a second, Ms. Bustillo.

15   Q.  So, Mr. Sood, it's a little -- it's blurred out but where

16   was Mr. Richardson seated during the meeting?

17   A.  He was against the wall over there, I guess the wood,

18   whatever that is, the wooden, right there.  Yes.

19   Q.  And where -- there's a -- to his left or I guess to his

20   right there is somebody.  Who is that?

21   A.  That's Alicia Carroll.

22   Q.  Where were you seated, do you remember?

23   A.  To the left of her.

24   Q.  And then the two people to the right of Ms. Carroll?

25   A.  That's Jill Bailey and Jeff D'Angelo.

1           MR. SOLOWIEJCZYK:  Thanks, Ms. Bustillo.

2           (Video played)

3           MR. SOLOWIEJCZYK:  Pause here, Ms. Bustillo.

4   Q.  Mr. Sood, just going back to page 2 of the transcript for a

5   moment.  And lines specifically starting at line 5.  You said,

6   "But the goal is to get you to a place where you're comfortable

7   with us like you are with Christian and how we can help you

8   continue to recruit."

9           What did you mean by that, Mr. Sood?

10  A.  That he should be -- he should get to a point where he can

11  ask us directly if he needs help with money for recruiting.

12          MR. SOLOWIEJCZYK:  Ms. Bustillo, you can continue and

13  I believe we left off at page 4, line 2, approximately of the

14  transcript.

15          (Video played)

16  Q.  Mr. Sood, turning back to page 6, starting at line 23, you

17  said to Mr. Richardson, "So you will help guide us both from an

18  economic perspective what you need and how you need it."

19          What did you mean by that, Mr. Sood?

20  A.  That Emanuel Richardson will -- should let us know how much

21  money he needs and when.

22  Q.  What was your sense at that time whether Mr. Richardson was

23  receptive to what you were proposing?

24  A.  I believed he was open to it.

25          MR. SOLOWIEJCZYK:  Ms. Bustillo, I think we're picking

1    up at page 7, around line 8 or 9.

2              (Video played)

3    Q.  Mr. Sood just going back to page 8 of the transcript,

4    there's a discussion here of somebody named DeAndre Ayton

5    starting at page 8, around line 20.

6    A.  Yes.

7    Q.  Who did you understand him to be at that time?

8    A.  A -- potentially a number one draft pick.

9    Q.  What school was he going to be playing basketball at?

10   A.  University of Arizona.

11   Q.  Mr. Sood, do you know if Mr. Ayton ended up being a number

12   one draft pick?

13   A.  Yes.

14   Q.  Page 8, starting at line 21.

15             Mr. Richardson said to you:  It's not about well hey

16   we're going to be one of three, excuse my expression, F that,

17   DeAndre, this is what you're doing.

18             What did you understand Richardson to be saying here?

19   A.  That instead of referring three agents to DeAndre he would

20   refer just one.

21   Q.  And who was that going to be going forward?

22   A.  Should be us if we're helping him with money.

23             MR. SOLOWIEJCZYK:  I think we were around the bottom

24   of page 9, Ms. Bustillo.

25             (Video played)

1          MR. SOLOWIEJCZYK:  All right.  Ms. Bustillo, if we

2    could back to page 11.

3    Q.  So, Mr. Sood, at lines 19 through 23 of page 11,

4    Mr. Richardson said to you and the group, "The goal is like,

5    again, and like I told Christian, get on campus.  He's getting

6    Rawle Alkins.  I'm telling you, he's getting Rawle Alkins.

7    There's, like, no ifs, ands about that."

8          Mr. Sood, what was your understanding who Rawle Alkins

9    was?

10   A.  A player with Arizona.

11   Q.  Is he on the Arizona team?

12   A.  Yes.

13   Q.  What did you understand Mr. Richardson to be saying with

14   respect to Rawle Alkins?

15   A.  That if Christian shows up on campus, he'll make the

16   introduction, and pretty much guarantees that he'll be a client

17   of the firm.

18   Q.  At page 12, at line 10, Mr. Sood, Emanuel Richardson said,

19   "I'm trying to take the risk out of the room."  Did you

20   understand what that meant?

21   A.  That if he's referring us as -- as the management company

22   for the player, he could -- he can control the environment by

23   keeping other agents and advisers away.

24   Q.  Then finally, Mr. Sood, at page 14, there was a mention of

25   a player named Jahvon Quinerly.  What was Richardson saying

1    about his status at that time?

2    A.  That he was considered top, top player in the country.

3    Q.  Was that a player he was trying to recruit at that time?

4    A.  Yes.

5            MR. SOLOWIEJCZYK:  All right.  So we're going to flip

6    a couple pages ahead to page 18, line 18.  Ms. Bustillo, if you

7    could play that clip, please.

8            (Video played)

9    Q.  Going back, Mr. Sood, at page 18 and focusing your

10   attention on the part starting at line 18, there's a discussion

11   here about Jahvon Quinerly, Mr. Sood, is that correct?

12   A.  Yes.

13   Q.  When Mr. Richardson said, "So, you know, I'm dealing with a

14   guy who says, hey, Book, it's 20 to get it done, and I'm like,

15   F, OK," what did you understand Mr. Richardson to be telling

16   you there?

17   A.  That a handler for Quinerly was looking for 20,000 to get

18   him to commit to University of Arizona.

19           MR. SOLOWIEJCZYK:  All right.  Ms. Bustillo, if we

20   could skip ahead to page 23, line 1, of the transcript and the

21   associated recording.

22           (Video played)

23   Q.  Mr. Sood, generally, during that portion of the

24   conversation, what was Mr. Richardson recounting for you?

25   A.  That he was using his personal money to help fund his

J4THDaw3                          Sood – Direct

1    recruits.

2    Q.   What, if anything, did he say about what Christian Dawkins

3    had told him about that?

4    A.   Christian had suggested using someone else, outside of

5    using his own money.

6              MR. SOLOWIEJCZYK:   OK.   We're now going to move on to

7    509B2, and we're not going to go through the entirety of the

8    exhibit.   We're just going to play a few excerpts of it.

9              Ms. Bustillo, if we could go to page 2, line 10, of

10   509B2.

11             (Video played)

12   Q.   Mr. Sood, what specific player was Mr. Richardson talking

13   about during this portion of the meeting?

14   A.   Rawle Alkins.

15   Q.   Richardson referenced somebody's cousin.   Who did you

16   understand that to be?

17   A.   Rawle's cousin.

18   Q.   What was your understanding regarding what Mr. Richardson

19   was telling you about the situation with the cousin?

20   A.   That in order to get Rawle Alkins to commit to Arizona, his

21   cousin had moved out, and he would have to fund him about -- he

22   had to fund him $2,000 a month.

23   Q.   Looking at page 4, Mr. Sood, lines 1 to 4, when

24   Mr. Richardson said, "If anything happens, it's their word

25   against mine.   And when it's cash, you know, I don't know what

J4THDaw3                          Sood - Direct

1   they're talking about," did you understand what he meant by

2   that?

3   A.  Yes.

4   Q.  What did you understand that to mean?

5   A.  That he shouldn't be paying these players and cash was not

6   traceable.

7   Q.  What was your understanding at that time about what, if

8   anything, could occur if these payments were discovered?

9   A.  He could be fired, Emanuel Richardson.

10          MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could pick up

11  at page 5, line 24, of the transcript.

12          (Video played)

13  Q.  Mr. Sood, what was Mr. D'Angelo generally proposing to

14  Mr. Richardson, if anything, during that portion of the

15  recording?

16  A.  That D'Angelo would allocate a sum of money for him, and

17  then it's up to Emanuel Richardson to tell us if he'd want

18  monthly or he wants for specific recruits or both.

19  Q.  What was Mr. Richardson's response to that idea?

20  A.  He was -- he was interested.  He was open.

21  Q.  What, if anything, did Richardson offer with respect to

22  making introductions to players?

23  A.  He would do that.

24  Q.  At the end when he said, "As soon as they commit, it's a

25  phone call, or if I can't, can you guys FaceTime," did you

J4THDaw3                          Sood - Direct

1   understand what he meant by that?

2   A.   That once the player was committed to the University of

3   Arizona, he would set up an initial meeting by phone call or

4   FaceTime.

5             MR. SOLOWIEJCZYK:  Ms. Bustillo, moving on Government

6   Exhibit 509B3.

7             (Video played)

8   Q.   Mr. Sood, turning to lines 5 through 8, when Mr. Richardson

9   said, "When I'm there, they're always going to defer to me.  If

10  a question is asked, they're going to look at me, and I'm like,

11  that's what they know," what did you understand him to mean by

12  that?

13  A.   That based on the relationship, he can direct players to

14  someone like us.

15            MR. SOLOWIEJCZYK:  Finally, turning to 509B4.

16            (Video played)

17  Q.   Mr. Sood, going back to the beginning of that call, at

18  page 1, what was Mr. Richardson saying, if anything, regarding

19  the nature of his relationship with Rawle Alkins?

20  A.   That it was strong.

21  Q.   Looking at page 2, line 23, when Mr. D'Angelo said, "We'll

22  do five now, and then, like you said, it's, you know, do what

23  you got to do," what did you understand Mr. D'Angelo to mean by

24  "we'll do five now"?

25  A.   That he was going to give him $5,000.

J4THDaw3                          Sood – Direct

1   Q.   And what did you see occur after that?

2   A.   That he did give him $5,000 in an envelope.

3          MR. SOLOWIEJCZYK:  Ms. Bustillo, if we could turn

4   ahead to page 11, line 6.

5          (Video played)

6   Q.   Mr. Sood, turning back to page 11, at line 7, you said,

7   "And, you know, everything we talk about stays here, so we're

8   very, very private about this stuff," what did you mean by

9   that?

10  A.   That he should not be accepting money for us; otherwise, he

11  will get fired.  He will be fired.

12  Q.   Why were you telling him you were going to be private about

13  stuff?

14  A.   Well, we shouldn't be giving and he shouldn't be passing it

15  on to the players as well.

16  Q.   What was Richardson's response to that?

17  A.   He said he trusted us.

18          MR. SOLOWIEJCZYK:  All right.  Ms. Bustillo, you can

19  take that down.

20  Q.   Now, Mr. Sood, after your meeting with Mr. Richardson that

21  day on June 20, did you have a second meeting that day?

22  A.   Yes.

23  Q.   Who was that with?

24  A.   Merl Code.

25  Q.   Whose idea was it to meet with Merl Code?

1  A.  Christian Dawkins.

2  Q.  Had you ever heard of Merl Code before that?

3  A.  No.

4  Q.  What did Dawkins tell you about Merl Code in advance of the

5  meeting?

6  A.  That Merl was a -- was at Adidas in the shoe business.  He

7  had relationships with coaches and players from the high school

8  level to the pro level.

9  Q.  What, if anything, did Dawkins tell you about how Code

10  might be helpful to the new business that you were starting?

11  A.  He could make introductions to both coaches and players.

12  Q.  Generally speaking, what did you understand the purpose of

13  meeting with Merl Code was that day?

14  A.  To get to know him and also determine if we can work

15  together.

16  Q.  Mr. Sood, at the time of that meeting, did you know it was

17  being video recorded?

18  A.  No.

19  Q.  Did you review a copy of the recording before testifying?

20  A.  Yes.

21          MR. SOLOWIEJCZYK:  Your Honor, this recording's

22  already in evidence.  We're going to play a couple of excerpts

23  from it.

24          THE COURT:  What's the recording?

25          MR. SOLOWIEJCZYK:  This is Government Exhibit 510A1 --

J4THDaw3                          Sood - Direct

1   sorry, yes, 510A1.  This is a June 20 meeting between Munish

2   Sood, Merl Code, Marty Blazer, Jill Bailey, Christian Dawkins,

3   Jeff D'Angelo, and Alicia Carroll.  And we're going to start at

4   page 1, line 1, of Government Exhibit 510A1T.

5              (Video played)

6   Q.  Mr. Sood, Mr. D'Angelo said, "I'm pretty sure he left

7   happy, so..." and then Mr. Code responded, "He was happy."

8   What did you understand that to mean?

9              MR. MOORE:  Your Honor, could we approach for a

10  moment, please?

11             THE COURT:  Yes.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            MR. MOORE:  Your Honor, I'm going to object to

3    Mr. Sood interpreting what my client meant.  This is the first

4    time he's ever met my client.  I don't believe that the

5    government has laid a sufficient foundation for his

6    interpretation.  In addition, I would renew my earlier

7    objection with respect to the playing of this video because the

8    agent's comments -- the agent's statement, "He was happy," the

9    government is truly offering that as substantive evidence.

10   They are not offering it to simply put Mr. Code's statements

11   into context.  That is an observation about an alleged

12   coconspirator.

13           So for those reasons, I renew my objection to this

14   video, and I also object to elicitation of any information from

15   Mr. Sood about the interpretation of what Mr. Code meant.

16           MR. SOLOWIEJCZYK:  Your Honor, with respect to the

17   latter argument, in order to put in context the statement by

18   Code, "he was happy," we needed the prior statement by

19   D'Angelo, "I'm pretty sure he left happy."  So I think that

20   deals with that arguments.

21           With respect to Mr. Sood's ability to interpret what

22   Mr. Code is saying, I think your Honor's already ruled on this.

23   He was a participant in the conversation, he has an

24   understanding of what's going on, and he proceeds from this

25   point forward to have an ongoing relationship with Merl Code in

J4THDaw3                              Sood – Direct

1   which they speak relatively frequently and understand each

2   other.

3            THE COURT:  We've gone over all of this before.  Even

4   if he's meeting for the first time and they're having a

5   conversation, he would be entitled to say what he believed the

6   other person meant to say.  So the objection is overruled, and

7   the renewed objection to the prior ruling is also overruled.

8            MR. MOORE:  I'm assume on cross-examination I'm free

9   to explore his relationship with Mr. Code prior to coming into

10  this meeting, correct?

11           THE COURT:  Sure.

12           MR. MOORE:  Thank you.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MR. SOLOWIEJCZYK:

3    Q.  Mr. Sood, I think I had asked you, Mr. D'Angelo said, "I'm

4    pretty sure he left happy, so..." and then Mr. Code responded,

5    "He was happy."  What did you understand that exchange to be

6    referring to?

7    A.  That Emanuel Richardson -- Jeff D'Angelo had given Emanuel

8    Richardson $5,000 and that Code was aware of it and he agreed.

9    Q.  Now, Mr. Sood, what, if anything, did you learn during this

10   meeting about the nature of the relationship between Merl Code

11   and Emanuel Richardson?

12   A.  That they had a preexisting relationship.

13   Q.  During the meeting, what did Mr. Code tell you, if

14   anything, about his prior work experience?

15   A.  That he had worked before at Adidas.  He was at Nike, and

16   University of Arizona is a Nike school.

17   Q.  What, if anything, did Code tell you about his

18   relationships with coaches at Nike-sponsored programs?

19   A.  That he still maintained them.

20   Q.  Mr. Sood, based on the conversation that happened that day,

21   how, if at all, did you believe that Mr. Code might be helpful

22   to the business that you were starting with Christian Dawkins

23   and Jeff D'Angelo?

24              MR. MOORE:  Objection.  Relevance.

25              THE COURT:  Overruled.

1   A.  That he would be able to introduce us to coaches and also

2   players.

3   Q.  Now, at that time, Mr. Sood, what was your understanding

4   regarding what, if anything, Mr. Code was going to receive in

5   exchange for his assistance?

6   A.  He was going to receive a retainer, a monthly fee.

7   Q.  Had you spoken to Christian Dawkins previously about this

8   before the meeting?

9   A.  Yes.

10  Q.  Mr. Sood, during this meeting, what was discussed, if

11  anything, regarding how your company was going to be working

12  with college basketball coaches going forward?

13  A.  That the company would be providing coaches with money so

14  the coaches can recruit and eventually give us access to those

15  players.

16  Q.  Did Merl Code participate in those discussions, Mr. Sood?

17  A.  Yes.

18  Q.  All right.  I want to review a couple of excerpts of this

19  recording with you, Mr. Sood.

20          If we could go to 510A3T, and we're going to pick

21  up -- we're going to pick up at page 2, line 24, of this

22  transcript.

23          Let's give the jury a minute to get there,

24  Ms. Bustillo.  All right.  Ms. Bustillo, please play when

25  you're ready.  We're starting at page 2, I believe.  Yes.

1          (Video played)

2     BY MR. SOLOWIEJCZYK:

3     Q.  Mr. Sood, going back up to line 5, when Mr. Code said, "I

4     need to be visible and present, right, and if the kid is that

5     important, I need to be there.  I need to fight off somebody

6     because the out of sight, out of mind is really in play here,"

7     what did you understand Mr. Code to be saying?

8     A.  That he needed to have a presence on campus.

9     Q.  For what purpose?

10    A.  To -- to remind the player that, you know, he's been

11    helping or he's part of the team.

12    Q.  Going a little further down at line 19, when Mr. Code said,

13    "And so if I'm not -- if I'm not there, we don't have a

14    presence there in some sense, I'm going to lose the kid," did

15    you understand what he meant by "a presence there in some

16    sense"?

17    A.  To have either a family member or a coach that's looking

18    out.

19          MR. SOLOWIEJCZYK:  If we could go to 510B3T,

20    Ms. Bustillo.

21          (Video played)

22    Q.  Mr. Sood, going back to page 1 of the transcript, at

23    line 4, Mr. Dawkins said, "And then we can activate them as it

24    comes, because it could be -- like I told you, everybody

25    doesn't need to be a retainer-type, monthly-type deal."  What

1  did you understand Mr. Dawkins to be referring to here?

2  A.   That money could be provided for a specific player that a

3  coach may be looking to recruit.

4  Q.   When he mentioned a monthly type or retainer type monthly

5  deal, did you understand what that meant?

6  A.   Versus just paying someone, say, $3,000 a month.

7  Q.   When you say "someone," who do you mean?

8  A.   I mean coach.

9  Q.   Going a little further down, at line 19, Mr. Code said,

10  "That's our value to you guys," and then he went on to say,

11  "You aren't just randomly spending money."  Did you understand

12  what he meant by that?

13  A.   That he could help identify which will be the best option

14  for us, monthly versus specific opportunity with a coach.

15  Q.   If you could take a look at Government Exhibit 510B5T.

16         Ms. Bustillo, I think we're picking up at page 1,

17  line 1, of that transcript.

18         (Video played)

19  Q.   Mr. Sood, just going back to page 3 at line 19, when

20  Mr. Code said, "And they understand, because they're going to

21  use those moneys not necessarily to put in their pockets.

22  They're going to use those moneys to recruit kids," what did

23  you understand Mr. Code to be saying?

24  A.   It's the coaches.

25  Q.   What about them?

J4THDaw3                          Sood - Direct

1    A.  That they'll be using the money for recruiting.

2    Q.  At page 4 when Mr. Code said, at line 4, "They typically

3    come out of their own pockets," and then "to take care of

4    rent," what did you understand that to mean?

5    A.  That coaches from -- coaches, if they didn't have access to

6    money, would be using their personal funds for recruiting

7    purposes.

8              MR. SOLOWIEJCZYK:  All right.  If we could just turn

9    ahead a little bit to page 6, line 25.

10             (Video played)

11   Q.  All right.  Mr. Sood, at page 7 when Mr. Code said, this is

12   line 5, "So the coach route is great, but not necessarily.  We

13   don't necessarily need to be paying everybody, every coach we

14   come into contact with, and we'll figure out who those people

15   are," what did you understand him to mean?

16   A.  That we should be strategic in the coaches that we are

17   working with.

18   Q.  When you say "working with," what do you mean, Mr. Sood?

19   A.  In providing money for recruiting.

20   Q.  Mr. Sood, at the end of that meeting, what, if anything,

21   did you observe Jeff D'Angelo provide to Merl Code?

22   A.  Envelope with money.

23   Q.  Mr. Sood, after the meeting that day, do you recall where

24   you went?

25   A.  To the bank.

1   Q.   Why'd you go to the bank?

2   A.   Made a deposit in the Loyd Management account.

3   Q.   Now, what was your understanding of what that money was

4   for?

5   A.   For the company to use for recruiting and expenses.

6   Q.   Did you make that deposit -- at which branch was it at?

7   A.   It was in Manhattan.

8   Q.   After that, where did you go?

9   A.   Back to New Jersey.

10  Q.   Now, Mr. Sood, after this meeting on June 20 with Emanuel

11  Richardson that we went over a few minutes ago, did there come

12  a point where you learned that Emanuel Richardson was seeking

13  more money from your new company?

14  A.   Yes.

15  Q.   How did you first learn about that?

16  A.   From Christian.

17  Q.   How did he tell you that?

18  A.   By phone call.

19          MR. SOLOWIEJCZYK:  Your Honor, at this time the

20  government would offer Government Exhibit 142 and the

21  corresponding transcript, 142T.

22          THE COURT:  Any objection?

23          MR. HANEY:  No objection, your Honor.

24          MR. MOORE:  403, your Honor.

25          THE COURT:  Overruled on that basis.  142 and 142T

J4THDaw3                         Sood - Direct

1    will be received.

2                (Government's Exhibits 142 and 142T  received in

3    evidence)

4                MR. SOLOWIEJCZYK:  So this is a July 7, 2017, call

5    between Christian Dawkins and Munish Sood at 10:36 a.m.  It's

6    Government Exhibit 142T.  Seems like it may not be in the

7    binders, but it's also going to be on the screen as well.

8                (Audio played)

9                MR. SOLOWIEJCZYK:  Your Honor, can I just have one

10   moment?

11               THE COURT:  Yes.

12               MR. SOLOWIEJCZYK:  My apologies, your Honor, we're

13   just getting a hard copy of one of the transcripts because it

14   was missing from the binder.

15   Q.  All right.  Mr. Sood, I want to go back to -- well, first

16   of all, what were you generally discussing with Mr. Dawkins

17   during this portion of the phone call we listened to?

18   A.  Christian had requested $15,000 from Jeff, and it seems

19   like Jeff really hasn't -- hadn't agreed to fund the 15,000 for

20   Emanuel Richardson.

21   Q.  So looking at page 5, line 6, when Dawkins said, "I got to

22   talk to him about this shit with Book, because Book needs to

23   get some money up front to try to get this shit done for the

24   recruit," what did you understand Mr. Dawkins to be saying?

25   A.  That Emanuel Richardson had requested $15,000 for a

J4THDaw3                              Sood - Direct

1   particular recruit.

2   Q.  When Dawkins said that Book needs to get the money -- to

3   get some money up front, what did you understand that to mean?

4   A.  Like he needed it right now.

5   Q.  Looking at page 5, lines 10 through 13, when Mr. Dawkins

6   said, "If Jeff doesn't say yes to this, I'm just gonna be like,

7   well, Jeff, your whole idea of everything is retarded.  Like,

8   it doesn't make sense," based on what Mr. Dawkins was saying,

9   what was your understanding regarding whether he did or did not

10  support making the $15,000 payment?

11  A.  At that time it seems like Jeff hadn't agreed yet to

12  provide the 15.

13  Q.  Mr. Sood, during this conversation, what was your own view

14  about whether Jeff should or should not provide the 15,000?

15  A.  I thought it made sense because it was for a particular

16  recruit.

17  Q.  Why was the fact it was for a particular recruit relevant

18  to you?

19  A.  Because then it's more likely that we'll be -- we'll have

20  access to the player if he gets to the pro level.

21  Q.  Who was going to give you that access?

22  A.  Emanuel Richardson, the coach.

23  Q.  Mr. Sood, prior to this occasion, had there been other

24  occasions when Jeff D'Angelo had provided payments to coaches

25  where it made less sense to you?

J4THDaw3                           Sood - Direct

1    A.   Yes.

2    Q.   When was that?

3    A.   For example, when he paid Emanuel Richardson 5,000 in the

4    meeting in New York.

5    Q.   Was that the meeting we reviewed a couple minutes ago?

6    A.   Yes.

7    Q.   Mr. Sood, before that meeting, did you know that

8    Mr. D'Angelo was planning to pay Mr. Richardson?

9    A.   No.

10   Q.   Mr. Sood, why did that payment of $5,000 not make sense to

11   you?

12   A.   Because I had no idea what the purpose of the money was.

13   Q.   What do you mean by "purpose"?

14   A.   Meaning what was it going to be used for, what which player

15   or something else?

16   Q.   Right after that meeting, did you have a conversation with

17   Mr. Dawkins?

18   A.   Yes.

19   Q.   This is the June 20 meeting in New York, right?

20   A.   Yes.

21            MR. SOLOWIEJCZYK:  At this time, your Honor, the

22   government would offer Government Exhibit 104 and 104T.

23            THE COURT:  Any objection?

24            MR. MOORE:  No objection.

25            MR. HANEY:  No objection, your Honor.  Thank you.

J4THDaw3                          Sood - Direct

1              THE COURT:  104 and 104T will be received.

2              (Government's Exhibits 104 and 104T received in

3      evidence)

4              MR. SOLOWIEJCZYK:  Can we have one moment, your Honor?

5              THE COURT:  Yes.

6              MR. SOLOWIEJCZYK:  Your Honor, if we could make a

7      brief request.  It he appears one of the binders is missing the

8      transcripts, but that the other jurors, the jurors who have

9      screens, some of them have them in their binders -- or they

10     don't, no.

11             OK.  All right.  Then we're just going to have to do

12     it on the screens, and for the jurors that don't have them in

13     their binders, we'll provide a hard copy.

14             THE COURT:  Very well.  Everyone has access to a

15     screen, right?

16             JUROR:  Yes.

17             MR. SOLOWIEJCZYK:  The ones at the end, it's hard for

18     them to see, so I'm going to be giving them a hard copy, if

19     that's OK with your Honor.

20             THE COURT:  OK.

21             MR. SOLOWIEJCZYK:  Ms. Bustillo, when you're ready, if

22     we could play an excerpt of this recording.

23             (Audio played)

24     BY MR. SOLOWIEJCZYK:

25     Q.  So, Mr. Sood, is this call directly after the meeting that

1    you had with Book Richardson in New York City on June 20?

2    A.  Yes.

3    Q.  Generally, what were you discussing with Mr. Dawkins during

4    the call?

5    A.  Just the fact that Emanuel Richardson received $5,000, and

6    Jeff D'Angelo was very happy that he took the money.

7    Q.  Mr. Sood, would it be fair to say that you and Mr. Dawkins

8    were making fun of Jeff D'Angelo a little bit during this call?

9    A.  Yes.

10   Q.  Why were you making fun of him?

11   A.  Because he -- he gave him $5,000, and I wasn't sure why he

12   gave the money to him.

13   Q.  Looking at page 1, line 18, when you said -- sorry,

14   line 17, when you said, "Jeff is like F'ing high," what did you

15   mean by that?

16   A.  That he was able to give Emanuel Richardson money, and

17   Emanuel Richardson took the money.

18   Q.  Looking at page 2, lines 9 through 11 -- sorry, 8 through

19   10, I should say, when you said, "You know, he's like F'ing

20   dying, man.  He's dying.  Don't wake him up," what did you mean

21   by that, Mr. Sood?

22   A.  That if he wants to keep funding coaches, then let him.

23   Q.  At the time, Mr. Sood, what benefit did you see, if any,

24   from Jeff D'Angelo providing money to coaches for yourself?

25   A.  Coaches be able to recruit and then, in return, give us

1   access to the players.

2   Q.  Now, Mr. Sood, taking a step back, prior to this we just

3   listened to a call from July 7 with Dawkins regarding an

4   additional $15,000 that Richardson was asking for from you?

5   A.  Yes.

6   Q.  Were you supportive or not supportive of making that

7   payment?

8   A.  I was OK with that payment.

9   Q.  Why were you OK with that payment?

10  A.  Because that's for a specific recruit.

11  Q.  What was the difference, in your mind, between the $5,000

12  payment on June 20 and the later $15,000 payment?

13  A.  The 5,000, I didn't think had any purpose.  I didn't -- I

14  needed clarity what the money was for; whereas 15 was for a

15  specific recruit.

16  Q.  What was your understanding that if -- if Mr. Richardson

17  got that recruit to Arizona, what was your understanding how

18  that could benefit you and your new company, if at all?

19  A.  It would give us access to that player and manage the

20  relationship.

21  Q.  Mr. Sood, did you have an additional discussion with

22  Mr. Dawkins on the same day, July 7, 2017?

23  A.  Yes.

24  Q.  When I say "same day," I mean the day of the prior phone

25  call we listened to regarding the $15,000 ask.

J4THDaw3                        Sood - Direct

1   A.  Yes.

2   Q.  Was that also by phone?

3   A.  Yes.

4            MR. SOLOWIEJCZYK:  Your Honor, at this time the

5   government would offer Government Exhibit 144 and 144T.

6            THE COURT:  Any objection?

7            MR. HANEY:  No objection, your Honor.  Thank you.

8            THE COURT:  144 and 144T will be received.

9            (Government's Exhibits 144 and 144T received in

10  evidence)

11           MR. SOLOWIEJCZYK:  I think many of the exhibits I'm

12  going to refer to are not in the jurors' binders, but they will

13  be on the screen, just so they know.

14           THE COURT:  Very well.

15           MR. SOLOWIEJCZYK:  Sorry, your Honor, we offer this.

16           THE COURT:  I think it was already.

17           MR. HANEY:  No objection.

18           THE COURT:  144 will be received.

19           MR. SOLOWIEJCZYK:  This is a July 7, 2017, call at

20  10:52 a.m. between Christian Dawkins and Munish Sood.  It's

21  Government Exhibit 144, and going to pick up at page 1, line 1.

22           (Audio played)

23           THE COURT:  OK.  Folks, it's 12:45, so we're going to

24  take our second break.  Please be prepared to come back out at

25  1 o'clock.  Do not discuss the case. (Jury excused)

1              (Jury not present)

2              THE COURT:  You folks can be seated.

3              Mr. Sood, you can step down.

4              Anything either side wants to raise?

5              MR. MOORE:  Just very briefly, your Honor.  I thought

6    we had an agreement with the government that words like

7    "retarded" were coming out of these calls and transcripts.  We

8    had that discussion in Gatto.  I thought we had that discussion

9    here, and I've seen that word repeated many times today.  I

10   thought we had an agreement with the government that they were

11   going to delete those words from the calls and from the

12   transcripts.

13             Second, to your Honor's earlier point about the rule

14   of completeness, I would simply -- and I know that your Honor

15   did not rest your ruling on the rule of completeness earlier,

16   but I would respectfully cite to the Court two cases.  One is

17   *United States v. Sutton*, which is a DC circuit case found at

18   801 F.2d 1346, and the second case is a Second Circuit case

19   which adopts the reasoning of the DC circuit case.  That case

20   is *United States v. Johnson*, 507 F.3d 793, 796.  It's a Second

21   Circuit case from 2007.  Both of those cases hold that if a --

22   if the content of a recording, a writing, a document, ought to

23   in fairness be introduced, then the Court needs to go no

24   further.  And just because something is inadmissible hearsay

25   does not mean that it should not be introduced into evidence

1    if, in fairness, it ought to be included.

2              I simply bring those two cases to the Court's

3    attention.  I decided to take a quick look and found those.  I

4    will be -- I will tell the Court, candidly, I've not KeyCited

5    them.  I've not looked for other Second Circuit cases because

6    I'm doing this a bit on the fly.

7              MR. HANEY:  Your Honor, to that point, now that the

8    Court has heard the call that was referenced early, 104 and

9    104T, I would submit that now the Court has a better

10   understanding of the context, and you can hear what these two

11   gentlemen are talking about.  They're laughing at Jeff

12   D'Angelo.  They're laughing at the payment being made to the

13   coach.  Munish Sood testified that he only wants to get veteran

14   players in the NBA.  He's not talking about Book Richardson

15   sending student athletes from the University of Arizona to the

16   financial planning arm of Loyd Management.  He's doing

17   something or wanting to do something that is completely lawful,

18   which is go get players that are veterans that Book Richardson

19   may have coached when he was an AAU coach or collegiate coach.

20             For him to later in that same conversation say, let's

21   get Jeff back and stroke him off a little more, I think, as

22   Mr. Moore has noted, it would violate the rule of completeness.

23   That particular statement of let's get him back and stroke him

24   off a little more, like we just did earlier, I think should be

25   heard by the jury, your Honor.

1          MR. SOLOWIEJCZYK:  Your Honor, what Mr. Haney said

2     that's what Mr. Sood testified.  There's some discussion in the

3     recording about veterans.  That's not what he testified to just

4     now.  He testified about the distinction between the $5,000

5     payment and the later $15,000.

6          Regarding what Mr. Moore has said to say, we've

7     definitely gone back and forth on lots of recordings.

8     Mr. Haney asked me to take some stuff out.  Over the weekend we

9     did.  The statement "If Jeff doesn't pay this money, that's

10    retarded," it's an incredibly important statement.  If you take

11    out the word "retarded," it won't have any meaning.  Frankly,

12    it's a very important piece of evidence.  I don't think there's

13    was anything untoward about including that statement.  And the

14    defense counsel have had these recordings for a long time.  So

15    if they had a specific issue with it, they should have taken it

16    up at that time.

17         THE COURT:  I take it the concern is that the jury

18    will hold it against Mr. Dawkins for using that word.

19         MR. MOORE:  Yes, sir.  And then also hold it against

20    Mr. Code because they're friends.  Mr. Dawkins, unfortunately,

21    I'm familiar with a lot of recordings, uses that word much more

22    frequently than I wish he did.

23         THE COURT:  Again, if there was an agreement between

24    the parties concerning that language, I was not made aware of

25    that agreement.  I don't know that there's anything to be done

1  now about it.  I don't know whether it's going to be used in

2  future transcripts.

3          MR. SOLOWIEJCZYK:  It does come up again in some

4  recordings, your Honor.

5          MR. HANEY:  Your Honor, we've had conversations for

6  more than a few months.  We've been talking about this back in

7  the Gatto trial when there were transcripts and references that

8  my client was using language that would be potentially

9  prejudicial to the jury, and I believe we've worked to try to

10 redact as much as we can.  However, we are getting rolling

11 transcripts, your Honor, at like midnight, right?

12         MR. SOLOWIEJCZYK:  That's not true, your Honor.

13         MR. HANEY:  That is true, your Honor.  We are getting

14 information, and I'm sure counsel can verify this.  We got a

15 letter motion last night at 11:30 in the evening.  I had to

16 respond at midnight.  So this is putting us in a very difficult

17 position being from out of jurisdiction, in hotel rooms

18 responding to motions that they're filing at midnight, your

19 Honor.  So if a word slips through the cracks, I would ask that

20 they exercise their duties and obligations I think they owe as

21 officers of the court to honor the agreement that we had and

22 not to intentionally project what they know is going to be

23 inflammatory and prejudicial references in transcripts to the

24 jury.

25         MR. SOLOWIEJCZYK:  Your Honor, we've provided all

1    these transcripts quite some time ago, and I think we've --

2    because we expected defense counsel to try to make arguments

3    like this, we keep pretty good track of when we provided

4    things.  They've had this transcript for a long time.

5          The statement, "If Jeff doesn't provide this money,

6    that's retarded," look, that's the word Mr. Dawkins used.  And,

7    frankly, if you took out the word "retarded," you wouldn't

8    understand what he was saying.  Sometimes there's important

9    pieces of evidence that have some language -- to be clear, your

10   Honor, these transcripts are full of curse words and other

11   offensive statements.  We've tried our best to keep things out.

12   To give you an example, Mr. Haney was very adamant with us.

13   There was a reference to somebody having Tourette syndrome and

14   Mr. Dawkins mocking that person.  We took it out because we

15   didn't think it was relevant.

16         So we're trying to be fair and reasonable.  We're

17   giving the defense a list of exhibits we plan to offer the next

18   day.  So if they have an issue, I'm not sure why they're now

19   raising it here.

20         THE COURT:  Like I said, this issue's being brought to

21   my attention for the first time now.  If there are particular

22   items that the parties don't agree on and you want me to rule

23   on, then bring them to my attention.

24         Mr. Haney, I'm in the same position as you are.  I'm

25   receiving documents and motions at midnight and having to deal

J4THDaw3                          Sood - Direct

1    with them at 9 o'clock in the morning.  That's just the way

2    trials go.  My working assumption is that these issues are

3    being addressed as they come up and not that anyone on either

4    side is trying to sandbag the other.

5              MR. HANEY:  Fair enough, your Honor.  However, I do

6    want to note I've been trying to personally work these issues

7    out for three weeks, your Honor, or longer.  We don't need to

8    address them at midnight the day before court.  I don't think

9    that's appropriate.

10             Thank you, your Honor.

11             THE COURT:  OK.  1 o'clock, don't be late.

12             (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

J4T9DAW4                          Sood – Direct

1                  THE COURT:  Could we get Mr. Sood back in, please.

2                  MUNISH SOOD, resumed.

3                  (Continued on next page)

J4T9DAW4                          Sood - Direct

1            (Jury present)

2            THE COURT:  Mr. Solowiejczyk.

3   BY MR. SOLOWIEJCZYK:

4   Q.  I believe, Mr. Sood, we were talking about a July 7, 2017

5   phonecall between you and Christian Dawkins.

6            Government Exhibit 144.  So, at page 1, Mr. Sood, what

7   concerns, if any, did you understand Mr. Dawkins to have

8   regarding D'Angelo at that time?

9   A.  That Jeff D'Angelo's ability to relate to these players.

10  Q.  And what was your understanding of whether D'Angelo had

11  asked to meet with some of the players?

12  A.  Yes.  D'Angelo had asked in particular to meet with the

13  players connected to Emanuel Richardson.

14  Q.  What was Dawkins' view of this?

15  A.  It didn't make sense.

16  Q.  If you could turn to page 4, specifically line 22.

17           MR. SOLOWIEJCZYK:  Ms. Bustillo, I'm not going to use

18  the recording.

19  Q.  So page 4, line 22, you said, Mr. Sood "The process is you

20  give -- we're gonna give Book some money.  Book is gonna do his

21  shit.  When the kid is solidly part of our team, committed,

22  that's when guys like me and Jeff will meet him."

23           What did you mean by that, Mr. Sood?

24  A.  Just the process.  Give Book, Emanuel Richardson, the money

25  he needs to recruit.  Once that's completed and if the -- if

J4T9DAW4                            Sood - Direct

1    and when the player commits to us, then introduce Jeff and

2    myself to the player and/or family.

3    Q.  So, looking at page 5, Mr. Sood, lines 18 to 20.  You said,

4    "Because I want you to get this kid, and I wanna sign the big

5    kid if we need that 25, 50,000 later too."

6          Who were you referring to here, Mr. Sood?

7    A.  DeAndre Ayton.

8    Q.  What, if anything, did you understand regarding how

9    providing this money to Richardson could assist in getting

10   DeAndre Ayton as a client?

11   A.  It could put us in a position, since we provided the funds

12   to Emanuel Richardson, it would position us to have access to

13   the player.

14   Q.  To be clear, this $15,000 that he was asking for, it was

15   for a different player?

16   A.  Oh, yes.  Sorry.  I thought you meant 25.

17   Q.  All right.  So turning to -- Mr. Sood, after you had these

18   conversations with Mr. Dawkins did you talk to Mr. D'Angelo

19   about the $15,000 payment to Richardson as well?

20   A.  Yes.

21   Q.  And after these discussions did Mr. D'Angelo ultimately

22   agree to provide the $15,000 to Richardson?

23   A.  He did.

24   Q.  And was Mr. Dawkins a party to those discussions as well?

25   A.  Yes.

J4T9DAW4                          Sood - Direct

1   Q.  Now, did Mr. D'Angelo provide the money to Richardson by

2   wire or by check?

3   A.  No.

4   Q.  How was it provided?

5   A.  Emanuel Richardson was traveling and he ended up being in

6   New Jersey so he came to my office and met with myself and Jeff

7   D'Angelo.

8   Q.  And was the $15,000 provided to him at that time?

9   A.  It was.

10  Q.  In what form?

11  A.  Cash.

12  Q.  Mr. Sood, which recruit was this -- what was your

13  understanding of which recruit this $15,000 was going to help

14  secure for Richardson?

15  A.  Jahvon Quinerly.

16  Q.  Prior to -- did you know the meeting at your office was

17  being recorded, Mr. Sood?

18  A.  No.

19  Q.  Prior to testifying, did you review a recording of that

20  meeting?

21  A.  Yes.

22  Q.  And who was present?

23  A.  Myself, Jeff D'Angelo, and Emanuel Richardson.

24           MR. SOLOWIEJCZYK:  Your Honor, at this time the

25  government would offer Government Exhibits 511B1, 511B2, 511B5,

J4T9DAW4                        Sood - Direct

1    511B6, 511B7 and the associated transcripts 511B1T, 511B2T,

2    511B5T, 511B6T and 511B7T.

3            MR. HANEY:  No objection.  Thank you.

4            MR. MOORE:  Same objection made previously under 403,

5    your Honor.

6            THE COURT:  Very well.  Over that objection those

7    exhibits will be received.

8            (Government's Exhibits 511B1, 511B2, 511B5, 511B6,

9    511B7, 511B1T, 511B2T, 511B5T, 511B6T and 511B7T received in

10   evidence)

11           MR. SOLOWIEJCZYK:  Ms. Bustillo, when you're ready

12   we'll play 511B1.

13           This is a July 20 meeting between Emanuel Richardson,

14   Jeff D'Angelo, and Munish Sood.

15           (Video played)

16   Q.  Mr. Sood, where is this meeting taking place?

17   A.  In Princeton, New Jersey.  My office.

18   Q.  And what specific player was Richardson discussing during

19   this part of the meeting?

20   A.  A player named Naz Reid.

21   Q.  What was Richardson generally describing regarding Naz

22   Reid's recruitment process?

23   A.  That he was recruiting.  But LSU seemed to be more willing

24   to pay him to attend LSU.  And then in return, since he had a

25   relationship with the coach at LSU, he would be offering him a

1    job so this way that would ensure Naz Reid goes to LSU, not

2    Arizona.

3    Q.   Who offered who a job?

4    A.   The head coach of LSU offered Emanuel Richardson a job.

5    Q.   Now, Mr. Sood, at the time what was your understanding

6    based on this conversation and prior conversations regarding

7    what financial -- what sorts of financial obligations assistant

8    coaches had?

9    A.   Their obligation was that to from time to time or that the

10   families or recruits -- recruits of families would require

11   money and they would have to compete to make those payments to

12   get the kid to play at their university.

13   Q.   Mr. Sood, based on the discussion that just occurred here,

14   were payments like that permissible under the rules?

15   A.   No.

16   Q.   The NCAA rules?

17   A.   No.

18   Q.   If we could turn to 511B2.

19            (Video played)

20   Q.   Mr. Sood, during this portion of the meeting what players

21   were you specifically talking about?

22   A.   Rawle Alkins.

23   Q.   And then later on was there a discussion regarding certain

24   recruits?

25   A.   Yes, Quinerly.

1   Q.  Now, with respect to Quinerly, what, if anything, did

2   Richardson tell you about Quinerly's mother?

3   A.  That she was looking to move to Tucson and also looking for

4   a potential job.

5   Q.  And looking at page 3, lines 1 to 5 when Richardson said,

6   "This is what I can do for you to put you in a situation to

7   move to Tucson.  Once all of that stuff is in place, then she

8   was like yeah.  Then, you know, we'll do it publicly."

9            Did you understand what Richardson meant by this?

10  A.  That he would be able to find her a job and then once --

11  once they publicly announce that he's agreeing to play for

12  University of Arizona.

13  Q.  Mr. Sood, to be clear, your understanding at this time was

14  the $15,000 that was being requested was in connection with

15  Book Richard recruiting Jahvon Quinerly, correct?

16  A.  Yes.

17  Q.  So if we could go to 511B5.

18            (Video played)

19  Q.  Mr. Sood, I want to go back.  At page 1, at lines 19 to 21

20  you said, "And I like what you said last time, coach, which is,

21  you have to direct them.  You can't give them options."

22            What were you referring to, Mr. Sood?

23  A.  That he would be just directing them to us, to Loyd

24  Management.

25  Q.  When you say "them," who do you mean?

1    A.   Meaning players.

2    Q.   Mr. Sood, at this time what was your understanding

3    regarding the reason Mr. Richardson was going to be doing that?

4    A.   Because we're giving him money to recruit.

5    Q.   Now, going to page 2, Mr. Sood.  Mr. Richardson

6    references -- this is at line 4, he says, "My analogy is always

7    the same.  I'm -- you know, they don't know the difference if

8    you take them to a Benz dealer, BMW, and a Porche.  They like

9    them all."

10             What was your understanding of the analogy that

11   Mr. Richardson was providing here?

12   A.   That with his relationship he could direct the player.

13   Q.   Was he going to give the player options or just one option?

14   A.   No.  Just direct them to us.  To Loyd.

15             MR. SOLOWIEJCZYK:  If we could turn to 511B6,

16   Ms. Bustillo.

17             (Video played)

18   Q.   Mr. Sood, going back to page 1, when Mr. D'Angelo said,

19   "We, we're gonna do -- gonna do 15 for three months, right?

20   And that should help with the kids."  What did you understand

21   him to mean?

22   A.   That we were giving him fifteen thousand dollars for the

23   particular recruit.

24   Q.   What did you observe happen during the meeting?

25   A.   Jeff D'Angelo giving him an envelope of money.

1    Q.  Going a little further down -- actually focusing on that,

2    Mr. Sood, Mr. D'Angelo said, "We're going to do fifteen for

3    three months."  Did you understand what he meant by "fifteen

4    for three months"?

5    A.  That it would be five thousand a month.

6    Q.  Sorry, Mr. Sood.  You just said he gave him fifteen

7    thousand.  What does the three months mean?

8    A.  That Emanuel Richardson will give the money over three

9    months to the mother.

10   Q.  Mr. Sood, who initially proposed providing this money to

11   Emanuel Richardson?

12   A.  Christian.

13   Q.  And when Richardson at page 1, line 15, "Just so you know I

14   put ten in of my own to give to the kid's mom," what did you

15   understand that to mean?

16   A.  That he was using ten thousand of his personal money.

17   Q.  For what?

18   A.  To pay the player's mom.

19   Q.  Then finally, Mr. Sood, you said at page 2, lines 7 to 8,

20   "If we get these three kids I mean we're on the road."  What

21   did you mean by this?

22   A.  That we'd be off to a great start with Emanuel Richardson

23   if he can refer us three clients.

24   Q.  When you say "three kids," what did you mean?

25   A.  Three recruits either that are heading there or that are

1    already on the team.

2                MR. SOLOWIEJCZYK:  If we could go to 511B7.

3                (Video played)

4    Q.  Mr. Sood if you could take a look at page 2 and starting at

5    line 25 through the top of page 3, Richardson said, "The goal

6    is to -- when, 'Hey this kid's going to the NBA.  Is he set,

7    Book?  'Yup, he's straight.  Book, can I come in and talk to

8    him?  No.  It's done.  Book, it's F'ing October.  Damn, Book."

9                What did you understand Mr. Richardson to be referring

10   to here?

11   A.  That he would keep other agents and advisers away from the

12   particular player.

13   Q.  Mr. Sood, after this meeting with Mr. Richardson, did you

14   have any discussions with Christian Dawkins about what had

15   happened at the meeting?

16   A.  Yes.

17   Q.  And generally what did you tell him?

18   A.  That we gave Emanuel Richardson $15,000.

19   Q.  Now, Mr. Sood, around this time in late July 2017 did you

20   learn that Jeff D'Angelo and Christian Dawkins were planning to

21   meet with other men's basketball coaches?

22   A.  Yes.

23   Q.  And where was that going to occur?

24   A.  Las Vegas.

25   Q.  Were you planning to attend those meetings with D'Angelo

J4T9DAW4                          Sood - Direct

1    and Dawkins in Las Vegas?

2    A.  No.

3    Q.  Did you know who, if anyone, had been involved in setting

4    up the meetings in Las Vegas?

5    A.  I believe --

6               MR. MOORE:  Objection.

7               THE COURT:  Overruled.

8               THE WITNESS:  I believe both Christian and Merl Code.

9    Q.  How did you learn Merl Code had been involved?

10   A.  Christian mentioned it.

11   Q.  Mr. Sood, did you participate in a phonecall with Merl Code

12   and D'Angelo in advance of those meetings in Las Vegas?

13   A.  Yes.

14   Q.  And Mr. Sood, at that time what was your understanding

15   regarding the reasons that Mr. Code was going to set up these

16   meetings for the group?

17              MR. MOORE:  Objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  The goal was to -- for the team to meet

20   with other coaches that would be interested in working with

21   Loyd Management.

22   Q.  Let me just rephrase the question, Mr. Sood.  What was your

23   understanding regarding whether Mr. -- why Mr. Code was setting

24   up the meetings for you?

25              MR. MOORE:  Objection, your Honor.  Asked and

1   answered.

2              THE COURT:  Sustained.

3   Q.  Mr. Sood, I believe you previously testified that Mr. Code

4   was receiving a monthly retainer; is that correct?

5   A.  Yes.

6              MR. SOLOWIEJCZYK:  At this time, your Honor, the

7   government would offer Government Exhibit 301 and 301T.

8              THE COURT:  Any objection?

9              MR. MOORE:  No objection.

10             MR. HANEY:  No objection, your Honor.

11             THE COURT:  Those exhibits will be received.

12             (Government's Exhibits 301 and 301T received in

13   evidence)

14             MR. SOLOWIEJCZYK:  We have hard copies to pass out to

15   the jury, with your Honor's permission.

16             THE COURT:  Very well.

17   Q.  This is a July 10, 2017 call between Munish Sood, Merl Code

18   and Jeff D'Angelo.

19             (Audio played)

20             MR. SOLOWIEJCZYK:  If you could go to the next clip,

21   Ms. Bustillo.

22             (Audio played)

23   Q.  Mr. Sood, at page 12, line 16 Mr. Code referenced

24   prioritizing a list of guys.  And you should have some, you

25   know, some interaction with -- while you're out there.  Do you

1    understand what he's referring to?

2              MR. MOORE:  Your Honor.  Same objection as previously

3    made.

4              THE COURT:  Overruled.

5              THE WITNESS:  Coaches.

6    Q.  Coaches for what?

7    A.  Who may be seeking money for recruiting.

8              MR. SOLOWIEJCZYK:  Can I have one moment, your Honor.

9              THE COURT:  Yes.

10             (Counsel confer)

11   Q.  Mr. Sood, I think you mentioned you didn't actually go to

12   the meetings in Las Vegas, right?

13   A.  Yes.  I did not attend.

14             MR. SOLOWIEJCZYK:  You can take this down,

15   Ms. Bustillo.

16   Q.  To your knowledge, did Mr. Code, in fact, set up the

17   meetings in Las Vegas with some of these coaches?

18   A.  Yes.

19   Q.  And what, if anything, did Christian Dawkins tell you about

20   the meetings?

21   A.  That they were plenty -- there were a number of meetings

22   and a number of the coaches left with money.

23   Q.  And do you recall him mentioning any specific coaches?

24   A.  Tony Bland.

25   Q.  Where did he coach again?

J4T9DAW4                          Sood - Direct

1   A.   USC.

2   Q.   What was your understanding, if any, regarding whether Merl

3   Code had been paid by your company for setting up these

4   meetings?

5             MR. MOORE:  Objection.

6             THE COURT:  Overruled.

7             THE WITNESS:  That he was being paid his monthly

8   retainer.

9   Q.   Mr. Sood, soon after this call you had with Merl Code and

10  Jeff D'Angelo what, if anything, did you learn about certain

11  concerns Mr. Code had about Mr. D'Angelo?

12  A.   There was a call where -- between Merl Code and Jeff

13  D'Angelo where there was someone in the background with Jeff

14  D'Angelo.  So Merl Code was concerned about who was with Jeff

15  D'Angelo on a particular call.

16            MR. SOLOWIEJCZYK:  Your Honor, at this time the

17  government would offer Government Exhibit 119 and 119T.

18            THE COURT:  Any objection?

19            MR. HANEY:  No objection, your Honor.

20            MR. MOORE:  No objection.

21            THE COURT:  119 and 119T will be received.

22            (Government's Exhibits  119 and 119T received in

23  evidence)

24            MR. SOLOWIEJCZYK:  This is a July 14, 2017 call

25  between Christian Dawkins and Munish Sood.

J4T9DAW4                          Sood – Direct

1           And actually let me just –- your Honor, may I pass out

2    transcripts again?

3           THE COURT:  You may.

4           MR. MOORE:  Your Honor, while he's handing out these

5    transcripts may we approach for just one minute, please.

6           THE COURT:  OK.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           MR. MOORE:  Your Honor, we're not re-litigating again

3    the Gatto case and I believe this call's primarily about Brian

4    Bowen.  So I'm not so sure I see the relevance of it.

5    Mr. Chaney wanted to add something.

6           MR. CHANEY:  I think on 403 grounds bringing up a

7    statement in a conversation between Mr. D'Angelo and Mr. Code

8    that relates only to the Bowen situation and not to any of the

9    charged conduct in this case does not survive a 403

10   prejudice-versus-probative-value analysis.

11          MR. SOLOWIEJCZYK:  Your Honor, just to give you a

12   little context.  In the three-way call between Mr. Sood and

13   Mr. D'Angelo and Mr. Code that we just listened to a portion

14   of, there was a portion where Mr. D'Angelo appeared to

15   potentially be speaking to another person on the phone.  It's

16   true.  Part of that call related to paying this player named

17   Brian Bowen who was the subject of the Gatto trial.

18          Mr. Code later expressed concerns about the fact that

19   Mr. D'Angelo was on the phone, was talking to somebody else

20   while he was on that phonecall, concerns he was being a little

21   too open about all the things they were doing.  Those concerns

22   applied to the entirety of the phonecall, including the part

23   that we offered.  And it really just goes generally to

24   consciousness of guilt of evidence that Mr. Code knows

25   generally the types of things they're doing, whether it be

J4T9DAW4                          Sood - Direct

1    making payments to players and families or paying coaches, he's

2    not allowed to be doing it, and he's reaching out to say Jeff

3    D'Angelo needs to be more careful.

4              MR. MOORE:  He knows that you're not allowed to pay

5    players because he knows it's a violation of the NCAA rules.

6    In addition, Mr. Solowiejczyk didn't play that portion of the

7    call for this jury.  And so I think, given his failure to play

8    that portion of the call, it should be 403ed out.

9              MR. SOLOWIEJCZYK:  That was pursuant to an agreement

10   with the defense because they didn't want to get into this.

11             THE COURT:  I'm going to allow it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. SOLOWIEJCZYK:  Your Honor, we offer 119 and 119T.

3          THE COURT:  It will be received.

4          (Government's Exhibits  119 and 119T received in

5    evidence)

6          (Audio played)

7          MR. SOLOWIEJCZYK:  We can pause there, Ms. Bustillo.

8    Q.  So, Mr. Sood, going back to page 5, at line 19 you said, "I

9    spoke to Jeff about, because Merl called me and I talked to

10   Jeff."  Was it true that Merl Code had called you?

11   A.  Yes.

12   Q.  And why had Mr. Code called you?

13   A.  Regarding the conversation he had with -- when Jeff

14   D'Angelo had someone else with him on the call or behind him.

15   Q.  And then at line 8 to 12 on page 6, Mr. Dawkins said, "I

16   mean definitely even if you're going to call him, you don't

17   have to meet him in person or everything, but don't call him

18   and like be in the background talking to somebody else."  What

19   did you understand Mr. Dawkins to be saying there?

20   A.  That if you're -- we're trying to keep this thing quiet and

21   confidential.  So he was concerned who else is Jeff sharing

22   this information with.

23   Q.  Now, in addition, starting at the bottom of page 6,

24   starting at line 17, there was a discussion of somebody

25   named -- there was a discussion of a player.  Which player was

1   that?

2   A.   Jeffrey Carroll.

3   Q.   And who coached Jeffrey Carroll at that time?

4   A.   Lamont Evans.

5   Q.   When Mr. the Dawkins said to you, this is at line 22,

6   "Regardless of whatever the F he feels, if we're paying this

7   F'ing guy and we don't get Jeffrey Carroll, like what the F are

8   we doing this for."

9        What did you understand him to be saying?

10  A.   If Lamont doesn't deliver Jeffrey Carroll, then we

11  shouldn't be paying Lamont Evans going forward.

12  Q.   Now, Mr. Sood --

13       MR. SOLOWIEJCZYK:   You can take that down,

14  Ms. Bustillo -- I'm sorry.  Actually there's one more clip to

15  play.  My apologies.  At page 16.  Sorry.

16       (Video played)

17       MR. SOLOWIEJCZYK:   You can take that down,

18  Ms. Bustillo.

19  Q.   Mr. Sood, you were discussing Lamont Evans with Mr. Dawkins

20  in that prior call; is that right?

21  A.   Yes.

22  Q.   Now, during the summer of 2017 what information did you

23  learn, if any, regarding Lamont Evans -- let me withdraw that

24  question.

25       In the summer of 2017 what, if anything, did you learn

J4T9DAW4                        Sood - Direct

1   about Lamont Evans?

2   A.  That he was -- he hadn't delivered a player and that --

3   Q.  Did you learn anything about other sources that Mr. Evans

4   was accepting money from?

5   A.  Yes.  He -- I learned that he was accepting money from a

6   few other people including a sports agent.

7   Q.  And what was the name of that sports agent?

8   A.  Michael Cohen -- sorry.  Seth Cohen.

9   Q.  And did you know Seth Cohen at that time?

10  A.  I did.

11  Q.  How did you hear about the fact that Seth Cohen was paying

12  Lamont Evans?

13  A.  Merl Code had brought it to my attention.

14  Q.  Did you have a conversation with Seth Cohen about it as

15  well?

16  A.  I believe I did, yes.

17  Q.  Did there come a point when you spoke to Christian Dawkins

18  regarding your concerns with respect to Lamont Evans?

19  A.  Yes.

20          MR. SOLOWIEJCZYK:  Your Honor, at this time the

21  government offers Government Exhibit 128 and 128T.

22          THE COURT:  Any objection?

23          MR. HANEY:  No objection, your Honor.

24          MR. MOORE:  No objection, your Honor.

25          THE COURT:  128 and T will be received.

J4T9DAW4                         Sood - Direct

<table>
<tr><td>1</td><td>(Government's Exhibits 128 and 128T received in</td></tr>
<tr><td>2</td><td>evidence)</td></tr>
<tr><td>3</td><td>MR. SOLOWIEJCZYK:  With the Court's permission,</td></tr>
<tr><td>4</td><td>request to hand out hard copies to the jury.</td></tr>
<tr><td>5</td><td>THE COURT:  Very well.</td></tr>
<tr><td>6</td><td>MR. SOLOWIEJCZYK:  Ms. Bustillo, we can play a portion</td></tr>
<tr><td>7</td><td>of this call when you're ready.</td></tr>
<tr><td>8</td><td>(Audio played)</td></tr>
<tr><td>9</td><td>Q.  OK, Mr. Sood.  I just want to go back over a couple things</td></tr>
<tr><td>10</td><td>that were said in this call.  At page 2, line 21 to 23 you</td></tr>
<tr><td>11</td><td>said, "But Lamont scares me because he's taking money -- I told</td></tr>
<tr><td>12</td><td>you -- taking money from Seth."</td></tr>
<tr><td>13</td><td>Who was the Seth you were referring to again?</td></tr>
<tr><td>14</td><td>A.  Again, Seth Cohen.  He's an agent.</td></tr>
<tr><td>15</td><td>Q.  Whether you said, "Lamont scares me," what did you mean by</td></tr>
<tr><td>16</td><td>that Mr. Sood?</td></tr>
<tr><td>17</td><td>A.  That he's taking multiple -- he's taking from different</td></tr>
<tr><td>18</td><td>parties and promising the same player.</td></tr>
<tr><td>19</td><td>Q.  What about the fact that Mr. Evans was taking money from</td></tr>
<tr><td>20</td><td>multiple parties concerned you?</td></tr>
<tr><td>21</td><td>A.  The fact that is he pulling a fast one on us and then will</td></tr>
<tr><td>22</td><td>it be -- will people find out what's really going on with him.</td></tr>
<tr><td>23</td><td>Q.  When you say "pulling a fast one," what do you mean?</td></tr>
<tr><td>24</td><td>A.  Like is he taking our money and then delivering the kid to</td></tr>
<tr><td>25</td><td>someone else.</td></tr>
</table>

J4T9DAW4                          Sood - Direct

1   Q.  Mr. Sood, just on the topic of Seth Cohen, did you have

2   ongoing discussions with Seth Cohen around this time?

3   A.  Yes.

4   Q.  What were those generally regarding?

5   A.  He wanted me to invest in his company.

6   Q.  Did there come a point when you exchanged agreements

7   regarding that?

8   A.  Yeah.  We had draft agreements.

9   Q.  Did you ever actually, to your knowledge, invest in

10  Mr. Cohen's company?

11  A.  No.

12  Q.  You said he was a sports agent; is that right?

13  A.  Yes.

14  Q.  Now, Mr. Sood, did you have any discussions with anyone

15  else around this timeframe regarding your concerns about Lamont

16  Evans?

17  A.  Both Merl Code and Christian Dawkins.

18          MR. SOLOWIEJCZYK:  At this time, your Honor, the

19  government would offer Government Exhibit 23 and 23T.

20          THE COURT:  Any objection?

21          MR. HANEY:  No objection, your Honor.

22          MR. MOORE:  No objection, your Honor.

23          THE COURT:  23 and 23T will be received.

24          (Government's Exhibits 23 and 23T received in

25  evidence)

1      MR. SOLOWIEJCZYK:  Your Honor, again, permission to

2 pass out hard copies.

3      THE COURT:  Very well.

4      MR. SOLOWIEJCZYK:  Ms. Bustillo, we're going to start

5 at page 6, line 2 of the transcript.

6      This is a September 11, 2017 call between Munish Sood

7 and Merl Code.

8      (Audio played)

9 Q.  Mr. Sood, what was Mr. Code generally advising you during

10 this call?

11 A.  Not to be paying Lamont Evans.

12 Q.  What was your understanding regarding what Mr. Code had

13 learned about Lamont Evans?

14 A.  That he had received money from Seth Cohen as well.

15 Q.  And to your knowledge did Merl Code and Seth Cohen have an

16 independent relationship from you?

17 A.  I believe they did, yes.

18 Q.  At page 6, lines 16 to 17 when Mr. Code said, "You know

19 what I'm saying or had been.  And Christian had given him money

20 for a kid."

21      Did you understand what Mr. Code was referring to?

22 A.  That Christian had given him money in the past for a

23 particular player.

24 Q.  And then finally at lines 19 to 20 of page 6, when Mr. Code

25 said to you, "So, at some point in time it becomes where you're

1   just using me versus it being a necessity for the business."

2          What did you understand Code to mean by the phrase,

3   "necessity for the business"?

4   A.  That is he really using the money for recruiting or is he

5   using the money for other purposes.

6          MR. SOLOWIEJCZYK:  You can take that down,

7   Ms. Bustillo.

8   Q.  Now, Mr. Sood, directing your attention to August of 2017.

9   Did there come a point when you took a trip with Christian

10  Dawkins?

11  A.  Yes.

12  Q.  What was the purpose of that trip?

13  A.  We went to meet potential recruits, clients, in Arizona and

14  then Las Angeles.

15  Q.  And did you meet with any coaches during those trips?

16  A.  We met with Emanuel Richardson and Tony Bland.

17  Q.  Who else accompanied you for the trip?

18  A.  Besides Christian, it was Jill Bailey.

19  Q.  And who was Jill Bailey again?

20  A.  The undercover agent.

21  Q.  Who did you understand her to be at that time?

22  A.  Jeff D'Angelo's business partner.

23  Q.  Let's take the trips one at a time.  So where specifically

24  in Arizona did you go?

25  A.  Campus of University of Arizona.

J4T9DAW4                              Sood - Direct

1   Q.  And then after that did you go to California?

2   A.  Yeah.  We flew to L.A., Los Angeles.

3   Q.  So with respect to the Arizona meetings, what was your

4   understanding of why you were going to Arizona?

5   A.  To meet with Rawle Alkins.

6   Q.  Did you end up meeting with Rawle Alkins?

7   A.  No.

8   Q.  Who did you meet with?

9   A.  We met with his cousin named Rodney.

10  Q.  Did you also meet with Emanuel Richardson during the trip?

11  A.  Yes.

12  Q.  Where did you meet with Richardson?

13  A.  At a hotel.

14  Q.  And were you aware that meeting was being recorded?

15  A.  No.

16  Q.  Have you reviewed a recording of that meeting before

17  testifying here today?

18  A.  Yes.

19          MR. SOLOWIEJCZYK:  Your Honor, at this time the

20  government offers Government Exhibits 518A through 518D and

21  518F and then also 518AT through 518DT and 518FT.

22          MR. HANEY:  No objection.

23          MR. MOORE:  Same 403 objection, your Honor.

24          THE COURT:  Over that objection, those exhibits will

25  be received.

1          (Government's Exhibits 518A through 518D and 518F and

2     518AT through 518DT and 518FT received in evidence)

3     Q.  So this is 518A that we're going to be going through.

4          MR. SOLOWIEJCZYK:  Ms. Bustillo, when you're ready you

5     can hit play.

6          (Video played)

7          MR. SOLOWIEJCZYK:  If you can pause for one second.

8     Q.  Who are we looking at right now, Mr. Sood?

9     A.  (No response).

10    Q.  Sorry.  That's blocked.

11         MR. SOLOWIEJCZYK:  Actually can you play a little more

12    Ms. Bustillo.

13         (Video played)

14    A.  Emanuel Richardson.

15         MR. SOLOWIEJCZYK:  Keep going, Ms. Bustillo.

16         (Video played)

17         MR. SOLOWIEJCZYK:  Is it possible to skip ahead a

18    little bit to the portion where they're not talking to the

19    server anymore.

20         (Video played)

21    Q.  Mr. Sood, what player were you discussing during this

22    portion of the meeting?

23    A.  Rawle Alkins.

24    Q.  Was he currently a player on the Arizona team?

25    A.  Yes.

J4T9DAW4                       Sood - Direct

1   Q.  What specifically were you discussing with respect to Rawle

2   Alkins?

3   A.  Who would help him make a decision which firm to work with

4   like Loyd Management.

5   Q.  Who were you talking about that might be involved in that

6   decision?

7   A.  Both Emanuel Richardson and Rodney, his cousin.

8   Q.  So looking at page 1, lines 16 to 20 or page 2, lines 16 to

9   20 when Mr. Dawkins said, "So now I'm a tell you Rawle will

10  have a big part of his decision.  I think Rodney, Rodney will

11  have some influence as well.  As long as we don't have to deal

12  with the mom, I think we'll be fine."  What did you understand

13  Dawkins to be saying?

14  A.  That if the mother was not involved Rodney can help, he'll

15  help Rawle make a final decision.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

J4THDaw5                          Sood - Direct

1   BY MR. SOLOWIEJCZYK:

2   Q.  A decision regarding what?

3   A.  To which firm to -- to which adviser and agent to work

4   with.

5          MR. SOLOWIEJCZYK:  All right.  Turn to 518B, please,

6   Ms. Bustillo, 518B, as in boy.

7          (Video played)

8   BY MR. SOLOWIEJCZYK:

9   Q.  All right.  Mr. Sood, at page 1, lines 11 to 15,

10  Mr. Dawkins said, "Yeah, he's F'ing clueless, clueless, but

11  that's good for us because I showed him a breakdown of

12  everything he can -- I think he'll do what you tell him to do."

13  Right after that Mr. Richardson responded, "He will."

14          What did you understand that exchange to mean?

15  A.  That Emanuel Richardson can direct him towards the company.

16  Q.  And the "he," you're talking about?

17  A.  Rawle Alkins.

18  Q.  What did Dawkins say, if anything, regarding the role that

19  Rodney would play in this decision?

20  A.  That if we have his support, he would be helpful as well.

21  Q.  And "he" was Mr. Alkins' cousin?

22  A.  Correct.

23          MR. SOLOWIEJCZYK:  If we can go to 518C, please.

24          (Video played)

25  Q.  Mr. Sood, just going back up to page 1, line 3, you

J4THDaw5                          Sood - Direct

1    referenced, "That's how we get the 7-footer."  Who was the

2    7-footer?

3    A.  We're referencing De'Andre Ayton.

4    Q.  And then you said a couple lines after that, Mr. Sood,

5    "Just remember what you said when we first saw you.  You no

6    longer giving suggestions, you're telling them."  Do you

7    remember that?  What were you referring to, Mr. Sood?

8    A.  The previous conversations with Emanuel Richardson where he

9    had suggested that going forward working with us, he would just

10   be recommending us, no one else.

11   Q.  Mr. Sood, at this time what, if anything, were you seeking

12   from Richardson with respect to De'Andre Ayton?

13   A.  An introduction.

14        MR. SOLOWIEJCZYK:  If we can go to 518D, Ms. Bustillo.

15        (Video played)

16   Q.  Mr. Sood, what player was generally being discussed during

17   this portion of the meeting?

18   A.  De'Andre Ayton.

19   Q.  What, if anything, was Richardson telling you about Ayton?

20   A.  He's one of the best players he's ever seen.

21        MR. SOLOWIEJCZYK:  If we could go to 518F.

22        (Video played)

23        MR. SOLOWIEJCZYK:  Pause here, Ms. Bustillo.

24   Q.  All right.  Mr. Sood, just going back to the very beginning

25   of that clip, when Ms. Bailey said, "Thank you for hooking

1    things up," and then Richardson said, "I did my job," what did

2    you understand that exchange to be about?

3    A.   Setting up a meeting with Rawle's cousin Rodney.

4    Q.   Who do you believe was responsible for helping set up that

5    meeting?

6    A.   Emanuel Richardson.

7    Q.   At page 2, looking at lines 3 through 5, when

8    Mr. Richardson said, "I'm just telling you, that's what will be

9    powerful, and we all sit down and just like, OK, Book, this is

10   who I trust," what did you understand Mr. Richardson to be

11   referring to?

12   A.   That he would have influence over Rawle to help make a

13   decision to work with us.

14   Q.   After this meeting with Emanuel Richardson, did you, in

15   fact, meet with Rawle Alkins' cousin Rodney?

16   A.   Yes.

17   Q.   Prior to testifying today, have you reviewed a recording of

18   that meeting?

19   A.   Yes.

20   Q.   All right.  Mr. Sood, I'm just going to ask you some

21   questions so you can give us a general summary of what

22   happened.

23          During the meeting, what did Rodney generally discuss

24   with you regarding his role in Rawle Alkins' life?

25   A.   That -- that Rawle Alkins' mom had -- had him travel and

J4THDaw5                              Sood - Direct

1   move down -- move to University of Arizona to stay with him and

2   manage him, and then he would work with Rawle once he turns pro

3   as well, and he will be part of his decision-making.

4   Q.  Are you familiar with a term that's often used to describe

5   somebody like Rodney?

6   A.  It's called a handler.

7   Q.  Where'd you meet with Rodney, by the way?

8   A.  Same hotel, right after the Emanuel Richardson meeting.

9   Q.  Who else was there besides you and Rodney?

10  A.  Jill Bailey and Christian Dawkins was there.

11  Q.  What was the purpose of that meeting?

12  A.  Again, to introduce ourselves, tell him what we do, and

13  then talk to him about him working with us.

14  Q.  Based on the discussions you had that day with Richardson

15  and Dawkins, what, if anything, was your understanding

16  regarding what Rodney's role was going to be?

17  A.  Rodney's role would be help influence Rawle to work with

18  us.

19  Q.  Now, Mr. Sood, based on the discussion that you had with

20  Dawkins, Bailey, and Rodney, did you have a sense of whether

21  Dawkins and Rodney had met before?

22  A.  I believe they'd met the day -- the night before.

23  Q.  Do you know who originally introduced them?

24  A.  Emanuel Richardson.

25  Q.  Based on the meeting, the discussion that happened, what

J4THDaw5                          Sood - Direct

1   was your understanding regarding whether Rodney intended to

2   recommend that Rawle work with you?

3   A.  He seemed on board to recommend us.

4   Q.  Did you get to meet with Rawle Alkins during that trip?

5   A.  No.

6   Q.  Do you know if Dawkins met with Alkins?

7   A.  I believe he met him the night before.

8   Q.  How do you know that?

9   A.  He mentioned it.

10  Q.  What did Rodney say, if anything, regarding whether you

11  could meet with Alkins in the future?

12  A.  He said he would arrange a meeting next time we're back in

13  Arizona.

14  Q.  During your discussion with Rodney, did Emanuel

15  Richardson's name come up at all?

16  A.  Yes.

17  Q.  What did Rodney tell you Richardson had said to him, if

18  anything?

19  A.  That they were good people, and he would direct Rawle to

20  meet with us and potentially work with us.

21  Q.  During the meeting, did Rodney tell you anything about any

22  concerns that Rawle Alkins had about this?

23  A.  Rawle would ask what would -- what would this be -- what

24  would it be -- what would it be for -- what would Emanuel

25  Richardson get from this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J4THDaw5                    Sood - Direct

1    Q.  Who did he say that to?

2    A.  To the group.

3    Q.  Let me take a step back, Mr. Sood.  You had a conversation

4    with Rodney, right?

5    A.  Yes.

6    Q.  Did Rodney convey anything to you about what Alkins had

7    said to him?

8    A.  Yes.  What is -- what is in this for --

9              MR. HANEY:  Objection.  Object to hearsay.

10             THE COURT:  Overruled.

11   A.  What is in this for Emanuel Richardson?

12   Q.  And at the end of the meeting, what did Rodney indicate

13   regarding whether he was going to recommend you?

14   A.  He would.

15   Q.  Now, Mr. Sood, after this meeting in Arizona, where'd you

16   go from there?

17   A.  To Los Angeles.

18   Q.  How did you get there?

19   A.  We flew.

20   Q.  Why were you going to Los Angeles that day, Mr. Sood?

21   A.  To meet with Tony Bland.

22   Q.  Your trip to Los Angeles, besides meeting with Tony Bland,

23   were you going there to meet with anyone else?

24   A.  Yes.  Tony Bland had set up meetings with a father of the

25   high school player who will be attending USC and a family

J4THDaw5                          Sood - Direct

1   member of another player.

2   Q.  Had you met Tony Bland before this trip?

3   A.  No.

4   Q.  When you first got to LA, who did you meet with?

5   A.  We met with the -- a father of a high school player who was

6   headed to USC by the name of Taeshon Cherry.

7   Q.  That was the name of the player?

8   A.  Yes.

9   Q.  And you met with his father?

10  A.  Yes.

11  Q.  Who was present for that meeting?

12  A.  Myself, Jill Bailey, and Christian and the father.

13  Q.  What was your understanding about who, if anyone, had set

14  up the meeting with Cherry's father?

15  A.  Tony Bland set up the meeting.

16  Q.  Generally, what was discussed during your meeting with

17  Cherry's father?

18  A.  Just the services we provided, how we could help them, and

19  in return, how Tony Bland spoke highly of us.

20  Q.  What, if anything, happened at the end of the meeting?

21  A.  Jill Bailey gave Christian Dawkins $4,000 to give to the

22  father.

23  Q.  Did you personally see Dawkins give the money to the

24  father?

25  A.  No.

J4THDaw5                          Sood - Direct

Q.  Now, during this trip, did there come a point when you met
with Tony Bland himself?

A.  Yes.

Q.  Do you recall where that occurred?

A.  I was at a restaurant on campus of USC.

Q.  Prior to the meeting, what, if anything, had Dawkins told
you about Bland?

A.  That Tony Bland was assistant coach at USC, a couple of
good recruits coming, and well-connected on the West Coast.

Q.  Mr. Sood, I believe you previously testified you were aware
Mr. Bland had met with Dawkins and D'Angelo in Las Vegas?

A.  Yes.

Q.  What was your understanding of what happened at that
meeting?

A.  That Jeff D'Angelo gave Tony Bland money.

Q.  What was your understanding of the purpose of the meeting
with Bland that day?

A.  To introduce us to some of his players.

        MR. SOLOWIEJCZYK:  Your Honor, at this point the
government would offer Government Exhibit 521A through 521D,
and the associated transcripts, 521AT through 521DT.

        THE COURT:  Any objection?

        MR. HANEY:  No objection.

        MR. MOORE:  No objection.

        THE COURT:  521A through D and the transcripts will be

J4THDaw5                          Sood - Direct

1    received.

2                  (Government's Exhibits 521A through 521D and 521AT

3    through 521DT received in evidence)

4    BY MR. SOLOWIEJCZYK:

5    Q.  So this is an August 31, 2017, meeting between Munish Sood,

6    Jill Bailey, Tony Bland, and Christian Dawkins.

7                  Mr. Sood, before -- and you can publish it to the

8    jury, Ms. Bustillo.

9                  Before we start, who were we looking at on the screen?

10   A.  Tony Bland.

11                 MR. SOLOWIEJCZYK:  All right.  You can begin playing,

12   Ms. Bustillo.

13                 (Video played)

14   Q.  All right.  Mr. Sood, going back to the beginning of that

15   recording, you mentioned at page 1, line 7 and 9, you mentioned

16   meeting Taeshon's dad.  Who was that again?

17   A.  A high school player who had committed to USC.

18   Q.  So then Dawkins talks about at page 2, lines 9 -- starting

19   around line 9, he says, "So one of the things that me and Tony

20   were discussing, I think it's important (unintelligible) this

21   situation (unintelligible) value out here.  So I guess one of

22   the reasons why -- because all of the resources, whatever the

23   case may be, it's as clean as possible," then he went on to

24   say, "It's as clean as possible to go directly who them."

25                 What did you understand Mr. Dawkins to be saying?

1    A.  It's cleaner, more straightforward just going to the

2    parents instead of going to Tony Bland.

3    Q.  Was Tony Bland present at that conversation?

4    A.  Yes.

5    Q.  If you gave money to a family member in the manner that

6    Dawkins described, what was your understanding how, if at all,

7    that would be helpful to Tony Bland?

8    A.  It would help Tony recruit the player.

9    Q.  What if it was a player already on the USC team?

10   A.  He can help them direct that player to us.

11   Q.  When Dawkins said, "It's as clean as possible," did you

12   understand what he meant by the word "clean"?

13   A.  That if the money's cash, it's not going to be able to be

14   tied back to anyone.

15   Q.  But paying directly to the family versus playing through

16   Bland, what's clean about that?

17   A.  That the coach can't get in trouble.

18   Q.  Taking a look at page 2, lines -- starting around line 25

19   and then to the top of page 3, Bland said, "My part of the job

20   can be to get parents and to introduce them to Christian, say,

21   hey, I trust him.  This is -- can vouch for him and even you

22   guys."  What did you understand Bland to be offering to do

23   here?

24   A.  Introduce us and -- to the players' parents.

25   Q.  When you said "vouch for him," what did you understand that

1    to mean?

2    A.  That Tony trusts Christian.

3    Q.  When Bland said at page 3, line 5, "And some guys like

4    Cherry, I can say, this is what you're doing," what did you

5    understand that to mean?

6    A.  That he could direct -- in this case, he can direct Cherry

7    to work with Christian and us.

8    Q.  At page 5, Mr. Sood, looking at line -- around line 18,

9    Bland said, "We have a couple opportunities where you've got us

10   a gold mine over here.  So we've had this opportunity before,

11   but it's not been this clean.  And from a guy that I'm

12   really -- that I trust."

13          I just want to take that statement a piece at a time.

14   When Bland said, "We have a couple of opportunities where

15   you've got us a gold mine over here," did you understand what

16   he meant by gold mine?

17   A.  Potential players.

18   Q.  When Bland said, "We've had this opportunity before, but

19   it's not been this clean," what did you understand that to

20   mean?

21   A.  Access to money.

22   Q.  Bland mentioned having trust.  What did you understand him

23   to mean when he talked about trust?

24   A.  That he trusts Christian.

25          MR. SOLOWIEJCZYK:  Your Honor, this might be a good

J4THDaw5                          Sood - Direct

1   point to break.

2              THE COURT:  Yes, it's almost 2:30.

3              So, ladies and gentlemen, we'll break for the day.

4   Please have a pleasant evening.  Please do not read anything or

5   watch anything you may see in the media about the case.  Please

6   do not discuss the case.

7              We'll get started promptly tomorrow at 9:30.  Have a

8   pleasant night.

9              (Jury excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4THDaw5                          Sood - Direct

1              (Jury not present)

2              THE COURT:  Mr. Sood, you may step down.

3              Everyone be seated.

4              About how much more do you think, Mr. Solowiejczyk?

5              MR. SOLOWIEJCZYK:  Not much at all, your Honor.

6    Probably about ten minutes at most.

7              THE COURT:  Any other issues that the parties wish to

8    raise?

9              MR. MARK:  Last night there was a motion that was

10   filed by defendant Code's counsel related to two witnesses that

11   he intends to call and a request for a ruling on admissibility

12   of certain evidence.  We will file a written response to that.

13   I mean, largely, it looks like most of that testimony that he

14   seeks to admit is plainly hearsay testimony that would be

15   inadmissible, but we'll write specifically on that.

16             In connection with that motion, though, we asked and

17   made a request for 3500 material of the defense for their notes

18   of conversations with those witnesses, largely because it's

19   incredibly important to flesh out what these people are going

20   to testify about, which is not that clear in the motion that

21   was made by defendant Code.  And in responding to that request

22   that we made of Code's counsel, they basically, it seemed to

23   be, implicitly acknowledging that they had rough notes of those

24   conversations, but they thought that they didn't have anything

25   that was 3500 material.  As your Honor knows, in this district

J4THDaw5                         Sood - Direct

1   we don't play too cute with the rules of what 3500 material

2   requires.  We produce our notes, we produce memorandums of our

3   notes, and that's the practice that we follow.

4            In response to that request, defendant Code's counsel

5   said that they thought they didn't need to produce those, and

6   we cited to him a case from the Second Circuit, *U.S. v. Scotti*,

7   that particularly outlines the procedure when it is doubtful or

8   there is a question of whether notes are producible.  And that

9   Second Circuit case, it's 47 F.3d 1237, Second Circuit case

10  from 1995, specifically says that when the notes are subject to

11  discovery and there's a question of whether they're

12  discoverable, a proper procedure is for those notes to be

13  submitted to the trial court for an *in camera* review to

14  determine whether they are discoverable.  And it also states

15  that the Court may, in its discretion, consider extrinsic

16  evidence in deciding whether the notes qualify as a witness

17  statement under 3500.

18           So as we let defendant Code's counsel know, we are

19  specifically requesting your Honor to do an *in camera* review of

20  those notes to determine whether they are producible under the

21  Jencks Act.

22           THE COURT:  Mr. Moore.

23           MR. MOORE:  Yes, your Honor, I find it somewhat

24  interesting that the government takes a position that these

25  documents are producible under the Jencks Act because if you

1    read the Jencks Act, 18 U.S.C. Section 3500, it only deals with

2    the production of materials by the government.  It does not

3    address the production of any materials by any defense attorney

4    for any purpose whatsoever.  It is completely silent as to

5    that.

6              I asked the government if they had any case law on

7    point that dealt with the production by defense counsel of

8    material to the government.  They cited me no such case.  The

9    *Scotti* case that they cited deals with a procedure for the

10   government to produce information *in camera* to a district judge

11   for the purpose of determining if it is 3500 material.  There

12   is no 3500 material that applies to defense counsel.  3500

13   simply does not apply.

14             However, just for the purpose of completeness,

15   Rule 26.2 addresses the production of witness statements, both

16   by the government and the defense.  And Rule 26.2's definition

17   of a statement is a little different than the Jencks Act

18   definition of a statement.  It defines a statement as a written

19   statement that the witness makes, signs, or otherwise adopts or

20   approves -- we do not have that here, I will tell you that as

21   an officer of the court -- a substantially verbatim,

22   contemporaneously recorded recital of the witness' oral

23   statements that is contained in any recording or any

24   transcription of any recording.  The plain language of that

25   Rule says if you record a witness, actually record their

1    statement by means electronically, then you must produce the

2    recording or a stenographic transcription of that recording or

3    the witness' statement to a grand jury, however taken or

4    recorded, or transcription of such a statement.  That,

5    obviously, does not apply here.

6           I don't think --

7           THE COURT:  Does it have to be recorded?  Can it be

8    written?  What if you wrote -- had really good note-taking

9    skills and had substantially verbatim accounts of what those

10   witnesses told you?

11          MR. MOORE:  I don't, but if I were a government

12   attorney, then that clearly would apply for 26.2 -- excuse me,

13   that would apply for the Jencks Act, 18 U.S.C. 3500, which does

14   not apply to us as defense counsel.

15          According to the rule, the rule says -- first of all,

16   we don't have a written statement made by the witness.  Second,

17   we don't have a substantially verbatim contemporaneously

18   recorded statement.  The rule requires that you have a recorded

19   statement, recorded by means of audio or video recording, and

20   then create a transcript.  At least that appears to me to be

21   the plain language of the rule.

22          That's why I asked the government for any case law in

23   support of their rather novel position that the Jencks Act

24   applies to defendants.  They provided me with no such case law.

25   I asked them if they had any case law that related to

J4THDaw5                        Sood - Direct

1    Rule 26.2.  They have provided us with no case law.

2               I will tell you, as an officer of the court, that I

3    didn't take notes of a brief discussion that we had on the

4    phone with Mr. Mowery the other day, and I have not talked to

5    Ms. Tutwiler.  I believe that Mr. Mathias has spoken to

6    Ms. Tutwiler, I do not believe he took any notes.  Mr. Chaney

7    took very brief notes of a conversation that we had with

8    Mr. Mowery on -- excuse me, with Warren Broughton on Sunday,

9    and I don't believe that it's substantially verbatim.  But if

10   your Honor chooses or asks -- if your Honor wants us to produce

11   them *in camera*, then we'll produce them to you *in camera*.

12   Mr. Haley is no longer part of this team.  I understand he may

13   have had discussions with them.  I don't believe he has any

14   notes.

15              MR. MARK:  Your Honor, I assume Mr. Moore is familiar

16   with, since he's cited Rule 26.2, which is obviously on point,

17   the reason we refer to the Jencks Act is the advisory committee

18   notes specifically make reference that Rule 26.2 is designed to

19   place disclosure of prior relevant statements of a defense

20   witness in the possession of the defense on the same legal

21   footing as in the disclosure of prior statements of prosecution

22   witnesses in the hands of the government under the Jencks Act.

23   That's from the advisory committee notes, Rule 26.2 in 1979, a

24   long time ago.

25              So since there clearly are a number of sets of notes,

1    including by current and prior counsel, we so -- including by

2    Haley who is -- counsel Haley, who is also counsel of record,

3    we would think that all of those notes are at least potentially

4    discoverable, and we just request that they be submitted for *in*

5    *camera* review for the Court's determination of whether they are

6    discoverable or not.

7          THE COURT:  OK.  I haven't read the committee notes,

8    but I do know that it's customary for defense lawyers here to

9    turn over 3500 materials when they call witnesses.  But given

10   that case law, Mr. Moore, do I need to look at this stuff, or

11   would you agree that the notes that you have, strictly

12   speaking, are in the nature of 3500 materials and just turn it

13   over to the government?

14         MR. MOORE:  First of all, I don't have Mr. Haley's

15   notes.  Mr. Haley is in South Carolina.  He has not been a

16   party to this case.  And, apparently, Mr. Mark didn't listen to

17   what I said.  I said I do not know if he has notes or not.  I

18   can speak to you *in camera* about why he's no longer a part of

19   the defense team if your Honor wishes me to do that.  I don't

20   want to do that in open court.  I doubt very seriously that he

21   has notes.

22         MR. MARK:  Your Honor, he's still counsel of record

23   for this case.  So to the extent that he has notes, I'm sure he

24   can email them over to your Honor and Mr. Moore.

25         THE COURT:  I think, in an overabundance of caution, I

J4THDaw5                              Sood - Direct

1    have not relieved Mr. Haley from this case, so as far as I'm

2    concerned, he's still counsel of record.  I believed that he

3    would be counsel at this trial.  If he has -- well, I would

4    direct you, Mr. Moore, or one of your team, to contact

5    Mr. Haley and produce to you what notes he may have of

6    conversations with those two witnesses.

7              MR. MOORE:  Could we approach for just one moment so I

8    can speak at sidebar about this?

9              THE COURT:  All lawyers or just --

10             MR. MOORE:  Just the lawyers.

11             (Page 897 SEALED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4THDaw5

1          (At sidebar)

2          MR. MOORE:  I can say this back on the record, I don't

3    agree that what we have is 3500 material, but I'd probably

4    prefer to turn them over to your Honor *in camera*.  It will take

5    you about two minutes to read it, if that.

6          THE COURT:  If I can read it.

7          MR. CHANEY:  About ten seconds.

8          MR. MOORE:  Assuming you can read it.  I think if you

9    look at it, you'll understand why I don't think it's

10   substantially verbatim.

11         THE COURT:  OK.

12         (In open court)

13         MR. MOORE:  I would ask that that sidebar be sealed,

14   your Honor.

15         THE COURT:  Any objection?

16         MR. MARK:  No objection.

17         THE COURT:  OK.  That sidebar will be sealed, subject

18   to any motion by either party to move to unseal.

19         So, Mr. Mark.

20         MR. MARK:  Just one thing.  I think this is not

21   something we can actually resolve right now, but I just want to

22   tee it up for your Honor because it's been a continuous issue,

23   which is the defense request for the testimony of certain FBI

24   agents.  As you know, they made a *Touhy* request.  We told them

25   we were going to file motions *in limine* geared towards most of

J4THDaw5

```
 1    it.  Your Honor issued an in limine ruling precluding the brunt
 2    of that, the requested testimony.  We then asked, in light of
 3    that ruling, if there was any potentially admissible testimony
 4    that the defense wanted to obtain from any of these four FBI
 5    agents that they had subpoenaed, and that was last week.
 6              We just received a response during the trial day today
 7    of what that material that they seek to elicit from those
 8    agents is.  It seems to us to all be inadmissible, so we'll
 9    file a written response to your Honor.  I'm highlighting that
10    mainly because we would, obviously -- if your Honor was
11    considering another way, we'd have to make those witnesses
12    available, but we don't think it's going to come to that,
13    because we really don't think there's any admissible testimony
14    that they have or that they're seeking from these agents.
15              THE COURT:  OK.
16              MR. MOORE:  I would simply say, your Honor, that, as I
17    believe I said, I felt like I needed to preserve my position
18    until I saw what evidence the government presented,
19    particularly through Mr. Blazer.  I believe he ended -- we came
20    very close to ending the day Friday on him, and we have spent a
21    lot of time dealing with other issues this weekend.  But I
22    think that it is interesting, since the government never
23    responded to my February letter and never responded to my March
24    letter, that now they complain that I'm dilatory, but we will
25    address whatever they say.
```

J4THDaw5

1          THE COURT:  I didn't understand Mr. Mark to be

2     complaining that you were dilatory, but --

3          MR. MARK:  No, I was just saying that this issue is

4     now before us at this point in time, and I wanted to give you a

5     heads-up.

6          And as to the responses, we have continually been

7     engaged with and responded to them.  To the extent he has an

8     issue with FBI's procedure, that's an issue with the

9     Administrative Procedure Act and one that he can take up if he

10    thinks that that was not complied with.

11         THE COURT:  Very well.  Unless there's anything more

12    that the parties want to raise now, we can take five minutes

13    and reconnoiter.

14         MR. MOORE:  Yes, sir.

15         THE COURT:  Thank you.

16         (Recess)

17         THE COURT:  Just wanted to touch base quickly on the

18    proposed charges.  Obviously, I'm going to have some

19    boilerplate charges with respect to general requests in the

20    indictment, what is evidence, so forth, and boilerplate charges

21    with respect to duty to deliberate and what is evidence and how

22    to -- how to evaluate the evidence.

23         With respect to the substantive charges here, we have

24    a lot of recent experience here in the Southern District not

25    only with the Gatto case but with a number of New York State

J4THDaw5

public corruption cases, including Valerie -- Judge Caproni's

case in Percoco and Judge Kimba Wood's case in Skelos.  So it

appears as though a lot of this ground has already been plowed.

I note that the government's proposed charges hew pretty

closely to that authority and to Judge Kaplan's instructions in

the Gatto case.

A couple of questions that I had concern the bribery

versus gratuity theory.  I take it the government is going to

be arguing both?

MR. MARK:  That's correct, your Honor, and that's

what's alleged in the indictment.

THE COURT:  With respect to the Travel Act charge, the

government's theory there is that they violated any one of a

number of different state -- do we, strictly speaking, need to

go down that road?

MR. MARK:  I don't think we need to go down the road

of parsing --

MR. SOLOWIEJCZYK:  I'm sorry.  I don't understand the

question.

THE COURT:  There are a number, like a South Carolina

statute, a California statute, I believe various state

statutes.

MR. MARK:  Your Honor, I mean, we laid it out there.

We can probably talk with defense counsel a little bit on that

issue.  They're all basically substantially the same state

J4THDaw5

1    statute.  Obviously, there needs to be reference to a state

2    commercial bribery statute, but given that they're all

3    basically the same, I'm not sure that we need to go down the

4    road of boring the jury with each of the different state

5    statutes.  But maybe we can discuss that with defense counsel

6    and see what their position is.

7              THE COURT:  How many different states actually did you

8    provide?

9              MR. MARK:  There are four different state statutes.

10             THE COURT:  I take it they relate to the schools that

11    we have been actively talking about in this trial?

12             MR. MARK:  That's correct.  They relate to schools --

13    so there were three coaches -- Lamont Evans, Emanuel "Book"

14    Richardson, and Tony Bland -- who taught, amongst them, at four

15    different schools in four different states, so those are the

16    particular state statutes that are cited in that count.

17             THE COURT:  With respect to the -- I take it someone

18    or another is going to want a missing witness charge?

19             MR. MOORE:  Yes, sir.

20             MR. CHANEY:  Yes, Judge.

21             THE COURT:  At this point I intend to use my standard

22    charge which essentially says that mention has been made of

23    various individuals that were not called, and I instruct you

24    that all of those individuals were as available or not

25    available to either side equally.  Is there going to be a

J4THDaw5

1   government summary witness?

2          MR. MARK:  There's a small potential for that, but

3   it's more likely that the government will probably just present

4   the materials just directly to the jury without a witness, but

5   we'll probably determine that tomorrow, your Honor.

6          THE COURT:  So there's no summary chart that you

7   intend to provide?

8          MR. MARK:  No, not at this moment, your Honor.

9          THE COURT:  Are there any false exculpatory statements

10  that either party is going to be pointing to?  Because I have

11  not heard any if that's the case, but I could be wrong.

12         MR. MARK:  At this point in time, I don't believe so

13  from the government.

14         THE COURT:  OK.

15         MR. MOORE:  Your Honor, just if we could go back to

16  the missing witness argument for a moment?

17         THE COURT:  Sure.

18         MR. MOORE:  We would object to that standard charge

19  because I think the facts here are different.  We've subpoenaed

20  witnesses from the FBI.  Those witnesses have not been made

21  available to us for us to interview, to make a proffer to your

22  Honor as to what their testimony would be, etc.  In addition,

23  we have no ability to -- we have no access to the three

24  defendants who pled guilty.

25         THE COURT:  I'm sorry, to the three?

J4THDaw5

1          MR. MOORE:  The three defendants in this case, the

2     three coaches who entered guilty pleas before your Honor.

3          THE COURT:  Yes.

4          MR. MOORE:  All three of them entered guilty pleas.

5     The government has the ability, and as I pointed out last week,

6     if you'll recall, the government asked -- your Honor had

7     scheduled a sentencing for at least one of those individuals to

8     take place prior to this trial.  You had set a time and date

9     for that.  The government, through Mr. Boone, asked your Honor

10     to defer sentencing until after this trial, and so your Honor

11     did.  The government could have let that sentencing go forward,

12     immunize that witness, and made him -- and compelled him to

13     testify in this case by taking away his Fifth Amendment rights.

14     And I know that there's a lot of law on the fact that the

15     defense has no such ability to do it, but that sole authority

16     rests with the government, and I know that it rests with the

17     government.  I exercised it seven or eight times in my 23 years

18     as a federal prosecutor.  It's solely their right to do that.

19     They could have done it.  They chose not to.

20          I think that, given all of those facts, I don't think

21     that the charge that these witnesses are equally available to

22     each party holds any water here.

23          (Continued on next page)

24

25

J4T9DAW6

1          THE COURT:  Mr. Mark.

2          MR. MARK:  Well, first on the FBI agents, as I

3   commented earlier when we were talking about the *Touhy* issues,

4   is that to the extent these witnesses have any admissible

5   evidence, we have noted that we will make them available.  So

6   there is no issue of unavailability.  It's the matter that they

7   just have no relevant testimony.  So that's not a basis for

8   that request.

9          Second, as to a request based on the witnesses who

10  have pled guilty to the exact same crimes of which the

11  defendants are charged with and their supposed desire to have

12  them testify despite, I don't think we're aware of any

13  subpoenas being issued to them, that has no merit.  I don't

14  think they cite to a single case for which they say that

15  because they think that we can compel a witness to testify that

16  then that witness is equally available to both sides.  Of

17  course, as they know, the immunity order is one that's issued

18  by the Court, not by the government, so it's actually the Court

19  that grants immunity or not.

20          THE COURT:  Yes.  But I don't do that sua sponte.  And

21  I do it with a request from the government.

22          And by the way, Mr. Moore, you did it six or seven

23  times.  In 20 years I've not seen it done.

24          MR. MOORE:  I did it six or seven times, in unusual

25  circumstances perhaps.  I did it very early on and in an odd

1    case where a cooperating witness decided he no longer wanted to

2    cooperate right before trial.  So, and that was the first -- my

3    first go around with it.

4            As your Honor correctly notes, it is -- your Honor has

5    no authority to compel -- to issue an immunity order absent a

6    motion from the government.  The government --

7            THE COURT:  Or a motion from the defense.  I mean I

8    have seen that done as well.  But the standard or the -- it's a

9    very high hurdle.

10           MR. MOORE:  The case law that I have seen on defense

11   motions -- I've never seen one granted in any proceeding.  Now

12   I can't say that I've read each and every one of those cases

13   but I've read a number of them.  I've been unable to locate any

14   authority where a district judge has granted a defense request

15   to immunize a witness.  It is some what routinely done,

16   depending on the facts, in cases where the government chooses

17   to immunize a witness.

18           I also noted, for purposes of the record, that the

19   government allowed these witnesses to plead to one count,

20   dismissed other counts without requiring their cooperation as a

21   reward for that.  I think that that is a factor that applies

22   here.

23           THE COURT:  That's consistent with the Department of

24   Justice policy, as I understand it, and the policy of this

25   office.  So you're not required or that the office does not

J4T9DAW6

1    require a defendant to plead to the entire indictment if

2    they're not going to cooperate.

3         MR. MOORE:  I understand, but the government retains

4    the ability to do that.  I have no bargaining power with those

5    witnesses, if you will, your Honor.  They are unavailable to

6    me.  Period.

7         With respect to Mr. Mark telling me that he would make

8    these witnesses available to us, these FBI agents.  I have

9    asked him to make them available to me tomorrow for an

10   interview so I can then make a proffer to your Honor as to

11   exactly what evidence I would seek to elicit from them.

12        THE COURT:  I'm not going to get in the middle of

13   those negotiations.  My role here is to determine, if the

14   government asks me to do so, whether or not the proffered

15   evidence would be relevant to any issue in this case.

16        MR. MOORE:  I'm just trying to take Mr. Mark up on

17   what I thought was his offer to make them available.  He says

18   I'll make them available to you.  I'd like him to make them

19   available to me and we'll see where we go.

20        MR. MARK:  As he full well knew, I said make him

21   available to testify which is what we were talking about.

22        THE COURT:  Let me ask the government this.  How far

23   away are we from you resting?

24        MR. MARK:  We understand there's probably about --

25   obviously, please correct me if I'm wrong, but from talking

J4T9DAW6

1    with defense counsel, maybe about three-and-a-half hours of

2    cross of Mr. Sood.  There's only a little bit of Mr. Sood's

3    testimony that's left on direct.  After that the next witness

4    would be a representative, a senior representative from the

5    University of Southern California.  He is in from out of town.

6    He's been here today.  He will be here tomorrow.  We're hopeful

7    that we can get him off the stand tomorrow so he can go back to

8    L.A.  He'll obviously be here to testify if we need to on

9    Wednesday.  After that, there is a handful of recordings, text

10   messages, and e-mails that we'll introduce.  As we said, we

11   might do it through a summary witness but we might just forego

12   that and just present it directly to the Court.  So we do

13   anticipate that we'll be able to rest on Wednesday.

14              THE COURT:  OK.  Go ahead.

15              MR. MARK:  And just one thing.  I'm just going to lay

16   a marker down.  There was one thing on the jury instructions

17   that I wanted to return to but since I didn't raise it before I

18   don't want to interrupt your Honor's --

19              THE COURT:  Go ahead.

20              MR. MARK:  Which is just that I know you referenced in

21   connection with the bribery charges, and which is charged sort

22   of a couple of substantive ways through the honest services

23   theory of wire fraud as well as through 666, and your Honor

24   referenced some of the cases that this office has brought in

25   connection with public officials and those public corruption.

J4T9DAW6

1    You'll note probably in our request to charge we specifically

2    modeled them off the private honor services fraud cases, that

3    there have also been plenty within this district which have a

4    little bit of difference in them because *McDonald* is a public

5    sector honor services case.  So we just wanted to note that.  I

6    know your Honor was I'm sure quite familiar with that but given

7    your Honor's reference to the *Skelos* and *Silver* case that was

8    the one point, and I think that *McDonald* to the extent that

9    there is any reference from defense about that, the Second

10   Circuit has held doesn't play to the 666 count.  So that's not

11   necessary in that charge.

12             THE COURT:  OK.

13             MR. MOORE:  Your Honor, I can also tell you I also

14   anticipate a Rule 29 motion on obviously all counts but a

15   hopefully fairly strong one on the Travel Act count and we can

16   certainly talk to the government, in case your Honor denies

17   that motion, on a charge.  I will tell you that we -- because

18   I'm sure that one of the things your Honor wants to know is are

19   you -- are we going to have a defense.  And obviously from the

20   motion that was filed last night that we -- defendant Code

21   intends to call two witnesses for sure.  We intend to seek to

22   offer certain calls.  I cannot tell you that my client has made

23   any decision yet as to whether he will or will not testify.

24   But I think that it is likely if the government rests on

25   Wednesday that we might get this case to the jury this week

J4T9DAW6

1    assuming -- but I'm not so sure, that we will get this case to

2    the jury this week if we have the same schedule on Wednesday

3    and Thursday and so I'm just asking your Honor to consider

4    whether we might run a little longer on Wednesday and Thursday

5    with the goal to actually getting it to them on Thursday and

6    letting them begin their deliberations.  That is obviously up

7    to the Court.  I know that your Honor said that at some point

8    you would talk with the jury and ascertain their preferences.

9    I can tell you I would certainly like to get this case to them

10   this week if that is at all possible.

11            THE COURT:  Absolutely.  My agreement with the jury is

12   always if you get here on time I will get you out on time and

13   that seems to work.  I'm happy to suggest to them that we might

14   get them back to their lives sooner than later if we adjust our

15   workday a little bit.  So, for example, I mean I'd like very

16   much -- we'll talk about the length of the summations, but if

17   we can get the summations all in over the course of one day

18   that would be useful.  I mean my guess is that the jury charge

19   will probably be an hour-and-a-half or so or hopefully

20   something short of two hours.  That eats up a lot of time.  I

21   think we'll get them the case this week.  I don't know that

22   we'll have a verdict this week.  I know that one of the jurors

23   has a Wednesday of next week trip planned.  So I'm sort of

24   using that as -- working backwards from there see how much I

25   can push.

1             I want to work as efficiently and as quickly as we

2      can.  And if I have to go back to the jury and fall on the

3      sword and make them work a little longer, I'm happy to do that

4      if I think we can get stuff done.  OK.

5             MR. MOORE:  I will tell you that we will get your

6      Honor a briefing tonight on the catch-all exception of the

7      hearsay rule issue.  I understand the government wants to

8      submit a paper.  We'll submit our own.  And then I understand

9      that the government is going to respond to our motion

10     concerning the two witnesses.  I'm assuming they can go ahead

11     and respond without reading this potential 3500 material.

12     We'll get that information to your Honor as soon as possible.

13            THE COURT:  OK.

14            MR. MOORE:  In camera.

15            THE COURT:  Very well.

16            MR. MOORE:  And I assume that to do that I would

17     simply e-mail like make a copy and e-mail it to the Court and

18     chambers.

19            THE COURT:  Yes.

20            MR. CHANEY:  We could do that.

21            THE COURT:  Or just hand up a hard copy.  I'll be

22     here.

23            MR. CHANEY:  We don't have a hard copy with us, Judge.

24            THE COURT:  OK.  Whatever is easiest for you guys.

25            MR. MOORE:  Yes, sir.  Thank you.

J4T9DAW6

1          THE COURT:  OK.  Have a good night.

2          MR. HANEY:  Thank you, your Honor, you too.

3          THE COURT:  I look forward to the e-mails.

4          (Adjourned to April 30, 2019 at 9 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination  of:                        Page
 3   MUNISH SOOD
 4   Direct By Mr. Solowiejczyk . . . . . . . . . . 766
 5                    GOVERNMENT EXHIBITS
 6   Exhibit No.                             Received
 7    106 and 106T  . . . . . . . . . . . . . . . 767
 8    509B1, B2, B3, B4, 509B1T, B2T, B3T and . . . 819
 9          B4T
10    511B1, 511B2, 511B5, 511B6, 511B7,  . . . . . 855
11          511B1T, 511B2T, 511B5T, 511B6T
12          and 511B7T
13   301 and 301T . . . . . . . . . . . . . . . . 862
14    119 and 119T  . . . . . . . . . . . . . . . 864
15    119 and 119T  . . . . . . . . . . . . . . . 868
16   128 and 128T . . . . . . . . . . . . . . . . 871
17   23 and 23T  . . . . . . . . . . . . . . . . . 872
18   518A through 518D and 518F and 518AT  . . . . 876
19          through 518DT and 518FT
20   104 and 104T  . . . . . . . . . . . . . . . 841
21   106 and 106T  . . . . . . . . . . . . . . . 767
22   142 and 142T  . . . . . . . . . . . . . . . 838
23   144 and 144T  . . . . . . . . . . . . . . . 844
24   203 and 203T  . . . . . . . . . . . . . . . 789
25   506B through 506F and 506BT through 506FT  . 780
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

507 and 507T     . . . . . . . . . . . . . . . 787

521A through 521D and 521AT through 521DT   . 886

623    . . . . . . . . . . . . . . . . . . . 795

655    . . . . . . . . . . . . . . . . . . . 792

658    . . . . . . . . . . . . . . . . . . . 776

659    . . . . . . . . . . . . . . . . . . . 812

1632B    . . . . . . . . . . . . . . . . . . 770

1632A    . . . . . . . . . . . . . . . . . . 814