J4U9DAW1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
               v.                        17 CR 684 (ER)
 4
     CHRISTIAN DAWKINS AND MERL
 5   CODE,
 6               Defendants.
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       April 30, 2019
                                         9:00 a.m.
 9
     Before:
10                    HON. EDGARDO RAMOS
11                                       District Judge
12
                         APPEARANCES
13
     GEOFFREY S. BERMAN
14        United States Attorney for the
          Southern District of New York
15   ROBERT L. BOONE
     NOAH D. SOLOWIEJCZYK
16   ELI J. MARK
          Assistant United States Attorneys
17
     HANEY LAW GROUP PLLC
18        Attorney for Defendant Dawkins
     BY:  STEVEN A. HANEY
19
     CHANEY LEGAL SERVICES, LLC
20   BY:  DAVID A. CHANEY, JR.
                 -and-
21   NEXSEN PRUET, LLC
     BY:  ANDREW A. MATHIAS
22        MARK C. MOORE
          Attorneys for Defendant Code
23
     ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
24   YOLANDA BUSTILLO, Paralegal Specialist USAO
     EMILY GOLDMAN, Paralegal Specialist USAO
25

J4U9DAW1

```
 1              (Jury not present)

 2              THE COURT:  Mr. Boone, do you know where your

 3   colleagues are?

 4              MR. BOONE:  Your Honor, I believe they're en route but

 5   we can begin.

 6              THE COURT:  OK.  So there were a number of filings

 7   that were made yesterday.  One was made ex parte by the defense

 8   concerning certain notes taken I believe by counsel of

 9   potential defense witnesses.  I have reviewed the notes and

10   they are relevant as, for shorthand, we'll refer to it as 3500

11   material.  So the defense should make these materials available

12   if they call the witnesses.  And indicating whose notes they

13   actually are.  And you may make whatever redactions are

14   appropriate if there are notes concerning other witnesses on

15   those documents.

16              MR. CHANEY:  We can do that.  Thank you, Judge.

17              THE COURT:  That takes care of that.

18              MR. MOORE:  I would note just that, obviously, your

19   Honor has not yet ruled on the government's motion to preclude

20   those two witnesses.  So I will assume we'll make that

21   available after ruling, assuming you agree to admit; is that

22   correct?

23              THE COURT:  Correct.

24              And then, as I understand, there are three other

25   motions.  One motion is to preclude the testimony of four FBI
```

J4U9DAW1

agents including the two undercovers in the case.  One motion

on behalf of Mr. Code to play a recorded conversation between

Mr. Dawkins and Mr. D'Angelo, the undercover, dated June 26,

2017.  And one motion concerning the August 8, 2017 tape

recorded conversation between Mr. Sood and Mr. Code which was

discussed at length yesterday.

So let's take them in this order.  Let's do the

defense motion to include the conversation of June 26, 2017

between Mr. Dawkins and Mr. D'Angelo.  So who wants to argue on

behalf of that?

MR. CHANEY:  I can do that, Judge.  So, your Honor, on

June 26 there is a phonecall between Mr. D'Angelo and

Mr. Dawkins.  It's less than a week after the June 20 meeting

in New York City that everyone has heard a great deal of

testimony, recordings about.  That would be the first meeting

between Mr. Code and Mr. D'Angelo.

And on the phonecall Mr. Dawkins is discussing with

Mr. D'Angelo what, if any, money Mr. Code should be paid by

their venture, Loyd Management.  There's also a conversation

about how much money and how regularly Book Richardson would be

paid by the same entity.

Most notably, Mr. D'Angelo is contrasting Mr. Code on

the one hand and Mr. Richardson on the other.  He makes the

statement, "Look, look I guess that -- all I'm saying -- I'm

not looking at like, hey, he's not a coach," meaning talking

J4U9DAW1

about Mr. Code, "he's not a coach and that he doesn't rank.  He

may be worth ten grand per month.  But what I guess in the

conversation we had it was not as direct maybe as if -- it was

pretty direct you but it was not like the Book conversation."

          That statement is a statement that should come in for

the truth of the matter regarding Mr. D'Angelo's interpretation

of his meeting with Mr. Code.  It directly contradicts the

government's other witnesses in this case who have testified

materially that Mr. Code was directing the meeting, that they

left that meeting with the understanding that an agreement had

been reached between Mr. Code and the alleged coconspirators.

          And so to the degree that your Honor has allowed these

other witnesses to testify as to their impression of that

meeting and what agreement, if any, was reached, certainly

Mr. D'Angelo's impression of the same meeting is relevant sort

of is directly relevant as well as relevant to impeach the

testimony of these previous witnesses.

          Even more importantly, Mr. D'Angelo goes on to say,

"Yeah, yeah, that's right.  I guess what I want from Merl,

though, what I want to hear -- and we kind of talked about it

but we never really I think came to a good agreement about --

is that," and then goes on to describe basically the

government's theory of this case with respect to Mr. Code, that

Mr. Code would allow Loyd Management to have access to all

these players and coaches because of his network.  But he's

1     suggesting this as a hypothetical that this is what he wants

2     out of the relationship.  This is a conversation a week after

3     the meeting and it's clear that at that time Mr. D'Angelo does

4     not believe that that's an agreement he has reached with

5     Mr. Code.  And so this is a statement by Mr. D'Angelo and a

6     person who was at the June 20 meeting who was at -- in as good

7     a position as any of the witnesses the government has called to

8     testify to what was or was not agreed upon at that meeting.

9     And this statement is directly relevant to Mr. Code's defense

10    and is exclusively at this point in the possession of the

11    government.

12          The defense's letter motion kind of sets forth two

13    alternatives.  On the one hand, as we've stated from the

14    beginning, we think it would be appropriate for the Court to

15    honor a subpoena of Mr. D'Angelo to compel his testimony here

16    in court and we can simply have him testify to -- he may change

17    his opinion at this point if he's called to the stand but

18    certainly it's the case that as of June 26 he was of the mind

19    that no agreement had been reached with Mr. Code.

20          In the alternative, if the Court does not agree with

21    the defense that it would be appropriate to produce

22    Mr. D'Angelo for testimony, we're asking for the Court to

23    consider the circumstantial guarantees of trustworthiness that

24    are contained in this conversation.

25          Mr. D'Angelo in the role he's playing has no reason

J4U9DAW1

whatsoever to undersell his impression of an agreement with

Mr. Code and every reason to the contrary.  He's trying to

build a case against anybody involved in this alleged

conspiracy.  And so given that that's the circumstance, his

statement that such an agreement had not been reached with

Mr. Code bears those circumstantial guarantees of

trustworthiness and is, therefore, admissible under 807.

We discussed with --

THE COURT:  Can I stop you there for a second.

MR. CHANEY:  Yes.

THE COURT:  Part of the problem that I'm having with

the defense position on this is that Mr. D'Angelo is somehow

some independent agent that doesn't know that he's in the midst

of a sting and that he's affirmatively lying to the people that

he's talking to.  So where is the trustworthiness that I'm

supposed to assert from this.

MR. CHANEY:  Sure.  Even accepting that that's his

position, I don't think it stands to reason that it serves his

interest as an undercover either as a law enforcement agent

moving forward in terms of participating in a prosecution or as

an undercover in terms of perpetuating his relationships with

these people who don't know he's an undercover to make a

statement for or against his impression of an agreement with

Mr. Code.  It doesn't further his undercover role to say to

Mr. Dawkins:  I don't think we have an agreement with Mr. Code.

J4U9DAW1

1    It doesn't directly follow from his role as an undercover that

2    he would misrepresent that particular fact.

3            Certainly, on a number of other issues, the fact that

4    he is sort of definitionly in a position to lie to the people

5    around him would cut against the reliability of his statements.

6    But I think in this particular instance, that reasoning doesn't

7    hold a lot of water.

8            MR. MOORE:  Could I add one point, your Honor?

9            THE COURT:  Sure.

10           MR. MOORE:  To follow up on your Honor's point if your

11   Honor comes down on the point that this is not really -- that

12   it's not the truth, then I think that the Court would have to

13   agree that if the Court considers this as not being offered for

14   the truth of the matter, then it's not hearsay and we should be

15   allowed to play it for its effect on the listener and so the

16   jury can understand that at least at this point this agent is

17   trying to push Mr. Dawkins to get more information from

18   Mr. Code.  And so I think that either way this statement is

19   admissible.

20           It is crucial to the defense case that the jury be

21   allowed to hear this agent, the guy who is running this sting,

22   the guy whose job it is to make sure that there's sufficient

23   evidence of Merl Code's intent is coming back to Mr. Dawkins

24   after that meeting and saying:  I didn't really -- we didn't

25   really reach an agreement here.  And the argument that we

1   haven't made but we will make it if we need to is -- and we

2   looked at some Second Circuit case law last night on the issue

3   of adoptive admissions versus admissions of a party opponent.

4   And I know that there's some case law that I don't really like

5   in the Second Circuit on admissions of a party opponent.

6   However, the Second Circuit does not take that same path with

7   respect to adoptive admissions, an admission that -- is one

8   that the party manifested that is adopted or believed to be

9   true.  And we can get you some law on that.

10          Again, your Honor, if your Honor concludes that this

11  is not being offered for the truth, and I think that's one of

12  the reasons why your Honor overruled a number of our objections

13  to Mr. D'Angelo's comments on the wire, because your Honor's

14  point was that he is an undercover and so, therefore, nothing

15  that he says is being offered for the truth of the matter

16  asserted, then the government has no hearsay objection to the

17  admission of that tape.

18          MR. MARK:  Your Honor, we're at a little bit of a

19  disadvantage because nobody on the government's side has seen

20  this letter motion.  We haven't reviewed it.  I don't know

21  how -- I didn't see it on ECF.

22          MR. MOORE:  We didn't file it on ECF but we e-mailed

23  it to the government.

24          MR. MARK:  We didn't receive a copy of it.  I'm not

25  saying that you didn't attempt to.  I'm just saying everybody

J4U9DAW1

on the government's side hasn't received it, hasn't reviewed

it.

I'm going to go a little bit off the cuff but to the

extent your Honor isn't our way, I would ask a little latitude

to just return --

MR. MOORE:  Could I make one quick point?

MR. MARK:  Yes.

MR. MOORE:  We didn't file it on ECF because it

contains a recitation of the wire call and I thought that we

could not do that; that's in the protective order.  So we are

moving to file these two letter motions under seal as the

government has done in other instances.

MR. MARK:  I'm not -- I'm just informing that we just

hadn't -- we also looked at each other and we had -- they've

been good about giving everything to us and I wasn't inferring

that they intended to file something with the Court without

giving it to us.  I just wanted to say that in my comments I'm

a little bit off the cuff here because we haven't reviewed this

and I know your Honor has.

My first impression is that it's a little surprising

since yesterday morning we came into court with a limiting

instruction, particularly that the defense wanted, which was

that you really can't take any of the undercover statements for

their truth and they got the limiting instruction that they

wanted and now today they were coming in and they're saying

J4U9DAW1

1   well we really want the undercover's statements in and these

2   are clearly for the truth of his own understanding.  So, I

3   think that in and of itself sort of shows the -- the sort of

4   fallacy of the defendants' argument.

5         We addressed this a bit in our letter on why Jeff

6   D'Angelo's testimony that they seek shouldn't come in.  And so

7   I feel comfortable dealing with some of it.

8         First is to the extent that they're looking at the

9   state of mind of a law enforcement agent, that's just not

10  relevant here.  He's not a member of the conspiracy.  As your

11  Honor has well recognized, he was playing a role here and he

12  has many reasons to say what he has to say.  But whether

13  there's a conspiracy entered into is not material because he

14  cannot be a party to the conspiracy.

15        To the fact that they are looking at his past or his

16  understanding of a prior conversation and saying that this is

17  somehow relevant, what they're trying to do is get out from him

18  the ultimate issue in the case.  And the ultimate issue here is

19  whether Mr. Code entered into an agreement with other

20  individuals.  That's an issue for the jury to decide, for the

21  jury to assess.  They've seen the recorded conversation that

22  Jeff D'Angelo has participated in.  His ultimate view, as a law

23  enforcement agent, as not a member of the conspiracy, and as

24  your Honor noted somebody who has reasons to not necessarily

25  accurately recollect or relay that recorded conversation with

J4U9DAW1

1   other people he's investigated isn't material and sort of is

2   attempting to displace the jury's role onto this one recorded

3   call.

4           So for those reasons we think that this statement is

5   not admissible, your Honor.

6           MR. CHANEY:  Your Honor, just on those two points by

7   Mr. Mark.  And I did look back at our e-mail.  We were last

8   night filing a number of letters with the Court, some of which

9   were just to the Court, some of which were to everyone, and it

10  does look like we failed to include the government on that

11  particular letter motion and that's our fault.  We apologize

12  for that.

13          To the degree that this is testimony or would be

14  testimony of an ultimate issue for the jury, we sat through

15  about four days of Mr. Blazer opining over and over and over

16  again about what his opinion was of what happened in the room,

17  what other individuals that aren't Mr. Blazer meant or did not

18  mean by certain comments and statements.  This is precisely the

19  same line of questioning that Mr. D'Angelo would be engaging in

20  in this particular situation.  He was a firsthand observer of

21  the both statements and demeanor of all of the participants in

22  the June 20 meeting.  And it is relevant for this jury to hear

23  his opinion, his interpretation of what happened insofar as the

24  government has produced witnesses that were allowed to do the

25  same.

J4U9DAW1

1          Mr. Blazer opined over and over and over again about
2     what his understanding was of what happened in that room.  He
3     was allowed to make quite attenuated inferences based on what
4     he actually observed, including what Mr. Code was being paid
5     for, what the agreement was moving forward, and he was allowed
6     to do so only based on his observations in the room.  To the
7     degree that Mr. D'Angelo made those same observations and came
8     up with an alternate and, in fact, completely contradictory
9     conclusion is directly relevant and admissible on the same vein
10    of relevance that the government's witnesses have testified
11    within for the last week.  So I don't think that it makes sense
12    for the government to take one position with respect to their
13    witnesses and then exactly the opposite position with respect
14    to this one.
15          To the degree that Mr. D'Angelo's state of mind is not
16    relevant because he's not a coconspirator, not a true
17    coconspirator, we're not seeking to introduce his statements
18    insofar as his role in the conspiracy is relevant in this case.
19    He -- it's true that his role insofar as he is not a
20    conspirator is not an issue.  There is a distinct question from
21    whether or not he believed Mr. Code had, in fact, entered into
22    an agreement in this case.  He is in a better position to
23    interpret that evidence than the jury is because he was, in
24    fact, in the room which is the point that the government made
25    with respect to Mr. Blazer and, I assume, will make with

J4U9DAW1

1    respect to Mr. Code or Mr. Sood.

2              MR. MOORE:  I would like to supplement by that by just

3    two points.

4              The government did make that point with Mr. Blazer.

5              THE COURT:  They?

6              MR. MOORE:  The government made that point with

7    Mr. Blazer.  They made it with Mr. Sood.  Your Honor, over our

8    objection, allowed the government to have Mr. Blazer and

9    Mr. Sood give their interpretation of cryptic comments and

10   attribute -- and attribute their interpretation to Mr. Code, a

11   man that they both met that very day.  And so I believe to the

12   extent that the government was allowed to do that they've

13   opened the door to this because they made a decision to ask

14   their trained seals to regurgitate a view that was consistent

15   with theirs.

16             Excuse my hyperbole, your Honor.  But I do note that

17   the interpretations of Mr. Sood and Mr. Blazer were eerily

18   similar.  That's an argument for a jury.  I understand that.

19             However, when the government does that and they choose

20   to do that, they chose not to call Mr. D'Angelo and do that

21   with Mr. D'Angelo.  And I know that they have their reasons.

22   OK.  They chose to do it with these two cooperators.  But when

23   they do that, they open the door to the admissibility of

24   Mr. D'Angelo, the trained law enforcement person in the room

25   whose job it is to try to get these supposed admissions out of

J4U9DAW1

1    Mr. Code.  They opened the door to allow a statement like this

2    in, we believe.

3          MR. MARK:  Your Honor, clearly what they're trying to

4    do is to get in what they perceive is Jeff D'Angelo's opinion

5    about what Mr. Code was thinking.  That is expressly what your

6    Honor told us that we were not to get out of our witnesses, nor

7    did any of the witnesses opine on what Mr. Code's state of mind

8    is.  They opined about what their firsthand perceptions were of

9    particular statements that he made.  That was completely

10   permissible and a far cry from what they're trying to do here

11   which is a past-looking, a rear-looking recollection of prior

12   conversation which the jury has seen now, recorded.  And

13   they've seen -- and they've made their own assessments of.  And

14   he was making that recollection within the context of playing a

15   role as your Honor noted.  So there isn't any reason to think

16   that that's particularly reliable and I don't think what

17   they've said moves the needle at all.

18         THE COURT:  Mr. Chaney, were you going to stand up?

19         MR. CHANEY:  I just wanted to make sure that we're

20   including -- that we're clear that our position is -- we want

21   to put him on the stand, not simply just introduce this

22   recording.  And so to the degree that the government disagrees

23   that Mr. D'Angelo's position is, in fact, that there is no

24   agreement reached, then they would be able to ask him questions

25   and make that point to the jury.

J4U9DAW1

1          MR. MOORE:  But if your Honor disagrees with us on

2     putting him on the stand, OK, because that's the ultimate push

3     here, then we would seek in the alternative to play this call.

4          THE COURT:  OK.  Well here is where I come down.  Even

5     if Mr. D'Angelo would take the stand I don't think he would be

6     allowed or I would allow him to testify as to whether or not

7     Mr. D'Angelo believed that an agreement had been reached.

8     Obviously, I think to my mind the reason that the defense wants

9     to put in this call is for the truth of the matter asserted.  I

10    think that you're overreading the transcript to a certain

11    extent because he doesn't say that there was no agreement

12    reached.  He says that there was an agreement reached but it's

13    not as clear as it could have been and there are any number of

14    investigative reasons why Mr. D'Angelo would have said that or

15    would have been directed to say that or the investigative team

16    would have agreed that he would say that because they are very

17    clearly contrasting Mr. Richardson's meeting which is, as I

18    recall, was much more open, much more direct, much more from an

19    investigative standpoint strong evidence, to Mr. Code's meeting

20    which was, according to Mr. D'Angelo on the tape, not as clear

21    and, therefore, they wanted more clear evidence, not that there

22    wasn't evidence.

23          So, to the extent that you believe that to be

24    exculpatory I do think that you are overreading it.  Obviously

25    because Mr. D'Angelo was an FBI agent in an undercover capacity

J4U9DAW1

1    nothing that he says can be admitted for the truth of the

2    matter asserted and if it's not admitted for the truth of the

3    matter asserted then to my view it's irrelevant and for those

4    reasons I will not allow you to play the tape.

5          MR. MOORE:  Your Honor, depending on what we do in the

6    defense case, for example, we may seek to revisit this ruling

7    with another argument but we'll save that for later.

8          THE COURT:  Absolutely.  A lot of things can happen

9    during the course of the trial that can cause me to revisit any

10   of these evidentiary rulings.

11         MR. CHANEY:  The other issue, Judge, is that

12   Mr. Blazer did testify on cross-examination that the

13   conversation on June 20 with Mr. Code was, in fact, direct and

14   as direct as conversations with any of the alleged

15   coconspirators and so Mr. D'Angelo's testimony that it was not,

16   in fact, direct would be to impeach that assertion by one of

17   the government witnesses.

18         THE COURT:  Again, I don't remember Mr. Blazer

19   testifying to that effect but, again, I don't think that

20   Mr. D'Angelo's testimony in an undercover capacity would be

21   evidence that would rebut that testimony even if that were the

22   testimony of Mr. Blazer.

23         OK.  We've got five minutes so let's at least begin

24   the conversation concerning the four undercovers or the four

25   FBI agents.  We've talked about this before.

J4U9DAW1

1           As the government notes, the two areas of questioning

2      that the defense identifies as being relevant are the agents'

3      interactions with Mr. Blazer during the investigation, I guess

4      their handling of Mr. Blazer and details about the evidence

5      presented to the grand jury.

6           As a general matter, those things are generally

7      irrelevant but let's talk about the first.  What is it about

8      the handling of Mr. Blazer that you believe merits direct

9      testimony in this case?

10           MR. MOORE:  Your Honor, I believe that what is

11      relevant here is the directions that Mr. Blazer received from

12      either Mr. Vourderis who is the case agent, Mr. Carpenter who,

13      as I understand until some incidents in Las Vegas, and I'll

14      just leave it at that, was the cocase agent, as I understand it

15      based on the government's pleading.  And the undercover,

16      Mr. D'Angelo, their instructions to Mr. Blazer, their telling

17      Mr. Blazer what they wanted him to do, I believe that is

18      relevant and I believe that is admissible testimony.  I believe

19      this jury should hear what instructions they gave to

20      Mr. Blazer, their star witness.

21           THE COURT:  Mr. Mark.

22           MR. MARK:  First, I mean I don't think he actually

23      offered any relevance for it other than he wants it which

24      doesn't sort of meet the 401 threshold.  But to the extent that

25      they argued that this has any relevance to it, your Honor

J4U9DAW1

1    actually permitted cross-examination of Mr. Blazer on this

2    exact matter.  So there is no need for them to call an FBI

3    agent to testify on this.  Your Honor allowed latitude on that

4    and they got out the points that they wanted to get out there.

5    Whether they're relevant at all, I mean we would suggest that

6    they're not but there's just no need and there is no proffered

7    relevance here for that testimony.

8              THE COURT:  I agree with the government.  I don't

9    think it's relevant.  Mr. Blazer was cross-examined vigorously

10   with respect to his role as an undercover in addition to a

11   number of other aspects of his background and his criminal past

12   and so to that extent any additional testimony along those

13   lines would be cumulative so I'm not going to allow it on that

14   basis.

15             Talk to me about the grand jury, Mr. Moore.

16             MR. MOORE:  The grand jury argument is not a great

17   argument and I'm just going to abandon it at this point frankly

18   because I don't want to waste your time or mine.

19             But the point that I do want to make at this point is,

20   your Honor, your Honor has ruled -- first of all, the

21   government could have called Mr. D'Angelo and could have asked

22   him any number of questions that I'm sure the Court and I would

23   have agreed were relevant.  We have been denied the opportunity

24   to meet with Mr. D'Angelo, whatever his real name is, to put

25   him before the jury and argue specific points of relevance to

J4U9DAW1

1    the Court.  And so I understand that the Court is denying our

2    motion but in denying that motion I believe that the Court is

3    denying us access to Mr. D'Angelo and so I'm going to object

4    again at the appropriate time to this argument that somehow

5    Mr. D'Angelo was equally available to me as he is to the

6    government because that's simply, I believe -- generally it's

7    difficult, OK.  But under the specific facts of this case when

8    I've written multiple *Touhy* letters, I've gotten no meaningful

9    response, your Honor has denied our request to call him as a

10   witness.  He's not equally available to me.

11             THE COURT:  Can I ask a question?  And I don't know

12   the answer to this.  Was every conversation that Mr. D'Angelo

13   had with either Mr. Dawkins or Mr. Code recorded?

14             MR. MOORE:  I don't know the answer to that, Judge.

15             MR. MARK:  So from just a quick inquiry from the case

16   agent what our understanding is they were.  Obviously we

17   weren't there so I mean -- but our understanding is that all of

18   the conversations were -- that Jeff D'Angelo took part in were

19   recorded and they were turned over.  And we haven't heard any

20   suggestion by any of the defense lawyers that there was a

21   conversation that was not recorded that they wanted to put into

22   evidence.

23             MR. MOORE:  What we don't know is if he had

24   substantive conversations with Mr. Sood which were not

25   recorded.

J4U9DAW1

1          The problem is when you have a witness like

2     Mr. D'Angelo who has, I'll politely refer to them as

3     credibility problems, I don't know that we can ever be

4     confident that we have a full answer to that question.

5          MR. MARK:  I'll just note I mean there was a

6     consensual T3 wiretap on both of the undercovers' phones and

7     the meetings were recorded so we have no reason to think that

8     everything wasn't recorded here.  I just hedged.  Obviously, I

9     was just trying to be a careful advocate before your Honor.

10          THE COURT:  There's been no suggestion that there were

11     meetings or calls that were not recorded.  And so to that

12     extent, anything that the government is relying on Mr. -- on

13     the -- D'Angelo for, is before the jury.  And to the extent

14     there were substantive conversations either with Mr. Blazer or

15     Mr. Sood that were not recorded, you're free to cross-examine

16     on that.

17          MR. MOORE:  I understand, your Honor.  But at the same

18     time your Honor is not allowing us to put before the jury this

19     comment by Mr. D'Angelo to Mr. Dawkins, one of the alleged

20     coconspirators.  And, obviously, there's a reason, as your

21     Honor noted, why Mr. D'Angelo would have that discussion with

22     Mr. Dawkins.  I'm sure he wanted Mr. Dawkins to go out and

23     prompt Mr. Code to say a little more incriminating stuff on

24     another call and that didn't happen, we believe.

25          And so, again, I believe that this call -- I believe

J4U9DAW1

1     that at the very least the door has been opened to it and

2     denying us the opportunity to present either Mr. D'Angelo or

3     the call, then should -- first of all, I respectfully disagree

4     with that ruling but I accept it, obviously.  But then to

5     bootstrap that into a jury instruction that Mr. D'Angelo is

6     equally available to the defense as he is to the government, I

7     believe that's just wrong under the facts of this case.

8          THE COURT:  It's 9:30.  As of 30 seconds ago we were

9     awaiting two jurors.

10          MR. CHANEY:  Your Honor, it make sense if we are still

11     waiting for jurors to address the 8-8 call, the August 8 call

12     with Mr. Code and Mr. Sood as Mr. Sood is still on the witness

13     stand.

14          THE COURT:  OK.

15          MR. CHANEY:  I think there was some issue yesterday

16     with the sort of scope of what the Court and opposing counsel

17     understood Mr. Code to be wanting to introduce in terms of the

18     substance of his phonecall with Mr. Sood.  And that's the

19     reason why we tried to include the entire transcript when we

20     filed this -- when we submitted it via e-mail last night.

21          If the Court had an opportunity to review the

22     phonecall, Mr. Code is discussing contemporaneously his opinion

23     of "You can't throw money at a problem."

24          Mr. Code is discussing an issue he had with Seth

25     Cohen, a mutual acquaintance of Mr. Sood and Mr. Code's, and

J4U9DAW1

1   saying that Mr. Cohen is a problem, he's not going about it the

2   right way, you can't throw money at a problem and expect to fix

3   everything, just generally on the ideas of money can't buy

4   loyalty.

5           And to illustrate that point he says, he goes into the

6   comment that was excerpted in the government's motion in

7   opposition that, "I told Christian and Jeff no, no, no don't

8   pay my guys."

9           Now it's true that that precise statement is looking,

10  it's recounting a prior conversation.  And I think there are

11  two alternative ways that the defense is proposing the Court to

12  deal with that.  On the one hand --

13          THE COURT:  I'm sorry.  I'm going to have to stop you.

14  The jury is here.  I don't want to keep them waiting.

15          MR. CHANEY:  I understand.

16          THE COURT:  Can we get Mr. Sood in.

17          (Continued on next page)

18

19

20

21

22

23

24

25

J4U9DAW1                          Sood - Direct

1              (Jury present)

2    MUNISH SOOD,

3              MUNISH SOOD, resumed.

4              THE COURT:  Everyone please be seated.

5              Good morning ladies and gentlemen, I trust you had a

6    pleasant evening.  Thank you, as always, for being prompt.  We

7    will now continue with the direct examination of Mr. Sood.

8    DIRECT EXAMINATION

9    BY MR. SOLOWIEJCZYK:

10   Q.  Mr. Sood, I want to take a step back for a moment and ask

11   you about a slightly different topic that we were discussing

12   yesterday afternoon.

13             During the time period beginning in the summer of 2017

14   did you begin to have contact with Merl Code on a periodic

15   basis?

16   A.  Yes.

17   Q.  Was that contact at times separate and apart from Christian

18   Dawkins?

19   A.  Yes.

20   Q.  Mr. Sood, does there come a point when you entered into a

21   separate arrangement with Mr. Code?

22   A.  Yes.

23   Q.  And I would direct your attention to what's been marked for

24   identification as Government Exhibit 641.

25             Do you recognize that document?

J4U9DAW1                        Sood - Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   It's a consulting agreement between one of my entities

4    called Princeton Advisory Wealth Management and Merl Code's

5    entity named Parkwest Energy.

6              MR. SOLOWIEJCZYK:  Your Honor, at this time the

7    government would offer Government Exhibit 641.

8              MR. HANEY:  No objection.

9              THE COURT:  641 will be received.

10             (Government's Exhibit 641 received in evidence)

11   principles Princeton Advisory Wealth Management.

12   Q.   Mr. Sood, who is this agreement addressed to?

13   A.   To Parkwest Energy and Merl Code.

14   Q.   What did you know about Parkwest Energy, if anything?

15   A.   That it was one of his LLCs.

16   Q.   Mr. Sood, what was the purpose of this letter that you sent

17   to Merl Code?

18   A.   That if Merl had introduced us successfully to professional

19   athletes we would provide him with a consulting fee.

20   Q.   When you say "we," who do you mean?

21   A.   Princeton Advisory.

22   Q.   Was this agreement separate from Loyd -- from your

23   investment in Loyd, Inc.?

24   A.   Yes.

25   Q.   Did you ever end up paying Mr. Sood -- sorry, Mr. Code, any

1   fees under the agreement?

2   A.   No.

3   Q.   How was it going to work?  Would you get a percentage?

4   A.   Yeah.  For example, if we generated ten thousand dollars in

5   fees annually, he would get a portion of that.

6   Q.   And this is for professional athletes?

7   A.   That's correct.

8   Q.   So, putting that to the side, Mr. Sood, I think where we

9   left off we were discussing a meeting in late August of 2017

10  with Tony Bland.

11  A.   Yes.

12  Q.   So, we're going to turn now to Government Exhibit 521B

13  which is another excerpt of that meeting.

14          MR. SOLOWIEJCZYK:  You can go ahead, Ms. Bustillo.

15  Thank you.

16          (Video played)

17  Q.   Mr. Sood at the end of that recording you said, "All we

18  need is someone like yourself, one or two kids a year."

19          What did you mean by that?

20  A.   That if Tony Bland, Coach Bland was working with us that

21  we'd love to see one to two referrals from him going forward.

22  Q.   And on an annual basis?

23  A.   Yes.

24          MR. SOLOWIEJCZYK:  If we could go to Government

25  Exhibit 521C, Ms. Bustillo.

1              (Audio played)

2     Q.   Mr. Sood, we're going to now turn to 521D.

3              (Video played)

4     Q.   Mr. Sood, during the portion of the recording we just

5     listened to what were you generally discussing with Coach

6     Bland?

7     A.   The players he's currently working with and his player

8     coming next year.

9     Q.   What was he generally telling you about the quality of the

10    players on his team?

11    A.   They were considered first-round picks.

12    Q.   There was a mention at page one of a player named

13    De'Anthony Melton.  Who was that?

14    A.   He was a current player on the team.

15    Q.   And what were Dawkins and Bland generally saying about

16    Melton's abilities?

17    A.   He's been playing really well.

18    Q.   During your trip to California did you meet with anybody

19    associated with De'Anthony Melton?

20    A.   Met with his uncle.

21    Q.   What was your understanding of who set up that meeting?

22    A.   Christian.

23    Q.   Did you think Tony Bland had anything to do with it?

24    A.   Yes.

25    Q.   Were you able to stay for the entirety of that meeting?

J4U9DAW1                        Sood - Cross

1    A.  No.

2    Q.  What happened?

3    A.  I had to drop Jill Bailey off at the airport.

4    Q.  So were you present for just the beginning of the meeting?

5    A.  Yeah.  For that few minutes.

6    Q.  And then after that did you leave California?

7    A.  Yes.

8            MR. SOLOWIEJCZYK:  One moment, your Honor.

9            (Counsel confer)

10           MR. SOLOWIEJCZYK:  Nothing further, your Honor.

11           THE COURT:  Cross-examination.

12           MR. HANEY:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. HANEY:

15   Q.  Mr. Sood, as we've seen from your testimony here today you

16   do understand you're here to testify against your former

17   business partner Christian Dawkins; is that correct?

18   A.  Yes.

19   Q.  Let's start with the jury getting to know a little bit

20   about your professional experience and how you met my client,

21   Christian Dawkins.

22           Now, isn't it true that prior to today on occasion

23   that you have met several times with the U.S. Attorney's

24   Office?

25   A.  Yes.

J4U9DAW1                              Sood - Cross

1   Q.  And that would include meeting with the prosecutors in this

2   courtroom; is that correct?

3   A.  Yes.

4   Q.  And you also were interviewed on numerous occasions by the

5   FBI; is that correct?

6   A.  Yes.

7   Q.  And those interviews included conversation about your

8   personal and business relationship with Christian Dawkins.  Is

9   that a fair statement?

10  A.  Yes.

11  Q.  And those interviews included conversations regarding your

12  involvement with a sports agency that was started in 2017 named

13  Loyd, Inc.  Is that right?

14  A.  Yes.

15  Q.  It was also referred to as Loyd Management on occasion; is

16  that correct?

17  A.  Correct.

18  Q.  And you've testified that your role in Loyd Management was

19  going to be that of a certified financial planner; is that

20  correct?

21  A.  Correct.

22  Q.  For respective NBA clients primarily?

23  A.  To start with, that's correct.

24  Q.  And perhaps branching off into other professional athletes

25  like football, correct?

J4U9DAW1                          Sood - Cross

1    A.  Correct.

2    Q.  But it's fair to say the real target of your future clients

3    were NBA players; is that right?

4    A.  Yes.

5    Q.  And during those interviews you had with both the

6    government and the FBI you stated that you learned this

7    business of basketball from Christian Dawkins.  Is that a fair

8    statement?

9    A.  Correct.

10   Q.  Now, you've testified that when you first became involved

11   or knew Christian Dawkins he was working at a sports agency

12   called ASM; is that right?

13   A.  Correct.

14   Q.  Would you agree with me that when you first met Christian

15   Dawkins you would have been at least twice his age?

16   A.  Yes.

17   Q.  How old are you now?

18   A.  46.

19   Q.  And you're aware that when you first met Christian Dawkins,

20   not to ask you his exact age, but he was in his early 20s.  Is

21   that fair to say?

22   A.  Yes.

23   Q.  Isn't it true that on occasion, including an occasion we

24   actually heard on a recording in this courtroom, that when you

25   first met Christian Dawkins you referred to him as a kid,

J4U9DAW1                          Sood - Cross

1    correct?

2    A.  Yes.

3    Q.  Well let's talk about whether it's likely that you learned

4    the business of basketball from Christian Dawkins, Mr. Sood.

5          Now you have a business degree, as you've testified,

6    in finance and accounting, correct?

7    A.  Correct.

8    Q.  And you were earned that finance degree, as you noted, from

9    Rider University; is that correct?

10   A.  Yes.

11   Q.  And based on your testimony I believe from last Friday you

12   stated that at one point in your career at least you were

13   registered with the SEC; is that right?

14   A.  Correct.

15   Q.  And you understand the SEC to be the Securities and

16   Exchange Commission; is that correct?

17   A.  Correct.

18   Q.  And that would be an entity that regulates those engaged in

19   the buying and selling of securities.  Is that a fair

20   statement?

21   A.  Yes.

22   Q.  And you also testified on Friday that you held a Series 7,

23   63, and a 24 license to engage in trading securities; is that

24   correct?

25   A.  Correct.

J4U9DAW1                          Sood - Cross

1   Q.  And you also testified you were the sole owner of a company

2   called the Princeton Advisory Group; is that right?

3   A.  Yes.

4   Q.  And when did you form that company, the Princeton Advisory

5   Group?

6   A.  2002.

7   Q.  And would you agree with me that you have said previously

8   that the Princeton Advisory Group offered financial planning

9   advice for high net worth individuals?  Is that a fair

10  statement?

11  A.  Correct.

12  Q.  And that company also was registered with the SEC; is that

13  right?

14  A.  Yes.

15  Q.  And you, in fact, are registered as a adviser with the SEC.

16  Fair statement?

17  A.  Correct.

18  Q.  And then correct me if I'm wrong, any of these dates.  From

19  January 1999 to April 2001, approximately, you were the senior

20  portfolio manager at a company called Global Value Investors.

21  Is that a fair statement?

22  A.  Yes.

23  Q.  And prior to that you were a senior analyst trader at Penn

24  Capital Management; is that right?

25  A.  Correct.

J4U9DAW1                         Sood - Cross

1   Q.  And what was a senior analyst trader?

2   A.  Responsible for managing -- helping manage a bond

3   portfolio.

4   Q.  And you also held what was called a chartered financial

5   analyst designation; is that right?

6   A.  Yes.

7   Q.  And what is a CFA?

8   A.  Again, similar to the Series 7.  It's an independent

9   designation for trading -- for managing portfolios.

10  Q.  In fact, at one point you were one of the eight founders of

11  what was called the First Choice Bank in Lawrenceville,

12  New Jersey, correct?

13  A.  Correct.

14  Q.  And that was a community bank that had assets over

15  $1.1 billion before it was sold to Berkshire Bank, correct?

16  A.  Correct.

17  Q.  In fact, from the dates of 2007 through December of 2016,

18  for nine years, you were the chairman of the board on that

19  bank, weren't you?

20  A.  Yes.

21  Q.  How much did you make from the sale of that bank to

22  Berkshire Bank?

23  A.  All the shareholders, I think it came out to almost 1.7

24  times their investments.

25  Q.  I asked you how much you made from the sale of that

J4U9DAW1                          Sood - Cross

1    $1.1 billion bank.

2              MR. SOLOWIEJCZYK:  Your Honor, objection.  Relevance.

3              THE COURT:  Sustained.

4    Q.  Now your financial planning company, the Princeton Advisory

5    Group, actually managed in excess of over two to three billion

6    dollars in assets, didn't it?

7    A.  We did.

8    Q.  And you expect the jury to believe you learned any business

9    from a 20-year-old kid?

10   A.  Christian was very integral in me to understand how

11   basketball worked and how the recruiting process worked.  So,

12   yes.

13   Q.  So, you've noted you've pled guilty to multiple felony

14   crimes involving being a dishonest person.  Is that a fair

15   statement for me to make?

16   A.  Yes.

17   Q.  Including crimes like bribery, right?

18   A.  Yes.

19   Q.  And wire fraud?

20   A.  Yes.

21   Q.  But despite your admitted criminality, your company,

22   Princeton Advisory Group, it still operates, doesn't it?

23   A.  Yes.

24   Q.  You are still the CEO of that company, aren't you?

25   A.  Yes.

J4U9DAW1                          Sood - Cross

1    Q.  But you are a convicted felon, aren't you, Mr. Sood?

2    A.  Yes.

3    Q.  You pled guilty to felony crimes like wire fraud and

4    bribery, correct?

5    A.  Correct.

6    Q.  But you're still making money in the financial planning

7    industry, aren't you?

8    A.  Trying to.

9    Q.  You're still allowed to operate as a financial planner,

10   right, making a living managing people's money, aren't you,

11   Mr. Sood?

12   A.  As of right now, yes.

13   Q.  And the reason -- because you are cooperating with the

14   government to assist them in convicting my client; isn't that

15   right?

16   A.  I just cooperated because I made mistakes and just taking

17   responsibility for my actions.

18   Q.  Well let me ask you this question.  If you weren't

19   cooperating against my client, you wouldn't be still working in

20   the financial planning industry, would you?

21   A.  I don't know that.

22   Q.  What do you think?

23   A.  Don't know.

24   Q.  That must have been a really good deal you got from the

25   government, wasn't it, Mr. Sood?

J4U9DAW1                        Sood - Cross

1   A.  I got no deal from the government.

2   Q.  Correct me if I'm wrong but back around 2011, 2012, at that

3   point you recognized the value of providing financial advice to

4   professional athletes.  Is that a fair statement?

5   A.  I saw an opportunity.

6   Q.  And you'd agree that generally speaking professional

7   athletes are wealthy, correct?

8   A.  Most of them, yes.

9   Q.  And managing wealthy people's money is good for a financial

10  planner, would you agree?

11  A.  Correct.

12  Q.  And as you noted your company, Princeton Advisory Group,

13  that's what they did.  They managed wealthy people's money,

14  right?

15  A.  Yes.

16  Q.  So would you agree that your recognition of the value of

17  managing pro athletes occurred long before you ever met my

18  client, Christian Dawkins, right?

19  A.  On the football front, yes.

20  Q.  That is not what I asked you.

21          You met Christian Dawkins in 2016, correct?

22  A.  Correct.

23  Q.  And back in 2011 you recognized the opportunity of managing

24  professional athletes' money, yes or no?

25  A.  Yes.

J4U9DAW1                              Sood - Cross

1    Q.  In fact, you became involved with managing professional

2    athletes when in 2011 you met a guy named Marty Blazer; is that

3    correct?

4    A.  Correct.

5    Q.  And you testified that around that time in 2011 you and

6    Marty Blazer started a company together called Princeton

7    Blazer; is that right?

8    A.  Yes.

9    Q.  And correct me if I'm wrong but you testified that you and

10   Marty Blazer were in business for approximately two years; is

11   that correct?

12   A.  Correct.

13   Q.  And then in 2013 you stopped working with Marty Blazer when

14   you learned through an SEC audit that Marty Blazer was stealing

15   money, right?

16   A.  Yes.

17   Q.  And then you severed your business relationship with Marty

18   Blazer because you learned he was a thief?  Was that your

19   testimony?

20   A.  Yes.

21   Q.  But then a couple of years later you reconnected with Marty

22   Blazer when he told you he wanted to get involved in the

23   basketball business?

24   A.  Yes.

25   Q.  And then despite knowing that two years earlier he was

1   stealing millions of dollars from his clients, you decided to

2   get back in business with Marty Blazer again, didn't you?

3   A.  It was the biggest mistake of my life, giving him a second

4   chance.

5   Q.  This is a partner that you had bought out for one dollar,

6   right?

7   A.  Yes.

8   Q.  Because he was a thief, correct?

9   A.  Correct.

10  Q.  And then you testified that in March of 2016 was the first

11  time you met Christian Dawkins, right?

12  A.  That's correct.

13  Q.  And as you've noted here today your belief would be he

14  would have been in his early 20s, correct?

15  A.  Correct.

16  Q.  And you've testified I believe on Friday you first met

17  Christian Dawkins at a meeting in Columbia, South Carolina with

18  Marty Blazer and a coach from the University of South Carolina

19  named Lamont Evans; is that right?

20  A.  That's correct.

21  Q.  Now you stated on your direct testimony on this first

22  occasion that you met Christian Dawkins you understood that he

23  worked for an agent named Andy Miller; is that right?

24  A.  Yes.

25  Q.  And you also testified on your direct examination on Friday

J4U9DAW1                          Sood – Cross

1   you knew that Andy Miller, as you put it, was one of the top

2   three or four basketball agents in all of professional

3   basketball?

4           Was that your testimony?

5   A.  Yes.

6   Q.  And you also knew, though, back in 2011, ASM actually

7   employed several other agents in addition to Andy Miller; isn't

8   that right?

9   A.  Correct.

10  Q.  And you testified on direct examination you were familiar

11  also with a licensed agent that you worked with by the name of

12  Steve Pina, correct?

13  A.  Correct.

14  Q.  And you knew him to be an agent from ASM, fair to say?

15  A.  Correct.

16  Q.  And you also know that Steve Pina was also a licensed

17  attorney, didn't you?

18  A.  Yes.

19  Q.  And you had personal knowledge that Mr. Pina would give

20  cash to families of the college athletes he was trying to

21  recruit to ASM; isn't that true?

22  A.  Yes.

23  Q.  And you testified that Steve Pina from ASM reached out to

24  you explaining to you that he needed, as you said, help

25  recruiting athletes; is that right?

J4U9DAW1                          Sood – Cross

1    A.  Yes.

2    Q.  But really the help he needed from you was to pay these

3    people, correct?

4    A.  Correct.

5    Q.  And you testified you understood that recruiting meant

6    players while they were still in college?  Fair to say?

7    A.  Fair.

8    Q.  Students athletes that were on college campuses playing

9    their respective sports, in this particular instance with Pina

10   basketball, correct?

11   A.  Correct.

12   Q.  Because Pina was not seeking you to assist in paying

13   football players families, right?

14   A.  Correct.

15   Q.  But you were the money guy so you accepted that role,

16   didn't you?

17   A.  Yes.

18   Q.  And as you testified on Friday, you agreed to fund these

19   payments to the college athletes and their families in exchange

20   for Mr. Pina recommending you for your future financial

21   planning services; is that right?

22   A.  Yes.

23   Q.  You and Marty Blazer, correct?

24   A.  No.

25   Q.  Now, you testified on Friday that at one point you worked

J4U9DAW1                         Sood - Cross

1    with ASM agent Steve Pina to funnel money to a family of a

2    player named Kyle Kuzma; is that correct?

3    A.   Correct.

4    Q.   Now you said Friday that Kyle Kuzma played at Utah State.

5    That's not right, is it?

6    A.   Sorry.  University of Utah.

7    Q.   And while he was at the University of Utah, Steve Pina

8    asked you to assist making a two thousand dollar monthly

9    payment to Kuzma and his family; is that right?

10   A.   No.  To his business manager.

11   Q.   Or a handler of Kyle Kuzma?  Fair to say?

12   A.   Yes.

13   Q.   One that you thought would have some influence over Kyle

14   Kuzma's ultimate decision of who he hired to be a financial

15   planner, correct?

16   A.   Correct.

17   Q.   And you understood, as you've testified, that under the

18   NCAA rules Kyle Kuzma, his family, his handler, anyone

19   associated with him, was not supposed to accept money while he

20   was a student athlete in college, correct?

21   A.   Correct.

22   Q.   And you also said when Mr. Boone asked you on direct

23   examination that if you understand or understood at that time

24   and you were breaking NCAA rules, you knew you were when you

25   were providing that money to go to Kyle Kuzma and his handlers,

J4U9DAW1                              Sood - Cross

1    correct?

2    A.  Correct.

3    Q.  But you didn't care, did you?

4    A.  I did not.

5    Q.  You wanted to break the rules so you could establish a

6    relationship with the Kuzma camp so he could become a client

7    one day, correct?

8    A.  That's what I was told how the business works.

9    Q.  I'm asking you what you did and not to blame somebody else

10   today, sir.

11        Let me ask you again.

12        You wanted to break the rules to establish a

13   relationship with the Kuzma camp.

14        Do you know what that means?

15   A.  Yes.

16   Q.  So that you could get him as a client one day; isn't that

17   right?

18   A.  Correct.

19   Q.  You're a 45-year-old, highly educated man with a stellar

20   resume, correct?

21   A.  Correct.

22   Q.  So you'll take responsibility for your own actions and not

23   blame a 20-year-old, won't you?

24   A.  I'm not blaming anyone.

25   Q.  I thought you just testified that that's how you were told

J4U9DAW1                          Sood - Cross

1   the business worked, Mr. Sood?

2   A.  That's true.

3   Q.  You don't call that blaming somebody?

4   A.  No.

5   Q.  And it worked, didn't it, Mr. Sood?

6   A.  Sorry?

7   Q.  Kyle Kuzma became a client of yours, didn't he?

8   A.  He did.

9   Q.  So you got rewarded for that cheating you were doing,

10  didn't you?

11  A.  I thought it was a service I provided.

12  Q.  That's not what I asked you.

13          You got rewarded for that cheating, didn't you,

14  Mr. Sood?

15  A.  I guess.

16  Q.  And you compromised the eligibility of that basketball

17  player at the University of Utah, didn't you?

18  A.  I guess so.

19  Q.  You don't even know if that kid knew that money was going

20  to that handler, did you?

21  A.  That would be up to the agent.

22  Q.  I asked you if you knew.

23  A.  I didn't know.

24  Q.  You didn't care because you wanted that kid as a client,

25  right?

J4U9DAW1                          Sood – Cross

1   A.   I wanted the referral.

2   Q.   And you wanted that referral from that handler who was

3   going to get that money and that kid may have never known about

4   it; isn't that true?

5   A.   That's possible.

6   Q.   So it's also possible that kid and that family maybe never

7   saw that money you gave to that handler, right?

8   A.   I guess.

9   Q.   You were doing all this while you were a CEO of a billion

10  dollar bank, weren't you?

11  A.   Yes.

12  Q.   Licensed with the SEC?

13  A.   Correct.

14  Q.   And you're still making money as a financial guy, aren't

15  you, Mr. Sood?

16  A.   I guess.

17  Q.   Well I don't know if you are or not, sir.  I don't see your

18  paychecks.

19           Are you or not?

20  A.   No.  Slightly.

21  Q.   In fact, multiple ASM clients ended up retaining you and

22  your company to provide financial advice, didn't they?

23  A.   Yes.

24  Q.   A number of those clients that you never would have

25  retained if your friend Christian Dawkins hadn't referred them

1    to you; isn't that right?

2    A.   Yes.

3    Q.   And he was your friend, wasn't he?

4    A.   Yes.

5    Q.   You testified there is a player name Malik Beasley that

6    Christian Dawkins introduced you to as well; isn't that right?

7    A.   Correct.

8    Q.   More specifically you met his family, correct?

9    A.   Correct.

10   Q.   And you've testified that Malik Beasley was looking for a

11   $50,000-dollar loan; is that right?

12   A.   Yes.

13   Q.   Or his family was, correct?

14   A.   Correct.

15   Q.   And you provided that loan to the family of Malik Beasley

16   after he attended the NBA draft; is that right?

17   A.   Yes.

18   Q.   And Beasley became a client of yours too, didn't he?

19   A.   Yes.

20   Q.   And you made money off of Beasley, didn't you?

21   A.   We did not.

22   Q.   Another player by the name of Isaiah Whitehead who you

23   loaned five thousand dollars to, correct?

24   A.   Correct.

25   Q.   Now, you testified that you knew all along, even though

1    Christian Dawkins worked at ASM for Andy Miller, he was never a

2    sports agent; isn't that right?

3    A.   Correct.

4    Q.   As you sit here today you know that Christian Dawkins did

5    not even have the basic educational requirements to be an NBA

6    agent, didn't you?

7    A.   I did not.

8    Q.   You know today he never even went to college, don't you?

9    A.   That's correct.

10   Q.   You testified on Friday that you knew Christian Dawkins to

11   be what was called a runner for Andy Miller; is that right?

12   A.   Yes.

13   Q.   And you also gave a general definition of what you

14   understood a runner to be, correct?

15   A.   Yes.

16   Q.   And you've testified that you knew that Christian Dawkins

17   in the capacity of a runner was a recruiter of future talent to

18   the ASM agency, fair to say?

19   A.   Yes.

20   Q.   Future basketball talent, right?

21   A.   Yes.

22   Q.   And that Andy Miller depended on Christian Dawkins to bring

23   new clients to ASM, right?

24   A.   That was my understanding.

25   Q.   And it was also your understanding that Andy Miller would

1    give Christian Dawkins cash to pass along to high school

2    athletes, college athletes, and their families; is that right?

3    A.  That was my understanding.

4    Q.  And you also stated on your direct examination you knew

5    that paying the athletes and the families of athletes was a

6    violation of the NCAA rules, correct?

7    A.  Correct.

8    Q.  And it was a selfish thing to do, wasn't it?

9    A.  Yes.

10   Q.  And based on your personal and professional relationship

11   with Christian Dawkins you also knew while he was at ASM he

12   broke the rules too, didn't he?

13   A.  Correct.

14   Q.  And he would pay college athletes and their families on

15   occasion too, wouldn't he?

16   A.  That's my understanding.

17   Q.  It was also your understanding that he was doing it because

18   that's what everyone was doing at ASM, correct?

19            MR. SOLOWIEJCZYK:  Objection, your Honor.

20            THE COURT:  Sustained.

21   Q.  Were you aware that others were doing that as well at ASM

22   like Steve Pina?

23            MR. SOLOWIEJCZYK:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q.  Are you blaming what you did in this case on Christian

J4U9DAW1                         Sood - Cross

1     Dawkins, Mr. Sood?

2     A.  No.

3     Q.  Mr. Sood, isn't it true, with all the rule breaking that

4     you've identified you too were doing with licensed agents at

5     ASM like Steve Pina, nobody at ASM ever asked you to give any

6     money to a coach, did they?

7     A.  That's correct.

8     Q.  Steve Pina never told you or asked you to give money to a

9     college basketball coach, did he?

10    A.  That's correct.

11    Q.  And isn't it true you knew the reason for that was that

12    paying coaches was not a good way to get a return on your

13    investment, right?

14    A.  At that time that was correct.

15    Q.  Wouldn't you agree with me that as much as Steve Pina was

16    cheating through you at ASM, if he thought paying a college

17    coach was a good way to get a player, he would have asked you

18    to do it?

19              MR. SOLOWIEJCZYK:  Objection, your Honor.

20              THE COURT:  Sustained.

21    Q.  Well let's see how it worked out with Lamont Evans,

22    Mr. Sood.  You've testified that after the first time you met

23    both Christian Dawkins and Lamont Evans in Columbia, South

24    Carolina, that was the first time you met at a restaurant,

25    correct?

J4U9DAW1                          Sood — Cross

1   A.  Yes.

2   Q.  And then at some point he left, being Lamont Evans, for

3   Oklahoma State, correct?

4   A.  Yes.

5   Q.  And you testified that during the year of 2016 you met with

6   Lamont Evans on multiple occasions; is that right?

7   A.  Yes.

8   Q.  And correct me if I'm wrong but when you'd meet with Lamont

9   Evans, you also did with your financial planning partner, Marty

10  Blazer, correct?

11  A.  (No response)

12  Q.  On occasion?

13  A.  On occasion.

14  Q.  But with the exception of the first time you met Lamont

15  Evans through Christian Dawkins, Christian Dawkins wasn't at

16  those subsequent meetings, was he?

17  A.  I don't believe he was.

18  Q.  It was always just either you or you and your partner,

19  Marty Blazer, correct?

20  A.  It was me, every so often Marty Blazer was there, but he

21  was not my partner.

22  Q.  But Christian Dawkins wasn't there?

23  A.  That's correct.

24  Q.  And certainly at this time in 2016 you were not meeting

25  with Lamont Evans as a part of Loyd, Inc., right?

J4U9DAW1                           Sood - Cross

1   A.  Correct.

2   Q.  Because Loyd, Inc. hadn't even been formed yet, right?

3   A.  Correct.

4   Q.  Because, as you've noted on your direct testimony, Loyd was

5   not formed until June of 2017, right?

6   A.  Correct.

7   Q.  So, when you and Marty Blazer met with Lamont Evans down in

8   South Florida in 2016, in August, it was not related to

9   anything Christian Dawkins was doing?  Fair to say?

10  A.  What I recall is the player were -- the two players we were

11  discussing, Christian was aware of those players and was part

12  of the discussions.

13  Q.  That's not what I asked you, sir.

14          You and Marty Blazer met with Lamont Evans in South

15  Florida in August of 2016, yes or no?

16  A.  Yes.

17  Q.  And you met with him down there in South Florida for the

18  purposes of meeting with him with regards to your financial

19  planning company, correct?

20  A.  Regarding my company.

21  Q.  It had nothing to do with Christian Dawkins, correct?

22  A.  Correct.

23  Q.  Christian Dawkins didn't work with your financial planning

24  company, did he?

25  A.  No.

J4U9DAW1                         Sood - Cross

Q.   So you were there August of 2016 meeting with Lamont Evans
regarding your financial planning operation?

A.   Right.

Q.   And isn't it true you and Marty Blazer were there in South
Florida, correct?

A.   Correct.

Q.   And you were meeting with Lamont Evans exclusive to the
referral business you were trying to build with Lamont Evans
with your financial planning business, correct?

A.   At that time, yes.

Q.   And you testified that when you were in Miami Lamont Evans
asked you and Marty Blazer for some money, didn't you?

A.   Yes.

Q.   And yesterday we heard testimony that you did not give
Lamont Evans the money down in Miami because you had learned
that Lamont Evans was also taking money from other agents; is
that right?

A.   I believe that came a little later that I discovered he was
taking money from others.

Q.   And more specifically he was receiving money from other
agents including a guy by the name of Seth Cohen; is that
right?

A.   Yes.

Q.   So, Lamont Evans was getting money from you and Marty
Blazer too, right?

J4U9DAW1                        Sood - Cross

1    A.  No.  He was getting money from Marty Blazer at that time.

2    Not me.

3    Q.  But he was also taking money from this guy Seth Cohen at

4    the same time.  Is that your understanding?

5    A.  Correct.

6    Q.  So Lamont Evans was playing everybody for the fool, wasn't

7    he, Mr. Sood?

8    A.  Yes.

9    Q.  Hustling everybody out of money, wasn't he, Lamont was?

10   A.  Seemed like it.

11   Q.  You have testified that when Christian Dawkins was working

12   for Andy Miller in 2016 it was your understanding at least that

13   he was paying Lamont Evans allegedly to get the future services

14   of a player named PJ Dozier.  Is that your testimony?

15   A.  That's what he said.

16   Q.  In hopes that PJ Dozier would sign with Christian Dawkins'

17   boss, Andy Miller, correct?

18   A.  Correct.

19   Q.  Because you know PJ Dozier couldn't have signed with

20   Christian Dawkins.  He wasn't an agent.  Right?

21   A.  Correct.

22   Q.  And you testified though when it came time for PJ Dozier to

23   go to the NBA he didn't sign with ASM and Andy Miller, did he?

24   A.  No, he did not.

25   Q.  And PJ Dozier, when it came time to go to the NBA he didn't

J4U9DAW1                          Sood - Cross

1    sign with the other agent Seth Cohen, did he?

2    A.  He did not.

3    Q.  You testified that instead PJ Dozier ended up signing with

4    a guy named Bill Duffy, right?

5    A.  Correct.

6    Q.  So would you agree that whatever money was paid to Lamont

7    Evans by Christian Dawkins when he was at ASM was not money

8    that resulted in Lamont Evans influencing PJ Dozier to sign

9    with ASM?

10   A.  Seems fair.

11   Q.  Does it also seem fair that the money that Seth Cohen was

12   paying to Lamont Evans apparently was not money either that

13   influenced PJ Dozier to sign with Seth Cohen?

14   A.  I mean I don't know anything about Seth Cohen or what his

15   dealings were with Lamont.

16   Q.  Well you testified yesterday that it was your understanding

17   that Seth Cohen gave Lamont $13,000, right?

18   A.  Correct.

19   Q.  And you also testified that PJ Dozier didn't sign with Andy

20   Miller, didn't sign with Seth Cohen, but he signed with a third

21   agent named Bill Duffy; isn't that right?

22   A.  Yes.

23   Q.  Wouldn't you agree this is a perfect example of how paying

24   a basketball coach is a complete waste of money?

25           MR. SOLOWIEJCZYK:  Objection, your Honor.

J4U9DAW1                        Sood - Cross

1           THE COURT:  Sustained.

2    Q.  Would you agree with me that it appears Lamont Evans just

3    took everybody's money and lied about it, didn't he?

4    A.  Yes.

5    Q.  And isn't it true this is why Christian Dawkins told you on

6    numerous occasions that the coaching model didn't make sense to

7    him?

8    A.  Based on my discussions with him Christian was in favor of

9    paying certain coaches if it helped with the recruiting.

10   Q.  Recruiting of the players, right?

11   A.  Right.  Through the coaches.

12   Q.  So would you at least agree with me that the return on

13   investment, as you financial guys call it, evidenced by this

14   instance with PJ Dozier was very uncertain, wasn't it?

15   A.  Yes.

16   Q.  You're in the business of managing money, right?

17   A.  Correct.

18   Q.  Does this seem like a good investment to you?

19   A.  At the end, no.

20   Q.  We're at the end now, Mr. Sood.  And as you sit here at the

21   end, as you call it, would you agree the entire space of

22   college sports or basketball management is a dark and corrupted

23   place?

24           MR. SOLOWIEJCZYK:  Objection, your Honor.

25           THE COURT:  Sustained.

1   Q.  You can't trust anyone in that business, can you?

2   A.  You can trust people in the business.

3   Q.  You wouldn't agree that everyone is hustling everyone?

4   A.  No.

5   Q.  No.

6            Marty Blazer hustled you, didn't he?

7   A.  He did.

8   Q.  You thought he was your friend, didn't you?

9   A.  I did.

10  Q.  And you and Christian Dawkins were friends, weren't you?

11  A.  Yes.

12  Q.  Now you're testifying against Christian Dawkins, aren't

13  you?

14  A.  I just took responsibility for my actions.

15  Q.  You wouldn't call all that a dark and corrupted space?

16           MR. SOLOWIEJCZYK:  Objection.

17           THE WITNESS:  Again, I --

18           THE COURT:  Sustained.

19  Q.  Would you agree with me that when PJ Dozier did not sign

20  with ASM and Andy Miller that Christian Dawkins was upset?

21  A.  I don't know.

22  Q.  Would you agree that when Christian Dawkins found out that

23  PJ Dozier signed with some other agent he felt he was misled by

24  Lamont Evans?

25  A.  I don't know.

J4U9DAW1                          Sood - Cross

1    Q.  You felt that way, didn't you?

2    A.  No.

3    Q.  So you knew money was being paid to Lamont Evans by Marty

4    Blazer and that PJ Dozier ends up in a different direction and

5    you don't feel that's misleading?

6    A.  I'm not an agent.

7    Q.  And isn't it true, Mr. Sood, that that's why Christian

8    Dawkins never paid Lamont Evans a penny after he left ASM;

9    isn't that right?

10             MR. SOLOWIEJCZYK:  Objection, your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  I don't know.

13   Q.  Well you know he didn't, don't you?

14   A.  No.  He did not.

15   Q.  Christian Dawkins never paid Lamont Evans any money, did

16   he, after ASM?

17   A.  No.

18   Q.  You testified that you did not pay Lamont Evans down in

19   Miami because he was all talk; isn't that right?

20   A.  Correct.

21   Q.  And the only reason that Marty Blazer wanted to pay Lamont

22   Evans was that because he helped the bribery case that Marty

23   Blazer was helping the government build against you and

24   Christian Dawkins; isn't that right?

25             MR. SOLOWIEJCZYK:  Objection, your Honor.

1           THE COURT:  Sustained.

2   Q.  Now you testified that on the date of May 8, 2017 Lamont

3   Evans reached out to you about news of an NBA players

4   association investigation of Christian Dawkins and his

5   activities while at ASM.

6           Is that your testimony?

7   A.  Yes.

8   Q.  We heard a call of that conversation with you and Lamont

9   Evans where Evans said that he was concerned for doing any

10  business with Dawkins because of the press he had read; is that

11  right?

12  A.  Yes.

13  Q.  And we also heard you during that call say to Lamont Evans

14  to assure him everything was OK that, quote, I'm not tied to

15  any one agent; isn't that right?

16  A.  Correct.

17  Q.  Because on May 8, 2017 you weren't in business with

18  Christian Dawkins, were you?

19  A.  Correct.

20  Q.  You had your own company at that time providing the

21  financial services to clients, right?

22  A.  Correct.

23  Q.  How was Marty Blazer involved at that time with your

24  company?

25  A.  He was not.

1    Q.  Then why was he around and going to meetings with you?

2    A.  That's something that I continue to second guess myself on.

3    Q.  Now you know why he was, don't you?

4    A.  Yes.

5    Q.  On that call on May 8, 2017 Lamont Evans was making

6    arrangements for you to meet with PJ Dozier's mother for you to

7    pitch your financial services to her; is that correct?

8    A.  Yes.

9    Q.  And you testified that it was for the purpose of telling

10   the mother how we can help her, correct?

11   A.  OK.  Yes.

12   Q.  So, who was "we"?  That wasn't you and Marty Blazer?

13   A.  It was me and my firm, my team.

14   Q.  "We" didn't mean you and Christian Dawkins, though, that's

15   for sure, correct?

16   A.  Correct.

17   Q.  Because he wasn't a part of your team?

18   A.  Correct.

19   Q.  And as you've testified that by May of 2017 PJ Dozier

20   already signed with another agent named Bill Duffy, correct?

21   A.  Yes.

22   Q.  So in May of 2017 your association and involvement with

23   Lamont Evans and PJ Dozier had nothing to do with Christian

24   Dawkins at all, did it?

25   A.  That's correct.

J4U9DAW1                          Sood - Cross

1  Q.  And then you testified that PJ Dozier after all this

2  trouble doesn't even get drafted, right?

3  A.  Correct.

4  Q.  Despite all this utter failure with Lamont Evans in July of

5  2017 he has the audacity to ask you for another ten thousand

6  dollars, doesn't he?

7  A.  Yes.

8  Q.  And you probably didn't feel real good about that, did you?

9  A.  Part of business.

10 Q.  Part of business is throwing money away?

11 A.  No.  People asking.

12 Q.  Well people who ask and then come through on something it

13 may be worthwhile to pay them, right?

14 A.  Sometime it takes longer than just one.  It's a long-term

15 relationship.

16 Q.  Then why did you testify that the only reason you gave

17 Lamont Evans $2,000 of the 10,000 they asked for is because

18 Marty Blazer harassed you into doing it?

19 A.  That was part of it.

20        And also, as I said, because he did end up arranging

21 the meeting with PJ.

22 Q.  Were those words you used on Friday that you only paid the

23 two thousand dollars to Lamont Evans because Marty Blazer

24 harassed you into making the payment, yes or no?

25 A.  Yes.

J4U9DAW1                        Sood - Cross

1   Q.  And isn't it true that you know now that Marty Blazer was

2   harassing you to make the $2,000 payment to Lamont Evans so it

3   could be used as a bribe payment as evidence in this case?

4           MR. SOLOWIEJCZYK:  Objection, your Honor.

5           THE COURT:  Sustained.

6   Q.  A payment that you understand and acknowledge today under

7   oath Christian Dawkins had nothing to do with it, right?

8   A.  Correct.

9   Q.  Now, Mr. Sood, you also testified last Friday that you

10  first met University of Arizona associate head coach Book

11  Richardson in Las Vegas; is that right?

12  A.  Yes.

13  Q.  And you knew Book Richardson to be the head associate coach

14  at Arizona?

15  A.  Yes.

16  Q.  You also knew that he was good friends with Christian

17  Dawkins; is that right?

18  A.  Yes.

19  Q.  And you testified that on that occasion in Las Vegas that

20  was the first time you ever met Book Richardson; is that right?

21  A.  Yes.

22  Q.  And that first meeting with Book Richardson in Arizona or

23  from Arizona was on or about April 17, 2017?  Was that your

24  testimony?

25  A.  Correct.

J4U9DAW1                          Sood – Cross

```
 1   Q.  And correct me if I'm wrong.  Christian Dawkins, you
 2   testified, was not at that meeting, right?
 3   A.  Correct.
 4   Q.  Your associate, Alicia, was there, I believe?
 5   A.  Correct.
 6   Q.  Alicia Carroll?
 7   A.  Yes.
 8   Q.  And correct me if I'm wrong, but at that meeting in April
 9   of 2017 you were pitching your value to Book Richardson in
10   hopes that he could deliver future financial planning clients,
11   correct?
12   A.  Correct.
13   Q.  And as we've heard on a wiretap phonecall you wanted Book
14   Richardson to introduce you to NBA veterans; isn't that right?
15   A.  Correct.
16   Q.  Not a bunch of college kids, correct?
17   A.  Both.
18   Q.  But there was nothing wrong with Book Richardson referring
19   you current NBA players, correct?
20           MR. SOLOWIEJCZYK:  Objection.
21           THE COURT:  Overruled.
22           THE WITNESS:  Correct.
23   Q.  Because they didn't have any college eligibility that would
24   be compromised, right?
25   A.  Right.
```

J4U9DAW1                         Sood - Cross

1    Q.  And that's why you were there meeting with Book Richardson?

2    Fair to say?

3    A.  That was part of it, yes.

4    Q.  Because the NBA veterans, they already had millions of

5    dollars that they could invest with you at that moment; is that

6    right?

7    A.  Yes.

8    Q.  Isn't it true that at that meeting with Book Richardson

9    there was no conversation with him about how Christian Dawkins

10   would get to be the NBA agent for any future players that Book

11   Richardson could refer?

12   A.  That's correct.

13   Q.  Because it wasn't possible, was it?

14   A.  Correct.

15   Q.  Because he wasn't an NBA agent, correct?

16   A.  Correct.

17   Q.  And you knew of no plans that he was going to be one?  Fair

18   to say?

19   A.  That's fair.

20   Q.  And would you also agree that when you first met with Book

21   Richardson on that initial meeting in April of 2017 the company

22   Loyd, Inc. hadn't even been formed yet?

23   A.  Correct.

24   Q.  So your interest in meeting with Book Richardson on that

25   date had absolutely nothing to do with Christian Dawkins, yes

1   or no?

2   A.  Yes.

3   Q.  But everything to do with your financial planning pursuits,

4   correct?

5   A.  Correct.

6   Q.  Now, I'd like to turn your attention to May of 2017, if you

7   would, and do your best to provide me with your personal

8   recollection and knowledge around that time period, OK,

9   Mr. Sood.

10          Now, you've testified that at some point you became

11  aware that Christian Dawkins had been fired by Andy Miller; is

12  that right?

13  A.  Yes.

14  Q.  And your testimony was that it occurred sometime in the

15  middle of or the early portion of May of 2017, right?

16  A.  Yes.

17  Q.  But despite the supposed termination, you knew that Andy

18  Miller and Christian Dawkins were still working together the

19  entire time, didn't you?

20  A.  Yes.

21  Q.  You knew Christian Dawkins was actually in the NBA green

22  room at the draft in June of 2017 with Andy Miller, wasn't he?

23  A.  I believe that's correct.

24  Q.  So that supposed termination of Christian Dawkins, you knew

25  that was for appearances sake, didn't you?

J4U9DAW1                          Sood – Cross

1    A.   Yes.

2              MR. SOLOWIEJCZYK:   Your Honor, may we approach for one

3    moment.

4              THE COURT:   Sure.

5              (Continued on next page)

1          (At sidebar)

2          MR. SOLOWIEJCZYK:  I just want to flag an issue,

3    mainly for Mr. Haney.  I don't want him to go down the road and

4    open the door to something he doesn't want to open the door to.

5    The underlying facts of why Christian Dawkins was fired via

6    stipulation right now is just alleged misconduct, but the

7    reality is there was a lot more detail there relating to

8    allegations that he misused a player's money on Uber rides.

9    We've agreed not to get into the specifics.  We've just sort of

10   left it in the stipulation that it's alleged misconduct.  And,

11   obviously, we won't be taking a position here whether it's true

12   or not, but I just want to flag it for your Honor because if

13   Mr. Haney goes too far with it, it may open the door.

14         MR. HANEY:  I appreciate the heads-up and acknowledge

15   that we did have a stipulation to go further into that as

16   unnecessary, and I don't have many more questions to ask.  I do

17   think his personal knowledge is relevant, though, that he was

18   aware that it was for show for why he was removed from ASM.

19   I'm not going to go much further than what was done.  Maybe one

20   more question.

21         THE COURT:  That point has been made.

22         MR. MOORE:  Can I ask, can we take an extra five

23   minutes, maybe break five minutes early?  I've got to go

24   downstairs and get an aspirin.  I may need an extra five

25   minutes.

J4UHDaw2

1              THE COURT:  In 25 minutes we'll break for 20 minutes.

2              MR. MOORE:  I'm good until then.

3              (Continued on next page)

1              (In open court; jury present)

2              MR. HANEY:  Your Honor, did you want me to continue or

3    we going to take --

4              THE COURT:  No, no, you can continue.

5              MR. HANEY:  Thank you, your Honor.

6    Q.  So, Mr. Sood, we left off with your understanding of

7    Christian Dawkins being fired by ASM, correct, and Andy Miller?

8    A.  Yes.

9    Q.  You noted that it was your understanding, at least, that

10   the termination was for appearance's sake, correct?

11   A.  Correct.

12   Q.  And you don't know a lot about the details with respect to

13   what all transpired, fair to say?

14   A.  Correct.

15   Q.  But you do know that the reason was so Andy Miller can

16   avoid scrutiny from the NBA Players Association, right?

17             MR. SOLOWIEJCZYK:  Objection, your Honor.

18             THE COURT:  Sustained.

19   Q.  Now, around May of 2017, you and Christian Dawkins had

20   conversations about working together and starting a new sports

21   management company, is that right?

22   A.  Yes.

23   Q.  And it was going to be called Loyd Inc., correct?

24   A.  Yes.

25   Q.  Or Loyd Management.  Which one was it?

1   A.  We went by both, but Loyd Inc. was the legal name.

2   Q.  And Loyd stood for living out your dreams, isn't that

3   right?

4   A.  Yes.

5   Q.  That was Mr. Dawkins' idea, correct?

6   A.  Yes.

7   Q.  To the best of your recollection, who was all going to be

8   involved in this new sports agency?

9   A.  Christian, myself, and then Jeff D'Angelo.

10  Q.  Correct me if I'm wrong, but you and Christian Dawkins were

11  going to represent professional basketball players and manage

12  their money.  Is that putting it in most simple terms?

13  A.  That was part of it.

14  Q.  But just so I'm clear, despite all the licenses you hold,

15  you never have held a license to represent NBA players, have

16  you?

17  A.  No.

18  Q.  You've already testified on direct examination you knew

19  Christian Dawkins did not have a license to represent NBA

20  players, correct?

21  A.  On the agent front, that's correct.

22  Q.  That's all I asked you.  I don't know about any other

23  front, Mr. Sood.

24          So you understand, in order to represent NBA players,

25  you got to be licensed by the NBA Players Association, right?

1    A.  Correct.

2    Q.  You know that because you have licenses and you know

3    there's licensing processes, correct?

4    A.  Correct.

5    Q.  But there's no question, as you sit here today, that at all

6    times relevant that you were aware that neither you nor

7    Christian Dawkins had any license to represent NBA players, is

8    that a fair statement?

9    A.  Loyd Inc. or --

10   Q.  Sir, that's a yes or no, did you have a license or

11   Mr. Dawkins?

12          Your Honor, that's a very simple question.

13          MR. SOLOWIEJCZYK:  Your Honor, can he be allowed to

14   answer the question?

15          THE COURT:  Can you answer that question yes or no,

16   Mr. Sood?

17          THE WITNESS:  I'd like to give a response to it with

18   some detail.

19          THE COURT:  Why don't you ask the question again.

20          MR. HANEY:  I'll ask it again, your Honor.

21   Q.  Yes or no, there is no question, as you sit here today,

22   that at all times relevant neither you nor Christian Dawkins

23   had a license to represent NBA basketball players, yes or no?

24   A.  Yes.

25   Q.  Let me ask you this, Mr. Sood:  How are you or Christian

J4UHDaw2                          Sood - Cross

1   Dawkins ever going to represent basketball players if you
2   didn't have a license to do so?
3   A.   Loyd Inc. was not a sports agency.  We were just going to
4   provide various services and help players find an agent as one
5   of the services being provided by the company.
6   Q.   Well, let's talk about the whole Loyd Management company.
7   Nobody, not even an independent contractor, was licensed to
8   represent an NBA basketball player, were they, Mr. Sood?
9   A.   No.
10  Q.   So I heard reference during this trial that Mr. Dawkins was
11  going to pay people's bills.  Was that going to be his role as
12  the manager?
13  A.   Potentially.
14  Q.   You tell me.  This is your company.  What was young
15  Christian Dawkins going to do in Loyd Management to make all
16  this money?
17  A.   What he does best is recruit players and coaches.
18  Q.   So that you could make the money on the financial planning,
19  right?
20  A.   He owned 50 percent of the company.
21  Q.   Did you think anyone was going to get rich off of paying
22  people's bills?
23  A.   Again, the company was charging fees for multiple services.
24  Q.   The company that never existed, right?
25  A.   Company that was formed and did spend money.

```
 1   Q.  You ever represent a client?

 2   A.  We never got that far.

 3   Q.  Never got that far.

 4        We know from your testimony it was your financial

 5   planning business partner who approached you at some point

 6   about a man and a woman who wanted to invest money in Loyd

 7   Management, right?

 8   A.  Correct.

 9   Q.  So it was your belief, at least at that time, your old

10   buddy Marty Blazer wanted to help you and Christian Dawkins by

11   getting you some funding for this new company, Loyd Management,

12   right?

13   A.  Correct.

14   Q.  At some point you, obviously, realized Marty Blazer really

15   didn't want to help you raise money for Loyd Management, right?

16   A.  Correct.

17   Q.  That, in fact, Marty Blazer was himself facing federal

18   criminal charges?

19        MR. SOLOWIEJCZYK:  Your Honor, I'm going to object on

20   relevance grounds.  This is all things learned after the fact.

21        THE COURT:  Overruled.

22   Q.  But at some point you came to understand Marty Blazer was

23   facing his own federal criminal charges for multiple federal

24   crimes, isn't that right?

25   A.  Yes.
```

J4UHDaw2                              Sood - Cross

1   Q.  And that he was not helping you; he was an undercover

2   informant for the FBI, right?

3   A.  Correct.

4   Q.  So instead of trying to help you, he was actually trying to

5   set you and Christian Dawkins up, wasn't he?

6          MR. SOLOWIEJCZYK:  Objection.

7          THE COURT:  Sustained.

8   Q.  But you did testify you knew that in association with

9   whatever troubles he had, it included the fact that he had

10  stole $2 million worth of his clients' money, correct?

11  A.  That's correct.

12  Q.  And you knew that from the SEC audit, is that right?

13  A.  Yes.

14  Q.  That you had learned about several years earlier, correct?

15  A.  Yes.

16  Q.  At that time you're the CEO of a bank, and you thought it

17  was a good idea to partner up with Marty Blazer?

18  A.  As I said earlier, the biggest mistake of my life, giving

19  him a second chance.

20  Q.  Would you agree with me that part of Marty Blazer's setting

21  you and Christian Dawkins up was introducing you to two

22  potential investors by the name of Jeff D'Angelo and Jill

23  Bailey?

24  A.  Yes.

25  Q.  And you realize now they weren't undercover -- they weren't

J4UHDaw2                          Sood - Cross

1   investors after all, they were undercover FBI agents, isn't

2   that right?

3   A.   Correct.

4   Q.   And then you testified that on the date of June 6, 2017,

5   you met Jeff D'Angelo and Jill Bailey on a two-story yacht

6   docked in the marina near Battery Park?

7   A.   Yes.

8   Q.   And you called it a boat yesterday on several occasions,

9   but it was a yacht, wasn't it?

10  A.   Yes.

11  Q.   Christian Dawkins was with you too on that occasion, wasn't

12  he?

13  A.   Yes.

14  Q.   And the meeting was set up by your friend Marty Blazer,

15  correct?

16  A.   Yes, Marty set it up.

17  Q.   So you, your assistant Alicia Carroll, Christian Dawkins,

18  and Marty Blazer, you all board the yacht on that occasion, is

19  that right?

20  A.   I believe Marty was already there.

21  Q.   Then when you arrived, you and Christian met with Jeff

22  D'Angelo and Jill Bailey about their interest in investing in

23  Loyd Inc., correct?

24  A.   Yes.

25  Q.   For the purpose of discussing Jeff D'Angelo and Jill Bailey

1    becoming your equity partners in this new sports agency, right?

2    A.  Yes.

3    Q.  Explain, if you would, to the jury in your words what

4    equity partner would mean in this new sports agency you were

5    forming.

6    A.  That they'd be putting up in that case a lot of the startup

7    money and ongoing funding.  In return, they would get a

8    percentage of the profits.

9    Q.  And you testified during that meeting at some point Jeff

10   D'Angelo produced $25,000 in cash, didn't he?

11   A.  Yes.

12   Q.  With a promise that another $25,000 would be funded at some

13   point thereafter, correct?

14   A.  Yes.

15   Q.  As well as a lot of other money thereafter, isn't that

16   right?

17   A.  Yes, we had a schedule.

18   Q.  So I get this straight, Mr. Sood, this cash of the $25,000,

19   that was just the initial investment being offered by Jeff

20   D'Angelo to help launch Loyd Management, is that right?

21   A.  Correct.

22   Q.  Living out your dreams, right?

23   A.  Correct.

24   Q.  And you're on a yacht with some people you barely know,

25   right?

J4UHDaw2                          Sood - Cross

1    A.  Yes.

2    Q.  But at least one of the people on the yacht you do know,

3    Marty Blazer, is a thief, right?

4    A.  Yes.

5    Q.  And another person on the yacht you do know is a

6    20-something-year-old kid that does dishonest things at the

7    direction of his boss Andy Miller, right?

8    A.  I guess.

9    Q.  Then somebody you barely know pulls out an envelope with

10   $25,000 cash.  Have I got that right, Mr. Sood?

11   A.  Yes.

12   Q.  Oh, wait, I forgot another part.  Someone on the yacht gave

13   you and your business partner Christian Dawkins expensive

14   bottles of Scotch, isn't that right?

15   A.  They did.

16   Q.  At this time you were a licensed and certified financial

17   adviser, right?

18   A.  Correct.

19   Q.  Of millions of dollars, right?

20   A.  Correct.

21   Q.  Like you are right now, correct?

22   A.  Correct.

23   Q.  A former CEO of a bank?

24   A.  Correct.

25   Q.  You didn't see about 100 things wrong about this scene on

J4UHDaw2                            Sood - Cross

1    that yacht, Mr. Sood?

2    A.  Like I said, today as I sit here, I do.

3    Q.  Then you testified that you and Christian Dawkins took that

4    money from Jeff D'Angelo, isn't that right?

5    A.  We did deposit it in the bank.

6    Q.  After that meeting on the yacht, you, Christian Dawkins,

7    your two new undercover FBI business partners, you all begin

8    working together to build Loyd Management.  Is that a fair

9    statement?

10   A.  Yes.

11   Q.  That included meeting with the families of young basketball

12   players, is that right?

13   A.  Yes.

14   Q.  On occasion, correct?

15   A.  Correct.

16   Q.  And that included on occasion paying the families of some

17   of those basketball players, is that right?

18   A.  Correct.

19   Q.  Just like you had done before years earlier with Steve

20   Pina, isn't that right?

21   A.  Correct.

22   Q.  This is nothing unfamiliar to you, was it?

23   A.  No.

24   Q.  You were cheating years before you got on that yacht,

25   weren't you, Mr. Sood?

J4UHDaw2                           Sood - Cross

1    A.   Correct.

2    Q.   Breaking NCAA rules?

3    A.   Correct.

4    Q.   Being greedy?

5    A.   I guess.

6    Q.   I guess?  What do you call it?  I don't want to put words

7    in your mouth, Mr. Sood.

8    A.   Call it trying to get a client.

9    Q.   By breaking the rules?

10   A.   Yes.

11   Q.   So you could make money?

12   A.   That's correct.

13   Q.   Is that greedy to you?

14   A.   OK.

15   Q.   I'm asking you yes or no, not OK.

16   A.   No.

17   Q.   To you it's not greedy.  But you would agree with me that

18   based on your longtime professional experience, paying parents

19   was one of the ways to get clients, correct?

20   A.   That's -- that's how I learned the business, yes.

21   Q.   From Christian Dawkins, right?

22   A.   Correct.

23   Q.   Who you met five years after you were paying players when

24   you were at ASM working with Steve Pina, right?

25   A.   It only started -- I met Steve Pina once I met Christian

J4UHDaw2                          Sood - Cross

1    Dawkins.

2    Q.  You met Steve Pina back in 2011, you said, correct?

3    A.  Absolutely not.

4    Q.  When did you first start working with Steve Pina?

5    A.  After I met Christian Dawkins in 2015.

6    Q.  You're blaming Christian Dawkins for everything?

7    A.  I'm just correcting the dates.

8    Q.  So you and Christian Dawkins, you were going to follow the

9    ASM business model of success and do the same thing with Loyd

10   Management, isn't that right?

11   A.  No.

12   Q.  Well, you knew that ASM was a multimillion-dollar sports

13   agency, right?

14   A.  Again, Loyd Management --

15   Q.  Yes or no, did you know that or not?

16   A.  Yes.

17   Q.  You knew that Andy Miller was one of the top three or four

18   agents in basketball, right?

19   A.  Correct.

20   Q.  And you knew at ASM they paid parents to get players,

21   correct?

22           MR. SOLOWIEJCZYK:  Asked and answered.

23           THE COURT:  Sustained.

24   Q.  You guys had the recipe for success at Loyd Management,

25   didn't you?

1    A.  Based on what I was told, yes.

2    Q.  Based on what you did with Steve Pina, correct?

3    A.  Steve Pina was -- just referred two players.

4    Q.  And that's how you got Kyle Kuzma, correct?

5    A.  Correct.

6    Q.  You made money off Kyle Kuzma, didn't you?

7    A.  Not yet.

8    Q.  Not yet.  You still got him as a client?

9    A.  Yes.

10   Q.  He's worth millions of dollars, isn't he?

11   A.  Not yet.

12   Q.  You're telling me under oath -- you know Kyle Kuzma was a

13   first-round draft pick for the Los Angeles Lakers, don't you?

14   A.  Yes.

15   Q.  You're telling me he didn't get a million-dollar contract

16   under oath?

17   A.  He does, but you asked me what his net worth is.

18   Q.  I didn't ask you that.  Has he made millions of dollars?

19   A.  He is.

20   Q.  Are you managing his money?

21   A.  Yes.

22        MR. SOLOWIEJCZYK:  Your Honor, we'd object to any

23   further questions along this line.

24        MR. HANEY:  I'll move on, your Honor.

25   Q.  Now, you've testified that after meeting on the yacht, Jeff

J4UHDaw2                              Sood - Cross

1    D'Angelo then proceeded to invest more money into you and

2    Christian's company, Loyd Inc., correct?

3    A.  Yes.

4    Q.  In fact, this guy Jeff D'Angelo, the undercover FBI agent,

5    he was investing tens of thousands of dollars of Loyd Inc.,

6    wasn't he?

7    A.  Yes, he was.

8    Q.  You saw him on numerous occasions with large denominations

9    of cash, would you agree?

10   A.  Yes.

11   Q.  Jeff D'Angelo was giving both you and Christian Dawkins

12   money to help run the sports agency called Loyd, isn't that

13   right?

14   A.  Giving me money for Loyd, yes.

15   Q.  The sports agency with no agent, right, Mr. Sood?

16   A.  Again, it wasn't a sports agency.

17   Q.  So, to the best of your recollection, would it be fair to

18   say from the period of time of around June of 2017 up to

19   September of 2017, Jeff D'Angelo was investing money into Loyd

20   Management?

21   A.  Yes.

22   Q.  And that Jeff D'Angelo facilitated payments to individuals

23   he felt could help secure future clients to Loyd; is that a

24   fair statement too?

25   A.  Yes.

1    Q.  Which included parents of high school and college

2    basketball players, is that right?

3    A.  Yes.

4    Q.  Mr. Sood, correct me if I'm wrong, but you knew that Jeff

5    D'Angelo had no experience in the sports management business,

6    isn't that right?

7    A.  Correct.

8    Q.  You knew that he was supposedly a young guy from some

9    family money.  Was that your understanding?

10   A.  Yes.

11   Q.  Or that perhaps he was a young guy with some family money

12   who then got into some real estate, correct?

13   A.  Correct.

14   Q.  You didn't really know anything about Jeff D'Angelo, did

15   you?

16   A.  Just that he was a businessman.

17   Q.  You familiar with the term "due diligence"?

18   A.  Yes.

19   Q.  You do that all the time, I would hope, don't you?

20   A.  I do.

21   Q.  You ever do any due diligence on Jeff D'Angelo?

22   A.  Just -- just checked on just a little -- just normal

23   background checks.

24   Q.  Well, usually when you do a background check, you put

25   somebody's name in it, isn't that usually their name?

J4UHDaw2                          Sood - Cross

1    A.   Yes.

2    Q.   You know his name wasn't Jeff D'Angelo now, don't you?

3    A.   Correct.

4    Q.   You don't know what his name was, do you?

5    A.   Not anymore, no.

6    Q.   Now, isn't it true on at least one occasion Christian

7    Dawkins expressed frustration with you in the manner in which

8    Jeff D'Angelo wanted to operate Loyd Management?

9    A.   Yes.

10   Q.   On several occasions, didn't he?

11   A.   Yes.

12   Q.   Would you agree with me that Christian Dawkins sometimes in

13   a very profane way expressed frustration with you on the fact

14   that Jeff D'Angelo wanted to pay college coaches?

15   A.   The discussions were more not about paying college coaches

16   but which coaches to pay and to focus on specific players, not

17   just randomly paying coaches, what they call, a retainer.

18   Q.   Because you've testified that Christian Dawkins said he did

19   not want to pay the coaches a monthly fee, isn't that right?

20   A.   In some cases, yes.

21   Q.   That paying the coaches the monthly fee, that was Marty

22   Blazer's idea.  That's what you said, didn't you?

23   A.   Yes.

24   Q.   The undercover FBI informant, right?

25   A.   Yes.

J4UHDaw2                          Sood - Cross

1   Q.  Jeff D'Angelo, the undercover FBI agent, right?

2   A.  Correct.

3   Q.  We heard you on a wiretap phone call say, "Jeff just wants

4   to do a bunch of coaches," didn't you?

5   A.  Yes.

6   Q.  And you were laughing when you said that, weren't you?

7   A.  Yes.

8   Q.  Because it was funny to you, wasn't it?

9   A.  It was surprising.

10  Q.  You just laugh at things that are surprising?

11  A.  In this case.

12  Q.  But you and Christian Dawkins were both laughing that Jeff

13  just wanted to do a bunch of coaches, weren't you?

14  A.  Again, the --

15  Q.  Yes or no, were you both laughing, sir?

16  A.  Yes.

17  Q.  Isn't it true that young Christian Dawkins was trying to

18  persuade you guys with all the money to give him the money and

19  let him decide who should get paid when, where, and how, isn't

20  that true?

21  A.  Yes.

22  Q.  You testified that Christian did not want to pay the

23  coaches monthly, but he also wanted to be the one to decide who

24  got paid, right?

25  A.  Well, he was in favor of paying Emanuel Richardson monthly.

J4UHDaw2                          Sood - Cross

1  Q.  Isn't it true you testified Christian Dawkins wanted to be

2  the one to make the decision who got paid, right?

3  A.  He did want to be, yes.

4  Q.  He wanted the money, didn't he?

5  A.  Yes.

6  Q.  He didn't want Jeff D'Angelo to decide who got paid, did

7  he?

8  A.  But he needed to talk to Jeff to convince Jeff to pay it.

9  Q.  Yes or no?

10  A.  Yes.

11  Q.  And he needed to talk to Jeff because Jeff was holding the

12  purse strings, wasn't he?

13  A.  Correct.

14  Q.  You know what that means, hold the purse strings?

15  A.  Yes.

16  Q.  Christian couldn't do anything unless Jeff said it was OK,

17  isn't that right?

18  A.  If he wanted the money, yes.

19  Q.  You don't have any doubt that he wanted the money, do you?

20  A.  No.

21  Q.  You knew where Christian Dawkins grew up, didn't you?

22  A.  Yes.

23          MR. SOLOWIEJCZYK:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.  You look back on this and realize Christian Dawkins was

J4UHDaw2                              Sood - Cross

1    just trying to get his hands on the money?

2    A.  No.

3    Q.  Now, we saw the exhibit, Government Exhibit 623.  It was a

4    Loyd shareholder agreement where Loyd was pledged $225,000

5    during that understanding and that agreement, would you agree?

6    A.  Yes.

7    Q.  $185,000 from Jeff D'Angelo, $40,000 from yourself, isn't

8    that right?

9    A.  Yes.

10   Q.  We also know that during a conversation with you and Book

11   Richardson, you said Christian Dawkins was just a kid, didn't

12   you?

13   A.  Yes.

14   Q.  And that you said he was a hustler, didn't you?

15   A.  Yes.

16   Q.  Would you agree with me that $225,000 is a lot of money to

17   a kid who hustles?

18          MR. SOLOWIEJCZYK:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q.  Let's go to summer of 2017 and do your best to recall the

21   occasion, and I want to start on June 20, 2017.

22          You testified there was an occasion where you had a

23   meeting in which Jeff D'Angelo, yourself attended with Book

24   Richardson, is that correct?

25   A.  Yes.

1    Q.  When I say "Book Richardson," you understand that to mean

2    the former associate head coach at the University of Arizona,

3    correct?

4    A.  Correct.

5    Q.  You testified that meeting occurred in New York, is that

6    right?

7    A.  Yes.

8    Q.  You testified that at that meeting on June 20, 2017, it was

9    you, Book Richardson, and Jeff D'Angelo.  Did I get that right?

10   A.  Correct.

11   Q.  And on this particular date, multiple meetings were

12   scheduled, is that fair to say?

13   A.  Yes.

14   Q.  Also scheduled to meet that day were Merl Code and a coach

15   by the name of Preston Murphy, is that right?

16   A.  Correct.

17   Q.  But Book Richardson's meeting was scheduled first at

18   10 a.m., is that correct?

19   A.  Yes.

20   Q.  So Book shows up to the meeting with you and Jeff D'Angelo,

21   is that right?

22   A.  Correct.

23   Q.  And then, as you saw in the video, he proceeds to sell his

24   value to you of how he can help Loyd Management.  Would that be

25   a fair way of putting it?

J4UHDaw2                          Sood - Cross

1   A.  Yes.

2   Q.  Would you agree with me that Book Richardson was very

3   animated, confident in his ability of how he could provide a

4   value to Loyd Management?

5   A.  Yes.

6   Q.  In fact, he was bragging about all the relationships he had

7   with the players at Arizona, wasn't he?

8   A.  He was.

9   Q.  As you reflect back on that meeting, would you agree with

10  me that Book Richardson was making you a very hard sell on just

11  how valuable he was to you and your partners?

12  A.  Yes.

13  Q.  You testified that when you were at that meeting with Book

14  Richardson, he received a cash payment, didn't he?

15  A.  Yes.

16  Q.  You were actually there when Book Richardson got the cash

17  payment, correct?

18  A.  Correct.

19  Q.  Book Richardson received that cash payment from Jeff

20  D'Angelo, didn't he?

21  A.  Yes.

22  Q.  And it was a $5,000 cash payment, correct?

23  A.  Correct.

24  Q.  But my client, Christian Dawkins, he wasn't even at the

25  meeting, was he, when Book Richardson got paid the $5,000, was

J4UHDaw2                          Sood - Cross

1    he?

2    A.  He was not.

3    Q.  Now, today we've heard a call -- or yesterday, I'm sorry,

4    we heard a call between you and Christian Dawkins discussing

5    that meeting when Book Richardson received the $5,000, is that

6    correct?

7    A.  Yes.

8              MR. HANEY:  Your Honor, I would at this time seek to

9    play Government Exhibit 104 and display their own transcript.

10   It's already been admitted.  Or we could take a break if

11   possible, your Honor.

12             THE COURT:  Can you pull up 104?

13             Why don't we do this:  We're going to take a 20-minute

14   break this morning, ladies and gentlemen.  So let's start now

15   and be prepared to come back at 12 minutes after the hour.

16             Don't discuss the case.

17             (Jury excused)

18             (Continued on next page)

19

20

21

22

23

24

25

1                (Jury not present)

2                THE COURT:  Mr. Sood, you may step down.

3                Everyone can be seated.

4                So will there be any technical issue with playing 104?

5                MR. CHANEY:  No, your Honor.

6                MR. HANEY:  They've offered to play that for us, your

7      Honor, generously.  Thank you.

8                THE COURT:  Why don't you folks take ten minutes, and

9      we'll come back.

10               MR. HANEY:  Thank you, Judge.

11               (Recess)

12               THE COURT:  Did we want to have a conversation before

13     we came back, Mr. Chaney, did you want to continue?

14               MR. CHANEY:  Yes, Judge.  Sorry, Judge, I'm just

15     trying to pull up the correct transcript.

16               So, your Honor, with respect to the call between

17     Mr. Code and Mr. Sood on August 8, there are a number of

18     statements that the defense seeks to introduce from that call

19     that are not excerpted in the government's motion in

20     opposition.

21               THE COURT:  That are not?

22               MR. CHANEY:  They're not excerpted in the motion in

23     opposition from the government.  So beginning at the -- on the

24     attached transcript --

25               THE COURT:  I'm sorry.

1          MR. SOLOWIEJCZYK:  Your Honor, we provided a full

2     transcript of the call.

3          MR. CHANEY:  Oh, I'm sorry.  I was just looking at the

4     body of the letter.  But I'll begin, it says, Mr. Code:  "So

5     I'll say this as tactfully as I can.  When everything you do is

6     about throwing money at it, you are not going to win."

7          THE COURT:  Where are you?

8          MR. CHANEY:  I'm sorry.  I'm looking at the defense

9     version of the transcript.  It's at page 3.  And that was the

10    transcript that was attached to our email.

11         THE COURT:  Let me just ask, as the government tells

12    me where we are, is there going to be a dispute as to these

13    other excerpts that we want aside from the "don't pay my guys"?

14         MR. BOONE:  If you could give us -- we actually didn't

15    realize they actually wanted more than what we discussed

16    yesterday.  Give us one second.

17         MR. SOLOWIEJCZYK:  Just to clarify, you're seeking to

18    offer different excerpts at this point?

19         MR. CHANEY:  I can clarify.

20         MR. SOLOWIEJCZYK:  All right.

21         MR. CHANEY:  We believe that under 807 the entirety of

22    the portion of this conversation between Mr. Code and Mr. Sood

23    where Mr. Code is describing his position with respect to

24    paying for loyalty, both in terms of his contemporaneous

25    statement, "when everything you do is throwing money at it,

1   you're not going to win.  More times than not, you're going to

2   be taken for your money and folks aren't going to be able to

3   deliver," and also including his recitation of a conversation

4   between himself, Mr. Dawkins, and Mr. D'Angelo, saying, "No,

5   no, no, you're not going to pay my guys.  I'm leveraging the

6   relationships.  They're going to show up because I ask them

7   to."  And that was the particular paragraph that I think was

8   submitted yesterday.

9          But under 807 we believe that all of these statements

10  are -- have circumstantial guarantees of trustworthiness

11  insofar as they're being covertly recorded without knowledge of

12  either participant, that it's from a time and in a situation

13  where neither party had any reason to misrepresent their

14  current state of mind or to misrepresent any prior

15  conversations.  They're between alleged coconspirators and not

16  with law enforcement, without any knowledge that there was a

17  then-existing criminal investigation into any of this conduct.

18         If the Court does not believe that 807 is appropriate,

19  we are renewing our motion under 803(3) insofar as the

20  statements can't -- "you can't just throw money at it" evinces

21  Mr. Code's then-existing state of mind are, in fact,

22  forward-looking, he's communicating to Mr. Sood his

23  contemporaneous perspective on the idea of paying coaches, and

24  that these -- the recitation of his prior conversation with

25  Mr. Dawkins and Mr. D'Angelo was offered by way of

J4UHDaw2                          Sood - Cross

illustration.  He was using that conversation to illustrate to

Mr. Sood yet another example of sort of supporting this idea

that throwing money at the problem is not the way to get

business done.  That statement does not -- can come in without

the jury necessarily relying on the accuracy of his recitation

of that conversation.

          Insofar as that's the case, it's not necessarily being

offered for the truth of the matter.  He can say, I'm telling

you now, throwing money at it is not the way to go, and then

recount by way of illustration this other conversation

supporting that same proposition.  The fact that he's telling

this story is the relevance, that it's supporting his

contemporaneous perspective that paying coaches or paying --

throwing money at a problem is generally a bad business plan.

So whether or not he is accurately restating that prior

conversation is not an issue that the jury would be forced to

determine.  Insofar as that's the case, it's not being

offered -- that recitation is not being offered for the truth

of the matter.

          So we have sort of separate parallel mechanisms to

introduce this call:  One in which sort of separately analyzes

the contemporaneous statements and then the prior conversation,

and then a second one where we say it's all sort of

circumstantially admissible -- reliable under 807.

          THE COURT:  Can we bring Mr. Sood in.  I understand

1     the government hasn't had an opportunity to think about those

2     issues, so we'll have to come back.

3              MR. BOONE:  Yes, your Honor.

4              MR. MOORE:  Your Honor, I'm going to want to do that

5     near the end of my cross, and so perhaps I'll just tell you

6     when I'm getting near the end of my cross, we can approach, and

7     if you want to, send the jury out for a few minutes.  I expect

8     that's going to be close to the next break anyway.

9              THE COURT:  OK.

10             MR. MOORE:  If not there.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4UHDaw2                          Sood - Cross

1              (Jury present)

2              THE COURT:  Everyone, please be seated.

3              Mr. Haney.

4              MR. HANEY:  Thank you, your Honor.

5    Q.  Mr. Sood, we left off with reference to a call that was

6    played yesterday in court between you and Christian Dawkins,

7    and it's marked as Government Exhibit 104.  There's a

8    corresponding transcript of Government Exhibit 104T.

9              And at this point, your Honor, we'd like to play that

10   call.

11             THE COURT:  Very well.

12             MR. HANEY:  Thank you, your Honor.

13             (Audio played)

14             MR. HANEY:  Can you stop it right there.  Thank you.

15   Thank you.

16   Q.  Now, you heard Mr. Dawkins -- first of all, you identified

17   already that that's Christian Dawkins on that recording,

18   correct?

19   A.  Yes.

20   Q.  And you as well?

21   A.  Yes.

22   Q.  Now, you heard Christian Dawkins ask how it went with Book,

23   right?

24   A.  Correct.

25   Q.  And you said, "He left with a gift," didn't you?

J4UHDaw2                          Sood - Cross

1    A.  Yes.

2    Q.  Isn't it true the gift you were referring to was the $5,000

3    that Jeff D'Angelo gave Book Richardson, correct?

4    A.  Correct.

5            MR. HANEY:  OK.  Can we resume.  Thank you.

6            (Audio played)

7            MR. HANEY:  We can stop it there.  We can stop.  Thank

8    you very much.

9    Q.  Now, isn't it true that you and Christian Dawkins were

10   joking about "Dude, Jeff is, like, fucking high.  He made his

11   whole thing.  He's happy," isn't that right?

12   A.  Yes.

13   Q.  Would you agree with me that you meant -- you understood

14   that to mean that Jeff was happy because Book left with some

15   money, right?

16   A.  Correct.

17   Q.  Jeff was happy about that, correct?

18   A.  I believe that's correct.

19   Q.  Would you agree with me now, as you sit here, that you

20   understand that Jeff D'Angelo was happy high, as you called it,

21   because he thought that Book Richardson, a high-profile coach

22   at the University of Arizona, he'd accepted what he believed to

23   be a cash bribe?

24           MR. SOLOWIEJCZYK:  Objection, your Honor.

25           THE COURT:  Sustained.

J4UHDaw2                           Sood - Cross

1   Q.  Isn't it true that after this meeting on this phone call,
2   you and Christian Dawkins are mocking this payment to Book
3   Richardson; is that a fair way of putting it?
4   A.  No.
5   Q.  You don't hear you and Christian Dawkins laughing about the
6   payment made to Book Richardson?
7   A.  We were laughing.
8   Q.  You guys thought it was funny that Jeff D'Angelo gave Book
9   Richardson a gift, didn't you, Mr. Sood?
10  A.  No.
11  Q.  Would you agree with me, in hearing what you just heard,
12  you could actually hear the joy in Christian Dawkins' voice
13  about how funny it was Book left with a gift, yes or no?
14  A.  I don't know.
15  Q.  In hearing that phone conversation, are you suggesting that
16  you both were serious?
17  A.  We weren't serious, but I'm not sure what -- I mean, I was
18  surprised about the money that -- I was surprised that he gave
19  money to Book at that -- at that meeting.
20  Q.  Let's look at page 1 of the transcript, if we can.  If you
21  look at line 21 through 25, let me know when you're there.
22  A.  I'm here.
23  Q.  Christian Dawkins says, "I don't know -- like, what does he
24  want out of this, though, Munish?  That's the question, like,
25  what does he think Book's going to do for him?  Like, what does

J4UHDaw2                          Sood - Cross

1    he -- is he just a fan?"

2             Wouldn't you agree -- or what's your understanding of

3    what Christian Dawkins means by that?

4    A.   I guess Christian was also surprised that Jeff D'Angelo

5    gave him $5,000, gave Book $5,000.

6    Q.   Don't you agree that Christian Dawkins is making fun of

7    Jeff D'Angelo thinking that paying Book is going to do anything

8    to help him?

9    A.   I don't know what Christian was thinking.

10   Q.   If we could look at page 2.  If you could turn your

11   attention to line 1, I'm sorry, through line 5.  Thank you.

12            During this call, you say to Christian Dawkins, "I

13   don't know.  I think he's -- I think he's hoping that if guys

14   like Book will send us some kids, this business is going to

15   just grow."  Isn't that what you said?

16   A.   Yes.

17   Q.   When you say "he's hoping," you're talking about Jeff

18   D'Angelo, right?

19   A.   Correct.

20   Q.   Then Christian Dawkins responds, "He's like -- guys like

21   Book are gonna send me kids anyway," isn't that right?

22   A.   Yes.

23   Q.   Wouldn't you understand that to mean that paying Book

24   Richardson makes no sense because guys like Book are going to

25   send players to Christian Dawkins anyway because of his

1    relationship with them?

2    A.   My understanding was that these coaches were looking --

3    like Book was looking for money to help recruit for future kids

4    that they can send to Loyd Management going forward.

5              MR. HANEY:  If we could look at page 3.  Thank you.

6    And line 7 through 11.

7    Q.   Now, isn't it true, Mr. Sood, that you indicate on --

8    statement on line 7, "Yeah, so -- so Book is good, you know.

9    Jeff wants to do a bunch of these coaches," isn't that right?

10   A.   Yes.

11   Q.   Then Christian Dawkins says, "OK.  God bless him," isn't

12   that right?

13   A.   Yes.

14   Q.   We heard the call.  Would you agree that you were

15   incredulous as to why Jeff just wanted to do a bunch of coaches

16   because it didn't make sense to you either, did it?

17   A.   Again, I was surprised that he gave money to Book at that

18   time, but my understanding was the reason these coaches were

19   coming here were because he needed help -- they needed -- they

20   needed money for recruiting purposes.

21   Q.   Well, you've testified that at that time when Book

22   Richardson received that $5,000 payment, to you it made no

23   sense, did it?

24   A.   That's correct.

25   Q.   And that's why you and Christian Dawkins were laughing

1  about it, isn't that right?

2  A.  Again, I was surprised the money was given.  I'm not sure

3  why Christian -- what his thoughts were.

4  Q.  And when you said that Jeff was hoping that Book would send

5  some kids, you meant basketball players from the University of

6  Arizona to Loyd Inc., isn't that right?

7  A.  Yes.

8  Q.  And Christian Dawkins knew it was ridiculous because Book

9  Richardson was going to send the players anyway, right?

10  A.  Like I said, I expected, based on the relationship, to get

11  at least one player, but we were trying to position Book to

12  send us future players, which required him to get money.

13  Q.  Just so I'm clear, the $5,000 cash payment from Jeff

14  D'Angelo to Book Richardson was never made at the direction of

15  Christian Dawkins to influence Book Richardson to steer kids at

16  Arizona to Loyd Inc., was it?

17  A.  Again, I was not part of any discussion.

18  Q.  So you don't have any personal knowledge that it was, do

19  you?

20  A.  No.

21  Q.  So even though you were a cooperating witness with the

22  government, you know that payment to Book Richardson from Jeff

23  D'Angelo was not a bribe payment, don't you, Mr. Sood?

24          MR. SOLOWIEJCZYK:  Objection, your Honor.

25          THE COURT:  Sustained.

J4UHDaw2                              Sood - Cross

```
 1   Q.  Isn't it true, Mr. Sood, you know that Jeff D'Angelo gave
 2   Book Richardson that money because Jeff D'Angelo wanted to give
 3   Book Richardson that money, isn't that right?
 4               MR. SOLOWIEJCZYK:  Objection, your Honor.
 5               THE COURT:  Sustained.
 6   Q.  Christian Dawkins never told you that Arizona coach Book
 7   Richardson needed to get paid at that meeting that day, did he?
 8   A.  Not that I'm aware of.
 9   Q.  Christian Dawkins never told you that Book Richardson
10   needed to get paid that day at that meeting so he could steer
11   players to Loyd Management one day, did he?
12   A.  Not that I'm aware of.
13   Q.  Because Christian Dawkins very clearly is laughing about
14   the fact that Book Richardson got paid that money, isn't he?
15               MR. SOLOWIEJCZYK:  Asked and answered.
16               THE COURT:  Sustained.
17   Q.  In fact, you even make fun about the payment Jeff D'Angelo
18   made to Book Richardson, don't you, when you tell Christian
19   Dawkins, Jeff is asleep.  Don't wake him up; isn't that what
20   you said?
21   A.  As I said, I was surprised he made that payment.
22   Q.  I asked you if that's what you said on the phone call.
23   A.  I did say that.
24   Q.  I don't want to mischaracterize.  If we can turn to page 2,
25   line 7 through 11.  Thank you.
```

1        After Christian Dawkins says to you, "Guys like Book

2   are going to send me kids anyway, does he understand that?"

3   You say, "No, but it's like fucking dying man.  He's dying.

4   Don't wake him up," is that what you said, yes or no?

5   A.  Yes.

6   Q.  Christian Dawkins says, "No, I know, trust me.  I'm not

7   going to say anything," isn't that right?

8   A.  Yes.

9   Q.  What you meant was that by Jeff D'Angelo throwing his money

10  away to pay Book Richardson, you didn't want to wake him up so

11  you could keep getting money out of him, isn't that right,

12  Mr. Sood?

13  A.  No.

14  Q.  What else would that mean, "don't wake him up," Mr. Sood?

15  A.  Like I said, if he wanted -- I was surprised he wanted to

16  pay.  If he wanted to pay, if it helps Loyd Management, then

17  let it help, then it will help the company.

18  Q.  Don't wake him up so you can all keep hustling Jeff

19  D'Angelo, isn't that right?

20  A.  No.

21  Q.  Guys like Book, that meant the other coaching friends of

22  Christian Dawkins, didn't it?

23  A.  Other coaches.

24  Q.  Like Book?

25  A.  Yes.

J4UHDaw2                          Sood - Cross

1  Q.  Is what Christian Dawkins said, correct?

2  A.  Correct.

3  Q.  And you know guys like Book, they also got Jeff D'Angelo to

4  pay them money too, didn't they?

5  A.  Yes.

6  Q.  Jeff was probably sleeping then, too, wouldn't you agree?

7  A.  No.

8  Q.  Now, you told Christian Dawkins, "If Jeff wants to give 20

9  grand to Book, and we get the same result, but you can leverage

10  Book for some other stuff, fine," isn't that what you said?

11  A.  Yes.

12  Q.  Let's look at page 2, if we can.  Still on page 2, line 12

13  through 18.  Thank you.

14          In fact, you say to Christian Dawkins, "Jeff wants to

15  give 20 grand to Book, and we can get the same results, but you

16  can leverage Book for some other stuff, fine."

17          Dawkins says, "OK."

18          You say, "Like I told Book, I said, 'Look, Book, you

19  know all these veterans, send me a couple of veterans.'"

20  Right?

21  A.  Yes.

22  Q.  And the 20 grand, as you've referenced it, Jeff D'Angelo is

23  paying Book Richardson won't matter to Loyd Inc. because you're

24  going to get the same results anyway, isn't that what you said?

25  A.  No.

1    Q.  In fact, at one point during this phone call, Mr. Sood, you

2    tell Christian Dawkins all you wanted Book Richardson for was

3    for him to refer you some current NBA veterans to manage their

4    money, isn't that right?

5    A.  That was part of it.

6    Q.  Let's look at 18 through 20.  Actually, 16 through 20, I'm

7    sorry.

8           You tell Christian Dawkins, "Like I told Book, I said,

9    'Look, Book, you know all these veterans, send me a couple

10   veterans.'"  You meant by that NBA veteran basketball players,

11   didn't you?

12   A.  Yes.

13   Q.  Who were multimillionaires, correct?

14   A.  Correct.

15   Q.  Who could invest their money with you in your financial

16   planning company, right?

17   A.  Correct.

18   Q.  And you say, "That's what I'm going to use it for," right?

19   A.  Yes.

20   Q.  So that's why you wanted Book to leave happy, so he could

21   send you some NBA veterans, isn't that right?

22   A.  No.

23   Q.  But that's what you said here, didn't you?

24   A.  I'm telling you what I said, but --

25   Q.  I'm asking you if that's what you said.  I'm looking at a

1    transcript.  Did I read it wrong?

2    A.  No.

3    Q.  So you were taking advantage of Jeff D'Angelo, too, weren't

4    you?

5    A.  No.

6    Q.  Is it fair to say it was your understanding that Christian

7    Dawkins did not like Jeff D'Angelo?

8    A.  I don't know.

9    Q.  Well, you heard him on the calls yesterday calling him some

10   inappropriate names, didn't we?

11   A.  Sure.

12   Q.  Would you agree with me that you don't call people those

13   types of names that you like?

14   A.  Again, I don't know what he was thinking, what Chris -- how

15   much Christian liked or did not like Jeff D'Angelo.

16   Q.  You spent a lot of time with Christian Dawkins between May

17   of '17 to September of 2017 when you all got arrested, didn't

18   you?

19   A.  Yes.

20   Q.  And you knew he would tell you on numerous occasions how

21   much he didn't respect Jeff D'Angelo, isn't that right?

22   A.  Only thing I recall was when Jeff was not willing to pay

23   some money as Christian had directed him to pay, that's what I

24   remember Christian being upset about that.

25   Q.  Because Christian Dawkins didn't like the fact Jeff

J4UHDaw2                          Sood - Cross

1    D'Angelo was holding the purse strings, did he?

2    A.  I mean, look, Christian --

3    Q.  Yes or no?

4    A.  I don't know.

5    Q.  You just said he didn't.  You just said he didn't like an

6    occasion when he, Christian Dawkins, couldn't make a payment

7    without Jeff D'Angelo's permission, right?

8    A.  No.  Christian had directed Jeff to make a payment, and

9    Jeff wasn't -- had some questions.

10   Q.  And Christian didn't like that, did he?

11   A.  Correct.

12   Q.  You testified just a moment ago that Christian Dawkins

13   could make no financial decisions or access to Loyd Management

14   funds without the permission of Jeff D'Angelo, isn't that

15   right?

16           MR. SOLOWIEJCZYK:  Objection.  Mischaracterization.

17           THE COURT:  Sustained.

18   Q.  We saw a shareholders agreement yesterday as an exhibit,

19   correct?

20   A.  Yes.

21   Q.  And you would agree that that shareholder exhibit denoted

22   the percentage interest each party had in Loyd Management, fair

23   to say?

24   A.  Yes.

25   Q.  And that percentage interest was Christian Dawkins was the

J4UHDaw2                              Sood - Cross

1   majority shareholder, wasn't he?

2   A.  Yes.

3   Q.  You know what that means, don't you?

4   A.  Yes.

5   Q.  Christian Dawkins owned 50 percent of the company, correct?

6   A.  Correct.

7   Q.  D'Angelo owned 35 percent of the company, right?

8   A.  Yes.

9   Q.  And you owned 15, is that correct?

10  A.  Correct.

11  Q.  But despite the fact that Christian Dawkins was the

12  majority shareholder, he had to go to the young dude with the

13  bread for financial decisions?

14  A.  As we've -- as we've -- as I've said, as you've seen,

15  Christian had given us a schedule of how much he wanted for

16  certain players or coaches, and that's how the money was being

17  distributed.  And --

18  Q.  But it wouldn't be distributed unless Jeff D'Angelo said

19  so, isn't that what you said?

20  A.  Well --

21  Q.  Yes or no, did you testify to that?

22  A.  Yes.

23  Q.  Now, we heard a call played on your direct examination

24  yesterday that was marked as Government Exhibit 144, with a

25  corresponding transcript of 144T, that reflected that

J4UHDaw2                              Sood - Cross

1    conversation between you and Christian Dawkins.  Do you

2    remember that phone call that was on July 7, 2017 --

3    A.  OK.

4    Q.  -- with you and Christian Dawkins?

5          And to give it context, do you recall that

6    conversation was about Christian Dawkins being unhappy about

7    Jeff D'Angelo, fair to say?

8    A.  Yes.

9          MR. HANEY:  OK.  Could we play that call briefly at

10   this time, your Honor?

11         THE COURT:  Yes.

12         MR. HANEY:  Thank you, your Honor.

13         (Audio played)

14         MR. HANEY:  Stop it there.  Can we stop it there,

15   please.  Thank you.

16   Q.  Now, after hearing this call, does that perhaps trigger

17   your memory or refresh your memory that clearly Christian

18   Dawkins did not like Jeff D'Angelo?

19   A.  He did not like Jeff D'Angelo because Jeff D'Angelo wanted

20   to meet, in this case, parents or the players themselves.

21   Q.  I didn't ask you why he didn't like Jeff D'Angelo.  I asked

22   you from that phone call can you conclude that at that point he

23   did not?

24   A.  I can't.

25   Q.  Would you agree this phone call was on July 7?

J4UHDaw2                        Sood - Cross

1   A.  Yes.

2   Q.  Would you agree that Jeff D'Angelo and Christian Dawkins

3   hadn't known each other very long at that point, correct?

4   A.  Correct.

5   Q.  They'd only known each other a couple months, fair to say?

6   A.  Yes.

7   Q.  And during this phone call, Christian Dawkins says that,

8   the person we heard, that Jeff D'Angelo is not dynamic and good

9   enough, right?

10  A.  Correct.

11          MR. HANEY:  If we can play the rest of that call.

12  Thank you.

13          (Audio played)

14          MR. HANEY:  Stop the call.  Thank you.

15  Q.  Now, you just heard Christian Dawkins refer to Jeff

16  D'Angelo as one of the kids who's not the cool kid, right?

17  A.  Yes.

18  Q.  In fact, he's the kid in school sitting across the table at

19  the lunch table from the cool kids, right?

20  A.  That's what he said.

21  Q.  And he says, "I just want Jeff D'Angelo to be the money

22  guy," isn't that right?

23  A.  That's what he said.

24  Q.  And then you even say, Jeff D'Angelo doesn't know "shit"

25  about this, don't you?

J4UHDaw2                              Sood - Cross

1    A.  But --

2    Q.  Yes or no?

3    A.  Yes.

4    Q.  Is that what you said?

5    A.  Yes.

6    Q.  "This" being this business of basketball, right?

7    A.  But it's not --

8    Q.  Yes or no?

9    A.  Yes.

10   Q.  Christian Dawkins doesn't want Jeff D'Angelo to do anything

11   but get out of the way and give him the money to run Loyd

12   Management, right?

13   A.  I don't know what Christian wanted.

14   Q.  He just said all he wants is Jeff to be the money guy.  Did

15   you misunderstand what that meant?

16   A.  Nope.

17   Q.  It was pretty clear, wasn't it?

18   A.  Yep.

19   Q.  So when I say Christian Dawkins wanted Jeff D'Angelo to do

20   nothing other than give him the money and get out of the way,

21   is that a fair statement for me to make?

22   A.  That's what Christian is saying.

23   Q.  Then Christian Dawkins on this call, 60 days, would you

24   agree, of this new partnership with Jeff D'Angelo, he says, we

25   got to find somebody to give Jeff his money back, didn't he?

J4UHDaw2                          Sood - Cross

1    A.  He did say that.

2    Q.  Because he wanted Jeff D'Angelo gone, isn't that right?

3    A.  He just wanted money without any questions being asked.

4    Q.  But you didn't want that to happen, did you?

5    A.  I didn't care either way.

6    Q.  You were talking Christian Dawkins off the ledge saying,

7    hey, look, let me talk to Jeff, settle down, weren't you?

8    A.  I was trying to explain to him it's not uncommon for an

9    investor to want to meet, in this case, the player.

10   Q.  You knew Christian Dawkins didn't have any money, didn't

11   you?

12              MR. SOLOWIEJCZYK:  Objection, your Honor.

13              THE COURT:  Overruled.

14   A.  I don't know what he had.

15   Q.  How much did he invest in Loyd Management?

16   A.  That was -- that was the structure --

17   Q.  My question was how much did he invest in Loyd Management?

18   Zero dollars, right?

19   A.  Correct.

20   Q.  You invested $40,000, right?

21   A.  Correct.

22   Q.  Jeff D'Angelo invested $185,000, right?

23   A.  Right.

24   Q.  So if Jeff D'Angelo is gone, you now become the guy with

25   the bread, don't you?

1   A.  Well, what Christian had was he had the relationships.

2   Q.  Not what I asked you, sir.

3   A.  That was the assets.

4   Q.  If Jeff D'Angelo was gone, now you're the guy's got to pay

5   for everything, right?

6   A.  Well, based on --

7   Q.  Yes or no?

8   A.  Well, based on this, he said he would bring in another

9   investor.

10  Q.  Where does it say that, sir?

11  A.  I've seen it somewhere.  He said he can find someone else

12  to replace him.

13  Q.  He's asking you if we should find somebody else to replace

14  him, isn't he?

15  A.  Right.  So either him or myself would have to find someone

16  else.

17  Q.  You're not suggesting he had someone lined up to take over

18  for Jeff D'Angelo?

19  A.  I don't know.

20  Q.  You don't know, that's my point, do you?

21  A.  No, I don't.

22  Q.  Now, when I asked you the question after you hear the

23  conversation, would you agree now Christian Dawkins didn't like

24  Jeff D'Angelo?

25  A.  Again, I don't know.

1  Q.  OK.  Clearly, he had no respect at all of Jeff D'Angelo's

2  ability to get involved in the sports business, right?

3          MR. SOLOWIEJCZYK:  Objection.  Asked and answered at

4  this point.

5          THE COURT:  Sustained.

6          MR. HANEY:  I didn't ask that question.

7          THE COURT:  Sustained.

8          MR. HANEY:  Thank you, your Honor.

9  Q.  You acknowledged all that Christian Dawkins is saying, but

10 you instead blame Jeff D'Angelo's buddy, Marty Blazer, for

11 feeding Jeff D'Angelo what you called some stupid shit, didn't

12 you?

13         MR. SOLOWIEJCZYK:  Objection, your Honor.

14         MR. HANEY:  We could play the call.  I'm not making it

15 up.

16         MR. SOLOWIEJCZYK:  Question's very unclear.  Perhaps

17 Mr. Haney --

18         MR. HANEY:  It's what he said, your Honor.

19         THE COURT:  Well, sustained as to form.  You want to

20 ask it, rephrase it, Mr. Haney?

21         MR. HANEY:  Yes, your Honor.  Thank you.

22 BY MR. HANEY:

23 Q.  Did you say that Marty Blazer was feeding Jeff D'Angelo

24 some stupid shit?

25 A.  I did.

J4UHDaw2                          Sood - Cross

1    Q.  Stupid shit, pardon my language, like paying college

2    coaches, right?

3    A.  No.

4    Q.  No.

5         But you do admit from your testimony, Jeff D'Angelo,

6    he wanted to pay the college coaches, didn't he, yes or no?

7    A.  Yes.

8    Q.  Because Jeff just wanted to do a bunch of coaches, that's

9    what you said, yes or no?

10   A.  Yes.

11   Q.  Including coaches like Lamont Evans who would take money

12   and then not deliver on promises, right, Mr. Sood?

13   A.  Correct.

14   Q.  In fact, you testified on direct examination that when you

15   worked with Christian Dawkins while he was at ASM, there was

16   never an occasion where you saw Christian Dawkins pay a college

17   coach money, isn't that right?

18   A.  In my short relationship --

19   Q.  Yes or no?

20   A.  No.

21   Q.  You understand that in this case Christian Dawkins is

22   charged with conspiracy to pay bribes to Book Richardson,

23   Lamont Evans, and Tony Bland, correct?

24        MR. SOLOWIEJCZYK:  Objection, your Honor.  Asking this

25   witness what a defendant is charged with.

J4UHDaw2                              Sood - Cross

1              MR. HANEY:  His personal knowledge, your Honor.

2              THE COURT:  Overruled.

3     Q.  You understand that in this case Christian Dawkins is

4     charged with a conspiracy to bribe Book Richardson, Lamont

5     Evans, and Tony Bland, is that right?

6     A.  Yes.

7     Q.  Correct me if I'm wrong, you never once saw Christian

8     Dawkins pay any of those coaches, did you, Mr. Sood?

9     A.  I just saw him --

10    Q.  Yes or no?

11    A.  No.

12    Q.  Never saw him pay the $5,000 to Book Richardson that Jeff

13    D'Angelo paid at the meeting, correct?

14    A.  Correct.

15    Q.  Then you testified that after Book Richardson was paid the

16    $5,000, shortly thereafter he asked for another $15,000, is

17    that right?

18    A.  Correct.

19    Q.  And you testified you were at that meeting where Book

20    Richardson received the $15,000 payment.  It was at your

21    office, if I recall, correct?

22    A.  Yes.

23    Q.  We saw a video of that meeting, is that right?

24    A.  Yes.

25    Q.  Yesterday, correct?

J4UHDaw2                          Sood - Cross

1    A.  Correct.

2    Q.  And you testified on direct that the purpose of that

3    $15,000 payment was to recruit a kid named Jahvon Quinerly,

4    right?

5    A.  Yes.

6    Q.  A kid that was targeted to go to Arizona to play

7    basketball, am I right?

8    A.  Yes.

9    Q.  And that you and Jeff D'Angelo gave Book Richardson the

10   $15,000 on that occasion, right?

11   A.  At the direction of Dawkins.

12   Q.  Yes or no, did you and Jeff D'Angelo give it to Book

13   Richardson?

14   A.  Yes.

15   Q.  To help lock in the commitment of Jahvon Quinerly, right?

16   A.  Right, for Loyd Management.

17   Q.  But isn't it true Jahvon Quinerly had already committed to

18   Arizona?

19   A.  I don't know.

20   Q.  As you've testified that you have personal knowledge with

21   your dealings with Steve Pina at ASM, if Jahvon Quinerly or his

22   family had received that money, Jahvon Quinerly would have been

23   ineligible to play basketball, wouldn't he?

24   A.  That's correct.

25   Q.  And he played basketball at Arizona, didn't he?

J4UHDaw2                          Sood - Cross

1    A.  I believe he did.

2    Q.  So Book Richardson never gave that money to anyone.  He

3    hustled you guys again, didn't he?

4    A.  I have no idea.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4H9DAW3                              Sood - Cross

1    Q.  But you do have an idea, a certainty that when you and Jeff

2    D'Angelo gave Book Richardson that $15,000 Christian Dawkins

3    wasn't there, right?

4    A.  Again, the money was --

5    Q.  Yes or no.  Was he there?

6    A.  No.

7    Q.  You know what it means to be there?

8    A.  Yes.

9    Q.  Was he in the room?

10   A.  He was not.

11   Q.  In fact, you never saw Christian Dawkins give Book

12   Richardson a dime, did he?

13   A.  That's correct.

14   Q.  Because you know the two occasions Book Richardson was paid

15   Christian Dawkins wasn't there on either indication, was he?

16   A.  That's correct.

17   Q.  And you also knew, because you've testified, that Christian

18   Dawkins and a coach by the name of Preston Murphy were very

19   good friends, correct?

20   A.  Yes.

21   Q.  You knew they grew up together, didn't you?

22   A.  Yes.

23   Q.  In Saginaw, Michigan, right?

24   A.  Correct.

25   Q.  And you knew that Christian Dawkins was also very close

J4H9DAW3                          Sood - Cross

1   friends with Book Richardson, correct?

2   A.  Correct.

3   Q.  And Corey Barker, correct?

4   A.  I don't know the last one.

5   Q.  Tony Bland?

6   A.  Tony Bland, yes.

7   Q.  But you weren't in Las Vegas when those meetings occurred,

8   were you?

9   A.  No.

10  Q.  But Marty Blazer was, wasn't he?

11  A.  That's my understanding.

12  Q.  And it's your understanding that Christian Dawkins

13  apparently, because you're saying he orchestrated everything,

14  he was OK that Marty Blazer was in those meetings in Las Vegas,

15  right?

16  A.  I don't know.

17  Q.  You do know, though, don't you, Christian Dawkins did not

18  want Marty Blazer around his network because of Marty Blazer's

19  rather public problems he was having?  Fair to say?

20  A.  Yes.

21  Q.  He made it very clear to you on a number of occasions he

22  didn't want Marty Blazer on his people, didn't he?

23  A.  Correct.

24  Q.  So you knew that Christian Dawkins was very careful about

25  associating his reputation with Marty Blazer, correct?

J4H9DAW3                          Sood - Cross

1    A.  I guess.

2    Q.  And that there was a meeting that was very important,

3    Christian Dawkins told you, he didn't want Marty Blazer at

4    those meetings; isn't that right?

5    A.  Don't recall that.

6    Q.  Well isn't this why Marty Blazer wasn't allowed to be a

7    partner of Loyd Management?

8    A.  To me, I don't know what value Marty Blazer added to Loyd

9    Management.

10   Q.  But isn't it true that for some reason Christian Dawkins

11   didn't care if Marty Blazer was present at the coaches'

12   meetings when his friends got paid in Las Vegas, did he?

13               MR. SOLOWIEJCZYK:  Objection, your Honor.  Asked and

14   answered.

15               MR. HANEY:  I didn't ask that question.

16               MR. SOLOWIEJCZYK:  Lack of personal knowledge.

17               THE COURT:  Sustained as to the form.  Why don't you

18   rephrase, Mr. Haney.

19               MR. HANEY:  Thank you.

20   Q.  But isn't it true you know Marty Blazer was at those

21   meetings when Christian Dawkins' friends received cash from

22   Jeff D'Angelo, right?

23   A.  I wasn't there so I don't know what happened there.

24   Q.  So as you're sitting here under oath today you're telling

25   me you don't know if Marty Blazer was in Las Vegas during those

J4H9DAW3                        Sood - Cross

1  meetings?

2  A.  He was in Las Vegas but I don't know which meetings he did

3  attend or didn't attend.

4  Q.  You know that Corey Barker received cash out in Las Vegas,

5  didn't he?

6  A.  I have no idea.

7          Who?

8  Q.  Sorry.  Corey Barker.  The coach of Texas Christian.

9  A.  I have no idea.

10 Q.  How about Preston Murphy?

11 A.  I have no idea.

12 Q.  How about Tony Bland?

13 A.  Yes.

14 Q.  Would you agree with me that at the end of July Christian

15 Dawkins was owed $25,000 by Jeff D'Angelo and Jill Bailey in

16 their agreement to fund Loyd Management?

17 A.  I have to check how much he's been given and not given.

18 Don't know.

19 Q.  Mr. Sood, so we are clear your presence here today is

20 because you have to be in order to get a deal that you and your

21 attorney worked out with the government?  Is that a fair

22 statement?

23 A.  Yes.  I agreed to cooperate.

24 Q.  You're not here by option?  You have to be here in order to

25 get a cooperation agreement, correct?

1    A.  Yes.

2    Q.  In fact, you have met with the government on numerous times

3    to discuss what you're going to say here today, how you're

4    going to say it; isn't that right, Mr. Sood?

5    A.  No.

6    Q.  Have you met with the government this week?

7    A.  Yes.

8    Q.  And when you met with the government this week are you

9    telling the jury that you did not meet about your testimony in

10   this case?

11   A.  Just --

12   Q.  Let met ask you this question.  Did you meet about the

13   Yankees and how they're doing?

14   A.  No, not the Yankees.

15   Q.  So you met with them about this trial and what you're going

16   to say in here, right?

17   A.  Just we reviewed the recordings and make sure I have my,

18   you know, I had all the information.

19   Q.  Who all have you met with this week in preparation of your

20   testimony?

21   A.  Who?

22   Q.  Who all have you met with?

23   A.  Just Noah.

24   Q.  Point them out.  Where are they?

25   A.  He's sitting in the first seat in the first row.  And one

1    of the FBI agents.

2    Q.  And you met with them for the purposes of preparing for

3    your testimony in this courtroom.  Would you agree?

4    A.  Yes.

5    Q.  Prepared to assist the prosecution in their efforts of

6    convicting Christian Dawkins?  Is that a fair statement?

7    A.  Just to tell the truth.  That's what I'm prepared to do.

8    Q.  Is that what they prepared you to say if any question I ask

9    you is difficult to answer, "I'm just here to tell the truth"?

10   A.  Nope.

11   Q.  Well you're helping the government by being here today,

12   aren't you, Mr. Sood?

13   A.  Yeah, I'm cooperating.

14   Q.  Are you helping the government today, yes or not, being

15   here?

16   A.  I guess.

17   Q.  You're not hurting the government by testifying against

18   Christian Dawkins, are you?

19   A.  Again, I'm just telling the truth.

20   Q.  If you had it your way you'd rather not be here today?

21   Would that be a fair statement?

22   A.  Sure.  Yes.

23   Q.  Would it also be a fair statement to say to you that you've

24   made a lot of bad decisions that have brought you to be sitting

25   in that seat that you're sitting in here today?

J4H9DAW3                          Sood - Cross

1   A.  Yes.

2   Q.  And you have on an earlier occasion admitted to Judge Ramos

3   that those decisions you made were, in fact, federal crimes;

4   isn't that right?

5   A.  Yes.

6   Q.  Federal crimes that you knowingly and voluntarily

7   committed, correct?

8   A.  Yes.

9   Q.  And did so because of greed; isn't that right?

10  A.  Yes.

11  Q.  And selfishness, would you agree?

12  A.  Yes.

13  Q.  You and my client used to be friends; isn't that right?

14  A.  Yes.

15  Q.  Shared some good times together, I would submit?

16  A.  Yes.

17  Q.  And you're here today to testify against your former friend

18  so you hopefully can get a break from the judge on your

19  sentence; isn't that right?

20  A.  I cooperated and I'm just telling the truth.

21  Q.  I'm asking you what your hope is by testifying.  Would you

22  agree you're hoping you get a better sentence by testifying

23  against him, yes or no?

24  A.  I'm hoping by testifying I get a better -- I get a better

25  deal, yes.

J4H9DAW3                          Sood - Cross

1  Q.  And the government here in this district they call it

2  cooperation, don't they?

3  A.  Yes.

4  Q.  That's a nice way of saying that somebody is testifying

5  against somebody else.  Would you agree?

6           MR. SOLOWIEJCZYK:  Objection, your Honor.

7           THE COURT:  Overruled.

8           THE WITNESS:  I guess.

9  Q.  We call it another word in my jurisdiction but wouldn't you

10 agree in this jurisdiction they call it a cooperator, right?

11 A.  Yes.

12 Q.  Everyone likes a cooperator, don't they?

13          MR. SOLOWIEJCZYK:  Objection.

14          THE COURT:  Sustained.

15 Q.  Isn't it true, Mr. Sood, the government has told you if you

16 cooperate that it might help you from going to prison, yes or

17 no?

18 A.  Yes.

19 Q.  And you know because you've testified you're facing

20 potentially decades in prison, aren't you?

21 A.  Yes.  Thirty-five years.

22 Q.  That's really why you're here, isn't it, Mr. Sood?

23 A.  Again, I cooperated.  I'm here to tell the truth.

24 Q.  Is it fair for me to say you don't want to go to prison?

25 A.  I don't think -- no.

J4H9DAW3                          Sood - Cross

1   Q.  You have a wife and three kids, don't you?

2   A.  Yes.

3   Q.  How old are your kids?

4   A.  17, 14, and 10.

5   Q.  And no dad would want that life for their kids and wife,

6   would they?

7   A.  No.

8   Q.  Miss high school graduation potentially, right?

9   A.  Correct.

10  Q.  Miss the prom, right?

11  A.  Yes.

12  Q.  Miss the first date even, right?

13  A.  Sure.

14  Q.  In fact, you and Mr. Blazer, the two star witnesses, are

15  facing over a hundred years in prison on this case, aren't you?

16          MR. SOLOWIEJCZYK:  Objection, your Honor.  He has no

17  basis to answer that as to Mr. Blazer.

18          THE COURT:  Sustained.

19  Q.  Is it fair for me to say that in your mind you believe that

20  by testifying against Christian Dawkins you are helping prison

21  from becoming a reality, yes or no?

22  A.  I don't know.

23  Q.  Would you agree you'd betrayed your friendship with

24  Christian Dawkins to save yourself, yes or no?

25  A.  No.

J4H9DAW3                          Sood - Cross

1    Q.  You don't think it's a betrayal to testify against your

2    friend when you did bad things too?

3    A.  I cooperated.  Everyone has got an option.

4    Q.  Everyone has got an opinion of what cooperation is too,

5    don't they, Mr. Sood?

6    A.  Fair enough.

7    Q.  Do you feel any responsibility at all for introducing Marty

8    Blazer to Christian Dawkins in the first place?

9    A.  Actually he had met Marty Blazer without me.

10   Q.  So, correct me if I'm wrong.  Your solution to facing what

11   you've characterized as potentially decades in jail was stalled

12   potentially by testifying against Christian Dawkins in a way

13   that the government would be satisfied, yes or no?

14   A.  I don't know.

15   Q.  To claim payments, like the ones that you've testified to

16   regarding Lamont Evans and Book Richardson, were bribe payments

17   when they weren't, right, Mr. Sood?

18   A.  Again, I don't know.

19   Q.  Would you agree with me, Mr. Sood, when you prepared with

20   the government this week you prepared to make sure that your

21   testimony supported their case?

22   A.  Again, I'm just stating the facts.

23   Q.  Well, isn't it a fact of reality you'd rather have

24   Christian Dawkins sitting in prison than yourself?

25              MR. SOLOWIEJCZYK:  Objection, your Honor.

J4H9DAW3                          Sood – Cross

1          THE COURT:  Sustained.

2     Q.  You've never been to prison before, have you Mr. Sood?

3     A.  No.

4     Q.  You don't know what it's like?

5     A.  No.

6     Q.  You have a lot to gain by testifying against Christian

7     Dawkins in this case, don't you?

8     A.  Again, I'm cooperating.  That's the decision I made.

9     Q.  My question was, yes or no, you have a lot to gain from

10    testifying against Christian Dawkins, yes or no?

11    A.  I don't know.

12         MR. HANEY:  Nothing further, your Honor.

13         THE COURT:  Mr. Moore.

14         MR. MOORE:  Thank you, your Honor.

15    CROSS-EXAMINATION

16    BY MR. MOORE:

17    Q.  Good morning, Mr. Sood.

18    A.  Good morning.

19    Q.  Now, about two minutes ago, correct me if I'm wrong, you

20    told Mr. Haney that you understood that by testifying you might

21    get a better deal; isn't that right?

22    A.  Yes.

23    Q.  That's what you said about two minutes ago, right?

24    A.  Yes.

25    Q.  But at the very beginning of Mr. Haney's cross-examination

1  you told Mr. Haney that you had no deal with the government;

2  isn't that right?

3  A.  That's correct.

4  Q.  So, which is it?  Are you hoping for a better deal or you

5  have no deal, Mr. Sood?

6  A.  I misspoke.  I have no deal with the government.

7  Q.  Well, Mr. Sood, you have a cooperation agreement with the

8  government, correct?

9  A.  Correct.

10  Q.  And many people would call that a deal, wouldn't they,

11  Mr. Sood?

12  A.  OK.

13  Q.  And so I'm going to go back over that in a minute.  But I

14  want to begin by talking to you a little bit about your

15  relationship with Marty Blazer.

16         Now, you met Marty Blazer in 2011 or 2012 when you

17  traveled to Pittsburgh to visit the Pittsburgh office of this

18  Lawrenceville, New Jersey, bank, right?

19  A.  Yes.

20  Q.  That's where you met him, correct?

21  A.  Yes.

22  Q.  And this Lawrenceville, New Jersey bank is the bank that

23  you helped found?

24  A.  Correct.

25  Q.  With assets of 1.2 billion?

J4H9DAW3                        Sood – Cross

1    A.  At the sale time, yes.

2    Q.  At the sale time.  OK.  And this is the bank that you were

3    the chairman of, correct?

4    A.  Yes.

5    Q.  So Mr. Blazer was introduced to you while you were in

6    Pittsburgh as somebody who represented athletes who needed help

7    with residential mortgages, right?

8    A.  Yes.

9    Q.  I believe that's what you told the government when you

10   first made your proffer agreement with the government, correct?

11   A.  Correct.

12   Q.  And you and Mr. Blazer hit it off, right, and you formed a

13   partnership, correct?

14   A.  Correct.

15   Q.  You were birds of a feather.  You were sort of kindred

16   spirits.

17           So you all became partners in this Princeton Blazer

18   Adviser Group, correct?

19   A.  Yes.

20   Q.  And you started out representing six to seven elite pro

21   athletes, correct?

22   A.  NFL players, yes.

23   Q.  Now, you chose to become Marty Blazer's partner, correct?

24   A.  Yes.

25   Q.  But you've told this jury that at the time you chose to

1    become Mr. Blazer's partner you didn't know that he was

2    stealing money from the clients of the company that you and he

3    formed, did you?

4    A.  The money he stole was not the money that we were managing.

5    He controlled completely different accounts for these players.

6    Nothing to do with us.

7    Q.  Well, but Mr. Sood those -- he was stealing money from

8    clients, correct?

9    A.  Stealing from clients, correct.

10   Q.  And he asked you if you wanted to invest in this horror

11   movie in Los Angeles, didn't he?

12          That's what you told the government the first time you

13   sat you down and talked to them; is that right?

14   A.  What's the question?  Sorry.

15   Q.  Mr. Blazer asked you to become an investor in this horror

16   movie project that he stole money to fund, correct?

17   A.  Yes.

18   Q.  And you refused to invest in that, correct?

19   A.  Yes.  We didn't invest in movies.

20   Q.  So in about 2012 or 2013 you learned that the SEC had

21   decided to audit your company, correct?

22   A.  Yes.

23   Q.  That's what you told the government first time you sat down

24   with them after you lied to them upon arrest.  We'll get back

25   to that in a minute.  But the first time you sat down with them

1   pursuant to this proffer agreement that your lawyers negotiated

2   with them you told them that the SEC decided to audit your

3   company, right?

4   A.  Correct.

5   Q.  And you came to learn that Mr. Blazer was defrauding the

6   clients of your company, correct?

7   A.  He was.

8   Q.  And you now know that Mr. Blazer not only was defrauding

9   the clients but that he created false documents that he had

10  your compliance officer submit to the SEC; isn't that right?

11  A.  What I recall is he attempted to have her submit but I

12  don't believe we ever did.

13          I have to check that.

14  Q.  You have to check that.  Can you check that and get back to

15  us?

16  A.  I know we supported it but I'm not exactly sure what

17  information was provided to the SEC regarding that.

18  Q.  So as we sit here some six years later you don't know what

19  information was provided to the SEC?

20  A.  I know exactly --

21  Q.  Is that your testimony, Mr. Sood?

22  A.  My testimony I don't know exactly what actual files or

23  documents were provided.

24  Q.  You know that Mr. Blazer, whether he succeeded or not,

25  tried to have your compliance officer submit false documents to

1   the SEC, correct?

2   A.   That's correct.

3   Q.   And you know that it's a crime to submit false documents to

4   the SEC, correct?

5   A.   Correct.

6   Q.   And so Mr. Blazer, your business partner, put your employee

7   in the position of exposing herself to prosecution, correct?

8   A.   Correct.

9   Q.   Nice guy, right?

10   A.   Agreed.

11   Q.   And you were advised to buy Mr. Blazer out for a dollar I

12   think is what you told us, correct, under oath?

13   A.   Yes.

14   Q.   But after you found out that Mr. Blazer was stealing money

15   from clients and put your company at risk, had submitted or had

16   attempted to submit false statements through your compliance

17   officer, you still continued to deal with him; isn't that

18   right?

19   A.   So once we bought him out in --

20   Q.   Mr. Sood, you can answer yes or no and then you can

21   explain.

22        You still continued to deal with him, did you not,

23   sir?

24   A.   Yes.

25   Q.   Because you continued to manage his wife and children's

J4H9DAW3                          Sood - Cross

1    money, right?

2    A.  Correct.

3    Q.  And you continued to service the clients that he had

4    brought you, correct?

5    A.  Correct.

6    Q.  Because you were making a buck from managing his children

7    and wife's money, correct?

8    A.  No.

9    Q.  And you were making a buck from continuing to service the

10   clients that he brought you, correct?

11   A.  Yes.

12   Q.  The same clients that he stole from, correct?  Mr. Sood?

13   A.  A few of them, yes.

14   Q.  A few of them.  OK.

15          You didn't want to completely disassociate yourself

16   with Mr. Blazer, did you?  Because you didn't, did you?

17   A.  As I said earlier, biggest mistake of my life.

18   Q.  Well and it's fair to say that Mr. Blazer did not tell you

19   that he decided to strike a secret deal and travel around the

20   country setting people up?  He didn't tell you that, did he?

21   A.  No.

22   Q.  And one of the people that Mr. Blazer set up was you,

23   right?

24   A.  Correct.

25   Q.  And he convinced you to come on a yacht and meet with this

1  Jeff D'Angelo guy, right?

2  A.  Yes.

3  Q.  And you not only came to that yacht alone, you brought your

4  assistant Alicia Carroll; isn't that right?

5  A.  Yes.

6  Q.  And, in fact, you also brought Ms. Carroll along to a

7  meeting at the Conrad Hotel here in New York, correct?

8  A.  Yes.

9  Q.  Now, Mr. D'Angelo is the one who picked the location of

10  each of those meetings; isn't that right?

11  A.  I believe that's correct.

12  Q.  Mr. D'Angelo was the one who picked the spot to meet at a

13  yacht at Battery Park in the Southern District of New York,

14  correct?

15  A.  Correct.

16  Q.  And he's the one who chose the meeting spot for this

17  meeting at the Conrad Hotel also in the Southern District of

18  New York, correct?

19  A.  Correct.

20  Q.  And we've listened to portions of those meetings.  It's

21  fair to say that Mr. Blazer put your assistant Alicia Carroll

22  in a difficult position by having her attend both of those

23  meetings, correct?

24  A.  Correct.

25  Q.  Is part of deal with the government that she not get

J4H9DAW3                        Sood - Cross

1    prosecuted, Mr. Sood?

2    A.   No.

3    Q.   Now, you would agree with me that Marty Blazer is a very

4    dishonest guy, correct?

5    A.   Correct.

6    Q.   And Marty Blazer is someone that you wish that you had

7    never trusted; isn't that right?

8    A.   Correct.

9    Q.   And I believe you said several times that trusting Marty

10   Blazer was one of the biggest mistakes of your life; isn't that

11   correct, Mr. Sood?

12           MR. SOLOWIEJCZYK:  Can we have a brief sidebar, your

13   Honor.

14           THE COURT:  OK.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Yes, sir.

3           MR. SOLOWIEJCZYK:  Your Honor, I think having one

4    witness opine on the truthfulness of another witness just

5    generally speaking is objectionable and to the extent that

6    Mr. Moore is going to do it, probably going to warrant some

7    kind of limiting instruction.

8           I just think it's an inappropriate line of cross.

9    It's for the jury to decide whether or not various witnesses

10   are telling the truth.  The facts have been laid out in

11   significant detail.  But all of Mr. Blazer's past crimes has

12   really no relevance to whether Mr. Sood thinks Mr. Blazer is

13   truthful.

14          MR. MOORE:  I didn't ask him whether he thinks

15   Mr. Blazer is truthful or was truthful in this courtroom.  I

16   asked him about his prior dealings with Mr. Blazer.

17          And that was explored by Mr. Solowiejczyk on direct

18   and also explored by Mr. Haney on cross and was not objected

19   to.  I'm at the end of this line of questioning.

20          THE COURT:  An objection that I would sustain if there

21   were any more questions as cumulativeness but if you're at the

22   end of the line.

23          MR. MOORE:  I'm at the end.  I'm ready to move on,

24   Judge.

25          THE COURT:  Then we're done.

J4H9DAW3                        Sood – Cross

1              MR. MOORE:  OK.  Thank you.

2              (Continued on next page)

J4H9DAW3                        Sood - Cross

1             (In open court)

2    Q.   Now, Mr. Sood, I'm going to try to do this quickly.  I'm

3    not going to do over all of the details of your career in

4    finance that Mr. Haney went over but it's safe to say that you

5    have a pretty significant history in the financial business,

6    correct?

7    A.   Correct.

8    Q.   You've got a college degree, right?

9    A.   Yes.

10   Q.   You were a senior portfolio manager of Global Value

11   Investors, right?

12   A.   Yes.

13   Q.   You were a senior analyst and trader in capital, right?

14   A.   Yes.

15   Q.   And you were the one who decided to found Princeton

16   Advisory Group, right?

17   A.   Yes.

18   Q.   And you later decided to partner with your good friend

19   Mr. Blazer in a separate business called Princeton Blazer,

20   correct?

21   A.   Yes.

22   Q.   And this Princeton Advisory Group offered financial

23   planning for wealthy people, right?

24   A.   Yes.

25   Q.   And you make money for providing financial advice to

J4H9DAW3                          Sood - Cross

1   wealthy people; isn't that right, Mr. Sood?

2   A.  Yes.

3   Q.  And you were registered with the SEC.  You got a chartered

4   financial analyst designation.  You were a member of the

5   Investment Analysts Society in New York, correct?

6   A.  Yes.

7   Q.  So you've always considered yourself a pretty savvy

8   business guy, right, Mr. Sood?

9   A.  I guess.

10  Q.  And you've been successful, correct?

11  A.  Yes.

12  Q.  You've made money, correct?

13  A.  Yes.

14  Q.  And as a part of your sphere of working in the financial

15  business you frequently meet with people who are prospective

16  new clients, right?

17  A.  Correct.

18  Q.  And when you meet with a prospective new client you want to

19  pitch them on your services to convince them that they should

20  retain you, correct?

21  A.  Correct.

22  Q.  And in addition to that you also meet with potential

23  business partners, correct?

24  A.  Correct.

25  Q.  People who might be able to invest in your business,

J4H9DAW3                          Sood – Cross

1    correct?

2    A.  Correct.

3    Q.  And so when you meet with a potential business partner,

4    again, you're sort of pitching them on your services, correct?

5    A.  Correct.

6    Q.  And your hope, whether it's a client or a potential

7    business partner, is that you develop a relationship with them

8    that will make you money; isn't that right, Mr. Sood?

9    A.  Yes.

10   Q.  That's the goal of the clients and potential business

11   partners, correct?

12   A.  Yes.

13   Q.  And so when you meet with a new client, a potential new

14   client, you want to make a good impression on that person;

15   isn't that right?

16            MR. SOLOWIEJCZYK:  Objection.  Relevance.

17            THE COURT:  Sustained.

18            MR. MOORE:  Your Honor, could we approach.

19            (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          MR. MOORE:  Your Honor, Mr. Code in his first meeting

3    with Jeff D'Angelo, etc., that was his first meeting.  It was

4    his pitch meeting.  Mr. Solowiejczyk allowed Mr. Sood over the

5    government's objection to characterize certain -- over our

6    objection to characterize certain portions of a meeting that

7    was video recorded.  I think I'm allowed to explore -- because

8    this gentleman is very savvy.  He understands how you deal with

9    clients.  He understands how you deal with potential business

10   partners.  And I think I'm allowed to explore what typically

11   happens in early relationships with clients and potential

12   business partners.

13         MR. SOLOWIEJCZYK:  That's why I objected, your Honor.

14   That's exactly where I thought Mr. Moore was going with this.

15   To the extent he wants to ask him specific questions about what

16   happened at that meeting, that's one thing obviously; but to

17   now have this witness to have standing for this is how things

18   typically work when you're pitching clients so Mr. Moore can

19   basically make a jury argument in the guise of

20   cross-examination.  This is not the witness to do this through,

21   just because he happens to be in the financial advisory

22   business.

23         THE COURT:  After all, a lot of cross-examination is

24   developing arguments to make before a jury.

25         MR. MOORE:  Yes, sir.

J4H9DAW3                          Sood - Cross

1            MR. SOLOWIEJCZYK:  Sure.

2            THE COURT:  But I think that -- there's a couple of

3    arguments in that could be made, I suppose, including this was

4    not a typical pitch meeting.  I mean this is a situation where

5    Mr. Sood has indicated he's not been involved in before.  I

6    will give you some leeway in this regard but if you start going

7    too far I will start sustaining objections.

8            MR. MOORE:  I understand.  I only have a couple more

9    questions here but Mr. Solowiejczyk I'm sure is very able to go

10   back on redirect and replow this ground if he chooses.

11           THE COURT:  Yes.

12           (Continued on next page)

J4H9DAW3                          Sood - Cross

1              (In open court)

2    Q.  And you've dealt with a lot of potential new clients and

3    potential business partners, correct?

4    A.  Yes.

5    Q.  And you want to keep them happy, correct?

6    A.  Yes.

7    Q.  So you can continue the relationship with them, correct?

8    A.  Correct.

9    Q.  And you know, Mr. Sood, that sometimes you tell new clients

10   and potential business partners what you think they want to

11   hear, correct?

12              MR. SOLOWIEJCZYK:  Objection, your Honor.

13              THE COURT:  Overruled.

14              THE WITNESS:  No.

15   Q.  Well, Mr. Sood, you don't tell a brand new client that

16   their ideas are stupid, do you?

17   A.  Yeah.

18   Q.  You do?

19   A.  Absolutely.

20   Q.  You don't tell potential new business partners, people who

21   are going to invest in your company or partner with you that

22   their ideas are stupid, do you, Mr. Sood?

23   A.  Depends on the idea.

24   Q.  Well, you also don't contradict them, do you, Mr. Sood?

25   A.  Again, depends.

1    Q.  Sometimes you play along with potential clients or business

2    partners and try to redirect their efforts if you disagree with

3    them in subtle ways.  You'd agree with that, wouldn't you,

4    Mr. Sood?

5    A.  I don't understand the question.

6    Q.  Mr. Sood, it's not a good idea the first time you meet with

7    someone to tell them that their ideas are stupid, correct?

8             MR. SOLOWIEJCZYK:  Objection.  Asked and answered at

9    this point.

10            THE COURT:  Sustained.

11   Q.  Mr. Sood, sometimes you are careful about the words that

12   you use when meeting with someone the first time, correct?

13   A.  No.

14   Q.  So you're not careful with the words that you use when

15   meeting with someone for the first time?

16   A.  No.  If I don't agree with the potential clients, then it's

17   not going to work.

18   Q.  Well you certainly didn't disagree with Mr. D'Angelo in any

19   of these recordings, did you, Mr. Sood?

20   A.  I don't believe I did.

21   Q.  Now, you viewed Mr. D'Angelo as either a client or a

22   potential business partner, correct?

23   A.  Correct.

24   Q.  And I believe you told Mr. Haney that this Princeton

25   Advisory Group that you owned and started actually managed

1    assets in excess of two to three billion dollars in 2012,

2    right?

3    A.   No, I said it was in 2004 or '5.

4    Q.   Well you told the government the first time you sat down

5    with them for your proffer arrangement, and you knew that

6    somebody was taking notes, you told the government, didn't you,

7    that in 2012 that company managed assets in excess of two to

8    three billion dollars, correct?

9    A.   Correct.

10   Q.   And that's a very successful company, wasn't it?

11   A.   Yes.

12   Q.   And the Princeton Advisory Group is still operating, isn't

13   it?

14   A.   Yes.

15   Q.   And you're still the CEO of that company, right, Mr. Sood?

16   A.   Yes.

17   Q.   And you're still making money at it, correct?

18   A.   Yes.

19   Q.   The government nor the SEC has shut you down yet, have

20   they?

21   A.   Correct.  Yes.

22   Q.   Although, as I believe you told Mr. Solowiejczyk on direct

23   examination, you are in the middle of an SEC inquiry; is that

24   correct?

25   A.   Yes.

1  Q.  What's that inquiry about, Mr. Sood?

2  A.  Just -- my lawyers are handling it but I just -- if there's

3  going to be any -- any fines or any type of suspension.

4  Q.  So, Mr. Sood, when you mentioned your lawyers, you have

5  multiple lawyers from multiple law firms assisting you in this

6  case and in the SEC investigation, correct?

7  A.  Just one law firm.

8  Q.  I believe you're represented in -- Mr. Sood --

9         MR. SOLOWIEJCZYK:  Your Honor, I'm going to object on

10  relevance grounds.

11         THE COURT:  Overruled at this point.

12  Q.  Mr. Sood, with your cooperation agreement which we referred

13  to earlier and which I'm going to talk about again, that was

14  approved by a lawyer named Richard Zach who is with the law

15  firm Pepper Hamilton, correct?

16  A.  Correct.

17  Q.  On at least two occasions you've met with people from

18  another prosecutor's office which I'm going to get to in a

19  minute and you had lawyers from another law firm in New Jersey

20  present for those two debriefings, correct?

21  A.  Yeah, but that has nothing to do with the SEC.  You were

22  asking about the SEC.

23  Q.  No, sir.  I'm asking you about your whole problem here.

24  You got criminal problems here in Manhattan and you also have

25  issues with the SEC, correct?

J4H9DAW3                           Sood - Cross

1   A.   Right.  And the law firm for both the SEC and this is
2   Pepper Hamilton.
3   Q.   Well you also had a different law firm in New Jersey attend
4   two debriefings with Mr. Solowiejczyk and some other folks
5   about this Lawrenceville, New Jersey bank, did you not,
6   Mr. Sood?
7   A.   That's a different law firm for that.  That's correct.
8   Q.   So you've had at least two different law firms representing
9   you in connection with things that have stemmed from this
10  investigation, correct, Mr. Sood?
11  A.   Again, the bank situation did not come from this situation.
12  Q.   You did not agree to talk to anybody about the problems at
13  that bank until you got arrested in this case, did you,
14  Mr. Sood?
15          MR. SOLOWIEJCZYK:  Objection, your Honor.
16          THE COURT:  Overruled.
17          THE WITNESS:  I guess.
18  Q.   Mr. Sood, you did not sit down and talk with any law
19  enforcement official about problems at that bank until you got
20  arrested by the Southern District of New York and the FBI, did
21  you?
22  A.   What I recall is that happened after this case.
23  Q.   Because it's part of your cooperation with the government
24  in this case, correct, Mr. Sood?
25  A.   Correct.

J4H9DAW3                        Sood - Cross

1    Q.  And despite the fact that you pled guilty in August of last

2    year to multiple crimes, you haven't been sentenced yet, have

3    you?

4    A.  No.

5    Q.  Because you and the government are waiting for your

6    testimony at this trial before they ask the judge to sentence

7    you, correct?

8    A.  I understand that's how the process works.

9    Q.  You understand that's how the process works, right,

10   Mr. Sood?

11   A.  Yes.

12   Q.  You understand that you want to get the benefit from

13   testifying here at this trial before the United States of

14   America takes a position on what sentence you should receive;

15   isn't that correct, Mr. Sood?

16   A.  Correct.

17   Q.  And just so we're clear, OK, your hope is that your

18   cooperation with the government means that you won't have to

19   spend a single day in jail; isn't that correct, Mr. Sood?

20   A.  Yes.

21   Q.  That's what you're hoping for?

22   A.  That's what I'm hoping for.

23   Q.  And so despite the fact that you have pled guilty to three

24   separate felonies, three separate federal felonies, you're

25   hoping never to spend a day in federal prison, correct?

J4H9DAW3                          Sood - Cross

1    A.  Correct.

2    Q.  Now, Mr. Sood, in this cooperation agreement which is

3    referenced as Government Exhibit 658 -- and I know the ladies

4    and gentlemen of the jury will have a chance to review it --

5    the government makes you some promises, don't they?

6    A.  Can you clarify.

7    Q.  Yes, sir.  They tell you that if you provide what they

8    determine that -- determine to be substantial assistance they

9    will write a 5K letter to your sentencing judge asking that

10   judge to consider your cooperation at sentencing, right?

11   A.  Correct.

12   Q.  They promised that they would do that, correct?

13   A.  Yes.

14   Q.  But they also say in that agreement that they retain the

15   sole discretion to determine whether you've provided

16   substantial assistance and whether you've complied with the

17   terms and conditions of that plea agreement; isn't that right,

18   Mr. Sood?

19   A.  That's correct.

20   Q.  They, nobody else but they, get to make that decision,

21   right?

22   A.  Yes.

23   Q.  And you know that if they don't write that letter the

24   likelihood that you spend some time in jail increases

25   exponentially, does it not, Mr. Sood?

J4H9DAW3                          Sood - Cross

1    A.  I guess.

2    Q.  You guess?

3         Well, Mr. Sood, you're the one who made the decision

4    to sign this cooperation agreement; isn't that right?

5    A.  Yes.

6    Q.  With the advise of some lawyers, right?

7    A.  Correct.

8    Q.  Now -- and you, like Mr. Code and Mr. Dawkins and other

9    people who were arrested in September of 2017, you got

10   arrested, correct?

11   A.  Correct.

12   Q.  Agents came to your home and arrested you, OK?  Right?

13   A.  Yes.

14   Q.  Put you in handcuffs, right?

15   A.  Yes.

16   Q.  And that same day they held a press conference and

17   announced --

18        MR. SOLOWIEJCZYK:  Objection, your Honor.  Sidebar if

19   he's going to say another word.

20        THE COURT:  Well then let's go to sidebar.

21        MR. MOORE:  I think that's correct, your Honor.

22        (Continued on next page)

23

24

25

1          (At sidebar)

2          MR. MOORE:  I didn't take offense, Mr. Solowiejczyk.

3     I was just waiting for the Court.

4          THE COURT:  Yes.

5          MR. SOLOWIEJCZYK:  Your Honor, this is just a totally

6     inappropriate line of questioning.  The jury shouldn't know

7     anything about whether there was a press conference or not.

8     It's obviously -- it's completely objectionable.  I think

9     Mr. Moore knows that as well.  Perhaps he can withdraw the

10    question and we can move on.

11         MR. MOORE:  If I thought it was completely

12    objectionable, I wouldn't have asked the question, your Honor.

13    I think the fact is that they chose to arrest certain people

14    here and display before the country that they had the playbook

15    of all these corrupt folks.  What they didn't do and where I'm

16    going next is that they didn't arrest Mr. Blazer.  Mr. Blazer

17    didn't spend a night in jail.  And if you want me to skip over

18    the press stuff and get to that, then I will.

19         MR. SOLOWIEJCZYK:  Can I respond to that briefly?

20         MR. MOORE:  That's up to your Honor.

21         THE COURT:  If you were to finish the question that

22    you were asking the objection would have been sustained; and if

23    you would have asked about Mr. Blazer, that would be sustained

24    as well.

25         MR. SOLOWIEJCZYK:  He has no personal knowledge

J4H9DAW3                          Sood - Cross

1    whatsoever about if Mr. Blazer ever spent a day in jail or not.

2              MR. MOORE:  I think Mr. Blazer already testified he

3    didn't spend a day in jail because he was allowed to plead

4    guilty to an information.

5              MR. SOLOWIEJCZYK:  That's in the record.

6              THE COURT:  So you have it.

7              Unless you can establish some basis for him knowing

8    it, and I don't know that you can, I mean I don't see how you

9    can go there.

10             MR. MOORE:  I understand.  I'll move on.

11             THE COURT:  OK.

12             MR. MOORE:  I'm sure Mr. Solowiejczyk will be

13   attendant as I do.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     Q.   Going back to your arrest, Mr. Sood.  So when you were

3     arrested that day, the FBI agents read you your Miranda

4     warnings, right?

5     A.   Yes.

6     Q.   And you decided to start talking to them, correct?

7     A.   Correct.

8     Q.   And, in fact, after your lawyer, Mr. Zach, called and asked

9     them to cease questioning, you said I'm happy to continue

10    talking to them, right?

11    A.   Correct.

12    Q.   Because you were lying to them that day, right?

13    A.   Yes.

14    Q.   You were lying to them and you lied to them more than once,

15    correct?

16    A.   On that day, yes.

17    Q.   On that day you lied to them about multiple things,

18    correct, Mr. Sood?

19    A.   Correct.

20    Q.   And you did that because, as I believe you told the ladies

21    and gentlemen of the jury yesterday, you wanted to try to talk

22    your way out of this, correct?

23    A.   Correct.

24    Q.   And you thought you were smart enough to talk your way out

25    of it; isn't that right, Mr. Sood?

J4H9DAW3                           Sood - Cross

1    A.  Correct.

2    Q.  So that's why you decided to lie to them?

3    A.  Correct.

4    Q.  And you know, as you sit here today, that lying to a

5    federal agent is a crime, right, Mr. Sood?

6    A.  Yes.

7    Q.  And you know that it's a violation of Title 18 United

8    States Code Section 1001 and you can get up to five years in

9    jail for each and every lie you tell an FBI agent, right?

10   A.  Yes.

11   Q.  The United States of America did not insist that you plead

12   guilty to lying to a federal agent, did they, Mr. Sood?

13   A.  Correct.

14   Q.  And you know that it is the policy of the Southern District

15   of New York that cooperators must plead guilty to all offenses

16   they commit, correct, Mr. Sood?

17           MR. SOLOWIEJCZYK:  Objection, your Honor.

18           THE COURT:  If he knows.

19   Q.  Do you know that, Mr. Sood?

20   A.  Sorry.

21   Q.  You know that it is the policy, the longstanding policy of

22   this United States Attorney's Office that cooperators have to

23   plead guilty to each and every crime they say they committed,

24   correct?

25   A.  I don't know that.

J4H9DAW3                        Sood - Cross

1   Q.  Well, the government didn't make you, Munish Sood, plead

2   guilty to a violation of Title 18 United States Code Section

3   1001, correct?

4   A.  Correct.

5   Q.  That was part of the deal that you cut with the government,

6   the deal that you referred to as no deal to Mr. Haney this

7   morning, correct?

8   A.  Correct.

9   Q.  Now, Mr. Sood you know that every time you sit down and

10  talk with the FBI or the United States Attorney's Office

11  somebody is taking notes, right?

12  A.  Yes.

13  Q.  And so -- and you know that those notes are turned over to

14  the defense at some point, correct?

15  A.  Yes.

16  Q.  And so would you disagree with me that you have been

17  interviewed by the United States Attorney's Office in

18  connection with this case or the FBI at least 30 separate

19  times?

20  A.  Sounds right.

21  Q.  At least 30 separate times?

22  A.  Yeah, I think -- sounds right.

23  Q.  Including Sunday of this week, right?

24  A.  Yes.

25  Q.  Including last week while this trial was going on, right?

J4H9DAW3                           Sood - Cross

1    A.  Yes.

2    Q.  And you did that, as you stated in another proceeding, to

3    sort of help you get your facts straight, right?

4    A.  Right.

5    Q.  You needed a lot of help in getting your facts straight; is

6    that right, Mr. Sood?

7    A.  Yes.

8    Q.  Those of your words, not mine, correct?

9    A.  Correct.

10   Q.  And so Mr. Solowiejczyk has been present for each and every

11   one of those interviews?  Is that not fair to say?

12   A.  That's fair.

13   Q.  And, in fact, when you went over the river to New Jersey to

14   meet with some federal agents in New Jersey Mr. Solowiejczyk

15   actually met with you there, correct?

16   A.  I believe that's correct.

17   Q.  Despite the fact that he doesn't have any jurisdiction in

18   the Southern District of -- in the District of New Jersey; is

19   that correct?

20           MR. SOLOWIEJCZYK:  Objection, your Honor.

21           THE COURT:  Sustained.

22   Q.  And Mr. Solowiejczyk went over with you, before you

23   testified here today, the questions that he intended to pose to

24   you?  Isn't that fair to say, Mr. Sood?

25   A.  Yes.

J4H9DAW3                          Sood - Cross

1   Q.  He went over the questions.  You all rehearsed some

2   answers, correct?

3   A.  No.

4   Q.  When he asked you a question you didn't answer the

5   question?

6   A.  I answered it based on what I know.

7   Q.  That's called rehearsing your answers; isn't that right,

8   Mr. Sood?

9   A.  I guess.

10  Q.  And he also talked to you about the fact that you'd be

11  cross-examined by defense attorneys like myself and Mr. Haney,

12  correct?

13  A.  Yes.

14  Q.  And he talked to you about how you might answer certain

15  questions that are posed to you on cross-examination as part of

16  your preparation; isn't that right, Mr. Sood?

17  A.  Yes.

18  Q.  So he actually coached you on how you were to respond to

19  the questions that were posed by me and Mr. Haney, correct?

20  A.  No.

21  Q.  And he told you, those people, the government, they told

22  you that you need to continue to say, "I'm just here to tell

23  the truth," that was a part of your preparation, was it not,

24  Mr. Sood?

25  A.  No.

J4H9DAW3                          Sood - Cross

1    Q.  So you're just telling us that it's coincidence that those
2    are the words that are coming out of your mouth; is that right?
3                MR. SOLOWIEJCZYK:  Objection.
4                THE COURT:  Sustained.
5    Q.  Did your lawyer tell you to say that, Mr. Sood?
6                MR. SOLOWIEJCZYK:  Objection.
7                THE COURT:  Sustained.
8    Q.  And I believe that you also told Mr. Solowiejczyk on
9    direct, and you told Mr. Haney on cross that you were just here
10   to accept responsibility for your actions, correct?
11   A.  Correct.
12   Q.  Well, accepting responsibility means pleading guilty,
13   right?
14   A.  Yes.
15   Q.  And saying you did something wrong, right?
16   A.  Yes.
17   Q.  It doesn't mean testifying and trying to gain a benefit for
18   yourself by doing so, does it, Mr. Sood?
19   A.  But if it helps me, why not?
20   Q.  In your view if it helps you, why not?
21               Now, you were arrested in this case and charged in a
22   criminal complaint, right?
23   A.  Yes.
24   Q.  And you are aware that you're supposed to be indicted
25   within 30 days of being arrested on a criminal complaint,

J4H9DAW3                          Sood - Cross

1    correct?

2    A.  I believe that's correct.

3    Q.  But you were never indicted, were you, Mr. Sood?

4    A.  That's correct.

5    Q.  In fact, either Mr. Solowiejczyk or another Assistant

6    United States Attorney filed at least 12 separate continuance

7    motions to postpone your case so that you wouldn't have to be

8    indicted, correct?

9    A.  Correct.

10   Q.  And those postponements occurred between September of 2017

11   when you were arrested and August of 2018 when you, in fact,

12   pled guilty, correct?

13           MR. SOLOWIEJCZYK:  Objection, your Honor.

14           THE COURT:  Overruled.

15   Q.  Correct?

16   A.  I believe that's correct.

17   Q.  And because you weren't indicted in this case your case got

18   assigned to a different judge; isn't that correct?

19   A.  That's correct.

20   Q.  And so the judge who ultimately sentenced you doesn't get

21   the benefit of listening to you live testify?  That judge will

22   receive a presentation from the United States of America about

23   how well you do; isn't that correct, Mr. Sood?

24           MR. SOLOWIEJCZYK:  Objection, your Honor.

25           THE COURT:  Sustained.

J4H9DAW3                          Sood - Cross

1    Q.  Now, like most people who get arrested, OK, you were let to

2    bond, correct?

3    A.  Yes.

4    Q.  And when you were let to bond your travel was originally

5    restricted, correct?

6    A.  Yes.

7    Q.  Your travel restricted -- correct me if I'm wrong.  You

8    live in New Jersey, correct?

9    A.  Yes.

10   Q.  You were allowed to travel between New Jersey and the

11   Southern and Eastern Districts of New York, correct?

12   A.  Correct.

13   Q.  And also the Eastern District of Pennsylvania because your

14   in-laws live there; is that right?

15   A.  Correct.

16   Q.  And if you wanted to travel beyond those places your lawyer

17   had to file a motion asking the Court to let you travel; isn't

18   that right?

19   A.  Yes.

20   Q.  And your lawyer filed motions, multiple motions, and the

21   government consented to those motions to let you travel on

22   business while you were on bond and negotiating with them to

23   Miami, Los Angeles, Arizona, and multiple other places,

24   correct?

25   A.  Yes.

1    Q.  And in May of 2018 after you had talked to the government

2    on a number of occasions, the government consented to modify

3    your bond so that you no longer had to seek the approval of the

4    Court to travel in the contiguous United States, correct?

5    A.  Correct.

6    Q.  So unlike Mr. Code and Mr. Dawkins you got to travel

7    wherever you wanted to in the contiguous United States so long

8    as you told your pretrial services officer 48 hours before you

9    left, correct?

10               MR. SOLOWIEJCZYK:  Objection.

11               THE COURT:  Sustained.

12   Q.  Now, Mr. Sood, you're aware that in the federal system

13   after someone is convicted either by plea or trial a

14   presentence report is prepared for them, correct?

15   A.  I believe that's correct.

16   Q.  And the presentence report is prepared and released to you

17   and your lawyer, correct?

18   A.  OK.

19   Q.  Is that correct?

20   A.  I guess.

21   Q.  Have you seen a presentence report or a draft presentence

22   report in your case, Mr. Sood?

23   A.  No.

24   Q.  So the presentence report hasn't even been done to give you

25   time to cooperate; is that right, Mr. Sood?

J4H9DAW3                          Sood - Cross

1    A.  Yeah.  I don't have a presentence report yet.

2    Q.  You don't have a presentence report.

3         Now, one of the things that occurs at sentencing is

4    that the Court and also -- not only in imposing a sentence,

5    whether it's an active sentence, or a sentence of probation,

6    which you want, right?

7    A.  Yes.

8    Q.  The Court has the ability to impose some financial

9    penalties as well, right?

10   A.  Yes.

11   Q.  Like a fine?

12   A.  OK.

13   Q.  Is that right?

14   A.  Yes.

15   Q.  And I believe that the maximum fines for each of your three

16   convictions are $750,000; isn't that right?

17   A.  I believe so.

18   Q.  You can add all three of them up, correct?

19   A.  I believe so.

20   Q.  And you're hoping that the government is going to help you

21   out on that fine at your sentencing, aren't you, Mr. Sood?

22   A.  I guess.

23   Q.  You are hoping that the government will speak to the Court

24   and ask for leniency with respect to a fine, correct --

25   A.  Yes.

1  Q.  -- Mr. Sood?

2  A.  Yes.

3  Q.  Because you don't want to lose anymore of the money that

4  you gained over the years; isn't that right, Mr. Sood?

5  A.  Yes.

6  Q.  What's your net worth, Mr. Sood?

7          MR. SOLOWIEJCZYK:  Objection.

8          THE COURT:  Sustained.

9  Q.  Now, Mr. Sood, I believe that when you told

10  Mr. Solowiejczyk on direct that you had met with a different

11  United States Attorney's Office in connection with an

12  investigation in New Jersey you neglected to mention that he

13  was present, right?

14  A.  Yes.  I forgot.

15  Q.  He didn't ask you that question, did he?

16  A.  I don't remember.  I don't recall.

17  Q.  You certainly didn't volunteer that to the ladies and

18  gentlemen of the jury because that wasn't part of your script,

19  was it?

20  A.  I don't remember him asking.

21  Q.  And you were the organizer and founder of that bank,

22  correct?

23  A.  Yes.

24  Q.  You served as chairman of the board for six or seven years,

25  correct?

J4H9DAW3                         Sood - Cross

1   A.  Correct.

2   Q.  You served on at least two separate occasions as the

3   interim president of the bank, correct?

4   A.  Yes.

5   Q.  And while serving as the chairman of the board and as the

6   interim president you oversaw the employment of certain

7   employees and those employees' conduct caused the bank to be

8   investigated; is that right?

9   A.  Yes.

10  Q.  Now, you didn't go in volunteering before you got arrested

11  to go talk about the people at the bank, did you?

12  A.  Again, as I said, that developed after I was arrested.

13  Q.  Well, Mr. Sood, the knowledge that you had before you

14  were -- you had knowledge of certain improprieties at that bank

15  before you were arrested; isn't that correct?

16  A.  We had -- we had other regulatory agencies that I did

17  voluntarily go and meet with as required.

18  Q.  Voluntarily as required are two different things, Mr. Sood.

19  A.  I voluntarily met, went to meet with those agencies when

20  they requested me to come.

21  Q.  You met with agencies when they requested you to come,

22  correct.

23       It's safe to say, isn't it, Mr. Sood, that since

24  you've been indicted -- excuse me.  Since you've been arrested

25  and since you decided to cooperate with the United States of

J4H9DAW3                        Sood - Cross

1    America you have told agencies a lot more about the activities

2    at that bank than you did pre-arrest, correct?

3    A.   Before or after I had nothing to hide so, yeah, I provided

4    the information they wanted.

5    Q.   And you haven't been required to settle with the SEC at

6    this point, have you, Mr. Sood?

7    A.   No.

8    Q.   And you know that the United States Attorney's Office in

9    this district often works closely with the SEC, correct?

10             MR. SOLOWIEJCZYK:   Objection, your Honor.  And on this

11   line we may need a really brief sidebar.  I'm sorry.

12             THE COURT:   OK.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J4H9DAW3                          Sood - Cross

1           (At sidebar)

2           MR. SOLOWIEJCZYK:  Your Honor, this case actually it's

3    not like a joint investigation with the SEC and New York.  It's

4    actually a completely separate investigation being run out of

5    the SEC in Texas.  So I just want to lay down a marker.  I

6    don't want to get too far afield here.

7           MR. MOORE:  I only had one more question here and

8    it's:  Do you expect that the U.S. Attorney's Office is going

9    to help you out with the SEC?  That's the only question I was

10   going to ask.

11          MR. SOLOWIEJCZYK:  That we have no objection to.

12          THE COURT:  OK.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J4H9DAW3                        Sood - Cross

1          (In open court)

2  Q.  Mr. Sood, you're hoping that the United States Attorney's

3  Office is going to help you out with the SEC and put in a good

4  word for you with the SEC, aren't you?

5  A.  Again, I'm not involved in that discussion right now.  My

6  attorney is handling it.

7  Q.  I didn't ask you if your attorneys were handling it.  I

8  asked you a very simple question.

9          You hope that your cooperation with this team will

10  afford you some benefit in negotiating with the SEC, do you

11  not, Mr. Sood?

12  A.  Again, they can talk to them, yes.  Again, I don't know

13  what the rules are; what they can and can't say.

14  Q.  You're hopeful that they will, aren't you, Mr. Sood?

15  A.  If they can.

16  Q.  That wasn't my question.  You are hopeful that they will;

17  isn't that correct, Mr. Sood?

18  A.  I don't know.

19  Q.  You don't know what you hope?

20  A.  Again, I said --

21  Q.  Is that an answer?

22  A.  Again, I don't know what they can and can't say.

23  Q.  Now, Mr. Sood, you also served on the board of a company

24  called United Services Network, Inc.; isn't that right?

25  A.  Yes.

J4H9DAW3                    Sood - Cross

1    Q.  And you were sued in a class action lawsuit brought by

2    shareholders of that company, correct?

3    A.  Correct.

4    Q.  And they allege that you breached your fiduciary duties,

5    correct?

6    A.  I believe so.

7    Q.  That you engaged in self-dealing?

8    A.  I believe so.

9    Q.  That you intentionally misrepresented the value of shares

10   to the detriment of shareholders?

11   A.  I believe so.

12   Q.  That you unjustly enriched yourself, correct?

13   A.  I believe so.

14   Q.  And that you aided and abetted others in breaches of your

15   fiduciary duties, correct?

16   A.  I believe so.

17   Q.  And you settled that lawsuit for nearly half a million

18   dollars; isn't that right, Mr. Sood?

19   A.  I believe the insurance company did.

20   Q.  You settled -- you were the party who was named in the

21   lawsuit, correct?

22   A.  I was one of the directors.

23   Q.  You were one of the directors.

24           Now, Mr. Solowiejczyk didn't ask you any questions

25   about that lawsuit, did he, Mr. Sood?

J4H9DAW3                         Sood - Cross

1    A.   No.

2    Q.   And you were also -- Princeton Advisory Group was sued by

3    one of your biggest clients, Capital Point Partners, in 2015 in

4    Delaware; isn't that right?

5    A.   Yes.

6    Q.   And they alleged that you had so severely mismanaged their

7    investment of tens of millions of dollars that they asked the

8    Court to freeze all of your company's assets; isn't that right?

9    A.   I believe so.

10   Q.   And they also sued you?

11   A.   Yes.

12   Q.   For fraud and for breach of your fiduciary duties?

13   A.   Correct.

14   Q.   And isn't it true that you even tried to pay your

15   attorneys' fees with their money and a Court had to intervene

16   and stop you from doing that; isn't that right, Mr. Sood?

17   A.   I don't remember that but OK.

18   Q.   You don't remember that?

19   A.   I don't.

20   Q.   The government didn't ask you about any of that, did they?

21   A.   Because once that was done they hired me to run their

22   public company so, you know.  It was a misunderstanding and

23   then it was -- it was adjusted and then we took over managing a

24   public company.

25   Q.   Well that wasn't my question but that lawsuit in

1    Pennsylvania wasn't settled on terms like that, was it,

2    Mr. Sood?

3    A.   It's a different situation.

4    Q.   Now, I want to talk to you for a few minutes about Merl

5    Code.  You have called him Merrill throughout your testimony;

6    isn't that right?

7    A.   I believe so.

8    Q.   You call him Merrill on wire recordings, correct?

9    A.   Yes.

10   Q.   You used the same pronunciation or mispronunciation that

11   your buddy Mr. Blazer uses, correct?

12   A.   OK.

13   Q.   And you only met Merl Code one time in your life; isn't

14   that right, Mr. Sood?

15   A.   Yes.

16   Q.   One time?  OK.  And you've talked to him on the phone a

17   couple of times.  And each time you've talked to him you've

18   called him Merrill; isn't that right?

19   A.   OK.

20   Q.   And you'd agree with me that you don't know the man you

21   call Merrill very well, correct?

22   A.   Just based on my discussions with him.

23   Q.   You would agree with me that you don't know him very well;

24   isn't that right?

25   A.   I know him from the business side.  That's what I know.

J4H9DAW3                         Sood - Cross

1  Q.  You've met him one time in your life, right?

2           MR. SOLOWIEJCZYK:  Asked and answered.

3           THE COURT:  Sustained.

4  Q.  Now --

5           MR. MOORE:  Your Honor I don't know when you want --

6  this would be a good time.

7           THE COURT:  This is a perfect time to break.  It's

8  quarter of one.  Please be prepared to come back at 1 o'clock.

9  Please do not discuss the case.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  Mr. Sood, you may step down.

 3              (Witness excused)

 4              THE COURT:  Everyone can be seated.

 5              MR. MOORE:  Your Honor, I'm probably two-thirds of the

 6    way through.

 7              I am going to want to play this call and so I think we

 8    will need a ruling at this point.

 9              THE COURT:  OK.  Does the government want to be heard.

10    Actually before we do that can I -- using the government's

11    Exhibit A, can you tell me exactly what it is that has not been

12    heard that you wish to have heard.

13              MR. CHANEY:  We can pull up A.

14              THE COURT:  This is A from the letter that they filed

15    last night.

16              MR. CHANEY:  OK.  Give me just a second.

17              MR. SOLOWIEJCZYK:  Your Honor, to clarify one thing.

18    None of this call has been admitted so far in this trial.

19              THE COURT:  Is that right?

20              MR. SOLOWIEJCZYK:  It should be Government Exhibit --

21    it should say Government Exhibit 2 on the front.

22              THE COURT:  2T.

23              MR. SOLOWIEJCZYK:  Yes.

24              THE COURT:  Wasn't there an objection concerning

25    completeness with respect to this?

1    MR. SOLOWIEJCZYK:  That was the other call that we

2    dealt with.  That was the stroke-it-off call.

3    MR. MOORE:  That was Mr. Haney and not me.  Just so

4    the record is clear.

5    MR. HANEY:  I don't appreciate that, your Honor.  We

6    could call it Government Exhibit 104 rather than Mr. Haney

7    stroking off all the time for the record.

8    MR. CHANEY:  Your Honor, I think the defense --

9    Mr. Code's position would be that the call from the beginning

10   of the transcript would be appropriate to give some context to

11   what Mr. Code is saying with respect to who he is talking about

12   because I think putting it in context makes sense.

13   But with respect to the particular statement that I

14   was referencing it is -- starts at page 5 of the government's

15   exhibit.  So starting at line 9 and in context he's speaking

16   about Seth Cohen.  "So I'll say this as tactfully as I can.

17   When everything you do is about throwing money at it, you're

18   not going to win."  I'll note for the Court this is all in

19   present tense language.

20   "Yeah," said Sood.  "Right," said Code.  And he goes

21   on to say, "And more times than not you're -- you're going to

22   get taken for your money and folks aren't going to be able to

23   deliver.  And if you don't have any history or something of

24   substance to really leverage that relationship, then you're in

25   a real bad place in our business, you know.  And that's one of

1   the things I was trying to tell him, you know..." him being

2   Seth.  "That even with Christian I've had the conversation,

3   said, Christian, look, you know, you've got Jeff and those guys

4   want to meet all those coaches OK.  Great.  Well, we can pay

5   them.

6          "No.  No.  You're not paying my guys.  I'm leveraging

7   the relationships I've built over the last 20 years or longer

8   with some of these dudes.  They're going to show up because I

9   asked them to.  And what I'm saying to you is he..." he being

10  Mr. Cohen again "...doesn't have the same level of connectivity

11  with some of the folks in our state."

12         It's our position that in context what Mr. Code is

13  communicating to Mr. Sood is his present state of mind with

14  respect to the general proposition of paying people in the

15  basketball space for loyalty and for any sort of bribe

16  relationship.

17         THE COURT:  So you would want heard from what to what?

18  From page 5, line 9 to page 6, line 15?

19         MR. CHANEY:  And honestly I think our preference would

20  be, and the government can weigh in, I'm kind of open to either

21  doing it from what the Court just read or from the beginning of

22  the transcript until the same end point that the Court just

23  read.  I think the rest would not -- would just be to give

24  context to those statements so that the jury knows who is the

25  pronoun "he" that's being referred to when they're talking

1    about Mr. Cohen.

2              THE COURT:  OK.

3              MR. SOLOWIEJCZYK:  Your Honor has already previously

4    ruled on this.  Nothing has changed.

5              I would note at page one, by the way, the way this

6    conversation starts is that Mr. Code is giving some backstory,

7    some history about Seth Cohen and his prior dealings with him

8    and what his views are on.

9              So number one, your Honor.  What Merl Code thinks of

10   Seth Cohen is really not altogether all that relevant but,

11   number two, as we've pointed out to your Honor previously,

12   what's really going on here is, what the defense wants in is

13   Mr. Code's recitation of a prior conversation that he

14   purportedly had with Christian Dawkins regarding that he did

15   not want Jeff D'Angelo to pay coaches.  It's all backward

16   looking.

17             The fact that it happens to be within the context of

18   talking about:  Hey, this is why this guy, Seth Cohen, isn't

19   particularly useful for you guys to work with and you should

20   work with people like me instead is really neither here nor

21   there.  It's still talking about a past conversation that he

22   says he had with Christian Dawkins.  And that's really what

23   matters here.

24             THE COURT:  The authority that the government provided

25   in yesterday's –– last night's letter, United States v. Little,

J4H9DAW3                          Sood - Cross

1    Mr. Chaney have you had an opportunity to read that case?

2              MR. CHANEY:  I have not your Honor but I can pull --

3              THE COURT:  Because in that case Judge Castel, I

4    believe, was the judge, indicates in construing Rule 807 that

5    the defendant in that case was in a position if he desired to

6    testify because one of the factors in determining whether or

7    not something can come in under 807 is whether it is the only

8    source of the conversation or the only course -- or the only

9    source of that testimony.  And here, presumably, as in Little,

10   while there are substantial constitutional rights at risk,

11   Mr. Code can testify as to what he believed at the time rather

12   than rely on this rule which is used, and I'm quoting now from

13   Little, very rarely and only in exceptional circumstances.

14             So why shouldn't I follow Judge Castel's analysis

15   which, by the way, I find persuasive?

16             MR. CHANEY:  I understand the line of reasoning, your

17   Honor.  And I don't have -- I can try to find it really quickly

18   but I did look for sort of a -- a Second Circuit case in which

19   the statements sought to be introduced were, in fact,

20   statements that the defendant was in control over as someone

21   that could take the witness stand and simply testify to saying

22   that.  And I did not note that specific argument in our letter.

23   I can try to find it very briefly.  But I found a case with

24   such -- with those facts where that prong of 807 was not

25   discussed.  It was not brought up to the Court.  It didn't seem

J4H9DAW3                          Sood - Cross

1    to be briefed or to be an issue in that case.  I did look for

2    and I did not find the Little case, your Honor, some version of

3    that general proposition, but I did not find something

4    affirmatively for or against that proposition; only cases in

5    which those facts would warrant such an argument and were not

6    addressed by the Court.

7           THE COURT:  Here's where I ultimately come down.  And

8    I acknowledge that from the defense perspective this is

9    important potential evidence to put before the jury but I'm

10   however -- I'm required to put before the jury only that

11   evidence which I determine to be relevant and admissible.  And

12   based on the arguments that have been made before at several

13   points during the trial I don't think that it's appropriate to

14   put in this testimony pursuant to the hearsay exceptions and

15   nor do I, after review of the applicable case law, believe that

16   it's appropriate to put in under the residual clause of the

17   federal rules allowing -- that would otherwise allow this type

18   of testimony.  So the defense application is denied.

19          MR. SOLOWIEJCZYK:  Your Honor, could we have an extra

20   three or four minutes just to have a bathroom break.

21          THE COURT:  Three or four minutes.  Hurry back.

22          (Recess)

23          (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  I'm sorry, Mr. Mark.  I'll give you an

3     opportunity to talk, but the jurors keep asking where we are in

4     the schedule and whether we are on track to finish by Friday.

5     I know as much as they do, so you want to clue me in?

6          MR. MARK:  That will actually tie into what I wanted

7     to highlight.  We've got one more substantive witness.  His

8     name's Michael Blanton.  He's a representative from the

9     University of Southern California.  He's in from out of town.

10    He's been here yesterday and today.  We're hoping to quickly

11    present him so he can get on and off the stand and not have to

12    spend another night.  So we're going to try to go through his

13    testimony as quickly as possible to do that, and we just wanted

14    to let your Honor know, and just in case you give us a little

15    latitude at the 2:30 mark if we're running over.

16         THE COURT:  How long is he going to be?  We could also

17    take him out of order.

18         MR. MARK:  He's the next witness.  We're actually

19    restructuring our presentation so that he's --

20         THE COURT:  But what I mean by that is if he can be on

21    and off in a half-hour, we can put him on now, then not worry

22    about it.

23         MR. MOORE:  I don't have a problem with that, Judge.

24         THE COURT:  I'm sorry?

25         MR. MOORE:  I don't have a problem with that.

J4UHDaw4

1          MR. HANEY:  We wouldn't either.

2          MR. MOORE:  I don't have a problem with interrupting

3    my cross.

4          MR. MARK:  I don't think we need to take him out of

5    order.  I think we could probably just go through his direct

6    pretty quickly.

7          THE COURT:  OK.

8          MR. MARK:  Then after that there's a bit of calls and

9    text messages and other documentary evidence.

10         THE COURT:  How long will that take?

11         MR. MARK:  How long will his -- it's going to be early

12   in the morning.  Probably, say, an hour to an hour and a half

13   or so of material.

14         THE COURT:  OK.

15         MR. MARK:  Then we'll in a position to rest.

16         MR. MOORE:  Then, Judge, we're still figuring out the

17   defense case.  I think there's a possibility of getting it to

18   them this week.  I think that the possibility increases

19   substantially if we have a full day on Thursday, and I don't

20   know if you want to ask them that or not.

21         THE COURT:  Let's --

22         MR. MOORE:  And a fuller day tomorrow.

23         THE COURT:  OK.  Bring them in.

24         (Continued on next page)

25

J4UHDaw4

```
 1              (Jury present)

 2              THE COURT:  Everyone, please be seated.

 3              Ladies and gentlemen, I understand that you've been

 4     inquiring as to where we are in the schedule.  Here's the best

 5     guesstimate that we can give you all.  There exists a strong

 6     possibility that the case will be in your hands and that,

 7     therefore, you will be able to begin deliberations before the

 8     end of Friday.  Now, of course, once you begin deliberations,

 9     it's in your hands.  Deliberations will take as long as they

10     take.

11              What we want to do by way of hoping to ensure that we

12     finish sooner rather than later -- and I don't mean to engage

13     in a dialogue with you right now.  I just mention this and then

14     I can ask questions in a more formal way -- is we are

15     considering moving from the truncated days that we've been

16     having to the standard jury days, not that you know what a

17     standard jury day is.  But, basically, it's 9:30 to 5:00 with a

18     traditional lunch break.

19              So at the appropriate time I will be asking Ms. Rivera

20     to see if there is a consensus as to whether or not you would

21     wish to do that, but I will leave that almost, almost, entirely

22     up to you if there is a strong consensus, OK?  But right now it

23     looks like there's a possibility that we finish up the entire

24     case by Friday, possibility that we go into the early part of

25     next week, including deliberations, but we'll see.  Then the
```

J4UHDaw4                              Sood - Cross

1    parties are working as efficiently and as quickly as they can.

2    I hope that you appreciate that.  But, yes, we'll ask some

3    questions later on of the group.

4              With that, Mr. Moore.

5              MR. MOORE:  Yes, sir.  Thank you, your Honor.  May I

6    continue?

7              THE COURT:  You may.

8    BY MR. MOORE:

9    Q.  So when we were talking when we broke, Mr. Sood, we were

10   talking about your acquaintance with Merl Code who you refer to

11   as Merl, correct?

12   A.  Yes.

13   Q.  Now, on April 20 of 2016, you testified on direct that

14   Mr. Dawkins emailed you and your friend Marty Blazer asking for

15   some independent funding for ASM, right?

16   A.  Yes.

17   Q.  All right.  You never heard of Merl Code at that point,

18   right?

19   A.  That's correct.

20   Q.  And it's true, is it not, that Merl Code never asked you

21   for money for anything, correct?  He never asked you for any

22   money for anything?

23   A.  That's correct.

24   Q.  And you had access to the bank accounts for Loyd Inc.,

25   correct?

J4UHDaw4                          Sood – Cross

1  A.  Yes.

2  Q.  You testified that the goal was to put Merl Code on a

3  monthly retainer, but you never sent him any money from Loyd,

4  did you, Mr. Sood?

5  A.  I never did, no.

6  Q.  You never sent him any money from Loyd, and you have access

7  to the bank account.  You know that no money from that bank

8  account went to Mr. Code, isn't that correct, Mr. Sood?

9  A.  Not from me, that's correct.

10 Q.  That's not what I asked you.  I asked, you have access to

11 that bank account, correct?

12 A.  Yes.

13 Q.  You had signatory authority over it, correct?

14 A.  I believe so.

15 Q.  You had control over the funds in that account, correct?

16 A.  Correct.

17 Q.  And your knowledge is that no moneys from that bank account

18 ever were transferred to Mr. Code in any way, shape, form, or

19 fashion, correct, sir?

20 A.  Correct.

21 Q.  Now, at this meeting that was held between you and Lamont

22 Evans and Marty Blazer in New York City, Mr. Code wasn't there,

23 was he?

24 A.  No.

25 Q.  And he wasn't there in Miami with you and Lamont Evans,

J4UHDaw4                          Sood – Cross

1    correct?

2    A.  Correct.

3    Q.  In fact, Mr. Code never attended a single meeting between

4    you and any college coach, isn't that right, sir?

5    A.  That's correct.

6    Q.  Now, you testified yesterday on direct, I believe, that

7    Mr. Lamont Evans set up a meeting for you and PJ Dozier's mom,

8    correct?

9    A.  Correct.

10   Q.  And that meeting occurred in South Carolina, correct?

11   A.  Correct.

12   Q.  Mr. Code wasn't there, was he, Mr. Sood?

13   A.  No.

14   Q.  And you know that Mr. Code lives in Greenville, South

15   Carolina, correct?

16   A.  That's correct.

17   Q.  My home state.

18          It's not a very large state, is it, Mr. Sood?

19   A.  I don't know.

20   Q.  You've been there, haven't you?

21   A.  To Columbia, yes.

22   Q.  OK.  You've been to Columbia on several occasions, correct?

23   A.  Twice.

24   Q.  And on one occasion, I believe you testified that after

25   this, shortly after this June meeting at the Conrad hotel where

J4UHDaw4                          Sood — Cross

1  you met Mr. Code, you and your son flew from New Jersey to

2  Columbia to attend PJ Dozier's draft party in Columbia, South

3  Carolina, right?

4  A.  We flew to Charlotte, but drove from there to Columbia,

5  yes.

6  Q.  You went from New Jersey to South Carolina for this draft

7  party, correct?

8  A.  Correct.

9  Q.  Three days after you met Mr. Code and you testified about

10  the events that occurred in the hotel suite at the Conrad

11  hotel, correct?

12  A.  Correct.

13  Q.  Now, Mr. Code, who lives less than an hour and a half away

14  from that place, was not at that party, was he, Mr. Sood?

15          MR. SOLOWIEJCZYK:  Objection, your Honor.

16          THE COURT:  Overruled.

17  A.  He was not.

18  Q.  You attended that party because of your involvement in one

19  of these conspiracies that you pled guilty to, isn't that

20  right, Mr. Sood?

21  A.  I believe that's correct.

22  Q.  All right.  And you're aware, are you not, Mr. Sood, that

23  several days after that meeting in New York, Jeff D'Angelo told

24  Christian Dawkins that Mr. Code, he did not believe he had a

25  firm agreement with Mr. Code?

1     MR. SOLOWIEJCZYK:  Objection, your Honor, hearsay.

2     THE COURT:  Sustained.

3  Q.  When you paid Lamont Evans $2,000 in Miami, Merl Code

4  wasn't involved, was he, Mr. Sood?

5  A.  No.

6  Q.  And when you introduced Jeff D'Angelo, the undercover

7  officer, to Mr. Dawkins in the spring of 2017, Merl Code was

8  not present for that meeting, was he?

9  A.  He was not.

10 Q.  In fact, you hadn't even heard his name before that time,

11 had you, Mr. Sood?

12 A.  That's correct.

13 Q.  All right.  And in May of 2017 when you met with Blazer and

14 D'Angelo and called Dawkins on the speakerphone to discuss

15 paying Lamont Evans and Book Richardson, Merl Code wasn't

16 involved in that juncture, was he?

17 A.  I do not believe so.

18 Q.  His name never came up, did it?

19 A.  I don't believe so.

20 Q.  Isn't it true that you have spoken to Merl Code less than

21 five times in your life, and in none of those conversations did

22 he agree to pay coaches or ask you for money?

23 A.  He -- he said he would refer us to coaches, but -- and I

24 never paid him any money.

25 Q.  You never paid him any money and he never referred you to a

1    single coach that you or anyone else paid, isn't that right,

2    Mr. Sood?

3    A.  Can you repeat that.

4    Q.  Yes, sir.

5           Merl Code never introduced you or Mr. D'Angelo or

6    Mr. Blazer to a single coach that took any money, did he,

7    Mr. Sood?

8    A.  I can't speak for them, but to me he did not.

9    Q.  OK.  You don't have any information that he ever introduced

10   anybody who took any money, correct --

11          MR. SOLOWIEJCZYK:  Objection.

12   Q.  -- Mr. Sood?

13          MR. SOLOWIEJCZYK:  Objection, your Honor.

14          THE COURT:  Sustained.

15   Q.  Now, you testified at length about this meeting with

16   Mr. Richardson that occurred in the suite at the Conrad hotel

17   the same day that you met Mr. Code, correct?

18   A.  Yes.

19   Q.  You would agree with me that Mr. Code wasn't present for

20   that meeting in the suite, correct?

21   A.  Correct.

22   Q.  He didn't hear what you all discussed in that meeting,

23   correct?

24   A.  As far as I know.

25   Q.  He wasn't there, so he couldn't have heard it, correct,

1    Mr. Sood?

2    A.  He was not there.

3    Q.  So he didn't hear the ins and outs of any arrangement that

4    you and Mr. D'Angelo and Mr. Blazer struck with Mr. Richardson,

5    did he?

6    A.  No.

7    Q.  Now, Mr. Richardson was very direct in that meeting about

8    what he was agreeing to do, isn't that correct, Mr. Sood?

9    A.  Yes.

10   Q.  Very direct.  And you would agree with me -- strike that.

11           Now, you testified about taking a trip with Jill

12   Bailey and Mr. Dawkins to meet Book Richardson in Arizona after

13   the June 20 meeting where you met Mr. Code, right?

14   A.  Yes.

15   Q.  Mr. Code wasn't there, was he?

16   A.  No.

17   Q.  He wasn't even invited to the meeting, was he?

18   A.  Correct.

19   Q.  To your knowledge, he didn't even know about the meeting,

20   correct?

21   A.  I'm assuming that's correct.

22   Q.  Then you went to Los Angeles, correct?

23   A.  Yes.

24   Q.  And Mr. Code wasn't there for that meeting, right?

25   A.  Correct.

J4UHDaw4                         Sood - Cross

1    Q.  Again, he wasn't even invited to that meeting, was he?

2    A.  Correct.

3    Q.  Now, you made payments to Lamont Evans, correct?

4    A.  I did.

5    Q.  You made that decision, right?

6    A.  Yes.

7    Q.  Merl Code never told you to pay Lamont Evans, did he?

8    A.  That's correct.

9    Q.  In fact, he never told you he thought it was a good idea to

10   pay Lamont Evans, correct?

11   A.  That's correct.

12   Q.  And to the extent that you ever spoke with Mr. Code about

13   payments to Lamont Evans, he told you he thought that was a bad

14   idea, didn't he?

15   A.  That's correct.

16   Q.  And you were involved in making payments to Book

17   Richardson, correct?

18   A.  Yes.

19   Q.  Mr. Code never told you to make any payments to

20   Mr. Richardson, did he?

21   A.  Not to me.

22   Q.  And Mr. Code was never present when any payments were made

23   to Book Richardson, was he?

24   A.  He was not.

25   Q.  You were involved in making payments to Tony Bland,

1    correct?

2    A.   Yes.

3    Q.   Mr. Code never told you to make any payments to Tony Bland,

4    did he?

5    A.   Not to me.

6    Q.   Mr. Code never said anything to you that suggested he

7    thought it was a good idea, did he, to make payments to Tony

8    Bland?

9    A.   That's correct.

10   Q.   You're aware, are you not, that Jeff D'Angelo made a

11   payment to Preston Murphy in Las Vegas?  Are you aware of that,

12   Mr. Sood?

13   A.   At this time I am.

14   Q.   At this time you are.  OK.

15            And you know that Merl Code wasn't involved in that

16   payment, correct?

17   A.   I wasn't there.

18   Q.   And there was a payment made to Corey Barker, correct?

19   A.   I wasn't there.

20   Q.   Well, you know that Mr. Code wasn't present for that

21   meeting or involved in the decision to make that payment,

22   correct?

23            MR. SOLOWIEJCZYK:  Objection, your Honor.

24            THE COURT:  Overruled.

25   A.   I wasn't there.  I don't know.

1   Q.  Mr. Code -- Mr. Sood, Mr. Code never sent a single college

2   basketball coach to you and your conspirators who took money,

3   isn't that a fact, sir?

4   A.  Not to me.

5   Q.  And you don't have any knowledge that he sent anybody who

6   ever took any money, isn't that right, Mr. Sood?

7   A.  I don't know.

8   Q.  Well, you were smack dab in the middle of this conspiracy

9   according to your testimony, isn't that right, sir?

10          MR. SOLOWIEJCZYK:  Objection to form.

11          THE COURT:  Sustained as to form.

12  Q.  Mr. Sood, according to you, you were a participant in this

13  conspiracy, as well as other conspiracies to which you pled

14  guilty, for at least two years, is that correct?

15  A.  Correct.

16  Q.  You traveled around the country doing part of what you

17  believed were your duties a coconspirator, correct?

18  A.  OK.  Yes.

19  Q.  So you have pretty intimate details of the way this

20  conspiracy functioned, do you not, Mr. Sood?

21          MR. SOLOWIEJCZYK:  Objection to form.

22          THE COURT:  Sustained as to form.

23  Q.  Now, Mr. Sood, you're not from New York, is that right?

24  A.  Correct.

25  Q.  You don't live in the Southern District of New York,

1  correct?

2  A.  Correct.

3  Q.  You know that Mr. Dawkins and Mr. Code don't live in the

4  Southern District of New York, correct?

5  A.  Correct.

6  Q.  But you also know that you and Mr. Dawkins and Mr. Code

7  were all the subject of court-authorized wiretaps, correct?

8           MR. SOLOWIEJCZYK:  Objection, your Honor.  I think

9  this may require a sidebar, depending on where it's going.

10          THE COURT:  Overruled.  We'll see about the sidebar

11  later.

12  Q.  There's a stipulation that's been entered in this case as

13  Government Exhibit 1902, and it reflects that from June 19,

14  2017, to on or about September 25, 2017, with a couple of dates

15  missing, there was a wiretap on Mr. Dawkins' phone, correct?

16  A.  Yes.

17  Q.  You got discovery in this case.  You're aware of the

18  discovery, are you not, Mr. Sood?

19          MR. SOLOWIEJCZYK:  Objection, your Honor.  No basis to

20  that.

21          THE COURT:  Sustained as to the discovery.

22          Ask another question, Mr. Moore.

23          MR. MOORE:  Yes, sir.

24  Q.  And you're aware, Mr. Sood, are you not, from your

25  involvement in this case that there was a wiretap on your phone

J4UHDaw4                        Sood - Cross

1   from April 7, 2017, to June 2, 2017, correct?

2   A.   Correct.

3   Q.   But you're also aware that after this meeting in June of

4   2017, agents did not seek permission to tap Mr. Code's phone

5   until September 7 of 2017, isn't that right?

6             MR. SOLOWIEJCZYK:  Your Honor, objection.  This

7   witness has no personal knowledge.

8             THE COURT:  Sustained.

9             MR. MOORE:  Well, your Honor, I will simply refer the

10  jury to the stipulation --

11            THE COURT:  Very well.

12            MR. MOORE:  -- later because it's in evidence.

13  Q.   Now, Mr. Sood, you're aware that these wiretaps were

14  man-hour intensive, correct, and were manned by multiple

15  agents?

16            MR. SOLOWIEJCZYK:  Objection to this line of

17  questioning, your Honor.

18            THE COURT:  Sustained.

19  Q.   Now, Mr. Sood, you would agree with me, would you not, that

20  you testified about multiple instances where you took action as

21  a part of your duties as an alleged conspirator in this case,

22  correct?

23            MR. SOLOWIEJCZYK:  Objection to form.

24            THE COURT:  Sustained.

25  Q.   Mr. Sood, you testified on direct to a number of actions

1   that you took in this case, correct?

2   A.  Yes.

3   Q.  We saw videos, we heard wiretaps, we heard consensually

4   recorded meetings, correct?

5   A.  Yes.

6   Q.  You'd agree with me, would you not, that one of those

7   events was in August of 2016, correct?

8   A.  Correct.

9   Q.  No Mr. Code, correct?

10  A.  Can you just give me what was August --

11  Q.  Mr. Code -- this was with Lamont and Christian Dawkins in

12  Florida.  No Mr. Code, correct?

13  A.  Correct.

14  Q.  When you met with -- when you traveled to Columbia, South

15  Carolina, the state where Mr. Code resides twice, you didn't

16  see him on either occasion, did you?

17  A.  That's correct.

18  Q.  And one of those happened after, days after, the meeting at

19  the Conrad Hilton, correct?

20  A.  Correct.

21  Q.  When you met in Miami, Florida, with Lamont and Marty

22  Blazer, Mr. Code wasn't there, was he?

23  A.  That's correct.

24  Q.  When you met in New York City with Lamont and Mr. Blazer,

25  and Mr. Code wasn't there, correct?

1   A.  Correct.

2   Q.  You traveled to Las Vegas at some point and were introduced

3   to Mr. Richardson by Mr. Dawkins, is that right?

4   A.  Yes.

5   Q.  Mr. Code wasn't there involved, correct?

6   A.  Correct.

7   Q.  Mr. Code wasn't on that yacht, correct?

8   A.  That's correct.

9   Q.  And you're aware that that was Mr. Dawkins' first time on a

10  yacht, right?

11  A.  I did not know that.

12  Q.  Was that your first time on a yacht, Mr. Sood?

13  A.  Yes.

14  Q.  It was your first time on a yacht too.  OK.

15          Mr. Code wasn't on that yacht, was he?

16  A.  No.

17  Q.  And you arranged for a meeting with Mr. Richardson in New

18  York City before this meeting with Mr. Code, correct?

19  A.  Christian arranged the meeting with --

20  Q.  You were involved in the arranging of that meeting, were

21  you not, Mr. Sood?

22  A.  I attended the meeting, yes.

23  Q.  And Mr. Code wasn't present, was he?

24  A.  No.

25  Q.  And, in fact, Mr. Sood -- strike that.

1          Beg a moment, your Honor.

2          THE COURT:  You may.

3   Q.  Now, Mr. Sood, the government showed you an exhibit, this

4   agreement that you reached with Mr. Code and Parkhurst Energy,

5   is that correct, or Park West Energy, is that right?

6   A.  Yes.

7   Q.  Now, this was a consulting agreement between you and

8   Mr. Code, right?

9   A.  Yes, for --

10  Q.  It's in writing, correct?

11  A.  Yes.

12  Q.  You testified that Mr. Code agreed to help you sign

13  professional athletes as clients, right?

14  A.  For that particular agreement, yes.

15  Q.  Nothing wrong or illegal about that, correct, Mr. Sood?

16  A.  I believe that's correct.

17  Q.  All right.  And this was not an agreement to sign players

18  that were entering the NBA draft, it was to sign professional

19  athletes, correct?

20  A.  Correct.

21  Q.  Pursuant to this contract, Mr. Code agreed to use his

22  connections and relationships for you to help you sign veteran

23  NBA players, correct?

24  A.  Correct.

25  Q.  And in exchange, you would pay Mr. Code a consulting fee,

1    correct?

2    A.  Yes.

3    Q.  Now, Andre Roberson is a professional basketball player,

4    correct?

5    A.  Say that again.

6    Q.  Andre Roberson is a professional basketball player,

7    correct?

8    A.  Yes.

9    Q.  He entered the NBA in 2013, correct?

10   A.  Correct.

11   Q.  And in the summer or early fall of 2017, you were trying to

12   sign Mr. Roberson as a client, correct?

13   A.  Yes.

14   Q.  So in September of 2017, you had a phone call with Mr. Code

15   about trying to get his help in signing Mr. Roberson, correct?

16   A.  Correct.

17   Q.  He agreed to help you, right?

18   A.  Yes.

19   Q.  In fact, he put you on hold, and he called a couple of

20   people while you were on hold, correct?

21   A.  Correct.

22   Q.  He made some calls to his friends or contacts in the NBA

23   space, correct?

24   A.  Yes.

25   Q.  He used his relationships with people to get information,

1   isn't that right, Mr. Sood?

2   A.   That's correct.

3   Q.   And he relayed that information to you, correct?

4   A.   Yes.

5   Q.   You would agree with me, would you not, Mr. Sood, that

6   Mr. Code did not pay any of those contacts for the information

7   that he got to help you fulfill your contract?  You'd agree

8   with me, would you not, Mr. Sood?

9   A.   Yeah, I'm not aware of any.

10  Q.   Well, Mr. Sood, you'd be aware of any money that changed

11  hands, would you not, because you would have been asked to

12  supply the money?

13              MR. SOLOWIEJCZYK:  Objection, your Honor.

14              THE COURT:  Sustained.

15              MR. MOORE:  Beg one moment, Judge.

16  Q.   In fact, Mr. Sood, again, Mr. Code never brought you a

17  single college coach who agreed to take any money, isn't that

18  right?

19  A.   Yes.

20  Q.   OK.  In fact, he told you specifically that you were not to

21  pay his guys, isn't that correct, Mr. Sood?

22              MR. SOLOWIEJCZYK:  Objection.

23  Q.   That's a question, Mr. Sood.

24              MR. SOLOWIEJCZYK:  Objection.

25              THE COURT:  I'm sorry.  The objection is overruled.

J4UHDaw4                          Sood – Cross

1    A.  Can you repeat that, please.

2    Q.  Yes, sir.

3           Mr. Code told you specifically in a wire recorded

4    phone call that you were not to pay his guys?

5           MR. SOLOWIEJCZYK:  Objection to form in that case.

6           THE COURT:  Overruled.

7    A.  My recollection is that he said not to pay all coaches,

8    just be strategic, coaches that could be helpful.

9           MR. MOORE:  Your Honor, could we approach, please?

10          THE COURT:  OK.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4UHDaw4

1          (At sidebar)

2          MR. MOORE:  That's not what that call says, and I

3     believe I'm now allowed to play that portion of the call to

4     impeach his testimony and/or to refresh his recollection.

5          MR. SOLOWIEJCZYK:  If he's refreshing his

6     recollection, it has to be done outside the presence of the

7     jury is my understanding of the law or he has to get headphones

8     or something.

9          But more to the point, I don't think he's made clear

10    to him what call he's talking about.  I think Mr. Sood's

11    referring to a call that is in evidence, which is a call

12    between him, Jeff D'Angelo, and Merl Code.

13         MR. MOORE:  I'd be happy to lay more foundation.

14         MR. SOLOWIEJCZYK:  It's not clear what -- the way the

15    question's been asked, it's not clear if he's talking about the

16    specific call that Mr. Moore is referring to or not.

17         MR. MARK:  To the extent he's trying to impeach him

18    with that call by asking that question, that question in and of

19    itself, as your Honor already sustained, would be

20    objectionable.  So you can't try to ask that --

21         MR. MOORE:  I believe your Honor overruled the

22    objection to that question.

23         MR. MARK:  Mr. Moore.

24         The question was, and the call -- to impeach him with

25    the call, I think you have to ask him, did somebody else

J4UHDaw4

1    recount to him or Mr. Code recount to him a prior conversation?

2    That was the question that your Honor sustained.  So he can't

3    sort of backdoor impeachment of this call by asking him an

4    objectionable question.  So I just wanted to note that for the

5    record.

6           MR. MOORE:  I'll be glad to ask a specific question.

7    I'll be glad to use the transcript of that phone call and say:

8    On this date, didn't Mr. Code not tell you X?

9           MR. SOLOWIEJCZYK:  I don't think that's --

10          MR. MOORE:  I think that's appropriate.  I've got to

11   clear this up.  There was no objection -- any objection to that

12   answer was overruled by your Honor.

13          MR. MARK:  But what he's trying to get out is that's a

14   statement of -- to somebody else, right, not to him.  The

15   direct question, did he ever say to you X, that was overruled,

16   and there's no issue of whether that's objectionable or not.

17   The issue is whether he's going to try to backdoor in a

18   statement that he made to somebody else, and that's why it's

19   objectionable.

20          MR. MATHIAS:  The comment that Mr. Solowiejczyk is --

21   the phone call that Mr. Solowiejczyk is referencing that he

22   believes Mr. Sood is discussing, that's not at all what was

23   said in that phone call.  What Mr. Sood is recalling is his

24   scripted answers to what Merl Code meant in the meeting.  What

25   Sood told Jeff D'Angelo, he said, no, you're not paying my

J4UHDaw4

1     guys, and he said something to the effect, you might pay

2     somebody later when we have the situation.  But he said that

3     Merl said you pay some people, you don't pay others.  That's

4     what he said took place at the June 20 meeting.  To the extent

5     it's referring to a phone call, it is the August 8 phone call,

6     and he's wrong.

7               THE COURT:  I just don't know these phone calls as

8     well as you all do.  So why don't we do this:  Why don't you

9     continue with your line of examination.  If you're able to lay

10    a foundation either to refresh his recollection or otherwise,

11    then we'll cross that bridge.

12              MR. MOORE:  OK.  Yes, sir.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J4UHDaw4                          Sood - Cross

1                    (In open court; jury present)

2       BY MR. MOORE:

3       Q.  Mr. Sood, you would agree with me that there were a number

4       of telephone calls intercepted between you and various other

5       people over multiple wires, correct?

6       A.  Yes.

7       Q.  You would agree with me that a large number of those calls

8       have not been played yet before this jury?

9                    MR. SOLOWIEJCZYK:  Objection, your Honor.  He has no

10      basis to answer that.

11                   THE COURT:  Sustained.

12      BY MR. MOORE:

13      Q.  Not referring to this June 20 meeting, do you recall an

14      August 8, 2017, phone call between you and Merl Code?

15      A.  If you give me some more details, I'm sure I will.

16      Q.  Well, do you recall a discussion about a man named Seth

17      Cohen?

18      A.  Yes.

19      Q.  Do you recall Merl Code telling you in that call, you are

20      not going to pay my guys?

21                   MR. SOLOWIEJCZYK:  Objection.

22                   THE COURT:  Sustained.  The objection is sustained.

23      Q.  Mr. Sood, do you recall any conversation with Mr. Code

24      about whether you were going to pay any of his guys?

25      A.  He on that call -- Code mentioned that -- that Seth Cohen

J4UHDaw4                          Sood - Cross

1    was receiving money from other sources.

2    Q.  I didn't ask you about that, Mr. Sood.

3           There's a specific -- would it help refresh your

4    recollection if you could actually listen to that call,

5    Mr. Sood?

6           MR. SOLOWIEJCZYK:  He didn't say he couldn't recall,

7    your Honor.

8    A.  No.

9           MR. SOLOWIEJCZYK:  There's an objection, your Honor.

10   He didn't say he couldn't recall.

11          THE COURT:  The objection is sustained.

12          MR. MOORE:  Let me ask a different question, your

13   Honor.

14   Q.  Do you recall with specificity the ins and outs of

15   everything on that particular call on that particular day,

16   Mr. Sood?

17   A.  I believe so, yes.

18   Q.  You believe you recall every word that was used verbatim,

19   is that what you're telling --

20   A.  No.

21   Q.  -- the ladies and gentlemen of this jury, that you recall

22   every word verbatim of that call today?

23   A.  No, no.

24   Q.  In point of fact, you don't recall every word verbatim,

25   correct?

J4UHDaw4                         Sood – Cross

1    A.   Correct.

2    Q.   Would it help refresh your recollection of the exact words

3    that were used on that call if you listened to it, Mr. Sood?

4              MR. SOLOWIEJCZYK:  Objection.

5              THE COURT:  Why don't you ask him a question,

6    Mr. Moore.

7    Q.   Mr. Sood, do you recall Merl Code saying during that call,

8    you're not going to pay my guys?

9              MR. SOLOWIEJCZYK:  Objection.

10             THE COURT:  Sustained.

11             MR. MOORE:  Beg a moment, your Honor?

12             THE COURT:  OK.

13             (Counsel confer)

14   BY MR. MOORE:

15   Q.   Mr. Sood, you recall your discussion about Mr. Cohen,

16   correct?

17   A.   Yes.

18   Q.   And you recall, Mr. Sood, Mr. Code being clear that his

19   position was no one should pay his coaches?

20             MR. SOLOWIEJCZYK:  Objection.

21             THE COURT:  Sustained.

22   Q.   Mr. Sood, again, Merl Code never brought you a single coach

23   who agreed to take any money, did he?

24   A.   That's correct.

25             MR. MOORE:  Thank you, sir.

1           MR. SOLOWIEJCZYK:  Brief redirect.

2           THE COURT:  Redirect.

3    REDIRECT EXAMINATION

4    BY MR. SOLOWIEJCZYK:

5    Q.  Mr. Sood, just a couple of quick questions for you.

6           You were asked a number of questions in

7    cross-examination about whether you knew that Marty Blazer

8    stole money from clients in the past.  Do you recall that?

9    A.  Yes.

10   Q.  Based on your discussions with Christian Dawkins, did he

11   know about all of that as well?

12   A.  I believe he did, yes.

13   Q.  You were asked about an agent named Stephen Pina at ASM.

14   Do you recall that?

15   A.  Yes.

16   Q.  Who first introduced you to Stephen Pina?

17   A.  Christian.

18   Q.  When it came to making payments to players or their

19   families, you were asked a number of questions about that.  Did

20   you decide which players -- this is during the period when

21   Christian Dawkins worked at ASM Sports, Mr. Sood -- were you

22   the one who decided which handlers and family members were

23   going to get money?

24   A.  No.

25   Q.  Who did?

J4UHDaw4                          Sood - Redirect

1   A.   Christian.

2   Q.   You were asked some questions, Mr. Sood, about your

3   dealings with Lamont Evans.  I just want to walk through that

4   briefly.

5           When you first met with Lamont Evans in South

6   Carolina, who facilitated that first meeting?

7   A.   I believe it was Marty Blazer and Christian.

8   Q.   And at the time of that meeting, what was your

9   understanding of what was being asked of you?

10  A.   To step in and make monthly payments that Christian was

11  already making to him.

12  Q.   To take over the payments for Christian Dawkins?

13  A.   Yes.

14          MR. HANEY:  Your Honor, I object to the

15  characterization of that statement by Mr. Solowiejczyk.  It's

16  been established Dawkins was working for ASM.

17          THE COURT:  The objection's overruled.

18          MR. HANEY:  Thank you.

19  Q.   Later on did you have discussions with Christian Dawkins

20  regarding whether he wanted to get PJ Dozier as a client?

21          MR. HANEY:  Objection to the form of the question as

22  to "he wanted to get," your Honor.

23          THE COURT:  Rephrase, Mr. Solowiejczyk.

24  Q.   Mr. Sood, did you ever have any discussions whether the

25  company that Mr. Dawkins was working for was interested in

J4UHDaw4                          Sood - Redirect

1   landing PJ Dozier as a client?

2   A.  Yes, they were.

3   Q.  And at the time that Christian Dawkins was working at ASM

4   Sports, was it your understanding that he was being paid for

5   that work?

6           MR. HANEY:  Objection as to foundation, your Honor.

7           THE COURT:  Overruled.

8   A.  Yes.

9   Q.  Now, ultimately, you got a meeting with PJ Dozier's mother,

10  right?

11  A.  Yes.

12  Q.  Who made that happen?

13  A.  Lamont Evans.

14  Q.  After Lamont Evans did that for you, you wrote him a check,

15  right?

16  A.  Correct.

17  Q.  Now, there came a point, Mr. Sood, when you weren't in

18  contact with Mr. Blazer as much, right?

19  A.  Correct.

20  Q.  And then you got back in touch with him around the time you

21  were starting Loyd Inc. with Christian Dawkins, right?

22  A.  Correct.

23  Q.  And at that time, did you learn that Marty Blazer had been

24  paying Lamont Evans since when you saw him in South Carolina

25  that first time?

J4UHDaw4                          Sood - Redirect

1    A.  Yes.

2    Q.  And then he introduced you to an investor, right?

3    A.  Yes.

4    Q.  Guy named Jeff D'Angelo?

5    A.  Correct.

6    Q.  You learned that Jeff D'Angelo was helping him make

7    payments to Lamont Evans, right?

8    A.  Correct.

9    Q.  I just want to put up for you something that's already in

10   evidence as Government Exhibit 1632B, as in boy.

11           That's not the right one.  Sorry.  I think it's 1632A

12   maybe.  Give me one moment.  My apologies, your Honor.  One

13   moment, your Honor.

14           (Counsel confer)

15           MR. SOLOWIEJCZYK:  My apologies.  It was 1632B.

16   Q.  You said to Mr. Dawkins -- can you see that, Mr. Sood?

17   A.  Yes.

18   Q.  -- "Just saw Lamont in Miami" -- this is June 28, 2017 --

19   "on my way to Bolivia.  You guys should sit down.  Jeff funding

20   him, so we may as well take advantage of it.  And Dawkins

21   responded, "Will do.  I like Lamont," right?

22   A.  Yes.

23   Q.  When Jeff D'Angelo made payment to Lamont Evans, what was

24   your understanding of whether that was going to be to the

25   benefit of the company that you had founded with Dawkins and

1    D'Angelo?

2    A.  It would be.

3    Q.  Mr. Sood, during your direct testimony, a number of

4    recordings were played of meetings you had with Book

5    Richardson?

6    A.  Yes.

7    Q.  I think there were three meetings in total, right?

8    A.  Yes.

9    Q.  During those meetings, did you talk about a player named

10   De'Andre Ayton?

11   A.  Yes.

12   Q.  Did you talk about a player nailed Rawle Alkins?

13   A.  Yes.

14   Q.  Did you talk about other players that were on the

15   University of Arizona team?

16   A.  Yes.

17   Q.  Fair to say, Mr. Sood, that was the vast majority of the

18   players that you discussed during those meetings?

19   A.  Yes.

20   Q.  You were asked on cross-examination about this $15,000

21   payment to Book Richardson.  Whose ideas was it to give $15,000

22   to Book Richardson?

23   A.  Book had requested it from Christian.

24   Q.  Then did Christian ask you and Jeff to make the payment?

25   A.  Yes.

1    Q.  Happened at your office, right?

2    A.  Correct.

3    Q.  After that meeting, did you tell Christian Dawkins at some

4    point, we gave him the $15,000?

5    A.  Yes.

6    Q.  Mr. Sood, you were asked some questions about your

7    cooperation agreement.  I think at one point you were asked

8    what was going to help you and what was going to hurt you.

9    Would lying here today help you at all?

10   A.  No.

11   Q.  You were asked some questions about the SEC investigation.

12   What's your understanding of what the potential consequences

13   are going to be to you as a result of that investigation?

14   A.  Could be fine or some kind of suspension or both.

15   Q.  Has anyone ever told you, made any promises to you, that

16   anyone from the United States Attorney's Office was going to

17   help you in connection with the SEC investigation?

18   A.  No.

19   Q.  And the terms of your agreement with the government,

20   they're in writing, right?

21   A.  Correct.

22   Q.  They're in the cooperation agreement that we've shown you,

23   right?

24   A.  Yes.

25   Q.  Does it say anything in that agreement about the SEC?

1    A.  No.

2    Q.  Mr. Sood, you were asked on cross-examination by Mr. Moore

3    a number of questions about your dealings with Mr. Code.

4    During this period in the summer of 2017, you didn't speak to

5    Mr. Code that often, did you?

6    A.  No.

7    Q.  Somebody you knew but not terribly well, is that fair to

8    say?

9    A.  Yes.

10   Q.  Who was the primary contact with Mr. Code for Loyd Inc.?

11   A.  Christian.

12   Q.  Would Christian from time to time tell you about some of

13   the things that were going on between him and Code?

14   A.  Yes.

15   Q.  And at some point, did he tell you, we're planning on

16   paying Mr. Code a monthly retainer?

17   A.  Yes.

18   Q.  You have multiple conversations about that?

19   A.  That's correct.

20   Q.  What was your understanding as a member of this business

21   about what Mr. Code was providing to Loyd Inc.?

22   A.  He would provide access to --

23           MR. MOORE:  Objection, your Honor.  Can we approach?

24           THE COURT:  OK.

25           (Continued on next page)

J4UHDaw4

1            (At sidebar)

2            MR. MOORE:  I don't see how this is responsive.  I

3      asked him if he was getting any money from him, but I didn't

4      ask him any questions about what he was or was not providing

5      for Loyd Inc.  In fact, I don't know the words "Loyd Inc." came

6      out of my mouth during -- they did come out of my mouth when I

7      talked about payments, but -- I'm rethinking, sorry.  But I

8      don't believe this is a fairly responsive question to my

9      questions.

10           MR. SOLOWIEJCZYK:  Your Honor, the line of questions

11     was really about his understanding of whether Merl Code was

12     going to -- what he was going to be doing for them, and then

13     there were a bunch of questions --

14           THE COURT:  I'm sorry.  I can't hear you.

15           MR. SOLOWIEJCZYK:  -- of did he introduce you

16     personally to any coaches, and what this goes to is his

17     understanding of why are we paying him, what are we paying him

18     for, and it is responsive to that question.

19           THE COURT:  I'll allow that.

20           MR. MOORE:  Thank you.

21           (Continued on next page)

22

23

24

25

1          (In open court; jury present)

2    BY MR. SOLOWIEJCZYK:

3    Q.  Mr. Sood, I was asking you, it was your understanding that

4    your company was paying Mr. Code a monthly retainer, right?

5    A.  Yes.

6    Q.  And I was asking you what your understanding was of what

7    that money was for?

8    A.  Introductions to players, college players, and college

9    coaches.

10   Q.  Now, your company's agreement with Mr. Code -- withdrawn.

11          You were asked some questions about an agreement, a

12   written agreement, that you had with Mr. Code.  That was

13   through Princeton Advisory Group, right?

14   A.  Yes.

15   Q.  That's your company, right?

16   A.  Yes.

17   Q.  And that agreement, it's in evidence.  It's in writing,

18   right?

19   A.  Yes.

20   Q.  And what type of players does it relate to?

21   A.  Professional players.

22   Q.  Now, this monthly retainer agreement that you had with Merl

23   Code, was it ever reduced to writing?

24   A.  No.

25   Q.  Why not?

1    A.  Not supposed to be paying coaches.

2            MR. SOLOWIEJCZYK:  No further questions.

3            THE COURT:  Any brief recross?

4            MR. MOORE:  No, sir.

5            MR. HANEY:  No, your Honor.

6            THE COURT:  Mr. Sood, you may step down.

7            (Witness excused)

8            THE COURT:  Does the government have another witness?

9            MR. MARK:  Yes.  The government calls it's next

10   witness, Michael Blanton.

11           THE COURT:  Sir, please step all the way forward, and

12   please step into the witness box next to me and remain

13   standing.

14   MICHAEL BLANTON,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MARK:

19   Q.  Mr. Blanton, are you currently employed?

20   A.  I am.

21   Q.  Where do you work?

22   A.  At the University of Southern California.

23   Q.  How long have you worked at the University of Southern

24   California?

25   A.  Since January 1, 2017.

1    Q.  Does the University of Southern California have any

2    nicknames or short forms?

3    A.  USC.

4    Q.  Do you have a particular title at USC?

5    A.  Currently, I am a vice president for the Office of

6    Professionalism and Ethics.

7    Q.  What division -- what is the office of legal affairs and

8    professionalism and ethics?

9    A.  The OPE, as we call it, is an office that oversees all

10   offices on campus that conduct any kind of misconduct

11   investigations.  The offices that report up through me include

12   the Office of Athletic Compliance.

13   Q.  How long have you held that position?

14   A.  Since May 27, 2018.

15   Q.  Prior to May of 2018, what role did you have at USC?

16   A.  I was the vice president for athletic compliance.

17   Q.  How long were you in that role?

18   A.  From January 1, 2017, until May 27, 2018.

19   Q.  What were your responsibilities as the vice president of

20   athletics compliance?

21   A.  I oversaw a staff of ten directors and assistant directors

22   of athletic compliance and basically managed all of those

23   directors and their roles as overseers of the 21 sports that we

24   play at USC.

25   Q.  Who did you report to in that role?

J4UHDaw4                        Blanton - Direct

1    A.   I reported to the senior vice president for administration,

2    Todd Dickey.

3    Q.   And is the athletics compliance department part of the

4    athletics department?

5    A.   No.

6    Q.   What part of the school is it?

7    A.   Athletic compliance reports up through the administration

8    side.

9    Q.   Why is it not part of the athletics department?

10   A.   It was determined some time ago that to remove any

11   appearance or actual conflict of interest, that athletic

12   compliance would report through administration and not through

13   the athletic director.

14   Q.   Prior to working at USC, where did you work?

15   A.   I was an attorney in private practice since 1997.

16   Q.   In your role at USC, do you also serve as an attorney to

17   the school?

18   A.   No, I am not.

19   Q.   Now, is USC located in LA?

20   A.   It is.

21   Q.   Is it a public or private institution?

22   A.   It is private.

23   Q.   Approximately how many students attend the school?

24   A.   Combined undergrad and graduate, I believe it's about

25   47,000.

J4UHDaw4                         Blanton - Direct

1   Q.  Is USC a member of the NCAA?

2   A.  It is.

3   Q.  What division is it part of?

4   A.  Division I.

5   Q.  Is USC part of any athletic conference?

6   A.  Yes, the Pac-12 Conference.

7   Q.  Is the University of Arizona also part of the Pac-12

8   Conference?

9   A.  Yes, it is.

10  Q.  You mentioned that USC has 21 athletic teams.  Is men's

11  basketball one of them?

12  A.  It is.

13  Q.  As a member of the NCAA Division I, does USC have to follow

14  any rules?

15  A.  Yes.  We are required, as being a member of the NCAA, to

16  follow the NCAA manual.

17  Q.  Who at the university do those rules apply to?

18  A.  It applies to all athletic department staff, coaches,

19  student athletes, and in many respects every other employee at

20  the university.

21  Q.  Are there particular NCAA rules governing the conduct of

22  coaches?

23  A.  Yes.

24  Q.  Do any of these rules concern interactions with agents and

25  advisers?

J4UHDaw4                        Blanton - Direct

1   A.  Yes, they do.

2   Q.  Do any of these rules concern what benefits it is

3   permissible for student athletes to receive?

4   A.  Yes.

5   Q.  OK.  I'll discuss a little more about those later.

6          What responsibilities, if any, do USC coaches have to

7   report known or potential NCAA rules violations to the

8   university?

9   A.  The coaches are required to immediately report to their

10  head coach or to me, when I was in that role, any known or

11  suspected NCAA violations.

12  Q.  Now, you mentioned you were in that role as sort of the

13  head of athletic compliance.  Can you just sort of broadly

14  explain the -- how that department was structured and how it

15  carried out its obligations.

16  A.  "That department" meaning athletic compliance?

17  Q.  The athletics compliance department.

18  A.  Athletic compliance, when I was overseeing it, had my role

19  at the head of it, and then each director was assigned a group

20  of sports.  Each director ideally would have an assistant

21  director to assist them in their oversight of those particular

22  sports.

23  Q.  And what would that oversight entail?

24  A.  Basically, just everything that comes with managing other

25  people and ensuring that all of the big picture items are taken

1    care of, answering any kinds of questions, dealing with any

2    investigations, any other matters that cannot be handled at the

3    assistant or director level.

4    Q.  Would it include training and education?

5    A.  Yes.

6    Q.  With respect to men's basketball coaches, can you sort of

7    briefly explain some of the training, education that they had

8    on the NCAA rules.

9    A.  Yes.  The director that is assigned to the sport of men's

10   basketball conducts frequent training on NCAA rules and

11   regulations.  They will meet -- if not monthly, they'll meet

12   weekly with both the student athletes on the team as well as

13   the coaches.  If matters come up in the press, if matters come

14   through the NCAA, they are responsible at the director and

15   assistant director level of educating all the coaches and being

16   there to answer any questions if there's any doubt about

17   anything.

18          THE COURT:  Mr. Blanton, could I ask you to keep your

19   voice up, please.

20          THE WITNESS:  Yes, sir.  Yes, your Honor.

21   Q.  When you were in that role, athletics compliance, did you

22   ever participate in any of those trainings?

23   A.  Yes.  I would conduct an annual training for the entire

24   athletic department, at a minimum, and we would typically hit

25   on the high enforcement matters that the NCAA was concerned

J4UHDaw4                        Blanton - Direct

1    with at the time.

2    Q.  Did any of the trainings that you participated in cover

3    interactions with agents and advisers?

4    A.  Yes.

5    Q.  And under the rules, are coaches permitted to steer student

6    athletes to certain agents and advisers in exchange for money?

7    A.  No.

8    Q.  Do those trainings also cover what benefits student

9    athletes can and cannot receive?

10   A.  Yes, they do.

11   Q.  Are you familiar with the term "extra benefit"?

12   A.  I am.

13   Q.  What is an extra benefit?

14   A.  Extra benefit refers to something that is not permitted

15   under the NCAA manual to be provided to a student athlete or a

16   prospective student athlete.

17   Q.  When you say "student athlete," does it also govern what

18   can be provided to a student athlete's family member or close

19   associate or friend?

20   A.  It does include that.

21   Q.  Does this include any prohibitions on payments from an

22   agent or a financial adviser?

23   A.  It would include both.

24   Q.  And what effect could such a payment from a financial

25   adviser or an agent have on a student athlete's eligibility?

1  A.  It would render them immediately ineligible upon receipt.

2  Q.  Is a coach permitted to facilitate an extra benefit to a

3  student athlete under the rules?

4  A.  No.

5  Q.  Now, the trainings that you participated or oversaw, do

6  they also include trainings regarding recruiting?

7  A.  Yes.

8  Q.  Based on your experience, how young are some of the players

9  that coaches in men's basketball begin recruiting?

10  A.  Ninth grade.

11  Q.  Just going back to some of the trainings that you oversaw,

12  did they also include any sort of internal USC policies as

13  well?

14  A.  Yes, they could.

15  Q.  Does USC have a policy relating to registration of agents?

16  A.  Yes.  We ask all athlete agents to register through the

17  Office of Athletic Compliance to let us know that they're out

18  there, and we also provide links to education sources for the

19  agents to view and understand what we expect of them.

20  Q.  Why do you recall all athlete agents to register with the

21  school?

22  A.  It's better for us to be able to know who is out there so

23  that we can provide education and ensure that we can warn

24  against the pitfalls of extra benefits and other issues

25  involving the interactions between agents and our student

1  athletes.

2  Q.  When you refer to athlete agent, who is an athlete agent

3  under that policy?

4  A.  We use the definition provided by the NCAA, so that would

5  include anybody that seeks to market or earn money from a

6  student athlete's athletic ability or potential future earnings

7  as an athlete.

8  Q.  So would that also typically cover a financial adviser, for

9  instance?

10  A.  Yes.

11           MR. HANEY:  Objection.  Leading.

12           THE COURT:  Overruled.

13  Q.  You can answer.

14  A.  It would.

15  Q.  Would it include a business manager?

16  A.  If they met that definition, yes, it could.

17  Q.  If a coach is aware of contact between a student athlete

18  and an agent adviser, what is the coach required to do?

19  A.  They should let us know in athletic compliance.

20  Q.  Now, were you familiar with Tony Bland?

21  A.  Yes.

22  Q.  Was he a coach at USC?

23  A.  Yes, he was.

24  Q.  What did he coach?

25  A.  He was an assistant men's basketball coach.

J4UHDaw4                        Blanton - Direct

1    Q.  When did he coach at USC?

2    A.  I believe he started in April of 2013 until September 26,

3    2017.

4    Q.  Could you explain, just broadly, what are the duties and

5    responsibilities of an assistant men's basketball coach at USC.

6    A.  There's a lot of them, but they're expected to be teachers

7    of the game, mentors in some fashion to the student athletes.

8    They're expected to teach them not just the points of the game

9    but matters having to do with compliance and, you know, being

10   overall -- keep using this term "mentor," but there's a lot of

11   broad responsibilities.

12   Q.  And are some of those responsibilities also laid out in

13   employment contracts that the coaches --

14   A.  Yes.

15   Q.  -- have with the school?

16   A.  Yes, they are.

17   Q.  Are you familiar with those contracts?

18   A.  Yes.

19   Q.  How are you familiar with them?

20   A.  When I was over the office, any new renewal or new hire of

21   any coach in any sport, the contract has to be approved by me,

22   or someone sitting in my role, to ensure that it has the

23   NCAA-specific reporting obligations and other language that we

24   require.

25             MR. MARK:  Ms. Bustillo, could you publish what's been

J4UHDaw4                     Blanton - Direct

1    marked as Government Exhibit 706 and has already been received

2    in evidence.

3    Q.  Mr. Blanton, do you recognize this document?

4    A.  Yes.

5    Q.  What is it?

6    A.  This looks to be the contract that was in place in 2017

7    between the university and Tony Bland.

8    Q.  What was the effective date of this contract?

9    A.  I believe it's effective April 1, 2017.

10   Q.  Were there prior contracts for Mr. Bland's employment

11   before this?

12   A.  Yes, I believe there was an original contract and several

13   amendments before this one.

14   Q.  Were those terms substantially similar to these ones in

15   this contract?

16   A.  From those in front of me, yes.

17   Q.  Now, generally speaking, could you just describe some of

18   the key terms in this employment contract.

19   A.  From my perspective, 2.01 is a key term.

20   Q.  OK.

21   A.  Everything underneath it.

22           MR. MARK:  Could we specifically highlight the last

23   bullet point there, Ms. Bustillo.

24   Q.  Mr. Blanton, is this one of the terms that you were

25   referring to?

1   A.   Yes.

2   Q.   What does this term generally require?

3   A.   This assigns the responsibilities to the assistant coach

4   and what is expected of him in terms of some of the compliance

5   responsibilities.

6           MR. MARK:  Ms. Bustillo, could we go to page 2.  Could

7   we highlight the top portion.

8   Q.   What's generally referred to here?

9   A.   It's more of the same.  It tries to lay out in clear

10  language what's expected in terms of compliance and the coach's

11  obligation to report concerns or other rules violations.

12          (Continued on next page)

1    Q.  And does this include references to contacts with agents?

2    A.  Yes.  In the last bullet point.

3    Q.  What specifically does it state regarding contacts with

4    agents?

5    A.  Requires the coach to report any awareness that a student

6    athlete or a prospective student athlete is having contact of

7    any kind with an agent.

8    Q.  And to whom was that reporting required to?

9    A.  To the assistant coach's supervisor which is the head coach

10   and while I was there to me.

11   Q.  And did Tony Bland report to you any contact by an agent to

12   any student athlete or prospective student athlete?

13   A.  No.

14        MR. MARK:  Ms. Bustillo, could we go to page 4.

15   Q.  And, Mr. Blanton, could you just take a look briefly at

16   this provision called disclosure of outside income.  What does

17   this generally relate to?

18   A.  This relates to the requirement to execute a form on an

19   annual basis telling the athletic department what forms and how

20   much outside athletically-related income the coach has earned

21   in that calendar or that period of time.

22   Q.  Why did Mr. Bland need to record outside income related to

23   athletics to the university?

24   A.  It was an NCAA rule for a period of time.  It also allowed

25   the athletic department to determine whether there were any

1    impermissible conflicts of interest or impermissible

2    supplemental pay that was going to the coach.

3    Q.  In your role at that time as head of athletics compliance

4    were you aware of any outside income for Mr. Bland?

5    A.  Not specifically.

6          MR. MARK:  Ms. Bustillo could we just highlight now

7    the bottom section.  Section 4.02.

8    Q.  Mr. Blanton, what's being discussed in this section of the

9    contract?

10   A.  4.02 is setting out the criteria for the university to

11   terminate the assistant coach's employment for cause.

12   Q.  And let me just refer you to now the next page which is

13   subsection (d) under this contract.

14         What is being discussed in this subsection?

15   A.  This is one of the areas that the university can terminate

16   employment for cause and it refers to violations that may be

17   committed by the coach being one of the areas that we can

18   terminate for cause.

19   Q.  And I see at the beginning it calls -- it said "a

20   significant violation."

21         Does that term have a particular meaning under the

22   NCAA rules?

23   A.  It does.  When I read this a significant violation would be

24   one that would rise to the level of a major infraction.

25   Q.  And why did the university retain the right to terminate

1    Mr. Bland if he committed a significant violation?

2    A.  Because it exposes the university to significant and severe

3    consequences from the NCAA.

4    Q.  And if Mr. Bland were to have taken cash from a sports

5    agent or financial adviser in exchange for directing his

6    players or prospective players to retain the services of a

7    sports agent or adviser would that conduct violated in the of

8    the terms of the agreement we just went over?

9    A.  Yes.

10   Q.  Which ones?

11   A.  The one we're looking at right now and I think there's

12   others under 4.02.

13   Q.  And if Mr. Bland were to have facilitated a sports agent or

14   adviser to give money to a student athlete or his family or

15   friends would that conduct have violated any terms of the

16   agreement we just went over?

17   A.  Yes.

18   Q.  Prior to September 2017 what, if anything, did you know

19   about Mr. Bland accepting money from a financial adviser or an

20   agent in exchange for his agreement to steer players at USC to

21   that agent or adviser?

22   A.  I was unaware of any such conduct.

23   Q.  Had you become aware of such an arrangement between

24   Mr. Bland and any agent or outside adviser, what effect, if

25   any, would it have had on Mr. Bland's employment?

1   A.  I'm confident we would have put him on immediate

2   administrative leave and investigated.

3   Q.  And what if you learned that Mr. Bland gave money he

4   received to current student athletes or student athletes he was

5   recruiting, would that have made a difference?

6   A.  Yes.  It would have impacted the eligibility of those

7   students or prospective student athletes.

8   Q.  And what if you learned that he facilitated money from an

9   agent or adviser to the family member of a student athlete or

10  prospective student athlete, would that have violated NCAA

11  rules?

12  A.  Yes, it would.

13  Q.  And we talked about the definition of the NCAA rules

14  definition in the context of USC's agent registration policy;

15  is that correct?

16  A.  That's correct.

17  Q.  And could you just explain for us again the breadth of that

18  definition?

19  A.  Yes.  It includes any individual that seeks to either make

20  money now or in the future from marketing a student athlete's

21  athletic abilities or earning money for themselves based on the

22  potential future earnings of that student athlete.

23  Q.  And if you learned that Mr. Bland facilitated money from an

24  agent or adviser to the family members of the student athlete

25  or prospective student athlete, what consequences would arise?

1  A.  It would impact, again, both the eligibility of the

2  students or student athletes that were involved and it would

3  negatively impact the coach's future employment.  It would also

4  require the university to self-report violations to the NCAA.

5          MR. MARK:  One moment, your Honor.

6          (Counsel confer)

7  Q.  And you said that in response to my earlier hypothetical

8  that would have been an NCAA violation?

9  A.  I believe it would.

10 Q.  Would it have been a significant violation as we were

11 talking about before?

12 A.  It potentially could expose us to a major infraction.

13 Q.  And would that under his contract give the university cause

14 to terminate?

15 A.  Yes.

16 Q.  And based on your experience at the university, would that

17 be -- would the university terminate an employee in that

18 situation.

19 A.  Yes, it would.

20          MR. MARK:  No further questions.

21          THE COURT:  Any cross?

22          MR. HANEY:  Yes, your Honor.  I'll be brief.

23 CROSS-EXAMINATION

24 BY MR. HANEY:

25 Q.  Good afternoon, Mr. Blanton.

1    A.  Good afternoon.

2    Q.  Mr. Blanton, I represent a young man in this case by the

3    name of Christian Dawkins and I'm going to ask you some very

4    direct questions and I won't keep you here long today.

5    A.  Thank you.

6    Q.  I appreciate you coming in from Los Angeles.

7            Now you're aware that there have been criminal

8    allegations made in connection with the relationship between my

9    client Christian Dawkins and your former basketball coach, Tony

10   Bland; is that correct?

11   A.  Yes.  I'm aware.

12   Q.  And you've testified that Tony Bland was, in fact, an

13   assistant basketball coach at one point at the University of

14   Southern California, right?

15   A.  Yes.

16   Q.  And would you agree with me that you have no personal

17   knowledge as to the relationship that existed between Christian

18   Dawkins and Tony Bland back during the point in time where

19   these allegations were made?

20   A.  So you're referring to some time prior to September?

21   Q.  Yes.

22   A.  That's correct.

23   Q.  Now, then it's also fair for me to say that you would have

24   no direct knowledge or personal knowledge of whether or not

25   Christian Dawkins was ever associated with any alleged scheme

J4U9DAW5                          Blanton – Cross

1    to bribe coach Tony Bland to steer players to an agency that he

2    worked with?  You don't have any personal knowledge of that; is

3    that correct?

4    A.  For the time period that we're speaking?

5    Q.  Yes, sir.

6    A.  That's correct.

7    Q.  Now, Mr. Blanton, you were interviewed by the government,

8    correct me if I'm wrong, on April 28, 2019?

9    A.  I'm not recalling the exact date but that sounds fair.

10   Q.  Phone interview, right?

11   A.  I met with the government at some point in person but I've

12   talked to them on the phone as well.

13   Q.  Thank you.

14        And during the course of that interview you did

15   indicate that USC had banned what were called runners on

16   campus; is that correct?

17   A.  Yes.

18   Q.  And you know what a runner is, right?

19   A.  I do.

20   Q.  Is it fair for me for say that a runner is a sports

21   management, I guess, professional who works on behalf of an

22   athlete agent?

23   A.  That is my understanding, yes.

24   Q.  Loose definition of a runner?  Fair to say?

25   A.  Fair.

1    Q.  You were the former vice-president of athletic compliance

2    at USC, right?

3    A.  That's correct.

4    Q.  So you're familiar, obviously, with the issue that

5    universities such as USC have with athlete agent runners on

6    campuses, correct?

7    A.  Correct.

8    Q.  In fact, USC even had what was called a stayaway list of

9    certain sports management professionals; is that right?

10   A.  It's been given that phrase and others, yes.

11   Q.  And you also noted during your phone interview that you're

12   aware that certain athlete agent student athlete contact can be

13   a violation of a particular state law in California; is that

14   right?

15   A.  That's right.

16   Q.  You're familiar as an attorney and also as an athletic

17   compliance individual that there is a California Athlete Agent

18   Act, right?

19   A.  That is right.

20   Q.  And that California Athlete Agent Act punishes certain

21   conduct that a runner may engage in with a student athlete?  Is

22   that fair to say?

23   A.  It provides for that punishment if enforced, yes.

24   Q.  If enforced, because it's usually not enforced, is it?

25   A.  Unfortunately, that's correct.

J4U9DAW5                    Blanton - Cross

1    Q.  And even when it is enforced the conduct punishing the

2    runners and their improper contact with student athletes on

3    campus, it's only a misdemeanor, isn't it?

4    A.  That's my understanding.

5              MR. MARK:  Objection.

6              THE COURT:  Overruled.

7    Q.  I'll ask the question again.  So this California Athlete

8    Agent Act punishes the conduct of runners engaging in improper

9    contact with the student athletes, right?

10   A.  Right.

11   Q.  Such as paying student athletes?  Fair to say?

12   A.  Yes.  That's included.

13   Q.  Such as giving a coach maybe some money to give to an

14   athlete?  Fair to say?

15   A.  That would be included.

16   Q.  Such as snooping around on campus trying to make improper

17   contact with the student athletes?  Fair to say?

18   A.  If they're trying to make first contact, yes.

19   Q.  And that would include basketball players at USC, right?

20   A.  Yes, it would.

21   Q.  And the State of California, my question before I was

22   interrupted, has punished that type of conduct as a

23   misdemeanor, right?

24   A.  It is listed as a misdemeanor in the statute.

25   Q.  And educate as a lawyer, if you can, what the difference is

J4U9DAW5                          Blanton - Cross

1   between a misdemeanor and a felony crime.

2                MR. MARK:  Objection, your Honor.

3                THE COURT:  Sustained.

4   Q.  Isn't it true that you know as a lawyer a misdemeanor is a

5   relatively insignificant crime, correct?

6                MR. MARK:  Objection.

7                THE COURT:  Sustained.

8   Q.  Now, you testified that if payments would have been

9   received by coach Tony Bland from an athlete agent that would

10  have been grounds for termination, correct?

11  A.  If it was for the purpose of steering a student athlete or

12  prospective student athlete, yes.

13  Q.  Thank you.

14               And it was the school's determination that in this

15  particular incident that is what occurred; is that right?

16  A.  That is to the best of my understanding what occurred.

17  Q.  And that would be in violation, as you noted, of policy at

18  the University of Southern California, correct?

19  A.  Yes.

20  Q.  Though you've noted there's a misdemeanor statute that

21  deals with athlete agent runner/student athlete contact, would

22  you agree there is no criminal law on the books that deals with

23  athlete agent runner contact with coaches that you're aware of,

24  is there?

25               MR. MARK:  Objection.

1    THE COURT:  I'll sustain it as to the form of the

2  question because I didn't understand it.

3    MR. HANEY:  OK.  I will try again.

4  Q.  Are you aware as the VP of professional ethics at the

5  University of Southern California of any law that would

6  regulate improper contact between an athlete agent runner and a

7  coach?

8    MR. MARK:  Objection, your Honor.

9    THE COURT:  Sustained.

10  Q.  Mr. Blanton, would you agree with me that in all your years

11  in university compliance and athletic department, other than

12  this case, you've never heard of a case before where an agent

13  runner has been charged criminally for bribing a college

14  basketball coach, have you?

15    MR. MARK:  Objection.

16    THE COURT:  Sustained.

17    MR. HANEY:  I have nothing further, your Honor.

18    THE COURT:  Mr. Moore, Mr. Chaney, Mr. Mathias.

19    MR. MATHIAS:  No questions, your Honor.

20    THE COURT:  Any redirect?

21    MR. MARK:  No, your Honor.

22    THE COURT:  Mr. Blanton, you may step down.

23    (Witness excused)

24    THE COURT:  Does the government have another witness?

25    MR. MARK:  At this time pursuant to certain

1    stipulations the government is going to enter some evidence in

2    or call for some evidence to be entered.

3              THE COURT:  I think, ladies and gentlemen, what

4    Mr. Mark is about to do will take us to the end of the day,

5    correct?

6              MR. MARK:  That's correct, your Honor.

7              THE COURT:  OK.

8              MR. MARK:  Just have one moment, your Honor?

9              THE COURT:  Sure.

10             (Prosecutor and defense counsel confer)

11             MR. MARK:  Thank you, your Honor.

12             Pursuant to the stipulation that covers text messages

13   the government offers into evidence Government Exhibit 1624C

14   which is an excerpt of text messages between Christian Dawkins

15   and Tony Bland.

16             May we publish, your Honor?

17             THE COURT:  Yes.

18             MR. MARK:  Could we direct the jury's attention to the

19   second page and if you could highlight this string of text

20   messages.

21             And starts with an outgoing text message on June 24,

22   2017 from Mr. Dawkins to Mr. Bland:  Did you get De'Anthony

23   Adidas Nations invite?  Rawle Alkins is coming up to L.A. this

24   weekend until Tuesday.  Who can I use in town to train him?

25   And a response from Tony Bland:  Hit me when you get up.

1          Then if we could highlight the bottom string.

2          Outgoing from Mr. Dawkins to Mr. Bland:  Did any of

3    your college guys get official invites to Nike Academy yet?

4    Incoming from Mr. Bland:  I don't know.  I think Metu did all

5    right.  Was waiting for one more.  From Mr. Dawkins:  Get

6    De'Anthony in.

7          If we could go to the next page.

8          At the top of this string, July 26, 2017, outgoing

9    from Mr. Dawkins to Mr. Bland:  When do you leave Vegas?

10         And on 1:16 a.m.:  Can you meet Friday at 10 a.m.?

11   And a response from Mr. Bland:  Have breakfast with Bagley at

12   8:30 a.m. on Friday morning.  Taking the PJ to Vegas directly

13   after.

14         And at the bottom at 2:43 p.m.:  OK.  Can you meet

15   Friday evening?  That's from Mr. Dawkins to Mr. Bland.

16         If we could go to the next page, Ms. Bustillo.  And

17   just highlight in the middle.  Just a little higher up.

18         July 28, 2017.  Can you do 10 at Cosmo.  From

19   Mr. Dawkins to Mr. Bland.  And a response:  Yup.

20         And if we could just highlight the bottom string of

21   these text messages.

22         August 4, 2017 from Mr. Dawkins to Mr. Bland:

23   De'Anthony Melton is starting for USC.  I don't give a fuck who

24   on the team.

25         And at this time the government offers pursuant to the

J4U9DAW5                      Blanton - Cross

1    wiretap stipulation Government Exhibit 131 and 131T which is an

2    excerpt of a wiretap phonecall between Christian Dawkins and

3    Andy Miller.

4              THE COURT:  Very well.

5              MR. MARK:  This is from August 15, 2017, as I said,

6    between Mr. Dawkins and Andy Miller.  Ms. Bustillo, could we

7    play.

8              (Audio played)

9              MR. MARK:  Ms. Bustillo, could we go back now to

10   Government Exhibit 1624C.  And if we could turn to the page

11   that's in the lower right-hand that says 8.  There's an

12   outgoing text message from Mr. Dawkins at the top 4:46.  It

13   says:  Munish Sood, Jill Bailey.  That's from Christian Dawkins

14   to Tony Bland.  And Tony Bland's response:  Meeting with

15   associate AD.  Can't make it at noon.  Response from

16   Mr. Dawkins:  LMAO.  All good chief.

17             Then if we could go down to the string a little bit

18   later in the day at 6:47 p.m.

19             Continues:  What spot should we go to?  And a response

20   from Tony Bland.  It's a spot called The Lab next to the Galen

21   Center.  And later on, the response from Mr. Dawkins:  OK.

22   I'll be there around 12:30.

23             And now pursuant to the wiretap stipulation the

24   government offers Government Exhibit 135 and 135T which is a

25   wiretap call between Christian Dawkins -- it's an excerpt from

1    a wiretap call between Christian Dawkins and Anthony Bland.

2            Ms. Bustillo, this is a call from August 31, 2017 and

3    if we could play this call.

4            (Audio played)

5            Now Ms. Bustillo, could we go back to the text message

6    chain at Government Exhibit 1624C.  And could we highlight the

7    text message at 8:32 p.m.  And that's a text message from Tony

8    Bland to Christian Dawkins:  Hit me when you get by yourself.

9    Response from Mr. Dawkins:  OK.

10           Now pursuant to the wiretap stipulation, the

11   government offers Government Exhibit 140 and 140T which is a

12   wiretap call between Christian Dawkins and Tony Bland.

13           THE COURT:  Very well.

14           MR. MARK:  And this is from September 9, 2017.

15           Ms. Bustillo, you can play this.

16           (Audio played)

17           THE COURT:  Mr. Mark, how much more of this?

18           MR. MARK:  There is probably 30 more seconds, your

19   Honor.

20           THE COURT:  OK.

21           (Audio played)

22           THE COURT:  OK.  Ladies and gentlemen, before we let

23   you go can I ask you to stay in the box just a couple of

24   seconds while I speak with the lawyers.

25           (Continued on next page)

```
 1              (At sidebar)

 2              THE COURT:  So what question do we propose I put to

 3     them?  My suggestion would be to ask them whether they would be

 4     willing to sit a full day Thursday and Friday?

 5              MR. MOORE:  I think that depending on -- we might get

 6     all the evidence in tomorrow.  We might be able to argue and

 7     charge on Friday.

 8              MR. MATHIAS:  On Thursday.

 9              THE COURT:  I was hoping argue the charge tomorrow

10     evening.

11              MR. MARK:  Can I just ask I mean are the defendants

12     going to testify, just to confirm that schedule.

13              MR. MOORE:  We don't know that yet.

14              MR. HANEY:  One thing we haven't established.  For a

15     month we've been trying to get some player state-of-mind calls.

16     And the government is very well aware of three or four calls

17     that are extremely critical to our defense.  And we have not

18     gotten a position back from them over a month of asking.  And

19     now here we are the day before.

20              THE COURT:  Let me do this.  Let me put the question

21     to the jury.  I'll have Ms. Rivera get a sense of whether

22     they'd be willing to do that.  If they're not, by the way, if

23     there's not consensus, then we'll go regular.  Then we can have

24     this fight.

25              MR. MOORE:  Yes, sir.
```

1          (In open court)

2          THE COURT:  OK, ladies and gentlemen, before we let

3     you go completely, I'm going to ask Ms. Rivera to sort of do --

4     take your temperature.  What we would like to do with your

5     consent is to sit full days Thursday and Friday and hopefully

6     get everything in during that period of time.  If there is not

7     a consensus amongst you, then we will just continue to go the

8     way we have been going.  Again, we think we may be able to get

9     everything in by Friday, but we are more likely to -- and,

10    again, there are no promises here, obviously -- if we sit a

11    full day until five o'clock Thursday and Friday.

12          So when you retire let her know.  She'll let me know

13    and we'll let -- certainly tomorrow we'll go until 2:30.  OK.

14          So until tomorrow at 9:30 when we get back together

15    don't discuss the case.  Don't read anything about the case.

16    Don't see anything about the case if you should encounter it on

17    the media.  Have a wonderful evening.

18          (Continued on next page)

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  Everyone please be seated.  Now it's my

3       expectation that we'll be able to get you the draft charge by

4       this evening and given my schedule tomorrow I won't be able to

5       have the charge conference, which I'd rather do tomorrow, until

6       approximately 5 o'clock in the evening.  So that gives folks at

7       least the afternoon to review it.  And I want to do it tomorrow

8       because, again, I don't know what everyone is going to do but

9       we may be closing as early as Thursday.  So I don't want to

10      spend the last minute going over -- drafting the final version

11      of the charge.

12            Is there -- actually let me ask the government how

13      much more time on the stuff that you guys have?

14            MR. MARK:  No more than an hour or an hour-and-a-half,

15      your Honor.

16            THE COURT:  OK.  And then no other witnesses?

17            MR. MARK:  We've consolidated so we're just going to

18      present this directly to the jury so we won't be calling

19      anymore witnesses.

20            THE COURT:  So you'll be resting after this

21      presentation?

22            MR. MARK:  Exactly, your Honor.

23            THE COURT:  What can the back table tell me about your

24      intentions?

25            MR. HANEY:  Well, your Honor, the intentions of where

1    we go from here in terms of timing I think largely depend on

2    the Court's position with respect to certain state-of-mind

3    calls.  And I would say that we have worked pretty well with

4    the government to date.  But I have myself for several weeks,

5    if not longer, been trying to get a position from them with

6    regards to some very specific calls that we have, obviously,

7    the motion in limine sent you the authority why we believe that

8    those calls are relevant, your Honor.  But I'm really, really

9    struggling to find how the government in good faith when my

10   client is on a wiretap phonecall telling Mr. Code:  I ain't

11   gonna to pay no coaches.  I know what I'm gonna do.  I'm gonna

12   take their money.

13        I don't know how the government can submit that that

14   is not a state-of-mind call.  I can't even get some common

15   ground of something so clearly obvious as my client telling on

16   the same call Mr. Code:  I tried to do it the right way.  I

17   tried to explain it to them multiple F'ing times.  They don't

18   listen.  So I am gonna take their money.

19        It's clearly a forward-thinking act.  "I'm gonna,"

20   right.  "I'm not gonna" pay coaches.  And that really is the

21   whole theory of what the defense is, is that when he told

22   Mr. Code that, what you saw thereafter was a lot of laughing at

23   guys that are easy to laugh at like Marty Blazer, like Jeff

24   D'Angelo.

25        And I can't even get an answer.  And no disrespect.  I

1   respect these guys professionally tremendously.  I can't even

2   get an answer, your Honor, on a call like that that is so

3   fundamental blatant.

4          And there's others that I would submit where my client

5   is having conversation with the undercover officer where, as

6   the Court is aware, the undercover officer, in the motion that

7   we filed, tells my client:  Look, here's the model.  You're

8   going to do that or I'm not going to fund you anymore.

9          And these are very important phonecalls.  And we don't

10  even as we're hours away from a case in chief, we still have no

11  understanding of whether or not those are going to be

12  permissible calls, your Honor.

13         Thank you.

14         THE COURT:  How many calls are there?

15         MR. HANEY:  Not many, your Honor.  That's another

16  point I would make.

17         We've heard days, hours of phonecalls.  I am

18  submitting, perhaps, I don't know, ten calls at the most that

19  may last a duration of maybe 35 minutes, your Honor.  I'm not

20  asking a lot.

21         THE COURT:  Have you identified them?

22         MR. HANEY:  Yes, I have.  They've had these calls for

23  months.

24         THE COURT:  OK.

25         MR. MARK:  We've been in ongoing discussions just to

J4U9DAW5                    Blanton - Cross

1     try to avoid the necessity to litigate a lot of these calls.  I

2     know -- I think we both have been acting in good faith in doing

3     that.  I think there's going to be a few that we're going to

4     disagree and I think those will -- will be litigated tomorrow,

5     I expect.

6            Mr. Haney's has sent us a revised list of calls.

7     They've changed a little bit as, of course, ours have too, of

8     what he plans to play and that affects what our determinations

9     are.  The last list we got yesterday included several calls

10    that we've played, are going to play this morning.  So I think

11    we're looking at maybe only about six or seven where there's

12    potential dispute and we'll let defense know that shortly after

13    the trial day today and then we can resolve that before your

14    Honor.

15           THE COURT:  Have the legal issues been fully briefed

16    before me or --

17           MR. MARK:  I think it imposes -- there are several

18    issues that are going to be raised by these calls.  One is that

19    they're just straight hearsay.  Two is whether they fall,

20    certain ones fall within state of mind that's been briefed

21    before, obviously, not with respect to the specific call.  And

22    then third would be whether these excerpts really are sort of

23    fair and accurate representations of the calls and will impact

24    potential rule of completeness issues.  I'm hopeful we can

25    maybe resolve some of those later today but if not, that's --

J4U9DAW5                        Blanton - Cross

1    will be before your Honor.

2            THE COURT:  OK.  So we've heard from the jury.  And

3    the message is that they're going to think it over tonight,

4    discuss it in the morning as a group before 9:30.  So they'll

5    let us know.

6            MR. SOLOWIEJCZYK:  They'll deliberate.

7            MR. MOORE:  Your Honor, the only point I would make is

8    we're getting to the point where we have to make decisions.

9    Mr. Mathias is going to address two issues in a moment.  But I

10   don't know when we don't have a final up or down from the

11   government on these calls because, you know, having to litigate

12   it in the morning -- I'm just concerned.  I do believe that the

13   government has worked with us in good faith but I don't know

14   what we don't have and we can't land on decisions now.  If

15   they're going to oppose something they should tell us they're

16   going to oppose it so we can tee it up before the Court -- I

17   don't want to waste the jury's time tomorrow and I can tell

18   that one of the things that your Honor is very serious about is

19   not wasting the time of this jury.

20           THE COURT:  That's correct.

21           MR. HANEY:  Your Honor, I would only add that I would

22   also emphasize they have acted in good faith.  I'm not

23   suggesting they haven't.  I just don't understand why we're

24   here now and I would submit that perhaps if the client were to

25   testify those statements could come in perhaps as a prior

J4U9DAW5                          Blanton - Cross

1   consistent statement.  But we're in a position now where we're

2   being asked if our clients are going to testify, which could be

3   steered -- perhaps the wrong word for this case -- could be

4   influenced by the Court's decision on whether or not those

5   calls may be able to get in in a different manner than

6   subjecting them to cross-examination.  I would ask that the

7   Court at least consider or understand the position we're in

8   with respect to that, your Honor.

9           THE COURT:  I do.  And I'm obviously prepared to

10  decide as soon as someone brings me a controversy.  So I'll

11  await you and Mr. Mark.

12          MR. MARK:  I think some of these are going to be

13  resolved later.  I mean, as you know, each time we come before

14  your Honor to argue about a call it takes about a half an hour.

15  So they're not easy decisions.  But I think most of them will

16  be resolved and there will be a few that won't.

17          MR. HANEY:  Hopefully not midnight tonight, your

18  Honor, like a lot of things that have been resolved.  We've got

19  to prepare, your Honor.

20          MR. MARK:  Just on two things, as to discussing for

21  tomorrow.  One is we need to know whether the defendants are

22  going to be testifying or not.  I mean that's only fair.  And

23  two is the outstanding motion by defendant Code about certain

24  hearsay statements by -- overheard by two witnesses.

25          MR. CHANEY:  Not hearsay, actually, is our position.

1    THE COURT:  I'm sorry?

2    MR. MARK:  I understand.  I mean it's obviously a

3    point of dispute.  But there's a motion about testimony by two

4    witnesses, Blondell Tutwiler and Warren Broughton.  Defendant

5    Code filed a motion seeking to -- I guess an in limine motion

6    to -- that these statements are admissible.  Your Honor, we

7    filed a response, a written response before the trial Court

8    date today explaining why we think the proffered testimony is

9    inadmissible.  But I think it would facilitate --

10   THE COURT:  You filed a response this morning?

11   MR. MARK:  We filed it this morning right before the

12   court day.  So what I would maybe request -- I know from

13   defendant Code's counsel these witnesses are not in New York

14   yet but I guess they're going to fly up if their testimony is

15   admissible.  We filed in our letter -- we filed it by e-mail.

16   We didn't file it on ECF because we tried to file quickly

17   before the court day.  I've got a paper copy right now but the

18   parties are available whenever the Court is ready if the Court

19   wants to work even on that.

20   MR. MATHIAS:  Yes, your Honor.  It's two witnesses

21   Blondell Tutwiler and Warren Broughton.  Ms. Tutwiler is

22   actually in New York so the necessity of a ruling on that issue

23   doesn't fact her.  But Warren Broughton if it -- would be to

24   fly up likely in the morning.

25   THE COURT:  OK.

1        MR. MATHIAS:  So we raise the issue so as not to

2   spring it on anyone and try and do things as smoothly as

3   possible.  If I can just sort of proffer to you what they would

4   say.

5        THE COURT:  Please.

6        MR. MATHIAS:  Both Ms. Tutwiler and Mr. Broughton were

7   in Florida on family vacation with the Codes the days leading

8   up to this Las Vegas meeting late July and during the Las Vegas

9   meeting in late July, I think the 27th to the 29.  Both

10  Ms. Tutwiler and Mr. Broughton overheard Mr. Code on numerous

11  occasions telling someone on the other end of a phone, "Do not

12  take money from these guys.  Go meet them as a favor to me.  Do

13  not take money from these guys."

14       We think that that in and of itself, the timing of

15  when they heard it and the utterance of it, the command that he

16  gave these listeners is simply not hearsay.  It's a command.

17  And I think the government actually concedes that to a degree.

18       The other two statements that we would like to have

19  them testify to as admissible testimony essentially are:  For

20  Mr. Broughton, Mr. Code explained that he was getting paid a

21  consulting fee for facilitating introductions between college

22  coaches as a -- and a sports management group in Las Vegas.

23  And Mr. Code also told Mr. Broughton that the telephone calls

24  Mr. Broughton overheard were with coaches in Las Vegas and that

25  for Ms. Tutwiler she asked Mr. Code, simply because she kept

J4U9DAW5                        Blanton - Cross

1    hearing it over and over again, who he was talking to, and that

2    Mr. Code told her that he was arranging meetings for certain

3    assistant basketball coaches in Las Vegas.  And we think that

4    those two last points for Mr. Broughton and Ms. Tutwiler are

5    admissible as a then existing mental, emotional or physical

6    condition, a statement of a declarant's then existing state of

7    mind (such as motive, intent, or plan).  Certainly these are

8    utterances of intent or plan for Mr. Code.  So we think that

9    all the three pieces of testimony are admissible.

10             THE COURT:  So I'll read the government's letter.  We

11   should be prepared to discuss that tomorrow morning.

12             Anything else?

13             MR. HANEY:  No, your Honor.

14             MR. MOORE:  Your Honor, the issue for Mr. Broughton is

15   we probably ought to let him know tonight if he has to fly up

16   in the morning.  I don't know if your Honor has the ability.

17             THE COURT:  I'll read the government's motion and I'll

18   let you guys know this afternoon on this oral argument.

19             MR. CHANEY:  That's fine.  With that in mind, I think

20   we would like to make sure that we're responding to the, sort

21   of the general points made by the government's motion.

22   Mr. Mathias mentioned that they had significantly conceded that

23   a verbal -- an order, a command, or instructions are not

24   hearsay because they can either be true or false.  So they're

25   not assertions under the definition of a statement under 801.

J4U9DAW5                          Blanton - Cross

1    To the degree that the government raises in argument that

2    because these witnesses were not the recipient of the order,

3    that somehow precludes them from testifying to that statement.

4    They don't cite any law sort of supporting that general

5    proposition or argument.  I can't cite for the Court that I've

6    ever found that to have come up.  But if you look at the case

7    law interpreting why instructions and orders are not hearsay

8    they liken those statements to verbal acts.  And so to the

9    degree that Mr. Broughton and Ms. Tutwiler have a firsthand

10   observation of these orders being uttered, they can testify to

11   those observations.  The not hearsay exception for commands and

12   instructions does not require that the testifying witness be

13   the recipient of the instruction or the order.

14        MR. MARK:  I meanwhile the legal points are not really

15   in dispute.  What is hearsay or is not hearsay, the application

16   is definitely in dispute.  The fact that merely they can call

17   something that's said an order or instruction doesn't make it

18   so.  And the fact here is that they were not actually a

19   participant to the phonecall where the statements were said.

20   So they are not in a position to say whether what was said by

21   Mr. Code was an order or instruction or anything like that.

22   And that's what we addressed in our letter, your Honor.

23        THE COURT:  OK.

24        MR. CHANEY:  Your Honor, just to that point, the quote

25   that both witnesses would testify to hearing is "do not accept

1  money from these people."  The statement "do not accept money

2  from these people" simply cannot be understood as a true or

3  false assertion.  The only importance for this jury is whether

4  it was or was not spoken.  And insofar -- it's the utterance

5  itself.  It's that those words came out of Mr. Code's mouth.

6          THE COURT:  But one of the words that came out of

7  Mr. Code's mouth was, "and I told him don't take money from

8  those people."

9          MR. CHANEY:  He's referring then to a previous

10  statement.  He's making an assertion on a previous occasion

11  made the statement X.  Here we don't have that layer.  We

12  simply have the utterance, the command, the instruction "do not

13  accept money from these people," which on its own terms can

14  neither be true or false.

15          MR. MARK:  I think you just demonstrated the problem

16  with the testimony here and by the fact that they're -- that

17  they don't want to call the actual participant to this

18  phonecall with Code but this person overheard only one side of

19  a phonecall without any context for what it is.

20          THE COURT:  OK.

21          MR. CHANEY:  Your Honor, to the degree that the -- as

22  Mr. Mathias went through it, the circumstances concerning or

23  surrounding these orders, these instructions, would certainly

24  be enough for a jury to reasonably infer that the instructions

25  were made to coaches related to this Las Vegas meeting.

1        Now, clearly these witnesses were not in a position at

2   the time when they were hearing it that these jurors are.  They

3   don't have nearly the backdrop of information concerning

4   Mr. Code, Mr. Dawkins, Mr. D'Angelo, etc., that these jurors

5   are.  These jurors at this point are trying to understand those

6   instructions, those orders as relevant and bearing on this case

7   as they come from Mr. Code in the days leading up to the Las

8   Vegas meeting.

9        THE COURT:  OK.  I actually have to leave.  So I will

10  be sending you the proposed jury instructions and my

11  determination if I should reach one this afternoon on whether

12  these two witnesses can testify.

13       MR. BOONE:  Your Honor, we don't want to hold things

14  up.  We would ask if the Court would inquire from defense

15  counsel if their clients are, in fact, testifying tomorrow.

16       THE COURT:  OK.  Are you in a position to tell me

17  whether or not your clients will be testifying tomorrow?

18       MR. HANEY:  I'm not now until I have further

19  conversation with the government on these calls, your Honor.

20       MR. MOORE:  I'm not until I receive a ruling from your

21  Honor and until we know about the specifics with respect to

22  each and every one of these calls.

23       I don't know that the government is entitled to know

24  that a defendant is going to testify until the defendant makes

25  that decision himself.

1    THE COURT:  That's what I expected the answer to be.

2    MR. MOORE:  Thank you.

3    THE COURT:  Have a good night folks.

4    (Adjourned to May 1, 2019 at 9 a.m.)

1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3    MUNISH SOOD

4    Direct By Mr. Solowiejczyk . . . . . . . . . . 937

5    Cross By Mr. Haney . . . . . . . . . . . . . . 941

6    Cross By Mr. Moore . . . . . . . . . . . . . .1040

7    Redirect By Mr. Solowiejczyk . . . . . . . . .1118

8    MICHAEL BLANTON

9    Direct By Mr. Mark . . . . . . . . . . . . . .1127

10   Cross By Mr. Haney . . . . . . . . . . . . . .1143

11                      GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    641  . . . . . . . . . . . . . . . . . . . . 938

14

15

16

17

18

19

20

21

22

23

24

25