```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
              v.                              17 CR 684 (ER)
4
     CHRISTIAN DAWKINS AND MERL
5    CODE ,
                                                  Trial
6              Defendants.
     ------------------------------x
7
                                         New York, N.Y.
8                                        May 2, 2019
                                         9:00 a.m.
9
     Before:
10
                         HON. EDGARDO RAMOS
11
                                         District Judge
12

13                          APPEARANCES

14   GEOFFREY S. BERMAN
              United States Attorney for the
15            Southern District of New York
     ROBERT L. BOONE
16   NOAH D. SOLOWIEJCZYK
     ELI J. MARK
17            Assistant United States Attorneys

18   HANEY LAW GROUP PLLC
              Attorney for Defendant Dawkins
19   BY:  STEVEN A. HANEY, SR.

20   CHANEY LEGAL SERVICES, LLC
     BY:  DAVID A. CHANEY, JR.
21                -and-
     NEXSEN PRUET, LLC
22   BY:  ANDREW A. MATHIAS
          MARK C. MOORE
23        Attorneys for Defendant Code

24   ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
                    YOLANDA BUSTILLO, Paralegal Specialist USAO
25                  EMILY GOLDMAN, Paralegal Specialist USAO
```

1

2              (Trial resumed; jury not present)

3         THE COURT:  Okay.  Good morning, everyone.

4         MR. MOORE:  Good morning, your Honor.

5         MR. HANEY:  Good morning, your Honor.

6         THE COURT:  I distributed a version of the jury

7    instructions yesterday evening.  I received Mr. Chaney's email.

8    And I don't have it for you, but I have added the two

9    instructions that I provided to the jury during the course of

10   the trial.  They have been included.

11        And with respect to the multiple conspiracy charge,

12   Mr. Mark, does the government have a view?

13        MR. MARK:  Your Honor, we don't think there was any

14   evidence of multiple conspiracies.  It's really just whether

15   Merl Code enters that conspiracy, so we don't think there's a

16   basis for a multiple conspiracy charge here.

17        THE COURT:  Mr. Chaney.

18        MR. CHANEY:  And, your Honor, the facts have come in

19   that cover a huge period of time, and there's a number of

20   different actors, all of whom seem to have separate agreements

21   about what's going to happen.  We have stuff of Lamont Evans

22   that goes way back in time before Mr. Code was involved.  We

23   have Mr. Dawkins and Mr. Sood, some evidence has come up with

24   handing off Mr. Evans in payment of that.  That doesn't involve

25   Mr. Code.

1     There's conversations between Mr. Sood and

2  Mr. Dawkins, Mr. Sood and Mr. Code, Mr. Code and Mr. Dawkins,

3  all of which seem to demonstrate different agreements with

4  different sort of goals of working together.  And so, to the

5  degree that the jury needs to be instructed that it's only in

6  agreement to commit the crimes as set forth in the indictment

7  to form the basis of the conspiracy charge, I think it's

8  warranted here.

9     MR. MARK:  I mean, I don't get too much into the

10  facts.  I mean, obviously the Court saw the emails that showed

11  that Merl Code was involved with Christian Dawkins, upon

12  evidence dating back to 2015.  But I think the main point that

13  Mr. Chaney was arguing is that they need to be instructed as to

14  what an agreement is, is already in the instruction on what is

15  a conspiracy.  So, I don't think that -- the confusion about

16  what is a conspiracy, or multiple conspiracy charge, it just

17  necessitates the conspiracy instruction your Honor already has

18  in the proposed jury charge.

19     MR. CHANEY:  And it's not just -- the law is not just

20  that they need to understand what an agreement is, it's also

21  that they need to understand that the government must prove the

22  precise agreement that's set forth in their indictment.  And

23  there has been, in fact, evidence concerning a number of

24  different agreements between the multiple different actors in

25  this case.  So, once again, we think that the facts warrant the

 1    instruction.

 2              THE COURT:  I disagree.

 3              I don't think that the facts, as I understand them,

 4    warrant the multiple conspiracy instruction.  Certainly there

 5    are conversations between various coconspirators, discussing

 6    whether it would be smart to pursue certain goals and how to

 7    pursue those goals.  But, generally speaking, the conspiracy

 8    that's alleged in the indictment is what has come out here.

 9    And again, whether or not Mr. Code joined the conspiracy is a

10    different issue but not one that matters the most.  So that

11    charge will not be included.

12              Is there anything else that we need to discuss this

13    morning before we get bring out the jury?

14              MR. MARK:  Not from the government, your Honor.

15              MR. HANEY:  Not for Mr. Dawkins, your Honor.

16              MR. MOORE:  Not for Mr. Code, your Honor.

17              THE COURT:  For Mr. Moore's and Mr. Haney's benefit,

18    we had a discussion yesterday concerning timing.  First of all,

19    I have determined that I will be giving the charge before

20    summations.

21              Then the question became whether we could get that

22    charge in this afternoon.  I doubt it.  But as I said, I mean,

23    if it looks like we're going to have -- because it's going to

24    take probably two hours to read this thing, because it's

25    60-something pages and plus the indictment that has to be read.

```
 1              If I have to keep the jury here an extra half hour,
 2     I'll shoot for that.  But beyond that, I'm not going to keep
 3     them.  By the way, I don't think that's going to be a problem.
 4              MR. MOORE:  Would your Honor consider running a full
 5     day on Friday so we can get arguments and charge in, in one
 6     day?  Would your Honor consider that?
 7              THE COURT:  I'll ask the jury.
 8              MR. MOORE:  Yes, sir.
 9              THE COURT:  Absolutely.
10              MR. MOORE:  Because I think if we ran a full day on
11     Friday, we could do that.
12              THE COURT:  Maybe.
13              MR. MOORE:  I understand.  I understand.  I have a
14     situation that I need to get back to.  And it's better than it
15     was, so I'll tell your Honor that.  But that's why I'm asking.
16              THE COURT:  No, no.  I understand, Mr. Moore.  I will
17     try to move as efficiently as we possibly can.
18              MR. HANEY:  I would only want to address, your Honor,
19     that I have planned my travel schedule around the truncated
20     schedule the Court has offered.  And I will have to look at my
21     arrangements on Friday to make sure that will be possible for
22     me to do.
23              THE COURT:  Okay.  Anything else?
24              Okay.  We'll await the jury.
25              And the defense has the government's proposed verdict
```

1410

1    form, correct?

2         MR. MARK:  I circulated both the clean indictment and

3    the verdict form to the defense.  And I also did a compare for

4    them, so they saw the difference.

5         THE COURT:  Okay.

6         If you folks don't mind, I have an issue to discuss

7    with you all.

8         MR. MARK:  Yes, sir.

9         THE COURT:  I received a letter -- or my chambers

10   received a letter from Matthew Lee of Inner City Press,

11   requesting access to the sidebar that we had, that we then

12   sealed.  So, I mean, I raise the issue.  We don't have to

13   decide it now, but think about what your positions will be,

14   obviously, before the state and the public have a right to

15   access to the transcripts.  And we just have to discuss whether

16   the substance of that particular sidebar remains sealed.

17        MR. MOORE:  Yes, sir.  Obviously, I think that was a

18   sidebar that I requested.

19        THE COURT:  It was.

20        MR. MOORE:  And I will ask your Honor to keep it

21   sealed.  But we can deal with it whenever your Honor chooses.

22        Could I simply ask one question?

23        THE COURT:  Sure.

24        MR. MOORE:  I've talked to the government and I've

25   talked with my client.  I think it's unlikely that we're going

1     to get this case to the jury on Friday, unless they agree to

2     stay all day, and perhaps not even if they do.  So I think, at

3     the latest, we would get it to them on Monday.

4          Would your Honor excuse me from deliberations?  I have

5     talked with the government; I've talked with my client.

6     Mr. Chaney and Mr. Mathias will remain, and Mr. Code is fine

7     with that.

8          Would your Honor excuse me from the actual

9     deliberations?

10         THE COURT:  Well, I mean, if you don't mind, I'd like

11    to allocute Mr. Code, briefly.

12         MR. MOORE:  Yes, sir.

13         THE COURT:  Now, Mr. Code, obviously you've been

14    paying attention throughout this trial.  And I realize how

15    important this is to you.  You have a very talented and

16    experienced legal team, and I think they have been serving you

17    very well thus far.

18         Mr. Moore obviously is a very experienced attorney.

19    And I understand that you and he have discussed him not being

20    present for deliberations.

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Mr. Code, deliberations are an incredibly

23    important part of the trial.  Any number of issues can come up

24    during deliberations, questions from the jury that require a

25    lot of thought, and perhaps even strategic decisions that need

1    to be made.  It has been my experience that, you know, things

2    can turn; questions that the jury has during deliberations, how

3    we respond to them.  Obviously I need to make sure that we are

4    as thoughtful as we can be when we respond to jury notes.

5             And so, given that, are you okay with Mr. Moore not

6    being present during deliberations?

7             THE DEFENDANT:  Yes, your Honor.

8             THE COURT:  And, Mr. Code, you do understand that if

9    for whatever reason things don't turn out the way that you hope

10   or expect, that you will not be able at a later time to allege

11   any sort of prejudice as a result of Mr. Moore not being here

12   during deliberations.

13            Do you understand that?

14            THE DEFENDANT:  Yes, your Honor.

15            THE COURT:  Is there anything else that I should ask?

16            MR. MARK:  I guess just to confirm that he actually

17   waives the appearance.

18            THE COURT:  Okay.  So, do you waive Mr. Moore's

19   appearance during deliberations?

20            THE DEFENDANT:  Yes, your Honor.

21            THE COURT:  Okay.

22            MR. MOORE:  I appreciate that, your Honor.  The only

23   reason I ask is because of the situation that I have.

24            THE COURT:  I appreciate that.

25            MR. MOORE:  Yes, sir.

1    (Jury present)

2    THE COURT:  Ladies and gentlemen, good morning.  And

3  thank you.

4    And, Mr. Dawkins, you're reminded that you're still

5  under oath.

6    Mr. Moore.

7    MR. MOORE:  Thank you, your Honor.

8  CROSS-EXAMINATION

9  BY MR. MOORE:

10 Q.  Mr. Dawkins, yesterday your lawyer played you portions of

11 calls that the government did not play in its case in chief,

12 correct?

13 A.  Correct.

14 Q.  And your lawyer also played calls for you that the

15 government did not play in their entirety during its

16 case in chief, correct?

17 A.  Correct.

18 Q.  All right.  And so I'm going to talk to you -- I'm going to

19 ask you a couple of questions about DX 2, a transcript -- a

20 call that your lawyer introduced.

21    Now, in this call, it was a meeting on June 20th,

22 2017, before the meeting in the Conrad Hilton, correct?  You

23 recall that meeting?

24 A.  Yes.

25 Q.  And so, you were talking to Mr. Code to prepare him for

1  that meeting, correct?

2  A.  Yes.

3  Q.  Okay.  And when Mr. Code mentioned the name, Zion Williams,

4  and you said:  "Yeah, exactly," and you told Mr. Code, "I just

5  want to get some money in your pocket so we can continue to

6  move forward," by that, you are meaning you were just trying to

7  help your friend get paid and trying to perhaps demonstrate to

8  the folks on the other end of the transaction that he had value

9  to them as a consultant, correct?

10  A.  Correct.

11  Q.  All right.  And in the middle of page two of the transcript

12  there --

13      MR. MOORE:  And I'll ask if Ms. Bustillo will bring it

14  up --

15  Q.  You said, "You bring around some players and shit like

16  that, oh my God."  Okay?

17      And so during that portion of the call, you're asking

18  Mr. Code to make an impression on your investors to keep them

19  happy; is that correct?

20  A.  Correct.

21  Q.  And you also talk about the fact -- in that call and in

22  other calls about Mr. Code's knowledge of NBA players, correct?

23  A.  Correct.

24  Q.  And there's a call where you're discussing the fact that if

25  you took Mr. D'Angelo to a Knicks game and introduced him to

1    some Knicks players, that would make a huge impression on him;

2    isn't that right?

3    A.   Correct.

4    Q.   And one of the reasons that you had these discussions with

5    Mr. Code and you've had these discussions with Mr. D'Angelo, is

6    because you believe that Mr. Code did have value in his

7    relationships with NBA players, correct?

8    A.   Correct.

9    Q.   And as an agent, you were trying to sign NBA players,

10   correct.

11   A.   Yes.

12   Q.   And you were pushing -- and I understand you didn't have an

13   agent's license.  But you were hoping to partner with somebody

14   who did, correct?

15   A.   Correct.

16   Q.   Okay.  And you were hoping that Munish Sood would manage

17   the financial affairs of those NBA players, correct?

18   A.   Correct.

19   Q.   High net worth individuals who could make money for your

20   company, correct?

21   A.   Yes.

22   Q.   And that's why you were pushing Mr. Code's value here,

23   correct?

24   A.   Yes.

25   Q.   You were not pushing Mr. Code as someone who could help pay

1    college coaches, were you, Mr. Dawkins?

2    A.  No.  It made no sense.

3    Q.  And despite the fact that you told Mr. D'Angelo over and

4    over and over again that it made no sense, he continued to

5    pressure you to do that; isn't that right?

6    A.  Yes.

7              MR. MOORE:  Now, your Honor, at this point I would

8    like to move in Defense Exhibit No. 3.  It's a call that we

9    agreed on with the government yesterday.

10             And I would ask for Ms. Bustillo's assistance in

11   playing this call.

12             THE COURT:  Okay.  Pursuant to the stipulation, it is

13   received.

14             (Defendants' Exhibit 3 received in evidence)

15             (Audio played)

16   BY MR. MOORE:

17   Q.  So, to orient the jury, this is a call between you and

18   Mr. D'Angelo, correct?

19   A.  Yes.

20   Q.  And it's on June 26th, 2017, six days after this meeting in

21   New York at the Conrad Hilton, correct?

22   A.  Yes.

23             MR. MOORE:  Please continue, Ms. Bustillo.  Thank you.

24             (Audio played)

25   BY MR. MOORE:

1   Q.  When you say, "I'm more powerful than any coach you're

2   going to need, I'm just being honest with you," what you're

3   telling him is you have more value to them than any coach in

4   terms of relationship with players; correct, Mr. Dawkins?

5   A.  Yes.

6           MR. MOORE:  Please continue Ms. Bustillo.

7           (Audio played)

8   Q.  So, just to give us some context, you understood that when

9   Jeff was saying to you that his discussion with Mr. Code wasn't

10  very direct, he was referring to that June 20th meeting,

11  correct?

12          MR. BOONE:  Objection.

13          THE COURT:  Sustained.

14  Q.  Mr. Dawkins, what did you understand Mr. D'Angelo to mean?

15  What meaning did you understand he was referring to?

16          MR. BOONE:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  I was under the impression that D'Angelo

19  was referencing the June 20th meeting that we had with Merl at

20  the Conrad Hotel.

21  Q.  Okay.  And was there a meeting just prior to that with

22  Book?

23  A.  Yes.

24  Q.  And he was comparing the directness of one with the

25  indirectness of another, right?

1    A.  Yes.

2              MR. MOORE:  Please continue, Ms. Bustillo.

3              (Audio played)

4    Q.  Now, what's Adidas Nation?

5    A.  Adidas Nation is an -- or it was an event that took place

6    every summer where you would get basically the top 20 high

7    school players in every class of freshman, sophomore junior --

8    rising freshmen, sophomores juniors -- and then all of the top

9    20 draft eligible college players would all come together and

10   participate in games against teams from overseas.  So it I

11   would be China, Europe, the best players from the draft from

12   those countries.  And it would be every nation basically in the

13   world would be represented.  Adidas sponsors the event.  It's a

14   bigtime event for NBA reps to come see all the top talent,

15   basically.

16   Q.  So you're telling Mr. D'Angelo here that Merl's value is on

17   things like getting you involved in Adidas Nation and making a

18   introductions to give to those at Adidas Nation, correct?

19   A.  Yes.  The way I looked at it was very simple.  Again, in my

20   head I'm thinking we're trying to run a legitimate business.

21   I'm not running a coach's shop.

22              So, the players are at Adidas Nation.  The parents are

23   at Adidas Nation.  I'm trying to get access to them because

24   those are the people who were going to be potential clients.

25              So, Merl running Adidas Nation, in my mind, if he can

1   help facilitate introductions, if I'm in the same rooms or the

2   same places at the top of these pro prospects, I mean, to me,

3   that's real value, and it can help translate into real

4   business.

5   Q.  A lot more value than paying a college coach, correct,

6   Mr. Dawkins?

7   A.  Correct.

8              MR. MOORE:  Please continue, Ms. Bustillo.

9              (Audio played)

10  Q.  So, Mr. Dawkins, you're telling him here that coaches need

11  Merl Code and you, not the other way around, correct?

12  A.  Correct, which was what I was trying to explain yesterday.

13  The process for the elite players is starting well before

14  someone arrives on a college campus.  The college coaches are

15  going to be recruiting somebody influential in a player's life.

16  So for us to put all the focus on a college coach, if you think

17  about it realistically, it just doesn't make common sense.

18  Q.  And that's not what you and Mr. Code were going to agree to

19  do, is it?

20  A.  No.  Our plan was to do exactly what I'm trying to explain

21  to Mr. D'Angelo here:  Get the players as early as possible,

22  build a real relationship with them, and hopefully one day sign

23  them.

24              MR. MOORE:  Please continue, Ms. Bustillo.  Thank you.

25              (Audio played)

1   Q.  So, here, the undercover, Mr. D'Angelo, is telling you that

2   he did not believe they ever really came to a good agreement at

3   the meeting on June 20th, correct?

4           MR. BOONE:  Objection.

5           THE COURT:  Sustained.

6   BY MR. MOORE:

7   Q.  Mr. Dawkins, what did you understand Mr. D'Angelo to mean

8   when he said, "We kind of talked about it but we never really

9   came to a good agreement"?

10  A.  From my interpretation, this was D'Angelo explaining to me

11  that he had a meeting, they reimbursed for the travel expenses

12  incurred.  But there was no agreement reached.  And at this

13  point obviously I'm trying to talk him into paying Merl.  So it

14  could have been an agreement that has been reached.  And he, at

15  this point, still wants Merl to try to facilitate coaches, so

16  there was no agreement at this point either.

17  Q.  And you were trying to tell him to pay Merl because you

18  believe Merl has value in helping you with NBA players and with

19  kids before they come to college, correct?

20  A.  Correct.

21          MR. MOORE:  Please continue, Ms. Bustillo.

22          (Audio played)

23  Q.  Now, Mr. Dawkins, I want to ask you a couple more questions

24  about Mr. Code's value to you before we move on to the next

25  call.

```
 1            You wanted Mr. Code around as a consultant because you
 2    believed he added value to you, correct?
 3    A.  Yes.
 4    Q.  Okay.  And he had contacts in the NBA front offices,
 5    correct?
 6    A.  Yes.
 7    Q.  He had contacts who were NBA players, correct.
 8    A.  Yes.
 9    Q.  He managed Adidas Nation and had contacts at the AAU level,
10    the amateur basketball level, correct?
11    A.  Yes.
12    Q.  Okay.  And you mentioned on your direct that part of
13    managing basketball players is getting them ready for the
14    draft?
15    A.  Yes.
16    Q.  That's a hectic time, correct?
17    A.  Very.
18    Q.  Working out for teams, correct?
19    A.  Correct.
20    Q.  Trying to manage expectations, correct?
21    A.  Yes.
22    Q.  It's difficult to figure out where someone is going to be
23    drafted and, in fact, if they're going to be drafted; isn't
24    that right, Mr. Dawkins?
25    A.  Very true.
```

1  Q.  And so in that process, having someone with contacts in the

2  NBA front offices is extremely valuable to the benefits that

3  you were trying to set up, correct?

4  A.  Very true.

5  Q.  Okay.  And you would agree with me that not many people are

6  more connected than Merl Code, or at least were before

7  Mr. Blazer and Mr. D'Angelo's little undercover operation?

8            MR. BOONE:  Objection.

9            THE COURT:  Sustained.

10  Q.  So, if you're trying to get a guy through the draft

11  process, Mr. Code is your guy, isn't he?

12  A.  Yes.

13  Q.  And Mr. Code could help you sign NBA players who might be

14  looking to go to other agents, correct?

15  A.  Correct.

16  Q.  As could Book Richardson, correct?

17  A.  Correct.

18  Q.  Because Book Richardson also knew NBA players; isn't that

19  correct?

20  A.  That's true.

21  Q.  And I believe you referred to that in a call, which I'm

22  going to get to in a minute.  Correct?

23  A.  Correct.

24  Q.  Now, with respect to DX 5, which is a call on 6/28/17

25  between you and Mr. D'Angelo -- and I'm not going to put it up

1   because the ladies and gentlemen of the jury have already seen

2   this and have already heard that call.

3               But Mr. D'Angelo told you he was hoping Merl could use

4   his connections that he developed while working at Adidas and

5   Nike to help him connect with college coaches, right?

6   A.   Yes.

7   Q.   Okay.  And you thought that was not a very smart position,

8   correct?

9   A.   Correct.

10  Q.   Okay.  And he was asking you this because, based on the

11  call we just heard, was it your understanding that he was

12  asking you this because Mr. Code didn't agree to bribe coaches

13  at the June 20, 2017 meeting?

14              MR. BOONE:   Objection.

15              THE COURT:   Sustained.

16              MR. MOORE:   I'll rephrase, your Honor.

17  BY MR. MOORE:

18  Q.   Was it your understanding -- what was your understanding of

19  what Mr. D'Angelo was saying that for?

20  A.   I mean, at the end of the day, like I've expressed over and

21  over, Jeff's biggest focus was to try to get us to bribe

22  coaches.  So, when me and Merl were not trying to do that, it

23  was kind of like he had -- everything we were saying was

24  falling on deaf ears, basically.  I believe, as you can kind of

25  see, he kind of perked up on the calls -- I believe his idea of

1  Merl was to use Merl's relationships with Adidas to bribe those

2  coaches.  That's what I think his endgame -- what he was trying

3  for his endgame to be.

4  Q.  That didn't happen, did it, Mr. Dawkins?

5  A.  No.

6  Q.  And you told Mr. D'Angelo during that call that any coach

7  that Merl could introduce you to, you could introduce him to,

8  correct?

9  A.  Correct.

10  Q.  Because you told him Merl had a different value, correct?

11  A.  Yes.

12  Q.  Not something he wanted to hear, was it?

13  A.  No.

14  Q.  And you told Mr. D'Angelo that paying Merl to introduce him

15  to coaches wasn't a smart investment, right?

16  A.  No, I didn't think it was.  I didn't think paying anybody

17  to be a coach was smart --

18        MR. BOONE:  Objection, your Honor.  He's not answering

19  the question.

20        THE COURT:  Overruled.

21        THE WITNESS:  I didn't think paying anybody to

22  introduce coaches to Jeff was a smart investment, not even me.

23  It was just a waste of money.  It was stupid.

24  Q.  Okay.  And you pushed back on that several times during

25  this call and got nowhere with Mr. D'Angelo; isn't that

1    correct?

2    A.  Yes, I did.

3    Q.  Okay.  All right.  Now, Mr. D'Angelo went on to tell you

4    during that call that:  "And for Merl, again, he's doing this

5    thing, he's helping you, but that's what I'm looking for him to

6    do for me.  So that's the type of money that there is for

7    just -- just for a coach that's going to come on board."

8         So, I want to just talk with you about your

9    understanding.  You already described what you want Merl to do

10   and what Jeff pushes back on, correct?

11   A.  Correct.

12   Q.  Okay.  And you and Merl have already worked out that he's

13   going to try to help get you access to players and NBA players,

14   correct?

15   A.  Correct.

16   Q.  And Jeff's trying to get you to get him to get you access

17   to coaches, correct?

18   A.  Absolutely.

19   Q.  And that's help that Merl never offered to give you; isn't

20   that correct?

21   A.  Never.

22   Q.  Okay.  And help that he never gave you, correct?

23   A.  No.

24   Q.  He ultimately had some folks show up in Las Vegas after it

25   was clear to you that Mr. D'Angelo wouldn't listen to you, but

1   none of those coaches accepted any money, did they?

2           MR. BOONE:  Objection.

3           THE COURT:  Sustained.

4   BY MR. MOORE:

5   Q.  Now, DX 7, which is a call on 6/28/17, this call took place

6   about four hours after the call between and you and

7   Mr. D'Angelo that we just talked about.  And at the bottom of

8   page one of the transcript, Mr. Code asked you what he is going

9   to get out of meeting with coach.  And you say, that's what I'm

10  trying to explain to him.  So, you would agree with me that on

11  June 28th, Mr. Code didn't even know why Mr. D'Angelo wanted to

12  meet coaches, right?

13  A.  No.

14          MR. BOONE:  Objection.

15          THE COURT:  Sustained.

16          MR. BOONE:  And if we could strike the answer,

17  your Honor.

18          THE COURT:  Stricken.

19  BY MR. MOORE:

20  Q.  Now, you didn't agree to cooperate with the government,

21  correct?

22  A.  No.

23          MR. BOONE:  Objection.

24          THE COURT:  It's been asked and answered.

25          MR. MOORE:  And I'm going to ask Ms. Bustillo, if you

1  could put up DX No. 7.  And if we could go to the first page.

2          Do you have the actual defense transcript,

3  Ms. Bustillo?  Well, I'll do this without a transcript.  I can

4  do it without a transcript.

5  BY MR. MOORE:

6  Q.  So you recall a discussion during that call about, Jeff

7  feels good right now; and Mr. Sood says, Jeff is F-ing high,

8  correct?

9  A.  Correct.

10 Q.  Okay.  And then you say, Yeah, yeah, I figured that, and

11 Mr. Sood says, I mean, you made his -- that whole day, he is so

12 happy.

13          Do you recall that?

14 A.  Yes, I do.

15 Q.  The "he" that you and Mr. Sood are referring to is Jeff

16 D'Angelo, not Book Richardson, correct, Mr. Dawkins?

17 A.  Yes.  This call is about Jeff D'Angelo.

18 Q.  All right.  And this is the same call where you say:

19 "Like, guys like Book is going to send me kids anyway.  Does he

20 understand that?"

21          You're talking to Mr. Sood about whether Mr. D'Angelo

22 understands that you're going to get references from Book

23 whether you pay him or not, correct, Mr. Dawkins?

24 A.  Correct.

25 Q.  Now, on the next page of this transcript, Mr. Sood says:

1    "Like I told Book, I told him, Book, you know all of these

2    veterans, send me a couple of veterans, that's what I'm going

3    to use it for."

4           So, Mr. Sood -- was it your understanding that

5    Mr. Sood is saying that Book's value is for veterans, veteran

6    NBA players?

7    A.   Yes.

8    Q.   Okay.  And in your mind, was that what you were paying

9    Mr. Richardson for -- or let me rephrase.

10          In your mind, was that Mr. Richardson's value, if any?

11   A.   So, Book was two-fold.  One was to -- like we discussed

12   yesterday, I had to do something to placate Jeff.  I had to put

13   a coach in front of him at the end of the day.  So that was the

14   first value that Book had, was just to get Jeff off our backs,

15   basically.  I didn't care -- like we discussed in the call

16   yesterday, I didn't care what Book did; it was irrelevant to

17   me.

18          Secondly, Book did have relationships with players

19   that were in the NBA because they had been players that's come

20   through Arizona who didn't make it to the NBA.

21          So, yes, secondly, that was another -- that was part

22   of our relationship that was a value that Book could have.

23   Q.   And you didn't need Book to help you win players at

24   Arizona, did you, Mr. Dawkins?

25   A.   No.  It was twofold reasons.  One, I --

1           MR. BOONE:  Objection.

2           THE COURT:  Sustained.

3           MR. MOORE:  I'll ask another question.

4    Q.  You had a relationship with the head coach at Arizona;

5    isn't that right, Mr. Dawkins?

6    A.  Correct.

7    Q.  Sean Miller, correct?

8    A.  Correct.

9    Q.  Okay.  And you didn't need Mr. Richardson to help you with

10   players in Arizona because you had a relationship with the head

11   coach at Arizona; isn't that right?

12   A.  That's correct.

13   Q.  And you didn't pay the head coach a dime, did you?

14   A.  Never.

15   Q.  Okay.  Because the head coach was a friend of yours,

16   correct?

17   A.  We had a pretty good relationship, yes.

18   Q.  Okay.  And I know you may not want to say this, but you

19   knew that the head coach was paying players themselves, right?

20           MR. BOONE:  Objection.

21           THE COURT:  Sustained.

22           (Continued on next page)

23

24

25

 1   BY MR. MOORE:

 2   Q.  Is that discussed on this wiretap call, Mr. Dawkins --

 3           MR. BOONE:  Objection.

 4   Q.  -- that the government played for you?

 5   A.  There is wiretaps that were played and not played where the

 6   government --

 7           MR. BOONE:  Objection to what's played and not played.

 8           MR. MOORE:  I'll ask a very -- I'll rephrase and ask a

 9   very specific question, and if you'd answer yes or no.

10   Q.  On this call, yes, DX 7, there is a discussion about Sean

11   Miller and him paying players, is that correct, Mr. Dawkins?

12   A.  Yes.

13   Q.  You didn't think that was a crime, did you?

14   A.  No.

15           MR. BOONE:  Objection.

16           THE COURT:  Sustained.

17   Q.  You still don't think it is, do you?

18   A.  No.

19           MR. BOONE:  Objection.

20           THE COURT:  Sustained.

21   Q.  Mr. Dawkins, did you ever try to defraud any school?

22   A.  No.

23           MR. BOONE:  Objection.

24           THE COURT:  Overruled.

25   A.  No, defrauding -- you can't defraud a school.  I don't even

1   know how that's possible by players getting money.  The

2   school's getting money.  It's ridiculous.

3   Q.  And Mr. Miller at Arizona, he knew what was going on,

4   correct?

5           MR. BOONE:  Objection.

6           THE COURT:  Sustained.

7   Q.  Now, we heard during your direct testimony you tell the

8   ladies and gentlemen of the jury what you did with the money

9   after these players were -- after money was given to these

10  coaches in Las Vegas and money was given in Los Angeles,

11  correct?  You recall telling --

12  A.  Yes.

13  Q.  -- the ladies and gentlemen of the jury about your meetings

14  with those coaches thereafter, correct?

15  A.  Yes.

16  Q.  OK.  All right.  Now, you know, don't you, Mr. Dawkins,

17  that law enforcement frequently uses the technique called

18  surveillance?

19  A.  Yeah.

20          MR. BOONE:  Objection.

21          THE COURT:  Overruled.

22  A.  Yes, I know now.  I didn't then, but I do know now.

23  Q.  And we've not heard anything about any post-meeting

24  surveillance, have we --

25          MR. BOONE:  Objection.

1    Q.  -- Mr. Dawkins?

2             THE COURT:  Sustained.

3    Q.  You know now, OK, that the government can subpoena bank

4    records, correct?

5             MR. BOONE:  Objection to what he knows now.

6             THE COURT:  Sustained.

7             MR. MOORE:  Then I'll rephrase.

8    Q.  You know that the government can subpoena bank records,

9    correct?

10   A.  Correct.

11   Q.  In fact, the bank records that Mr. Haney went over with you

12   were a government exhibit in this case, correct?

13   A.  Correct.

14   Q.  And you know now that the government can go to banks and

15   subpoena videos, correct?

16            MR. BOONE:  Objection.

17            THE COURT:  Sustained.

18   Q.  Mr. Dawkins, when you go to an ATM, is it your experience

19   that there's a video camera at the ATM?

20            MR. BOONE:  Objection.

21            THE COURT:  Sustained.

22            MR. MOORE:  Your Honor, could we approach for a

23   moment?

24            THE COURT:  Sure.

25            (Continued on next page)

1      (At sidebar)

2      MR. MOORE:  I believe it's relevant that this witness

3  knows that there are video cameras on ATMs.  I know it.

4  Everybody else in the world knows, I think.  I think most

5  people know it.  And the government didn't bother to go

6  subpoena any video information.

7      MR. BOONE:  Your Honor, Mr. Dawkins is not a law

8  enforcement witness.  He does not have personal knowledge of

9  all the various law enforcement techniques that are used.

10  Also, as we've said repeatedly, it's not relevant what the

11  government did or didn't do.  The investigation's not on trial,

12  and it's certainly not on trial through Mr. Dawkins who knows

13  nothing about law enforcement.

14      MR. MOORE:  It is relevant what the government did not

15  do because what they do not bring to this jury is something

16  that is relevant, and it's certainly the subject of something

17  that can be argued in a closing argument.  The investigation

18  may not be on trial, but the jury is entitled to consider what

19  they heard and also what they did not hear, and I'm simply

20  trying to lay a foundation for the argument.  I'm almost done,

21  but I do believe that that last question -- I don't know what

22  the basis of the objection was.  I don't know if it was

23  relevance, but I was --

24      MR. BOONE:  It was relevance.

25      MR. MOORE:  I would respectfully request that your

1    Honor revisit that ruling.

2            MR. MARK:  Your Honor, I also think it would be 403.

3    To the extent he's making common sense points, it's a waste of

4    time for the jury.

5            MR. MOORE:  It's not a waste of time for the jury.

6            THE COURT:  I think you have what you need.  You asked

7    him about surveillance at banks.  He said, yes, I understand

8    there's surveillance at banks.  And there's no evidence of that

9    surveillance here.

10           MR. HANEY:  May I add one thing?  There is evidence he

11   did go to a bank and make a deposit into an ATM machine.

12           MR. MARK:  There's no evidence of who made the

13   deposit.

14           MR. HANEY:  There is.  He testified that he did.

15           MR. MARK:  He testified.

16           MR. HANEY:  Exactly.  That's evidence.

17           MR. MOORE:  So I don't run afoul, because my next

18   question was going to be:  And you're aware that there was a

19   *Los Angeles Times* article about the fact that there was a video

20   from --

21           MR. MARK:  No way.

22           MR. MOORE:  That's why I'm asking before I go there.

23   I know I haven't always done that, and I've tried your

24   patience.  But I felt like I was going -- I was going to raise

25   that at sidebar before I did it anyway.

1           THE COURT:  OK.

2           MR. MOORE:  So I understand even from the look on your

3    face that I can't do it, correct?

4           THE COURT:  Very well.  You cannot.

5           MR. MOORE:  Thank you, Judge.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court; jury present)

2    BY MR. MOORE:

3    Q.  Now, you didn't spot any surveillance teams when you were

4    in New York, did you, Mr. Dawkins?

5    MR. BOONE:  Objection.

6    THE COURT:  Sustained.

7    Q.  Let me ask this question:  Did you travel to New York,

8    Mr. Dawkins, and did the ladies and gentlemen of the jury hear

9    evidence of undercover meetings you had in New York?

10   A.  Yes.

11   Q.  By means you didn't know were taped, correct?

12   A.  No, I didn't know they were taped.

13   Q.  You went to Las Vegas, correct?

14   A.  Yes.

15   Q.  And you had meetings with Mr. D'Angelo and his friend

16   Mr. Blazer there, correct?

17   A.  Yes.

18   Q.  Then you went to Arizona, correct?

19   A.  Yes.

20   Q.  And you went to Los Angeles, correct?

21   A.  Yes.

22   Q.  But when you went to Arizona and Los Angeles, Mr. D'Angelo

23   was no longer in the picture, and you were with a lady named

24   Jill Bailey, is that correct?

25   A.  Yes.

1  Q.  Now, I believe we heard some evidence from Mr. Blazer about

2  you sending some shoes to someone, is that right?

3  A.  Yes.

4  Q.  Did you send those shoes to someone?

5  A.  Yeah.  It wasn't the guy he said I sent them to, but yes.

6  Q.  Who did you send shoes to and who else was involved in the

7  sending of those shoes?

8  A.  Well, at that point I just realized that they was just --

9  it was like a free flow of money.  So I was going to Louisville

10  from Vegas.  I sent the money to a player we talked about

11  yesterday, to Brian Bowen, and when I got to Louisville, I just

12  picked up the rest of the money.

13  Q.  Now, was Jeff D'Angelo involved in sending those shoes.

14  A.  He did buy the shoes in the store.  He gave me the shoes

15  and gave me the money, but I'm the one who actually, like,

16  programmed the address and stuff into FedEx and sent them off.

17  Q.  Now, did you have any discussions with Mr. D'Angelo during

18  that sending of the shoes about your plans to go clubbing that

19  evening?

20          MR. BOONE:  Objection.  Hearsay.

21          THE COURT:  Sustained.

22  Q.  I believe you told the ladies and gentlemen of the jury on

23  direct that you actually did go clubbing, is that right, with

24  Mr. Bland?

25  A.  Correct.

1   Q.  And you gave him some money to go club for what reason?

2   A.  That was in evidence.  His friend had a wedding the next

3   day, so it was a bachelor's party that night that we had the

4   meeting.

5   Q.  Was that the only money that you participated in giving

6   Tony Bland, Mr. Dawkins?

7   A.  Correct, yes, and the money was basically both of us --

8           MR. BOONE:  Objection.

9           THE COURT:  Sustained.

10  Q.  Mr. Dawkins, was it less than 2,500?

11  A.  Absolutely.

12  Q.  What did you do with the rest of it?

13  A.  I put it in the bank account, and I -- some of it I spent

14  on, like, dinner and stuff.

15  Q.  Las Vegas is expensive, right?

16  A.  Pretty -- well, depends on where you go, but it can be

17  expensive, yes.

18  Q.  It can be expensive, right?

19  A.  Yes, it can.

20  Q.  People go gambling; they go to restaurants; they do lots of

21  things in Las Vegas?

22          MR. BOONE:  Objection.

23          THE COURT:  Sustained.

24  Q.  Mr. Dawkins, you've heard the phrase "what happens in Vegas

25  stays in Vegas," right?

1    A.  I have.

2              MR. BOONE:  Objection.

3              THE COURT:  Sustained.

4    Q.  Did you ever actually see Mr. D'Angelo after those meetings

5    in Las Vegas again?

6    A.  When we were going out, they were walking into the Cosmo.

7    When I say "they," I'm referring to Jeff D'Angelo and Marty

8    Blazer.  Either they were walking in or we were walking out of

9    the Cosmo, but we passed each other during that point.

10   Q.  After you left Las Vegas, you didn't see him again,

11   correct?

12   A.  Never seen Jeff D'Angelo.  I don't think I ever talked to

13   him again.

14             MR. MOORE:  Beg a moment, your Honor.

15             (Counsel confer)

16   Q.  Now, Mr. Dawkins, you testified about meetings with Preston

17   Murphy, Corey Barker, and Tony Bland?

18   A.  Correct.

19   Q.  And you arranged those meetings, not Mr. Code, correct?

20   A.  Yes.

21   Q.  And you arranged those meetings as part of your ruse with

22   Mr. D'Angelo, correct?

23   A.  Yes.

24   Q.  Because the money went back to you, not kept by them,

25   correct?

```
 1   A.  Yes.

 2   Q.  These coaches were your friends, correct?

 3   A.  Close friends, yes.

 4   Q.  Code didn't arrange for them to come or travel, did he?

 5   A.  No.

 6   Q.  Mr. Code wasn't there, correct?

 7   A.  No.

 8   Q.  Because Mr. Code was in Florida with his family, correct?

 9   A.  I believe so, yes.

10   Q.  And you know Mr. Code, correct?

11   A.  Yes.

12   Q.  You've known him for a long time, correct?

13   A.  Yes.

14   Q.  You know his wife, Candace?

15   A.  Yes.

16   Q.  You know his infant son?

17   A.  Yes.

18   Q.  Mr. Code never agreed to participate in any scheme to bribe

19   college coaches, did he?

20              MR. BOONE:  Objection.

21              THE COURT:  Sustained.

22   Q.  Did you ever agree to bribe college coaches?

23              MR. BOONE:  Objection.

24              THE COURT:  Overruled.

25   A.  No.
```

1    Q.  Do you have any knowledge that Mr. Code ever --

2              MR. BOONE:  Objection.

3    Q.  -- agreed to do such a thing?

4              THE COURT:  Sustained.

5    Q.  Did you ever have an agreement --

6              MR. BOONE:  Objection.

7              MR. MOORE:  Your Honor, I haven't gotten the question

8    out.

9              THE COURT:  You can finish your question.

10   Q.  Did you ever have an agreement with Merl Code to bribe any

11   college coach?

12             MR. BOONE:  Objection.

13             THE COURT:  Overruled.

14   A.  No.

15             MR. MOORE:  Thank you, Mr. Dawkins.

16             THE COURT:  Cross-examination.

17   CROSS-EXAMINATION

18   BY MR. BOONE:

19   Q.  Good morning, Mr. Dawkins.

20   A.  Good morning.

21   Q.  Now, you testified on direct that you have previously been

22   convicted of some crimes, correct?

23   A.  I have, unfortunately.

24   Q.  And you testified that you also were convicted as a result

25   of a trial, correct?

1  A.  Yes.

2  Q.  And that trial happened in this courtroom, or in this

3  building, correct?

4            MR. HANEY:  Objection as to relevance, your Honor --

5            THE COURT:  Overruled.

6            MR. HANEY:  -- where it happened.

7  A.  I don't know if it was this courtroom, but it was this

8  building.

9  Q.  It was in the Southern District, correct?

10 A.  Yes.

11 Q.  And you were convicted around October 2018, correct?

12 A.  Yes.

13 Q.  Now, in that trial, in that case, you were accused of

14 committing multiple crimes, right?

15 A.  I don't know about multiple.  I was convicted of wire

16 fraud.

17 Q.  You were accused of committing wire fraud, right?

18 A.  Correct.

19 Q.  And you were accused of committing conspiracy to commit

20 wire fraud, correct?

21 A.  Yes, yes.

22 Q.  That means committing wire fraud with other people, right?

23 A.  I don't know what it means.  I was convicted of wire fraud.

24 Q.  Do you know what conspiracy means?

25 A.  Yes.

1    Q.   This --

2              MR. MOORE:  Your Honor, can we approach for a moment,

3    please?

4              THE COURT:  OK.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. MOORE:  He was convicted of conspiracy with my

3   client and Jim Gatto.  I'm assuming that Mr. Boone understands

4   that it would be highly improper for him to ask him if he was

5   convicted with Mr. Code, correct?

6          MR. BOONE:  So I'm not going to ask him if he was

7   convicted with Mr. Code.  I will ask him about Mr. Code and

8   their dealings regarding Brian Bowen, which is obviously the

9   subject of that conviction, but I'm not going to say he was

10  convicted with Merl Code in anything.

11         MR. HANEY:  Your Honor, this is my concern about the

12  prejudicial effect and what I believe Mr. Boone's going to do,

13  which is spend a lot of time rehashing what occurred in October

14  which we're appealing and we have feel we have good grounds for

15  a appeal.  They have very narrow issues that have nothing to do

16  with this case, your Honor.

17         THE COURT:  I'm not going to allow him to spend a lot

18  of time rehashing that trial.

19         MR. HANEY:  Thank you, your Honor.

20         MR. BOONE:  I don't intend to spend a lot of time

21  rehashing that trial.  Obviously, there have been rulings that

22  make it permissible for us to ask about it, and you certainly

23  opened the door on it in your direct.  Spent a lot of time on

24  that trial.

25         MR. HANEY:  We had to get ahead of it.  They know the

1  obligation I have as a defense attorney is to put the bad out

2  front.  It doesn't mean it's reopened to retry the case.

3          MR. BOONE:  No one's retrying the case.  It's a few

4  questions.

5          MR. MOORE:  And it also doesn't open the door to him

6  suggesting, not even asking, but suggesting that Mr. Code was a

7  participant in that trial or that conspiracy, for that matter.

8          MR. BOONE:  That's not right.

9          THE COURT:  He can't go into whether or not Mr. Code

10  was a participant in that trial or whether he was convicted in

11  that trial, but he can question him concerning his dealings

12  with Mr. Code in connection with that conspiracy.

13          MR. MOORE:  We're going to ask for a severance at this

14  point, your Honor.

15          THE COURT:  That application is denied.

16          MR. MOORE:  Yes, sir.

17          (Continued on next page)

18

19

20

21

22

23

24

25

```
 1                  (In open court; jury present)

 2                  MR. BOONE:  May I proceed, your Honor?

 3                  THE COURT:  You may.

 4      BY MR. BOONE:

 5      Q.  I think where we left off, you were confirming that you had

 6      been convicted of wire fraud, correct?

 7      A.  Correct.

 8      Q.  Now, you know what the word "fraud" means, right?

 9      A.  I do.

10      Q.  You know that in a fraud, there is dishonesty, correct?

11      A.  Yes.

12      Q.  There is lying involved in a fraud, right?

13      A.  Yes.

14      Q.  And so you were convicted of a crime that involves you

15      being dishonest, correct?

16      A.  Yes.

17      Q.  I'm not saying -- I know you disagree with that.  I'm just

18      saying you were convicted --

19      A.  Yes.

20      Q.  -- of that crime that involved you being dishonest, right?

21      That means you were convicted of a crime that involved lying?

22      A.  Correct.

23      Q.  Now, obviously, like this jury, there are 12 people in the

24      juries, right?

25      A.  Yes.
```

1    Q.  So there were 12 people who found you to be lying, right?

2            MR. MOORE:  Objection, your Honor.

3    Q.  Sorry.  There were 12 people that found you to be engaged

4    in a crime that involved lying?

5    A.  I don't know if we were lying, but --

6    Q.  Well, if there were 12 people who found you, whether you

7    agree with that or not, to be engaged in a crime that involved

8    lying?

9    A.  I don't know what the jury was thinking and why they

10   convicted us.

11   Q.  I'm asking if you were convicted of a crime.

12           MR. HANEY:  Your Honor, asked and answered.

13   A.  Yes, I was convicted of crime.

14   Q.  You were convicted of crime?

15   A.  I don't know what the jury thought.

16           THE COURT:  Everyone needs to stop talking now.  The

17   way this is going to work is Mr. Boone is going to ask a

18   question.  You may object at the appropriate time.

19           Mr. Dawkins, you should wait until the question is

20   asked, and if you see one of the lawyers standing up to object,

21   you should not answer the question, OK?

22           THE WITNESS:  I'm sorry, your Honor.

23           MR. HANEY:  Your Honor, I would object to the last

24   question.  It's asked and answered, and now we're already being

25   argumentative with the witness.

 1          THE COURT:  I didn't hear the last question, as it

 2   turns out, because everyone was talking.

 3          Mr. Boone, ask another question.

 4          MR. BOONE:  Sure.

 5   Q.  In October 2018, a few months ago, you were convicted in a

 6   trial, correct?

 7          MR. HANEY:  Objection.  Asked and answered, maybe

 8   three times.

 9          THE COURT:  Overruled.

10          MR. HANEY:  Thank you.

11   A.  Yes, I was.

12   Q.  And the crime you were convicted of involved dishonesty and

13   lying --

14          MR. HANEY:  Same objection.

15   Q.  -- correct?

16          MR. HANEY:  Asked and answered.

17          THE COURT:  Overruled.

18   A.  I don't know what the crime was.  I was convicted of wire

19   fraud.  What that entailed, that's you guys' interpretation.

20   Q.  I want your interpretation.

21   A.  My interpretation --

22          MR. BOONE:  Your Honor, if we could ask the witness to

23   make sure he doesn't talk while I'm talking so the transcriber

24   can transcribe correctly.

25          THE COURT:  Mr. Dawkins, please do not answer the

1    question before it's completed.

2              THE WITNESS:  I'm sorry.

3              MR. HANEY:  I would note also, Mr. Boone is doing the

4    same thing, as a matter of fairness to the optics of this right

5    now, your Honor.  Thank you.

6    BY MR. BOONE:

7    Q.  You testified maybe two minutes ago that you understood

8    what the word "fraud" meant.  Do you recall testifying to your

9    understanding of what the word "fraud" meant?

10   A.  I do.

11   Q.  Do you recall saying that your understanding is that it

12   involved dishonesty?

13   A.  I recall you asked me what the word "fraud" meant, and I do

14   know that's another word for -- you know, dishonest would be a

15   word for fraud, yes.

16   Q.  That's what you're convicted of?

17   A.  I was convicted of wire fraud, yes.

18   Q.  Now, your October trial was not the first instance in which

19   you were accused of being dishonest, right?

20   A.  No.

21   Q.  So you heard some testimony earlier -- you gave some

22   testimony earlier about the NBA Players Association.  You

23   recall that?

24   A.  Yes.

25   Q.  And the NBA Players Association is a union, right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    A.   Yes.

2              MR. HANEY:   Objection as to foundation, your Honor.

3              THE COURT:   Overruled.

4              MR. HANEY:   Thank you.

5    A.   Yes, it is.   The players association is a union, yes.

6    Q.   Yes.   And it's a union for the NBA players, right?

7    A.   Correct, and the agents.

8    Q.   OK.   And you understand, obviously, what the purpose of

9    unions are, right?

10   A.   Yes.

11   Q.   And the purpose of unions are to protect the union members,

12   right?

13   A.   Yes.

14   Q.   Sometimes they fight for certain wages, right?

15   A.   Correct.

16   Q.   And other sort of employment protections, right?

17   A.   Correct.

18   Q.   Certain benefits that union members might want, right?

19   A.   Sure.

20   Q.   Now, the NBA players union does a couple of different

21   things, right?   Let me be more specific.

22             One of the things of the NBA union does is it

23   certifies agents, correct?

24   A.   Yes, it is.

25   Q.   And the reason they certify agents is because they want to

1    make sure agents of good character and of good quality are

2    representing NBA players, right?

3    A.   Yes.

4    Q.   The idea is to keep out shady agents, right?

5    A.   Sure.

6    Q.   So you have this requirement that you be certified by the

7    NBA so that there is some vetting of the agents, right?

8    A.   Yes.

9    Q.   Because as, you know from your experience, there are people

10   who are very good agents of high moral character, right?

11   A.   There's people of very good agents who get the players

12   paid, yes.

13   Q.   My question is not that.  My question is you know, based on

14   your experience, there are some agents who are very well

15   qualified and of high moral character, correct?

16   A.   Yes.

17   Q.   And there are some who are not very well qualified and of

18   lower character, correct?

19   A.   Yes.

20   Q.   So the idea is to keep out the bad agents and allow the

21   good agents to do their job, right?

22   A.   I don't know if that's the idea, but that's your

23   interpretation.

24   Q.   Now, the NBA Players Association issued a memo about you,

25   right?

1   A.  They did.

2   Q.  And they issued that memo to its members, right?

3   A.  They did.

4   Q.  And that means it issued a memo to all the NBA players,

5   right?

6   A.  And agents, yes.

7   Q.  And how many NBA players are there?

8   A.  Fifteen on each team, 30 teams.

9   Q.  So what's that?  Do the math for us.

10  A.  It's over 300.  I don't --

11  Q.  So it's fair to say there are 300 players in the NBA, give

12  or take?

13  A.  Yes.

14  Q.  So all of those 300 or so players got a memo about you that

15  had accused you of dishonesty, correct?

16          MR. HANEY:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A.  Yes, they did.

19  Q.  Now, you talked about this a little bit on your direct, but

20  I want to talk about it a little bit more.

21          Now, the memo -- first of all, the memo was issued in

22  May 2017, right?

23  A.  I believe so, that's correct.

24  Q.  And the memo made several allegations, right?

25  A.  The allegation was that a client --

1    Q.  My question's yes or no.

2    A.  It wasn't several.

3    Q.  My question's yes or no.

4    A.  No.

5    Q.  My question is yes or no.

6    A.  That was my understanding.

7           MR. HANEY:  Your Honor.

8           THE COURT:  Stop talking again.

9    A.  I said no.  Your question was yes or no.  I said no.

10   Q.  I'm sorry.  I didn't hear you.

11          MR. HANEY:  Your Honor, I'm going to object.  May I

12   make an objection, or do we need a sidebar?

13          THE COURT:  We don't need a sidebar.

14          MR. HANEY:  I have an objection.  He's clearly being

15   argumentative on a level I haven't seen in a while.  Thank you.

16          THE COURT:  OK.  Overruled.

17   A.  No.

18   Q.  The memo that was sent to every player in the NBA and,

19   according to you, also agents said the following --

20          MR. HANEY:  Your Honor, I would object.  May we have a

21   sidebar?

22          THE COURT:  OK.

23          MR. HANEY:  Thank you.

24          (Continued on next page)

25

1    (At sidebar)

2    MR. HANEY:  My objection, this is clearly hearsay.  We

3  don't have any stipulation that the memo itself -- we don't

4  have an authenticity stip.  We don't have a foundational basis

5  to admit the memo.  He can't read the memo.  It's a hearsay

6  record.

7    MR. BOONE:  Your Honor, I don't intend to read the

8  memo.

9    MR. HANEY:  He just did.

10    MR. BOONE:  If I could respond, please.

11    I don't intend to read the memo.  I can rephrase the

12  question so that's clear.  However, if we need to get an NBA

13  Player Association person to certify this as a business record

14  that they normally keep, we can do that, and we will seek to

15  admit it.

16    THE COURT:  I think if you just ask questions in a

17  general way concerning what the substance of the allegations

18  were, that would be fine.

19    MR. BOONE:  Yes, your Honor.

20    MR. HANEY:  He did intend to read the memo.  He was

21  reading the memo.

22    MR. BOONE:  I don't have the memo.  This is my

23  outline.

24    THE COURT:  It sounded like you were starting to read

25  the memo.  In any event, just sort of characterize whatever the

1  allegations are.  Otherwise, this is garden variety

2  cross-examination.

3          MR. HANEY:  Thank you, your Honor.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury present)

2           MR. BOONE:  May I proceed, your Honor?

3           THE COURT:  You may.

4    BY MR. BOONE:

5    Q.  Mr. Dawkins, do you enjoy using the Uber service?

6    A.  I love it.  It's very convenient.

7    Q.  So the NBA Player Association accused you of using Uber,

8    correct?

9    A.  No, they accused me of misappropriating client funds.

10   Q.  Yes-or-no answer.

11   A.  No.

12   Q.  So the NBA Players Association did not accuse you of

13   spending $42,000 in Uber fees?

14   A.  They accused me of misappropriating client funds.

15   Q.  Yes or no?  Yes or no?

16           Your Honor, I ask his answer be stricken.

17           THE COURT:  Answer's stricken.

18           Mr. Dawkins, if you're not able to answer a question

19   yes or no, just let me know that, and I'll have Mr. Boone

20   rephrase, OK?

21           THE WITNESS:  OK.  Thank you.

22   Q.  The NBA Players Association accused you of spending $42,000

23   in Uber fees, correct?

24   A.  Correct.

25   Q.  And the NBA Players Association accused you of doing -- of

1  using Uber more than 100 times?

2  A.  Correct.

3          MR. HANEY:  Your Honor, I would object to hearsay.

4          THE COURT:  Overruled.

5          MR. HANEY:  Thank you.

6  A.  Mr. Boone, I didn't see the --

7  Q.  Yes or no?

8  A.  I don't know.  I didn't see the memo.  I didn't read it.

9  Q.  OK.  Is it fair to say that they accused you of using Uber

10 1,865 times in a year?

11 A.  I didn't read the memo.

12 Q.  Is it fair to say that they accused you of using Uber by

13 using a client's credit card without that client's permission?

14         THE WITNESS:  Your Honor, at this point can I explain

15 what happened?

16         THE COURT:  No.  Can you answer that question, yes or

17 no?

18 A.  Can you repeat the question, sir?

19 Q.  Yes.  I think we've agreed, at least, that the NBA Players

20 Association accused you of using Uber to the tune of $42,000,

21 right?

22 A.  Correct.

23 Q.  And the players association's accusation is that you used

24 Uber without the permission of a client?

25 A.  I don't know if that was the accusation.

1    Q.  OK.  So it's not your understanding that the reason they

2    wrote a memo and sent it to every player in the NBA and their

3    agents was not to inform them of the fact that you had misused

4    a client's credit card to ride Uber 1,865 times in a year that

5    equaled approximately $42,000 in Uber fees?

6    A.  A memo was sent.  It outlined --

7    Q.  Yes or no?

8    A.  Ask the question again, please.

9    Q.  Yes.  Is it true that the NBA Players Association, which is

10   designed to protect the NBA players --

11           MR. MOORE:  Your Honor, objection to Mr. Boone's

12   characterization of what the players association is designed to

13   do.

14           THE COURT:  This has already been covered by

15   Mr. Dawkins.  The objection's overruled.

16   A.  The answer is yes.

17   Q.  Let me ask the question, please.

18           Is it true that the NBA Players Association, that is

19   designed to protect the NBA players, sent a memo to all of the

20   NBA players and the NBA agents to inform them that Christian

21   Dawkins spent $42,000 of a player's money on Uber fees without

22   that player's permission?

23   A.  Yes.

24   Q.  In your view, that's not true, right?

25   A.  You want me to explain now?

1    Q.  I just want you to answer yes or no if you think that

2    accusation is correct or not.

3    A.  It's not correct, no.

4    Q.  And your fraud conviction's not correct either?

5    A.  My what?

6    Q.  Your fraud conviction from October 2018 that was also in

7    this courtroom, that was also incorrect, right?

8             MR. HANEY:  Objection, your Honor, to it was in this

9    courtroom.  It wasn't in this courtroom.  Mr. Boone wasn't

10   there, apparently.

11            THE COURT:  Overruled.

12   A.  Yes, I was convicted of fraud.

13   Q.  Is it correct or incorrect, that's the question?

14   A.  You asked me how do I feel about the fraud conviction.

15   Q.  I'm not asking how you feel.  I'm asking you -- in some

16   ways I am.  I'm asking you, in your view, was that ruling, that

17   judgment by the jury that you engaged in dishonesty, correct?

18   A.  No.  You cannot defraud the university.

19   Q.  That's all.

20            Now, you're obviously here on another trial, right?

21   A.  Correct.

22   Q.  And you've been accused of fraud again?

23            MR. CHANEY:  Your Honor, objection.

24   A.  I thought it was --

25            MR. CHANEY:  -- the presumption of innocence.

1      THE COURT:  Overruled.

2  A.  I thought this was a bribery case.

3  Q.  Do you want to see the indictment?

4  A.  I don't need to see the indictment.

5  Q.  OK.  You agree that you're on trial, right?

6  A.  Yes, yes.

7  Q.  And you agree that the government is claiming that you've

8  done several things.  I know you don't agree with any of them,

9  but they're claiming you've done several things, right?

10      MR. HANEY:  Objection to the form of the question.

11  He's testifying.

12      THE COURT:  Sustained as to the form.

13      MR. BOONE:  I agree.  I'll try to be better.

14  Q.  You agree you've been accused of committing bribery,

15  correct?

16  A.  I have.

17  Q.  And you agree that you've been accused of being dishonest

18  in your dealings with individuals, right?

19  A.  In what way?

20  Q.  Do you want me to go over the ways of dishonesty in this

21  case?

22  A.  Please.

23  Q.  You know what?  I'll just speed through this a little more

24  quickly.  How about this, we'll just get right to the meat of

25  it.

```
 1           Now, just to be clear, you're obviously testifying

 2    under penalty of perjury, correct?

 3    A.   Yes.

 4    Q.   You understand that means you can be prosecuted for lying?

 5    A.   Yes.

 6    Q.   And you understand why that is, right?

 7    A.   Yes.

 8    Q.   And that's because it's very serious to testify in a

 9    criminal trial?

10    A.   Very.

11    Q.   It's very serious to lie to jurors in a criminal trial?

12    A.   Correct.

13    Q.   Your position is you have not lied to the jurors, correct?

14    A.   My interpretation of everything has not been a lie.

15    Q.   I didn't ask what your interpretation of anything was.  I

16    asked you --

17    A.   Yes, you did, you said my understanding.

18           MR. BOONE:  Your Honor.

19           THE COURT:  Wait for him to finish the question,

20    Mr. Dawkins.

21    Q.   Is it your testimony that you have not lied to the jurors

22    that are sitting right here?

23    A.   My interpretation of everything --

24    Q.   Is it your testimony that you have not lied, yes or no --

25    A.   Yes.
```

1    Q.  -- to the jurors who are sitting right here?

2    A.  Yes.

3    Q.  OK.  Now, yesterday you talked a lot about this model of

4    paying coaches.  You recall that?

5    A.  Yes.

6    Q.  And you said, and I'm quoting, "Paying coaches was Jeff

7    D'Angelo's idea," and you thought it was idiotic.  Is that a

8    fair representation of your view?

9    A.  Yes.

10   Q.  In fact, you've said that at least, let's say, half a dozen

11   times in this trial, right?

12   A.  On the stand and the wiretaps that you guys recorded.

13   Q.  On the stand, particularly, to the jury you've told them

14   that you thought this view was idiotic and that it was Jeff

15   D'Angelo's idea, right?

16   A.  Yes.

17   Q.  Now, if we can -- I want us to take a look -- we're going

18   to take a trip back to South Carolina.  If we could take a look

19   at Government Exhibit 501AT.

20          Mr. Dawkins, I'm going to hand you a physical copy of

21   it because I think it actually may be easier to follow that

22   way.

23          Your Honor, may I approach?

24          THE COURT:  You may.

25   A.  Thank you.

1    Q.  You're welcome.

2            Now, you took a road trip to South Carolina, correct?

3    A.  Yes.

4    Q.  And the purpose of taking that trip was to meet with Lamont

5    Evans, right?

6    A.  Correct.

7    Q.  And Lamont Evans was a basketball coach, right?

8    A.  Yes.

9    Q.  And you traveled from Atlanta, Georgia, to Columbia, South

10   Carolina?

11   A.  I did.

12   Q.  Was that approximately a four-hour trip each way?

13   A.  I can't remember.

14   Q.  But the school, University of South Carolina, is in

15   Columbia, South Carolina?

16   A.  It is.

17   Q.  Now, you went with Marty Blazer, right?

18   A.  Correct.

19   Q.  And you went with Munish Sood, right?

20   A.  Correct.

21   Q.  And that trip actually was the first time you had ever met

22   Munish Sood, right?

23   A.  I believe so, yes.

24   Q.  OK.  At that time, you actually didn't know Marty Blazer

25   very well either, right?

```
 1   A.  No, I didn't know him well, no.

 2   Q.  That was the first road trip you guys took together?

 3   A.  I believe.  This is four years ago.  I can't really recall.

 4   I believe so.

 5   Q.  So you got in the car with two people you don't know very

 6   well, and you traveled to South Carolina, right?

 7   A.  Yep.

 8   Q.  To meet with a coach, right?

 9   A.  Yes.

10   Q.  When you don't pay coaches, right?

11   A.  No.

12   Q.  No, never pay coaches.

13        And when you got there -- now, you testified earlier

14   you had an interest in recruiting PJ Dozier.  You recall that?

15   A.  Yes, at the time, at this time of this meeting, I

16   definitely had an interest in recruiting PJ Dozier.

17   Q.  And I think you said he was on some draft boards and that

18   Andy Miller had essentially sort of reached out to you to make

19   sure you worked on getting that client, right?

20   A.  Correct.

21   Q.  On this trip you didn't meet with PJ Dozier, right?

22   A.  I can't recall.  I met PJ Dozier's mom.  I can't recall if

23   this was the trip.

24   Q.  Let me ask you this:  On the recordings you went over, was

25   PJ Dozier on any of those recordings?
```

```
 1   A.  He was on no recordings, no.

 2   Q.  It was just you, your new friends, Marty Blazer and Munish

 3   Sood, and Lamont Evans, a basketball coach, right?

 4            MR. HANEY:  Objection as to form of the question, your

 5   Honor.

 6            THE COURT:  Overruled.

 7   A.  Correct.

 8   Q.  Again, you don't pay college coaches, right?

 9            MR. HANEY:  Your Honor, I would object to the

10   mischaracterization of testimony.  He's done it twice now.

11            THE COURT:  Overruled.

12            MR. HANEY:  Thank you.

13   A.  No.

14   Q.  Correct, you don't pay college coaches?

15   A.  Define "pay college coaches."

16   Q.  Do you give college coaches money?

17   A.  For themselves or for a player?

18   Q.  For any reason.  Your testimony was that you don't pay

19   college coaches?

20   A.  My testimony yesterday, like I --

21   Q.  Would you like to change your testimony?

22   A.  No, I don't want --

23            THE COURT:  You gentlemen need to stop that again.

24            Mr. Boone, please wait for him to finish an answer.

25            Mr. Dawkins, please wait for him to finish the
```

 1   question, OK?

 2            MR. BOONE:  Yes, your Honor.

 3            THE COURT:  OK.  Ask another question.

 4   Q.  Your testimony has been consistently since you've taken the

 5   stand that you do not pay college coaches for the purpose of

 6   them steering players to you?

 7   A.  Correct.

 8   Q.  All right.  And you testified that you do pay lots of other

 9   people for that purpose, right?

10   A.  Yes.

11   Q.  Moms, right?

12   A.  Correct.

13   Q.  Dads?

14   A.  Yes.

15   Q.  Brothers?

16   A.  Yes.

17   Q.  Any uncles?

18   A.  Might have.

19   Q.  Second cousins?

20   A.  Get to the question.

21   Q.  Unfortunately, you don't get to ask the questions.

22            Mr. Dawkins, have you paid second cousins?

23   A.  I don't -- I don't recall.

24   Q.  Have you paid neighbors?

25            MR. HANEY:  Your Honor, I would object.

```
 1              THE COURT:  Overruled.

 2              MR. HANEY:  Thank you.

 3    A.   Neighbors of who?  Your neighbor?

 4    Q.   Neighbors of basketball players who you're interested in

 5    recruiting.

 6    A.   I don't recall.  I don't know.

 7    Q.   School bus drivers?

 8              MR. HANEY:  Your Honor, object.  Objection, your

 9    Honor.

10              THE COURT:  Overruled.

11    A.   School who?

12    Q.   Have you paid a school bus driver to get a player?

13    A.   I have never paid a bus driver.

14    Q.   Have you paid a cafeteria lady to get a player?

15    A.   No.

16    Q.   Now, if you could take a look -- oh, you did testify you

17    did pay youth basketball coaches, right?

18    A.   Yes, I do.

19    Q.   Just not -- once they get to college, you stop paying them,

20    right?

21    A.   The youth basketball coach?

22    Q.   You pay youth basketball coaches, that's your testimony,

23    right?

24    A.   Yes.

25    Q.   You don't pay college basketball coaches, right?
```

 1   A.  No.

 2   Q.  So if a youth basketball coach gets promoted to college,

 3   then you cut off the payments, right?

 4   A.  It's a good question.

 5   Q.  Yes or no?

 6   A.  Ask --

 7   Q.  A youth basketball coach gets elevated to becoming a

 8   college basketball coach, is that when you implement your

 9   policy of paying no college coaches?

10   A.  Correct.

11   Q.  Now, if we could take a look at -- I'm looking at page 6.

12   This is a transcript, obviously, of the meeting with Lamont

13   Evans and Marty Blazer, Munish Sood, when you guys went on the

14   trip together to South Carolina, two guys you basically don't

15   know.

16          If we could start with line 11 of page 6, I'll read

17   for you what I think is relevant.

18          This is Dawkins:  "But -- but -- it's just, like, I

19   was just telling y'all, y'all trying to get more into

20   basketball.  OK.  Agents obviously have influence, but you

21   gotta get the college coaches too."

22          You said that?

23   A.  Yes, you read it.

24   Q.  You said that?

25   A.  Correct.

1    Q.   Thank you.

2             Now, I'm looking at line 19 of the same page:  "You --

3    you skipping -- it's almost like you skipping a step if you

4    just deal with the agents."

5             You said that, right?

6    A.   Yes.

7    Q.   Now, Jeff D'Angelo did not exist in March 2016, right?

8    A.   He did not.

9    Q.   That fictional character had not been created, right?

10   A.   You didn't create him --

11   Q.   You didn't actually meet him at all in the year 2016,

12   right?

13   A.   No.

14   Q.   So this predated the birth, so to speak, of Jeff D'Angelo,

15   right?

16   A.   Correct.

17   Q.   So he, obviously, didn't make this statement, right?

18   A.   No.

19   Q.   OK.  Now, if we could take a look at Government

20   Exhibit 501BT.  Would it be helpful if I gave you a hard copy

21   of that?

22   A.   Please.

23   Q.   No problem.

24   A.   Thank you.

25   Q.   Now, this is a continuation of the same transcript.  I'm

1     looking at page 1, line 1.

2              Dawkins:  "Yeah, yeah, but that's the thing, like,

3     one, y'all need to be involved with people like Lamont because,

4     like you said, he know the player.  He coach PJ every day."

5              You said that?

6     A.  I did.

7     Q.  Lamont is, obviously, Lamont Evans, a basketball coach?

8     A.  Yes.

9     Q.  A college basketball coach?

10    A.  It is.

11    Q.  And PJ's obviously PJ Dozier?

12    A.  Correct.

13    Q.  And that's the player you testified you were interested in

14    recruiting for ASM, right?

15    A.  Yes, PJ Dozier, yes.

16    Q.  Now I'm looking at line 6, Dawkins:  "And it's not just

17    gonna be PJ, it's gonna be five PJs down the line."

18              You said that, right?

19    A.  I did.

20    Q.  Jeff D'Angelo does not exist, right?

21    A.  He does not.

22    Q.  Marty Blazer did not say that, right?

23    A.  No.

24    Q.  Munish Sood, who barely knows basketball, did not say that,

25    right?

1  A.  No.

2  Q.  OK.  Now, looking at line 10, Dawkins:  "But you need to

3  get in bed with somebody like him now so you got complete

4  access to a kid.  Like they -- PJ and his mom can't talk to no

5  more than that, you know what I'm saying?  And he can control

6  who else comes in this bitch."

7       You said that?

8  A.  I did.

9  Q.  Line 18:  "Yeah, talking to me is one thing, but you need

10 the source if -- because if the coach says, yo, can't nobody

11 come around, can't nobody fucking come around."

12      You said that?

13 A.  I did.

14 Q.  Line 23:  "Yeah, South Carolina, that's a state where it's

15 a federal offense."

16      You said that?

17 A.  Can you please turn to the next page of the transcript?

18 Q.  No.

19      Did you say, "Yeah, South Carolina, that's a state

20 where it's a federal offense," yes or no?

21 A.  I don't know.  I don't --

22 Q.  You don't know if you said that?

23 A.  I mean, that's what your transcript --

24 Q.  Let me be clear.  Your testimony is that you did not say,

25 "Yeah, South Carolina, that's a state where it's a federal

1    offense"?

2    A.   The transcript says that, yes.

3    Q.   Did you say that?

4    A.   It was through four years ago, Mr. Boone.

5    Q.   Do you want us to play the recording for you; would that

6    help?

7    A.   Please.  I need to hear it in context.

8            MR. BOONE:  OK.  If we could play Government

9    Exhibit 501BT, please.

10           (Audio played)

11           MR. BOONE:  Can we pause here, please.  Thank you.

12   Q.   Did you say that?

13   A.   Yes.

14   Q.   Now, if we could move to Government Exhibit 501CT.

15   A.   Thank you.

16   Q.   This is a continuation of this buddy trip with you and

17   Blazer and Sood.  If we could look at page 1, line 18, Dawkins:

18   "It's going to be like this every step.  And that's the good

19   thing about working with a college coach, good players every

20   year, buddy."

21           You said that?

22   A.   I did.

23   Q.   Page 4, line 2, Dawkins:  "See, that's why I be involved

24   with the coaches too."

25           You said that?

 1   A.   Yes.

 2   Q.   Line 15:  "When they got their money, the head coaches

 3   ain't willing to do it 'cause they're making too much money,

 4   and it's too risky."

 5        Line 19, Dawkins:  "See, it falls on the assistant

 6   coach."

 7        Line 21, Dawkins:  "And then if they don't deliver,

 8   then they're fired."

 9        You said that?

10   A.   I did.

11   Q.   Page 6, line 8 Dawkins:  "That's the thing where it's like,

12   man, that's the grind you do have to go through to become a

13   head coach is" --

14        Line 12:  "-- you got to shoulder that burden and kind

15   of take it in the chin."

16        You said that, right?

17   A.   I did.

18   Q.   Line 15:  "Until you get to that point because that's the

19   kind of thing you got to do until you make a million,

20   $2 million."

21        Line 20:  "You know what I'm saying?  Because, like,

22   take PJ, he is saying PJ in this restaurant is like, Who should

23   I talk to about your stuff?  He ain't talking.  He ain't

24   talking to Frank Martin."

25        You said that, right?

1   A.   Correct.

2   Q.   Frank Martin's the head coach of South Carolina?

3   A.   He is.

4   Q.   Next page, line 2:  "Your head coach, he's just a figure

5   head, basically."

6        You said that?

7   A.   I did.

8   Q.   Page 9, line 4:  "This is why I want y'all to meet college

9   coaches because" -- and there's some other language here -- "if

10   you ain't involved with the kids when they're recruiting, when

11   seniors in high school and being involved," you said that?

12   A.   Same thing I've been saying, yes.

13   Q.   That's not my question.  Did you say that?

14   A.   I did.

15   Q.   Yes or no?  Thank you.

16   A.   I did.

17   Q.   Line 11:  "Yeah, they got that one year and they gone."

18        You said that, right?

19   A.   Further makes my point.

20   Q.   You said that, right?

21   A.   Yes.

22   Q.   Now, you testified earlier that college coaches don't have

23   a lot of time to -- they don't get a lot of time with one on

24   one -- one and done players because those players leave early,

25   right?

 1   A.  Yes.

 2   Q.  Based on your experience in the sports industry and in

 3   basketball, in particular, is the first time a coach ever meets

 4   a new recruit at freshman orientation?

 5   A.  No.

 6   Q.  No.  They've met that player before, right?

 7   A.  Yes.

 8   Q.  OK.  So it is incorrect to say that the only time they

 9   spend with that player is from freshman orientation until they

10   declare for the draft in March, assuming they're one and done?

11   A.  Yes, that would be incorrect to say.

12   Q.  OK.  Page 9, line 21:  "That's why I'm like, y'all have to

13   get your guys early, 'cause you can't wait until PJ's a

14   junior."

15           You said that?

16   A.  I did.

17   Q.  I want now to take a look at Government Exhibit 501DT.  I'm

18   going to bring you a copy.

19   A.  Thank you.

20   Q.  You're welcome.

21           So this is a continuation.  We're still in South

22   Carolina, right?

23   A.  Yes.

24   Q.  If we could take a look at page 1, and I'm looking at

25   line 6:  "Another guy I got to get you all to meet is -- I told

1  him when you call, when you pick me up, he called me literally,

2  Tony Bland, another one of my close, close friends 'cause I

3  only introduce y'all to people I'm close, like family with.

4  Tony Bland is the associate coach at USC.  Fucking king of LA."

5       You said that?

6  A.  I did.

7  Q.  Jeff D'Angelo didn't say that, right?

8  A.  He didn't.

9  Q.  Jeff D'Angelo's not born yet, right?

10  A.  I don't know if he's born, but, yes, I said this.

11  Q.  OK.  Tony Bland is a college basketball coach, right?

12  A.  Yes.

13  Q.  You just said in here that he coaches at USC, right,

14  associate coach at USC, right?

15  A.  Right.

16  Q.  University of Southern California?

17  A.  Yes.

18  Q.  And you're saying this on a trip in which you just met with

19  a college coach, right?

20  A.  Yes.

21  Q.  And that was Lamont Evans?

22  A.  Right.

23  Q.  You don't --

24  A.  No one here --

25  Q.  I asked you, you testified earlier --

1    A.   No.

2    Q.   -- you don't pay college coaches, yes or no?

3    A.   No.

4    Q.   It was Jeff D'Angelo's idea, right?

5    A.   You heard that yesterday.

6         MR. BOONE:   Your Honor.

7         THE COURT:   Yes or no, Mr. Dawkins?

8    A.   Say the question again, please.

9    Q.   You testified earlier that you do not pay college coaches,

10   right?

11   A.   Yes.

12   Q.   You testified earlier that it was Jeff D'Angelo's idea to

13   pay college coaches, right?

14   A.   I did.

15   Q.   Now, if we could go to page 2, line 19, Dawkins:   "I got so

16   many coaches, man."

17        You said that?

18   A.   What does that mean?

19   Q.   Did you say that?

20   A.   Yes.

21   Q.   Then you go on to say, line 21:   "Well, you know, my dad's

22   a college coach."

23        You said that, right?

24   A.   Yes.

25   Q.   Now I'm looking at page 3, line 8.   I actually want to

1    start on line 12:  "Them dudes have known me since I was a

2    little kid.  And then the younger assistants all came, you

3    know, we all came up in the business together."

4             You said that, right?

5    A.  Yes.

6    Q.  You're talking about assistant college basketball coaches,

7    right?

8    A.  Yes.

9    Q.  OK.  Now, line 18, Dawkins:  "The one thing I didn't say in

10   front of him is you can never get caught up because his job is

11   on the line too."

12            You said that, right?

13   A.  Correct.

14   Q.  Line 22:  "Nothing can, 'cause if he gets caught some -- if

15   shit doesn't get done, what he did is wrong, too, by the NCAA

16   rules.  So he's not going to let it not go right."

17            You said that?

18   A.  I did.

19   Q.  Page 4, line 3:  "Or if it doesn't go right, you better

20   fucking believe he didn't try to fuck you."

21            You said that, right?

22   A.  I did.

23   Q.  Line 13:  "He's going to block everybody from coming

24   around."  Talking about coaches, right?

25   A.  I'm talking about Lamont Evans, yes.

1    Q.  You're talking about basketball coach who coaches in

2    college, correct?

3    A.  Yes.

4    Q.  OK.  "He's going to bring -- give you access to the

5    situation, the parents, whatever.  You know, when the time is

6    right, like, everything will be lined up, because that's his

7    job too.  That's what -- like, you almost got him by the balls,

8    so to speak."

9           You said that, right?

10   A.  Yes.

11   Q.  And you say you were talking about a college basketball

12   coach, right?

13   A.  Yes.

14   Q.  Line 21:  "And people don't think of it that way, but I'm

15   like, yo, everybody wants to deal with AAU coaches, and some

16   AAU coaches aren't really good resources.  But most of the

17   time, it's the college coaches, man."

18          You said that, right?

19   A.  Yes.

20   Q.  You don't pay college coaches, right?

21   A.  There's nothing here saying I'm paying college coach.

22   Q.  I'm asking you if you testified earlier to the fact that

23   you do not pay college coaches, yes or no?

24   A.  No.

25   Q.  Now, page 5, line 21:  "He had assistant there now.  I

1    mean, he'll a head coach in the future or he'll be a very

2    powerful assistant coach, which to us" -- continues on the next

3    page -- "is better because then you got direct access.  You're

4    the one controlling the kids.  If he's the head coach, then

5    he's just telling his assistants."

6            And I'm at line 6.  "His assistants, these are my

7    guys, but they don't necessarily have to fuck with your guys."

8            You said that, right?

9    A.  Yes.

10   Q.  Talking about college basketball coaches, right?  You're

11   talking about college --

12   A.  I'm trying to read it, Mr. Boone.  Can you please relax.

13           I don't really understand what the last paragraph

14   means, but the first one, yeah, I'm talking about the college

15   coaches.

16   Q.  Let me read the last paragraph:  "It's better when you got

17   direct access.  You're the one controlling the kids.  If he's

18   the head coach, then he's just telling his assistant."

19           You agree that's talking about basketball coaches,

20   right, head coach, assistant?

21   A.  Yeah, I said I understand the first.  The second one, I

22   don't really get.

23   Q.  I apologize.  "His assistant, these are my guys.  They

24   don't necessarily have to fuck with your guys."

25           You said that, right?

1   A.  Yes.

2   Q.  When you say "assistant," you're referring to assistant

3   basketball coaches?

4   A.  I don't understand what this mean.  The unintelligible

5   thing throws everything off.  "His assistant, these are my

6   guys.  They don't necessarily have to fuck with your guys," I

7   don't know what that means right here.

8   Q.  Your testimony is you're not sure when you say assistant

9   two lines from when you previously said assistant if you're

10  still talking about assistant basketball coaches, is that

11  correct?

12  A.  I'm sure it's assistant basketball coaches, yes.

13  Q.  OK.  Now let's look at line 12:  "He's hands-on with them

14  now."

15          Line 14:  "When you become the head coach, it's almost

16  like it's a dictatorship.  And if you're telling people, OK,

17  these are my guys, this is who you need to deal with, does the

18  relationship ever really work in the way it would have worked

19  if you were doing it?"

20          You said that, right?

21  A.  Yes.

22  Q.  Now, line 23:  "So, shit, for us, we need to try to get --

23  as long as he's an assistant coach, maximize it."

24          You said that, right?

25  A.  Yes.

1    Q.   Talking about Lamont Evans, right?

2    A.   Correct.

3    Q.   A basketball coach, right?

4    A.   Correct.

5    Q.   In college, right?

6    A.   Correct.

7    Q.   Jeff D'Angelo's not born yet, right?

8    A.   I don't know if Jeff D'Angelo --

9    Q.   Line 4, Dawkins:  "Or help him get as many elite kids

10   that -- for instance, if he's on a kid that's looking like a

11   potential two-and-done kid or one-and-done kid, you talking

12   about five grand or pay their mom's little rent in fucking

13   Florence, South Carolina.  That's going to be $500 a month.  I

14   mean, you got you a first-round pick before the shit got crazy

15   at the end, when people are talking about real money."

16            You said that, right?

17   A.   Yes.

18   Q.   And you testified earlier that it's idiotic?

19   A.   Can you read, bro?  It says pay someone's mother.

20            THE COURT:  Mr. Dawkins --

21   Q.   Read the whole --

22            THE COURT:  Stop, stop.

23            Mr. Dawkins, answer the question yes or no, OK?

24            Mr. Boone.

25   Q.   Page 7, line 4, Dawkins:  "Or help him get as many elite

1  kids that -- for instance, if he's on a kid that's looking like

2  a potential two-and-done kid or one-and-done kid, you talking

3  about five grand or pay their mom's little rent in fucking

4  Florence, South Carolina.  That's going to be $500 a month.  I

5  mean, you got you a first-round pick before the shit got crazy

6  at the end, when people are talking about real money."

7         You said that?

8  A.  I did.

9  Q.  OK.  And you don't pay college basketball coaches, right?

10 A.  It says very --

11 Q.  I'm asking you a yes-or-no question.  I think you know this

12 question by now.  Did you --

13 A.  No.

14 Q.  -- testify -- your Honor, if he would let me finish.

15        You testified earlier that you do not pay college

16 basketball coaches, correct?

17 A.  Correct.

18 Q.  And you testified earlier that the idea was idiotic,

19 correct?

20 A.  Correct.

21 Q.  And you testified that it didn't make any sense, correct?

22 A.  Correct.

23 Q.  And you just explained what sense it made, correct?  We'll

24 move on.

25        Now, if we could take a look at Government

1    Exhibit 501ET.

2    A.   Thank you.

3    Q.   You're welcome.

4         This is a continuation of the same conversation,

5    right?

6    A.   Correct.

7    Q.   Now, I'm looking at page 1.  I'm going to start with

8    line 3.  This is what Blazer says:  "So with Lamont."

9         Then Blazer says on line 5:  "How do we do it?  I

10   mean -- what do you --"

11        Then you say on line 9:  "I mean, I know I was giving

12   him 2,500 a month for a couple months.  He's needing shit when

13   the kid first got here."

14        You said that, right?

15   A.   Yes.

16   Q.   You understand what a month is, right?

17   A.   Yes, 30 days.

18   Q.   Yes, 30 days in a month.

19        And you understand what a couple of months means,

20   right?

21   A.   Correct.

22   Q.   And that's more than one month, right?

23   A.   Two.

24   Q.   OK.  You testified -- excuse me.

25        And you testified earlier that you were not paying

1    Lamont Evans, correct, yes or no?

2    A.  Correct.

3    Q.  OK.  Now, line 13:  "I would just come to the drop down

4    here."

5            Skip to line 15:  "Or, you know, Lamont recruited in

6    Atlanta, see him in Atlanta, go to the bank."

7            You said that, right?

8    A.  Yes.

9    Q.  Line 18:  "Give him 2,500.  He ain't gonna do shit like

10   that now on no paper."

11           You said that, right?

12   A.  Correct.

13   Q.  Line 21:  "But the good thing about it is" -- and I'm

14   skipping to line 24 -- "the more times you're down here" --

15   next page, line 2 -- "the more you see PJ."

16           You said that, right?

17   A.  I did.

18   Q.  PJ, you're referring to PJ Dozier, right?

19   A.  Sure.

20   Q.  The player at South Carolina, right?

21   A.  Correct.

22   Q.  Who Lamont Evans coached, right?

23   A.  Correct.

24   Q.  And who you just visited with earlier in this trip, right?

25   A.  Correct.

1   Q.  With Marty Blazer, right?

2   A.  Yes.

3   Q.  Who you had barely known, right?

4   A.  Correct.

5   Q.  And Munish Sood, who you did not know at all, right?

6   A.  Correct.

7   Q.  And you traveled by car, right?

8           MR. HANEY:  Your Honor, I would object.  He's asked

9   and answered these questions.

10          THE COURT:  Overruled.

11  A.  We did.

12  Q.  OK.  It took some time, right?

13  A.  Say that again.

14  Q.  Did it take some time to get there?  How far is South

15  Carolina?

16  A.  I don't know how far, but, yes, it took time.

17  Q.  OK.  Line 4 Dawkins:  "The more you see his mom or the more

18  she sees you at the game" -- and, again, you're just referring

19  to PJ Dozier, PJ Dozier's mom, correct?

20  A.  Yes, I am.

21          MR. BOONE:  Your Honor, I don't know.  I can keep

22  going, but this is a good time to stop.

23          THE COURT:  We can break now.  We'll take our first

24  break, ladies and gentlemen.  Be prepared to come out in 15

25  minutes.  Don't discuss the case.   (Jury excused)

1    (Jury not present)

2    THE COURT:  Everyone, please be seated.

3    Mr. Dawkins, you may step down.

4    We will be providing counsel copies of Mr. Lee's

5    letter from the *Inner City Press*.  If I could ask the

6    government at some point later this break to let me know what

7    your position is on whether or not that part of the transcript

8    should be unsealed.

9    Mr. Boone, I always allow, or try to allow, a lawyer

10   leeway to express his personal style, such as it may be, so

11   I've overruled a couple of asked and answered objections.  I

12   may not do that going forward, OK?

13   MR. BOONE:  Understood, your Honor.  Thank you.

14   THE COURT:  OK.  Anything else, Mr. Mark?

15   MR. MARK:  Your Honor, I would just ask the Court to

16   remind Mr. Dawkins that he's on cross-examination.  Given

17   there's a joint defense agreement, that he be instructed not to

18   speak with anybody during this break.

19   THE COURT:  Very well.  Counsel.

20   MR. MOORE:  I don't have a joint defense agreement

21   with Mr. Dawkins, first of all, and we weren't planning on

22   talking to him.

23   THE COURT:  I didn't think that you were.  OK.

24   MR. MOORE:  Thank you, Judge.

25   (Recess)

1    BY MR. BOONE:

2    Q.   Now, we just finished talking about Lamont Evans.  I want

3    to move on and talk about another college basketball coach,

4    Book Richardson -- Emmanuel Book Richardson.

5         Now, Mr. Dawkins, do you recall testifying earlier

6    that you did not think paying Book Richardson -- sorry.  Let me

7    start over.

8         You testified the other day that you didn't think Book

9    was worth paying money to?

10   A.   Correct.

11   Q.   Okay.  And I think you said that you were just hooking Book

12   up with money because he was your friend?

13   A.   Correct.

14   Q.   Okay.  Now, I want to focus on the June 6th, 2017 meeting.

15   This is the meeting on the yacht we've talked about before in

16   this trial.

17        Do you recall that?

18   A.   Yes.

19   Q.   And that meeting is where Loyd was sort of officially

20   formed; is that right?

21   A.   Yes.

22   Q.   The shareholder agreement was signed in that meeting,

23   right?

24   A.   Yes.

25   Q.   And at that meeting were several people.  Jeff, the

 1   undercover, was there, right?

 2   A.  Yes.

 3   Q.  And Jill, the other undercover, was there, right?

 4   A.  I'm pretty sure, yes.

 5   Q.  Okay.  Munish Sood, you recall him being there?

 6   A.  Yes.

 7   Q.  And he brought Mr. -- with him, right?

 8   A.  Yes.

 9   Q.  And Martin Blazer with him, right?

10   A.  Correct.

11   Q.  Okay.  And this was the first meeting where this group of

12   people, this entire group of people, were in the same place; is

13   that right?

14   A.  Yes.

15   Q.  Okay.  Now, I wanted to take a look at Government Exhibit

16   508-AT.

17   A.  Thank you.

18   Q.  You're welcome.  And I want to focus on page 10, line 18.

19          Dawkins:  "Well, I'll say this, if there is a

20   situation where we can support college coaches, like there

21   aren't many college coaches I don't have, like the head

22   coaches, I don't have access to now."

23          You said that?

24   A.  Yes.

25   Q.  Jeff D'Angelo did not say that, correct?

 1   A.  He did not.

 2   Q.  Now, I want to take a look at page 12, line 20:

 3          "So, for Lamont -- so, if you're going after like a

 4   Book or a Kenny Johnson in Louisville, or like -- because like

 5   Lamont's good, but he's not the elite-elite dudes."

 6          You said that, right?

 7   A.  I did.

 8   Q.  And by Book, you're referring to Emmanuel Book Richardson?

 9   A.  I am.

10   Q.  And Kenny Johnson obviously was just a coach in Louisville,

11   right?

12   A.  He was.

13   Q.  Okay.  Is it fair to say the University of Arizona and

14   University of Louisville are some of the more premier college

15   basketball programs?

16   A.  Yes.

17   Q.  Okay.  Page 13, line one:

18          Dawkins:  "If you're going after those kind of dudes,

19   I mean, like I'm talking to Book on the way, coming to the

20   hotel just now."

21          You said that, right?

22   A.  Yes.

23   Q.  And, again, Book Richardson, that's the one you're

24   referring to?

25   A.  Correct.

1   Q.  Okay.  And page 14, line 23:

2           "But if you're going to fund those kind of guys, man,

3   we'd be running college basketball, I think, because none of

4   them aren't my friends."

5           You said that, right?

6   A.  I did.

7   Q.  Now if we can take a look at page 16, line 19:

8           Dawkins:  "I say, you do this to make me smarter and

9   get the most bang so everybody can make money.  If you're just

10  giving the guy four grand a month, I just don't know what

11  you're giving them four grand a month for.  You know what I'm

12  saying?  So this is what you should do, let me speak to them

13  when they need it."

14          You said that, correct?

15  A.  I did.

16  Q.  So, Jeff D'Angelo didn't say that, right?

17  A.  He did not.

18  Q.  And if we can go to page 17, line six:

19          "So, like Book may need these two kids.  He may need a

20  grand amount to get something done for you, okay, and then you

21  give it to them at that point, because all they should be using

22  the money for is to take care of situations for us all to be

23  able to make money in the long run.

24          You said that, right?

25  A.  I did.

1   Q.  Jeff D'Angelo, didn't say that, right?

2   A.  He did not.

3   Q.  Then Blazer responds, saying I might do a little bit of

4   both though.  And then couple lines down:

5           Dawkins, line 15, you say the following:  If you're

6   going, okay, I'm going to say this, if you do a little bit of

7   both, only give the elite level dudes like a Book four grand a

8   month is a lot.

9           You said that, right.  I did.

10  Q.  And then again, referring to Book Richardson at Arizona,

11  right?

12  A.  Correct.

13  Q.  And you testified earlier Arizona is one of those elite

14  programs, right?

15  A.  Traditionally, yes.

16  Q.  Traditionally, yes.  If we could go now to page 19.  I'm

17  going start at line 7 just to give context.

18          This is -- this is Jeff D'Angelo speaking.  So, if you

19  want to facilitate introductions, however you want to do it,

20  you want to do it at the draft, you want to do it at workout,

21  some of the workouts in Vegas, you want to do it down in Miami,

22  you want to bring them on -- do the introduction here with one

23  or two, three guys, that's kind of what we're offering as a way

24  to, you know, network, open the door.  Obvious D'Angelo said

25  that, right?

1    A.  He did.

2    Q.  Now, a few lines down, line 22, you said,s let's do it,

3    let's do it in Vegas because every coach in the country goes to

4    Vegas the end of July.

5            You said that, right?

6    A.  I did.

7    Q.  And then next page, line one of page 20, let's do it in

8    Vegas because that will be the easiest place for me to get to.

9            Then skip to line five, and you say:  "Yeah, we'll do

10   it in like a hotel suite or something like that and have them

11   come through one at a time.  And then the other ones don't need

12   to know about each other."

13           You said that, right?

14   A.  I did.

15   Q.  And you were talking about setting up a meeting in Vegas

16   with college basketball coaches, right?

17   A.  Right.

18   Q.  And line 10, page 20, you say:  "It's supposed to say we

19   want them all to feel special, like we're only doing this for

20   you now, you know what I'm saying."

21           You said that?

22   A.  I did.

23   Q.  Okay.  Now, I want to address sort of a related but

24   different point regarding Book.  I believe you testified that

25   -- actually I think you already referred to this that really

1    Book was someone who was going to help you out regardless of

2    whether you paid him or not, right?

3    A.   Right.

4    Q.   And I think you testified to those words in regards to some

5    of the other coaches we've been talking about?

6    A.   Yes.

7    Q.   These are considered to be your friends?

8    A.   Yes.

9    Q.   Tony Bland, right?

10   A.   Yes.

11   Q.   Preston Murphy?

12   A.   Yes.

13   Q.   Corey Barker, right?

14   A.   Yes.

15   Q.   Now, you would agree that just as a general matter, money

16   can motivate people to do things, right?

17   A.   Some cases.

18   Q.   And you would agree, for instance, that even if you enjoy

19   doing your job, if someone actually pays you more to do your

20   job, maybe you're a little bit more motivated to do that job,

21   right?

22   A.   In some cases.

23   Q.   All right.  And, you obviously know by now that the

24   government's theory is that you gave money to Book to motivate

25   him to steer players your way, right?  That's our view.

1   A.  Oh, okay.  Got you.

2   Q.  We're arguing that you gave money to book Richardson to

3   motivate him to incentivize him to steer players to you; do you

4   understand that?

5           MR. HANEY:  Object to the form of the question, your

6   Honor.

7           THE COURT:  Sustained as to the form.

8   Q.  Is it your understanding that the government's theory is

9   that you paid Book Richardson money, in exchange he was going

10  to steer players towards you?

11          MR. HANEY:  Objection, your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, that's my understanding.

14  Q.  Okay.  Now, and obviously we talked about how your view

15  basically -- your testimony is that certain coaches would have

16  just helped you out anyway, right?

17  A.  Yes.

18  Q.  Now, Preston Murphy was a coach at Creighton; is that

19  correct?

20  A.  Yes.

21  Q.  And Corey Barker was at Texas Christian, TCU, right?

22  A.  Yes.

23  Q.  Book was already at Arizona, right?

24  A.  Yes.

25  Q.  Bland, we talked about being at the University of Southern

1    California, right?

2    A.   Yes.

3    Q.   Now, in the earlier part of your direct, you talked about

4    your work at ASM; do you recall that?

5    A.   I do.

6    Q.   And you talked about how your job was essentially to be a

7    runner, right?

8    A.   Correct.

9    Q.   And I think you find that as more or less as connecting a

10   player and also a player's family to one of the agents at ASM,

11   right?

12   A.   A recruiter, yes.

13   Q.   A recruiter.

14        And you mentioned people that since over your time

15   there that you felt you were responsible for recruiting, so to

16   speak, right?

17   A.   Yes.

18   Q.   Now, Durrelle Martin was one of those people, right?

19   A.   He was.

20   Q.   He played at Louisiana State University, right?

21   A.   LSU.

22   Q.   Correct.  So, Mike Malik Beasley, you mentioned him, right?

23   A.   Yes.

24   Q.   He played at Florida State University; is that right?

25   A.   He did.

```
 1   Q.   You mentioned Brice Johnson; is that correct?

 2   A.   Yes.

 3   Q.   He played at the University of North Carolina; is that

 4   right?

 5   A.   He did.

 6   Q.   You mentioned Fred VanVleet; is that correct?

 7   A.   Yes.

 8   Q.   And he played at Wichita State; is that correct?

 9   A.   He did.

10   Q.   You mentioned Justin Patton, right?

11   A.   Yes.

12   Q.   He played at Creighton, right?

13   A.   He did.

14   Q.   And you mentioned Jaron Bollsomgame?

15   A.   Yes.

16   Q.   He played at Clemson; is that right?

17   A.   He did.

18   Q.   And you mentioned Edwin Sumner, right?

19   A.   Yes.

20   Q.   He played at Xavier, right?

21   A.   Correct.

22   Q.   And so none of those players played at the University of

23   Arizona, correct?

24   A.   No.

25   Q.   And none of those players played at University of Southern
```

1 California, correct?

2 A. No.

3 Q. And none of those players played --

4 A. No.

5 Q. And so, Book Richardson, since he has been a coach at

6 Arizona has never helped you get a player at the University of

7 Arizona, right?

8 A. When you say "actually help," you mean deliver somebody?

9 Q. I mean people you consider to be people you have recruited

10 for ASM?

11 A. Uh-huh.

12 Q. Or any of those people players at the University of Arizona

13 that Book Richardson facilitated --

14 A. No. He didn't deliver any of those players to me, no.

15 Q. And I take it the same is for Tony Bland, right?

16 A. No, he didn't.

17 Q. I take it the same is for Corey Barker, right?

18 A. No. He didn't deliver any of those players.

19 Q. And so, although they were your friends, they had yet to

20 produce any players before you started paying them?

21 A. I didn't pay them, the evidence shows. But, no.

22 Q. Now, is it fair to say that the very top basketball players

23 tend to hire very good agents and other advisers to sort of be

24 on their team and represent them?

25 A. That's an opinion.

1   Q.  You worked for Andy Miller, right?

2   A.  I did.

3   Q.  He was one of the greatest agents of all time?

4   A.  Ever lived.

5   Q.  And we talked a little bit about Bill Duffy in this trial,

6   right?

7   A.  Yes.

8   Q.  And he's another well-regarded agent, right?

9   A.  Yes.

10  Q.  And you said that Andy Miller had, at one point, Kevin

11  Garnett as one of his players, right?

12  A.  Uh-huh.

13  Q.  And I think you even said that -- it may not be true now,

14  but at some point Kevin Garnett had made the most money of any

15  players; is that right?

16  A.  Right.

17  Q.  And so is it fair to say that top players tend to align

18  themselves with top agents?

19  A.  It's an opinion.  You can't -- it's a case-by-case basis.

20  There are agents who will have an All-Star type player --

21  Q.  I'll ask you another question if you can't answer yes or

22  no.

23              MR. HANEY:  Objection.

24              THE COURT:  Objection sustained.

25              MR. HANEY:  May I have a sidebar, your Honor, briefly?

1          THE COURT:  Okay.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JT2SAWN2

1                (At side bar)

2           MR. HANEY:  Obviously, I'm not asking to un-sustain

3    the objection, but more from a stylistic standpoint, it doesn't

4    necessarily always call for a yes-or-no answer to the question.

5    If my client feels that he needs to explain his answer, I don't

6    think that Mr. Boone can tell him yes or no repeatedly, if he

7    hasn't answered.  I don't believe every single question

8    necessarily has to be a yes-or-no answer.  And I think that's

9    the theme of this cross-examination.  I haven't said anything

10   to this point, and that's why I'm raising this point at this

11   moment.

12           MR. BOONE:  Your Honor, obviously in criminal trials

13   the answer of the witness must be responsive to the question

14   that is asked.  So if it's a yes-or-no answer, then he can

15   answer yes or no; it's expected that he answer yes or no.  If

16   he can't answer yes or no, he can say, I can't answer yes or

17   no, and it will be on me to figure out what to do next.

18           MR. HANEY:  And my response to that would be:  He's

19   made attempts on several occasions to follow up and offer an

20   explanation that Mr. Boone is not allowing him to do.  We did

21   not have that same latitude on cross-examination, because when

22   we tried to do the same thing, they objected to that.

23           MR. MARK:  Note for the record, they did that multiple

24   times on their cross-examination.

25           THE COURT:  Well, if you're going to ask a yes-or-no

1  question, Mr. Boone, do so clearly.  I think this last series

2  of questions about good agent and what makes a good agent and

3  do most elite players use good agents, I mean, I think that was

4  -- you know, clearly Mr. Dawkins indicated an unwillingness to

5  adopt that position.  So, ask another question and make it

6  clear.

7           MR. BOONE:  Yes, your Honor.

8           MR. MOORE:  Could I just ask your Honor:  Is it

9  your Honor's position that if a witness is asked a yes-or-no

10  question, he or she must answer yes or no and is not allowed to

11  explain their answer, and then that has to be cleared up on

12  redirect?

13           THE COURT:  Absolutely.

14           MR. MOORE:  Okay.  Because that's not been my

15  experience.  But we're in a different place.  I understand that

16  may be the custom here.

17           THE COURT:  Yeah.  And obviously I'm not going to step

18  on a -- if we're talking about something that I believe to be

19  immaterial or predatory or -- you know.  But we're dealing with

20  the meat of the matter here.

21           MR. MOORE:  So I understand that on redirect or

22  perhaps recross, we can explore the things that Mr. Boone cut

23  him off on; is that correct?

24           THE COURT:  Absolutely.

25           MR. MOORE:  Thank you.

(Continued on next page)

```
 1              (In open court)

 2   BY MR. BOONE:

 3   Q.  Chris -- was an All-Star NBA player, correct?

 4   A.  No, he's never made an All-Star game.

 5   Q.  He was never a All-Star player?  Was he a first-round draft

 6   pick?

 7   A.  He was.  I don't think Chris was -- I can't remember.

 8   Q.  I think he made it once but then got hurt.

 9              So he was represented by Andy Miller of Andy Miller

10   Sports, right?

11   A.  Andy and his brother, yes.

12   Q.  Okay.  And Kevin Garnett was an All-Star --

13   A.  Yes.

14   Q.  Let me ask it again.  Kevin Garnett was an All-Star for

15   multiple years in the NBA?

16   A.  Yes.

17   Q.  And he was represented by Andy Miller, right?

18   A.  He was.

19   Q.  Now, you testified that obviously you're not an agent,

20   right?

21   A.  Correct.

22   Q.  And that your career in sports has been that one of more of

23   a connector, right?

24   A.  Yeah, I guess.

25   Q.  In terms of connecting family, players to agents, correct?
```

1  A.  Yes.

2  Q.  Okay.  And so you've never actually had a client of your

3  own, right?

4  A.  No.

5  Q.  Okay.  And you're obviously not a financial adviser, right?

6  A.  No.

7  Q.  And so you never had clients as a financial adviser, right?

8  A.  No.

9  Q.  And I assume because you never had a client, you've also

10  not been hired as a manager for an NBA player, business

11  manager, I'm talking about.

12  A.  Define business manager, please.

13  Q.  Sure.  Someone who manages the sort of various businesses

14  of NBA players, including marketing, their endorsements, other

15  financial deals.

16  A.  That's not what a business manager does in the NBA.  But,

17  yes, I have managed players.

18  Q.  What is your definition?

19  A.  A business manager for an NBA player is someone who's going

20  to work on the accounting side, work in conjunction with their

21  financial adviser.  A marketing endorser is going to fall under

22  the hat of the agent.

23  Q.  Is it fair to say that there are many sorts of sports

24  agencies that exist in the marketplace?

25  A.  Yes.

1   Q.  ASM is obviously one we talked about.  Bill Duffy, what's

2   his group called?

3   A.  BTA.

4   Q.  Okay.  CTA --

5   A.  You're wrong.  It's CBA.

6   Q.  Oh, excuse me.  Is CAA a group?

7   A.  Yes.

8   Q.  What about -- sports?

9   A.  No longer.  They used to be.

10  Q.  Used to be.  Okay.  Is it fair to say -- well, let me

11  withdraw that question.

12          Now, the Lloyd management venture was going to be your

13  first venture into managing in the ways that we've discussed.

14  Is that right?

15  A.  Not really but.

16  Q.  Let me be more clear.  I think you testified that the idea

17  was that Lloyd would sort of be a one-stop shop for the

18  players, financial advisers you could use, actual agents you

19  could use, bill-pay persons, is that a fair description?

20  A.  No.  It wouldn't be a --

21  Q.  Would it cover those things I just mentioned?

22  A.  No.

23          MR. HANEY:  He's stepping on his answers.

24          THE COURT:  He answered.

25          Next question.

1    BY MR. BOONE:

2    Q.  Was part of Lloyd's management goal to represent players?

3    A.  The goal was to represent players, yes.

4    Q.  Okay.  And was part of that goal also to represent in terms

5    of the contract negotiations?

6    A.  No.

7    Q.  Was part of the goal to represent them financially?

8    A.  No.

9    Q.  So, an issue was not going to be the financial adviser for

10   the --

11   A.  He could have been.  But he also could have been for the

12   financial adviser.

13   Q.  That's not my question.  My question was:

14          Did you testify earlier that he sued someone who you

15   consider to be a financial adviser?

16   A.  That is correct.

17   Q.  Right?  And you testified earlier that there was also

18   consideration about agents you would align yourself with that

19   Loyd mentioned, right?

20   A.  Correct.

21   Q.  Okay.  And this was going to be obviously a new venture,

22   right?

23   A.  It was.

24   Q.  Okay.  And that's how the UC sort of got involved in this,

25   right?

1   A.  The who?

2   Q.  I said the UC, referring to Jeff D'Angelo.

3   A.  Yes.

4   Q.  He got involved to help that, right?

5   A.  Yeah.  He was introduced to fund it.

6   Q.  And so, this would be a new company that would be competing

7   against existing companies for business, right?

8   A.  Yes.

9   Q.  Okay.  Now, I want to go to -- actually, I want to stay on

10  this boat meeting.

11          Now, you testified earlier that you felt that Jeff

12  D'Angelo -- you see him on the cover -- wasn't going to fund

13  Loyd Management unless you agreed with his coach's model.

14          Do you recall saying that?

15  A.  Yes.

16  Q.  Okay.

17          MR. BOONE:  If we could pull up Government Exhibit

18  623.

19  Q.  This is the shareholder agreement?

20  A.  It is.

21  Q.  And if we could look at page -- it's the second-to-last

22  page.  The bate stamp ends in 60.

23          You signed this agreement, obviously?

24  A.  I did.

25  Q.  Okay.  And if we could now take a look at section 5 of this

1    agreement.

2    A.   Yes.

3    Q.   Now section 5, if we could highlight for the jury, where it

4    says:   Loan to Loyd, Inc.   It says:

5         "Mr. D'Angelo provided a loan in the amount of

6    $185,000, and Mr. Sood a loan for $40,000, which will be repaid

7    by the company from earnings before distribution of any net

8    income."

9         Do you see that?

10   A.   I do.

11   Q.   Now, is there anything in this section about Mr. D'Angelo's

12   loan being contingent on following the coach's model?

13   A.   It is, Mr. Boone.

14   Q.   Now, if you could take a look at the shareholder agreement,

15   is there anything generally in the entire agreement that says

16   anything about Mr. D'Angelo demanding that you follow the

17   coach's model in order to receive the money we just went over?

18   A.   It is not.

19   Q.   Okay.   And now, the section we just went over, section 5,

20   does it list someone other than Mr. D'Angelo as giving money to

21   Loyd Management?

22   A.   Munish Sood.

23   Q.   And that's obviously a person we talked about who was a

24   financial adviser, right?

25   A.   He was.

1    Q.  Okay.  Now, if we could take a look at Government Exhibit

2    508-DT.  I'm going to just hand you 508-DT and 508-AT.

3           This is 508DT.

4    A.  Thank you.

5    Q.  Now, take a moment to look at it.  I believe this is a

6    transcript from the boat meeting on June 6th.

7           Let me know if you've had a chance to look at it and

8    if that looks correct to you?

9    A.  Yes.

10   Q.  Okay.  Again, this is where Loyd was formed, right?

11   A.  Yes.

12   Q.  And this is that meeting that we showed earlier, where

13   $25,000 was given by Jeff, and I think he gave it to Munish

14   Sood technically, right?

15   A.  Yes.

16   Q.  Okay.  And if we could take a look at page ten.  Now,

17   focusing on line 22 of that page, D'Angelo is speaking:

18           "So, this is 25, right, five, 10, 10, so I'll get you

19   the -- I didn't know."  Then he goes on, other people talking.

20           Do you see that?

21   A.  I do.

22   Q.  Okay.  And that's D'Angelo talking about giving $25,000,

23   right?

24   A.  I'm pretty certain, yes.

25   Q.  And is there any discussion either in this line or anywhere

1  in this transcript of Jeff D'Angelo saying that the money was

2  contingent on you funding college basketball coaches?

3  A.  It is not.

4  Q.  Okay.  If we can look at 508-AT.  This should be another

5  transcription of the boat meeting.  And this is actually --

6  you're right.  This is one we went over earlier where there is

7  a discussion of Book Richardson, do you recall that?

8  A.  I do.

9  Q.  And do you recall in this transcript Jeff D'Angelo ever

10  saying that the $25,000 he was going to give Loyd was going to

11  be contingent on Loyd Management adopting his coach's model?

12  A.  No.

13  Q.  And your testimony is that, in fact, Jeff D'Angelo's money

14  was contingent on adopting the coach's model; is that correct?

15  A.  My testimony on the phone call was never played.

16  Q.  Just yes or no.

17  A.  Excuse me?

18  Q.  Just yes or no.

19  A.  Repeat the question, please.

20  Q.  Sure.

21       Your testimony is that the money Jeff D'Angelo gave

22  Loyd Management was, in fact, contingent on Loyd Management

23  following the coach's model, like we've been discussing?

24  A.  Yes.

25  Q.  Okay.  Now, you testified earlier that this was the first

1  meeting of sort of this four group of people, right?

2  A.  Yes.

3  Q.  You had met Jeff once before, right?

4  A.  Correct.

5  Q.  All right.  And now I think Munish --

6  A.  Can you repeat it.

7  Q.  Yes.  Sorry.

8      Just going over who was there again:  Joe Bailey, Jeff

9  D'Angelo, Munish Sood, Marty Blazer.

10      Does that sound right?

11  A.  At the boat meeting, right?

12  Q.  At the boat meeting, yes.  Still on the boat meeting.

13      Okay.  And generally speaking at this meeting, we went

14  over, first of all, conversations discussing Book Richardson,

15  right?

16  A.  Correct.

17  Q.  Now, among this group of people on the boat, are you the

18  only person who has real knowledge about how the basketball

19  world works?

20  A.  I can't speak for everybody else.

21  Q.  Based on your conversations with those people over the

22  course of the case, would you say that you have more basketball

23  knowledge than Jeff D'Angelo?

24  A.  That would be an opinion.  I can't say for a fact.

25  Q.  You can say; it's fine.

1    A.  Than Jeff D'Angelo?

2    Q.  Yes.

3    A.  Yeah, I would say so.

4    Q.  And Marty Blazer, right?

5    A.  I don't know about Marty.

6    Q.  Again, based on your interactions with Marty --

7    A.  Marty has been in the business a long time.  I couldn't say

8    that to be a fact, or my opinion.  I don't know what he knows.

9    Q.  Would you agree that earlier the testimony was that Marty

10   Blazer, in fact, was a football person?

11          Did you hear that?

12   A.  I didn't mean because he was an expert football guy, I

13   meant that --

14   Q.  Let me rephrase it.

15          When you were sitting at this trial, and you saw Marty

16   Blazer testify, do you recall him saying that his experience

17   had been primarily in football?

18          Do you recall him saying that?  That's my question.

19   A.  Yes.

20   Q.  Now, at any point in time during this meeting on the boat,

21   did you ever tell Jeff that you thought it was a bad idea to

22   pay college coaches?

23   A.  From my interpretation, I said it numerous times.

24   Q.  Not your interpretation.  I'm talking about specifically on

25   this boat, over the transcripts we've been over, did you ever

1   say that paying basketball coaches is a bad idea?

2   A.   I thought so.

3   Q.   No.   I'm not asking what you thought.

4   A.   Yeah, you are.

5   Q.   I literally mean, did you say the words:   This is a bad

6   idea?

7   A.   Not at that point, no.

8   Q.   Okay.   And did you literally say the words:   This is a

9   stupid idea?

10  A.   Not at that point, no.

11  Q.   And did you literally say the words:   This is an idiotic

12  idea?

13  A.   At that point, I hadn't.

14  Q.   Okay.   And did you literally say the words:   I do not want

15  to do this?

16  A.   At that point, I hadn't.

17  Q.   I want to now switch gears a bit and talk about Brian

18  Bowen.   Now, you testified earlier that you were convicted in a

19  trial that happened in October.

20          Do you recall saying that?

21  A.   I did.

22  Q.   And do you recall testifying that that trial was about

23  Brian Bowen and the Brian Bowen situation?

24  A.   Partly.

25  Q.   Okay.   And Brian Bowen, again, is a basketball player you

1   testified that you have known for a while, right?

2   A.  I have.

3   Q.  I think you may have said he was a family friend; is that

4   right?

5   A.  Right.

6   Q.  I think you said you had known him your whole life,

7   correct?

8   A.  A good portion, yes.

9   Q.  Okay.  And you had testified that you were assisting him in

10  his decision to choose what college to go to; do you recall

11  saying that?

12  A.  Yes.

13  Q.  Okay.  And you testified that he ultimately did choose to

14  go to the University of Louisville?

15  A.  He did.

16  Q.  Okay.  And you testified that you felt he should get paid

17  for going to the University of Louisville?

18  A.  Absolutely.

19  Q.  You said absolutely he should get paid?

20  A.  Say that again.

21  Q.  You said absolutely he should get paid to go to Louisville?

22

23  A.  He should get paid, yes.

24  Q.  Okay.  And you're aware obviously -- I know your views on

25  this.

1    But you're aware that that would be a violation of

2    NCAA rules?

3    A.   Everything is a violation of NCAA rules.

4    Q.   Maybe.  But you're aware that that particular instance of

5    paying a player to go to Louisville is a violation of NCAA

6    rules?

7    A.   That particular instance, yes.

8    Q.   Okay.  And I think you testified that what you did -- and

9    I'm summarizing here -- is that you got Adidas to bribe his

10   father with money, correct?

11   A.   Correct.

12   Q.   Now, if we could take a look at Government Exhibit 501-A1T.

13        I have a hard copy if you want.  But if the screen is

14   easier, I'll keep it.  I'm going to start on page nine, line

15   five.

16        First of all, this is a meeting from June 20th --

17   A.   Is this the boat meeting still, sir?

18   Q.   No.  So, take a look, if you need time to look through it.

19   On the front it says June 20th --

20   A.   Just tell me which hotel it's at.

21   Q.   I believe it's a meeting in the Conrad Hotel.

22   A.   Okay.

23   Q.   Okay.  So, this is the meeting with Merl Code?

24   A.   I got it.

25   Q.   Okay.  Now, page nine, line five, you say:

1      "So I think -- I mean, there's a deal.  I don't know

2   if you -- well, I think I told you about it, Munish, the Brian

3   Bowen deal with Louisville, which was -- I don't know -- a week

4   or two ago.  I had good affiliation with the kid.  Louisville

5   is what probably the top team you guys have."

6           You said that, correct?

7   A.  I did.

8   Q.  And the Merl you're referring to is Merl Code, correct?

9   A.  Correct.

10  Q.  And essentially what happened was Merl helped get money to

11  the Brian Bowen family, correct?

12  A.  Say that again.

13  Q.  Is what essentially happened is that Merl helped get money

14  to the Brian Bowen family?

15  A.  He was a part of it, yes.

16  Q.  Okay.  And was the money amount about a hundred thousand

17  dollars?

18  A.  They never received $100,000, no.

19  Q.  Was the initial goal $100,000?

20  A.  The agreed upon payment was $100,000, yes.

21  Q.  Okay.  And you kept some of that money, right?

22  A.  No.  Me?

23  Q.  Your testimony --

24  A.  The Brian Bowen money?

25  Q.  Yes or no?

1    A.  Never.  Didn't keep up with --

2              MR. BOONE:  Your Honor, I ask that you --

3              THE COURT:  He answered.

4    BY MR. BOONE:

5    Q.  Is your understanding that Merl Code kept some of that

6    money?

7    A.  No.  What are you talking about?

8    Q.  Now, if we could move on.  You testified earlier that you

9    -- actually, let me back up a little bit.

10             Now, obviously, we've gone over a lot of transcripts

11   during the course of this trial, right?

12   A.  Yeah.  We went through a lot.  Jesus.

13   Q.  Maybe too many transcripts?

14   A.  Too many.

15   Q.  And you have followed along with some of the transcripts as

16   you've been sitting here, right?

17   A.  I have.

18   Q.  And I'm sure you've noticed some mistakes here or there,

19   right?

20   A.  What do you mean?

21   Q.  In terms of typos or things of that nature.

22   A.  I haven't looked that closely.  I don't know.

23   Q.  Let me show you.

24             MR. BOONE:  If we could pull up actually Defense

25   Exhibit 2.

1   Q.  Your attorney showed you this yesterday.

2   A.  Okay.  I'm on it.

3   Q.  Okay.  And this is a call between you and Merl Code, it

4   looks like, right?

5   A.  Yes.

6   Q.  From June 20th, right?

7   A.  Correct.

8           MR. BOONE:  And if we could go to page two of this

9   transcript, and if we could highlight where Merl Code says

10  "Okay."  We can just highlight the Merl Code part.  We don't

11  need the rest of it.  Thank you.

12  BY MR. BOONE:

13  Q.  Can you see this, Mr. Dawkins?

14  A.  Yes.

15  Q.  Okay.  Now Code says:

16          "Okay.  Then that's what we should do.  We should come

17  up for a Nix -- N-i-x -- game or some shit and have him come

18  get backstage and meet Mellow and Porzingis and just shit like

19  that."

20          Do you see that?

21  A.  I do.

22  Q.  The New York Knicks is spelled N-i-x?

23  A.  I get that.

24  Q.  And your understanding that Carmelo Anthony was a player

25  for the New York Knicks, right?

1    A.   Yes.

2    Q.   And his last name is not spelled M-e-l-l-o-w, right?

3    A.   Well, his first name would be the Mellow; but yes.

4    Q.   Fair enough.   But the Carmelo part wasn't spelled --

5    A.   Correct.

6    Q.   The Mellow part or the Carmelo wasn't spelled --

7    A.   Yes.

8    Q.   Thank you.   Now, switching gears a little bit.   I now want

9    to focus on the meetings that occurred in Vegas.

10   A.   Okay.

11   Q.   Now, you testified, I think, multiple times that you

12   essentially held a bunch of sort of fake meetings in Vegas; is

13   that fair to say?

14   A.   I wouldn't call them fake.

15   Q.   Well, meetings in which you acted like you were going to

16   fund coaches?

17   A.   Correct.

18   Q.   Okay.   And in reality, I think you testified that you

19   weren't going to fund coaches because that's just not what you

20   wanted to do, right?

21   A.   Exactly.

22   Q.   Okay.   Now, one of the people who you met with while you

23   were in Vegas was Preston Murphy, right?

24   A.   Yes.

25   Q.   And you testified about the fact that Preston Murphy came

1    to the hotel suite where Marty Blazer and Jeff, the undercover,

2    were, right?

3    A.   Yes.

4    Q.   And this was, again, part of those meetings where you were

5    going to pretend to be funding college coaches, right?

6    A.   Yes.

7    Q.   Okay.  And you talked about on your direct testimony the

8    fact that you -- during that particular meeting, the Preston

9    Murphy meeting, there's a mention of a great player named

10   Marcus Phillips, right?

11   A.   Correct.

12   Q.   And I think your attorney asked you about some things you

13   said.  You said Phillip was a potential NBA player --

14   A.   I didn't say that.

15   Q.   Murphy said Phillip was a potential NBA player?

16   A.   Right.

17   Q.   And basically had high potential to be a good NBA player;

18   is that fair?

19   A.   Fair.

20   Q.   Okay.  And then you testified and told the jury that this

21   Marcus Phillips player didn't actually exist, right?

22   A.   There was no Marcus Phillips that ever played at Creighton,

23   no.

24   Q.   No Marcus Phillips.

25            And you said that you and Preston Murphy made this

1  name up, right?

2  A.  Right.

3  Q.  And you said that, although on the video it shows you

4  handing Preston $6,000, later he gave the money back to you,

5  right?

6  A.  Yes.

7  Q.  I think you said you went down to the lobby or something,

8  the bathroom --

9  A.  Yes.

10  Q.  And your attorney asked, and you confirmed, that you and

11  Preston Murphy laughed about sort of this whole situation,

12  right?

13  A.  Yes.

14  Q.  The situation being that you had said there is this great

15  player named Marcus Phillips to Jeff and Marty, and you both

16  knew there was no player named Marcus Phillips at Creighton,

17  right?

18  A.  There is no player named Marcus Phillips, no.

19  Q.  Right.  And you talked about in your testimony how Preston

20  had asked you essentially if he could use sort of any name in

21  this meeting.

22       Do you recall saying that?

23  A.  I don't recall saying that.  But I remember talking about

24  prepping before the meeting, yes.

25  Q.  Okay.  And you recall, in sum and substance, sort of

1   generally speaking, that in that prep meeting, you basically

2   told him, it's okay to use any name --

3   A.  I told him to say whatever, let's just get in and get out.

4   Q.  Right.  And that's basically what happened, right?

5   A.  Right.

6   Q.  Okay.  Now, if we could play and not put up a transcript of

7   the audio for Grand Jury Exhibit 526B.

8           (Audio played)

9           MR. BOONE:  Sorry.  If we can play that again.  If we

10  could actually go back and sort of hear the part where a

11  player's name is mentioned.

12          (Audio played)

13  BY MR. BOONE:

14  Q.  Now, it is your understanding that there's a player -- or

15  there was a player on Creighton's team named Marcus Foster?

16  A.  There was a Marcus Foster, yes.

17  Q.  Marcus Foster, correct?

18  A.  Correct.

19  Q.  And he was a senior on the team in the years 2017 to 2018?

20  A.  I stopped following after you guys arrested me.

21  Q.  So you don't know?

22  A.  I don't know.

23  Q.  Okay.  Now, if we could stay with the Vegas meetings.  And

24  you testified earlier that Jeff D'Angelo gave you $25,000 on

25  August 1st, 2017.  Do you recall saying that?

1    A.  I seen the bank deposit.  I'm assuming -- it wasn't Jeff.

2    It was probably Jill at that point.  I know 25,000 was

3    deposited, yes.

4    Q.  Okay.  So, let me -- you testified earlier that one of the

5    undercovers gave you $25,000 on August 1st; is that correct?

6    A.  Correct.

7    Q.  Okay.  And you safe-deposited that money, right?

8    A.  No.  The $25,000 was deposited by someone else.  I didn't

9    have $25,000 to deposit, I'm almost certain.

10   Q.  Well, let me ask you this.  $25,000 was given from one of

11   the other undercovers, right?

12   A.  Let me be clear.  Are you asking the August 1st, 25,000, or

13   the 25,000 total?

14   Q.  Correct.

15   A.  We're on the same page.  Ask your question now, please.

16   Q.  Sorry.  So, did one of the undercovers, either Jeff,

17   D'Angelo, or Jill Bailey, give you the $25,000 on August 1st?

18   A.  It had to be Jeff, Jill or Munish.  I didn't have $25,000

19   on me.

20   Q.  Do you recall your testimony being that Jeff gave you

21   $25,000?

22   A.  I do not recall my testimony, but I know it had to be one

23   of the undercovers or Munish.

24   Q.  I'm just asking do you recall your testimony being that

25   Jeff gave you $25,000; yes or no?

1    A.  It could have been that.

2    Q.  Okay.  And do you recall your testimony being that you

3    essentially handed out the money to your basketball coach

4    friends while you were in Vegas, right?

5    A.  So, the 25,000 in August is independent of the coach's

6    money.

7    Q.  I want to be clear.  You got $25,000 from the undercover,

8    right?

9    A.  August 1st.

10             MR. HANEY:  Your Honor, objection.

11             THE COURT:  Overruled.

12   BY MR. BOONE:

13   Q.  Right.  $25,000, you got August 1st, right?

14   A.  $25,000 was in my account, yes, August 1st.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

BY MR. BOONE:

Q.  You testified that in Vegas you met with several coaches, right?

A.  Correct.

Q.  You met with Tony Bland, right?

A.  Correct.

Q.  And you said you gave him $13,000?

A.  I did not say that.

Q.  You testified -- your testimony is that you did not testify that you gave him $13,000?

A.  I told I did not give him 13,000.

Q.  Let me rephrase it.  I understand you're denying that you gave him the money, and all that.  Let me ask you differently.

MR. HANEY:  Objection to the form of that question.

THE COURT:  He hasn't asked it yet.

Q.  You watched Marty Blazer's testimony, right?

A.  Yes.

Q.  OK.  And you saw us go over multiple videos regarding the Vegas meetings, right?

A.  Yes.

Q.  And you saw us go over some transcripts related to those meetings, right?

A.  Yes.

Q.  And you saw Marty Blazer testify that Tony Bland got $13,000, right?

1  A.  He did say that, yes.

2  Q.  Now, Preston Murphy, you recall him, right?

3  A.  Uh-huh.

4  Q.  And to be clear -- let me move on to Preston Murphy.  We'll

5  get back to Bland.

6          Preston Murphy is another coach you met with in Vegas,

7  right?

8  A.  Uh-huh.

9  Q.  Another coach who the government claims you gave $6,000 to?

10 A.  Uh-huh.

11 Q.  Obviously, you disagree with that, right?

12 A.  Uh-huh.

13 Q.  And you gave another $6,000 to Corey Barker, correct -- let

14 me rephrase that.

15         The government claims you gave another $6,000 to Corey

16 Barker, correct?

17 A.  Yes.

18 Q.  Your testimony is that you gave the money back.  Is that a

19 fair statement?

20 A.  Uh-huh.

21 Q.  That $13,000, $6,000, and another $6,000, does that equal

22 $25,000?

23 A.  Uh-huh.

24 Q.  OK.

25 A.  The $25,000 --

1    Q.  I'm just asking you --

2    A.  Yes.

3    Q.  -- if the numbers 13,000 --

4    A.  Correct.

5    Q.  -- 6,000 and 6,000 equal 25,000?

6    A.  It does.

7    Q.  Now, what you did not testify to when you were on direct

8    was the fact that $13,000 was given to Brad Augustine, right?

9    A.  I don't --

10   Q.  I'm asking if you testified to that.

11   A.  No, no.

12   Q.  You did not testify to the fact that Lamont Evans received

13   $14,500 in Vegas, right?  You didn't talk about that?

14   A.  No, I didn't.

15   Q.  Now, you testified that, essentially, the $25,000 you had

16   received from the undercover went to pay the coaches we just

17   talked about, Bland, Murphy, and Barker, correct?

18   A.  Repeat the question.

19   Q.  The $25,000 that you received on August 1 --

20   A.  Uh-huh.

21   Q.  -- so we're dealing with --

22   A.  No, no.  The August 1 payment is a payment independent of

23   the thirteen, six, and six in July.

24   Q.  Would it help if I refreshed your recollection from the

25   transcript from when you testified?

```
 1   A.  Sure.

 2   Q.  Now, don't read it to --

 3           MR. HANEY:  Your Honor, could we have a copy of that

 4   transcript as well?

 5           THE COURT:  Just let them know what pages.

 6           MR. HANEY:  It's from the trial.

 7           MR. BOONE:  Page 1319.

 8           MR. HANEY:  Thank you.

 9           MR. BOONE:  Starting at line 12.

10   BY MR. BOONE:

11   Q.  So just read it to yourself.  Don't sort of say anything on

12   the record.  Ignore my highlighting here.  You can start here,

13   but the question's obviously there.

14   A.  Yes.

15   Q.  Don't say anything yet.

16           Does that help refresh your recollection?

17   A.  Correct.

18   Q.  OK.  Is your recollection that the August $25,000 was

19   related to the payments to the coaches we discussed?

20   A.  No.  My recollection was --

21   Q.  Just yes or no.

22           OK.  Now, if we could -- now, you testified that

23   Loyd's bank records showed a deposit of $25,000 on August 1.

24   Do you recall saying that?

25   A.  Yes.
```

1    Q.  And you recall saying that Jeff had, and this is a quote,

2    "Jeff had, you know, expressed that he wanted to pay coaches"?

3    You recall saying that?

4    A.  Repeat it.

5    Q.  "Jeff had, you know, expressed that he wanted to pay

6    coaches"?

7    A.  You're saying that I said that Jeff wanted to pay coaches?

8    Q.  I'm saying you said this specific quote.  Do you recall

9    saying the specific words, "Jeff, you know, expressed that he

10   wanted to pay coaches"?

11   A.  OK.  I got you, yes.

12   Q.  OK.  Same thing for this next question.  You recall saying

13   that, "I wasn't so sure that he was going to actually give me

14   the money"?  Do you recall saying that?

15   A.  Correct.

16   Q.  You recall saying, "So for protection, I set up three

17   meetings where money would be transferred"?  Do you recall

18   saying that?

19   A.  Yes.  You said transfer.  I'm saying from the coaches back

20   to me, correct, or bank transfers?

21   Q.  I'm literally quoting from the transcripts.

22   A.  So that's my words, yeah.

23   Q.  Yes, these are your words.

24   A.  OK.

25   Q.  There is also a quote from you, let me know if you remember

1  saying this: "One for 13,000, one for six," and there were a

2  few other words, "another one for six, which equals to be

3  $25,000"?

4  A.  Correct.

5  Q.  This is another quote from you:  "It went for recruiting

6  expenses and everything like that, but they actually did come

7  through with the number that was supposed to be given to me."

8       You recall saying that?

9  A.  Uh-huh.

10 Q.  Now, do you recall being asked by your attorney when you

11 were on direct examination the following:  "Based on what we've

12 seen from these bank records, the dates the government showed

13 the coaches getting paid and the amounts corresponding, do you

14 have any other explanation how you would have deposited that

15 money" -- "that amount of money," excuse me, "in a bank at the

16 end of July of 2017 in August?"  It ends there.

17      Do you recall your attorney asking you that question?

18 A.  Yes.

19 Q.  Do you recall your answer saying, "No"?

20 A.  That was my answer?

21 Q.  Yes.

22 A.  OK.  Yeah.

23 Q.  I'll go on.  There's another quote.  You say, "No, every

24 dollar."  And later on you went to say, "Everything that was

25 deposited was given to me from the government."

1       You recall saying that?

2   A.  Yes.

3   Q.  Now, if we could take a look at Government Exhibit 1401C.

4       Now, first, just to orient ourselves, this is a

5   bank -- these are bank account statements from Loyd

6   Management's bank account?

7   A.  Yes.

8   Q.  Says "Loyd" right on front, right?

9   A.  Uh-huh.

10  Q.  Now, if we could take a look at page -- the Bates stamp

11  ends in the numbers 22578.

12  A.  Correct.

13  Q.  If we could highlight the August 1 entry.

14  A.  Uh-huh.

15  Q.  OK.  So this says, August 1, 2017, counter credit in the

16  amount of $25,000.  Do you see that?

17  A.  I do.

18  Q.  Now, if we could take a look at Government Exhibit 1401E,

19  and I'm looking -- so the record's clear, it ends in Bates

20  stamp No. 22618.  Do you see that on your screen?

21  A.  Uh-huh.

22  Q.  This is a check made payable to Loyd, right?

23  A.  OK.

24  Q.  And it's in the amount of $25,000, right?

25  A.  Uh-huh.

1  Q.  And it's dated August 1, 2017, right?

2  A.  Correct.

3  Q.  And it's for consulting fees, it says, right?

4  A.  Uh-huh.

5  Q.  And it is signed by Ricky Roberts, is that correct?

6  A.  I can't call -- yeah, I guess that's him.

7  Q.  It's not signed by Jeff D'Angelo, right?

8  A.  No.

9  Q.  It's not signed by Jill Bailey?

10 A.  No.

11 Q.  It's not signed by Marty Blazer?

12 A.  No.

13 Q.  It's not -- now let me ask you this:  You testified

14 earlier, I think, correct me, that you weren't sure if you

15 actually deposited the check or not, right?

16 A.  Which check?

17 Q.  The $25,000 you said you received --

18 A.  Correct.

19 Q.  -- right?

20        Merl Code deposited that check, right?

21 A.  Say that again.

22 Q.  Merl Code deposited this check we're looking at right here,

23 correct?

24        MR. HANEY:  Objection, your Honor.  Foundation.

25        THE COURT:  Overruled.

1  A.  How would I know?

2  Q.  I'm just asking.  Yes or no?

3  A.  You said it was signed by Ricky Roberts, so I don't know.

4  Q.  I'm asking who deposited this into the Loyd bank account.

5  Did Merl Code deposit this check into Loyd bank account?

6  A.  I didn't --

7  Q.  Yes or no?

8  A.  No.

9  Q.  Is it no or I don't know?

10 A.  I don't know.

11 Q.  Do you know the name Ricky Robertson?  You've heard that

12 name before?

13 A.  Yes.

14 Q.  Ricky Robertson doesn't work for the FBI, right?

15 A.  No.

16 Q.  He doesn't work for the U.S. Attorney's Office?

17 A.  No.

18 Q.  He is a grassroots basketball coach, correct?

19 A.  Yes.

20 Q.  Coached a team called Carolina Chaos, right?

21 A.  Yes.

22 Q.  And Carolina Chaos -- let me -- withdrawn.

23      Is it your understanding that the bank account of

24 Carolina Chaos was used in the Brian Bowen --

25 A.  It was.

1  Q.  -- situation?

2  A.  Yes.

3  Q.  And that's what led to your previous conviction?

4  A.  Correct.

5  Q.  OK.  Now let's go back to the bank account statements.

6  That's Government Exhibit 1401C.

7          And if we could go back to the same page we were on

8  before, ends in Bates stamp numbers 22578.  If we could

9  highlight the second line that's the August 3, 2017, line.

10         Now, this is a counter credit of $8,000 into the Loyd

11 bank account, right?

12 A.  Correct.

13 Q.  Now, if we could take a look at Government Exhibit 1401E,

14 and specifically the page that ends in Bates stamp 22618.

15 Sorry, 22622.

16         This is a check, right?

17 A.  Uh-huh.

18 Q.  It's for $8,000, right?

19 A.  Correct.

20 Q.  It's dated August 3, 2017, right?

21 A.  Yeah.

22 Q.  It's made out to Loyd Inc., right?

23 A.  Uh-huh.

24 Q.  And it's from the Princeton Advisory Group in Princeton,

25 New Jersey, right?

```
 1   A.  Correct.

 2   Q.  That's not the FBI, right?

 3   A.  No.

 4   Q.  That's not the U.S. Attorney's Office, right?

 5   A.  No.

 6   Q.  And that was deposited into the bank account of Loyd Inc.,

 7   correct?

 8   A.  Correct.

 9   Q.  You testified earlier that every money you got that went

10   into Loyd Inc. came from the government?

11   A.  When the government --

12   Q.  Yes or no?

13          MR. HANEY:  Your Honor, I'll object.

14   A.  Princeton is Munish's company.

15          THE COURT:  Stop talking, everyone.

16          The objection's overruled.

17          MR. HANEY:  Thank you.

18   Q.  Let me ask my question again.

19          Did you testify earlier that all the money you

20   received that went into the Loyd bank account came from the

21   government, the government being the undercover agents we've

22   talked about extensively, Jeff D'Angelo, Jill Bailey?

23          MR. MOORE:  Your Honor, could we approach for a

24   moment, please?

25          THE COURT:  Sure.
```

1          (At sidebar)

2          MR. HANEY:  Wait for him or --

3          THE COURT:  No, let's just start.

4          MR. HANEY:  Your Honor, they're mischaracterizing --

5          THE COURT:  I was kidding.

6          MR. MOORE:  You don't have your friends yet.

7          MR. HANEY:  I'm sorry.  Your Honor, it's

8   mischaracterization of the testimony.  And the deposit that

9   they're showing is from Munish Sood who's part of Loyd

10  Management, and he's depositing money from Princeton Advisory

11  Group into an account.  It was a mischaracterization of what

12  was testified to.

13         MR. BOONE:  It's certainly not a misrepresentation.

14  Munish Sood was not cooperating with the government, he did not

15  work for the FBI, he does not work for the U.S. Attorney's

16  Office on August 3, 2017.  His testimony -- we can pull out the

17  transcript so we can be 100 percent accurate -- was that every

18  money he got into Loyd was from the government.  Munish Sood is

19  unequivocally not part of the government on August 3, 2017.  It

20  was a false statement.

21         MR. MOORE:  First of all, it may have been an unclear

22  question.  First of all, we don't have the transcript.  That's

23  why we're operating at a bit of a disadvantage.  I'm just

24  saying I would ask Mr. Boone before he asks such a direct

25  question to show us in the transcript what question he's

1    referring to so that I can assure myself that he's got a good

2    faith basis to ask the question.

3            THE COURT:  I'm not going to require them to do that.

4    I wouldn't require, if the government asked, for you to do

5    that.  It seems to me appropriate cross-examination, so he will

6    be allowed to pursue it.

7            MR. HANEY:  Thank you.

8            (Continued on next page)

1       (In open court; jury present)

2   BY MR. BOONE:

3   Q.  OK.  So the check that's on your screen now, this is from

4   Munish Sood, correct?

5   A.  Yes.

6   Q.  And the check we looked at earlier that was for 25,000,

7   that was from Ricky Roberts, correct?

8   A.  It was.

9       MR. BOONE:  No further questions.

10       THE COURT:  Redirect.

11       MR. HANEY:  Thank you, your Honor.

12   REDIRECT EXAMINATION

13   BY MR. HANEY:

14   Q.  Now, Mr. Dawkins, I'm going to try to get back to some

15   plain English here and ask my questions slowly, and if you can,

16   respond slowly as well so the jury can understand, please.

17   A.  OK.

18   Q.  Isn't it true that the only occasion that you ever provided

19   Lamont Evans with any money was when you were employed at ASM?

20   A.  Correct.

21   Q.  There was no occasion other than that that you ever

22   provided Lamont Evans with money, fair to say?

23   A.  Never.

24   Q.  Any money that you ever gave Lamont Evans at any point in

25   time was at the direction of your boss at ASM, Andy Miller, is

1    that right?

2    A.  Correct.

3    Q.  You've testified now several times that the amount was

4    around $2,500.  Is that a fair statement?

5    A.  It was 2500.

6    Q.  The only reason that you gave Lamont Evans that $2,500 back

7    in 2016 was to help a kid named PJ Dozier, is that right?

8    A.  Yes.

9    Q.  I say a kid, but he was a college basketball player at

10   South Carolina at the time, right?

11   A.  Correct.

12   Q.  A kid whose family needed financial assistance, is that

13   right?

14   A.  Correct.

15   Q.  A kid that you know didn't have money, right?

16   A.  Correct.

17   Q.  A kid that you knew was on campus getting situated and

18   needed the things that all kids need on campus to get situated,

19   right?

20   A.  Correct.

21   Q.  Like microwaves, right?

22   A.  Correct.

23   Q.  Like clothes, right?

24   A.  Correct.

25            MR. BOONE:  Objection.

```
 1                    THE COURT:  Overruled.
 2   A.   Yes.
 3   Q.   Like Hot Pockets --
 4   A.   Yes.
 5   Q.   -- right?
 6   A.   Uh-huh.
 7   Q.   And he didn't have that money?
 8   A.   He had no money, nor did his family.
 9                    MR. BOONE:  Objection.
10   Q.   But you knew, being in business, he and other kids like him
11   were about to make millions of dollars for his school, isn't
12   that right?
13   A.   Correct.
14                    MR. BOONE:  Objection.
15                    THE COURT:  Sustained.
16                    MR. BOONE:  We ask that the answer be stricken from
17   the record, your Honor.
18                    THE COURT:  The answer will be stricken.
19   BY MR. HANEY:
20   Q.   After you made that payment to help PJ Dozier get situated
21   at the University of South Carolina, you never paid Lamont
22   Evans another penny, did you?
23   A.   Never.
24   Q.   Even the government's own cooperating witness Marty Blazer,
25   he testified he never saw you on any occasion give Lamont Evans
```

```
 1    any money, isn't that right?

 2              MR. BOONE:  Objection.

 3    A.  He never did.

 4              THE COURT:  Overruled.

 5    A.  He never did.  He also testified that he never --

 6              MR. BOONE:  Objection.

 7              THE COURT:  Sustained.

 8    Q.  In fact, from the testimony from Mr. Blazer that you

 9    recall, not to ask you what he said, between March of 2016 and

10    March of 2017, you never even talked to Lamont Evans again, did

11    you?

12    A.  No, very rarely, if any.

13    Q.  You also testified that around that time, you knew that

14    Lamont Evans also had his hand out to other agents, isn't that

15    correct?

16    A.  Yes.

17    Q.  Including a guy by the name of Seth Cohen down in Florida,

18    right?

19    A.  Yes.

20    Q.  Another basketball agent?

21    A.  Yes.

22    Q.  And you understood that Seth Cohen had given Lamont Evans

23    $13,000, is that right?

24    A.  Yes.

25    Q.  So any money, or gratuity as the government is going to
```

1  call it --

2          MR. BOONE:  Objection.

3          THE COURT:  Sustained.

4  Q.  Any money or gratuity that was ever paid to Lamont Evans

5  after March of 2016, to your knowledge, was either paid by

6  Marty Blazer or Munish Sood, isn't that right?

7  A.  Yes.

8  Q.  So they, not you, could influence Lamont Evans perhaps to

9  use them for their financial services for the future players,

10  is that right?

11  A.  Yes.  I was understanding Marty and Munish were both paying

12  Lamont.

13          MR. BOONE:  Objection.

14          THE COURT:  Overruled.

15  A.  For the financial services company they had set up.  I

16  wasn't even talking to either of them during that time.

17  Q.  That had nothing to do with you, did it?

18  A.  Zero.

19  Q.  Now, the government just went through a bunch of

20  transcripts reflecting a meeting that occurred in March of 2016

21  back in South Carolina.  Do you recall that?

22  A.  They did.

23  Q.  You remember that meeting, right?

24  A.  Yes.

25  Q.  Mr. Boone said it was a buddy meeting; isn't that what he

 1   said?

 2   A.  Yes, he did.

 3   Q.  Yeah, he characterized buddies being Munish Sood and Marty

 4   Blazer, isn't that right?

 5   A.  Yes.

 6   Q.  And you barely knew Munish Sood, correct?

 7   A.  Barely.  First time meeting him.

 8   Q.  You didn't know Marty Blazer at all, did you?

 9   A.  Vaguely.  Not really, no.

10   Q.  So we saw both these two guys testifying in this courtroom,

11   right?

12   A.  Yes.

13   Q.  You had to drive with those two guys from Atlanta down to

14   South Carolina?

15   A.  Yeah, unfortunately.

16   Q.  Let me ask you this question:  At which point -- at which

17   Waffle House did you pass before you realized Marty Blazer

18   wasn't the smartest guy in the world?

19             MR. BOONE:  Objection.

20             THE COURT:  Sustained.

21   Q.  You realized Marty Blazer wasn't a very smart guy pretty

22   fast, didn't you?

23             MR. BOONE:  Objection.

24             THE COURT:  Sustained.

25   Q.  But during that meeting, the government spent a lot of time

1    showing how you were pitching Marty Blazer and Munish Sood

2    about Lamont Evans' value, correct?

3    A.   Correct.

4    Q.   I'm not going to go over the whole thing again.  The jury's

5    seen it enough.

6    A.   Uh-huh.

7    Q.   Isn't it true that you were just trying to get Lamont Evans

8    over to Marty Blazer and Munish Sood, isn't that right?

9             MR. BOONE:  Objection.

10            THE COURT:  Sustained.

11   Q.   What was your reason for telling Marty Blazer and Munish

12   Sood, the two guys you drove down on the buddy trip with, that

13   they really ought to get together with this guy Lamont Evans?

14   A.   At the end of the day, I didn't want to sign PJ to me.  We

15   had a company decision not to continue to invest in it.  There

16   was an email that the government admitted into evidence --

17            MR. BOONE:  Objection.

18            THE COURT:  Sustained.

19   A.   Can you repeat the question so I can answer without that.

20   Q.   What was the reason why you were down there with Munish

21   Sood and Marty Blazer on the buddy trip, as Mr. Boone said, to

22   introduce these two guys to Lamont Evans?

23   A.   We no longer wanted to invest into the situation, and at

24   that point, Marty wanted to get into the financial services of

25   pro basketball players.  I introduced him to Lamont Evans as

1    well as Munish Sood, and I basically was essentially saying,

2    you got to work your own relationship, which is the reason why

3    I was saying on the call that was put in front of everyone

4    today --

5            MR. BOONE:  Objection.

6            THE COURT:  Sustained.

7    Q.  Go ahead.  Just finish your thoughts, not about what you've

8    seen during the trial.

9    A.  OK.  Which was the reason why I mentioned to --

10           MR. BOONE:  Objection.

11   A.  Mentioned to Marty that the agent is only so much.  What I

12   meant by that was I can't get everything done for you.  You've

13   got to build your own relationship with a college coach, AAU

14   coach, a parent, whatever.

15   Q.  Isn't it true that your bosses at ASM, they made a business

16   decision to get off of PJ Dozier; isn't that what you said?

17   A.  They did.

18   Q.  Isn't that a really nice way an agency business saying, you

19   know, PJ isn't scoring enough points in South Carolina?

20   A.  Yes.  As he came in, he was projected to be a first

21   round --

22           MR. BOONE:  Objection.

23           THE COURT:  Sustained.

24   Q.  Isn't it true that when kids get on college campuses,

25   sometimes they don't turn out to be what you think they're

1    going to be?

2    A.   Correct.

3             MR. BOONE:   Objection.

4             THE COURT:   Overruled.

5    Q.   They might get on campus and be a five star.  What's a

6    five-star basketball player?

7    A.   Five-star recruit is the most elite-level basketball

8    recruit coming out of high school.

9    Q.   And that's projected by guys who rate and rank kids in AAU

10   tournaments, correct?

11   A.   Correct.

12   Q.   The guys that got the backpacks on.  Probably never play

13   basketball before, right?

14   A.   Right.

15   Q.   Often they're wrong about it, aren't they?

16   A.   Sometimes.  I give them a little more credit.

17   Q.   More than I do.

18            But PJ Dozier apparently wasn't panning out, as they

19   say in the basketball business, right?

20   A.   No.  His freshman year, he had adjustments he had to make.

21   He wasn't looking like a one and done at that point.

22   Q.   And you guys were a big-time sports agency, correct?

23   A.   At that point, yes.

24   Q.   One of the biggest in basketball?

25   A.   Yes.

1    Q.  You guys didn't want to associate with kids that were going

2    to be second-round draft picks, correct?

3    A.  It wasn't ideal.  And at that point in the meeting, it was

4    March, the season was over.  We kind of had seen what he had

5    done, and it was not a worthwhile investment at that point.

6    Q.  So you wanted to pass PJ Dozier off onto Marty Blazer and

7    Munish Sood, correct?

8    A.  Yes.  I didn't want to -- yeah, I didn't want to do it

9    anymore, or neither did Andy.

10   Q.  And none of this money you ever gave anybody at ASM was

11   your money, was it?

12   A.  I didn't have no money to give nobody, so no.

13   Q.  But Andy Miller wanted to make sure you were having those

14   meetings, not him, correct?

15   A.  Correct.

16   Q.  The reason he did that was so he wouldn't be sitting over

17   there?

18           MR. BOONE:  Objection.

19           THE COURT:  Sustained.

20   Q.  Apparently, Marty Blazer and Munish Sood, they bought your

21   pitch, didn't they?

22   A.  They I assume --

23           MR. BOONE:  Objection.

24           THE COURT:  Sustained.

25   Q.  Did Marty Blazer and Munish Sood end up taking over the

1    responsibilities of Lamont Evans?

2    A.   I know now that Marty Blazer did pay.  I didn't at that

3    time.  I left the situation alone.

4    Q.   Now, Mr. Boone got into the issue of what are called one

5    and dones, is that right?

6    A.   Yes.

7    Q.   He made the suggestion that the college coaches apparently

8    have a lot of contact with high school players before they get

9    to college, didn't he?

10   A.   Yes, he made that point.

11   Q.   You know that's not true, don't you, Mr. Dawkins?

12   A.   It's not as --

13            MR. BOONE:  Objection.

14            THE COURT:  Overruled.

15   A.   It's nowhere how Mr. Boone tried to make it.

16   Q.   Well, we're going to have you educate the government for a

17   moment, if we can.  Hold on.

18            MR. BOONE:  Objection.

19            THE COURT:  Sustained.

20   Q.   I'll ask you a question.  You familiar with the recruiting

21   calendar?

22   A.   Yes, I am.

23   Q.   You familiar with the no-contact period?

24   A.   Yes, I am.

25   Q.   Are you familiar with only making one phone call a week?

1    A.  Yes, I am.

2    Q.  You familiar with only being able to text at a certain

3    time?

4    A.  Yes, I am.

5    Q.  Why don't you educate -- or why don't you tell us why

6    college coaches don't have access to high school kids when

7    they're playing high school basketball.

8    A.  So the NCAA rules essentially restrict contact between

9    coaches, college coaches, and the actual student athletes and

10   their families.  I'm pretty sure their families too.  Mr. Boone

11   was trying to say that --

12               MR. BOONE:  Objection.

13               THE COURT:  Sustained.

14   A.  OK.  I'm sorry.  There was some kind of idea that the

15   coaches have this great relationship, but in reality, they can

16   make maybe one phone call a month at a certain age.  As they

17   get older, to the senior year, it picks up a little bit, but

18   under no circumstances college coaches can just go to a high

19   school and just hang out with a player and his family.  It just

20   doesn't happen that way.  The relationship, as I've said over

21   and over, is with a youth coach, a parent, or some kind of

22   handler or mentor.

23   Q.  Isn't it true there's even restrictions on if they can call

24   kids in high school?

25   A.  Yes.  At a certain point, they can't call at all.  As they

1    get older, you can make limited calls to the actual player.

2    Q.  Isn't it true there are restrictions on how many times they

3    can even text message a potential recruit?

4    A.  Yes.  They could have changed the rule.  At one point I

5    don't think you could text at all, but they might have changed

6    the rule.  But, yes, there definitely is restrictions.

7    Q.  Isn't it true that there are periods of time during the

8    calendar, during the year, where they can't even have contact

9    in any way at all with the recruits and their families, isn't

10   that true?

11   A.  They can't have any contact at all.  So certain points in

12   the summer, they can't even go see them play.

13   Q.  Now it's reduced, isn't it true, to a point they can only

14   watch them play a couple weekends a summer?

15   A.  Unfortunately, yes, due to this case.  It was such a crazy

16   emphasis put on everything, I don't think they can --

17           MR. BOONE:  Objection.

18           THE COURT:  Sustained.

19   Q.  Isn't it true that at those tournaments, they can't even

20   say hello to the player if they pass them on the way to get a

21   hot dog?

22   A.  Yes, that's true.

23           MR. BOONE:  Objection.

24           THE COURT:  Overruled.

25   A.  Yes, that's true, college coaches cannot speak to any

1  player or parents at events at all.

2  Q.  Isn't that why you've testified that when a kid gets on a

3  college campus, he has a very limited relationship with these

4  guys; the NCAA does not want them around for their high school

5  careers, correct?

6  A.  Correct, that was the reason.

7  Q.  Then when they get to the college campus, would you agree

8  with me they're only there for a few months?

9  A.  Yes.

10  Q.  You were being kind yesterday when you said that Kentucky

11  was going to make it all the way to the Final Four and perhaps

12  be done playing in early April, weren't you?

13  A.  Yes.

14          MR. BOONE:  Objection.

15          THE COURT:  Sustained.

16  Q.  Isn't it true that a school could get knocked out of the

17  conference tournament, right?

18  A.  A school could get knocked out conference tournament or not

19  even make it to post-season play at all.

20  Q.  Isn't it true these kids may not even be on campus until

21  February?

22  A.  Some instances, late January, you're done.

23  Q.  In your experience, the top players, they just drop out of

24  school anyway?

25  A.  Yes.  Usually once you're done your last game, you don't

1   take any more classes.  You just have to --

2   Q.  So it's not a one and done, it's a semester and done on

3   certain occasions, isn't it?

4   A.  That is correct.

5   Q.  A semester being maybe three or four months?

6   A.  I didn't go to college, but I would assume, yes.

7   Q.  That's why you would also assume that it doesn't make a lot

8   of sense to pay coaches that could only be around a kid for

9   three months, fair to say?

10  A.  Absolutely.

11  Q.  That's why you tried to talk Jeff D'Angelo out of that,

12  didn't you, on June 28?

13  A.  That is correct.

14  Q.  But he wasn't having it, was he?

15  A.  He was not.

16  Q.  In fact, he told you that I'm funding you, staying out of

17  your way, but you're going to do that; isn't that what he said?

18          MR. BOONE:  Objection.

19          THE COURT:  Sustained.

20  Q.  What did you take it to mean -- what was your understanding

21  of what Jeff D'Angelo meant when he said, I'm funding you, but

22  you're going to do that?

23          MR. BOONE:  Objection.  Misstates.

24          THE COURT:  Sustained.

25  Q.  Do you recall on that occasion on that phone call on

1    June 28 Jeff D'Angelo telling you that he was funding you?

2    A.  I do.

3    Q.  Do you recall on that occasion or that phone call on

4    June 28 him saying you're going to do that?

5    A.  I do.

6    Q.  What did you understand that to mean?

7    A.  I was under --

8            MR. BOONE:  Objection.  Vague.

9            THE COURT:  Overruled.

10   A.  I was under the impression that Jeff had this idea of how

11   the company should be run.  He was the one funding it.  He had

12   his side of the business, which was, in his mind, the coaches,

13   and he was going to do it.  And if I didn't introduce him to

14   people, everything was going to be over.

15   Q.  And the jury's going to get to listen to that phone call if

16   they choose during deliberations.

17           Is it fair for me to say you spent a long time on that

18   phone call trying to talk him out of the coaches' model?

19   A.  Yes, I over and over -- and not just that, when it was

20   previous --

21           MR. BOONE:  Objection.

22           THE COURT:  Sustained.

23   Q.  Isn't it true that you told him on that call that the

24   coaches' model was given to him?

25   A.  Yes.

1    Q.  And you understand it was given to him by the FBI

2    undercover Marty Blazer, isn't that right?

3    A.  I was under the impression of that, yes.

4    Q.  Really now you understand this whole coaches' model was the

5    basis of this bribery case, right?

6    A.  Correct.

7            MR. BOONE:  Objection.

8            THE COURT:  Sustained.

9            MR. BOONE:  Ask that the statement be stricken.

10           THE COURT:  Stricken.

11   Q.  Is it fair for me to say that when you were talking to Jeff

12   D'Angelo, you could hear almost a panic in his voice?

13   A.  Yes.

14   Q.  Is it fair for me to say that Jeff D'Angelo at that point

15   realized this kid ain't going to pay these coaches?

16           MR. BOONE:  Objection.

17           THE COURT:  Sustained.

18   Q.  But you were the majority shareholder, weren't you,

19   Christian?

20   A.  I was.

21   Q.  They told you you were, right?

22   A.  That's what they told me.

23   Q.  On that boat, on that yacht that day?

24   A.  Yes.

25   Q.  And they gave you the impression that you were going to be

1  running this company worth $225,000, didn't they?

2  A.  Correct.

3  Q.  Worth probably millions one day, right?

4  A.  Hopefully.

5  Q.  Live out your dreams, uh, Mr. Dawkins?

6  A.  Correct.

7          MR. BOONE:  Objection.

8          THE COURT:  Sustained.

9  Q.  But that was all lies?

10  A.  Yes.

11          MR. BOONE:  Objection.

12          THE COURT:  Sustained.

13  Q.  When Jeff D'Angelo said, you're going to do that, you've

14  testified that you took it to mean he wasn't going to fund you

15  anymore.  Did you have a 401K?

16  A.  No, I did not.

17  Q.  Did you have a savings account?

18  A.  No.

19  Q.  Did you have anybody who you could call to give you some

20  money?

21  A.  No.

22          MR. BOONE:  Objection.

23          THE COURT:  Sustained.

24  Q.  But we do know that on that very day when you felt that

25  Jeff D'Angelo was telling you you were getting cut off, you

1   called Merl Code immediately, didn't you?

2   A.  I did.

3   Q.  And you called Merl Code and you told him the coaches'

4   model doesn't make any sense, didn't you?

5   A.  I did.

6   Q.  We heard that from your words on the call, didn't we?

7   A.  We did.

8   Q.  And you told Merl Code on June 28, 2017, in no reservation,

9   you said, I ain't paying no coaches, didn't you?

10  A.  I did.

11            MR. BOONE:  Objection.

12            THE COURT:  Sustained.

13  Q.  On that call did you tell Merl Code, I'm not going to pay

14  coaches?

15  A.  I did.

16            MR. BOONE:  Objection.

17            MR. HANEY:  Your Honor, may I ask the question?

18            THE COURT:  Yes.

19            MR. HANEY:  Is there a ruling on it?

20            THE COURT:  No.

21  Q.  You told Merl Code on June 28, I'm not paying coaches?

22            MR. BOONE:  Objection.

23            THE COURT:  Overruled.

24  A.  I did.

25  Q.  Now, can you offer any other interpretation of what "I'm

not paying coaches" means?

2          MR. BOONE:  Objection.

3          THE COURT:  Sustained.

4  Q.  Isn't it true in that same phone call you told Merl Code

5  that you tried to tell Jeff D'Angelo multiple times the model

6  didn't make sense?

7  A.  I did.

8  Q.  You told Merl Code, he won't listen to me, right?

9  A.  I did.

10  Q.  Then you told Merl Code, you know what?  If he's not going

11  to listen to me, I'm going to take his money, didn't you?

12  A.  I did.

13          MR. BOONE:  Objection.

14          THE COURT:  Sustained.

15  Q.  Now, you had no idea that Jeff D'Angelo at that point was

16  an FBI agent, did you?

17  A.  I did not.

18  Q.  Now, there's been talk about the coaches out in Las Vegas,

19  how some were paid and some were not, right?

20  A.  Correct.

21  Q.  We saw Marty Blazer take the stand under oath and tell the

22  jury that the coaches who didn't get paid were the guys who

23  didn't have players at their school.  Isn't that what he said?

24  A.  He did.

25  Q.  Would you agree with me that that is a ridiculous

1    statement?

2              MR. BOONE:  Objection.

3              THE COURT:  Sustained.

4    Q.  Why would that statement by Marty Blazer be untrue?

5              MR. BOONE:  Objection.

6              THE COURT:  Sustained.

7    Q.  Isn't it true that there were coaches there in Las Vegas

8    that didn't get paid that had really good players on their

9    team?

10             MR. BOONE:  Objection.

11   A.  True.

12             THE COURT:  Sustained.

13   Q.  Was a coach from Alabama out in Las Vegas?

14   A.  He was.

15   Q.  Did he get paid?

16   A.  No.

17   Q.  Did he have players on his team?

18             MR. BOONE:  Objection.

19             THE COURT:  Sustained.

20             MR. BOONE:  Can we ask the record be stricken,

21   statement be stricken, your Honor?

22             THE COURT:  It will be stricken.

23   Q.  But we do know the coaches that were paid were Preston

24   Murphy, Corey Barker, and Tony Bland?

25   A.  That's true.  Those were the coaches that they alleged to

1  be paid, yes.

2  Q.  And those were your good, closest friends who were out in

3  Las Vegas at that meeting; would you say that's a fair

4  statement?

5  A.  Yes.

6  Q.  Now, we heard the government spend some time scrutinizing

7  your bank records, and I want to -- I'm not going to go over

8  that all over again.  The bank records speak for themselves.

9  A.  Right.

10  Q.  But there was a deposit that was made from the Princeton

11  Advisory Group that the government represented that you were

12  not telling the truth when you said that --

13            MR. BOONE:  Objection.

14            THE COURT:  Sustained.

15  Q.  The deposit from the Princeton Advisory Group, that was a

16  deposit from your partner Munish Sood, correct?

17  A.  Correct, I --

18            MR. BOONE:  You answered the question.

19            THE COURT:  You've answered the question, Mr. Dawkins.

20  Q.  Yeah, why did Munish Sood give you -- or the company, not

21  you, money on that occasion?

22            MR. BOONE:  Objection.

23            THE COURT:  Sustained.

24  Q.  Do you know why that money was transferred to Loyd

25  Management --

```
 1              MR. BOONE:  Objection.

 2              MR. HANEY:  Your Honor, I didn't ask the question,

 3   your Honor.

 4              THE COURT:  The objection is sustained.

 5              MR. HANEY:  Thank you, your Honor.

 6   Q.  Now, we know from your testimony that the government, more

 7   specifically, Jeff D'Angelo or Marty Blazer, gave you six --

 8   gave $6,000 -- or $6,000 was provided to Corey Barker, correct?

 9              MR. BOONE:  Objection.

10              THE COURT:  Sustained.

11   Q.  Now, the government spent a lot of time about your history

12   of paying players' families and handlers?

13   A.  They did.

14   Q.  Isn't it true when you were paying players on occasion that

15   you felt you were helping the families out?

16              MR. BOONE:  Objection.

17              THE COURT:  Sustained.

18   Q.  The government mentioned the player by the name of Brian

19   Bowen, correct?

20   A.  They did.

21   Q.  And indicated that you had been convicted of providing or

22   being a part of a circumstance where Brian Bowen's father

23   received money, correct?

24   A.  Yes.

25   Q.  What was your understanding of why Brian Bowen was paid
```

1    that money or his father?

2    A.   Under my -- from my understanding, Brian, the kid Brian

3    Bowen Jr., had decided to go to University of Louisville.

4    Adidas sponsored Louisville, hundred-million-dollar contract,

5    and once he decided, the family's house had burned down in

6    Saginaw, they had no insurance on it --

7              MR. BOONE:  Objection.

8              THE COURT:  Sustained.

9              MR. HANEY:  I'm sorry, your Honor.

10             MR. BOONE:  We ask it be stricken from the record.

11             THE COURT:  It will be stricken.

12   A.   The family needed money.

13             MR. BOONE:  Objection.

14             THE COURT:  Sustained.

15             MR. BOONE:  Stricken from the record.

16             THE COURT:  Ask another question, Mr. Haney.

17             MR. HANEY:  Thank you, your Honor.

18   Q.   Now, you had a long relationship with the Bowen family

19   you've testified to, correct?

20   A.   I did.

21   Q.   And how long have you known the Bowen family?

22   A.   Since I was a child.

23   Q.   Just so it's clear, you didn't give that money to Brian

24   Bowen's dad, did you?

25   A.   No.

1    MR. HANEY:  Just a moment, your Honor.  I'm sorry.

2  Q.  Mr. Dawkins, you've never had a client of your own, have

3  you?

4  A.  No.

5  Q.  You've never had the ability to take in money from any NBA

6  player directly, correct?

7  A.  No.

8  Q.  There's allegations that you influenced or caused money to

9  be paid to Book Richardson from Arizona to influence him to

10  steer players to you or Loyd Management, isn't that right?

11  A.  Yes, there are allegations.

12  Q.  Book Richardson was your friend, correct?

13  A.  He was.

14  Q.  And --

15  A.  He is.

16  Q.  When you were at ASM, you never did that, did you?

17  A.  Never.

18  Q.  You wanted to impress your bosses at ASM, right?

19    MR. BOONE:  Objection.

20    THE COURT:  Sustained.

21  Q.  Wasn't the goal at ASM to sign future NBA players?

22  A.  Yes.

23  Q.  And wouldn't you agree, Arizona had a lot of NBA players?

24  A.  They did.

25  Q.  And Book Richardson was coaching at Arizona, right?

```
 1    A.  He was.

 2    Q.  But ASM, through Andy Miller or anyone, never paid any

 3    coaches at Arizona, did they?

 4    A.  Never.

 5              MR. BOONE:  Objection.

 6              THE COURT:  Sustained.

 7    Q.  And you never paid Book Richardson a penny, did you?

 8    A.  No.

 9              MR. BOONE:  Objection.

10              THE COURT:  Overruled.

11    A.  I did not.

12    Q.  And the only evidence in this case is that Book Richardson

13    received a $5,000 payment on June 20, 2017, correct?

14              MR. BOONE:  Objection.

15              THE COURT:  Sustained.

16    Q.  Part of the evidence in this case is that Book Richardson

17    received a $5,000 payment at a meeting here in New York on

18    June 20, is that right?

19    A.  Yes.

20    Q.  You weren't there?

21    A.  No.

22    Q.  But we do know on the cab ride over to that meeting, you

23    told Book Richardson what the play was going to be?

24              MR. BOONE:  Objection.

25              THE COURT:  Sustained.
```

```
 1   Q.  On that phone call with Book Richardson, did Book

 2   Richardson tell you, what can I do to make sure you and I are

 3   good?

 4   A.  He did.

 5              MR. BOONE:  Objection.

 6              THE COURT:  Sustained.

 7              MR. BOONE:  Ask it be stricken.

 8              THE COURT:  Answer will be stricken.

 9   Q.  The only other evidence in this case of when Book

10   Richardson received $15,000, you weren't even there, were you?

11              MR. BOONE:  Objection.

12   A.  I was not.

13              THE COURT:  Sustained.

14              MR. HANEY:  Nothing further, your Honor.

15              MR. MOORE:  Can we approach for one moment, your

16   Honor?

17              THE COURT:  Sure.

18              (Continued on next page)

19

20

21

22

23

24

25
```

1           (At sidebar)

2           MR. MOORE:  (a) I need to go to the restroom, and then

3    (b) I'm going to have some questions, and I just want to

4    preview those with your Honor instead of doing it this way.

5           THE COURT:  OK.

6           MR. MOORE:  If we could take our break and --

7           THE COURT:  OK.

8           MR. MOORE:  -- I can promise you that if you let me

9    ask any questions, I'm not going to ask many.

10          THE COURT:  OK.

11          MR. BOONE:  Good selling point.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Folks, we're going to take a break now.

3    So please be prepared to come out at five minutes of the hour.

4    Please do not discuss the case.

5          (Jury excused)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury not present)

2          THE COURT:  Everyone, please be seated.

3          You may step down, Mr. Dawkins.

4          I just want to note that I find it a little

5     frustrating that the parties keep pushing me to get this trial

6     done, and over the last however many hours, all we've gotten is

7     a lot of questions that have been asked and answered over and

8     over and over again.  I'm doing as much as I can.  I'm getting

9     people here on time, I'm making sure we have witnesses ready to

10    go, but if you want to get this trial done, let's move on to

11    things that have not already been covered.

12          (Recess)

13          THE COURT:  Mr. Moore, you want to do it at sidebar?

14          MR. MOORE:  However your Honor would prefer to do it.

15    Sidebar's fine with me.

16          THE COURT:  It's up to you.  You tell me.

17          MR. MOORE:  Could we just do it, it might be quicker

18    at sidebar.

19          (Continued on next page)

20

21

22

23

24

25

1      (At sidebar)

2          MR. MOORE:  During the cross-examination by Mr. Boone,

3   Mr. Boone asked him repeated questions about whether he, him

4   being Mr. Dawkins, about whether he was convicted of fraud.

5   And he asked that question multiple times, and he used the word

6   "lie" multiple times.  Not my -- I don't know that I felt like

7   I could object to that, but there is some law that says that

8   the conviction itself is admissible, sometimes the underlying

9   evidence surrounding it is not, but I will also say that that

10  conviction is on appeal.  The rule permits the use of a

11  conviction which is on appeal to be inquired of, but it also

12  requires -- allows the Court to inquire on the fact that the

13  case is on appeal.

14         So I simply want to ask him those questions, and I

15  want to ask him -- and I want to ask him this further question.

16         THE COURT:  When you say "those questions," that's a

17  question.

18         MR. MOORE:  So what I would like to say is:

19  Mr. Dawkins, Mr. Boone asked you a number of questions about

20  your conviction in this court, correct?

21         You're appealing that conviction, is that not correct?

22         Mr. Boone asked you a number of questions about

23  whether that offense involved fraud and lying, correct?

24         Do you believe that you committed any fraud or lied in

25  any way?

1   And he can answer the question.  Then my final

2   question is going to be:  And are you appealing that conviction

3   because you do not believe that you defrauded the University of

4   Louisville in any way?

5   Those are the questions I want to ask him.  I know

6   those might draw an objection, so I'm asking the Court for a

7   ruling on them.

8   MR. BOONE:  Yeah, I think all of those questions have

9   already been asked and answered.  I think Mr. Haney himself

10   brought out the fact that he was appealing his conviction from

11   the Brian Bowen situation.  It's already in the record.  To the

12   extent that he asked questions that -- I'm forgetting all of

13   them, but I -- although one of them was sort of, Did you agree

14   with the decision or did you have some issue with it?  I think

15   he said very clearly he did disagree with it and didn't accept

16   that he was guilty of those crimes.

17   THE COURT:  You want to ask those four questions?

18   MR. MOORE:  Yes, sir.

19   THE COURT:  I'll let you ask those four questions.

20   MR. MOORE:  OK.  And part of my reasoning is that the

21   government has tried to bootstrap Mr. Code into this by asking

22   questions about Loyd Inc. and Loyd Management, etc.  So I

23   appreciate that.  Those are going to be the majority of my

24   questions.  I may have several other questions that I don't

25   think are as objectionable.

1        THE COURT:  As objectionable?

2        MR. MOORE:  Or --

3        MR. MARK:  Could we ask you to revisit your ruling?

4        MR. MOORE:  Of course, I know that I might likely draw

5    an objection, but I did think that that was one that I needed

6    to preview for your Honor.

7        THE COURT:  That's fine.

8        In terms of timing, I don't know how much longer this

9    is going to go, but we only have another hour and a half, and

10   the instructions are going to be probably two hours.  So I'm

11   going to let them go early, just so you folks are aware, and

12   we're probably not going to finish with summations tomorrow.

13       MR. MARK:  Your Honor, could we actually consider

14   whether we do the jury instructions before the summations or

15   after the summations?

16       THE COURT:  You mean reconsider?

17       MR. MARK:  Reconsider that decision.  Just if we can

18   make a decision after the end of the court day on that, only

19   because it might make a little bit of change because --

20       THE COURT:  Yes, we can maybe get all the arguments in

21   tomorrow if I don't charge.

22       MR. MARK:  If you don't charge.

23       MR. MOORE:  Right.

24       MR. MARK:  That's my thought, right, because we were

25   trying to --

1    THE COURT:  Yes.  I think Mr. Solowiejczyk indicated

2  that his closing also would be close to two hours.

3    MR. MARK:  Since we're not going a full day, I

4  think --

5    MR. BOONE:  We should think about it.

6    MR. MARK:  -- we should consider it.

7    MR. MOORE:  If you're going to send them home early,

8  we can all talk about it at that point.  I mean, I know your

9  Honor doesn't want to keep them here until 3:30 and charge them

10  today, correct?

11    THE COURT:  Correct.  They won't -- they don't want to

12  stay, not that I don't want to keep them.  They don't want to

13  stay.

14    MR. MOORE:  I don't either, but I don't have that

15  choice.

16    THE COURT:  Correct.

17    OK.  So we're going to get the jury back out.

18    MR. MOORE:  Yes, sir.

19    (Continued on next page)

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Everyone, please be seated.

 3              Mr. Moore, did you wish to cross-examine?

 4              MR. MOORE:  Yes, sir, your Honor, briefly.

 5   RECROSS EXAMINATION

 6   BY MR. MOORE:

 7   Q.  Mr. Dawkins --

 8   A.  Uh-huh.

 9   Q.  -- Mr. Boone asked you a series of questions about a

10   conviction that occurred in this courthouse, correct?

11   A.  He did.

12   Q.  OK.  You're appealing that conviction, correct?

13   A.  Correct.

14   Q.  And you do not agree that you involved -- that you engaged

15   in fraud or lying, do you?

16   A.  I did not.

17              (Continued on next page)

18

19

20

21

22

23

24

25
```

1    BY MR. MOORE:

2    Q.  And you do not agree that you defrauded the University of

3    Louisville in any way by paying Brian Bowen, correct?

4    A.  I do not.

5    Q.  And I guess your decision about that conviction will be

6    made by the Second Circuit Court of Appeals, correct?

7    A.  That's my understanding.

8    Q.  Okay.  You didn't testify in the case, did you?

9    A.  I did not.

10   Q.   Now, Mr. Boone also asked you about these bank records,

11   okay?

12   A.  Uh-huh.

13   Q.  And I'm going to ask you a question.  If you don't

14   understand it, or if the answer is not yes or no, if you feel

15   like you need to explain, you answer the question the way you

16   need to answer it.

17   A.  Okay.

18   Q.  Okay, Mr. Dawkins?

19   A.  Okay.

20   Q.  It goes:  Do you recall this question being posed to you:

21           Based on what we've seen from these bank records, the

22   dates the government showed the coaches getting paid and the

23   amounts corresponding, do you have any other explanation how

24   you would have deposited that amount of money in a bank at the

25   end of July of 2017?

1    A.   Yes, I recall the question.

2    Q.   Okay.  All right.  And --

3              MR. BOONE:  Objection.

4              THE COURT:  Overruled.

5    Q.   I believe there was an objection, and that was sustained.

6              And then the next question was:  Did you have any

7    sources of income that would explain these deposits into your

8    bank account on that day?

9    A.   I did not.

10   Q.   All right.  And so, when you told this jury that you did

11   not have any other sources of income, you personally, to make

12   those deposits, were you telling them the truth?

13             MR. BOONE:  Objection.

14             THE COURT:  Sustained.

15             MR. BOONE:  Ask that the answer be stricken.

16             THE COURT:  It will be stricken.

17   BY MR. MOORE:

18   Q.   Now, Mr. Boone asked you a couple questions about a couple

19   of items that went into that account, okay?

20   A.   Uh-huh.

21   Q.   Did you have anything to do with Munish Sood putting money

22   into that account, Mr. Dawkins?

23             MR. BOONE:  Objection.

24             THE COURT:  Sustained.

25   BY MR. MOORE:

1    Q.  And Mr. Boone also asked you a question about a deposit by

2    a man -- or a check by a man he called Ricky Roberts, but who

3    was, in fact, Ricky Robinson.

4              Did you have anything to do with that?

5    A.  No.

6              MR. BOONE:  Objection.

7              THE COURT:  Sustained.

8              MR. BOONE:  Ask that the answer be stricken from the

9    record, your Honor.

10             THE COURT:  It will be stricken.

11   BY MR. MOORE:

12   Q.  Now, with respect to this question about Marcus Foster, are

13   you aware that Marcus Foster played at Creighton and was not

14   drafted and does not play in the NBA?

15   A.  I am.

16   Q.  Marcus Foster, is it fair to say, would not have been a

17   player that you would have been interested in representing,

18   correct?

19             MR. BOONE:  Objection.

20             THE COURT:  Sustained.

21             MR. BOONE:  Ask that the answer be stricken.

22             THE COURT:  It will be stricken.

23   BY MR. MOORE:

24   Q.  Do you know anybody named Marcus Phillips who was in --

25             MR. BOONE:  Objection.

```
1                THE COURT:  Overruled.

2                THE WITNESS:  There was no Marcus Phillips, no.

3                MR. MOORE:  One moment, your Honor.

4           Thank you, your Honor.  No further questions.

5                THE COURT:  Anything further, Mr. Boone?

6                MR. BOONE:  Yes, your Honor.

7    RECROSS EXAMINATION

8    BY MR. BOONE:

9    Q.  You were asked on redirect a question regarding Lamont

10   Evans.  Do you recall that?

11   A.  Excuse me?

12   Q.  You were asked by your attorney when he came up to ask you

13   his redirect questions, he asked you questions about Lamont

14   Evans.

15           Do you recall that?

16   A.  Yes.

17   Q.  Okay.  And you testified about the fact that after the

18   March 3rd meeting in South Carolina, you didn't know what

19   Blazer and Sood were doing with Lamont; is that basically

20   right?

21   A.  Yeah.  I wasn't involved.

22                MR. BOONE:  Okay.  If we could put up Government

23   Exhibit 118.  And this is a transcript from July 13th, 2017.

24   Okay.  So it looks like we're looking at page two, line four.

25   And if we could scroll back just to see who's speaking here.
```

 1  Q.  This is Dawkins speaking.  We'll start with line three.

 2  This is the bottom line:  "I was giving Lamont resources prior

 3  to knowing you guys.

 4          D'Angelo says:  "Yeah."

 5          Dawkins:  "Shit didn't get done.  I've helped Lamont

 6  with numerous things.  And he got a kid right now that I want.

 7  I think that if --"

 8          D'Angelo asks:  Who's the kid?

 9          You respond:  "The kid's name is Jeffrey Carroll in

10  Oklahoma State."

11          D'Angelo says:  "Yep."

12          Dawkins says:  "One hundred percent."

13          D'Angelo says:  "You think you should have him."

14          Dawkins replies:  "Ain't no question."

15          D'Angelo says:  "Yeah."

16          And then Dawkins responds:  "If you're going to give

17  him the money every month, like what are we talking?  What else

18  are we doing it for?"

19          In those portions that we attribute to you, did you

20  make those statements?

21  A.  Yes.

22  Q.  Okay.

23          THE WITNESS:  Judge, may I respond?

24          THE COURT:  No.

25  BY MR. BOONE:

1  Q.  Now, you testified earlier just moments ago about sort of

2  restricted contact rules that are in place by the NCAA

3  regarding when a college coach can do recruiting.

4      Do you recall that?

5  A.  Yes.

6  Q.  And you had testified earlier in your testimony about the

7  fact that there are people whose job it is to deal with

8  compliance and to make sure people are following the rules,

9  particularly the monitoring rules; do you remember that?

10     MR. HANEY:  Objection.

11     THE COURT:  Overruled.

12  Q.  You testified earlier that there are people whose job it is

13  to monitor who's calling who in regards to appropriate contact,

14  correct?

15  A.  Yesterday, you're saying?

16  Q.  Yes.  It wasn't today.  It was yesterday.

17  A.  Yes.

18  Q.  And yesterday you were talking about how your phone number

19  is known to those individuals; is that fair to say?

20     MR. HANEY:  Objection, your Honor.  This was

21  yesterday.

22     THE COURT:  Overruled.

23     THE WITNESS:  Yes.

24  Q.  And you were talking about particularly the phone that you

25  used that you later learned was tapped by the FBI.  That was

1   that phone number that you felt the NCAA compliance people were

2   aware of?

3   A.   Yes.

4   Q.   And so you testified that because you knew compliance

5   people knew that number, you avoided calls with Corey Baker

6   when you were in Vegas in July, and during the month of July,

7   rather.

8              Do you recall saying that?

9              MR. HANEY:   Objection.

10             THE COURT:   Overruled.

11             MR. HANEY:   Your Honor, it's not Corey Baker.   It's

12  Barker.

13             MR. BOONE:   Sorry.   Corey Barker.

14             THE WITNESS:   Yes, it's Corey Barker.

15             I didn't say I never talked to him at all.

16  Q.   My question was:   You testified that you avoided calls with

17  Corey Baker --

18  A.   Barker.

19  Q.   Sorry.   You avoided calls with Corey Barker because your

20  phone number was known; do you recall saying that?

21  A.   I recall saying that in some instances I did not call them

22  on that 99 number, on the other numbers or met with him in

23  person at the tournament.

24  Q.   Would it help if I showed you a transcript?

25  A.   I'm telling you what I remember saying.

 1          MR. BOONE:  Your Honor, may I approach?

 2          THE COURT:  You may approach.

 3   BY MR. BOONE:

 4   Q.  If you could take a look at -- and, again, don't read it

 5   into the record.  It's really just the underlined portion that

 6   starts here?

 7          MR. MOORE:  Your Honor, can we get a page and citation

 8   for that, please?

 9          MR. BOONE:  Yes.  Page 1305, beginning on line 21 and

10   ending on 1306, line 15.

11          THE WITNESS:  This doesn't --

12          MR. BOONE:  I'll ask.

13   Q.  Now, does this refresh your recollection as to whether you

14   testified that you avoided having contact with Corey Barker on

15   that phone number?

16   A.  The transcript doesn't state that.

17   Q.  Does it refresh your recollection?

18   A.  I read the transcript.

19   Q.  The question is:  Does this refresh your recollection or

20   not?

21   A.  I read the transcript.

22   Q.  Is that a no?

23          MR. BOONE:  Your Honor?

24          THE COURT:  Mr. Dawkins, can you answer that question?

25          THE WITNESS:  Can you ask the question again, please?

```
 1            MR. BOONE:  Yes.

 2  BY MR. BOONE:

 3  Q.  Does this transcript refresh your recollection that you

 4  avoided contact with Corey Barker in January?

 5  A.  That's not what it says.

 6            THE COURT:  So, the answer is no.

 7            THE WITNESS:  So, yeah.  No, it doesn't reflect my

 8  recollection if that was my testimony.

 9            MR. BOONE:  Your Honor, pursuant to the text message

10  stipulation we discussed earlier, the government wants to offer

11  Government Exhibit 1625-S.

12            MR. MOORE:  Your Honor, well, first of all, has the

13  government offered this in evidence before?

14            MR. BOONE:  No.

15            MR. MOORE:  Let us take a look at it and see if we

16  have an objection.

17            I don't have any objection.

18            MR. HANEY:  No objection.

19            THE COURT:  The Exhibit will be received.

20            (Government's Exhibit 1625-S received in evidence)

21  BY MR. BOONE:

22  Q.  Is this the report of the text message exchange on your

23  phone between you and Corey Barker?

24            The 99 number, is that your number?

25  A.  That is.
```

1    Q.  And the 401 number, is that Corey Barker's number?

2    A.  I assume, yes.

3         MR. BOONE:  And if we could take a look at page five.

4    And I'm looking -- this is basically the fifth line from the

5    bottom.  If we could highlight from there.

6    Q.  Specifically I'm looking at the text message from Corey

7    Barker on July 21st, 2017 at 9:08 p.m.  It says:  "RJ Hampton

8    is a layup."

9         Do you see that?

10   A.  I do.

11   Q.  Do you know who RJ Hampton is?

12   A.  I do.

13   Q.  Who is he?

14   A.  A good basketball player.

15   Q.  And then the next message, July 21st, 2017, 9:18.  It says:

16        "I haven't heard back from Stacey and those guys."

17   A.  Uh-huh.

18        MR. BOONE:  And if we could now take a look at page

19   seven, same exhibit, and highlight the top half of the page,

20   please.

21   Q.  And so specifically I'm looking at the 7/29/2017 messages

22   from Barker at 2:19 p.m. where he says:  "Send me names of guys

23   you had the last four years."

24        Do you see that?

25   A.  Yes.

1    Q.  And then there's a response from you on 7/29/2017 at

2    3:00 o'clock.  This year, Justin Patton, No. 16.

3           Do you see that?

4    A.  Yes.

5    Q.  There's also mention of Christian, KJ McDaniels?

6           Do you see that?

7    A.  Yes.

8    Q.  Now, I believe you testified earlier that -- so just to

9    reorient you, I want to talk about the $25,000 deposit into

10   Loyd bank account on August 1st, 2017?

11   A.  Uh-huh.

12   Q.  I believe you testified earlier that you didn't know if

13   Merl Code was involved in depositing that check; is that right?

14   A.  Yes.

15   Q.  Okay.  And that check we just said was dated August 1st,

16   2017; is that right?

17   A.  Uh-huh.

18   Q.  And did you text with Merl Code on August 1st, 2017?

19   A.  I'm sure.

20   Q.  Are you also sure that he sent you a text message on that

21   date?

22   A.  If I texted him, I'm sure he texted me back.

23           MR. BOONE:  Your Honor, the government wants to offer

24   the text message exchange from that day between Merl Code and

25   Christian Dawkins.  Exhibit No. 102T-2, not for the jury.

1    THE COURT:  Any objection?

2    MR. MOORE:  No.  No, your Honor.

3    THE COURT:  That exhibit will be received.

4    (Government's Exhibit 102T-2 received in evidence)

5    MR. BOONE:  If it's possible, blow it up to make it

6    easier to see.

7    BY MR. BOONE:

8    Q.  This is the text message exchange between you and Merl

9    Code.  Do you see that?

10   A.  Yes.

11   Q.  It's a little bit hard to see.  But if you look at sort of

12   the second set of boxes where it says:  "Subject, no subject,

13   body forward."  Do you see that box?  And where it says:  "When

14   the money is available?"

15   A.  Yes, I do.

16   Q.  Okay.  And it looks like there are some pictures

17   attachments below that.

18        Do you see that?

19   A.  Yes.

20   Q.  This is a text from Merl Code on August 1st.  If we could

21   go to the next page.  And so this is for the Loyd bank account

22   ending in number 1919.

23        Do you see that?

24   A.  Yes.

25   Q.  And this is a deposit slip of $25,000.  Do you see that?

1    A.   Yes.

2    Q.   And it's dated August 1st, 2017, 2017.  Do you see that?

3    A.   Yes.

4    Q.   No further questions.

5              MR. HANEY:  Briefly, your Honor.

6              THE COURT:  Okay.

7    REDIRECT EXAMINATION

8    BY MR. HANEY:

9    Q.   Mr. Dawkins, you testified that you would avoid having

10   conversation with Corey Barker on a particular cell phone,

11   correct?

12   A.   Correct.

13   Q.   Isn't it true you may have had conversations with him on

14   multiple cell phones?

15             MR. BOONE:  Objection.

16             THE COURT:  Overruled.

17   BY MR. HANEY:

18   Q.   What would be the reason for that?

19             MR. BOONE:  Objection.

20             THE COURT:  Sustained.

21   BY MR. HANEY:

22   Q.   Do you remember every phone call you would have made in

23   2017?

24   A.   I don't remember, no.

25   Q.   Do you remember every single text message you would have

1    made in 2017?

2            MR. BOONE:  Objection.

3            THE COURT:  Overruled.

4            THE WITNESS:  I do not.

5    BY MR. HANEY:

6    Q.  Could you have made phone calls on multiple phones in 2017?

7            MR. BOONE:  Objection.

8            THE COURT:  Overruled.

9            THE WITNESS:  I could have and also could have made

10   multiple calls or texts to the same people on different phones.

11           MR. BOONE:  Your Honor, we ask that this part be

12   stricken.

13           THE COURT:  It will be stricken.

14           MR. HANEY:  Thank you.  Nothing further, your Honor.

15           THE COURT:  Okay.

16           MR. MOORE:  No, sir.

17           THE COURT:  Mr. Dawkins, you may step down.

18           Mr. Haney, anything else?

19           MR. HANEY:  No, your Honor.

20           THE COURT:  Mr. Moore?

21           MR. MOORE:  The defendant, Code, rests.  We will not

22   present any evidence.

23           THE COURT:  Ladies and gentlemen, the defense has now

24   rested, and the evidentiary portion of the trial is over.  I

25   now have some --

```
 1              MR. MARK:  Your Honor, may we have just a moment

 2   before?

 3              THE COURT:  Oh, absolutely.  Yes.  Yes.  Yes.

 4              MR. MARK:  May we just have a five-minute recess?  Is

 5   that possible?

 6              THE COURT:  Okay.  Ladies and gentlemen of the jury,

 7   we're going to take a five-minute recess.

 8              (Jury not present)

 9              MR. BOONE:  Your Honor, we've decided not to go

10   forward with the rebuttal case.

11              THE COURT:  Very well.  Now we've got to wait a couple

12   minutes.  Tomorrow?  No, the schedule is going to be the same

13   tomorrow.

14              MR. SOLOWIEJCZYK:  Okay.  Thank you, your Honor.

15              MR. MOORE:  And so, your Honor, I take it the plan is

16   to try to get in all of the closings tomorrow; is that right?

17   I know that's the plan.

18              THE COURT:  The plan is to go from you 9:30 to 2:30

19   tomorrow.  So, what you guys do with that time is up to you.

20              MR. MOORE:  Okay.

21              THE COURT:  But we'll let the opening summation go as

22   long as it goes, so we won't break if it's not over.  And you

23   may take like a five-minute or ten-minute break after that

24   before the defense summations.

25              MR. MOORE:  And I take it -- I guess we'll see where
```

 1   we are at that time period, and then I'll tell you how long my

 2   summation will take.  Because, what I do not want to do,

 3   frankly, is to have the government's reply on Monday.

 4           THE COURT:  That may very well be the case.

 5           MR. BOONE:  Yes, your Honor.  And I think we said we

 6   were going to get back to you on our preference regarding when

 7   to give the jury instructions.  We're fine with continuing to

 8   give it before summations.

 9           MR. MOORE:  And I'm fine with doing that.  I'm fine

10   with your Honor giving the jury instructions tomorrow and

11   getting through Mr. Solowiejczyk's opening.  I'm fine with

12   that.

13           THE COURT:  Okay.

14           MR. MOORE:  I think it's actually more fair to

15   everyone.

16           THE COURT:  That will be about four hours.

17           MR. MOORE:  Yes, sir.

18           MR. HANEY:  Your Honor, would the Court anticipate my

19   opening being tomorrow as well, or are we suggesting that

20   probably more likely on Monday, just for my preparation sake.

21           THE COURT:  Again, my working guess here is that if

22   Mr. Solowiejczyk's opening is approximately two hours, and the

23   reading of the charge is approximately two hours, maybe

24   something south of that, that's the substantial part of the

25   day.

1            MR. HANEY:  Understood.

2            MR. SOLOWIEJCZYK:  Can we have one moment, your Honor,

3    on the government team to talk about this?

4            THE COURT:  Sure.

5            (Counsel conferred)

6            MR. SOLOWIEJCZYK:  I'm going tomorrow no matter what.

7            (Jury present)

8            THE COURT:  Ladies and gentlemen, I have some bad

9    news.  You may not agree that it's bad news, but we're going to

10   have to let you go early today.  We're done for today.  And the

11   reason for that is what comes next are the summations and my

12   charge to you before you begin to deliberate.  And those

13   presentations necessarily come in chunks, and it's not favored

14   to like start such a presentation and then break.  So I want to

15   respect your wishes not to go past 2:30.  So we'll begin early

16   tomorrow morning with the charge and the beginnings of

17   summations.  We will likely not finish if we're going to go to

18   2:30.

19           So the summations will likely continue until Monday

20   morning.  I would ask again that you not discuss the case, not

21   read anything about the case that you may encounter, that you

22   not read anything about the case in the media.  Please try to

23   be prompt tomorrow morning, and we'll get started bright and

24   early at 9:30.  And we'll go as far as we can.

25           Have a wonderful evening.

```
 1                    (Jury not present)

 2              THE COURT:  So unless there's anything else, I guess

 3     we can begin with Mr. --

 4              MR. HANEY:  I want to make some clarity.

 5              Doing my math, if they're going to take two hours, and

 6     the charge will perhaps take two hours, I would believe it

 7     would be unlikely that I'm going to close tomorrow.  I would

 8     seek the Court's direction on that.  I would prefer if possible

 9     to go on Monday to have the closings of the defense on Monday.

10              THE COURT:  As a practical matter, I'm sure that's the

11     way it's going to work out, that you won't be closing tomorrow.

12              MR. HANEY:  Thank you, your Honor.

13              MR. MOORE:  I mean, what we don't want is not to be

14     completely prepared, and then your Honor stands up and says, we

15     got another hour or another 45 minutes.

16              THE COURT:  Oh, no, no.  Right.

17              MR. MOORE:  So, your Honor's not going to do that to

18     us?

19              THE COURT:  I'm not going to do that to you.

20              MR. MOORE:  Thank you.  We'll do the summation and the

21     government opening, and then when we're done, we're done.

22              THE COURT:  Right.

23              MR. MOORE:  Thank you, Judge.

24              MR. HANEY:  Thank you, your Honor.

25              THE COURT:  Okay.  We'll see you tomorrow.
```

```
 1              Before you leave, we'll get you a hard copy of the

 2    instructions.

 3              MR. MOORE:  Your Honor, do you want to deal with this

 4    issue?  When do you want to deal with it?  I don't care.

 5              THE COURT:  We can do it now if you guys want to do it

 6    now.

 7              Okay.  So does the government have a view?

 8              MR. MARK:  I know this was defense's motion.  I'm not

 9    sure how this meets the requirements to seal and overcome

10    presumption of public access, but obviously the defense, it's

11    their motion.

12              THE COURT:  Okay.  Mr. Moore.

13              MR. MOORE:  Yes, sir, your Honor.

14              There are a number of things that have been sealed in

15    this case, that have been subject to protective orders and the

16    like, including transcripts, some partial and some not.  There

17    is other information that the government has sought to seal

18    that dealt with the undercover, Mr. Carpenter, and some

19    information that they did not believe was appropriately out in

20    the public domain.  And we obviously have not taken a

21    contraposition or asked the Court to unseal that information.

22    The information here -- well, I think it is very innocuous.  It

23    deals with discussions and deliberations amongst our defense

24    team.  And we were simply advising your Honor of that to deal

25    with this 3500 issue.
```

                    And so, therefore, I don't see how that is a matter of

public record.  Not public record, of public interest.  And to

the extent that those discussions could arguably be privileged,

I think that it's just like presenting information that's

arguably privileged to your Honor in chambers.  I have no

problem with the government being present, but I don't think

that's appropriate for public disclosure.

                    I don't think it's a big deal quite frankly, given

what I recall of it.

                    THE COURT:  Right.

                    MR. MOORE:  But I do believe it's appropriately

sealed, given the nature of it and given the fact that perhaps

what I could have done was simply ask your Honor to take that

information in chambers without the government involved.  I

just didn't think that was the appropriate way to treat the

other party, because I'm a big believer that you don't exclude

the other party from discussions.

                    THE COURT:  Mr. Mark, anything you want to add?

                    MR. MARK:  No, your Honor.

                    THE COURT:  I'm going to unseal it.  I think that the

information, while we may argue about whether or not it's in

the public interest, the actual presumption is that court

documents should be made available to the public, absent some

important reason.

                    And, you know, the substance of what was discussed at

1    sidebar is not something that -- does not rise to the level of

2    something that I believe should be kept under seal.  It's a

3    simple issue of an individual deciding who should and then

4    should not be representing them -- or will or will not be

5    representing them.  So that portion of the transcript will be

6    unsealed.

7          Anything else?

8          MR. MOORE:  No, sir, your Honor.

9          MR. HANEY:  Thank you, your Honor.

10         THE COURT:  Have a good night.

11         MR. HANEY:  Have a good night, sir.

12         MR. MARK:  You too.

13         (Adjourned to May 3, 2019, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1594-A

INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Moore . . . . . . . . . . . . .1414
Cross By Mr. Boone . . . . . . . . . . . . .1442
Redirect By Mr. Haney . . . . . . . . . . .1540
Recross By Mr. Moore . . . . . . . . . . . .1574
Recross By Mr. Boone . . . . . . . . . . . .1578
Redirect By Mr. Haney . . . . . . . . . . .1587

GOVERNMENT EXHIBITS

Exhibit No.                               Received

1625-S    . . . . . . . . . . . . . . . . .1583

 102T-2    . . . . . . . . . . . . . . . . .1586

DEFENDANT EXHIBITS

Exhibit No.                               Received

3    . . . . . . . . . . . . . . . . . . . .1417