## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
UNITED STATES OF AMERICA                      :
                                              :        Case No.   17-cr-00684-ER
v.                                            :
                                              :
                                              :
CHRISTIAN DAWKINS and                         :
MERL CODE                                     :
                                              :
                                              :
        Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## SENTENCING MEMORANDUM

## ON BEHALF OF CHRISTIAN DAWKINS

**HANEY LAW GROUP, PLLC**
Steven A. Haney, Sr.
3000 Towncenter Dr., Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………………… iii

INTRODUCTION ……………………………………………………………………… 1

BACKGROUND ………………………………………………………………………. 3

APPLICABLE LAW ………………………………………………………………... 12

THE APPROPRIATE SENTENCE …………………………………………………. 16

I. Consideration of the Section 3553(a) Factors Merits a Lenient Sentence ……………... 16

A. Christian Dawkins' History and Character ……………………………………………. 17

B. The Nature and Circumstances of the Offense ………………………………………... 20

C. A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities

    with Comparable Cases …………………………………………………………….. 21

D. A Non-Custodial Sentence is Sufficient to Deter Others ……………………………... 24

II. The Sentencing Guidelines Merit a Lenient Sentence …………………………………. 25

III. PSR's Assertion this Case is Not Relevant Conduct For Purposes Of § 1B1.3,

    § 5G13 Concurrent Sentencing Is Incorrect …………………………………………... 27

CONCLUSION …………………………………………………………………………. 31

# TABLE OF AUTHORITIES

## Cases

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ……………………………………………….. 12

*Blakely v. Washington,* 124 S. Ct. 2531 (2004) ……………………………………………… 12

*Gall v. United States*, 552 U.S. 38, 49 (2007) ……………………………………………… 13

*Rita v. United States*, 551 U.S. 338 (2007) …………………………………………………  13

*Setser v. United States*, 132 S. Ct. 1463, 1468 (2012) ……………………………………… 29

*United States v. Booker*, 125 S. Ct. 738 (2005) ………………………………………….. 1; 13; 15

*United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) …………………………… 16

*United States v. Fuentes, 107 F.3d 1515, 1524* (11th Cir. 1997) …………………………… 29

*United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1998)  …………………………… 16

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ……………………….. 14

*United States v. Gray*, 96 F.3d 769, 772 (5th Cir. 1996) …………………………………… 22

*United States v. Hampton*, 441 F.3d 284, 289 (4th Cir. 2006)  …………………………….. 15

*United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005) ……………………….. 15

*United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) …………………………… 15

*United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir.1994) …………………………… 30

*United States v. Quinteri*, 306 F.3d 1217, 1230 (2d Cir. 2002)  ………………………….. 16

*United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005) ………………….. 15

*United States v. Scroggins*, 880 F.2d 1204, 1209 n. 12 (11th Cir.1989) ………………….. 30

*United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ………………………………… 24

*United States v. Walters* 997 F.2d 1219, 1221 (7th Cir. 1993) …………………………… 22

*United States v. Young*, No. 03-20400B, 2005 WL 3879034 (W.D. Tenn. Nov. 7, 2005) ……….. 23

## Other Authorities

Sentencing Reform Act of 1984 ……………………………………………………………. 12

## Rules

18 U.S.C. § 3553(a); 18 U.S.C § 3553(a)(2); 18 U.S.C. § 3553(a)(4) …. 1; 13; 14; 15; 16; 19; 21; 22; 24

18 U.S.C. § 3553(b)(1); 18 U.S.C. § 3742(e) ………………………… 12

18 U.S.C. § 3582; 18 U.S.C. § 3661 …………………………………….. 14

U.S.S.G. § 4A1.2(a)(1) ……………………………………………….. 27

U.S.S.G. § 5Hl ……………………………………………………….. 15

18 U.S.C. § 5G1.3; 1B1.3 ………………………………………… 27; 28; 30

Defendant Christian Dawkins ("Christian") respectfully submits this memorandum in advance of his October 3rd, 2019 sentencing, to provide information and aid the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## INTRODUCTION

From the three week trial in this matter, the Court is no doubt familiar with the nature and circumstances of the offenses for which Mr. Dawkins will be sentenced. However, as discussed below, Mr. Dawkins respectfully requests that this Court impose a probationary sentence because any sentence within the advisory Guidelines range would be a sentence greater than necessary to achieve the statutory purposes of sentencing.

Christian Dawkins has been living with the difficult consequences of the very public investigation and arrest since September of 2017, when before the entire nation he was implicated as a key figure in one of the largest corruption scandals in college basketball history. We submit to this Honorable Court he is deserving of both the Court's mercy and leniency. As a result of his conviction, Christian's budding, and once promising career, in the Sports Management business is decidedly over.

As noted in the Presentence Investigation Report, Christian was raised in a very loving, principled home with the value of discipline, morality and ethics instilled by both his mother and father. The consequence of his own selfish actions has left his reputation in tatters and even impacted his direct family, including his father, who was recently fired as an NCAA Division I basketball coach at Cleveland State University. Certainly the scrutiny and infamy of being

1

associated with the facts of this rather unprecedented case played a role in that termination. Even a cursory Google search of Christian's name generates hundreds of hits with the labels, "hustler", "con man" and references to how he "ruined college basketball."

The national publicity derived from this case has resulted in Christian's reputation being destroyed and has left him perilously in debt. As evidenced by his Presentence Investigation Report, Christian's most recent venture with Atlantic Records has provided him with some hope of a viable financial future, but such is predicated on his ability to continue fulfilling his contractual obligations under the Chosen Records/Atlantic Records venture, **which will not be possible if incarcerated**. ("PSR") ¶ 142.

In short, the consequences of this case have rendered Christian Dawkins, as well as his family, relative pariahs in the sports world and for certain has ruined his father's professional opportunity of once again securing employment as a college basketball coach. The words of Honorable Lewis Kaplan, at the prior Sentencing in U.S. v. Gatto ring true, "they have suffered enough."

A non-custodial sentence would not differ markedly from a properly calculated Guidelines range. The range of 37-46 months has been calculated by the Probation Department based on a total offense level of 20 and a criminal history category of 2 "PSR" pg. 31. As noted, we disagree with that guideline calculation, finding such to be more appropriately calculated to be the range of 27-33 months. Nonetheless, regardless of the calculated guideline range, a non-Guidelines sentence of supervised release, with special conditions of home confinement and community service, fully accords with Christian Dawkins' individual characteristics and circumstances, the offense at issue, and the sentencing goals that govern the Court's sentencing

decision.   Further, such a sentence would allow Chrsitian to continue his new career with Atlantic Records, which a lengthy period of incarceration would certainly summarily end, along with much hope of putting this matter behind him and finding a meaningful and purposeful existence.

No term of imprisonment is necessary to deter Christian from committing crimes similar to those charged in this case, nor is a term of imprisonment necessary to achieve a just punishment for his actions, which he resides with daily.

In a case such as this, a probationary sentence would not be a substantial deviation from the year and a day Guidelines recommendation by Pretrial Services. However, notwithstanding this recommendation, a probationary sentence fully accords with Christian's individual characteristics and circumstances, the offense at issue, and the goals of sentencing that govern the Court's sentencing decision.

## BACKGROUND

Christian Dawkins, now 26 years old, was born in Muskogee, Oklahoma and moved to Saginaw, Michigan when he was three years old.  ("PSR") ¶ 120.  From the age of three, he resided in Saginaw, Michigan with his mother, Latrisha Dawkins, his father, Lou Dawkins and his two siblings, Dorian Dawkins, who passed away in 2009 at the age of 14 from a heart attack, and little sister Hailee Dawkins, age 20, who is currently a college student at Spellman College in Atlanta, Georgia. ("PSR") ¶ 121.  The Dawkins family was a legacy family in the rough town of Saginaw, and despite the prevalence of crime, was largely immune from the violence of the city, as Christian's father was a well respected high school basketball player and varsity coach, and his mother, an assistant middle school principal("PSR") ¶ 122.

During his childhood years in Saginaw, Christian was raised in a very diverse setting and spent time in specialized academic programs ("PSR) ¶ 122. Christian's mother characterized his personality as a youth as "introverted", but had no diagnosed behavioral, or mental health concerns. ("PSR) ¶ 127.

After he graduated from Saginaw High School, Christian spent one year at Saint Mark's Boarding School in Southborough, Massachusetts, to play basketball at a post-graduate preparatory school. ("PSR) ¶ 134.   In 2009, he left Saint Mark's when his brother, Dorian, tragically passed away at the age of 14 while playing basketball.  Immediately after the tragedy, Christian had a difficult time with his brother's passing, but turned the loss into a positive movement by the creation of a non-profit organization dedicated to raising money for the American Heart Association.  ("PSR) ¶ 127.

In 2010, upon Christian's return to Saginaw, Michigan, his non-profit foundation, LOYD, Inc. (Living Out Your Dreams) began a mentorship program for at risk youths in the community of Saginaw, as well as the neighboring inner city community of Flint.  At that same time, Christian founded a grassroots travel basketball team named Dorian's Pride, in honor of his late brother ("PSR) ¶ 127.  The travel program, offering opportunities to youth age 12-17, played in tournaments throughout the nation called Show Your Heart, which raised money for the American Heart Association. ("PSR) ¶ 107/141.   Concurrent to this time, Christian attended College in University Center, Michigan, for about one year.  His enrollment lasted from August 31st, 2010 through April 6th, 2011, which was interrupted when his father received a new coaching position at Northern Illinois University, prompting the entire family, including Christian's, relocation.

4

When the Dawkins family relocated to Illinois, Christian continued his studies at Kishwaukee College in Malta, Illinois, where he was enrolled from August 22nd, 2011 to December 20th, 2013. While attending Kishwaukee College, he had a 2.05 GPA and earning 43 college credit hours. ("PSR") ¶ 136. His relatively poor academic performance was reflective of his boredom with the monotony of school and his decision to drop out and be "done with college" and move to Atlanta, Georgia to pursue his dream of becoming a sports agent ("PSR") ¶ 136.

In 2014, at the young age of only 21, Christian Dawkins was hired as a Managing Director for International Management Advisors (IMA) based in Cleveland, Ohio. This was his first foray into the world of professional sports management, where he was responsible for managing and coordinating the day-to-day activities of the firm's NBA players. Despite having no formal college education, Christian earned an annual salary of $60,000 ("PSR") ¶ 140. In 2016, he left IMA to seek a more lucrative position with NBA super agent Andy Miller and his agency, ASM. ("PSR") ¶ 140. It was here at ASM, where he was mentored and taught the very behavior which resulted in the charged conduct before this Court.

As noted during the course of much of the proofs at trial, Christian's time at ASM was replete with short cuts, dishonesty and rule breaking. Certainly the fact he was trained, mentored and often instructed to break the rules, the sort of which ultimately gave rise to the conduct charged, is no excuse for the poor decision making he exhibited for which he now understands cost him the ultimate price of his professional career and very possibly his liberty. Only the Government can answer the question why an underling at ASM like Christian Dawkins was charged, while the direct benefactors, including his boss Andy Miller, were not.

5

As the Court well knows, the charges against Christian Dawkins arose from his actions during the course and scope of his ASM employment as a "recruiter/runner" for the basketball agency with an emphasis on future NBA players.  **As not to recite the entire 3-week trial, the below submission is a factual summary, largely supported and incorporated by reference by and through the Probation Presentence Investigative Report and findings.**

In the Spring of 2015, in his efforts of developing future business, Christian was introduced by Rashan Michel, at the time an owner of a bespoke clothing company with a client base consisting of primarily professional athletes,  to an unscrupulous Pittsburgh based financial planner, named Louis Martin Blazer III.  Blazer, unbeknownst to Christian, had substantial federal criminal issues stemming from numerous allegations of criminal wrongdoing including Securities Fraud ("PSR") ¶ 47.  Blazer at all times relevant was a Government cooperating witness whose rather clear "exit strategy" was to implicate Christian, and as many people as he possibly could, in what the Government characterized as a wide-spread coaches bribery scheme, allegedly spearheaded by the 22 year old Dawkins.

In December of 2015, Christian Dawkins and Blazer spoke on a recorded call discussing a situation where Dawkins informed Blazer he had talked to an assistant basketball coach at the University of South Carolina (co-defendant Lamont Evans) and that "money would be coming."("PSR") ¶ 48.  At trial it was established that Christian was providing money from his employer ASM to Coach Lamont Evans for the purpose of providing money to a student athlete at the University of South Carolina named P.J. Dozier.  Dozier was a recruiting target of the ASM sports agency of which Christian was assigned and directed to assist financially while on campus.  At trial, Christian Dawkins testified he had paid Lamont Evans approximately $2,500

6

and introduced Blazer to Coach Evans for the purpose of Blazer taking over the financial obligation of paying Coach Evans, so that Coach Evans could then steer players at the University of South Carolina, including Dozier, to Blazer's financial management company named Blazer Capital.

On March 3rd, 2016, Christian Dawkins met with Blazer, Coach Evans and Christian's business partner Munish Sood at a restaurant near the University of South Carolina campus, where the group discussed future payments being made to Coach Evans, by Sood and Blazer, both financial management professionals, in exchange for Coach Evans referring student athletes to sign financial planning agreements with the Blazer and Sood. ("PSR") ¶ 50. It is the position of the Government that Defendant Coach Lamont Evans received a total of $22,000 in "bribe" payments from Christian Dawkins, Marty Blazer and/or Munish Sood ("PSR") ¶ 59. However, it is also undeniable that outside the $2,500 Chrisitan Dawkins acknowledged paying Coach Evans, the balance of those payments were made either by Blazer, or Sood, for a future benefit of their financial planning company, entirely unrelated to Christian Dawkins.

In May of 2017 Christian was introduced, by Government operative Marty Blazer, to a pair of purported investors of Christian's fledgling sports agency LOYD, Mgmt. As the Court's aware, despite neither testifying, these two purported investors were actually undercover FBI agents, by code names of "Jeff D'Angelo" and "Jill Bailey" ("PSR") ¶ 63.

Even the most zealous opponent of Chrisitan Dawkins would agree LOYD, Mgmt. was nothing other than a poorly thought through under-funded concept that but for the FBI's undercover "investment funds", would have never become operational. In fact, at the time of the infamous "yacht meeting", where LOYD, Mgmt. was consummated and funded, the "sports

7

agency" lacked any structure, or even a licensed NBA player agent capable of achieving the companies representation goals.     In fact, the "Shareholder's Agreement", drafted by the Government, falsely represented that Christian would be the majority shareholder of Loyd Mgmt., yet it was established at trial Christian had no control over either the funding of the company, or ability to access the money that was partially funded by "Jeff D'Angelo."  Pursuant to this business arrangement with the undercover FBI agents, as well as Government operative Marty Blazer, Sood and "D'Angelo" agreed to provide Christian with $200,000 in funding on an annual basis, to be paid quarterly, in exchange for receiving an equity share of Christian's fledgling sports management company.  ("PSR") ¶ 65.

During the May 2017 "yacht meeting", the group, which included faux investor/undercover FBI agent "Jill Bailey", discussed over expensive scotch, Christian Dawkins' ability to leverage his ASM network, as well as his personal relationships, with athletes, their parents and college coaches. ("PSR") ¶ 63.  Included in these conversations were recruiting targets that were central to the prosecution in the companion case U.S. v. Gatto, et. al.

From May of 2017, through September of 2017, Christian Dawkins, faux investors "Jeff D'Angelo", "Jill Bailey" and Munish Sood, participated in numerous meetings and phone calls, many recorded, where the group discussed payments to be made to college coaches in exchange for future referrals of student athletes at numerous NCAA Division I-A institutions to the fledgling Loyd Mgmt. sports agency.  As noted by the PSR, these institutions included; University of Southern California, University of Arizona, Oklahoma State University, Creighton University, Texas Christian University, as well as Louisville, Kansas and North Carolina State,

8

which at all times relevant were related and associated with the efforts of the Loyd Mgmt. "investment team."

Shortly after consummating their fictitious partnership, on the date of June 28th 2016, Christian Dawkins and undercover FBI agent/investor "Jeff D'Angelo" had a spirited phone call where in substance and part, Christian informed "D'Angelo" that his "Coach's Model" did not make sense and paying college basketball coaches bribes, was a "waste of fucking money" **(DX 3 and DX3TB).** This call, played at trial, was lengthy and included "D'Angelo" informing Christian he could either go along with the coach's bribe scheme, or he would stop funding Loyd Mgmt. Pre-trial defense Motions advocating for an entrapment jury instruction were denied.

Within hours of the June 28th, 2016 call to "D'Angelo", Christian Dawkins called co-Defendant Merl Code to vent his displeasure of "D'Angelo's" desire to pay bribes to college coaches, and while captured on a judicially authorized wire-tapped phone call, Christian informed Merl Code he felt "Jeff D'Angelo's" model of paying coaches did not make sense and he, being Christian, "ain't gonna pay no coaches" **(DX 109 and DX 109T)**. During this call, Christian informed Merl Code he in fact was going to do something quite different, which drew the response from Merl Code "so you are just gonna take these fool's money." **(DX 109 and DX 109T)**.

In response to Merl Code's assumption, Christian affirmed such emphasizing he was in fact going to **"take these fools money"** i.e. alleged bribe funds, and keep the money himself because he had "tried to tell him (D'Angelo) multiple fucking times, this is not the way to go, this is not the way to do it, but fuck it, if he won't listen, **I will just take his money."** **(DX 109 and DX 109T)**.

9

After that June 28th, 2016 recorded wiretap phone call, where Christian Dawkins told Merl Code he was going to take the funds provided to him by the undercover FBI agents, and keep the money for himself, evidence at trial submits that it exactly what Christian Dawkins did. **(GX 1401C, GX 1401 E, GX 1401 G).**   Though this was, and continues to be an embarrassing point of contention for the Government, the bank deposits presented at trial, along with the dates of the ATM cash deposits in Los Angeles and Las Vegas, time stamped within hours of receiving the FBI funds, more than supports the fact Christian Dawkins made good on his promise to "take these fools money."

The purpose of this Sentencing Memorandum is not to relitigate the facts and issues of the case, however, it should be emphasized the Defendants in this case were acquitted on 7 of the 10 counts before the Jury, including Christian Dawkins being acquitted on all counts of wire fraud,  so clearly some defense evidence resonated with the jury as represented by their verdict.

At trial, the Government contended that the University of South Carolina, Oklahoma State University, University of Arizona and the University of Southern California were the victims of Christian Dawkins deprivation of their employees honest services.  The jury did not agree and found Christian Dawkins not guilty on all charges associated with this misguided theory.

It is of comical note that the University of Southern California, actually produced their Vice President of Professionalism and Ethics Michael Blanton, for the purpose of offering testimony as to how alleged bribes paid from Christian Dawkins to assistant coach Athony Bland discredited the reputation of the storied USC Trojans athletic program.  Mr. Blanton testified that a $7,000 cash payment to Anthony Bland, allegedly for the purpose to unduly influence the

10

decisions of student athletes, sullied the image and reputation of USC athletics.  In a letter dated May 23rd, 2019, the University of Southern California provided a victim impact statement which stated "the actions of Mr. Bland and his co-conspirators have significantly damaged the reputation of USC as an institution, the USC athletic department, and its men's basketball program."

However, on the date of March 24th, 2018, a year and a half AFTER this quid pro quo bribery case was charged, the University of Southern California replaced **"disgraced"** assistant basketball coach Tony Bland, with Eric Mobley, an AAU coach with the Compton Magic, who in his "coaching career" had not a single day of  prior college coaching experience, but coincidentally  happened to be the AAU coach and father of two of the top high school basketball players in the country.  Of no surprise to anyone, after hiring new assistant coach Eric Mobley to a six figure contract, his  6'10" McDonald's All American son Isaiah Mobley signed a National Letter of Intent to play college basketball at the University of Southern California, with his other 6'10" son, Evan, currently ranked as the #1 High School player in America.  History will forever bear the burden of explaining the hypocrisy of the quid pro quo of college athletics and how certain conduct is ratified by the Universities and other criminalized.  In short, based on the Mobley hiring decision, the only disgrace is not Tony Bland, but instead the very athletic department whining foul.   USC's facially obvious quid pro quo and "above the table" payment to the Mobley family is manifested ten fold in other ways, including shoe companies openly paying hundreds of thousands of dollars in "AAU sponsorship contracts" to mothers and fathers of top high school basketball players, facts known to all, including the Government, but oddly deemed distinguishable from the charged conduct here.

11

Ultimately, no monetary fines, or other penalties, have been imposed by the NCAA upon any of the school's associated with this case, nor have there been any announced sanctions related to the charged conduct.  It is unclear why at this junction, the Government would surmise any fines, or penalties, would ever be assessed to institutions at issue, emphasizing the jury found Christian Dawkins not guilty of defrauding these same schools of the honest services of its coaches.

Christian Dawkins has no criminal history and has never been arrested, charged, prosecuted or convicted of any criminal matter, including misdemeanors, or juvenile adjudications unrelated to this FBI sting operation.    Therefore, for the reasons set forth herein, Mr. Dawkins respectfully requests that the Court impose a probationary sentence, or an alternative non-custodial sentence, which would not be a substantial deviation from the year and a day sentence recommended by the probation department.

## APPLICABLE LAW

It is duly noted the applicable law provided herein is consistent with the Sentencing Submission of the co-Defendant in this case.

In 2005, the Supreme Court ruled that its Sixth Amendment holdings in *Blakely v. Washington,* 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) apply to the Federal Sentencing Guidelines.  *Booker*, 125 S. Ct. at 756. Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 ("Sentencing Reform Act") that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(e), incompatible with its Sixth Amendment

holding. *Id*. Accordingly, the Court severed and excised those provisions, making the Guidelines effectively advisory. *Id.* at 757.

The Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4) (Supp. 2004), but also permits the court to tailor the sentence in light of other statutory concerns. *See* 18 U.S.C. § 3553(a); *see also Booker*, 125 S. Ct. at 757.

District courts are required to properly calculate and consider the Guidelines when sentencing, even though the Guidelines are advisory in nature. *Rita v. United States*, 551 U.S. 338 (2007) (stating that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range); *see also Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). The Court, in determining the appropriate sentence in a particular case, therefore, must consider the properly calculated Guideline range, the grounds for departure provided in the policy statements, and then the factors under 18 U.S.C. § 3553(a). *Rita*, 551 U.S. at 351.

Under *Booker*, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

13

18 U.S.C. § 3553(a)(2).  In addition, when determining a minimally sufficient sentence, Section

3553(a) further directs sentencing courts to consider the following factors:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> . . .
>
> (3)    the kinds of sentences available;
>
> . . .
>
> (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)    the need to provide restitution to any victims of the offense.

Other statutory sections also give the district court direction in sentencing.  Under 18

U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in

determining whether and to what extent imprisonment is appropriate based on the Section

3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means

of promoting correction and rehabilitation.

Under 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the

background, character, and conduct of the defendant, which a court may receive and consider for

the purpose of imposing an appropriate sentence. *See also United States v. Gupta*, 904 F. Supp.

2d 349, 350 (S.D.N.Y. 2012) (explaining that although a sentencing court is required to

"correctly calculat[e] the applicable Guidelines range," that calculation falls "second" to "the

bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a

defendant's character in imposing sentence."). This statutory language certainly overrides the

(now-advisory) policy statements in Part H of the Sentencing Guidelines, which list as not

ordinarily relevant to sentencing, a variety of factors such as the defendant's age, educational and

14

vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. § 5Hl.

The directives of *Booker* and Section 3553(a) make clear that courts should no longer uncritically apply the Guidelines. Such an approach would be inconsistent with the holdings of the merits majority in *Booker*, which rejected mandatory Guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, which directed courts to consider all of the Section 3353(a) factors, many of which the Guidelines either reject or ignore. *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005). As another district court judge has correctly observed, any approach which automatically gives heavy weight to the Guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005); *see also United States v. Hampton*, 441 F.3d 284, 289 (4th Cir. 2006) ("[I]n fashioning a reasonable sentence, district courts must properly calculate the advisory guideline range and then must determine what sentence—one within the advisory range or outside of it—most effectively meets the factors set forth § 3553(a).").

Moreover, a sentencing court should consider a defendant's family circumstances in fashioning an appropriate sentence. Indeed, the Second Circuit has upheld downward departures where the defendants' family circumstances warranted the departure. *See United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) (upholding a downward departure where a mother was the sole caretaker of her children and stating, "[t]he rationale for [the] downward departure . . . [was not that Johnson's family circumstances decrease[d] her culpability, but that [the court was] reluctant to wreak extraordinary destruction on [her] dependents who rel[ied] solely on the

defendant for their upbringing"); *see also United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1998) (upholding a downward departure where the defendant, whose wife spoke little English and had a limited earning capacity, played a primary role in the education, upbringing and support of two young children); *United States v. Quinteri*, 306 F.3d 1217, 1230 (2d Cir. 2002) ("we do not doubt" that a defendant could seek a downward departure based on extraordinary family circumstances if she was the sole caregiver to young children).

In sum, in every case, a sentencing court should not merely consider the Guidelines. Rather, the court should consider all of the Section 3553(a) factors, including any extraordinary family circumstances, in determining a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing. And, where the Guidelines conflict with other sentencing factors set forth in Section 3553(a), these statutory sentencing factors should generally take precedence over the Guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires that a sentence be no greater than necessary to meet the four purposes of sentencing set forth in subsection 3553(a)(2), the imposition of a sentence greater than necessary to meet those purposes violates the statute and is reversible, even if within Guideline range).

## THE APPROPRIATE SENTENCE

### I.    Consideration of the 18 U.S.C. § 3553(a) Factors Merits a Lenient Sentence.

In light of the foregoing, and based on the following analysis of the applicable Section 3553(a) factors, Christian Dawkins respectfully submits that a probationary sentence is sufficient to comply with the statutory purposes of sentencing.

16

### A. Christian Dawkins History And Character

Christian Dawkins is a loving son, big brother to his sister Hailee, who is currently a college student at Spellman College in Atlanta, Georgia, and a surrogate father to his little brother Elijah Dawkins. In addition, Christian has tremendous support of family and friends, many who have written Your Honor to emphasize the value and benefit Christian has to his family, friends and to society. (*See Ex. A*, **(Letters to Judge Ramos)**. Though the Dawkins family is a basketball legacy family, the individuals who submitted letters on behalf of Christian are not famous basketball players, but instead a diverse cross section of individuals who have known Christian from his infancy to the present, and are able to speak not just to his character, but to the type of young man his mother and father raised.

One constant theme in the overwhelming supportive letters received on Christian's behalf is the mention of the tragic death of his little brother Dorian Styles Dawkins and the impact his passing had on Christian. When Dorian Dawkins died so suddenly, at the age of 14 in a summer league basketball game, his passing made national news and rocked the entire state of Michigan. There is little question much of Christian's shortcuts to success, which led to the poor decisions exemplified in this case, were due to his quest to "be somebody" in the basketball world and fill the void left by his brother Dorian. For Christian, becoming a prominent basketball agent was the way he could keep his little brother's memory alive, and make his family proud of his success. This misguided thinking, created a perfect storm when combined with the corrupt working environment exhibited during his employment at ASM Sports.

When Christian began working at ASM, he was only 21 years old, with no formal education outside of a high school diploma. While employed at ASM, being mentored under the

immediate direction of Superagent Andy Miller, Christian was literally trained, and in fact directed, to break the NCAA rules.  To his understanding, paying parents and college coaches was not only "normal", but customary, and the way business was conducted in both the industry and at his place of employment.  Though the conduct was undoubtedly dishonest and wrong, very curiously no other employees at ASM were ever charged in this case, including the owner of the agency, Andy Miller.  Notably since this case was charged, Andy Miller has been decertified and banned from the NBA.  We would respectfully ask the court give consideration to the youth of Christian Dawkins at the time of his actions, with the very reasonable understanding that very likely this level of influence would have been far less with more maturity and life experience, undoubtedly lacking a 21 year old in a business of very persuasive, older subordinates.

Unique to Christian Dawkins' circumstances in this case was one distinguishable factor shared by no other co-defendants; his age.  At the time of the events giving rise to the charges, Christian was nearly half the age of his co-Defendants.  Certainly at the age of 22 or 23, one makes decisions not expected to be made at age 45.

In fact, this very district provides a diversion program for such youthful non-violent offenders called the Young Adult Opportunity Program.  Despite satisfying all program qualifiers to the program, of which Christian applied, the Government  objected to Christian's enrollment, arguing that in their opinion he was not a viable candidate.  Despite evidencing no criminal history, being under the age of 25 and being charged with non-violent felonies, the Government in their vitriol of Christian Dawkins, could not  offer one single reason, other than their contempt

at his non-cooperation, for his disqualification into the SDNY Young Adult Opportunity Program (YAOP).

Further, not excusing the decisions ultimately made, it would be remiss not to consider, under 3553(a), the age difference and manipulation engaged by a cooperating witness, who feigned victim status and blamed everyone other than himself for his miserable existence.

As noted, Christian will never again work in basketball business in any capacity. After he was indicted, his name was synonymous with the infamy of the case and he was vilified, perhaps rightfully so, by the mainstream media. Simply put, if Chrisitan is incarcerated, his new opportunity, and contractual agreement with Atlantic Records, will be short lived. Any alternative to a custodial sentence provided by the Court will literally save a young life who has unthinkably, with a felony conviction, found a way to make strides towards normalcy and success.

When interviewed by the probation department, it was noted that Christian Dawkins did not appear to be "at the top of the decision-making tree for this larger scheme." ("PSR) ¶ pg. 29. It was further acknowledged that this and many similar schemes were found, and known to continue, at multiple other schools, so consideration should be made as to Christian's overall culpability. This combined with consideration of Christian's youth, his loving and supportive family and seemingly bright future ahead, resulted in the probation department's application of 18 U.S.C. § 3553(a) factors in concluding year and one day sentence would be sufficient and not greater than necessary, to comply with the factors to be considered in imposing a sentence outlined in  18 U.S.C. § 3553(a). We submit this reasoning to be consistent with the above and

19

ask the Court adopt such reasoning for the departure from the sentencing guidelines and exercise its discretion in ordering a non-custodial sentence.

### B.  The Nature And Circumstances Of The Offense.

Here, the conduct for which Christian Dawkins was convicted, falls far outside the norm of bribery cases that typify the offense. Undeniably, Christian had great aspirations for the Loyd Mgmt. sports agency, and undeniably, by his own admission, he was ready, willing and able to break NCAA rules to advance his business interests.  Certainly factual questions exist whether or not Christian Dawkins took the money from the FBI with the intention of paying bribes to college basketball coaches, or whether or not he believed the "bribe funds" would be better put to use by paying financially destitute student athletes, and their families.  Really, either way, the conduct at issue was against the rules, and despite Chrisitan's quest to right the social wrongs of the NCAA's current model of indentured servitude, he embarked upon a misguided personal crusade.

In Chrisitian's mind he was helping the financially destitute student athletes and their families and in turn one day hoped they would return the favor and hire him to be their Manager. A simple proposition and decades long standard operating procedure for sports agents.  However, unquestionably such conduct was immature, lacking in reality and representative of the type of decisions one may make at 23 years old, which one would not make at 45 years old.

Though the jury found Christian Dawkins guilty on Counts 1-2 (Bribery and Conspiracy), they found him not guilty on all the remaining counts of the derivative Wire Fraud.  The Government argued Christian's actions harmed the Universities and deprived them of their employees honest services, and the jury disagreed.  However, it is with great emphasis that the

foregoing does not justify Christian Dawkins' actions. Clearly, at the time of the events giving rise to the charges, Christian had an understanding what he was doing was in violation of the NCAA rules, and conduct he knew he should not have been engaging. Therefore, he accepts the consequences of his actions and offers no excuse for conduct he realizes in hindsight was not only wrong, but a perilous attempt of taking a misguided shortcut to success.

Given the unique nature and circumstances of this alleged offense, a "sentence other than imprisonment is generally appropriate", and we would ask the Your Honor recognize this benchmark and depart from the year and a day recommendation and impose a non-custodial period of supervision.

### C. A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.

One of the factors to be considered under Section 3553(a) is the need to avoid unwarranted sentence disparities. In Christian Dawkins' case, this factor supports a non-custodial sentence. Christian may be sentenced to prison for engaging in conduct that has been going on for decades without criminal sanction. As described above, in the vast majority of cases, NCAA rule-breaking, where detected, is handled outside the criminal justice system, almost always by the NCAA and in the instance of alleged bribery, never by the Federal Courts.

We don't make this argument as a challenge to the Government's ability to bring these charges, but rather to point out that for sentencing purposes, the applicable precedents are not the bribery and wire fraud cases that have been previously prosecuted in this District, since the underlying conduct in those cases is meaningfully different than what took place here. Instead, we ask the Court to consider the fact that the most analogous cases are the ones that have been, up until this point, handled exclusively through the NCAA, without criminal charges and with no

21

incarceration.   Under Section 3553(a), which contemplates gradations of punishment based not on the formal charges themselves, but on the level of culpability, this distinction matters.

Furthermore, many of the other individuals that the Government knows participated in the exact same conduct as Christian Dawkins, and the co-Defendants, have not been, and apparently will not be criminally charged.   Notwithstanding the terms of the current protective order, the Government is fully aware numerous Division I head basketball coaches engaged in the same conduct as charged in this case, but for some inexplicable reason were not charged.

Moreover, even in the few other instances in which conduct that is arguably somewhat similar to Christian Dawkins' has resulted in criminal charges, those defendants have ended up being sentenced to little to no time in prison.   Though the case before this court was a case of first impression involving payment of cash bribe to college coaches, a similar case of historical note is the case of *United States v. Walters*, where the defendant, a sports agent named Norby Walters, participated in a scheme to induce college football players to sign contracts with him, through payments of cash, cars, and other valuables.   997 F.2d 1219, 1221 (7th Cir. 1993).   The Government charged Walters with mail fraud, alleging that Walters had defrauded the universities that the football players attended by "causing the universities to pay scholarship funds to athletes who had become ineligible as a result of the agency contracts."   *Id*.   While the legal theory of bribery and honest services wire fraud was different here, the theory of harm caused by the conduct here and in *Walters*—causing a university to be deprived of its honest services - is similar.   But Walters did not go to prison.   *Id*. at 1227.

Likewise, in *United States v. Gray*, three college basketball coaches were involved in a case of academic fraud at Baylor University.   In short, the coaches helped

prospective recruits obtain the academic credits required for athletic eligibility and possibly for scholarships by providing the students with written coursework or answers to correspondence exams. 96 F.3d 769, 772 (5th Cir. 1996). Such conduct violated NCAA rules on academic eligibility and rendered the students ineligible for competition, resulting in harm similar to what is alleged to the Universities here. At trial, the defendants were convicted of honest services fraud for depriving their employer (Baylor) of the honest services of its employees (the coaches). *Id*. Defendants received no jail time. Rather, they were sentenced to three years of probation and 50 hours of community service. *Id*.

In *United States v. Young*, No. 03-20400B, 2005 WL 3879034 (W.D. Tenn. Nov. 7, 2005), a fan of, and donor to, the University of Alabama gave $150,000 to the high school football coach of a highly sought after football recruit named Albert Means so that Means would agree to attend the University of Alabama and play football for the school's team. The donor, Logan Young, was charged with: (1) one count of structuring the $150,000 to avoid filing cash transaction reports in violation of 31 U.S.C. § 1952, (2) one count of violating the Travel Act, § 18 U.S.C. 1952, by traveling across state lines to carry on illegal activity (here, bribing a public servant) and (3) one count of conspiracy under 18 U.S.C. § 371 for conspiring with the high school coach to carry out the first two offenses. Upon conviction, Young was sentenced to just 6 months in prison and 2 years of supervised release.

Most recently, former Auburn University basketball assistant coach Chuck Person, entered a guilty plea to one count of Conspiracy to Commit Bribery in a case, which just like this, was derived from the cooperation of Mary Blazer and charged out of the same FBI investigation. At Sentencing, despite a loss amount of $91,500, **nearly two times that of**

23

**Christian Dawkins**, Person was sentenced to two years probation and 200 hours of community service. Very arguably the conduct of Chuck Person was far more egregious than that of Christian Dawkins. Person, a basketball coach, in a fiduciary position of trust with young men, accepted nearly $100,000 in cash bribes for the purpose of steering largely poor young men and their families to a known thief in Marty Blazer. Conversely, Christian Dawkins was providing money to largely poor families of NCAA student athletes for a future benefit that never materialized.

For these reasons we submit it would be unjust for Christian Dawkins to be imprisoned, when so many people twice his age, have engaged in the exact same type of conduct, or worse, and have never been, and will never be even criminally charged. Under § 3553(a), Christian Dawkins' sentence should reflect this disparity, especially given that he has always been a law-abiding and responsible citizen, a son and a loving brother to his little brother and older sister.

### D. A Non-Custodial Sentence is Sufficient to Deter Others

Although § 3553(a) requires this Court to consider the need for deterrence before sentencing a defendant, that objective can be achieved in this case through a non-custodial sentence. As the Second Circuit has observed, "the need for further deterrence and protection of the public is lessened" when conviction impacts a defendant's livelihood, because "the conviction itself already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The permanent loss of one's reputation and career, especially in cases where a defendant has spent a lifetime working hard to achieve success in his field, is a tremendous blow. The public humiliation associated with being indicted, much less

24

convicted, of a crime is acute, and that was especially true here, where a sensational story involving well-known college coaches, universities with prominent sports programs, and the involvement of household name apparel brand, combined to create an absolute media frenzy. Christian's humiliation has been eagerly reported in virtually every sports-related periodical and television show in the country. Anyone paying attention has now received the message, loud and clear, that breaking the NCAA's rules, and paying college coaches cash bribes, is not a good idea. Certainly Christian Dawkins does not need to be incarcerated in order to send that message.

Finally, there is no need for specific deterrence in this case. Christian Dawkins is not a threat to the public. This case, along with the companion case in *U.S. v. Gatto,* is an aberration in a life otherwise characterized by law-abiding behavior, as the many individuals who have wrote letters to the Court on Chrisitan's behalf can readily attest. There is no risk of recidivism: Christian has found a way to move on with a new and exciting possibility that certainly will be shattered with a lengthy term of incarceration. The public does not need to be protected from Christian Dawkins.

## II. THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE

Although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculat[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50. In the present instance, the Presentence Investigation Report, dated July 9th, 2019 (the "PSR"), calculated an offense level of 20 and a Criminal History Category of II, which equates to a sentence between 37 and 46 months. (PSR, at p. 31.) However, the Probation Office itself concluded that a variance below the Guidelines was appropriate here and recommended a sentence of 12 months and one day. (PSR, at p. 32.) Included in the

Government's rationale for such variance was the fact "it was clear Christian Dawkins did not appear to be at the top of the decision making tree for the larger scheme and that by many accounts, this and similar schemes have been, and continue to occur at multiple other schools." (PSR, at p. 32).

As noted in our objections to the PSR, Christian Dawkins respectfully disagrees with the calculation of the applicable Guidelines range found in the PSR.  We submit that evidence at trial established that Christian literally made cash deposits for his own personal use the same day he was provided with numerous cash bribe funds from "Jeff D'Angelo" **(GX 1401C, GX 1401 E, GX 1401 G)**. Even if Christian Dawkins was associated with all other alleged bribe payments, an adjustment for the cash funds he clearly kept for himself would attribute him to at most $32,800 of alleged bribes, which would result in a 6 level increase to his offense level. (USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)(A)).

Lastly, we object to Christian Dawkins' total offense level and guideline imprisonment range calculations, which are found in Paragraphs 111 and 147 of the PSR. Specifically, it is agreed Christian Dawkins' base offense level is 12. (USSG §§ 2X1.1(a) and 2C1.1(a)(2)). And, based on the above, a proper calculation under the Guidelines results in a 6 point increase (+2 for Specific Offense Characteristic and +4 Specific Offense Characteristic) to that base offense level, thus resulting in a total offense level of 18. Furthermore, and also based on the above, Mr. Dawkins' criminal history category should be I. As such, Mr. Dawkins guideline imprisonment range, based on a total offense level of 18 and a criminal history category of I, should be 27-33 months.

26

## III. THE PSR'S ASSERTION THIS CASE IS NOT RELEVANT CONDUCT FOR PURPOSES OF § 1B1.3, § 5G13 CONCURRENT SENTENCING IS INCORRECT

Under the Guidelines, "[t]he term 'prior sentence' means any sentence previously imposed . . . for conduct *not part of the instant offense*." (USSG § 4A1.2(a)(1) (emphasis added)). The Application Notes to USSG § 4A1.2 state that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 . . . ." (USSG § 4A1.2 Application Note 1). Notably, USSG § 1B1.3(a)(1) provides the following regarding relevant conduct:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that *occurred during the commission of the offense of conviction, in preparation for that offense*, or in the course of attempting to avoid detection or responsibility for that offense[.]   (emphasis added). The conduct for which Mr. Dawkins was convicted in Docket No. 17CR686 is clearly relevant conduct under USSG § 1B1.3(a)(1).

### §5G1.3 - Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment or Anticipated State Term of Imprisonment

27

(a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

(b) If subsection (a) does not apply, and a term of imprisonment resulted from another offense **that is relevant conduct to the instant offense of conviction** under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

> **(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.**

(c) If subsection (a) does not apply, and a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.

(d) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or

consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

Federal courts generally "have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings." *Setser v. United States*, 132 S. Ct. 1463, 1468 (2012); 18 U.S.C. § 3584(a).   Sentencing is "a matter of discretion traditionally committed to the Judiciary." *Setser v. United States*, 566 U.S. 231, 236 (2012). When multiple sentences are imposed simultaneously, or a prior sentence has already been imposed, including in state proceedings, "[j]udges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively." Id.

§ 5G1.3(b) **requires** a concurrent sentence "when a defendant is serving an undischarged sentence resulting from conduct that is required to be considered in a subsequent sentencing proceeding as **relevant conduct pursuant to section 1B1.3.**"   *United States v. Fuentes, 107 F.3d 1515, 1524 (11th Cir. 1997)*.   It is surmised that here, the Government does not believe the conduct which occurred in the *Gatto* case, is relevant conduct to what was charged in Evans. Given the scope of the investigation, the manner in which both cases were derived from the use of informant Marty Blazer, and virtually all the scheme participants were the same, such position is is almost unimaginable.

The statutory purpose of both sections 5G1.3(b) and 1B1.3 is to provide one, uniform punishment for the same criminal activity. The Courts have interpreted the Sentencing Guidelines provide for punishment not just for the "offense of conviction," but for all "offense conduct," which "refers to the totality of the criminal transaction in which the defendant

participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment." *United States v. Scroggins*, 880 F.2d 1204, 1209 n. 12 (11th Cir.1989), cert. denied, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990); see also "Same course of conduct" and "common scheme or plan" are terms of art defined in the commentary to section 1B1.3. Two offenses form the same course of conduct if **"they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."** U.S.S.G. § 1B1.3, comment. (n.9(B)) (Nov. 1, 1995) (emphasis added). In evaluating whether two or more offenses meet this test, the sentencing court should consider **"the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."** Id.; see also *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir.1994). Moreover, the offenses also constitute a common scheme or plan.

In this case, there is no possible argument the conduct at issue in each of the two cases did not involve the exact same federal investigation, many of the same cooperating witnesses, and some of the same defendants, all derived literally simultaneous to one another. At no time were the charges arising from each case based on two separate schemes. A common scheme or plan refers to offenses "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, comment. (n.9(A)) (Nov. 1, 1995). Here, the *Gatto* and *Evans* cases could not better exemplify the precise definition of U.S.S.G. § 1B1.3.

The intended purpose of section 5G1.3(b) is to effectively 'credit[ ] for guidelines purposes' defendants who have already served time--generally in another jurisdiction--for the same conduct or course of conduct.") (quoting U.S.S.G. § 5G1.3, comment. (n.2)). Because the concept of relevant conduct under the Guidelines is reciprocal, § 5G1.3 operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence.... Significant safeguards therefore protect [a defendant] against having the length of his sentence multiplied by duplicative considerations of the same criminal conduct....Id. at 115 S.Ct. at 2208-09.

Rather, for whatever reason, the Government chose to charge different parts of the same scheme in separate cases, of which Christian Dawkins was central to both.  Even if the Court is moved by the argument the conduct at issue is not "relevant conduct", but is "similar conduct", the Court has the discretion  to have this sentence run concurrent to the 6 month sentence already administered in the *Gatto* case, which given the totality of the circumstances would be proper given the spirit of the law.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a probationary sentence, which is "sufficient, but not greater than necessary" to achieve the statutory purposes

31

of sentencing, or in the alternative administer a non-custodial sentence no greater than the administration of justice would require.

Dated:  <u>September 19th, 2019</u>

**HANEY LAW GROUP, PLLC**
<u>/s/ Steven A. Haney, Sr.</u>
3000 Towncenter Dr., Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*

# EXHIBIT "A"

Lou A. Dawkins
743 Capitol Place
Muskogee, OK 74401

September 16th, 2019

Hon. Judge Edgardo Ramos
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     Sentencing of Christian Vaughn-Dawkins
        Case No. 17-cr-0686

Dear Judge Ramos:

I am the father of Christian Vaughn-Dawkins, a young man that is truly my heart and my life. As a parent the first commandment is to always protect your children and to make sure they have a stable environment. My wife and I accomplished that, building a strong family with great values in all our children. When all of this first took place the pain that I experienced of the unknown was overwhelming and catastrophic. The stories that were being told about our son were untrue then and they are untrue today! The day that the jury found Christian guilty, the internal pain, unfairness, and guilt that I felt words can't explain.

My wife and I instilled in all our kids, GOD, love, respect, trust, and to never look down on anyone and we live and stand by those beliefs today. I am asking you as a father, a man of strong values and beliefs please consider probation for my son. Christian is an ambitious young man, that loves to joke and laugh, loves his family, loves to read and self-educate himself. He is free spirited, full of imagination, passion, and the desire to be the best in everything. When you look at him, look at him and say WOW! This young man has the ability to be anything he wants, don't take or slow his journey.

Thank you for your time, attention, and consideration

Sincerely,


Lou A. Dawkins

September 16th, 2019

Subject: Character reference letter for court

Honorable Edgardo Ramos,

I, Peggie M. Hall am writing this letter to provide a character reference about Christian Vaughn-Dawkins. I have known Christian all of his life. My husband and I are close personal friends of the Dawkins family. Christian has always been a respectful, caring, and pleasant young man. I have had the wonderful privilege of watching him grow up to become a dynamic young man.

I also have had the opportunity to be Chris's school administrator. He was not a disciplinary problem. He conducted himself with dignity, and self-control at all times. He was dedicated to learning, paid close attention to the instructions, followed the rules consistently and was definitely a hard worker. His citizenship and behavior was exceptional. Christian also demonstrated a great sense of humor with his fellow classmates.

Christian is of good moral character. He comes from a great family. He deserves to be given a second chance. I personally feel that I can trust him whole-heartily in any situation at any time. Please do whatever possible to give Christian an opportunity for the second chance that he truly deserves.

Thank you for your consideration of my character reference.

If you need additional information please do not hesitate to contact me.


Peggie M. Hall, PhD

Former School Administrator

Personal Family Friend

Inspirationbypeggie@gmail.com

### KENTUCKY STATE UNIVERSITY
### MIGHTY MARCHING THOROBREDS

400 E. Main St. Bradford Hall Rm 116, Frankfort, KY 40601
PH: 502-597-5815 Fax 502-597-5999, alvin.level@kysu.edu

Alvin E. Level
Director of Bands/Division of Fine Arts

Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 1000

Dear Honorable Edgardo Ramos,

It is with complete honor and pride that I write this letter on behalf of Mr. Christian Dawkins.

My name is Al Level and I have known the Dawkins family all of my life. Although we are not bound by blood, this family has been near and dear to me since I can remember. Chris' father Lou, his brothers and my sisters and I were raised together like we were blood brothers and sisters. Lou's parents were able to chastise my siblings and I while the same held true concerning my parents and his siblings. Growing up without a positive brother in my household, his older brothers were my role models. They were very influential in my success and are some of the positive reasons that I am considered successful today.

When Chris was born, there was much expectation and excitement upon his arrival. As Chris began to mature and grow, you could see that he was destined to be something great. He met and exceeded all of the expectations that were placed before him. He led a great life growing up and he always found a way to make his parents proud. Chris is a very respectful young man. He has never been the type of young man that would disrespect adults and even his peers. If you had the opportunity to visit his hometown and question the community about Chris and his family, it would be nearly impossible to find anyone that would say anything negative about them.

As Chris began to delve into his new career of being a sports agent, we were all so proud of him. Quite honestly, I thought that he was too young to attempt such a cutthroat career but I knew that if anyone could become successful at it, it would be Chris. Your Honor, Chris is a go-getter and quick-study of people. Many young black men today do not possess the drive and determination to succeed like Chris has within him. It saddens me to see Chris in the situation that he is in today.

I could have never imagined that I would be writing a character letter for Christian Dawkins. He has done everything right throughout his entire life. He has been a model son, brother, nephew, grandson and friend. We are so proud of him.

Judge Ramos, I am asking for leniency for this young man.  He has a family and community that is willing to embrace him and give all of the necessary encouragement needed for him to positively reinstate his family name.  I am personally willing to do whatever I can to assist him if given the opportunity. Rehabilitation for a young man like Chris should look different from that of a young man that lives day-to-day without any future plans.  The public humiliation and negative exposure of his personal life is rehabilitation enough for a young man like Chris.  This coupled with other consequences sanctioned by your court that will allow him to remain free and rebound from this mistake should not stunt his personal and professional growth.

I will be more than happy to discuss Christian with you if there is a need.  Please contact me directly at 313-671-7879.

Thank You and May God continue to bless and shine upon you.

Al Level

September 16th, 2019

Dear Judge Ramos,

I am delighted to write a character letter for Christian Dawkins. The Dawkins family and I connected as the parents of children whom attended Bethel AME Church Day Care over 20 years ago. During that time, and beyond, I have grown to know the Dawkins family very well as we both supported our children in various academics and athletics activities. My family is also very proud to consider them as personal friends, while also regarding the Dawkins family as extended family members. Therefore, I believe I can offer a true assessment of Christian's personality and character.

As I've witnessed Christian grow from an adolescent into an intelligent, mature young man, I have consistently witnessed a person of high integrity, accountability, ambition and professionalism who also possesses a positive, can-do attitude and strong work ethic to be successful in life. More importantly Christian is a young man of very high faith. He has compassion not only for his family but, for friends too. Christian wears his heart on his sleeve and offers his support to assist others during their time of need. As a man of faith Christian, believes in serving the people in the community where he resides through volunteerism.

In summary, I am confident that Christian would be a tremendous asset to any community he would serve in. And that community would be fortunate to have him. Therefore, I consider it an utmost honor to write a character letter on behalf of Christian

Sincerely,

Brenda Beckom

Honorable Edgardo Ramos

United States District Judge

Southern District Of New York

500 Pearl Street

New York, New York 1000

Dear Judge Ramos,

My name is Julian Springer. I am writing this letter of support for Christian Dawkins. Christian's father, Lou Dawkins, is one of my best friends in the college coaching profession having worked with him on the staff at Northern Illinois University. I've had a chance to not only interact with Christian but also follow his journey for years as he chased his dreams with passion and vigor.

Having worked in higher education for more than fourteen years, I've come across many smart and talented young people. Christian is certainly in the top tier of that group. Christian has always shown me a great deal of respect along with everyone else that he encounters on a daily basis. This is a unique situation for Christian as I truly hope that you will find it in your heart to show mercy in this case.

Christian Dawkins comes from a  very genuine, hard- working family that has always emphasized making the right decisions and owning up to mistakes understanding that no individual is perfect. I have watched Christian mature and come into his own as a man throughout the years. I'm extremely proud of what he has become and I ask that you accept this letter on his behalf.

I believe that I am strongly qualified to speak on behalf of Christian's character. If you have any questions, please do not hesitate to contact me at springer_julian@yahoo.com.

Respectfully,

Julian Springer

Associate Director of Facilities

University of Alabama at Birmingham