UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                                                                :
UNITED STATES OF AMERICA                                        :
                                                                :
                     - v. –                                     :
                                                                :        S1 17 Cr. 684 (ER)
                                                                :
CHRISTIAN DAWKINS, and                                          :
MERL CODE,                                                      :
                                                                :
                     Defendants.                                :
                                                                :
--------------------------------------------------------------- X


### THE GOVERNMENT'S SENTENCING MEMORANDUM




                              GEOFFREY S. BERMAN
                              United States Attorney
                              Southern District of New York




Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys
       - Of Counsel -

## Table of Contents

PRELIMINARY STATEMENT ............................................................................................... 1

   I.    The Offense Conduct ......................................................................................... 2

      *The Lamont Evans Scheme* .................................................................................. 2

      *The Emanuel Richardson Scheme* ....................................................................... 5

      *Merl Code Facilitates Bribery of Additional Coaches* ........................................ 9

      *The Corey Barker Scheme* ................................................................................. 13

   II.    The Charges and the Trial ............................................................................ 13

   III.    The Guidelines Calculation ........................................................................... 18

     A.   Christian Dawkins's Guidelines Range ..................................................... 18

     B.   Merl Code's Guidelines Range .................................................................. 19

     C.   Christian Dawkins Obstructed Justice ...................................................... 19

     D.   The Defendants' Guidelines Objections are Without Merit ..................... 22

DISCUSSION ..................................................................................................................... 28

   I.    A Meaningful Term of Imprisonment – Consistent with the Recommendations of the Probation Department – Is Warranted ........................................................... 28

   II.    The Defendants' Arguments Are Unpersuasive ........................................... 31

CONCLUSION ................................................................................................................... 35

## PRELIMINARY STATEMENT

The Government respectfully this memorandum in connection with the sentencing of defendants Christian Dawkins and Merl Code (collectively, "the defendants") and in response to their respective sentencing submissions ("Dawkins Mem." and "Code Mem.," respectively).  As established during a four-week trial before the Court, the defendants conspired to pay bribes to college basketball coaches, and Dawkins, in fact, paid bribes to at least five different coaches.  In exchange for those cash bribe payments, the defendants expected that the college coaches would steer their most talented student-athletes to retain the defendants and their co-conspirators' services upon becoming professional athletes.  The defendants' conduct did not simply violate applicable NCAA rules, but it broke the law.

As this Court is aware, this case and the defendants' trial exposed wrongdoing by numerous people connected to college basketball – agents, financial advisors, college coaches, shoe companies – that the defendants themselves argue is far too common.  The defendants, like others, have utilized and justified corruption all too frequently through the excuse of a policy disagreement with the NCAA's amateurism rules.  However, their flagrant deceit and rule breaking not only failed to set a good example for the student-athletes they sought to recruit as clients, and for whom they asserted they cared about, the defendants' conduct in fact sought to take advantage of them and, at times, also put their own collegiate experience at risk.  The Court is well positioned to and should send a strong message that bribery in any industry – including amateur athletics – is wrong and will be punished.

For their crimes, as correctly calculated, Dawkins faces an advisory Guidelines range of 46 to 57 months' imprisonment, and Code faces an advisory Guidelines range of 37 to 46 months' imprisonment.  The United States Probation Office (the "Probation Office")

recommends a sentence of 12 months and one day for each defendant to run consecutive to the

defendants' sentences in the *Gatto* matter.  The Government agrees that a meaningful term of

imprisonment is required and respectfully submits that any sentence imposed on Dawkins, in

particular, reflect Dawkins's central role in the scheme and his perjurious testimony at trial.

I.      **The Offense Conduct**

As is described below, Dawkins's participation in bribing college basketball coaches

spanned a period of years and began when he was employed by ASM Sports as a "runner" who

assisted in recruiting high school and college basketball players as clients.  Merl Code became

involved in the bribery scheme in at least June 2017, and furthered the scheme by introducing

Dawkins and his new business associates to additional coaches that they could bribe.  Code was

compensated for this role.

*The Lamont Evans Scheme*

Dawkins began speaking with Martin Blazer – a business manager to athletes who,

unbeknownst to Dawkins, was cooperating with law enforcement – in late 2015 about providing

money to a coach at the University of South Carolina in exchange for the coach directing

student-athletes under his supervision to retain Blazer's services.  Dawkins eventually revealed

that the coach in question was Lamont Evans, an assistant coach with the University of South

Carolina men's basketball team.  Dawkins informed Blazer in sum and substance that Blazer

would be expected to provide payments to Evans beginning in early 2016 and, in exchange,

Evans would steer players to sign with Blazer.  Eventually, Munish Sood, a financial advisor

who had worked with Blazer in the past, became part of these discussions.

On March 3, 2016, Dawkins travelled with Blazer and Sood to South Carolina to meet

with Evans near the campus of the University of South Carolina.  During this meeting, which

was recorded, the group discussed that Evans could steer and influence the current players on his team to retain the services of Dawkins, Blazer and Sood.  Dawkins stressed the importance of working with an assistant coach like Evans and that assistant coaches were important in the recruiting process.  Dawkins stated, among other things, that "it's almost like you skipping a step if you just deal with agents" and that Blazer and Sood "needed to be involved with people like Lamont, because, like you said, he know the player." (GX 501B).  Dawkins stated that if Blazer and Sood got "in bed with somebody like [Evans] now . . . you got complete access to a kid . . . because if the coach says nobody can come around – can't nobody fucking come around." (GX 501B).  After the meeting with Evans, Dawkins told Blazer and Sood that Evans could not get caught receiving bribes because "his job is on the line" and so that Evans would have an incentive to "block" other agents and advisors from having access to the players that he coached.  Dawkins also admitted that he had paid Evans $2,500 per month "for a couple of months" previously and that he would travel to South Carolina or to Atlanta to give Evans the funds in cash.  (Dawkins PSR ¶ 50).

Consistent with the plan laid out by Dawkins, Blazer continued to provide payments to Evans on a monthly basis soon after the March 2016 meeting.  These payments continued even after Evans was hired by Oklahoma State University as an assistant coach.  Evans ultimately followed through on his promise to connect Blazer with players he coached.  Evans arranged for him to meet Jeffrey Carroll, a player Evans coached at Oklahoma State University.  The meeting occurred on February 3, 2017 in a hotel room in West Virginia, where Oklahoma State was in town for a game.  (Tr. 322-323).  During the meeting, Evans vouched for Blazer, telling Carroll that "I'm so comfortable [with Blazer] that we hang out together.  We coordinate meeting in Miami, meet in Arizona, meeting in California . . . . He just opened a restaurant in Pittsburgh.  I

3

just haven't been up there yet, you know what I mean." (Compl. ¶ 65c). Blazer had not, in fact, opened a restaurant in Pittsburgh, and the extent of Blazer's relationship with Evans was that he paid him bribes at the direction of law enforcement. Evans further touted Blazer's ability to help Carroll and instructed Carroll that Blazer would "handle [his] business advisory services when he turned pro." (Tr. 323). After the meeting, Evans accepted another $2,000 cash bribe from Blazer and a pair of expensive headphones Evans had previously requested. (Tr. 321-323).

Dawkins also sought to and ultimately did use Evans's influence over his players in order to seek to recruit clients. After going into business with one of Blazer's purported business associates – who in reality was an undercover FBI agent ("UC-1") – Dawkins was adamant that if they were going to continue paying Evans, Evans needed to deliver players as clients in return. In particular, Dawkins stated to UC-1 that he was "giving Lamont resources prior to knowing you guys," that he had "helped Lamont with numerous things," and that Evans currently had control over a player that Dawkins wanted as a client, Jeffrey Carroll at Oklahoma State University. When UC-1 asked him "you think you should have him?" Dawkins responded, "Ain't no question" and added "if you gonna give him the money every month, like what are we talking – what else – what else are we doing it for?" (GX 118T). Dawkins reiterated the same message to Munish Sood, stating "if we're paying this fucking guy, and we don't get Jeffrey Carroll, like what the fuck are we doing this for?" Thereafter, Evans arranged in August 2017 for Dawkins to meet with Jeffrey Carroll (GX 1627E). And Evans later bragged to defendant Merl Code that he had connected Dawkins with Jeffrey Carroll. (GX 3T).[1]

---

[1]   With respect to Sood, Evans arranged for Sood to meet the mother of P.J. Dozier, a player from the University of South Carolina, in connection with Evans's attempt to influence Dozier to retain Sood as a financial advisor. Indeed, Sood testified at trial that a few weeks prior to the 2017 National Basketball Association ("NBA") draft, Evans arranged for Sood to meet Dozier's mother in Columbia, South Carolina. (Tr. 731.) At that meeting, Sood talked with

After Code joined the bribery scheme – as is discussed in further detail below – he came to learn that Dawkins and his new business partners had been paying Lamont Evans.  In a call with Munish Sood, Code recommended that Sood not pay Evans any further because Code had learned that another financial advisor was paying Evans.  Code noted, "at some point in time it becomes where you're just using me versus it being a necessity for the business." (GX 23).  Code also noted during this call that he was aware that "Dawkins had given him [Evans] money for a kid." (*Id.*).

*The Emanuel Richardson Scheme*

In or about February 2017, Sood spoke with Blazer and informed him that Dawkins had facilitated an introduction for Sood to University of Arizona assistant coach Emanuel Richardson, a/k/a "Book," and that Sood would be meeting with Richardson in Las Vegas.  Thereafter, and consistent with the call described above, Sood in fact met with Richardson in Las Vegas.  During the meeting and in follow up calls that were intercepted during the investigation, Sood and Richardson generally discussed the high caliber of the players Richardson coached at the University of Arizona and how Sood could provide financial assistance for Richardson's recruiting efforts, while Richardson said he would "deliver" a player to Sood as a client in return.

In May 2017, Dawkins was terminated by ASM Sports as a result of allegations that Dawkins had misused a client's credit card to pay for tens of thousands of dollars in car service rides.  (Dawkins PSR ¶ 61).  Shortly thereafter, Dawkins decided to start his own sports management company, Loyd Inc., and Sood agreed to assist Dawkins in starting the venture.  In May 2017, the FBI introduced UC-1 to Dawkins and Sood through Blazer. UC-1 posed as

---

Dozier's mother about what he could do to help her son once he entered the NBA.  (Tr. 732).  For facilitating Sood's meeting with Dozier's mother, Evans requested that Sood pay him $10,000.  (Tr. 733).  Sood did not pay Evans the full amount, but instead paid him $2,000.  (*Id.*).

Blazer's financial backer.  UC-1 indicated he was interested in helping to provide funding for

Dawkins should he decide to form his own sports management company.  During in-person

meetings in Manhattan, Dawkins, Sood, and UC-1 discussed Dawkins's ability to leverage his

relationship with athletes, their parents, and college coaches and how having influence over the

coaches would be crucial in recruiting future clients.

With respect to college coaches, these recorded meetings in May and June of 2017 made

clear that a central component of the new company's business going forward would be paying

bribes to specific assistant coaches so that they could exert influence over their players to

ultimately sign with Dawkins and his new company.  (Dawkins PSR ¶ 64 (noting that Dawkins

explained that at certain schools "we won't have access to the coaches, and that just means that I

have to be down there more. You have the coaches, it saves us money in expenses" and that

having influence over the coaches could "protect the investment.")).  In particular, during one of

these meetings, Blazer informed Dawkins that he had continued paying Evans on a monthly

basis and that "when you set that in motion with him [Evans] and doing what he needed to have

done and I never backed away from that." (GX 508AT).  Dawkins' response to the fact that

Blazer was paying Evans $4,000 a month was to suggest that, in addition to paying Evans, the

new company should pay other coaches that had access to superior players, including

Richardson. (GX 508AT (Dawkins: "like a Book [Richardson], okay, that makes sense to give

him four grand a month because he's got the number one pick, he's got -- every year they got a

top-10 pick.")).

In June 2017, Dawkins, Sood, and UC-1 signed a shareholder agreement under which

Sood and UC-1 agreed to provide funding exchange for receiving an equity share of Dawkins's

new company.  Under the terms of the agreement, Sood received a 15% equity stake in the

company and UC-1 received a 35% equity stake, with the remaining ownership interesting belonging to Dawkins.

Soon after the signing of the shareholder agreement, Dawkins re-approached Richardson regarding receiving bribes in exchange for steering student-athletes at the University of Arizona to retain the services of Dawkins' new company.  (Dawkins PSR ¶ 66).  Dawkins arranged for Richardson to meet with Sood and UC-1, among others, and for UC-1 to provide Richardson with a $5,000 payment at the meeting, which occurred on June 20, 2017.  (PSR ¶ 67).  During a call immediately preceding the meeting, Dawkins told Richardson to expect $5,000 from the group at the meeting and that "you need some bread to continue, to build, fucking, what you're doing and, in turn, everybody could win basically." (GX 101T).  Dawkins and Richardson also discussed on the call a specific player that Richardson claimed he needed to pay to recruit to the University of Arizona, Jahvon Quinerly.

At the June 20, 2017 meeting arranged by Dawkins, Richardson informed Sood and UC-1, among other things, that he would steer a particular player on the University of Arizona men's basketball team, Rawle Alkins, to Dawkins and his company.  Richardson stated, among other things, that he could guarantee Alkins would sign with Dawkins and his new company and that Richardson was willing to direct certain players that he coached to retain the services of Dawkins and his new company.  (GX 509B1T-509B4T; Dawkins PSR ¶ 67).

After the June 20, 2017 meeting, Richardson quickly requested more money from Dawkins and his new company.  In particular, Richardson sought $15,000 from Dawkins and informed Dawkins that he needed this money in order to provide it to the mother of a top high school basketball player, Jahvon Quinerly, so that the player would commit to attending the University of Arizona. (Complaint ¶ 91; GX 114; GX 1631A (Richardson: "Moms needed some

7

extra blessings. That's why I tried to call you. He's supposed to make it public. Just got to take care of moms."). Dawkins thereafter relayed this request to Sood and UC-1 and urged that UC-1 should make the payment. UC-1 agreed to provide the money in exchange for Richardson's efforts to steer Quinerly to sign with Dawkins and his new company. (Complaint ¶ 92; GX 142). Dawkins and UC-1 spoke about the fact that this $15,000 payment would represent three months of $5,000 monthly payments that had been promised to Richardson. Dawkins thereafter conveyed to Richardson that UC-1 would provide the $15,000 that Richardson had requested, and Richardson agreed that this sum would represent 3 months' worth of his monthly payments and that he would start receiving payments again in October. (GX 114T).

On or about July 20, 2017, Richardson met with Sood and UC-1 at Sood's offices in New Jersey. During the meeting, Richardson discussed his willingness to steer current University of Arizona players to sign with Dawkins, Sood, UC-1 and their new company. At the end of the meeting UC-1 gave Richardson the $15,000 in cash, as had been requested and arranged by Dawkins.

On or about August 30, 2017, Dawkins arranged for another meeting with Richardson in Arizona. Sood and another individual posing as UC-1's business partner ("UC-2"), who was, in reality, an undercover agent, accompanied Dawkins to a meeting with Richardson near the campus of the University of Arizona. During this meeting, Richardson and Dawkins discussed how Richardson needed to be assertive in directing Rawle Alkins, the University of Arizona basketball player, to sign with Dawkins' new company:

> DAWKINS: Yeah, he's fucking clueless, clueless. But that's good for us because (U/I), I showed him a breakdown of everything, if he can -- I think that he'll do what you tell him to do.
>
> RICHARDSON: He will.

> DAWKINS: I think that he'll do exactly -- you have to be very specific with him, very clear cut, like to the point where you're almost talking to like a three-year-old.

(GX 518BT).  Richardson again promised during this meeting to use his influence as a coach to

steer his players to sign with Dawkins. (Complaint ¶ 99).

During this same trip, as arranged by Richardson, UC-2, Sood, and Dawkins also met

with a cousin and "handler" of Alkins.  UC-2 thanked Richardson for facilitating this meeting,

and Richardson responded, "I did my job." (Tr. 879:25 - 880:13).  Thereafter, as had been

arranged by Richardson, Dawkins, Sood, and UC-2 met with the cousin and "handler" of Alkins.

During that meeting, Alkins' cousin indicated, in substance and in part, that Richardson had

recommended to the cousin that Alkins should work with Dawkins and his new company.  (Tr.

882:10-20; *see also* Complaint ¶ 100).

As noted above, Richardson had an agreement with Dawkins, Sood, and UC-1 that he

would receive $5,000 per month going forward, but Richardson was arrested in September 2017

before any additional payments could be made to Richardson.  In total, Richardson received

$20,000 in bribe payments from Dawkins, Sood, and UC-1.

*Merl Code Facilitates Bribery of Additional Coaches*

On June 20, 2017, Dawkins arranged for the investors in his new sports management

company, UC-1 and Munish Sood, to meet with Code, a consultant for the sports apparel

company Adidas.  In advance of the June 20, 2017 meeting, Dawkins and Code spoke by phone.

During that call, Dawkins and Code discussed that Richardson had received a $5,000 payment

from the group earlier that day. (GX 103T)  Code later confirmed the same during the meeting

with UC-1, Blazer, Sood, and Dawkins on June 20, 2017 in a Manhattan hotel room. (GX

510A1T).

During the June 20, 2017 meeting between Code, Dawkins, Sood, Blazer and UC-1, the group spoke candidly about bribing assistant coaches and about how Code had relationships with coaches that they could leverage.  Code spoke about the important role that assistant college coaches played in steering the athletes they coached to agents and advisors (GX 510A2T) and touted his close relationships with certain coaches, including Richardson at the University of Arizona.  Dawkins introduced Code as a "consiglieri type" who would be on a "salary, payroll, whatever the case may be" and specifically touted Code's close relationships with college coaches, as did Code himself.  Dawkins said Code would be able to "from a collegiate perspective . . . figure out which schools make the most sense for whatever kids" and "help some of the coaches that we're involved with." (GX 510B1T).  After hearing that the group had paid Richardson earlier that day and about their plans to pay other coaches, Code specifically discussed how he could introduce Dawkins and his new business associates to more coaches, noting that when it came to the coaches "I think we need to prep them in terms of what the --- ask or what they're requiring. What are they --- what are the expectations – in terms of what we are expecting of them as coaches." (GX 510B2T).  Dawkins and Code said that their value to the group was to make sure they were not just "randomly spending money" and instead that Code could help them identify the right coaches to pay.  (GX 510B3T).

Following the June 20, 2017 meeting, Code arranged for Dawkins and his new business associates to meet with numerous coaches in Las Vegas in late July of 2017.  Code was to be paid for setting up these meetings and indeed, during a phone call with Dawkins in advance of the meetings, when Dawkins asked Code how many coaches he would be setting up meetings with, Code responded, "I mean, how many you paying me for? Cause that's the better question." (GX 113T).  Code sent Dawkins a detailed list of coaches that Code had set up meetings with for

10

Dawkins and his new associates. (GX 1619A). This list included, among other coaches, Preston

Murphy of Creighton University and Tony Bland of the University of Southern California

("USC"). In advance of the meetings, Code advised UC-1 that he needed to build trust with the

coaches and that they would then come back to UC-1 and his associates for money for recruiting

purposes when they needed it. (GX 301 (Code: "So there, there will be some scenarios with

particular kids where yes, we'll need some assistance, but the majority of them will be like nah,

uh, just, you know, if I need something, then I'll holler at those guys and -- because again, they

don't know who to trust. They don't know who they can talk to, who they can't talk to.")).

 During the Las Vegas meetings, certain of the coaches that Code facilitated introductions

to received bribes and others discussed receiving bribes in the future, like Steve Smith at the

University of Clemson, who was recruited by Code. In particular, during a July 28, 2017

meeting with Preston Murphy of Creighton University that was arranged by Code, Dawkins, UC-

1, and Blazer made a bribe payment to Murphy of $6,000 cash in exchange for Murphy's

agreement to steer certain of the student-athletes that he coached to retain Dawkins and his new

company. (Code PSR ¶ 82).

 In addition, on July 29, 2017, Dawkins, UC-1, and Blazer met with Anthony Bland of

USC. During that meeting, Dawkins and Bland discussed additional cash bribes in the future,

whether they would be on a monthly or "as-needed" basis, where and how Bland might receive

these bribes, and they further agreed, at this juncture, that Dawkins would help the defendant

with money "as-needed" to pay to prospective student-athletes and/or pay to the defendant for

expenses the defendant incurred in recruiting them. (GX 524T ("[I]t's going to be on an as-

needed basis, basically."); Tr. 430-33.) Bland noted that he had had similar opportunities to

work with other corrupt agents before but Bland added that he thought the instant scheme was

better since the prior situation had not been as "clean" and Bland trusted Dawkins.  (GX 521AT, p.5 ("So, we've had this opportunity before, but it's not been this clean. And from a guy that I'm really – that I trust.").)  At the end of the meeting, Dawkins handed Bland an envelope containing $13,000. (Tr. 433-34).  Bland ultimately kept $4,100 and Dawkins kept the rest.

Following the bribe payment from Dawkins and his associates, Dawkins worked actively with Bland for Bland to begin steering him players.  Dawkins and Bland discussed by phone a particular player that Bland could steer to Dawkins, with Dawkins asking Bland "when can we do this to get it done and over with T?" and Bland responding "You don't have to do nothing, dog. That's what I'm telling you . . . [T]his is about to be my layup." (GX 140T).  Dawkins then asked, "I can get [the player]?" and Bland responded, "No question, no question." (*Id.*).

In August 2017, Dawkins, Sood, and UC-2 travelled together to California to meet with Bland.  During the trip, Bland assisted in making arrangements for Dawkins, Sood, and UC-2 to meet with family members and/or close associates of a current University of Southern California basketball player and one prospective recruit.  These family members/associates received payments from the group during these meetings.  On August 31, 2017, Dawkins, Sood, and UC-2 met with Bland at a restaurant on the University of Southern California campus.  During the meeting, Bland informed the group that if they continued to fund the families of players and recruits, Bland would ensure that those players would retain Dawkins' new company's services. Dawkins also discussed  the subject of paying players or their family members, telling Bland, Sood and UC-2 that "it's as clean as possible" to pay the families directly, instead of paying them through Bland, because if Bland were caught, the scheme would be over and Bland could no longer help. Bland then added, "my part of the job can be to get the parents, and to introduce

them to Christian [Dawkins] and say hey, I trust him, and vouch for him and even you guys [UC-2 and Sood]."  (Dawkins PSR ¶ 78).

*The Corey Barker Scheme*

In addition to the coaches introduced by Code that received bribe payments in Las Vegas, Dawkins also set up a meeting in late July 2017 in Las Vegas with Corey Barker, an assistant coach with Texas Christian University's men's basketball team.  During that meeting, Dawkins paid Barker a $6,000 cash bribe and discussed with Barker how he would "be able to provide you something, you know, to make sure the kids that you involved with, we get them back." (GX 523T).  Following the meeting, Dawkins communicated directly with Barker regarding how Barker could steer players to sign with Dawkins.  Barker discussed a particular player he would steer to Dawkins, stating "[t]his is a layup for you" and referenced that they would "[g]et that done and we'll slam dunk this and that'll be our two or three."  (GX 139).  Dawkins and Barker further discussed Barker arranging a meeting between Dawkins and one of Barker's current players after official practices started for the men's basketball team.  (Dawkins PSR ¶ 84).

## II.      The Charges and the Trial

Dawkins and Code were charged in Indictment, S1 17 Cr. 684 (ER), with conspiracy to commit federal funds bribery, in violation of Title 18, United States Code, Section 371 (Count One); paying bribes and gratuities to agents of federally funded organizations, in violation of Title 18, United States Code, Section 666(a)(2) (Count Two); conspiracy to commit honest services wire fraud (Count Three); and conspiracy to violate the Travel Act, in violation of Title 18, United States Code, Section 371 (Count Six).  Dawkins was also individually charged with two substantive counts of honest services wire fraud (Counts 4 and 5).

At trial, Dawkins principally argued that he did not intend to bribe any coaches and, instead, intended to hustle his new investor, UC-1, out of his money.  Code principally argued that he never agreed to bribe any coaches and that, to the contrary, he had warned Dawkins and his associates not to try to pay coaches.

Dawkins elected to testify at trial.  He testified that he was not actually trying to bribe any coaches, but that he did make payments to players and their families.  Dawkins claimed that paying players and their families was the business model that he believed made sense and that the model of bribing coaches was, in his words, "idiotic." (Tr. 1248).  As to the meetings in Las Vegas where coaches were captured on tape taking money from Dawkins, Dawkins testified that these payments were actually part of an elaborate ruse designed to get UC-1 to part with his money so that Dawkins could use that money as he saw fit to further the interests of the new business.  (Tr. 1302).  Dawkins testified that after his meetings with the coaches where he was seen handing envelopes of money to them, he met with the coaches and they gave the money back to Dawkins.  Dawkins then took a large portion of this money and deposited it into an ATM machine in Las Vegas.

With respect to the meeting with Preston Murphy of Creighton University, Dawkins testified that he and Murphy hatched a plan under which they agreed to simply make up the name of a player to tell UC-1 and Blazer that Murphy would pretend he was promising to steer to them in exchange for the money.  The transcript of the Las Vegas meeting with Murphy indicated that the group discussed a player named "Marcus Phillips." (GX 526T).  According to Dawkins, the player mentioned during the recorded meeting was "just a random person who we made up."  (Tr. 1303-04).  Dawkins claimed that he instructed Murphy in advance of the meeting to just "make up a name" and "[h]e said Marcus Phillips. And they bought it." (Tr. 1305).

Dawkins testified under oath that after the meeting, he went down to the casino floor and met Murphy in a bathroom where he "handed me the money back in the stall" and that he and Murphy were "laughing" because "it was pretty funny." (Tr. 1304).

    While the transcript of the recorded meeting reflected that the player mentioned was "Marcus Phillips," on the recording itself – which, was, of course, the actual evidence – Dawkins and Murphy could be heard discussing a player named "Marcus *Foster*," a *real* player on the Creighton University basketball team  (GX 526B).  On cross-examination, Dawkins acknowledged as much thereby confirming that his testimony on direct examination about telling Murphy to "make up a name" was demonstrably false, a story concocted to mislead the jury. (Tr. 1523).

    In order to further support his story that the various payments to coaches captured on tape were, in reality, all part of an elaborate ruse to "hustle" UC-1 out of his money, Dawkins testified that Murphy, Corey Barker, and Tony Bland all returned substantially all[2] of the money to Dawkins after the meetings and Dawkins deposited this money into his bank account while in Las Vegas.  Dawkins sought to bolster this version of events by pointing to bank statements that showed that there were deposits of $21,900 into the bank account during the time period when Dawkins was in Las Vegas for the meetings (GX 1401C), which roughly corresponded with the amount of money Dawkins claimed to have received back from coaches Murphy, Barker and Bland in total, which was $23,000. (Tr. 1314-15 (Q: Almost exactly the amount of the deposits

---

[2]    Dawkins said that of the $13,000 handed to Bland, Dawkins kept $11,000 of the $13,000 and that Bland kept $2,000, which represented a payment for "a bachelor's party that we went to that night" and was not a bribe to get him to steer his players to Dawkins (Tr. 1307).  Dawkins claimed that Barker returned the entire $6,000 and Murphy returned the entire $6,000 he received.

reflected on the bank statement in Las Vegas around the end of July and early August, correct?"
A: "Correct.")).[3]

This too was false.  Dawkins's version of events – that he had received the cash back
from the three coaches and immediately deposited it into his bank account – appeared to be
supported by the bank statements themselves.  But the underlying deposit records showed that
Dawkins's story was demonstrably false.  In particular, while Dawkins claimed the $8,000
deposit on August 3, 2017 represented a *cash* deposit, and, indeed, cash he had received back
from the coaches and deposited into his bank account in Las Vegas, in fact the underlying
deposit records showed that this deposit was actually a completely unrelated check from
Dawkins's co-conspirator Munish Sood.  (GX 1401E).

In addition to the Las Vegas payments, Dawkins also testified under oath that a $25,000
deposit reflected on the bank statement for Loyd Inc. on August 1, 2017 represented $25,000 in
funds that had been promised by UC-1 to help fund the business:

Q. Now, on this same bank record, we see a $25,000 deposit, correct?

A. Correct.

Q. Very top?

A. Yes.

Q. What was your understanding that was for?

A. So, obviously, Jeff had, you know, expressed that he wanted to pay coaches. That was
the way he wanted to run the business. I wasn't so sure that he was going to actually give
me the money. So for protection, I set up three meetings where money would be
transferred, one for 13,000, one for six, one for -- another one for six, which equals to be
$25,000. On the first I actually did get $25,000. I was assuming for – for actually

---

[3] Dawkins' bank statement showed deposits of $5,000 on July 28, 2017, $8,900 on July 29, 2017,
and $8,000 on August 3, 2017.  This totaled $21,000.  Dawkins testified that he kept the full
$6,000 payment to Murphy, the full $6,000 payment to Barker, and $11,000 of the $13,000 to
Bland, which totaled $23,000.

fulfilling my responsibilities. It went to recruiting expenses and everything like that, but they actually did come through with the number that was supposed to be given to me.

      *      *      *

Q. Were you working anywhere other than with Loyd Management?

A. No.

Q. Was there any other money that you had coming in from any works that you were performing?

A. No.

Q. Would there be any other reason why your bank or the Loyd Management account would reflect those deposits other than what you're testifying to today?

A. No. Everything that was deposited was given to me from the government.

(Tr. 1319-20).

In reality, the underlying deposit records showed that the $25,000 payment was *not* from UC-1 (who went by the name Jeff D'Angelo) as Dawkins claimed, but instead was a check of $25,000 in "consulting fees" from Ricky Robertson.  (GX 1401C and 1401E).  Text messages between Dawkins and Merl Code that were introduced during Dawkins's cross-examination showed that, in fact, Code had caused the deposit of the $25,000 check into Dawkins's bank account.  (GX 102T-2).  On cross examination, Dawkins admitted that he knew Ricky Robertson was the coach of a team called the Karolina Khaos, an AAU basketball team, and that the deposits at issue related to the fraud scheme for which he was convicted in *United States v. Gatto et al.*, 17 Cr. 686. (Tr. 1534-35).  The Government argued in its summation that the jury should consider "the audacity of this lie" and that "Dawkins under oath tried to say that a deposit that's actually related to a separate fraud conviction was instead a deposit from the government that bolstered his defense in this case." (Tr. 1694).  More generally, the Government argued that the jury could not "trust a word that Christian Dawkins said to you over the past two days, not a

17

word of it.," including, of course, Dawkins's testimony that he "never paid a coach with the intent of bribing or influencing him to do anything for me." (Tr. 1694, 1321-22).

The jury convicted both Dawkins and Code of Count One and Dawkins of Count Two, and acquitted on all remaining counts.

### III.    The Guidelines Calculation

As set forth below, with one exception, the Government generally agrees with the Probation Department's Guidelines calculations for each defendant as set forth in its Presentence Investigative Reports ("PSRs").

#### A.  Christian Dawkins's Guidelines Range

The Government agrees with the view of the Probation Office that Christian Dawkins's offense level should be calculated as follows:  the base offense level begins at level twelve; a two-level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe; and a six-level increase is warranted pursuant to § 2C1.1(b)(2) because the value of the bribes facilitated by Dawkins exceeded $40,000 but was less than $95,000. (Dawkins PSR ¶¶ 100-104).   For the reasons discussed below, the Government further argues that an additional two-level increase is warranted pursuant to U.S.S.G. § 3C1.1 because the defendant obstructed justice by giving false testimony at trial.[4]  Accordingly, Dawkins' total offense level is 22.  The defendant has two criminal history points related to his conviction in the *Gatto* trial and is therefore in Criminal History Category II (*see* Dawkins PSR ¶¶ 113-115), resulting in an applicable Guidelines range of 46 to 57 months' imprisonment.

---

[4]      The Probation Department, while noting the Government's argument for this enhancement, deferred to the Court on its application given the Court's familiarity with the testimony in question.  (Dawkins PSR ¶ 98).

### B.  Merl Code's Guidelines Range

The Government agrees with the view of the Probation Office that Merl Code's offense level should be calculated as follows:  the base offense level begins at level twelve; a two-level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe; and a six-level increase is warranted pursuant to § 2C1.1(b)(2) because the value of the bribes facilitated by Code exceeded $40,000 but was less than $95,000; resulting in a total offense level of 20. (Code PSR ¶¶ 101-110).   The defendant has two criminal history points related to his conviction in the *Gatto* trial and is therefore in Criminal History Category II. (Code PSR ¶ 112-114).  Accordingly, the applicable Guidelines range for Code is 37 to 46 months' imprisonment.  (Code PSR ¶ 152).

### C.  Christian Dawkins Obstructed Justice

A two-level enhancement should apply to Dawkins's offense conduct pursuant to U.S.S.G. § 3C1.1, because the defendant clearly impeded his prosecution by giving false testimony at trial.

The Supreme Court has held that in order for a district court to apply an enhancement for perjury it must find "an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury."  *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). The *Dunnigan* Court further found that the district court's finding that "the defendant was untruthful at trial with respect to material matters in this case" in a manner "designed to substantially affect the outcome of the case" was sufficient to support the § 3C1.1 enhancement for committing perjury. *Dunnigan*, 507 U.S. at 95.

Consistent with *Dunnigan*, the Second Circuit has held that an obstruction enhancement is appropriate where the defendant "1) willfully, 2) and materially 3) committed perjury, which is

(a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997); *see also United* States *v. Agudelo*, 414 F.3d 345, 350 (2d Cir. 2005) (Finding the district court erred when applying an obstruction of justice enhancement for falsifying an affidavit when the allegedly false information could have been the result of a "misunderstanding or misremembering" rather than a willful fabrication). The Second Circuit has further held that "in a case where the defendant has clearly lied on the stand, the district court need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." *United States v. Williams*, 70 F.3d 334, 337-38 (2d Cir. 1996); *accord United States v. G.H. Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000).

As discussed above, Dawkins plainly perjured himself on numerous material matters, including one of the ultimate issues before the jury – whether Dawkins participated in a scheme to bribe college basketball coaches. For example, Dawkins testified that he was not actually trying to bribe any coaches. Dawkins claimed that paying players and their families was the business model that he believed made sense and that the model of bribing coaches was, in his words, "idiotic." (Tr. 1248). All of this was demonstrably false. At trial, the Government introduced evidence that Dawkins had been involved in paying coaches prior to ever meeting Blazer, let alone UC-1, including recorded conversations in which Dawkins confirmed that he had made bribe payments to a basketball coach at the University of South Carolina, Lamont Evans. Moreover, the Government offered recordings in which Dawkins stressed the importance of paying bribes to an assistant coach like Evans stating, among other things, that "it's almost like you skipping a step if you just deal with agents" and that Blazer and Sood "needed to be involved with people like Lamont, because, like you said, he know the player." (GX 501B).

More specifically, and as detailed above, Dawkins repeatedly and brazenly lied in an effort to explain away a series of recorded meetings in Las Vegas in which Dawkins, on videotape, offered bribe payments to several assistant coaches.  Dawkins tried to convince the jury that these payments were actually part of an elaborate ruse designed to get UC-1 to part with his money so that Dawkins could use that money as he saw fit to further the interests of his new business.  (Tr. 1302).  Dawkins testified that after his meetings with the coaches where he was seen handing envelopes of money to them, he met with the coaches and they gave the money back to Dawkins.  Dawkins further told the jury that he then took a large portion of this money and deposited it into an ATM machine in Las Vegas.

This testimony was demonstrably false. As an initial matter, and as Dawkins was well aware at the time he took the stand, each of the coaches charged as a co-defendant in this case had already *admitted*, in their pleas, to having received bribes from Dawkins and UC-1, including Bland and Evans who met with Dawkins in Las Vegas.  Second, Dawkins attempted to misuse his bank statements to mislead the jury when, in fact, the bank records directly contradicted Dawkins's testimony.  For example, as detailed above, while Dawkins claimed that he got back much of the bribe money from the coaches and then deposited $8,000 of that money on August 3, 2017 into the Loyd Inc. bank account, in fact the underlying deposit records showed that this deposit was actually a check from Dawkins's co-conspirator Munish Sood. (GX 1401E).

Similarly, and to further support his lie that he only pretended to pay coaches in Las Vegas in order to get UC-1 to part with his money, Dawkins testified that a $25,000 deposit reflected on the bank statement for Loyd Inc. on August 1, 2017 represented $25,000 in funds that had been promised to him by UC-1 if Dawkins set up the Las Vegas meetings.  (Tr. 1319-

20).   In reality, however, as noted above, the underlying deposit records showed that the $25,000 payment was not from UC-1 as Dawkins claimed, but instead was a check of $25,000 in "consulting fees" from Ricky Robertson.  (GX 1401C and 1401E).  On cross examination, Dawkins admitted that he knew Ricky Robertson was the coach of a team called the Karolina Khaos, an AAU basketball team, and that the deposits at issue related to his prior conviction in the fraud scheme for which he was convicted in *United States* v. *Gatto*. (Tr. 1534-35).

Finally, perhaps Dawkins's boldest lie was one involving a meeting he had with Preston Murphy of Creighton University in Las Vegas.  As detailed above, on direct examination Dawkins made up a story about how he and Murphy hatched a plan under which they agreed to simply "make up a name" make up the name of a player to tell UC-1 and Blazer that Murphy would pretend he was promising to steer to them in exchange for the bribe money, adding that "they bought it." (Tr. 1305).  In fact, as the recording made clear, no such "plan" existed. Dawkins and Murphy instead told Blazer and UC-1 that they would steer a very real player, Marcus Foster, on the Creighton team to them in return for the equally real bribe payments the defendant was involved in facilitating to Murphy.

Given that Dawkins flagrantly and repeatedly lied about the most critical issues in the case – whether he bribed college coaches -- a two-level enhancement should apply to his offense conduct pursuant to U.S.S.G. § 3C1.1.

### D.  The Defendants' Guidelines Objections are Without Merit

Both Dawkins and Code object to the calculation of the sentencing Guidelines contained in their respective Presentence Investigation Reports.  Each of their arguments are without merit and should be rejected.

First, Dawkins objects to the calculation of the bribe amounts attributable to him under the Guidelines.  Dawkins argues that the loss should be less than $58,100 based on the fact that he "made cash deposits for his own personal use" on the same day he paid bribes to coaches (Dawkins Mem. 26).  His argument should be swiftly rejected.  In convicting Dawkins of bribery, the jury plainly rejected his argument that he was simply participating in a scheme to steal money from UC-1.  The defendants' attempt to re-assert it now falls just as short. The evidence at trial, and as set forth in the PSR, established that the $58,100 was paid as bribes to the coaches.  And, as stated earlier, each of the co-defendant coaches admitted, in their pleas and at their sentencings, that the money they received from Dawkins and UC-1 was bribes.  Although Dawkins did make cash deposits sometimes on the same days as bribes were paid, the defendant provides no basis to conclude any of that money was a part of the $58,100 in bribe payments, as opposed to unrelated money or money intended to be used for an entirely different purpose (for example, money he received to pay players, their families or to money he received for himself). Therefore, there is no basis to reduce the amount of the bribes – which was supported by both the trial evidence and his co-defendants' pleas – by the amount of any cash deposits the defendant made.[5]

Next, Code argues that the two-level enhancement imposed because the offense involved more than one bribe is incorrect because "the evidence at trial . . . established that, at most,

---

[5]        Dawkins appears to further argue that even if the Court finds that he is responsible for participating in making bribe payments in the amount attributable to him in his PSR, $58,100 (*see* Dawkins PSR ¶ 104), he should only be responsible for the amount of bribe money he claims he stole for himself.  (Dawkins Mem. 26.)  Not only is Dawkins's argument nonsensical, it is not based in law.  Indeed, Dawkins does not even attempt cite to any authority to support his position. His argument should be rejected.

[] Code only had knowledge of *one* actual bribe payment, which was a $5,000 payment to

[] Richardson."  (Code Mem. 20).  Code is wrong and misstates the evidence presented at trial.

That evidence demonstrated that Code was not merely aware of a single $5,000 payment

to Richardson, but rather was aware that his co-conspirators had engaged previously and would

continue to engage in additional bribe payments to men's college basketball coaches.  For

example, with respect to Lamont Evans, during an intercepted telephone call with Munish Sood,

Code specifically acknowledged that he knew Christian Dawkins had provided money to Evans

in the past to recruit a player at the University of South Carolina (*see* GX 23, 23T).  Code was

likewise aware that in exchange for bribe payments being provided by his co-conspirators, Evans

had introduced Dawkins to a player that Evans currently coached on the Oklahoma State

University men's basketball teams.  (*See, e.g*., GX 3 (Code and Dawkins discussing in an

intercepted telephone call the fact that Evans had informed Code he attempted to connect

Dawkins with current Oklahoma State University men's basketball player Jeffrey Carroll)).

Finally, the evidence at trial showed that Code was responsible for setting up multiple meetings

for his co-conspirators in Las Vegas in July 2017, all arranged with the knowledge and intention

that bribe payments would be made and or offered.  By way of example, at the Las Vegas,

Nevada meeting set up by Code, Tony Bland of the University of South Carolina received a

bribe payment from Dawkins and others.  In sum, Code's assertion that he was "only involved in

one bribe" – the $5,000 bribe to Emanuel Richardson in New York in June 2017 – is belied by

all of the evidence presented at trial.  The two-level enhancement, thus, is properly applied.

Relatedly, Code argues that the six-level enhancement for loss amount is also incorrect.

(Code Mem. 20).  Code asserts, "because [] Code was only involved in one bribe, and the value

of that bribe was less than $6,500.00, neither the 2-level enhancement nor the 6-level

enhancement is warranted." (*Id.*)  The PSR attributes $41,100 in bribes to Code, resulting in a six-level enhancement under the Guidelines.  (Code PSR ¶ 103).  Before attributing co-conspirator conduct to a defendant, "a district court is required to make two particularized findings: (1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, coconspirator conduct in question; and (2) that the relevant conduct on the part of the coconspirator was foreseeable to the defendant." *United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013) (alterations and quotation marks omitted).  Here, the evidence was more than sufficient to attribute the $41,000 in bribes to Code.[6]

First, during the very first June 20, 2017 meeting when Code met Sood, Jeff D'Angelo, and Marty Blazer, Code was informed that the group had paid a $5,000 bribe to Emanuel Richardson of the University of Arizona earlier that day, and that the group wanted Code to introduce them to additional coaches that they could bribe. (GXs 103, 510A1-510A3, 510B1-510B3, 510B5-510B6).  Thus, from the very outset of his membership in the conspiracy, Code understood from his co-conspirators that they had bribed coaches, that they intended to bribe coaches in the future, and that Code would be expected to, among other roles, introduce the group to coaches that they could provide money to going forward.  Thereafter, the evidence showed that Code did just that.  He facilitated meetings for the group with multiple men's basketball coaches in Las Vegas, even sending Dawkins an itemized schedule of all the coaches that he had set up meetings with in Las Vegas.  (GX 1619A).  Certain of the coaches that Code

---

[6]     Notably, the Government did not seek to attribute to Code any bribe payments predating Code's initial June 2017 meeting with Dawkins, Sood, Blazer and D'Angelo in New York.  Code was specifically held responsible for the following bribe payments – all of which began in or about June 2017 or after: (i) $5,000 to Lamont Evans (portion of the bribes paid in Las Vegas in July 2017); (ii) $20,000 to Emanuel Richardson; (iii) $4,100 to Anthony Bland; (iv) $6,000 to Preston Murphy; and (v) $6,0000 to Corey Barker.

set up meetings with in Las Vegas accepted bribes at these very meetings, including Tony Bland of the University of Southern California.

Code also discussed with his co-conspirators the need to be discrete and that in many situations they would need to first build trust with the coach and then the coach would in the future come to them looking for money to help that coach recruit. (*See, e.g.,* GX 301, 116).  In light of this evidence, it was clear that bribing coaches was (1) within the scope of the activity to which Code agreed to participate and (2) that bribing the coaches that Code has been held accountable for was readily foreseeable to him.  *See Getto*, 729 F.3d at 234; *see also United States v. Medina*, 74 F.3d 413, 417 (2d Cir. 1996) (The defendant "is responsible if an act performed in furtherance of a conspiracy by a co-conspirator was 'reasonably foreseeable,' regardless of whether the defendant acted to promote it or facilitate it." (quoting U.S.S.G. § 1B1.3(a)(1)(B))).

 Code also argues that the evidence at trial establishes that he was a minor participant in the alleged offense.  (Code Mem. 20).  However, Code points to no evidence that would justify application of the two-level reduction under U.S.S.G. § 3B1.2, and, to the contrary, Code's conduct makes clear that the minor role adjustment does not apply to him.  Code was plainly made aware of the scope of activities of his co-conspirators and played a substantial role in furthering the goals of the conspiracy by, among other things, introducing Dawkins and others to numerous additional coaches willing to accept bribes and then arranging meetings for those bribe payments to be made.  Moreover, Code fully intended to make tens of thousands of dollars from his role in the scheme.  Code was not a mere minor player who, for example, was purely following the directions of others, or only involved in a single or isolated component of a

broader scheme.  His actions directly furthered and expanded the scope of the conspiracy.

Accordingly, his baseless assertion that the minor role adjustment applies should be rejected.

Finally, both Dawkins and Code argue that the criminal history category is calculated

incorrectly in their respective PSRs.  The defendants' arguments that their sentences in *United

States v. Gatto* are "relevant conduct," and should not be counted in calculating their criminal

history, should be swiftly rejected.  Relevant conduct is limited to acts "(i) within the scope of

the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, <u>and</u> (iii)

reasonably forseeable in connection with that criminal activity; that occurred during the

commission of the offense of conviction, in preparation for that offense, or in the course of

attempting to avoid detection or responsibility for that offense."  USSG § 1B1.3(a)(1).  Instead of

addressing this three prong test to determine whether their prior sentence is relevant conduct,

they simply argue that the "conduct at issue in each of the two cases involved the *exact same

federal investigation*, many of the same cooperating witnesses, and *most* of the same *evidence*."

(Code Mem. 21; s*ee also* Dawkins Mem. 26-31).  Although the two cases had some limited

factual relationship, as the Probation Department recognized (*see, e.g*., Dawkins PSR p. 29) the

*Gatto* conduct does not meet all of the required elements, and, therefore, is not relevant conduct.[7]

Critically, the conduct in the two cases was not part of the same jointly undertaken criminal

activity; the schemes had different objects, different participants, and separate harm against

separate victims.  The *Gatto* conduct involved making payments to players to affect school

choice, while the instant conduct involved bribes to coaches in order to get players to sign with

---

[7]     As the Probation Department also recognized, if the defendants' argument that the *Gatto*
conduct was "relevant conduct" for purposes of calculating the appropriate criminal history was
adopted, then that conduct similarly would have to be considered in the calculation of the offense
level for this offense.  (*See, e.g.* Dawkins PSR p. 29).

Dawkins's sports management company.  Nor did the *Gatto* conduct occur in furtherance of the bribery scheme charged here or vice versa.  As such, the defendants cannot – and do not seriously try to – meet their burden under § 1B1.3(a)(1).  Moreover, and for substantially the same reasons, to the extent the defendants argue that their sentence should run concurrent to the sentence they received in *Gatto*, pursuant to U.S.S.G. § 5G1.3(b), that argument should also be rejected.

## DISCUSSION

Consistent with the recommendation of the Probation Department, the Government respectfully submits that a sentence that includes a period of incarceration is appropriate for each defendant and would be sufficient but not greater than necessary to promote the legitimate goals of sentencing.  Indeed, consideration of the factors set forth in 18 U.SC. § 3553(a) militates strongly in favor of a custodial sentence.

### I.      A Meaningful Term of Imprisonment – Consistent with the Recommendations of the Probation Department – Is Warranted

Every one of the factors set forth in 18 U.S.C. § 3553(a) strongly weighs in favor a meaningful term of imprisonment.

*First*, a sentence of incarceration is necessary to reflect the seriousness of the offense conduct and the magnitude of the harm the defendants caused.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).  The defendants stand guilty of bribery, a serious crime that predates James Naismith's invention of basketball and its rules.  The defendants did not simply break NCAA rules -- they schemed, recruited and paid bribes to college basketball coaches at multiple universities to steer players to retain their services.  They engaged in this conduct with wanton disregard that the bribes not only subjected the universities to the risk of significant penalties but that they were designed to manipulate the very student-athletes that the defendants profess they cared so much

about.  This conduct undoubtedly harmed, not helped, the student-athletes that they claim are not treated fairly by the NCAA rules.  And while they did seek to help their coaching friends by lining their pockets at these players' expense, the defendants' conduct in fact resulted in the loss of jobs for no less than six coaches. This is serous conduct that requires serious punishment, including a custodial term, and certainly more than the proverbial slap on the wrist that the defendants now seek.

*Second*, the history and characteristics of the defendants, the circumstances of the offenses, and the need for the sentences imposed to promote respect for the law warrant meaningful sentences of imprisonment.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendants did not commit bribery hesitantly or fleetingly.  The defendants took their disagreement with the NCAA rules as justification to freely engage in corrupt conduct in service of their economic self-interest.   As the record at trial demonstrated, Dawkins participated in making bribe payments for years -- since at least late 2015, in connection with bribe payments to Lamont Evans; and Code joined the scheme in at least June 2017, although the evidence appeared to demonstrate his awareness and assistance, at a minimum, of Dawkins's earlier and prior dealings. There was nothing about their criminal conduct here that demonstrated integrity, character, or a desire to see others succeed.

In addition, also militating in favor of a meaningful sentence of imprisonment is the defendants' lack of remorse for their wrongful, deceitful, and deceptive conduct, and the consequences and harm it has had on student-athletes, coaches, and the universities.  This lack of remorse – and willingness to seek to blame others such as the Government and their respective prior employers – ASM and Adidas –for their conduct -- stands in stark contrast to the statements they previously made before Judge Kaplan prior to sentencing in the *Gatto* case.  *Contrast*, *e.g.*,

Dawkins Mem. 19 ("[I]t would be remiss not to consider … [the] manipulation engaged by a cooperating witness, who feigned victim status and blamed everyone other than himself for his miserable existence.") and Code Mem. 3 ("Code was arrested on these charges in 2017 (based in substantial part on conduct encouraged by and undertaken for the benefit of Adidas).") *with Gatto* Sentencing Tr. at 26 (Dawkins: "In my quest to get ahead, I broke rules and made some really bad decisions. Nobody forced me to do either. . . . There was a point I decided to play by my own set of rules and not those that I willingly and knowingly broke.  For that I was wrong then and I stand wrong today.") and *Gatto* Sentencing Tr. at 24-25 (Code: "I deeply regret what has brought me before you today.").

In addition, with respect to Dawkins, the fact that he engaged in perjury when he lied under oath in his own defense by itself demands a meaningful term of imprisonment.  As the Court no doubt observed during his testimony, far from being humiliated by his actions as he professes in his sentencing submission (Dawkins Mem. at 24-25), Dawkins appeared strident and outspoken in decrying the seriousness of his own crimes.  (*See, e.g.,* Tr. 1248 (Dawkins: "I though it [paying college coaches] was idiotic."); Tr. 1430 (Dawkins: "You can't defraud a school. …  It's ridiculous.")).  And he concocted stories that involved not only his own actions but also those of others, like those of Preston Murphy, the Creighton coach, with whom he falsely suggested they had hatched a scheme to make up the name of a star player that Dawkins and his investors could later sign upon turning professional.

*Finally*, the need for general deterrence strongly weighs in favor of meaningful sentences of imprisonment.  *See* 18 U.S.C. § 3553(a)(2)(B).  As the Rice Commission Report has

recognized, a "culture of silence in college basketball enables bad actors,"[8] making it exceedingly difficult to uncover schemes that affect – and take advantage of -- young student-athletes for the personal benefit of agents, advisors, consultants, and managers (like the defendants) and coaches (like their co-conspirators).  This case along with the companion cases charged by the Government in 2017 make it clear that such a message is necessary if the justice system is to have any impact on corruption in college athletics.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (same).  The defendants' suggestion that they need not be sentenced to any prison time whatsoever to achieve robust deterrence (Dawkins Mem. 25; Code Mem. 18-19), flies in the face of case law, logic, and human experience.  The non-incarceratory sentences sought by the defendants would have a substantially diminished deterrent impact on an industry in need of one.

## II.     The Defendants' Arguments Are Unpersuasive.

In their submissions, the defendants seek non-incarceratory sentences on several principal grounds.

*First*, through their submission and their letters, the defendants argue that they were always trying to help the student-athletes.  *See, e.g.,* Dawkins Mem. 20.  The defendants conduct did not help the student-athletes at all.  The bribes the defendants paid were intended to cause coaches – people the young players viewed as mentors -- to *manipulate* student-athletes in

---

[8]     Commission on College Basketball: Report and Recommendations to Address the Issues Facing Collegiate Basketball dated Apr. 2018 at 15.

connection with one of the most significant decisions they would make upon turning professional.  Moreover, even crediting that some of the money provided to the coaches was meant for the families of the student-athletes, as Dawkins claims, such conduct – which jeopardized the student-athletes' athletic scholarships and collegiate careers – did not help these students and was not conduct engaged in for their benefit.  Rather, the defendants were acting principally to help themselves by maximizing their economic return.

*Second*, the defendants contend that a lenient sentence is appropriate because NCAA rules violations are common.  (*See, e.g.,* Code Mem. 18).[9]  As an initial matter, the defendants were not convicted of NCAA rules violations, and, as a result, the penalties attendant to rules violations are not the appropriate measuring stick for their conduct.  The defendants engaged in bribery, conduct which is unquestionably criminal and which has historically merited substantial punishment consistent with the Sentencing Guidelines ranges in this case.  There is nothing about the realm of college basketball or the pervasiveness of rules breaking that should merit the leniency the defendants request here.  Moreover, in contrast, the pervasiveness of the corrupt influence of money in college basketball should counsel in favor of sending a strong message that criminal conduct even in the realm of amateur athletics will result in prison time.

Third, the defendants' contention that there were no real victims of their crimes, because universities cannot be victimized, should be rejected.[10]  *See, e.g.,* Dawkins Mem. 10.  There is no

---

[9]     Oddly, Dawkins argument that "paying [] college coaches is not only 'normal,' but customary" (Dawkins Mem. 18), completely contradicts his own statements from the witness stand that he would pay everyone related to the recruitment of a student-athlete but that he thought paying college coaches was counterproductive.  (*See, e.g.*, Tr. 1334 ("It's no need to pay a college coach because these players are coming into college with agents.")

[10]     Dawkins's suggestion, like that made by Tony Bland at sentencing, that the University of Southern California should not be considered a victim because the university supposedly engaged in "bribery" by hiring an assistant coach whose sons were top recruits (Dawkins Mem. 11), should also be swiftly rejected.  The university's hiring decisions – which posed no risk of

doubt that the defendants sought to misuse the college coaches' positions at their schools, that they hid their crimes from the universities, and that their conduct exposed the universities to significant potential penalties from the NCAA.[11]  Moreover, completely absent from the defendants' sentencing submissions is any recognition of the effect of the defendants' conduct on the student-athletes they supposedly cared about, for whom they wanted to gain trust, and who were completely unaware of their criminal conduct.

Fourth, the defendants, contend that "they have suffered enough" (Dawkins Mem. 2), referencing such circumstances as the loss of reputation, jobs, and impacts on their families.   In particular, Code focuses on the supposed injustice he has had to endure because, after he was arrested, "he was cut off by Adidas—i.e., Adidas refused to pay him the amount owed on his contract and refused to indemnify him" and now faces a civil suit from a student-athlete.  (Code Mem. 3, 18).  However, Adidas's actions in terminating Code, and the fact that Code is a civil defendant, do not lessen the need for a substantial sentence, instead these facts demonstrate the wrongfulness of Code's conduct.  Similarly, Dawkins's suggestion that the recent termination of his father was related to this investigation – despite Dawkins having been charged two years ago and having been convicted twice in the interim – and should be considered in evaluating a fair sentence is not only completely unsupported but is irrelevant.[12]

---

harm to either the university or any student-athletes -- have no bearing whatsoever on the defendant's deceitful and criminal conduct.  There are certainly no similarities between that recent hiring decision and the defendants' willingness to pay cash bribes to coaches to steer unsuspecting young men to engage their services.

[11]     As has been public reported, although the universities have not yet been notified by the NCAA of violations, the NCAA's investigations are ongoing, and only recently has the NCAA started notifying universities that were affected by the first trial in *Gatto*, such as North Carolina State University and the University of Kansas.

[12]     According to public reports, and statements from the university that used to employ his father, far from being related to Dawkins's criminal conduct, his father's termination resulted

Lastly, the defendants seek leniency arguing that similar conduct resulted in little to no prison time.  As an initial matter, the facts of every case are different, and drawing direct comparisons between sentences on different facts is virtually impossible.  That said, Dawkins's and Code's circumstances are plainly distinguishable from the other conspirators who were charged in this and the related cases who pled guilty and accepted responsibility, and the defendants deserve a lengthier sentence than they received.  Dawkins was the driving force behind the bribery scheme, and both defendants recruited coaches to engage in the scheme and had the most potential economic upside from the corrupt scheme.[13]

---

from soliciting $25,000 from a student-athlete. *See* Frank G. Runyon, *NCAA Bribery Convict's Dad Fired For $25K Ask, Univ. Says*, Law 360 (Sept. 20, 2019).

[13]    In addition, Dawkins's assertion that he deserves leniency because he was somehow intentionally kept out of the Court's Youthful Adult Opportunity Program ("YAOP") by the Government's "contempt," or in retaliation for Dawkins' decision not to cooperate (Dawkins Mem. 18-19), is utterly baseless.   As an initial matter, the Court's judicial committee, *not* the Government evaluated and rejected the defendant's application for the YAOP.   The committee did not seek the Government's position on Dawkins's YAOP application before rejecting it; and, even if the Government's position had been requested and the Government had opposed the application, the Government does not have veto power over the Court's independent eligibility determination.  But second, in order to be eligible for the program, the defendant would have had to plead guilty and accept responsibility for all of his crimes, a position wholly at odds with Dawkins's perjurious testimony at trial and the tenor of the rest of his submission.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that, consistent with the recommendation of the Probation Department, sentences of incarceration for each defendant are appropriate and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
       September 27, 2019

                        Respectfully submitted,

                        GEOFFREY S. BERMAN
                        United States Attorney


                By:    ____/s/_____
                        Robert L. Boone
                        Noah Solowiejczyk
                        Eli J. Mark
                        Assistant United States Attorneys
                        (212) 637- 2208/2473/2431