JA3KDAWS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          17 CR 684 (ER)

5  CHRISTIAN DAWKINS,

6          Defendant.

7  ------------------------------x

8                                  New York, N.Y.
                                   October 3, 2019
9                                  2:30 p.m.

10 Before:

11                HON. EDGARDO RAMOS,

12                                 District Judge

13                      APPEARANCES

14

15 GEOFFREY S. BERMAN,
        United States Attorney for the
16      Southern District of New York
   ROBERT BOONE
17 ELI J. MARK
   NOAH SOLOWIEJCZYK
18      Assistant United States Attorneys

19 STEVEN A. HANEY, SR.
        Attorney for Defendant

20

21

22

23

24

25

JA3KDAWS

1

2          (Case called)

3          MR. BOONE:  Good morning, your Honor.  Robert Boone

4    from the government.  Here with me at counsel's table are Eli

5    Mark and Noah Solowiejczyk.

6          THE COURT:  Good afternoon.

7          MR. HANEY:  And good afternoon, your Honor.  Steve

8    Haney on behalf of Mr. Dawkins, who appears to my right.

9          THE COURT:  Good afternoon to you too.

10          This matter is on for sentencing.  In preparation for

11    today's proceedings, I have reviewed the following:  I have

12    reviewed the presentence investigation report, last revised on

13    August 29, 2019, prepared by U.S. probation officer Nicolo

14    DiMaria, which includes a recommendation; I have reviewed the

15    sentencing letter submitted by Mr. Haney, filed on August 19,

16    2019, which includes letters submitted by Mr. Dawkins' father

17    and various of his friends; and I have reviewed the

18    government's submission, dated September 27, 2019, in

19    connection with some other sentencings in this case; I've also

20    reviewed, I believe, two victim impact statements from two of

21    the universities that are alleged to have been victimized in

22    this case.

23          Is there anything else that I should have received or

24    reviewed, Mr. Boone?

25          MR. BOONE:  Not from the government, your Honor.

JA3KDAWS

1          THE COURT:  Mr. Haney?

2          MR. HANEY:   No, your Honor.  Thank you.

3          THE COURT:  Very well.

4          Mr. Haney, have you read the presentence report and

5    discussed it with Mr. Dawkins?

6          MR. HANEY:  I have, your Honor.

7          THE COURT:  And, Mr. Dawkins, have you received a copy

8    of the presentence report and discussed it with your attorney?

9          THE DEFENDANT:  I have.

10          THE COURT:  Other than the objections that are noted

11    in the presentence report, are there any objections to the

12    report concerning its factual accuracy?

13          MR. HANEY:  Not on behalf of the facts, your Honor.

14          THE COURT:  Very well.

15          Although I am not required to impose a sentence within

16    the guidelines range, I am required to consider the guidelines

17    in imposing sentence, and in order to do so, I need to

18    determine the applicable sentencing range.

19          Mr. Dawkins was convicted of Counts One and Two of the

20    indictment, which charge him with conspiracy to commit bribery

21    in violation of 18, U.S.C., Section 371, and bribery in

22    violation of 18, U.S.C., Section 666.  Those counts are

23    grouped.  And it carries a base offense level of 12, to which

24    two levels are added because the crime involved more than one

25    bribe.

JA3KDAWS

1          And then the amount of the bribes and whether or not

2     an obstruction of justice adjustment is appropriate, I believe,

3     are still being disputed; is that right, Mr. Haney?

4          MR. HANEY:  That would be correct, your Honor.

5          THE COURT:  Okay.

6          So let's first talk about the amount of the bribes.

7     According to the government and the probation department, Mr.

8     Dawkins is being held liable for approximately $58,000 in

9     bribes.

10          Why isn't that the correct number?

11          MR. HANEY:   Your Honor, may I use the podium?

12          THE COURT:  You may, absolutely.

13          MR. HANEY:  It's easier for me.

14          Your Honor, as noted in my sentencing memorandum with

15     respect to Mr. Dawkins, I calculated the loss amount of the

16     bribe amount to be $32,000, $32,800, as opposed to the $58,100

17     that was noted in the presentence investigation report on page

18     17, paragraph 104.  My calculation in my submission to the

19     Court -- and I have exhaustively referenced it in my sentencing

20     memorandum, your Honor -- I submit that the record evidence in

21     this case was rather clear that Mr. Dawkins did deposit in ATM

22     machines a total of $20,300 in both Las Vegas, Nevada and in

23     Inglewood, California.

24          Your Honor, I would submit that the timing of those

25     deposits coincides with, in fact, what he told Merl Code he was

JA3KDAWS

1   going to on June 20, 2017 -- and we heard the phone call

2   several times during the course of the trial -- in that phone

3   call when he told Merl Code, I just hung up with Jeff D'Angelo,

4   the coach's model does not make sense, I am not going to pay

5   the coaches.

6           And then Mr. Code responded, so you're going to take

7   those fools' money?

8           And Mr. Dawkins, if the Court recalls that phone call,

9   noted, exactly that's what I'm going to do, I'm just going to

10  take his money.

11          Two months later, the same individual, Jeff D'Angelo,

12  provided Mr. Dawkins with $20,300 in cash.  The same day,

13  within hours, he deposited that money in the ATM machine.

14          Now, I know the government contends that that was just

15  some elaborate lie, and they have actually referenced that in

16  their memorandum to enhance for obstruction.  But I would

17  submit that it's supportive by the evidence at trial.  I also

18  would emphasize -- not that we're here to excuse or retry this

19  case -- that Mr. Dawkins was acquitted on the majority of the

20  charges at trial.  So I would submit the jury believed some of

21  the defense.  And I don't believe that that $58,100 amount,

22  which is the entire amount of money that he received from the

23  government or from the undercover operative would be

24  representative of what his bribe calculated amount should be

25  for guideline purposes, your Honor.

1          THE COURT:  Well, he was acquitted of some counts but

2     he was convicted of the bribery counts.  So why should I take

3     that into consideration at all?

4          MR. HANEY:  Well, your Honor, nobody polled the jury.

5     We don't know what bribery counts they convicted him of.  We

6     don't know who they were satisfied or believed actually was

7     bribed.  We do know that, as the Court has noted, they found

8     him guilty of bribery.  And, based on the Lamont Evans

9     transactions and the evidence there, that's a hard argument to

10    make, that, based on their findings of the law, that that

11    wasn't supportive of that finding.  But I don't think anybody

12    can answer that question with any degree of satisfaction or

13    accuracy, in saying the jury concluded that the loss amount was

14    $58,100.  And all I can do is reference the record evidence,

15    which is undeniable, that he did put cash in those ATM

16    machines, and he did, within hours of getting the money from

17    the guy, he said on the wiretap, that he was going to steal the

18    money from, so --

19         THE COURT:  I'll ask the government this as well.

20         MR. HANEY:  Yes, your Honor.

21         THE COURT:  Are you saying there was not an identity

22    of amounts in terms of what Mr. Dawkins received and what he

23    paid the coaches?

24         MR. HANEY:  I would say that, along with the

25    supportive evidence at trial, that he did what he said he was

JA3KDAWS

1    going to do, which is take the money from the FBI and keep it.

2    And that was reflected by the record evidence, I submit, by way

3    of the deposits he made into the ATM machines.

4         THE COURT:  I don't want to have to depend on Mr.

5    Dawkins at this point, but what I'm trying to do is whether

6    someone has done the calculation, as to of the money that was

7    given to Mr. Dawkins, how much of that money was given to

8    coaches.  Because you have to understand, I understand the

9    argument that you made to the jury, but I had three coaches

10   come before me and plead guilty and admit they took bribes, so

11   some bribes were paid, so I'm trying to determine what the

12   delta is between the amount of money that Mr. Dawkins received

13   and the amount of money that was paid to coaches.

14        MR. HANEY:  I recognize that, your Honor, but also, I

15   would recognize too that Tony Bland pled to an amount -- I

16   believe before your Honor, it wasn't at a sentencing -- that

17   was certainly less than what the government contended it was,

18   and, in fact, when they superseded their indictment, they

19   corrected the mistake and modified the amount of money that

20   Tony Bland accepted from Christian Dawkins, because they

21   recognized and realized he didn't receive everything.

22        So I don't believe the government is certain -- I

23   don't think anybody is certain -- exactly what amounts of money

24   Christian Dawkins did given the coaches and what amounts of

25   money he kept.  But one thing is certain:  He kept money.  And

JA3KDAWS

```
 1    one thing is certain:  He told Merl Code, when he was being
 2    monitored on a phone call, and he was unaware he was being
 3    monitored on a phone call, he was going to steal the money from
 4    the FBI agent.  He didn't know, obviously, it was an FBI agent,
 5    but for him, two months later, to put the money in the bank --
 6    and we had bank records at trial that supported that -- I don't
 7    believe -- I don't think anybody can say that the jury didn't
 8    buy that, obviously the jury bought a lot, as they acquitted
 9    him on the majority of the charges.
10              THE COURT:  Okay.
11              MR. HANEY:  Thank you, your Honor.  And, of course,
12    it's the Court's discretion; I'm making my argument here, your
13    Honor.
14              THE COURT:  Very well.  Thank you, Mr. Haney.
15              MR. HANEY:   Thank you, your Honor.
16              THE COURT:  Mr. Boone?
17              MR. BOONE:   Thank you, your Honor.
18              As we said in our sentencing submission, at least in
19    regards to this argument in particular, is, defense counsel is
20    clearly trying to relitigate what the jury has already
21    determined.  He was convicted of bribery, so any arguments to
22    the contrary, in terms of him having the intent to pay bribes,
23    has been resolved by the jury's verdict.
24              In terms of his specific arguments, let's first sort
25    of walk the Court through the bribe payments.  $22,000 went to
```

JA3KDAWS

Lamont Evans, $20,000 went to Emanuel Richardson, $6,000 went to Murphy, $6,000 went to Barker, and then we credited $4,100 that went to Bland.

As your Honor intimately knows, each of those coaches admitted to receiving that amount.  So that, in and of itself, counters the defendant's claim that he actually kept the money and he didn't actually receive the money.

In addition to that, his argument that, well, there were these deposits -- and, again, this is an argument that was made at trial and the jury heard it, and we gave our counter but our counter is still the same -- to the extent he's arguing there are deposits made and maybe they reflected the money he kept, none of that was proven.  He hasn't traced any of those deposits to anything.  The 22 or 25 thousand dollars he mentioned earlier, as we said, and we showed at trial, actually was from Ricky Robertson and related to the Gatto case.

The $8,000 that he referenced at trial as being an example of deposited bribe money was actually a check from Munish Sood, who was obviously not a coach.  So other than just sort saying this is what happened, he hasn't actually proven anything -- obviously, it's not his burden at trial to prove anything -- but, here, when he's taking it upon himself to counter the guidelines calculation, he hasn't offered any support other than just saying, it must be true because I'm saying it's true and there are these deposits.

JA3KDAWS

1          Just to remind your Honor, Mr. Blazer, at trial, sort

2    of went over the bribery amounts, particularly those given in

3    Las Vegas, that he was aware of.

4          So, again, there's certainly more than enough evidence

5    in the record to show that, at a minimum, $40,000, which is the

6    threshold for guidelines purposes for the six-point

7    enhancement, was met.

8          THE COURT:  And the amounts that you listed, 22,000 to

9    Mr. Evans, 20,000 to Mr. Richardson, 6,000 to Murphy, 6,000 to

10   -- Barker?

11         MR. BOONE:  Correct, Corey Barker.

12         THE COURT:  -- and the 4,000 to?

13         MR. BOONE:  Tony Bland, 4100.

14         THE COURT:  So that adds up to $58,100?

15         MR. BOONE:  Correct.  That is how we calculate the

16   number.

17         THE COURT:  Thank you.

18         Yes, Mr. Haney, those numbers are numbers that

19   individuals admitted to or that were otherwise proven.  So it

20   does add up to $58,100.  And, in any event, certainly the

21   amounts given to Mr. Richardson, Mr. Evans and Mr. Bland, who

22   were part of this case, add up to more than $40,000, which

23   meets the level 6 enhancement.  So, I will add six levels

24   because the amount of bribes involved in this case is more than

25   $40,000.

JA3KDAWS

1          Now, with respect to obstruction of justice, Mr.

2     Haney, did you wish to be heard?

3          MR. HANEY:  Yes, your Honor, I do.

4          Your Honor, the government has noted in their

5     memorandum a case actually I'm relying upon as well -- that

6     would be U.S. v. Agudelo, a Second Circuit case, which held, in

7     part, that alleged false information could have been a result

8     of a misunderstanding or mistake rather than a willful

9     fabrication.  Under the U.S. v. Zagari, also a Second Circuit

10    case, the sentencing court must find that the defendant, by a

11    preponderance of the evidence, willfully and materially

12    committed perjury, which is (a) the intentional giving of false

13    testimony as to a material matter, and then enhancement is

14    appropriately only where the defendant acts willfully,

15    intentionally to provide false testimony, rather than as a

16    result of confusion, mistake or faulty memory.

17         When Mr. Dawkins testified, it's clear he was

18    testifying to facts that had occurred a year and a half

19    earlier.  And I know the government made exception or made an

20    example of the Marcus Phillips versus Marcus Foster example in

21    their sentencing memorandum, and I think they missed the point.

22    The point was, neither Marcus Phillips nor Marcus Foster was an

23    NBA prospect.  That was the point of the testimony -- that was

24    what was material about that testimony -- was that Preston

25    Murphy was there with Christian Dawkins, telling the FBI agent

JA3KDAWS

1    information that was not true so that the undercover FBI agent

2    would then provide Preston Murphy with the $6,000.

3            I would also note that with Corey Barker, the $6,000

4    the government has alleged, Corey Barker just got hired

5    yesterday at New Mexico State University to still coach college

6    basketball.  So somebody within at NCAA, New Mexico State,

7    somebody, was satisfied that whatever was represented to them

8    occurred didn't with respect to Corey Barker.  But I submit a

9    two-level enhancement, given the facts and circumstances of

10   this case, does not rise to the level of obstruction and should

11   not be counted towards him with the sentencing guidelines or

12   against him.

13           THE COURT:  Are you suggesting that the instances of

14   purported perjury that the government points to are simply

15   mistakes made by Mr. Dawkins when he testified?

16           MR. HANEY:   Well, we materially differ in their claim

17   that the cash deposits were a fictitious fabrication of money

18   that maybe he got from somewhere else but claimed that that was

19   money that he took from the FBI and deposited it into the ATM

20   machines.  We'll never agree on that.  That's just a question

21   of fact that I don't agree with, and I think it's supportive,

22   again, of what other evidence was during the course of the

23   trial.

24           THE COURT:  But didn't the government offer

25   documentary evidence supporting their position that those

JA3KDAWS

monies that were deposited by Mr. Dawkins were not the money
that were given to him by the undercovers?

          MR. HANEY:   In one instance, they referenced the
$25,000 check deposit -- not a cash deposit -- from evidence
from the Gatto case Ricky Robinson South Carolina Supreme, I
believe, AAU program.

          THE COURT:  Why isn't that false?

          MR. HANEY:   Well, the evidence, the record evidence,
and testimony that I recall, your Honor, was that Christian
Dawkins was referencing the money he took from the FBI and that
he put into the bank.

          THE COURT:   Right.  So he said that he received 25 --
or however much money in cash from the undercover and that's
the money that he deposited, but the government established at
trial that, in fact, that deposit was a check and the
approximate amount of the cash that he received from the
undercover.

          MR. HANEY:   Well, your Honor, I don't believe the
testimony ever was all the money that was deposited was from
the undercover FBI, that the testimony, at least on direct and
on cross, that I recall, dealt with money that he received from
Jeff D'Angelo directly by way of cash.  Whether it was in hotel
meetings, whether it was in other meetings he had with Jeff
D'Angelo, that that money is the money that he in fact
deposited in the ATM machines or, in the situation with Barker

JA3KDAWS

1  and Murphy, was money that he received back from those two

2  coaches.

3       THE COURT:  And the testimony there, as I recall, was

4  that he gave -- and I forget the name of the coach he gave

5  money to, but he gave the coach money and they met up

6  afterwards and went into a in bathroom stall, and the coach

7  gave him money back.

8       MR. HANEY:  That is correct.  That was Preston Murphy,

9  your Honor.

10      THE COURT:  Why isn't that facially preposterous?

11      MR. HANEY:  I don't know why it would be facially

12  preposterous.

13      THE COURT:  That an individual coach would agree to

14  take part in arguably fraudulent conduct as a favor to Mr.

15  Dawkins, give him all the money back, and take nothing for

16  himself, that seems to me to be preposterous.

17      MR. HANEY:  Well, your Honor, if you recall, they had

18  grew up together, they had been friends in Saginaw, Michigan.

19  This wasn't just a coach he knew, that he called up and had

20  come over.  This is a guy he had grown up with.  And I don't

21  believe -- at least to me, facially, that would not be a

22  circumstance that couldn't exist between two fronds.

23      THE COURT:  And the coach gets nothing out of it other

24  than his affection for Mr. Dawkins?

25      MR. HANEY:  Absolutely.  I don't think there's some

JA3KDAWS

1    rule that that is that implausible, I don't think that that is

2    that much of a reach.

3          THE COURT:  Let's talk about the Phillips/Foster

4    situation.  You indicated that the point of that was to

5    establish that neither one of these gentlemen became NBA

6    players.  I thought the point of that was to show that Mr.

7    Dawkins was grifting the undercovers.

8          MR. HANEY:  It was.

9          THE COURT:  So then it's not because neither of these

10   players became NBA players?

11         MR. HANEY:   No, it was because neither of those

12   players -- in fact, Creighton didn't have the single player in

13   the roster that was an NBA prospect, so it was even more

14   preposterous than that.  There was nobody on the Creighton

15   basketball team that year that was anything remotely an NBA

16   prospect, and that was the point of the testimony, not the

17   actual name of what Marcus' last name was.

18         The player in question that was being pitched or sold

19   to the FBI as a valuable commodity that could be delivered to

20   Loyd Management, that player didn't exist because Creighton

21   didn't have a player on their roster that was going to ever be

22   a Loyd Management client.  And that was supported at trial, I

23   would submit to the Court.

24         THE COURT:   Well, except that the very point of it

25   was, arguably, the government argues, is that the government

JA3KDAWS

1   made a mistake in the transcript, Mr. Dawkins saw the mistake,

2   and created a narrative that fit with his argument to the jury

3   that he was not really interested in bribing coaches but,

4   rather, grifting the FBI agents.

5           So what does that have to do with Creighton not having

6   any NBA-caliber players?

7           MR. HANEY:  Because the reference to this Marcus

8   Foster/Phillips, whoever he was, that player did not exist in

9   the context of being a future commodity for Loyd Management or

10  anybody worth bribing for.

11          THE COURT:  But what he told the jury was that he and

12  the coach decided to make up a story and they gave them the

13  name of a player that doesn't exist.  And that's the story that

14  he told the jury,when, in fact, I think the government

15  established, that they made a mistake and Mr. Dawkins sought to

16  exploit that mistake.  I don't see how your explanation

17  explains that away.

18          MR. HANEY:   Your Honor, my recollection, again, of

19  his testimony was that the reference to Marcus Foster/Phillips

20  was done with the intention of convincing Jeff D'Angelo that he

21  had a player at Creighton that could one day be a Loyd

22  Management client, therefore paying Preston Murphy money would

23  be a wise investment because Preston Murphy could influence

24  that player, that didn't exist, to sign the Loyd Management,

25  and that was the justification for the $6,000 paid.  The fact

JA3KDAWS

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | that a year and a half later there's a question about whether          |
| 2  | or not Marcus' last name was Foster or Phillips, I would               |
| 3  | submit, your Honor, would be, at least under what I've cited as        |
| 4  | authority, would be inappropriate if that was nothing other           |
| 5  | than faulty member, confusion or mistake, based on the fact           |
| 6  | that it occurred a year and a half, earlier understanding, too,        |
| 7  | that he was on the witness stand for, I believe, that whole           |
| 8  | day.                                                                   |
| 9  | THE COURT:  Okay.                                                      |
| 10 | MR. HANEY:  Thank you, your Honor.                                     |
| 11 | THE COURT:  Thank you.                                                 |
| 12 | Mr. Boone?                                                            |
| 13 | MR. BOONE:   Your Honor, just briefly.                                 |
| 14 | I think you sort of made some of the points we would          |
| 15 | make, particularly in regards to Marcus Foster.  Obviously, the        |
| 16 | point of him telling that story on the stand was a part of his        |
| 17 | general testimony, which was that all of these Vegas meetings         |
| 18 | were simply a ruse and that he was not actually intending to          |
| 19 | take bribes from the coaches.                                          |
| 20 | To the extent that it's of interest to the Court,            |
| 21 | Marcus Foster actually did enter the NBA, so, at least as far         |
| 22 | as he's concerned, he was an NBA-caliber player -- NBA draft,         |
| 23 | sorry.                                                                 |
| 24 | But our bigger point, your Honor, is all of the              |
| 25 | defendant's testimony was geared towards, and aimed at,               |

JA3KDAWS

1    convincing the jury that he did not want to pay college

2    coaches.  We introduced several elements of evidence that

3    showed he in fact did want to pay college coaches, and had a

4    history of doing so, we introduced recordings in which he

5    stressed the importance and what was so great about paying

6    college coaches, which clearly stood in contrast to his

7    testimony, that included the sort of lie about how he actually

8    was sort of pretending to pay college coaches.

9            And, based on the jury's verdict, it's clear they also

10   believed that was a lie, as it seems implausible they could

11   find him guilty of committing bribery based on his testimony

12   that he did not commit bribery.

13           THE COURT:  Thank you.  Yes, I do find that the

14   enhancement for obstruction of justice is appropriate in this

15   case.  Obviously, although the jury did not hear this, I did,

16   and there were several coaches, again, that came before me and

17   pled guilty and admitted that they received bribes from,

18   amongst others, Mr. Dawkins and Mr. Dawkins' coconspirators.

19   Mr. Dawkins clearly and materially denied that he had done so.

20   I find that that testimony was false, and that it was meant to

21   deceive the jury, so I do find that.

22           And the other instances that we discussed, including

23   the Phillips/Foster dichotomy, I do not find that the

24   explanation that has been provided for it is colorable.  I do

25   find that he perjured himself with respect to that testimony as

well, as well as the testimony concerning the deposits that
were made at the ATMs.

So, for those reasons, I do find that the enhancement
for obstruction of justice is appropriate.

Accordingly, the total offense level, in this case,
will be 22 because, again, there was a base offense level of
12; two levels were added because there was more than one
bribe; six levels are added because the amount of the bribes
was at least $40,000; and two levels are added for obstruction
of justice.

Now, with respect to criminal history category:  The
government and probation recommend that, or suggest, that he is
in criminal history category II because of the sentence that
was imposed on him by Judge Kaplan in the related case.

Mr. Haney, did you wish to be heard?

MR. HANEY:  Thank you, your Honor.

Your Honor, obviously, we do not agree that the
two-level enhancement in the criminal history calculation
should be included, and that previous conviction of the Gatto
case is relevant conduct to the instant offense, for not only
purposes of the sentencing guidelines but also for purposes of
concurrent sentencing, which, of course, the Court has
discretion.

Your Honor, we really rely -- I rely -- upon the
argument that this and the Gatto case were really one common

JA3KDAWS

scheme.  A common scheme or plan refers to offenses

substantially connected to each other by at least one common

factor, such as common victims, common accomplices, common

purpose or a similar modus operandi.

Here, I submit, the Gatto and Evans cases could not

better exemplify the precise -- the definition of U.S.S.G.

Section 1B1.3.  The scheme at all times, your Honor, with both

cases, in both Gatto and Evans, the scheme was always to

deliver clients and players, future clients, to Loyd Management

in both cases.  The fact that in the Gatto case players are

being paid, family members are being paid, is no different,

really, than in this case where the argument that the coaches

were being paid to steer clients to Loyd Management.  That was

the only scheme that existed in each of these cases, your

Honor.

We had cross-over evidence.  We had the same

codefendants in this case with the exception of Mr. Gatto that

were the defendants that comprised the Gatto case.  We had the

same cooperating witnesses testifying in this case.  We

actually have evidence that the government just referenced for

purposes of arguing obstruction, which was evidence in the

Gatto case, which was the $25,000 invoice from the AAU program

out of South Carolina.

I don't know how an argument can be presented, your

Honor, that these two cases are not related in the manner in

JA3KDAWS

1    which the Second Circuit has ruled that related conduct should

2    be viewed by the Court and that for those reasons the criminal

3    history category is enhancement is incorrect.  And, perhaps

4    more importantly, with the Court's discretion as well, I don't

5    see how the two could not be viewed as concurrent to one

6    another.

7            Thank you.

8            THE COURT:  Thank you.

9            Mr. Boone?

10           MR. BOONE:  Your Honor, as we've argued in our

11   papers, obviously, there are two different schemes, there are

12   two different charges, there are two different goals to those

13   schemes.  Here, we're dealing with a bribery case.

14           THE COURT:  Let's talk about the goals, because I

15   think Mr. Haney makes a good point, that the ultimate goal in

16   both cases is to gin up clients for Loyd Management.

17           MR. BOONE:  Maybe, your Honor, but that's not enough.

18   The ultimate goal, in most fraud cases, is for the defendant to

19   make more money.  That doesn't necessarily mean that everything

20   they do is to make that money, is a part of the same scheme;

21   you can have multiple schemes to make money, clearly.  Here,

22   one scheme was to make money by paying college coaches and

23   getting those coaches to steer players towards Loyd Management,

24   and in the Gatto case, the scheme was more aimed at getting

25   certainly players in certain universities and sort of building

JA3KDAWS

1    a relationship with those players so that down the line maybe

2    they could convince them to join Loyd Management.  Those are

3    still two different schemes and, hence, why they've been

4    charged separately.

5            Also, they were not mostly overlapping individuals

6    involved in those cases.  In this case, obviously, there are

7    several coaches who were charged; they were not charged in the

8    Gatto case, as Mr. Gatto obviously wasn't charged in this case.

9    The cooperating witnesses were not completely identical.  Here,

10   we obviously had Mr. Blazer as one of the key cooperating

11   witnesses.  He was not a witness that was called in the Gatto

12   case.

13           Similarly, in the Gatto case, TJ Gassnola, who was a

14   cooperating witness, wasn't called in the case because he had

15   nothing to do with this scheme because it was a totally a

16   separate scheme.

17           Also, here, there's -- obviously, in the Gatto case, a

18   large part of that scheme was built around Adidas, which had no

19   function at all in this case whatsoever.

20           THE COURT:  Probation makes an interesting point:

21   What was the amount of the fraud in the Gatto case?

22           MR. BOONE:  In terms of what we think the loss

23   amount --

24           THE COURT:   Yes, the 2B1.1 table amount.

25           MR. BOONE:  There was approximately $160,000, which

JA3KDAWS

1    represented the amount of the four-year scholarships.

2              THE COURT:  So, in other words, if I did not conclude

3    that the Gatto case was different, if I concluded that it was

4    relevant conduct, I would have to include that amount in the

5    loss calculation here, correct?

6              MR. BOONE:  That is correct, loss calculation would go

7    up.

8              THE COURT:  So $160,000 plus $58,000 would put Mr.

9    Dawkins in 2B1.1(b)(1)(F), which is more than $150,000, and I

10   would have to add ten points, which means he'd be worse off?

11             MR. BOONE:  Correct.

12             THE COURT:  Okay.  Be careful what you ask for, I

13   suppose.

14             But in any event, I do find that the probation got it

15   right, and that the two schemes are not that similar.  As

16   probation indicates, these two cases involve separate schemes

17   and different victims.

18             Accordingly, I will not consider the Gatto case

19   relevant conduct.  Therefore, he has two criminal history

20   points, and the criminal history category is II.

21             And I believe that is it, in terms of the guideline

22   calculation and criminal history calculation.  Accordingly, I

23   find that the criminal history category is II, total offense

24   level is 22, yielding a guidelines range of 46 to 57 months.

25             Mr. Boone, does the government wish to be heard in

JA3KDAWS

terms of sentencing?

MR. BOONE:  Yes, your Honor, just briefly.

Your Honor, we know you're very familiar with the facts and our submissions, so I won't rehash many of the facts or the arguments.  I just want to highlight a couple of themes that stood out to the government from the defendant's submission, and respond to those.

One of those is an argument that essentially everyone in the space of college basketball was doing the same type of conduct that Christian Dawkins was doing but he was the one who got caught and is being punished for it, and that suggests that to be fair, your Honor should show some leniency because of that fact.

First of all, your Honor, obviously, there are many people who commit all sorts of crimes; there are, no doubt, people committing crimes right now, and many of those people may never be caught.  The mere fact that many people who do the same conduct haven't been caught doesn't weigh in favor of giving the person caught less of a sentence or more lenient of a sentence.  The government argues, if anything, it favors giving a fair sentence but a sentence that will send a message to those who have not been caught, because, obviously, one of the goals of sentencing is to deter individuals who are engaged in criminal conduct from continuing to engage in that conduct, and one of the ways you do that is by having a sentence that is

JA3KDAWS

serious enough to scare those individuals off from committing

that conduct.  So we think his argument for leniency on the

grounds that many people sort of in this industry haven't been

punished is not one that weighs in favor of giving him the

probationary sentence he seeks.

Another argument that stood out, to the government at

least, was an argument that the defendant is young, and that he

made this bad decision when he was young, in terms of this

case, and that many of the other codefendants in this case were

significantly older and, therefore, had more life experience,

to make better decisions, and that he should get some sort of

leniency because he's a young person who made some bad

decisions at a young age.  Again, as your Honor is aware, and

as I'm sure defense counsel is aware, there are individuals who

appear for sentencing in this courthouse regularly who have

committed crimes when they are young, and those individuals, in

some cases, have been sentenced to incarceratory sentences.

Obviously, the mere fact someone commits a crime when they are

young in age, alone, does not necessarily warrant that they do

not get a meaningful sentence of incarceration.

What I would point out in regards to this individual

is that, unlike at least some of the defendants who appear for

sentencing for having committed crimes at a young age in this

courthouse, the defendant here had some advantages that many

don't.  He had two parents in his home.  He had two parents who

1    were educated, who worked in the field of education.

2    Obviously, he's talked about, in the sentencing submission,

3    about his mother being an assistant principal of a middle

4    school, his father being a high school coach and later college

5    coach; point being, he had role models in the home that some

6    people don't have, frankly, that at least could have given him

7    some guidance and some role models to look up to in terms of

8    his conduct.

9            Also, unlike some defendants who find themselves being

10   sentenced in this courthouse, the defendant had an opportunity

11   to go to college.  He talked, in his sentencing submission,

12   about going to two different universities, I think, for a total

13   of about three years.  Again, he was placed in another

14   environment where he's around people who are doing something

15   positive with their lives, living law-abiding lives, and so it

16   is not a scenario in which he was sort of born into a life of

17   crime and all what he saw around him were people who were also

18   involved in criminal activity.  He had exposure to people who

19   were doing the right things with anywhere lives and still chose

20   to make the choices he made after the fact.

21           Another point, your Honor, staying with this topic for

22   just a second longer, is, if your Honor recalls from the

23   evidence at trial, the recordings in Las Vegas, the recordings

24   in New York, the recordings involving the undercovers that Mr.

25   Dawkins was involved in, he was the one leading those

JA3KDAWS

1    conversations in many of those cases.  He's the one at Las

2    Vegas who was essentially acting as the MC of those meetings,

3    introducing the coaches to the UCs, explaining what the plan is

4    going forward.  Similarly, he's the one doing that in New York

5    when they're meeting with Emanuel Richardson and his

6    codefendant, Mr. Code.  He's the one who's driving the scheme.

7    It's his scheme.  It's not a situation where he is, to use an

8    example, sort of the last person picked up on a car that's

9    going to do a robbery or sort of the low man on the totem pole

10   in an office whose boss asked him to sign a false document;

11   he's the person who's driving the entire criminal activity.

12           So, even though he is younger than the codefendants,

13   in many ways, he's the one who is driving this, and

14   particularly in respects to Marty Blazer and Munish Sood, he's

15   the one who's teaching them how to do this, he's the one who's

16   corrupting them, in a sense, and letting them know sort of how

17   to give bribes and why it will be a good thing to do for

18   business purposes.

19           Lastly, your Honor -- and some of this sort of was

20   exhibited earlier today -- there is a bit of a theme that the

21   defendant really didn't do the conduct that he's been convicted

22   of, he didn't actually intend to pay bribes to the coaches that

23   have been discussed, and, in fact, there were other people who

24   sort of influenced him and who are more to blame -- Andy Miller

25   is one person mentioned; Marty Blazer is mentioned; Jill, the

JA3KDAWS

1    undercover; Jeff D'Angelo, the undercover; the other

2    individuals in the scheme; many people were named to suggest

3    that they were more at fault and really more to blame for

4    defendant's conduct.  That's important because one of the other

5    goals of sentencing is to deter the specific defendant from

6    committing crimes in the future.  And to the extent that the

7    defendant hasn't yet fully grasped his level of responsibility

8    in what he's been convicted of, then it makes the defendant

9    more susceptible to committing crimes in the future because the

10   defendant thinks that they already didn't do anything wrong to

11   begin with.

12           I'm sure there will be an argument made that it is

13   extremely unlikely that the defendant will be involved in

14   college bribery scandal again, and that may be true, but

15   specific deterrence isn't just about the exact crime the

16   defendant has committed, it's about making sure that defendant

17   doesn't commit crimes, period.  So, to the extent the defendant

18   is now in the music industry and maybe in another industry in

19   the future, the point is to have a sentence that is serious

20   enough to make it clear that committing crimes in any context,

21   even if it's basketball or not, is not acceptable and can be

22   punished.

23           So, for those reasons, the government is seeking an

24   incarceratory sentence and also for the reasons we mentioned in

25   our submission.

JA3KDAWS

1          THE COURT:  Thank you.

2          Mr. Haney?

3          MR. HANEY:  Thank you, your Honor.

4          Your Honor, I will submit to the Court, you could have

5     every single defendant that's either pled in this case or was

6     convicted at a jury trial, and they would come in here and say

7     what they thought, when they were doing this, was they were

8     breaking NCAA rules.  There's no excuse-making here today --

9     I'm not here to try to relitigate this case -- but there is no

10    question, I'll bet every penny, either Merl Code or Christian

11    Dawkins, when they were doing what they did, ever thought for a

12    minute that it would be a federal crime.

13          I was a licensed NBA player agent for 25 years,

14    represented two Hall of Fame basketball players.  I scored over

15    a thousand points at the Division One level.  When I heard this

16    happened, I couldn't believe it.  I immediately thought back to

17    when I played 30 years ago and thought of all the things that I

18    witnessed during those days.

19          Your Honor, we're here for one reason, and one reason

20    only, and that is because Christian Dawkins made epically poor

21    choices, of his own volition.  Nobody forced him to do it.

22    Certainly, to suggest that he corrupted Marty Blazer, I say,

23    is offensive to say in this courtroom, but I'm going to move

24    on.

25          Today is not a day of whining, deflecting,

JA3KDAWS

relitigating or excuse-making, but it shouldn't be a day of
exaggerating either, your Honor.  This should be a day of
ownership and accountability.  And with ownership comes
acceptance for your consequences, and the realization that
there are consequences for poor choices.  And that is where
Christian Dawkins stands here today, before the Court -- owning
and accepting the consequences of the poor choices and
decisions he made and the people he put around him.

          Has he learned his lesson?  You've got to be kidding.
How could he not?  What he's been through for the last two
years, and, yes, I do believe it's noteworthy under 3553(a) --
and just in general common sense it's noteworthy -- that he
stands uniquely distinguishable from the other codefendants,
whether they pled in this courtroom or in another courtroom,
and that he made these decisions, he made these bad choices and
this poor judgment, when he was 22 years old.  Certainly, as
men, we all know, part of growing up and becoming a man is the
process of falling down, making mistakes, failing, learning,
getting up, and dusting yourself off and being a better man the
next day.

          And we have -- every man in this courtroom has -- done
the same thing, has fallen, put themselves around bad people
and made mistakes.  I would submit even your Honor has too.
It's a cycle of manhood.  It's the evolution of growth.
Regrettably, the people he put himself around, willingly and

JA3KDAWS

1    knowingly, and what he did, was interpreted by a jury of his

2    peers to be federal crimes.  For him, that lesson is going to

3    be far more painful and it already has been.

4            So we respectfully ask the Court to grant deference --

5    not to excuse Christian Dawkins for what he did, but grant

6    deference -- to that understanding, that at 22 you're not going

7    to make the same mistakes you make at 42.  And very likely what

8    he did would not have been made, those decisions would not have

9    been made, with greater life maturity and experience.

10           Christian Dawkins walked into my office August of

11   2017, your Honor, unexpectedly came in, told me about a great

12   opportunity he had.  He wanted to use me and my profile of

13   having represented Magic Johnson and Dominique Wilkins, to go

14   down to Miami and meet some investors and be a part of Loyd

15   Management.  I was going to be the licensed NBA player agent.

16   I sat there asking Christian about 15 questions.  I said, get

17   out of my office, you're crazy, that's the worst idea I've ever

18   heard.

19           He wanted me to fly down, your Honor, and meet Jill

20   Bailey and Jeff D'Angelo.  But you know what?  I didn't,

21   because I was too old, I've been around, I had life experience

22   and maturity.  The government knows that.  My name was

23   referenced on a wiretap in the Gatto case.

24           Not to excuse what he did, your Honor.  At 23 years

25   old, maybe I would have made a different decision.  Maybe not,

JA3KDAWS

1    but, certainly, it's a factor you consider when you have a

2    young life standing before you.

3            And, as noted by the government, despite the literal

4    chaos of the last two years of his life, self-induced, in May

5    of this year, Christian managed, somehow, to secure a

6    contractual partnership -- not a job, a contractual

7    partnership -- with Atlantic Records, and he formed a new

8    management company.  Go figure.  And it wasn't called Loyd,

9    named as something different.  And this new partnership with

10   Atlantic Records has resulted in Christian relocating to

11   Los Angeles -- as the Court's aware, we've transferred his

12   supervision -- and now he spends ten to twelve hours a day

13   working in a new industry, I would submit probably with less

14   regulations.

15           But, certainly, imposing a lengthy term of

16   incarceration, as I gather the government is suggesting is

17   appropriate in this case, would alter his life forever,

18   summarily would end obviously any relationship he has with his

19   new opportunity with Atlantic Records and close the door

20   literally, despite all the darkness of the last two years, your

21   Honor, all the darkness he's lived through, the doors that were

22   open, offering a glimmer of light in hope for his future.

23           I would emphasize as I wrap it up -- I know we have a

24   time limit here, but as I wrap it up, your Honor, I would note

25   this is not mere zealous advocacy or bias on behalf of his

JA3KDAWS

1  lawyer.  It's not.  Mr. DiMaria, from the probation department,

2  he also noted in his presentence investigation report these

3  3553(a) factors and others that I've referenced in my

4  memorandum, that a sentencing recommendation and a downward

5  departure is warranted under these circumstances, for the ones

6  also that I have noted.

7          And we would ask the Court to do nothing other than

8  adopt the spirit of these recommendations in fashioning a

9  sentence, your Honor, that balances an appropriate punishment

10  with the young life that stands before you here today.

11          Your Honor, thank you.  It was an honor to be in your

12  courtroom.  And thank you for allowing me to speak on behalf of

13  Christian Dawkins.  And at this time, with the Court's

14  permission, he'd like to say a few words.

15          THE COURT:  Absolutely.

16          MR. HANEY:  Thank you, your Honor.

17          THE COURT:  Mr. Dawkins.

18          THE DEFENDANT:   Your Honor, thank you for the time to

19  say a few words here today.

20          I stand here today realizing the situation and my

21  choices have not just impacted my life but those closest and

22  dearest to me.  That reality hurts beyond any words I can offer

23  to the Court.

24          My remorse is not for myself but for the pain and

25  embarrassment I have caused for others.  I now realize none of

JA3KDAWS

1     this was worth it.

2              I was raised by my parents to accept the consequences

3     of my own actions.  And even though I was --

4              THE COURT:  If you want, you can take a moment, Mr.

5     Dawkins.

6              (Pause)

7              THE DEFENDANT:  And even though I was offered the

8     choice to do so --

9              THE COURT:  Why don't you be seated and take a moment.

10             MR. HANEY:  Thank you, your Honor.

11             (Pause)

12             THE DEFENDANT:  And even though I was offered the

13    choice to do so, I never pointed the finger at others in this

14    case to make it easier on me.  I broke rules and associated

15    with the wrong people.  Nobody forced me to do either.

16             Over the last two years, I have learned a lot about

17    life, friendship, and loyalty, that I wish I could have read in

18    a book.  My personal feelings about the inequities and social

19    dysfunction about amateurism in the system, that I believe take

20    advantages of kids and their families, undoubtedly clouded my

21    judgment.  At a point, I decided to play by my own set of

22    rules, and for that I am wrong.

23             My intentions were never to hurt anyone, but I realize

24    that, in the end, I did.  So I will take this very difficult

25    experience, learn from it, in the end become a better person.

JA3KDAWS

1           Thank you.

2           I wrote that.  I also want to say, like, I heard

3    earlier about the -- me lying on the stand.  I know this is

4    going to sound crazy to you, but I wasn't, like -- I didn't --

5    one, I wasn't making that up, and I wasn't doing it make myself

6    look innocent.  I was -- I mean, I was obviously trying to not

7    lose the case, but, at the same time, people did give me

8    money -- they did give me the money back.  And that makes them

9    look like -- that could hurt them and they can lose their job

10   for something that they didn't do.

11          So I just want to say, I know that the whole story

12   sounds crazy and this whole thing was stupid, but some of the

13   stuff didn't happen.

14          That's all I have to say.

15          THE COURT:  Thank you, Mr. Dawkins.

16          In deciding what sentence to impose, in addition to

17   the sentencing guidelines, I have considered all of the factors

18   set forth in Section 3553(a) of Title 18 of the United States

19   Code, including, as most relevant to Mr. Dawkins, the nature

20   and circumstances of the offense and his history and

21   characteristics.  I considered the need for the sentence

22   imposed to reflect the seriousness of the offense, to promote

23   respect for the law, provide a just punishment for the offense,

24   afford adequate deterrence to criminal conduct, to protect the

25   public from further crimes of the defendant.  I've also

JA3KDAWS

considered the need to avoid unwarranted sentence disparities among similarly situated defendants, and the need to provide restitution to any victims of the offense.

Having considered these factors, it is my intention to accept the recommendation of the probation department and impose a sentence of 12 months and one day on both counts, to be served concurrently with each other and consecutively to Mr. Dawkins' sentence in the case before Judge Kaplan, 17 CR 686.

That will be followed by two years of supervised release on each count, to be served concurrently and a $200 special assessment.

I will not impose a fine as I find that Mr. Dawkins will not be able to pay a fine.

I believe that this sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in Section 3553(a)(2), for the following reasons:

Part of what made this case difficult for me is not the fact that I did not think that the conduct was wrong or illegal -- I do believe that the conducted was wrong and I certainly accept the government's theory of this case -- rather, what made it difficult for me was the fact that Mr. Dawkins and Mr. Code and the others were engaged in conduct that, by and large, almost exclusively, had always been treated in the civil context and not in a criminal context.  So I don't

JA3KDAWS

1    lose the point that there is an element of inequity in the fact

2    that these gentlemen were prosecuted while others have not

3    been, and I think I certainly am not alone in that.  I take it

4    that the parties will recall, during the voir dire, many

5    members of the venire had very strong feelings about the

6    current state of amateur athletics in this country; and, again,

7    the defendants, even if not before the jury, have frequently

8    before the Court argued that there is a level of unfairness in

9    this prosecution.  But, like I said, that's not for me to

10   determine.  The government prevailed on a fairly standard

11   theory of bribery, and the jury accepted their arguments.

12           One of the other issues that I struggled with, with

13   respect to Mr. Dawkins in particular, part of the argument that

14   was made at trial, and made again today, was that he was a very

15   young man, who was misled by others, including the government's

16   cooperators and undercovers.  But the problem with that

17   argument is, I heard the tapes, and I heard Mr. Dawkins testify

18   at trial, and, from my perspective, the problem -- his

19   problem -- was not that he was duped or misled by others; from

20   my perspective, his problem was that he was too clever by half.

21   And Mr. Boone, I think, was exactly right when he said that he

22   was the one that was leading a lot of these conversations.  He

23   was not a shrinking violet; he was very much an active

24   participant in those conversations, and he was leading the

25   conversations and tried to convince Mr. -- I'm forgetting his

JA3KDAWS

name now -- the investor, and others into exactly what they
should do and how they should do it.

So, when Mr. Haney made the argument at trial that he
was just like this poor, unsophisticated kid from Saginaw,
Michigan, I didn't see how that sort of jibed with certainly
the Mr. Dawkins that the jury saw, not only on the stand but
heard on the tapes.

And he is a person, in addition, who by virtue of his
upbringing, knew better.  He was raised in a close family, a
family that certainly experienced a great amount of tragedy but
was also a loving and close family, and he had opportunities to
go a different way, but he chose to do certain things that
brought him here today.

And, by the way, he may have been 22 when he engaged
in these activities with Mr. Blazer and others, but he was 25
or 26 when he came into this courtroom, stood up in the witness
stand, put his hand up and swore to tell the truth, and then
and, as difficult as this may be for him and his family to
hear, I believe that he lied to the jury.  And at that time,
not only was he not surrounded by unsavory individuals, he had
incredibly competent counsel to whom he could have turned and
with whom he could have discussed these things, but he made
another bad choice in what I consider to be a brazen attempt to
get out from under the charges that were leveled against him.

So, I do believe that a sentence of incarceration is

JA3KDAWS

1    necessary.  I believe that Mr. Dawkins did himself no favors by

2    testifying, and that, accordingly, he made the sentence worse

3    for himself.

4           However, I am required to look at the other side of

5    the ledger as well, and I do.

6           Again, I note that Mr. Dawkins is a person of

7    considerable skill.  He is obviously incredibly intelligent,

8    very articulate, very industrious, he has a good upbringing,

9    and he arguably has an incredibly bright future ahead once he

10   gets all of this past him.  He is still a very young person and

11   has an opportunity to right the ship, as it were, and he has

12   continued to try to work to try to make a law-abiding life for

13   himself.

14          So, although I do believe that punishment is

15   necessary, I do not believe that a sentence within the

16   guidelines range of 46 to 57 is appropriate, especially in

17   light of the fact of the sentences that have been handed out in

18   the other related cases; and, therefore, I do believe that the

19   probation department got it right with its recommendation of

20   one year and one day.

21          With that, does anyone know of any legal reason, other

22   than what has already been argued, why the sentence should not

23   be imposed as I have indicated?

24          Mr. Boone.

25          MR. BOONE:   No, your Honor.

JA3KDAWS

1          THE COURT:  Mr. Haney?

2          MR. HANEY:   No, your Honor.

3          THE COURT:   In that event, it is the judgment of the

4   Court that Mr. Dawkins be sentenced to 12 months and one day

5   imprisonment on each count of conviction, to be served

6   concurrently with each other and consecutively to the sentence

7   imposed in 17 CR 686.

8          The standard conditions of probation 1 through 12

9   shall apply, as well as the following mandatory and special

10  conditions:

11         The mandatory conditions are:

12         That you not commit another federal, state or local

13  crime;

14         You not unlawfully possess a controlled substance;

15         You must refrain from the unlawful use of a controlled

16  substance;

17         And you must submit to a drug test within 15 days of

18  release from imprisonment and at least two periodic drug tests

19  thereafter, as determined by probation.

20         The special conditions are:

21         That you will participate in an outpatient program

22  approved by the probation office, which program may include

23  testing to determine whether you have reverted to using drugs

24  or alcohol;

25         You must provide the probation officer with access to

JA3KDAWS

| | |
|---|---|
| 1 | any requested financial information; |
| 2 | You must not incur new credit charges or open |
| 3 | additional lines of credit without the approval of probation; |
| 4 | And if you live outside of this district, it is |
| 5 | recommended that you be supervised by the district of |
| 6 | residence. |
| 7 | You are also ordered to pay a mandatory special |
| 8 | assessment of $200, which shall be due immediately. |
| 9 | With respect to forfeiture and restitution, Mr. Boone, |
| 10 | what is the government's position? |
| 11 | MR. BOONE:   Your Honor, we're not seeking forfeiture. |
| 12 | In terms of restitution, we've notified the victims, |
| 13 | and, so far, no one has indicated they are seeking restitution. |
| 14 | THE COURT:  Very well. |
| 15 | So, forfeiture and restitution will not be imposed. |
| 16 | That constitutes the sentence of the Court. |
| 17 | Mr. Dawkins, you have a right to appeal the sentence; |
| 18 | however, there are very strict guidelines or time limits within |
| 19 | you must protect your appeal. |
| 20 | So, Mr. Haney, will you assure me that you will |
| 21 | promptly and thoroughly discuss with Mr. Dawkins his appellate |
| 22 | rights, including the timeliness on the exercise of those |
| 23 | rights? |
| 24 | MR. HANEY:  I will, your Honor. |
| 25 | And could we be heard on bail pending appeal, as we |

JA3KDAWS

1    did in the Kaplan Gatto case as well?

2              THE COURT:  Sure, certainly.

3              MR. HANEY:  Would you like that now, your Honor?

4              THE COURT:  Does the government oppose bail pending

5    appeal?

6              MR. BOONE:  I'd like to hear his application.  We may.

7              THE COURT:  Very well.

8              MR. HANEY:  Thank you, your Honor.

9              I'm not going to educate the Court.  The Court is

10   obviously well aware, under 18, U.S.C., Section 3143(b), there

11   is bail pending appeal.  We offered these same arguments in the

12   Gatto case, and, as the Court is obviously aware, bail pending

13   appeal was granted.

14             In part, if I recall -- I didn't make that argument,

15   Mr. Moore did, but it was granted rather summarily by Judge

16   Kaplan, given the novel nature of the questions at issue -- I

17   would submit there certainly has never been a case upholding

18   convictions of comparable facts, in the history of the country,

19   not that I'm aware of, where there was a case such as this, not

20   to diminish the case or any of the judges' decisions or

21   rulings, but would submit it would be appropriate, as it was in

22   the Kaplan case, that bail pending appeal would be granted.

23             Thank you, your Honor.

24             THE COURT:  Yes.

25             Mr. Boone?

JA3KDAWS

1        MR. BOONE:  Your Honor, the legal issues in this case
2    are very different than the ones in the Gatto case.  The Gatto
3    case involved the right-to-control theory that, at least to
4    some degree, has been litigated in the Second Circuit.  As your
5    Honor indicated moments ago here, our charges are bribery
6    charges, and the way we have applied them are pretty standard.
7    So, we don't see that there actually is a close question as to
8    the charges and the legal issues here.

9        I haven't heard any suggestion that there are any
10   close questions regarding sort of evidentiary rulings that
11   would -- certainly not any that would result in a different
12   outcome for the defendant.

13       So, we do oppose, based on that ground that there are
14   not close questions of law.

15       THE COURT:  I will grant the application, and Mr.
16   Dawkins can remain free on bail pending appeal.

17       MR. HANEY:  Thank you, your Honor.

18       THE COURT:  Any other applications, Mr. Haney?

19       MR. HANEY:  No, sir.  Thank you.

20       THE COURT:  Mr. Boone?

21       MR. BOONE:  Nothing further, your Honor.

22       THE COURT:  In that event, we are adjourned.

23       And, Mr. Dawkins, good luck to you, sir.

24       THE DEFENDANT:  Thank you.

25                                  * * *